**VOLUME I – Appx00001 through Appx01447**
2025-1127, 2025-1177

IN THE
**UNITED STATES COURT OF APPEALS**
FOR THE FEDERAL CIRCUIT

**JETAIRE AEROSPACE, LLC,**
*Plaintiff/Counterclaim Defendant–Appellant*

**JETAIRE FLIGHT SYSTEMS, LLC, MICHAEL D. WILLIAMS,**
*Counterclaim Defendants-Appellants*

v.

**AERSALE, INC.,**
*Defendant/Counter-Claimant–Cross-Appellant*

Appeals from the U.S. District Court for the Southern District of
Florida in No. 1:20-cv-25144-DPG, J. Darrin P. Gayles

*CORRECTED* **NON-CONFIDENTIAL JOINT APPENDIX**

| | |
|---|---|
| JONATHAN L. HARDT **ROZIER HARDT MCDONOUGH PLLC** 712 W. 14th Street, Suite A Austin, Texas 78701 | Scott A. Penner **EVERSHEDS SUTHERLAND (US) LLP** 12255 El Camino Real, Suite 100 San Diego, California 92130-2071 |

June 3, 2025

**CONTAINS CONFIDENTIAL INFORMATION SUBJECT TO
PROTECTIVE ORDER**

**Confidential Information Redacted**

## TABLE OF CONTENTS

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| ** VOLUME I ** | | | | |
| 1. | -na- | Protective Order entered by the Court pursuant to a stipulation of the Parties | 46 | -na- |
| JUDGMENT/KEY ORDERS | | | | |
| 2. | Appx00001 -00002 | Final Judgment (Dated September 23, 2024) | 423 | -na- |
| 3. | Appx00003 -00011 | ORDER Adopting [366] Report and Recommendations on [196] Defendant / Counter-Plaintiff's Motion for Summary Judgment (Dated August 9, 2024) | 415 | -na- |

---

[a] Docket Number for S.D. Fla. Case No. 1:20-cv-25144-DPG.

[b] If marked with an asterisk, the document is Confidential (at least in part) under terms of the Protective Order entered by the District Court and was maintained as such during the district court proceeding. Material deemed confidential has been redacted from the Non-Confidential version and identified by yellow highlighting in the Confidential version.

[c] Where applicable, a brief description of the reason the document is considered confidential is provided. As noted in the Protective Order (included as the first document), the documents constitute "confidential, proprietary, trade secret, and/or commercially sensitive information" within the meaning of Rule 26(c) of the Federal Rules of Civil Procedure. In particular, the details of the competitive business relationship between the Parties is the primary reason for the designation of documents as "confidential" or "attorneys eyes only" under the Protective Order

|  | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 4. | Appx00012 -00014 | ORDER Adopting [398] Report and Recommendations on [322] Plaintiff / Counter-Defendants' Motion for Summary Judgment (dated September 4, 2024) | 418 | -na- |
| 5. | Appx00015 -00033 | ORDER on [199, 200] Defendant / Counter-Plaintiff's Motions to Strike the Testimony of Experts Ashworth and Blok | 296 | -na- |
| **ORDERS AND REPORT & RECOMMENDATIONS** | | | | |
| 6. | Appx00184 -00198 | ORDER granting in part [164] Plaintiff / Counter-Defendants' Motion to Dismiss [159] Defendant / Counter-Plaintiff's Third Amended Counterclaims | 274 | -na- |
| 7. | Appx00199 -00217 | ORDER on [199, 200] Defendant / Counter-Plaintiff's Motions to Strike the Testimony of Experts Ashworth and Blok | 297 | -na- |
| 8. | Appx00218 -00245 | Report and Recommendation on [196] Defendant / Counter-Plaintiff's Motion for Summary Judgment | 366 | -na- |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 9. | Appx00267 -00291 | Report and Recommendation on [322] Plaintiff/Counter-Defendants' Motion for Summary Judgment | 398 | -na- |
| 10. | Appx00292 -00294 | ORDER overruling [305] Defendant/Counter-Plaintiff's Objections to [296, 297] Order Denying [200] Defendant/Counter-Plaintiff's Motion to Exclude the Testimony of Expert Blok | 414 | -na- |
| **PATENTS** | | | | |
| 11. | Appx00295 -00310 | U.S. Patent No. 9,849,998 (Exhibit A to Complaint) | 1-1 | -na- |
| 12. | Appx00311 -00331 | U.S. Patent No. 10,633,109 (Exhibit B to Complaint) | 1-2 | -na- |
| 13. | Appx00332 -00352 | U.S. Patent No. 10,800,541 (Exhibit C to Complaint) | 1-3 | -na- |
| **DOCKET REPORT** | | | | |
| 14. | Appx00353 -00394 | Docket Report | -na- | -na- |
| **HEARING TRANSCRIPTS** | | | | |
| 15. | Appx00395 -00434 | Transcript of May 19, 2022 Hearing before Magistrate Judge Torres re: Discovery | 261 | -na- |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 16. | Appx00435 -00436 | Minutes of January 24, 2024 Hearing before Magistrate Judge Torres re: Summary Judgment Motions | 310 | -na- |
| 17. | Appx00437 -00775 | Transcript of January 24, 2024 Hearing before Magistrate Judge Torres re: Summary Judgment Motions [*Excerpts]* | 316 | -na- |
| **FILED DOCUMENTS-GENERAL** | | | | |
| 18. | Appx00776 -00788 | Complaint | 1 | -na- |
| 19. | Appx00798 -00853 | Counterclaims-Third Amended (Redacted) [*Excerpts]* | 159 | -na- |
| 20. | Appx00854 -00909 | Counterclaims-Third Amended (Sealed) [*Excerpts]* | 161* | Filed under seal – contains confidential business information |
| 21. | Appx00965 -01019 | Counterclaims-Fifth Amended (Sealed) [*Excerpts]* | 376-1* | Filed under seal – contains confidential business information |
| 22. | Appx01020 -01023 | Plaintiff/Counter-Defendants' Notice of Appeal | 427 | -na- |
| 23. | Appx01024 -01027 | Defendant/Counter-Plaintiff's Notice of Appeal | 431 | -na- |

4

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| | | **FILED DOCUMENTS – SECTION 1** | | |
| 24. | Appx01028 -01104 | Jetaire's 2d Supplemental Responses to AerSale's 2d Set of Interrogatories (Exhibit H to [196] Defendant/Counter-Plaintiff's Motion to for Summary Judgment) [*Excerpts*] | 197-10 | -na- |
| 25. | Appx01105 -01120 | Plaintiff/Counter-Defendants' Response To AerSale's Statement Of Material Facts In Support Of Its Motion For Summary Judgment [*Excerpts*] | 232* | Filed under seal – contains confidential technical and business information |
| 26. | Appx01121 -01142 | Excerpts from Deposition Transcript: Williams as (30)(b)(6) witness for Jetaire Aerospace - 7 February 2023 (Exhibit 21 to Plaintiff/Counter-Defendants' Response To AerSale's Statement Of Material Facts In Support Of Its Motion For Summary Judgment) (with highlighting in as-filed document) [*Excerpts*] | 232-01 | -na- |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 27. | Appx01143 -01146 | Declaration of Michael D. Williams (Exhibit 22 to Plaintiff/Counter-Defendants' Response To AerSale's Statement Of Material Facts In Support Of Its Motion For Summary Judgment) | 232-02 | -na- |
| 28. | Appx01147 -01168 | Excerpts from Deposition Transcript: Williams as (30)(b)(6) witness for Jetaire Flight Systems - 8 February 2023 (Exhibit 23 to Plaintiff/Counter-Defendants' Response To AerSale's Statement Of Material Facts In Support Of Its Motion For Summary Judgment) (with highlighting in as-filed document) *[Excerpts]* | 232-03* | Filed under seal – contains confidential business and financial information |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 29. | Appx01169 -01204 | Excerpts from Deposition Transcript: Moyer - 21 February 2023 (Exhibit 30 to Plaintiff/Counter-Defendants' Response To AerSale's Statement Of Material Facts In Support Of Its Motion For Summary Judgment) (with highlighting in as-filed document) [*Excerpts*] | 232-10* | Filed under seal – contains confidential technical, financial, and business information |
| 30. | Appx01205 -01215 | Excerpts from Deposition Transcript: Nezaj - 1 March 2023 (Exhibit 34 to Plaintiff/Counter-Defendants' Response To AerSale's Statement Of Material Facts In Support Of Its Motion For Summary Judgment) (with highlighting in as-filed document) [*Excerpts*] | 232-14* | -na- |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 31. | Appx01216 -01226 | Excerpts from Deposition Transcript: Finazzo - 23 February 2023 (Exhibit 35 to Plaintiff/Counter-Defendants' Response To AerSale's Statement Of Material Facts In Support Of Its Motion For Summary Judgment) (with highlighting in as-filed document) | 232-15* | -na- |
| 32. | Appx01227 -01241 | Excerpts from Deposition Transcript: Williams as (30)(b)(6) witness for Jetaire Aerospace - 7 February 2023 (Exhibit E to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) | 315-01 (197-07) | -na- |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 33. | Appx01242 -01255 | Excerpts from Deposition Transcript: Williams as (30)(b)(6) witness for Jetaire Flight Systems - 8 February 2023 (Volume II)  (Exhibit F to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) | 315-02 (197-08)* | Filed under seal – contains confidential technical, financial, and business information |
| 34. | Appx01256 -01264 | Excerpts from Deposition Transcript: Williams - 8 February 2023 (Individual) (Exhibit G to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) | 315-03 (197-09) | -na- |
| 35. | Appx01265 -01390 | Jetaire's 3d Supplemental Responses to AerSale's 2d Set of Interrogatories (Exhibit I to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) *[Excerpts]* | 315-04 (197-11)* | Filed under seal – contains confidential technical, financial, and business information |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 36. | Appx01391 -01498 | Expert Report of Justin Blok (dated April 27, 2023) (Exhibit J to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) *[Excerpts]* | 315-05 (197-12)* | Filed under seal – contains confidential financial and business information |

|  | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
|  | *** VOLUME II ***** |
|  | **FILED DOCUMENTS – SECTION 1 (CONTINUED)** |
| 37. | Appx01534 -01616 | Expert Report of Bill Ashworth (dated April 27, 2023) (Exhibit L to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) (with highlighting in as-filed document) *[Excerpts]* | 315-07 (197-14)* | Filed under seal – contains confidential technical and business information |
| 38. | Appx01617 -01948 | Rebuttal Expert Report of Bill Ashworth (dated May 25, 2023) (Exhibit P to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) *[Excerpts]* | 315-11 (197-18)* | Filed under seal – contains confidential technical and business information |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 39. | Appx01949 -02070 | Expert Report of Jeffrey Smith Regarding Invalidity of Jetaire's Patents (dated April 26, 2023) (Exhibit Q to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) *[Excerpts]* | 315-12 (197-19)* | Filed under seal – contains confidential technical and business information |
| 40. | Appx02071 -02072 | Image of boxes imprinted with Jetaire logo and patent number (Exhibit W to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) | 315-14 (197-25) | -na- |
| 41. | Appx02073 -02074 | Image of boxes imprinted with Jetaire logo and patent numbers (Exhibit X to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) | 315-15 (197-26) | -na- |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 42. | Appx02075-02076 | Image of boxes imprinted with Jetaire logo and patent numbers (Exhibit Y to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) | 315-16 (197-27) | -na- |
| 43. | Appx02077-02078 | Image of boxes imprinted with Jetaire logo and patent numbers (Exhibit Z to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) | 315-17 (197-28) | -na- |
| 44. | Appx02079-02080 | Image of label imprinted with Jetaire logo and patent numbers (Exhibit AA to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) | 315-18 (197-29) | -na- |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 45. | Appx02081 -02083 | FAA Supplemental Type Certificate No. ST03450NY (Exhibit BB to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) | 315-19 (197-30) | -na- |
| 46. | Appx02363 -02386 | Email dated 9 December 2013 from Williams to Morrill (Xtra Airways) with attached draft Agreement and with 8 Dec 2013 letter (Exhibit C to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) | 315-26 (197-38)* | Filed under seal – contains confidential financial and business information |
| 47. | Appx02387 -02389 | Email dated 11 April 2014 from Williams to Dunn (Xtra Airways) with 11 Apr 2024 Letter Attachment (Exhibit D to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) | 315-27 (197-39)* | Filed under seal – contains confidential financial and business information |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 48. | Appx02390 -02393 | Email dated 14 July 2014 from Williams to Nezaj (AerSale) with 14 July 2014 Letter Attachment (Exhibit E to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) | 315-28 (197-40)* | Filed under seal – contains confidential financial and business information |
| 49. | Appx02394 -02406 | Excerpts from Deposition Transcript: Moyer - 21 February 2023 (Exhibit 44 in support of Plaintiffs' Amended Summary Judgment Motion- Dkt. No. 322 {324}) (with highlighting in as-filed document) *[Excerpts]* | 382-05* | Filed under seal – contains confidential technical and business information |
| 50. | Appx02407 -02410 | Declaration of Michael D. Williams (Exhibit 46 in support of Plaintiffs' Amended Summary Judgment Motion- Dkt. No. 322 {324}) | 382-07* | Filed under seal – contains confidential technical and business information |
| 51. | Appx02427 -02429 | Declaration (Exhibit A to AerSale's Response to Supplemental Statement of Material Facts) | 392-1* | Filed under seal – contains confidential business information |

15

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 52. | Appx02430 -02437 | Excerpts from the Deposition of Iso Nezaj (Exhibit B to AerSale's Response to Supplemental Statement of Material Facts) | 392-2* | Filed under seal – contains confidential business information |
| 53. | Appx02438 -02443 | Declaration (Exhibit C to AerSale's Response to Supplemental Statement of Material Facts) | 392-3* | Filed under seal – contains confidential business information |
| 54. | Appx02444 -02487 | Declaration of Iso Nezaj (Exhibit D to AerSale's Response to Supplemental Statement of Material Facts) [Excerpts] | 392-4* | Filed under seal – contains confidential business information |
| 55. | Appx02488 -02497 | Excerpts from Arbitration Transcript: Williams taken 24 October 2019 (Exhibit E to AerSale's Response to Supplemental Statement of Material Facts) (with highlighting in as-filed document) | 392-5 | -na- |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 56. | Appx02498 -02502 | "Nondisclosure, Nonuse And Confidentiality Agreement" between Jetaire Flight Systems, LLC and AerSale, Inc. dated 16 January 2015 (Exhibit V to Statement of: Undisputed Material Facts in Support of [196] AerSale's Motion for Summary Judgment) | 197-24 | -na- |
| 57. | Appx02503 -02517 | Excerpts from Deposition Transcript: Williams as (30)(b)(6) witness for Jetaire Aerospace - 7 February 2023 (Exhibit XX to AerSale's Response in Opposition to Plaintiffs' Motion for Summary Judgment) *[Excerpts]* | 257-2 | -na- |
| 58. | Appx02518 -02573 | "Defendant AerSale, Inc.'s Application to Conform Arbitration Award" in N.D. Ga. Case No. 1:16-cv-02970-LMM (Exhibit 4 to Plaintiff's Motion to Dismiss [19] Defendant's Answer and Counterclaims) *[Excerpts]* | 25-5 | -na- |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 59. | Appx02574 -02606 | Excerpts from Deposition Transcript: Finazzo - 23 February, 2023 (Exhibit 5 to [322] Plaintiffs' Amended Motion for Summary Judgment) (with highlighting in as-filed document) *[Excerpts]* | 325- 05* | Filed under seal – contains confidential technical and business information |
| | | **FILED DOCUMENTS – SECTION 2** | | |
| 60. | Appx02684 -02687 | Patent Assignment Cover Sheet (Exhibit D to AerSale's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment) | 197-6 | -na- |
| 61. | Appx02688 -02710 | Jetaire Group Brochure [bates range: Jetair-0033046 to Jetair-0033067] (Exhibit YY to AerSale's Response in Opposition to Plaintiffs' Motion for Summary Judgment) *[Excerpts]* | 257-3* | Filed under seal – contains confidential business information |
| 62. | Appx02717 -02756 | Email dated April 8, 2017 from Williams to Chi (Exhibit AAA to AerSale's Response in Opposition to Plaintiffs' Motion for Summary Judgment) *[Excerpts]* | 257-5* | Filed under seal – contains confidential technical information |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 63. | Appx02757 -02771 | Email dated July 14, 2018 from Yenice to Lee (Exhibit BBB to AerSale's Response in Opposition to Plaintiffs' Motion for Summary Judgment) *[Excerpts]* | 257-6* | Filed under seal – contains confidential technical information |
| 64. | Appx02772 -02778 | Excerpts from Deposition Transcript: N. Finazzo (Exhibit B to AerSale's Statement of Disputed Facts and Response to Amended Statement of Disputed Facts) | 338-03* | Filed under seal – contains confidential business information |
| 65. | Appx02779 -02787 | Excerpts from Deposition Transcript: Williams as (30)(b)(6) witness for Jetaire Flight Systems [Williams - February 8, 2023] (Exhibit  C to AerSale's Statement of Disputed Facts and Response to Amended Statement of Disputed Facts) | 338-04* | Filed under seal – contains confidential business information |
| 66. | Appx02788 -02794 | Excerpts from Deposition Transcript: Iso Nezaj (Exhibit D to AerSale's Statement of Disputed Facts and Response to Amended Statement of Disputed Facts) | 338-05* | Filed under seal – contains confidential business information |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 67. | Appx02806 -02808 | Declaration of E. Couvreur (Exhibit G to AerSale's Statement of Disputed Facts and Response to Amended Statement of Disputed Facts) | 338-08* | Filed under seal – contains confidential business information |
| 68. | Appx02809 -02823 | August 13, 2020 Purchase and Sale Agreement between Eastern Airlines, LLC and Jetaire Flight Systems, LLC (Dep. Ex. 62.) (Exhibit H to AerSale's Statement of Disputed Facts and Response to Amended Statement of Disputed Facts) | 338-09* | Filed under seal – contains confidential financial and business information |
| 69. | Appx02824 -02844 | Excerpts from Deposition Transcript: Williams as (30)(b)(6) witness for Jetaire Aerospace, LLC [Williams - February 7, 2023] (Exhibit I to AerSale's Statement of Disputed Facts and Response to Amended Statement of Disputed Facts) *[Excerpts]* | 338-10* | Filed under seal – contains confidential business information |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 70. | Appx02845 -02849 | Email dated September 5, 2016 between Williams and Male (Dep. Ex. 35) (Exhibit J to AerSale's Statement of Disputed Facts and Response to Amended Statement of Disputed Facts) | 338-11* | Filed under seal – contains confidential business information |
| 71. | Appx02850 -02868 | Email dated April 3, 2016 between M. Williams and P. Male (Dep. Ex. 63) (Exhibit K to AerSale's Statement of Disputed Facts and Response to Amended Statement of Disputed Facts) *[Excerpts]* | 338-12* | Filed under seal – contains confidential business information |
| 72. | Appx02869 -02877 | Email dated August 17, 2016 from M. Williams to "bobrjmj" (Dep. Ex. 41) (Exhibit L to AerSale's Statement of Disputed Facts and Response to Amended Statement of Disputed Facts) | 338-13 | -na- |

|  | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 73. | Appx03019 -03070 | SAE AIR4170 Rev. A (Exhibit DD to Defendant/Counter-Plaintiff's Supplemental Statement of Undisputed Material Facts) *[Excerpts]* | 197-32 | -na- |
| **FILED DOCUMENTS – SECTION 3** | | | | |
| 74. | Appx03071 -03075 | Fifth Amended Scheduling Order | 171 | -na- |
| 75. | Appx03076 -03085 | Excerpts from Deposition Transcript: Williams as (30)(b)(6) witness for Jetaire Flight Systems - 8 February 2023-Volume II (Exhibit 43 in support of Plaintiffs' Amended Summary Judgment Motion- Dkt. No. 322 {324}) (with highlighting in as-filed document) | 382-43* | Filed under seal – contains confidential technical and business information |
| 76. | Appx03086 -03095 | Excerpts from Deposition Transcript: Moyer - 21 February 2023 (Exhibit 6 to [322] Plaintiffs' Amended Motion for Summary Judgment) (with highlighting in as-filed document) | 325-06* | Filed under seal – contains confidential business information |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 77. | Appx03096 -03102 | AerSale's First Supplemental Interrogatory Responses and Objections to Jetaire's First Set of Interrogatories (Exhibit 14 to [322] Plaintiffs' Amended Motion for Summary Judgment) | 325-14* | Filed under seal – contains confidential technical and business information |
| 78. | Appx03103 -03121 | Excerpts from Deposition Transcript: Williams as (30)(b)(6) witness for Jetaire Aerospace - 7 February 2023 (Exhibit 45 in support of Plaintiffs' Amended Summary Judgment Motion - Dkt. No. 322 {324}) (with highlighting in as-filed document) *[Excerpts]* | 382-45 | -na- |
| 79. | Appx03122 -03123 | Email dated April 8, 2021 (Exhibit 49 in support of Plaintiffs' Amended Summary Judgment Motion - Dkt. No. 322 {324}) | 382-48* | Filed under seal – contains confidential business information |

| | RANGE | DESCRIPTION | No.[a,b] | Confidential[c] |
|---|---|---|---|---|
| 80. | Appx03124 -03125 | AerSale 757 Customer Log (Exhibit 50 in support of Plaintiffs' Amended Summary Judgment Motion - Dkt. No. 322 {324}) (with highlighting in as-filed document) | 382-50* | Filed under seal – contains confidential financial and business information |
| 81. | Appx03126 -03149 | Email dated July 16, 2021 (AERSALE0027480-27502) (Exhibit 51 in support of Plaintiffs' Amended Summary Judgment Motion - Dkt. No. 322 {324}) *[Excerpts]* | 382-51* | Filed under seal – contains confidential financial and business information |
| 82. | Appx03150 -03171 | Email dated June 15, 2021 (AERSALE0027146-27166) (Exhibit 52 in support of Plaintiffs' Amended Summary Judgment Motion - Dkt. No. 322 {324}) *[Excerpts]* | 382-52* | Filed under seal – contains confidential financial and business information |
| 83. | Appx03175 -03199 | Excerpts from Deposition Transcript: Iso Nezaj (Exhibit 16 to [322] Plaintiffs' Amended Motion for Summary Judgment) (with highlighting in as-filed document) *[Excerpts]* | 325-16* | Filed under seal – contains confidential business information |

Dated: <u>June 3, 2025</u>       Respectfully submitted,

<u>*/s/ Jonathan L. Hardt*</u>

Jonathan L. Hardt
**ROZIER HARDT MCDONOUGH PLLC**
712 W. 14th Street, Suite A
Austin, Texas 78701
Telephone: (210) 289-7541
Email: hardt@rhmtrial.com

*Attorney for* JETAIRE AEROSPACE, LLC,
Plaintiff/Counterclaim Defendant–Appellant,
JETAIRE FLIGHT SYSTEMS, LLC,
Counterclaim Defendant-Appellant, and
MICHAEL D. WILLIAMS, Counterclaim
Defendant-Appellant

<u>*/s/ Scott A. Penner #*</u>

Scott A. Penner
**EVERSHEDS SUTHERLAND (US) LLP**
12255 El Camino Real, Suite 100
San Diego, California 92130-2071
Telephone: (858) 252-6502
Email: scottpenner@eversheds-sutherland.com

Attorneys for AERSALE, INC. Appellee/Cross-
Appellant

*# e-signed with express permission*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, on behalf of Appellants/Cross-Appellees JETAIRE AEROSPACE, LLC, JETAIRE FLIGHT SYSTEMS, LLC, MICHAEL D. WILLIAMS and Appellee/Cross-Appellant AERSALE, INC., I caused to be filed with the Clerk of the United States Court of Appeals for the Federal Circuit *via* the Court's CM/ECF system, which caused to be served by on all counsel of record, a copy of the *CORRECTED* NON-CONFIDENTIAL JOINT APPENDIX.

Dated: <u>June 3, 2025</u>    Respectfully submitted,

*/s/ Jonathan L. Hardt*

Jonathan L. Hardt
**ROZIER HARDT MCDONOUGH PLLC**
712 W. 14th Street, Suite A
Austin, Texas 78701
Telephone: (210) 289-7541
Email: hardt@rhmtrial.com

*Attorney for* JETAIRE AEROSPACE, LLC, Plaintiff/Counterclaim Defendant–Appellant, JETAIRE FLIGHT SYSTEMS, LLC, Counterclaim Defendant-Appellant, and MICHAEL D. WILLIAMS, Counterclaim Defendant-Appellant

26

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 20-25144-Civ-GAYLES/TORRES

JETAIRE AREOSPACE, LLC,

        Plaintiff/Counter-Defendant,

v.

AERSALE INC.,

        Defendant/Counter-Plaintiff.

_____/

### AGREED PROTECTIVE ORDER & ESI ORDER

This matter is before the Court on Plaintiff/Counter-Defendant JETAIRE AEROSPACE, LLC, and Defendant/Counter-Plaintiff AERSALE INC. Joint Motion for Entry of a (1) Protective Order Regarding the Disclosure and Use of Discovery Materials ("Protective Order") and (2) Order Concerning Production of Electronically-Stored Information ("ESI Order"). [D.E. 44]. After careful review of the motion, the relevant authorities, and record, the motion is **GRANTED** for good cause.

**FURTHER ORDERED AND AJUDICATED** that:

### Protective Order

The parties anticipate that documents, testimony, or information containing or reflecting confidential, proprietary, trade secret, and/or commercially sensitive information are likely to be disclosed or produced during the course of discovery, initial disclosures, and supplemental disclosures in this case. As such, the parties

agree, as set forth below, the conditions for treating, obtaining, and using such information.

Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure the parties find good cause for the following Protective Order.

1. **Designation and Maintenance of Documents and Information**.

A. "Confidential Information" designation means that the document contains information, as determined in good faith by the producing party, that is not readily and or normally available to the public, including but not limited to trade secrets or commercial information not publicly known, which trade secrets or commercial information is of technical or commercial advantage to its possessor, in accordance with Fed. R. Civ. P. 26(c)(1)(G), or other information required by law or agreement to be kept confidential.

B. The "Attorneys' Eyes Only Information" designation means that the document contains information that the producing party deems especially sensitive, which may include, but is not limited to, proprietary information related to any of the following: technical data, research  and development information, marketing or other business plans, product or service information, customer information, trade secrets, competitive information, or financial information of the party,  or any other information such as confidential research and development, financial, technical, marketing, or any other sensitive trade secret information.

C. "Confidential Information" and "Attorneys' Eyes Only Information" do not include, and this Protective Order does not apply to, documents

already in the knowledge or possession of the party to whom disclosure is made unless that party is already bound by an agreement not to disclose such information, or information that has been disclosed to the public or third persons in a manner making such information no longer confidential.

2. **Documents Produced in Discovery and Depositions**.

A. **Documents and things produced** during the course of this litigation within the scope of paragraph 1(A) or 1(B) above, may be designated by the producing party as containing "Confidential Information" by placing on each page and each thing a legend substantially as follows:

<u>CONFIDENTIAL</u>

Documents and things produced during the course of this litigation within the scope of paragraph 1(B) above may be designated by the producing party as containing "Attorneys' Eyes Only Information" by placing on each page and each thing a legend substantially as follows:

<u>ATTORNEYS' EYES ONLY</u>

For digital files being produced, the producing party may mark the medium, container, or communication in which the digital files are contained.

B. **Depositions**

(i) For deposition testimony or exhibits to be entitled to protection under this Order, a party must designate the testimony and exhibits disclosed at a deposition as "Confidential Information" or "Attorneys' Eyes Only" by requesting the reporter to so designate the transcript or any portion of the transcript at the time of the deposition.

(ii)    If no such designation is made at the time of the deposition, any party has fourteen (14) calendar days after delivery by the court reporter of the transcript of the deposition session to designate, in writing to the other parties and to the court reporter, what portions of the transcript and which exhibits the party designates as "Confidential Information" and "Attorneys' Eyes Only."

(iii)    During the transcription and following fourteen (14) day period after a deposition session, the transcript and exhibits must be treated as Attorneys' Eyes Only Information, unless the disclosing party consents to less confidential treatment of the information.

(iv)    Each party and the court reporter must attach a copy of any final and timely written designation notice to the transcript and each copy of the transcript in its possession, custody or control, and the portions designated in such notice must thereafter be treated in accordance with this Protective Order. It is the responsibility of counsel for each party to maintain materials containing Confidential Information or Attorneys' Eyes Only Information in a secure manner and appropriately identified so as to allow access to such information only to such persons and under such terms as is permitted under this Protective Order.

(v)    If no such designation is made at the deposition or within the fourteen (14) calendar day period following delivery of the transcript,

then the entire deposition will be considered devoid of Confidential Information or Attorneys' Eyes Only Information.

3. **Inadvertent Failure to Designate**.

A.    The inadvertent failure to designate a document or deposition transcript as "Confidential Information" or "Attorneys' Eyes Only" will not be a waiver of a claim that the document or transcript contains confidential or attorneys' eyes only information, and will not prevent the producing party from designating such information as confidential at a later date in writing, so long as the designation is done with particularity.

B.    In the event a producing party later designates a document or deposition transcript as "Confidential Information" or "Attorneys' Eyes Only," the document or transcript must be treated by the receiving party as confidential or attorneys' eyes only from the time of receipt  of the notice of the "Confidential Information" or "Attorneys' Eyes Only" designation.

4. **Higher Designation.**

If a producing party produces any information, document, or thing, and later ascertains that such material requires protection via a designation or via a higher level of designation under this Protective Order, the producing party shall promptly notify all parties of the requested change in designation and provide copies of the material with the changed designation. All receiving parties shall respond to such notification within five business days to the producing party and shall state either (1) that they have collected and destroyed all instances of any information, document or

thing which requires a new designation, and have limited distribution of such material to only those persons permitted to receive such material under the new designation; OR (2) that the receiving party has a good faith dispute with the producing party's position that such materials are subject to a new confidentiality designation.

5. **Challenges to Designations**.

A party's designation of documents "Confidential Information" or "Attorneys' Eyes Only" is not binding if the procedures below are followed:

A. A receiving party may challenge a producing party's designation at any time. Any receiving party may request in writing that the producing party change the designation. The producing party within fourteen (14) calendar days after receipt of a written challenge, must advise the receiving party whether or not it will change the designation.

B. If the parties are unable to reach agreement after the expiration of this fourteen (14) calendar day period, they shall confer. If they cannot resolve the issue, the receiving party may seek an order to alter the confidential status of the designated information.

C. Until the presiding judge has ruled on a dispute under this paragraph, the "Confidential Information" or "Attorneys' Eyes Only" designation will remain in full force and effect, and the document continues to be protected by this Protective Order.

6. **Disclosure and Use of Confidential Information**.

**A.**    Information designated as "Confidential Information" or "Attorneys' Eyes Only" may only be used for purposes of preparation, trial, and appeal of this action. "Confidential Information" or "Attorneys' Eyes Only" may not be used under any circumstances for any other purpose. All information, documents, or things produced, exchanged, or inspected in the course of this proceeding shall be used by the receiving party solely for the purposes of this proceeding.

**B.**    Subject to paragraph 9 below, "Confidential Information" may be disclosed by the receiving party only to the following individuals, provided that such individuals are informed of the terms of this Protective Order and agree to be bound by it: **(a)** employees of the receiving party who are required in good faith to provide assistance in the conduct of this litigation, including any settlement discussions; **(b)** in-house counsel; **(c)** outside counsel of record for the receiving party; **(d)** supporting personnel employed by (b) and (c), such as paralegals, legal secretaries, data entry clerks, legal clerks, and private photocopying services; **(e)** experts and consultants; **(f)** third party vendors, including any persons requested by counsel to furnish services such as document coding, image scanning, mock trial, jury profiling, translation services, court reporting services, demonstrative exhibit preparation, or the creation of any computer database from documents; and **(g)** those individuals designated in paragraph 6(E)(c) below.

**C.**    Subject to paragraph 9 below, "Attorneys' Eyes Only Information" may be disclosed by the receiving party only to the following individuals, provided that such individuals are informed of the terms of this Protective Order: **(a)** outside

counsel of record for the receiving party; **(b)** supporting personnel employed by outside counsel, such as paralegals, legal secretaries, data entry clerks, legal clerks, private photocopying services; **(c)** experts and consultants, **(d)** third party vendors, including any persons requested by counsel to furnish services such as document coding, image scanning, mock trial, jury profiling, translation services, court reporting services, demonstrative exhibit preparation, or the creation of any computer database from documents, and **(e)** those individuals designated in paragraph 6(E)(c) below.

**D.**    Counsel is responsible for the adherence by experts, consultants, employees of any party, and third-party vendors to the terms and conditions of this Protective Order. Counsel may fulfill this obligation by obtaining a signed Confidentiality Agreement in the form attached as Exhibit A, in the case of experts, consultants, and employees of any party, and Exhibit B, in the case of vendors.

**E.**    "Confidential Information" or "Attorneys' Eyes Only Information" may be disclosed to a person who is not already allowed access to such information under this Protective Order *if*: **(a)** the information was previously received, reviewed or authored by the person or was authored or received by a director, officer, employee or agent of the company for which the person is testifying as a designee under FED. R. CIV. P. 30(b)(6); **(b)** the designating party is the person or is a party for whom the person is a director, officer, employee, consultant or agent; or **(c)** counsel for the party designating the material agrees that the material may be disclosed to the person.

**F.** Nothing in this Order shall preclude any party to the proceeding or their attorney from:

(i) Disclosing or using, in any manner or for any purpose, any information, documents, or things from the party's own files that comprise its own "Confidential Information" or "Attorneys' Eyes Only Information" simply because it is produced and designated as such under this Protective Order in this action.

(ii) Disclosing or using, in any manner or for any purpose, any information, documents, or thing obtained from a source other than discovery or to which a party has a right of access independent of discovery.

Disclosure of material pursuant to this section 6(F) does not constitute a waiver of the confidential status of the material so disclosed.

7. **Filing Under Seal; Disposal of Sealed Materials**.

If a party needs to file "Confidential Information" or "Attorneys' Eyes Only Information," in any pleading or filing, the parties agree they shall follow and comply with all procedures outlined in Local Rule 5.4 of the Local Rules of the United States District Court for the Southern District of Florida.

8. **Prosecution Bar**.

Absent written consent from the producing party, any individual who receives access to information designated as Attorneys' Eyes Only Information shall not be involved in either of (i) the prosecution of patents or patent applications relating to

foam in fuel tanks, including without limitation the patents asserted in this action and any patent or application claiming priority to or otherwise related to the patents asserted in this action, before any foreign or domestic agency, including the United States Patent and Trademark Office ("the Patent Office"); or (ii) the development of and/or application for Supplemental Type Certificates ("STCs") as defined by the US Federal Aviation Regulations ("FARs"), or any similar approvals from other national or international aviation authorities, in any jurisdiction, that relate to or involve the use of foam in fuel tanks.  For purposes of this paragraph, "prosecution" includes directly or indirectly drafting, amending, advising, or otherwise affecting the scope or maintenance of patent claims.[1]  To avoid any doubt, "prosecution" as used in this paragraph does not include representing a party challenging a patent before a domestic or foreign agency (including, but not limited to, a reissue protest, *ex parte* reexamination or *inter partes* reexamination).[2]  This Prosecution Bar shall begin when access to information designated as Attorneys' Eyes Only Information is first received by the affected individual and shall end two (2) years after final termination of this action.

9. **Non-Party Information**.

The existence of this Protective Order must be disclosed to any person producing documents, tangible things, or testimony in this action who may

---

[1] Prosecution includes, for example, original prosecution, reissue and reexamination proceedings.

[2] Plaintiff reserves the right, if and when any challenge to any patent asserted in this action before a domestic or foreign agency is filed or instituted, to move the Court for good cause shown and in accordance with paragraph 14 to allow counsel defending such challenge to access Attorneys' Eyes Only Information so long as such counsel is not directly or indirectly involved in drafting, amending, or restructuring any claim, and Defendant reserves its right to oppose any such motion.

reasonably be expected to desire confidential treatment for such documents, tangible things or testimony. Any such person may designate documents, tangible things, or testimony confidential or attorneys' eyes only pursuant to this Protective Order.

10. **No Prejudice.**

Producing or receiving "Confidential Information" or "Attorneys' Eyes Only Information," or otherwise complying with the terms of this Protective Order, will ***not***: **(a)** operate as an admission by any party that any particular "Confidential Information" or "Attorneys' Eyes Only Information" contains or reflects trade secrets or any other type of confidential or proprietary information; **(b)** prejudice the rights of a party to object to the production of information **or** material that the party does not consider to be within the scope of discovery; **(c)** prejudice the rights of a party to seek a determination by the presiding judge that particular materials be produced; **(d)** prejudice the rights of a party to apply to the presiding judge for further protective orders; or **(e)** prevent the parties from agreeing in writing to alter or waive the provisions or protections provided for in this Protective Order with respect to any particular information or material.

11. **Conclusion of Litigation.**

Within sixty (60) calendar days after final judgment in this action, including the exhaustion of all appeals, or within sixty (60) calendar days after dismissal pursuant to a settlement agreement, each party or other person subject to the terms of this Protective Order is under an obligation to destroy or return to the producing party all materials and documents containing "Confidential Information" or "Attorneys' Eyes Only Information," and to certify to the producing party that this

destruction or return has been done. However, outside counsel for any party is entitled to retain all court papers, trial transcripts, exhibits, and attorney work as part of its own records for purposes of its document retention policy or as required under any applicable state bar rules, provided that any such materials are maintained and protected in accordance with the terms of this Protective Order and are not accessible or available to any party or client.

12. **Other Proceedings.**

By entering this Protective Order and limiting the disclosure of information in this case, the parties do not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or party subject to this Protective Order who may be subject to a motion to disclose another party's information designated "Confidential" or "Attorneys' Eyes Only" pursuant to this Protective Order must promptly notify that party of the motion so that the party may have an opportunity to appear and be heard on whether that information should be disclosed.

13. **Remedies**.

It is agreed that this Protective Order may be enforced by the sanctions set forth in FED. R. CIV. P. 37(a) and any other sanctions as may be available to the presiding judge, including the power to hold parties or other violators of this Protective Order in contempt. All other remedies available to any person injured by a violation of this Protective Order are fully reserved.

14. **Relief from Protective Order.**

Any party may petition the presiding judge for good cause shown if the party desires relief from a term or condition of this Protective Order.

## ESI Order

The parties are in agreement that discovery in this action is likely to involve discovery of information stored in an electronic form. For documents not currently in electronic form, the Parties believe that converting such documents to an electronic form is preferable, to the extent practicable, to streamline such discovery. Accordingly, the Parties have stipulated to be bound by the following ESI Order in this action.

1. **DEFINITIONS**

2.1. "Electronically Stored Information" or "ESI" carries its broadest meaning consistent with Fed. R. Civ. P. 34(a)(1)(A).

2.2. "Document" carries its broadest meaning consistent with Fed. R. Civ. P. 34(a)(1)(A) and the definitions of "writings," "recordings," and "photographs" in Fed. R. Evid. 1001, and thus includes both ESI and Paper Discovery (defined below).

2.3. "E-Documents" includes ESI.

2.4. "Paper Discovery" means any Document or thing discoverable under Fed. R. Civ. P. 26(b)(1) and Fed. R. Civ. P. 34(a)(1)(A) that is not ESI.

2.5. "Email" or "electronic mail" means electronic correspondence sent from a person to one or more people over a computer network via an electronic mail server.

2.6. "Format" means the internal structure of an electronic file which defines

the way the file is encoded for storage.

2.7.  "Native Format" means the Format of ESI in the application in which such ESI was originally created.

2.8.  "Producing Party" means a Party that produces Documents.

2.9.  "Receiving Party" means a Party to whom Documents are produced.

2.10.  The "Litigation" refers to Civil Action No. 1:20-cv-25144-DPG in the U.S. District Court for the Southern District of Florida.

2.11.  "Tagged Image File Format" or "TIFF" refers to the CCITT Group IV graphic file Format for storing bit-mapped images, with multiple compression formats and resolutions.

2.12.  "JPEG" refers to the Joint Photographic Experts Group's file Format for storing graphic images using a compression algorithm.

2.13.  "Production Bates Number" means the unique serial number embedded on each page of a Document produced.

2.14.  "MD5 Hash" means the output from the MD5 message-digest algorithm set forth in the Internet Engineering Task Force Request for Comments 1321.

## 2.  SCOPE

The procedures and protocols set forth herein hereinafter shall govern the production of ESI between the Parties in the Litigation.  The ESI provisions of Rules 16, 26, 33, 34, and 37 of the Federal Rules of Civil Procedure are incorporated herein to the extent such provisions do not contradict this ESI Order.  The procedures and protocols set forth herein shall apply only to ESI produced after the date of this ESI Order and may be modified only by written agreement of the Parties approved by the

Court.  The purpose of these procedures and protocols is to promote an efficient and cost-effective manner of conducting discovery pursuant to the Federal Rules of Civil Procedure.

### 3.  PROTOCOL FOR PRODUCING ESI

General requests for production of ESI shall comply with Federal Rules of Civil Procedure 34 and 45 to the extent such Rules are consistent with this ESI Order.

### a.  USE OF ESI

Pursuant to Fed. R. Evid. 502(d), the inadvertent production of privileged or work product protected ESI, no matter the type, quantity, or volume, is not a waiver of any applicable privilege or protection in the pending case or in any other federal or state proceeding.

### b.  DOCUMENTS NOT DISCOVERABLE

The following Documents are not discoverable in the Litigation except upon a showing of good cause as may be determined by the Court:

1. Backup data maintained in a party's normal or allowed processes, including but not limited to backup tapes, disks, SAN, and other forms of media.  If a Party requests that such long-term storage media be searched for a Document that is not cumulative of ESI stored in active media or that is not available as Paper Discovery, the Parties agree to meet and confer in good faith regarding the request, and the presumption shall be that the Requesting Party will pay for the cost associated with restoring and searching said media.

2. Temporary data stored in a computer's random-access memory or RAM.

### 4. PRODUCTION FORMAT

The Parties shall produce all images, paper documents, scanned to images, rendered ESI, or other Documents as 300 dpi single-page, TIFF files or 200 dpi single-page color JPEG files.  Documents should be uniquely and sequentially numbered with a Production Bates Number embedded on each image.  Document level text (.txt) files for the TIFF files shall be included, comprising text extracted from files in Native Format and Optical Character Recognition ("OCR") text for files not in Native Format or files that do not have extractable text in Native Format, except when OCR would result in the extraction of redacted data.  Images with text extracted by OCR should have a single .txt file produced for each Document.  No image folder should contain more than 2500 images.  Images should be accompanied by Concordance load files that associates each Production Bates Number with its corresponding single-page TIFF image.  If one of the parties does not have the capability to produce documents in this format, the parties will discuss in good faith and attempt to agree on alternate production format means that provides the same or equivalent level of detail, image quality, extracted text, metadata, and Production Bates Numbering.

In addition, general ESI productions shall include metadata as described in Exhibit A.  Without a showing of good cause, no Party shall be obligated to perform an additional search and production of metadata associated with any ESI beyond the metadata that shall allow for compliance with the production Format contained herein.  Metadata includes embedded data about ESI, and do not include the text of the ESI itself.

Electronic production of all discovery materials is the preferred manner of

producing discovery for this Litigation. As such, Paper Discovery should be produced in electronic form to the extent practicable. Paper Discovery produced in electronic form (such as scanned Documents) shall be rendered text searchable via OCR by the Producing Party. Such Documents shall be produced in the manner in which they were kept in the usual course of business. A Party need not produce a paper copy of any Paper Discovery produced in electronic form, except that upon a reasonable request by the Receiving Party and a showing of good cause (for example, problems with legibility or formatting), the Producing Party must produce a paper copy of the Paper Discovery at a mutually agreeable time and place.

a. **APPEARANCE AND CONTENT**

Subject to any necessary redaction, each Document's image file shall contain the same information and same physical representation as the original Document, whether paper or electronic. Documents containing color need not be produced in color unless the Receiving Party makes a reasonable request for the production of ESI in Native Format or for production of paper copies of Paper Discovery, as applicable.

1. Document Unitization

If a Document is more than one page, to the extent possible, the unitization of the Document and any attachments or affixed notes shall be maintained as it existed when collected by the Producing Party. If unitization cannot be maintained, the original unitization shall be documented in a load file or otherwise electronically tracked.

2. Document Numbering

Each Document image shall contain a footer with a sequentially ascending

Production Bates Number.   The footer shall also contain an indication of any confidentiality designation.

3. Production of ESI in Native Format

As an exception, if production of a Document in a commercial image file Format (i.e., TIFF) is impracticable or unreasonable (such as for video, animation, audio files and large Excel spreadsheets), the Producing Party shall produce such Document in Native Format consistent with the 2006 Amendments to Rule 34 of the Federal Rules of Civil Procedure.   The Producing Party shall collect and produce Documents in Native Format in a manner that preserves the integrity of the files.   In all other instances, after initial production of ESI in TIFF, a Party wanting to receive a Native Format copy of a Document may make a reasonable request.   No Document produced in Native Format shall be intentionally manipulated to change the appearance or substance of the Document before its collection.   Files in Native Format shall provide a "Document ID" field, a native file name field, and a production file name field as part of the production load file.   A link to files in Native Format shall be provided in a Native Path field within the load file.   For the sake of clarity, this provision does not allow the production of all ESI in Native Format nor does it apply to source code, which is addressed in the separate protective order.

4. Language

If any Document exists in more than one language, the Document shall be produced in English, if available.   If no English version of a Document is available, the Producing Party does not have an obligation to produce an English translation of that Document and does not have an obligation to render that Document text-

searchable via OCR or other means.

### b. PRODUCTION MEDIA

Productions may be served by Electronic Mail or via FTP if the size of the production files is a reasonable size for download from an FTP site. The Producing Party may also produce images of Documents and load files on external hard drives, CDs, DVDs or other mutually agreeable media. Each Production shall include a unique identifying label corresponding to the identity of the Producing Party and the Production Bates Number ranges of the Documents in that production (for example, "BetaNet Production, BETA0000123 - BETA0000456").

### c. THIRD-PARTY SOFTWARE

Each Party is individually responsible for obtaining any third-party software necessary to render and/or view any Documents produced in the Litigation.

### 5. MISCELLANEOUS PROVISIONS

### a. MODIFICATION.

This ESI Order may be modified by the Parties by written agreement, but such modification shall have no force or effect unless approved by the Court. The Parties shall meet and confer in good faith to discuss a Party's proposed modifications to this ESI Order.

### b. RESOLUTION OF DISPUTES.

The Parties shall meet and confer in good faith to resolve any disputes that may arise under this ESI Order. If the Parties cannot reach agreement on a disputed matter, the Parties shall submit the matter to the Court.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 12th day of July, 2021.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

**EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:20-cv-25144-GAYLES

JETAIRE AEROSPACE, LLC,

       Plaintiff/Counter-Defendant,

v.

AERSALE INC.,

       Defendant/Counter-Plaintiff.

**CONFIDENTIALITY AGREEMENT FOR EXPERT, CONSULTANT OR EMPLOYEES**
**OF ANY PARTY**

I, _____, under penalty of perjury, 28 U.S.C. § 1746, that:

    1.    Information, including documents and things, designated as "Confidential Information" or " Attorneys' Eyes Only Information," as defined in the Protective Order agreed to in the above-captioned action ("Protective Order"), is being provided to me pursuant to the terms and restrictions of the Protective Order.

    2.    I have been given a copy of and have read the Protective Order.

    3.    I am familiar with the terms of the Protective Order and I agree to comply with and to be bound by its terms.

    4.    I submit to the jurisdiction of the United States District Court for the Southern District of Florida for enforcement of the Protective Order.

    5.    I agree not to use any "Confidential Information" or "Attorneys' Eyes Only Information" disclosed to me pursuant to the Protective Order except for purposes of the above-captioned litigation and not to disclose any of this information to persons other than those

specifically authorized by the Protective Order, without the express written consent of the party who designated the information as confidential or by order of the presiding judge.

6.    I also agree to notify any stenographic, clerical or technical personnel who are required to assist me of the terms of this Protective Order and of its binding effect on them and me.

7.    I understand that I am to retain all documents or materials designated as or containing "Confidential Information" or "Attorneys' Eyes Only Information" in a secure manner, and that all such documents and materials are to remain in my personal custody until the completion of my assigned duties in this matter, whereupon all such documents and materials, including all copies thereof, and any writings prepared by me containing any "Confidential Information" or "Attorneys' Eyes Only Information" are to be returned to counsel who provided me with such documents and materials.

Signed at _____(city)_, _____(state), this _____, day of _____, 20__.

_____
Signature

**EXHIBIT B**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:20-cv-25144-GAYLES

JETAIRE AEROSPACE, LLC,

      Plaintiff/Counter-Defendant,

v.

AERSALE INC.,

      Defendant/Counter-Plaintiff.

**CONFIDENTIALITY AGREEMENT FOR THIRD-PARTY VENDORS**

I, _____, under penalty of perjury, 28 U.S.C. § 1746, that:

1. Information, including documents and things, designated as "Confidential Information" or "Attorneys' Eyes Only Information" as defined in the Protective Order entered in the above-captioned action ("Protective Order"), is being provided to me pursuant to the terms and restrictions of the Protective Order.

2. I have been given a copy of and have read the Protective Order.

3. I am familiar with the terms of the Protective Order and I agree to comply with and to be bound by its terms.

4. I submit to the jurisdiction of the United States District Court for the Southern District of Florida for enforcement of the Protective Order.

5. I agree not to use any Confidential Information or Attorneys' Eyes Only Information disclosed to me pursuant to the Protective Order except for purposes of the above-captioned litigation and not to disclose any of this information to persons other than those

specifically authorized by the Protective Order, without the express written consent of the party

who designated the information as confidential or by order of the presiding judge.


Signed at  _____(city)_ , _____(state), this _____ , day of _____ ,
20__.


_____
Signature

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:20-cv-25144-GAYLES/TORRES

JETAIRE AEROSPACE, LLC,

      Plaintiff/Counter-Defendant,

v.

AERSALE, INC.,

      Defendant/Counter-Plaintiff,

v.

JETAIRE AEROSPACE, LLC,
JETAIRE FLIGHT SYSTEMS, LLC,
and MICHAEL WILLIAMS,

      Counter-Defendants.

_____/

**FINAL JUDGMENT**

**THIS CAUSE** comes before the Court on Defendant/Counter-Plaintiff AerSale, Inc.'s

("AerSale") Motion for Partial Summary Judgment, [ECF No. 196], and Plaintiff/Counter-Defendant

Jetaire Aerospace, LLC and Counter-Defendants Jetaire Flight Systems, LLC and Michael D.

Williams' (collectively, "Jetaire") Amended Motion for Summary Judgement, [ECF No. 322], (the

"Motions"). The Court granted AerSale's Motion and granted Jetaire's Motion, in part, in separate

orders. [ECF Nos. 415 and 418]. Pursuant to Federal Rules Civil Procedure 58(a), the Court enters

this final judgment.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.      Final Judgment is entered in favor of Defendant/Counter-Plaintiff AerSale, Inc. and against Plaintiff/Counter-Defendant Jetaire Aerospace, LLC on all counts of Plaintiff's Complaint, [ECF No. 1], and on Counts I-VI of Defendant's Fifth Amended Counterclaims, [ECF No. 376-1].

2.      Final Judgment is entered in favor of Counter-Defendants Jetaire Aerospace, LLC; Jetaire Flight Systems, LLC; and Michael Williams, and against Defendant/Counter-Plaintiff AerSale, Inc., on Counts X and XI of Defendant's Fifth Amended Counterclaims, [ECF No. 376-1].

3.      In light of the Court's decision to grant summary judgment in favor of Defendant/Counter-Plaintiff AerSale, Inc. as to Counts I-VI of Defendant's Fifth Amended Counterclaims, [ECF No. 376-1], Counts VII-IX of Defendant's Fifth Amended Counterclaims are dismissed, as moot, but without prejudice to any party's right to file any post-judgment motion for attorneys' fees, including fees awardable pursuant to 35 U.S.C. § 285, within ninety (90) days of the date of entry of this Final Judgment per the Court's September 10, 2024 Order, [ECF No. 422].

4.      The Court shall reserve jurisdiction to determine attorneys' fees and costs.

5.      This action shall be CLOSED.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 23rd day of September, 2024.

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

2

Appx00002

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:20-cv-25144-DPG

JETAIRE AEROSPACE, LLC,

     Plaintiff,

v.

AERSALE INC.,

     Defendant/Counter-Plaintiff,

v.

JETAIRE AEROSPACE, LLC,
JETAIRE FLIGHT SYSTEMS, LLC,
and MICHAEL WILLIAMS,

     Counter-Defendants.

_____/

## ORDER ADOPTING AND AFFIRMING REPORT OF MAGISTRATE JUDGE

**THIS CAUSE** comes before the Court on Chief Magistrate Judge Edwin G. Torres' Report and Recommendation on Defendant/Counter-Plaintiff's Motion for Summary Judgment (the "Report"). [ECF No. 366]. On July 14, 2023, Defendant/Counter-Plaintiff AerSale, Inc. ("AerSale") filed its Motion for Summary Judgment. [ECF No. 196].[1] Plaintiffs/Counter-Defendants Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, and Michael Williams ("Mr. Williams") (collectively, "Jetaire") filed their Response on August 4, 2023. [ECF No. 230].[2] On August 11, 2023, AerSale filed its reply. [ECF No. 246].[3] On December 8, 2023, the case was referred to Judge Torres for a

---

[1] AerSale filed an unredacted, sealed version of its Motion for Summary Judgment. [ECF No. 249].
[2] Jetaire filed an unredacted, sealed version of its Response. [ECF No. 236]. The Court will refer to the unredacted, sealed filing for the remainder of the Order.
[3] AerSale filed an unredacted, sealed version of its Reply. [ECF No. 247].

ruling on all pretrial, non-dispositive matters, and for a report and recommendation on any dispositive matters. [ECF No. 279].

After holding a hearing on the Motion, [ECF No. 310], Judge Torres issued his Report recommending that the Court grant summary judgment in favor of AerSale as to Counts I–VI of the Third Amended Counterclaims, [ECF No. 366]. On May 6, 2024, Jetaire filed its Objections to the Report ("Objections"). [ECF No. 394].[4] AerSale filed its response on May 20, 2024. [ECF No. 402].[5]

A district court may accept, reject, or modify a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1). Those portions of the report and recommendation to which objection is made are accorded *de novo* review, if those objections "pinpoint the specific findings that the party disagrees with." *United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009); *see also* Fed. R. Civ. P. 72(b)(3). Any portions of the report and recommendation to which *no* specific objection is made are reviewed only for clear error. *Liberty Am. Ins. Grp., Inc. v. WestPoint Underwriters, L.L.C.*, 199 F. Supp. 2d 1271, 1276 (M.D. Fla. 2001); *accord Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).

Jetaire alleges that AerSale infringed on three of its patents for fuel tank ignition mitigation technology: U.S. Patent No. 9,849,998 ("'998 Patent"), U.S. Patent No. 10,633,109 ("'109 Patent"), and U.S. Patent No. 10,800,541 ("'541 Patent") (collectively, the "Asserted Patents"). Together, the Asserted Patents culminate into Jetaire's invicta kit (the "Invicta Kit"), which provides "a method and system of accomplishing ignition mitigation using reticulated polyurethane safety foam in coordinated shapes to fill the fuel tanks." [ECF No. 1 ¶ 17]. The Report found that Jetaire made three different commercial offers for sale of the Invicta Kit: a

---

[4] Jetaire filed an unredacted, sealed version of its Objections. [ECF No. 395]. The Court will reference the unredacted, sealed version for the remainder of the Order.
[5] AerSale filed an unredacted, sealed version of its Response to the Objections. [ECF No. 401].

December 9, 2013 email with an attached agreement and letter of proposal from Jetaire to Xtra Airways; an April 11, 2014 email with a revised offer from Jetaire to Xtra Airways; and a July 14, 2014 email offer from Jetaire to AerSale (collectively the "Proposals"). [ECF No. 366 at 8–9]. The Report found that a year before Jetaire applied for its patents (1) Jetaire made a commercial offer for sale of the Invicta Kit and (2) the invention was ready for patenting. *Id.* at 27. Thus, the Report concluded that the on-sale bar applied and recommended this Court find the Asserted Patents to be invalid. *Id.*

Jetaire argues that the Report errs in four ways: (1) by failing to distinguish between method and apparatus claims in its analysis of the Proposals; (2) by conflicting with Federal Circuit precedent as to what constitutes a commercial offer; (3) by failing to consider all thirteen *Allen* factors[6] and improperly finding that Jetaire's primary motive was not experimentation; and (4) by incorrectly concluding that the Asserted Patents were "ready for patenting". [ECF No. 395]. This Court conducted a *de novo* review of the record and agrees with Judge Torres' well-reasoned analysis and recommendations.

As a preliminary matter, Jetaire waived its first objection. In its attempt to invalidate the Report's finding that Jetaire made a commercial offer for sale of the Invicta Kit, Jetaire argues that the Report failed to distinguish between method and apparatus claims.[7] [ECF No. 395 at 7–11]. Specifically, Jetaire maintains that Judge Torres should have performed the on-sale bar analysis on a claim-by-claim basis because the claims of the '998 Patent and '109 Patent are all

---

[6] *Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1353 (Fed. Cir. 2002).

[7] A method claim is "[a] claim directed to a series of acts/steps for performing desired functions." An apparatus claim, on the other hand, is "a claim directed to elements or components that comprise the apparatus or machine." *Basics of claim drafting for utility patent applications*, UNITED STATES PATENT AND TRADEMARK OFFICE, https://www.uspto.gov/sites/default/files/documents/InventionCon2021WhatsinaPatentClaimWorkshopFinalstakeho lders.pdf (last visited Aug, 5 2024).

method claims. *Id.* at 7. Jetaire furthers that there was no commercial offer for sale because the Proposals failed to require Jetaire to perform all the elements of those method claims. *Id.* at 11–12. However, at no point in its Response in Opposition to the Motion did Jetaire advance this argument. *See* [ECF No. 236]; *May v. Pritchett*, No. 22-10147, 2022 WL 16753599, at *7 (11th Cir. Nov. 8, 2022) ("Grounds not raised by a plaintiff in opposing a motion for summary judgment are 'deemed abandoned.'") (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 598–99 (11th Cir. 1995)). Jetaire cannot now object to the Report based on a new argument that Judge Torres did not have the benefit of considering. *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1259 (11th Cir. 2022) ("A district court has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge.") (citation and quotation omitted). Notwithstanding Jetaire's waiver, its argument also fails on the merits.

The Court agrees with the Report's finding that the Invicta Kit encompasses the Asserted Patents, including the Patents that involve method claims. [ECF No. 366 at 7] ("Mr. Williams (Jetaire's designated representative) testified that the 'original design' of the Invicta product, 'as covered by the STC, [is] protected by the patents-in-suit.'") (citation omitted). As AerSale aptly notes, Jetaire conceded this in its discovery responses. [ECF 315-4 at 51–74] (providing, in its interrogatory responses, an exemplary claim chart showing how the Invicta products practice each and every limitation of all the Asserted Patents). The discovery responses, coupled with Jetaire's corporate representative's deposition testimony, make clear that the Invicta Kit offered for sale in the Proposals incorporated each element of all the method claims. Thus, a claim-by-claim analysis was not warranted.

4

Also, the Court is not persuaded by Jetaire's argument that the Proposals involved "only [a] delivery of an SFAR compliant product" and that there was no provision requiring Jetaire to install the Invicta Kit or perform the other steps in the method claims. [ECF No. 395 at 11]. At his corporate representative deposition, Mr. Williams testified "yes" when asked whether additional installation services were required as part of Jetaire's July 14, 2014 Proposal. [ECF No. 315-2 at 10–11 (343:2-344:2)]; [ECF No. 315-40 at 4 (the July 14, 2014 Proposal included a provision where Jetaire quoted a price per unit for the "[i]nstallation services for the above system")]. Furthermore, as stated above, the Invicta Kit practiced each of the limitations of the Asserted Patents. Therefore, the record reflects that the Proposals were not simply for the delivery of a product, but the sale of a modification system that required Jetaire's installation services.

Consistent with Federal Circuit precedent, the Report correctly applied contract law and the Uniform Commercial Code ("UCC") in its analysis of whether a commercial offer for sale occurred.[8] Jetaire asserts that the Report should have evaluated whether a commercial offer for sale was made through the lens of Federal Aviation Agency ("FAA") regulations because the aviation industry is the "commercial community" applicable here. [ECF No. 395 at 12–13]. It is from this context that Jetaire then argues that potential buyers understood that the Invicta Kit could not have possibly been offered for sale because it was not yet approved by the FAA when the Proposals were made. *Id.* at 13.

Jetaire misconstrues *Medicines Co. v. Hospira, Inc.*, which at no point finds that the phrase "in the commercial community" means that courts must evaluate whether a commercial offer for sale occurred in the context of an agency's regulations. 827 F.3d 1363, 1373 (Fed. Cir.

---

[8] The Court also notes that Jetaire did not object to Judge Torres' previous finding that the UCC applies when conducting an on-sale bar analysis. [ECF No. 296].

2016). In fact, *Medicines* explains that "as a general proposition," courts "look to the [UCC] to define whether . . . a communication or series of communications rises to the level of a commercial offer for sale." *Id.* (citation omitted). Regardless of whether the Proposals for the Invicta Kit were contingent upon the FAA's approval, it does not change the fact that the Proposals were commercial offers for sale in the context of the UCC. *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.,* 855 F.3d 1356, 1365 (Fed. Cir. 2017), *aff'd*, 586 U.S. 123, (2019) ("There can be no real dispute that an agreement contracting for the sale of the claimed invention contingent on regulatory approval is still a commercial sale as the commercial community would understand that term."). As such, Jetaire's argument—that because the FAA had not yet approved the Invicta Kit, those in the aviation industry would understand the Proposals were incapable of being accepted—is without merit.[9] *Id.* ("It has been implicit in our prior opinions that the absence of FDA or other regulatory approval before the critical date does not prevent a sale or offer for sale from triggering the on-sale bar."); *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1328 (Fed. Cir. 2001) ("An offer for sale does not have to be accepted to implicate the on sale bar.").

Next, the Court agrees with the Report's finding that the Proposals were commercial offers for sale and not for experimental use. Jetaire contends that the Report erred by failing to analyze all thirteen *Allen* factors and because the determination of whether the Proposals were for "experimental use" is a question of fact for a jury. The Court disagrees. While *Allen* created a list of factors to guide courts in assessing experimentation, it did not require courts to evaluate each factor in every case. *Allen Eng'g Corp.*, 299 F.3d 1336, 1352 (Fed. Cir. 2002) ("In assessing experimentation, this court has considered a number of factors, ***not all of which may apply in***

---

[9] Mr. Williams, Jetaire's corporate representative, testified that these Proposals were in fact offers. [ECF No. 315-2 at 9–10 (336:23-338:6, 339:8-25; 342:16-344:2)].

*any particular case*.") (emphasis added). As the Report correctly notes, the Federal Circuit has since streamlined the *Allen* factors and found that courts have looked to "the objective evidence of the contract". *Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161, 1173 (Fed. Cir. 2022) (citation and quotation omitted). Evaluating the language of the Proposals and the surrounding circumstances, the Report found that the Proposals were not for experimental use as a matter of law.[10]

Jetaire's attempts to create a genuine dispute of material fact fall flat. First, Jetaire maintains that testimony from an AerSale executive, indicating that the Invicta Kit "was a poor design", is evidence of the fact that the Proposals were for experimental use. [ECF No. 395 at 15]. However, the Report already addressed this. [ECF No. 366 at 17]. Jetaire fails to cite any authority that supports the proposition that, because a purchaser does not like a product, it follows that the primary purpose of the offer was for experimental use. *Id.* Furthermore, Mr. Williams' confirmation that testing of his prototype was necessary is also of no consequence.[11] *Lough*, 86 F.3d at 1122 ("[T]he expression by an inventor of his subjective intent to experiment, particularly after institution of litigation, is generally of minimal value.").

The Court also finds that Jetaire lacked control over the Invicta Kit programs detailed in the Proposals. As the Report notes, a critical factor in determining whether an offer is for experimental use is whether the inventor retains control over the use of the patented product for the purpose of testing and experimentation. To show it had control over the alleged experiments, Jetaire asserts that the December 9, 2013 Proposal contemplated that Jetaire was required to

---

[10] Jetaire is incorrect in its assertion that "experimental use" is a question of fact for the jury. *Lough v. Brunswick Corp.*, 86 F.3d 1113, 1120 (Fed. Cir. 1996) ("To determine whether a use is 'experimental' [is] a question of law.").
[11] Jetaire relies on and cites to the expert report of Bill Ashworth in its Objections. *See* [ECF No. 395 at 14]; [ECF Nos. 197-14, 253-7]. This Court already excluded Bill Ashworth's expert testimony as it pertains to the on-sale bar analysis. [ECF Nos. 296, 297].

provide written reports related to testing. [ECF No. 395 at 16]. However, the December 9, 2013 Proposal states otherwise. That Proposal required Jetaire to provide written reports, which included tests for the status of the program, to the buyer and "as directed by the BUYER's Program Manager." [ECF No. 315-38 at 16]. Based on this language, Jetaire's tests and reports were ultimately controlled by the Buyer.

Finally, the Court agrees with the Report's conclusion that the Invicta Kit was ready for patenting when the Proposals were made.[12] Jetaire argues that the Report failed to show that the Invicta Kit was "reduced to practice" because every step of the method claims was not performed. [ECF No. 395 at 18–19]. However, as the Report aptly notes, AerSale does not argue that the Invicta Kit was reduced to practice. Instead, AerSale argues that the Invicta Kit became ready for patenting when Jetaire applied for an STC[13] for the Invicta Kit, thereby providing a sufficient written description to practice the invention. [ECF No. 366 at 22]. Once more, Jetaire fails to "address head-on" the attachments to Jetaire's STC application, which included detailed drawings of the Invicta Kit and the installation process. *Id.* at 24. At no point in its Objections does Jetaire explain why or how the STC application process fails to equate to the level of detail and quality required by the patent application process, and its failure to do so is telling.

## CONCLUSION

Accordingly, after careful consideration, it is **ORDERED AND ADJUDGED** as follows:

---

[12] "An invention is 'ready for patenting' when evidence shows that the invention was reduced to practice *or* described in a written description sufficient to permit one of ordinary skill in the art to practice the invention without undue experimentation." *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 997 (Fed. Cir. 2007) (emphasis added).

[13] "A supplemental type certificate (STC) is a type certificate (TC) issued when an applicant has received FAA approval to modify an aeronautical product from its original design. The STC, which incorporates by reference the related TC, approves not only the modification but also how that modification affects the original design." *Supplemental Type Certificates*, FED. AVIATION ADMIN., https://www.faa.gov/aircraft/air_cert/design_approvals/stc (last visited Jul. 31, 2024).

(1)  Plaintiffs/Counter-Defendants Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, and Michael Williams' Objections to the Report and Recommendation Regarding Summary Judgment for On-Sale Bar, [ECF No. 394], are **OVERRULED**;

(2)  Chief Magistrate Judge Torres' Report and Recommendation on Defendant/Counter-Plaintiff's Motion for Summary Judgment, [ECF No. 366], is **AFFIRMED AND ADOPTED** and incorporated into this Order by reference;

(3)  Defendant/Counter-Plaintiff AerSale, Inc.'s Motion for Summary Judgment, [ECF No. 196], is **GRANTED** as to Counts I–VI of the Third Amended Counterclaims, [ECF No. 159]; and

(4)  In accordance with Federal Rule of Civil Procedure 58, final judgment shall be entered separately. Defendant/Counter-Plaintiff AerSale, Inc. shall submit a proposed final judgment as to the Third Amended Counterclaims within fourteen (14) days of this Order.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 9th day of August, 2024.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:20-cv-25144-DPG

**JETAIRE AEROSPACE, LLC**,

       Plaintiff,

v.

**AERSALE INC.,**

       Defendant/Counter-Plaintiff,

v.

**JETAIRE AEROSPACE, LLC,
JETAIRE FLIGHT SYSTEMS, LLC,
and MICHAEL WILLIAMS,**

       Counter-Defendants.

_____/

**ORDER ADOPTING AND AFFIRMING REPORT OF MAGISTRATE JUDGE**

**THIS CAUSE** comes before the Court on Chief Magistrate Judge Edwin G. Torres' Report

and Recommendation on Counter-Defendants' Motion for Summary Judgment (the "Report"). [ECF

No. 398]. On February 5, 2024, Plaintiffs/Counter-Defendants Jetaire Aerospace, LLC, Jetaire Flight

Systems, LLC, and Michael Williams ("Mr. Williams") (collectively, "Jetaire") filed their Amended

Motion for Summary Judgment. [ECF No. 322].[1] Defendant/Counter-Plaintiff AerSale, Inc.

("AerSale") filed its Response on February 15, 2024. [ECF No. 335].[2] Both parties also provided

supplemental briefing. [ECF Nos. 382, 390].[3] On December 8, 2023, the case was referred to Judge

---

[1] Jetaire filed an unredacted, sealed version of its Motion for Summary Judgment. [ECF No. 324].
[2] AerSale filed an unredacted, sealed version of its Response. [ECF No. 339-1].
[3] Jetaire filed an unredacted, sealed version of its supplement, [ECF No. 383], as did AerSale, [ECF No. 393].

Torres for a ruling on all pretrial, non-dispositive matters, and for a report and recommendation on any dispositive matters. [ECF No. 279].

Judge Torres issued his Report recommending that the Court grant summary judgment in favor of Jetaire as to Counts X and XI and dismiss, as moot, Counts VII–IX of the Fifth Amended Counterclaims. [ECF No. 398]. On May 31, 2024, AerSale filed its Objections to the Report ("Objections"). [ECF No. 406].[4] Jetaire filed its Response on June 14, 2024. [ECF No. 410].[5]

A district court may accept, reject, or modify a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1). Those portions of the report and recommendation to which objection is made are accorded *de novo* review, if those objections "pinpoint the specific findings that the party disagrees with." *United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009); *see also* Fed. R. Civ. P. 72(b)(3). Any portions of the report and recommendation to which *no* specific objection is made are reviewed only for clear error. *Liberty Am. Ins. Grp., Inc. v. WestPoint Underwriters, L.L.C.*, 199 F. Supp. 2d 1271, 1276 (M.D. Fla. 2001); *accord Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).

AerSale argues the Report errs in several ways, including: (1) by improperly concluding that federal patent law preempts AerSale's tort claims; (2) by misconstruing the arbitration panel's findings; (3) by applying the incorrect legal standard, and (4) by improperly concluding that a reasonable jury could not find, by clear and convincing evidence, that Jetaire acted in bad faith. This Court, having considered the Objections and conducted a *de novo* review of the record, agrees with Judge Torres' well-reasoned analysis and agrees that the Motion should be granted, in part.

---

[4] AerSale filed an unredacted, sealed version of its Objections. [ECF No. 407-1].
[5] Jetaire filed an unredacted, sealed version of its Response to the Objections. [ECF No. 412].

CONCLUSION

Accordingly, after careful consideration, it is **ORDERED AND ADJUDGED** as follows:

(1)   Defendant/Counter-Plaintiff AerSale, Inc.'s Objections to Report and Recommendation on Counter-Defendants' Motion for Summary Judgment, [ECF No. 406], are **OVERRULED**;

(2)   Chief Magistrate Judge Torres' Report and Recommendation on Counter-Defendants' Motion for Summary Judgment, [ECF No. 398], is **AFFIRMED AND ADOPTED** and incorporated into this Order by reference;

(3)   Plaintiffs/Counter-Defendants Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, and Michael Williams' Motion for Summary Judgment, [ECF No. 322], is **GRANTED, in part,** as to Counts X and XI of the Fifth Amended Counterclaims, [ECF No. 376-1];

(4)   Counts VII–IX of Defendant/Counter-Plaintiff AerSale, Inc.'s Fifth Amended Counterclaims, [ECF No. 376-1], are **DISMISSED, as moot**; and

(5)   In accordance with Federal Rule of Civil Procedure 58, final judgment shall be entered separately. The parties shall submit a proposed final judgment within fourteen (14) days of this Order.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 4th day of September, 2024.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

Appx00014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-CV-25144-GAYLES/TORRES

JETAIRE AEROSPACE, LLC,

 *Plaintiff*,

v.

AERSALE, INC.,

 *Defendant*.

_____

AERSALE, INC.,

 *Plaintiff*,

v.

JETAIRE AEROSPACE, LLC,
JETAIRE FLIGHT SYSTEMS, LLC, and
MICHAEL WILLIAMS,

 *Defendants*.
_____/

## ORDER ON MOTIONS TO STRIKE EXPERTS

This matter is before the Court on Aersale's Motions to strike expert testimony [D.E. 199; D.E. 200]. The motions are fully briefed and ripe for disposition. Having reviewed the briefing, the record, the relevant authorities, and for the reasons discussed below, Aersale's motion to strike Bill Ashworth's expert testimony [D.E. 199] is **GRANTED IN LIMITED PART** and otherwise **DENIED**. Aersale's motion to strike Justin Blok's expert testimony [D.E. 200] is **DENIED**.

1

Appx00015

## I.     INTRODUCTION

This is a patent infringement case arising from the aviation industry. The Federal Aviation Administration ("FAA") requires passenger and cargo aircraft to be fitted with fuel tank ignition mitigation solutions to minimize the risk of an explosion. For a system to meet these Fuel Tank Flammability Reduction ("FTFR") requirements, the FAA must issue a Supplemental Type Certificate ("STC"), permitting the system to be used in aircraft. To acquire an STC, the applicant must show that the FTFR system can be effectively and safely used on an actual aircraft. Michael Williams, principal of Jetaire Aerospace, LLC ("Jetaire"), developed and patented[1] his INVICTA products, which are FTFR-compliant foam-based ignition mitigation kits. Basically, filling an aircraft fuel tank with specialized foam helps prevent a spark causing an explosion. While seeking the STC for its Boeing 737 FTFR system, Jetaire entered into a relationship with Aersale, Inc. ("Aersale") who provided Jetaire with private access to one of Aersale's Boeing 737s for development and testing purposes. After Jetaire declined a request from Aersale to develop a FTFR system for its own use, Aersale developed and marketed its Aersafe™ products, directly competing with Jetaire. This patent infringement litigation ensued. After extensive discovery and motion practice, the case is now set for trial in February 2024.

---

[1] The three patents at issue, which share a common specification, are U.S. Patent Nos. 9,849,998 (the '998 patent),10,633,109 (the '109 patent), and the 10,800,541 (the '541 patent). Collectively, these are the "Asserted Patents."

## II.    BACKGROUND

### A.    *The remaining claims and counterclaims.*

Jetaire is suing Aersale for infringing the '998, '109, and '541 patents. Aersale is seeking declaratory judgments that Jetaire's Asserted Patents are invalid, unenforceable, and not infringed. Aersale also contends that Jetaire, Jetaire Flight Systems, and Michael Williams defamed and disparaged Aersale to customers for whose business the parties are in direct competition, causing a tortious interference with Aersale's business relationships. Aersale is also pursuing a false patent marking claim against Jetaire.

### B.    *The proffered experts.*

*William Ashworth* is Jetaire's proffered expert on patent infringement and the practices of the Federal Aviation Administration ("FAA"). He holds an undergraduate degree in Aeronautical Engineering from St. Louis University and a master's degree in Technical Management from University of Washington. He has extensive experience designing, managing, and certifying FAA compliant aircraft systems. Mr. Ashworth also has a 15-year employment record with the FAA, beginning as a project engineer and concluding as a senior manager of the Seattle Certification Office, where he oversaw the application of safety and airworthiness regulations for transport airplanes. He also issued Type and Production Certificates for Boeing and Airbus airplanes as a senior manager.

*Justin Blok* is Jetaire's proffered damages expert. He is a certified fraud examiner who holds an undergraduate degree in Business Administration from

3

Baylor University, an M.B.A. with a concentration in Finance from University of Houston-Clear Lake, and a master's degree in Accounting from University of North Carolina at Chapel Hill. Out of over 20 years of accounting experience, Mr. Blok has 14 years of litigation consulting experience, part of which included the valuation of economic damages in a variety of commercial disputes.

### III.    GOVERNING PRINCIPLES

The decision to admit or exclude expert testimony is within the trial court's discretion and the court enjoys "considerable leeway" when determining the admissibility of this testimony. *See Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005). As explained in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the admissibility of expert testimony is governed by Fed. R. Evid. 702. The party offering the expert testimony carries the burden of laying the proper foundation for its admission, and admissibility must be shown by a preponderance of the evidence.[2] *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The

---

[2]    Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case.").

"Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589). The purpose of this role is "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Also, in its role as gatekeeper, a court's duty is not to make ultimate conclusions as to the persuasiveness of the proffered evidence. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

To facilitate this process, district courts engage in a three-part inquiry to determine the admissibility of expert testimony:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.,* 609 F.3d 1183, 1194 (11th Cir. 2010); *City of Tuscaloosa v. Harcros Chemicals,* 158 F.3d 548, 562 (11th Cir. 1998). The Eleventh Circuit refers to these requirements as the "qualification," "reliability," and "helpfulness" prongs and, while they remain distinct concepts, courts must take care not to conflate them. *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech*, 326 F.3d at 1341).

In determining the reliability of a scientific expert opinion, the Eleventh Circuit also considers the following factors to the extent possible:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.  Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis.

*Quiet Tech*, 326 F.3d at 1341 (citations omitted).  These factors are not "a definitive checklist or test," *Daubert*, 509 U.S. at 593, but are "applied in case-specific evidentiary circumstances," *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005).  While this inquiry is flexible, the Court must focus "solely on principles and methodology, not on conclusions that they generate." *Daubert*, 509 U.S. at 594-95.  It is also important to note that a "district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" *Quiet Tech*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)).  Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 597; *see also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) ("As gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology

properly can be applied to the facts in issue.'") (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)).

"[T]he objective of [the gatekeeping role] is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert,* 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)).

### IV.    ANALYSIS

Aersale has moved to strike expert testimony from both Mr. Ashworth and Mr. Blok. Each expert will be discussed in turn.

#### A.    *Bill Ashworth.*

Aersale argues that Mr. Ashworth's entire expert testimony should be excluded under *Daubert* and Rule 702. Aersale claims that Mr. Ashworth's testimony is unreliable and unhelpful because it contradicts the Court's construction of patent terms, the patents' definitions, its own accepted facts, and it fails to disclose a person of ordinary skill in the art. Aersale also moves to strike Mr. Ashworth's testimony because he is not sufficiently qualified. Alternatively, Aersale moves to strike portions of Mr. Ashworth's testimony that reach legal conclusions. For the reasons

Appx00021

below, the Court disagrees with Aersale's objections to Mr. Ashworth's entire expert testimony but agrees that limited portions of his opinions at trial should be stricken as improperly proffering a legal conclusion.

Aersale contends that Mr. Ashworth's report construes certain patent terms differently than the Court does. Specifically, the Court initially concluded that the term "FAA-certified fuel gauge calibrating procedures for the [subject] aircraft"[3] was indefinite, adopting the Special Master's conclusion. [D.E. 133 (R&R) at 114; D.E. 155 (adopting R&R)]. Mr. Ashworth advances his patent infringement opinion as if that term is not indefinite and that therefore, the '998 patent claims are valid. Normally, this disagreement would be grounds to strike the contradicting constructions of the expert report as irrelevant and unhelpful. *See Treehouse Avatar LLC v. Valve Corp.*, 54 F. 4th 709, 715 (Fed. Cir. 2022) (affirming the striking of expert testimony "based on a claim construction that is materially different from the construction adopted by the parties and the court").

But on September 14, the Court granted Jetaire's Motion for Reconsideration that objected to the Court's adoption of the Special Master's recommended conclusion that the term was indefinite. [D.E. 266]. The Court found the term "FAA-certified fuel gauge calibrating procedures for the [subject] aircraft" is *not* indefinite, contrary to the Special Master's Report and Recommendations. "[T]he Court finds that the FAA-Certified Limitations are not indefinite and accords them their plain and ordinary

---

[3] "FAA certified fuel gauge calibrating procedures for the [subject] aircraft" appears in claims 1–3 of the '998 patent.

meaning." [D.E. 266 at 5]. Therefore, Mr. Ashworth's expert report does not improperly rely on invalid patent claims in the '998 patent. Aersale's argument that Mr. Ashworth's reliance on the formerly rejected claim construction of "FAA-certified fuel gauge calibrating procedures" would be unhelpful under *Daubert* is largely moot.

Similarly, Aersale argues that Mr. Ashworth's proffered opinions on the meaning of the terms "channel void to reduce weight"[4] should be excluded as unreliable because the Special Master's report rejected the same supporting arguments when Jetaire made them in its claim construction brief. But Aersale cites no *Daubert*-based authority mandating exclusion of an expert opinion supported by analysis allegedly rejected by the Court at claim construction. Aersale's cited authority merely supports the general idea that the court at summary judgment or the fact finder at trial should "discount" or not give significant weight to extrinsic evidence such as expert testimony when it clearly contradicts the intrinsic written patent record. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005). But this says nothing about the admissibility of expert testimony under *Daubert* and Rule 702. In fact, *Phillips* acknowledged the "considerable task" of deciding between contradicting, yet admissible, expert testimony. "In the course of litigation, each party will naturally choose the pieces of extrinsic evidence most favorable to its cause, leaving the court with the considerable task of filtering the useful extrinsic evidence from the fluff." *Id.*

---

[4] "Channel void to reduce weight" appears in all claims of the '109 patent and claims 5 and 18 of the '541 patent.

A jury's assessment of an expert testimony's credibility and a court's assessment of an expert testimony's admissibility are separate inquiries. This Court will "be careful not to conflate questions of admissibility of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *Carideo v. Whet Travel Inc.*, No. 16-23658-CIV, 2018 U.S. Dist. LEXIS 43356, at *31 (S.D. Fla. Mar. 16, 2018). Here, although the Court adopted the Special Master's concerns with Jetaire's arguments for definiteness of the term "channel void to reduce weight," the Special Master, and thereby the Court, did not construe the term itself. The Court "defer[s] ruling on construction of ["channel void to reduce weight"] until a later point in the case, when more evidence may be available." [D.E. 133 (R&R), at 73-83; D.E. 155 (adopting R&R)]. The Court's lack of claim construction leaves Mr. Ashworth free to render an opinion as to the term's meaning to a person of ordinary skill in the art. Therefore, Mr. Ashworth's testimony relating to the term "channel void to reduce weight" does not per se contradict the Court's and should not be excluded under *Daubert*.

Aersale similarly argues that Mr. Ashworth's opinion relating to the term "fully packed system" is unreliable because his definition of the term is allegedly inconsistent with the definition in the patents. The patents define the term as follows: "A fully packed system is defined as one where all potential fuel tank ullage is filled with reticulated polyurethane foam with cutouts for components only." [D.E. No. 1-1 at 4:38-42]. Mr. Ashworth opines on the term "fully packed system" while rebutting

Aersale's expert's opinion that the prior art invalidates the Asserted Patents. Specifically, he states,

> In my opinion, Mr. Smith only points to evidence of foam usage in military aircraft in general and not the specific determination of dimensions required by the claim. In fact, the disclosures cited by Mr. Smith teach away from the requirements of element 1[a] because they refer to a "fully packed system" in which (as is often typical in military applications), foam can be effectively stuffed or forced into a fuel tank without attempting to determine precise sizing that would be necessary in a civilian context, like that governed by the FAA to which the asserted patents are directed.

[D.E. 197-18 ¶ 78] (citations omitted).

Mr. Ashworth here does not explicitly construe "fully packed system" and he seems to imply that the relevant meaning of "fully packed system" requires measuring space out of the foam to make way for the components. Nevertheless, there is nothing per se unreliable about this opinion because the Court has not construed "fully packed system," leaving the expert free to apply the term's plain and ordinary meaning from the perspective of a person of ordinary skill in the art. Mr. Ashworth's testimony relating to the term "fully packed system" should not be excluded.

Aersale further moves to exclude Mr. Ashworth's testimony because he allegedly does not define who qualifies as a person of ordinary skill in the art. Not so. Although Mr. Ashworth does not explicitly define the relevant "person of ordinary skill" in his main report, he does in his rebuttal report. Specifically, Mr. Ashworth adopts the opposing expert's definition and adds his own modification, disclosing his own definition of "person of ordinary skill":

> I have reviewed [opposing expert's] opinion that a person of ordinary skill in the art for purposes of the asserted patents "would have been a

11

person having at least a bachelor-level degree in Mechanical Engineering, Aerospace Engineering, Aviation Maintenance (or equivalent), and three years' experience in the field of aviation maintenance, or an FAA-licensed mechanic with five years' experience and two years direct experience with aircraft fuel systems." I generally agree with this assessment, though I would add that in my opinion the relevant level of skill in the art would also include concurrent industry experience with the FAA certification process for obtaining approval for related designs and associated manufacturing authorizations.

[D.E. 197-18 ¶ 64] (citations omitted). Nevertheless, Aersale does not cite any binding or persuasive authority to support the theory that a patent infringement expert must define with precision a person of ordinary skill in the art for the testimony to be reliable under *Daubert*. The Court will not exclude Mr. Ashworth's testimony on this basis.  Of course, the trier of fact will be instructed on the proper law to apply and how a determination of a person skilled in the art will have a bearing on the jury's finding of invalidity or obviousness.  *See, e.g., KSR Intern. Co. v. Teleflex, Inc.,* 550 U.S. 398, 421 (2007).

Aersale further argues that Mr. Ashworth's testimony regarding the absence of non-infringing alternatives to the foam-based ignition mitigation systems should be excluded because he allegedly contradicts himself. Mr. Ashworth states that there are no "competitive or comparable non-infringing alternatives to the patented inventions of Jetaire" while conceding that "nitrogen-inerting systems like those offered by Boeing and Airbus" are "available in the marketplace." [D.E. 222-1 ¶ 110]. Aersale's objection arises from a plainly factual dispute that does not implicate *Daubert*-based issues of unreliability or unhelpfulness. Any supposed contradiction can be cross-examined at trial. *See, e.g., Rutledge v. NCL (Bahamas), Ltd.,* 464 F.

12

Appx00026

App'x 825, 828 (11th Cir. 2012) (affirming denial of *Daubert* motion; "this creates a contradiction, which could certainly go to the weight accorded to the results by the jurors, but it does not destroy the reliability of the method itself, which was confirmed in laboratory testing. The purpose of *Daubert* is to determine whether a methodology 'is sufficiently reliable' to be presented to a jury.") (quoting *Hudgens v. Bell Helicopters/Textron,* 328 F.3d 1329, 1338 (11th Cir. 2003)); *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2022 WL 1262203, at \*5 (N.D. Fla. Apr. 28, 2022) (contradictions and inconsistencies in expert's reports/opinions "are more appropriately addressed through cross-examination and competing expert testimony."); *Exim Brickell LLC v. Bariven, S.A.*, No. 09-CV-20915, 2011 WL 13131317, at \*5 (S.D. Fla. Mar. 11, 2011) (denying *Daubert* motion premised on "witness contradicted [himself] or went back on certain assertions that he had previously made in his written reports," . . . "because such contradictions or concessions should go toward the weight of the evidence put forth by the expert, not toward its admissibility.").

Lastly, Aersale contends that this Court should exclude the entirety of Mr. Ashworth's expert testimony because he lacks basic qualifications. "To offer expert testimony from the perspective of a skilled artisan in a patent case—like for claim construction, validity, or infringement—a witness must at least have ordinary skill in the art." *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1376–77 (Fed. Cir. 2022). Although conceding that Mr. Ashworth "unquestionably has experience in the broad field of aviation, and in particular . . . FAA procedures,"

Appx00027

Aersale argues that Mr. Ashworth does not have direct experience with aircraft fuel systems or fuel tank ignition mitigation technology. [D.E. 199 at 20].

Yet it seems that Aersale is unduly attempting to narrow the scope of the relevant art to exclude Mr. Ashworth, who, with his extensive engineering, aviation industry, and FAA experience, is more than minimally qualified to give his opinion on aircraft patent infringement. The Court's "gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury" because "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech*, 326 F.3d at 1341. Ultimately, although Aersale naturally disagrees with Mr. Ashworth's substantive conclusions, Aersale does not advance any legitimate grounds to exclude the entirety of Mr. Ashworth's testimony under *Daubert* or Rule 702.

In the alternative, Aersale argues that this Court should exclude Mr. Ashworth's improperly reached legal conclusion that Jetaire's alleged offers for sale could not be invalidating offers for sale for purposes of the on-sale bar. Mr. Ashworth states that "the Alleged Invalidating Patent Sales could not be commercial offers for sale" and "the Alleged Invalidating '109 Patent Sales could not be commercial offers for sale." [D.E. 222-1 ¶¶ 1238, 1243]. If the claimed invention was the subject of a commercial offer for sale and was ready for patenting at some time before the critical date, the patent is invalidated. *The Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1371 (Fed. Cir. 2016) (en banc). Whether or not a product was on sale for purposes of

14

the on-sale bar is a question of law. *Sonoscan, Inc. v. Sonotek, Inc.*, 936 F.2d 1261, 1264 (Fed. Cir. 1991). The courts analyze this question under the law of contracts as generally understood. *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047 (Fed. Cir. 2001). Specifically, the Uniform Commercial Code defines "whether . . . a communication or series of communications rises to the level of a commercial offer for sale." *Id.* Mr. Ashworth's experience does not include UCC or other commercial law expertise. Therefore, for the on-sale bar issue, this Court doubts he would meet the *Daubert* qualification requirement. But even if he did, it is not clear from the record that his opinion is supported by a reliable application of the UCC. Embracing its gatekeeping role, the Court will strike that limited part of his testimony because Mr. Ashworth is unqualified and fails to reliably support his conclusion as required by law.

This Order striking this opinion does *not* foreclose Mr. Ashworth's engineering or industry-related expertise from being admitted if it relates to a purely factual point underlying the on sale bar analysis. For instance, an expert opinion may be offered to address whether a product's drawings or disclosures evidence readying for patenting, which is an essential element of an on sale bar invalidity defense. *See, e.g., Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1145 (Fed. Cir. 2004) (expert opinion as to nature of disclosure was relevant and substantial evidence supporting on sale bar analysis).

Here it is not clear that Mr. Ashworth is prepared to or disclosed for such an opinion and whether that is an issue here. Our review of the record only evidences a

15

broader legal conclusion that he is making without having any particular expertise on that broader legal issue. So to that extent the motion is Granted in part and he is stricken for that purpose, again without prejudice to any proffer at trial of a factual opinion that may go to the on sale bar issue.

### B.   *Justin Blok.*

The Patent Act provides that a patentee shall be awarded "damages adequate to compensate for infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C § 284. As Jetaire's damages expert, Mr. Blok opines on both the lost profits and reasonable royalty theories of damages. Aersale argues that Mr. Blok's entire expert damages testimony is "inherently unreliable" and unhelpful because it contradicts binding Federal Circuit law and it is unsupported by the record. [D.E. 200 at 4]. For the reasons below, the Court disagrees with Aersale's wholesale objections to Mr. Blok's expert testimony.

Aersale starts by objecting to Mr. Blok's lost profits theory because Mr. Blok treats Jetaire and Jetaire Flight Systems as the same entity for purposes of determining lost profits, contradicting Federal Circuit case law. Specifically, "the patentee needs to have been selling some item, the profits of which have been lost due to infringing sales," and "a patentee may not claim, as its own damages, the lost profits of a related company." *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004); *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1375 (Fed. Cir. 2015). Here, Jetaire is the patentee, but Jetaire Flight Systems sells the patented INVICTA brand products at issue in this case. Therefore, Aersale

Appx00030

argues, Jetaire cannot recover lost profits damages for the alleged infringement of Jetaire's patents.

But *Poly-America* also provides that "the recovery of lost profits by a patentee is not limited to the situation in which the patentee is selling the patented device." 383 F.3d at 1311. Jetaire relies on this and *Polaris Indus., Inc. v. Arctic Cat Inc.*, to argue that Jetaire and Jetaire Flight Systems share a bank account, a structural arrangement that allows Jetaire to retain control over the revenue earned by Jetaire Flight Systems such that any lost profits damages Jetaire Flight Systems incurs "inexorably flows" to Jetaire. *See* No. 15-4129, 2019 U.S. Dist. LEXIS 38530, at *20 (D. Minn. Mar. 11, 2019). Further, Jetaire contends that treating both companies as the same entity is proper because Jetaire, as the holder of the FAA required STC certifications, charges a licensing fee with every sale of an INVICTA product that ensures the customer's lawful use of the INVICTA product under Jetaire's STC. In other words, Jetaire Flight Systems cannot sell a single INVICTA product without Jetaire's STC license. Combining these facts, both product and licensing fee revenues flow into a shared bank account controlled by a single person—Michael Williams, the owner and operator of Jetaire and the inventor on the Asserted Patents.

Based on this record, a genuine dispute of material fact exists as to whether Jetaire's STC license satisfies the *Poly-America* requirement that the patentee must sell "some item" the profits of which are lost because of infringing sales. *Poly*-America, 383 F.3d at 1311. This issue—along with other relevant facts regarding Jetaire's business arrangement—persuades us to decline to strike Mr. Blok on the basis that

Appx00031

his lost profits theory opinion contradicts Federal Circuit law. The trial judge will instruct the jury on the rule of law to follow on this score and the jury will find if Jetaire may recover lost profits given this arrangement.

Aersale next argues that Mr. Blok's reasonable royalty opinion lacks an evidentiary basis in the record because Mr. Blok solely relies on the assumption that the entirety of Aersale's gross profits can be credited to the claimed invention of the Asserted Patents. Given this assumption, Mr. Blok then calculates Aersale's gross profit margin applying a 100.0% technical apportionment factor to arrive at a hypothetical royalty rate for each product. Mr. Blok multiplies the respective royalty rates by the number of infringing products to arrive at the final reasonable royalty amounts. Aersale contends that the 100.0% technical apportionment factor and the resulting final royalty amounts are baseless because Mr. Blok only superficially references an interview with Mr. Ashworth as support while the basis for the assumption does not appear in Mr. Ashworth's report. In response, Jetaire argues that any confusion could have been resolved if Aersale deposed Mr. Blok and, alternatively, that the substance of Mr. Ashworth's report clearly supports Mr. Blok's 100.0% technical apportionment factor.

The Court agrees with Jetaire.  The record here does not allow for us to strike his testimony under *Daubert*.  Mr. Ashworth explains in his report how, in his opinion, all the components of the Aersafe products are covered by the Asserted Patents from a technical standpoint. Mr. Blok then properly relies on this opinion and a clarifying interview with Mr. Ashworth to assume that 100.0% of Aersale's

18

Appx00032

allegedly infringing sales should be apportioned for a reasonable royalty damages calculation. Regardless, Aersale had an opportunity to depose Mr. Blok and declined to do so. Any gap in the record that goes to Mr. Blok's lack of proper methodology falls on Aersale.  For its part, Jetaire has satisfied its initial prima facie burden of showing that Mr. Blok is qualified to render this damages opinion and has a reliable basis in the record with which to do so.  Whether the trier of fact reaches a different conclusion after cross-examination and after hearing from Aersale's own expert is a matter that will be determined at trial.  A *Daubert* motion is not the appropriate vehicle to reach that conclusion.

### V.    *CONCLUSION*

For the foregoing reasons, it is hereby **ORDERED** that:

(1) Defendant Aersale, Inc.'s Motion to Exclude the Testimony of Bill Ashworth [D.E. 199] is **GRANTED IN LIMITED PART** and **DENIED IN PART**;

(2) Defendant Aersale's Motion to Exclude the Testimony of Justin R. Blok [D.E. 200] is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 8th day of January, 2024.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
Chief United States Magistrate Judge

Appx00033

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:20-cv-25144-DPG

JETAIRE AEROSPACE, LLC,

      Plaintiff,

v.

AERSALE INC.,

      Defendant/Counter-Plaintiff,

v.

JETAIRE AEROSPACE, LLC,
JETAIRE FLIGHT SYSTEMS, LLC,
and MICHAEL WILLIAMS,

      Counter-Defendants.

_____/

**ORDER**

**THIS CAUSE** comes before the Court upon Plaintiff/Counter-Defendants' Motion to Dismiss Defendant/Counter-Plaintiff's Third Amended Counterclaims (the "Motion"). [ECF No. 164]. The Court has reviewed the Third Amended Counterclaims, the Motion, and the record and is otherwise fully advised. For the reasons set forth below, the Motion is **GRANTED, in part, and DENIED, in part**.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

In this action, Plaintiff Jetaire Aerospace, LLC ("Jetaire") alleges Defendant AerSale Inc.

---

[1] The Court accepts Counter-Plaintiff's factual allegations set forth in their Third Amended Counterclaims, [ECF Nos. 159 and 161-1], as true for purposes of the motion to dismiss. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

("AerSale") directly and indirectly infringed on three of its patents for aircraft fuel tank ignition mitigation technology: U.S. Patent No. 9,849,998 (the "'998 Patent"), U.S. Patent No. 10,633,109 (the "'109 Patent"), and U.S. Patent No. 10,800,541 (the "'541 Patent"). [ECF No. 1]. Specifically, Jetaire alleges that the at-issue patents protect a unique concept that provides a method and system of accomplishing ignition mitigation using reticulated polyurethane safety foam in coordinated shapes to fill the fuel tanks in compliance with Federal Aviation Administration regulations. *Id.* ¶ 17. Jetaire entered into a confidential relationship with AerSale so that Jetaire could make use of AerSale's aircraft to test and develop the unique foam-based ignition mitigation system. *Id.* ¶ 20. After recognizing the benefits of this unique system, AerSale requested that Jetaire develop a system for AerSale, but Jetaire declined. *Id.* ¶ 22. Jetaire alleges that, thereafter, AerSale began developing a competing and almost identical foam-based ignition mitigation system to the one developed and patented by Jetaire. *Id.* ¶ 23.

Jetaire alleges three counts of patent infringement against AerSale. *Id.* ¶¶ 40−86. On March 2, 2021, AerSale filed its Answer with Affirmative Defenses and Counterclaims. [ECF No. 19]. On March 23, 2021, Jetaire moved to dismiss AerSale's counterclaims and to strike AerSale's affirmative defenses. [ECF No. 25]. Prior to a ruling on the Motion to Dismiss the Counterclaims, AerSale filed its Amended Counterclaims on April 13, 2021. [ECF No. 30]. Subsequently, on April 27, 2021, Plaintiff filed its Motion to Dismiss the Amended Counterclaims. [ECF No. 34]. On June 30, 2021, AerSale filed its Motion for Leave to File Second Amended Counterclaims and to Join Counterclaim Defendants, [ECF No. 43], which this Court granted on October 29, 2021, [ECF No. 83]. The Court then denied Jetaire's Motions to Dismiss, [ECF Nos. 25 and 34], in light of the Court's Order granting AerSale's request for leave to file its Second Amended Counterclaims. [ECF Nos. 84 and 85].

Appx00185

On November 2, 2021, AerSale separately filed its Second Amended Counterclaims against Jetaire, Jetaire Flight Systems, LLC, and Michael Williams (collectively "Counterclaim Defendants"). [ECF No. 90]. On November 16, 2021, Counterclaim Defendants moved to dismiss the Second Amended Counterclaims. [ECF No. 99]. On September 27, 2022, the Court granted that motion because the Second Amended Counterclaims was a shotgun pleading and permitted AerSale to file an amended counterclaim within twenty (20) days of the Order. [ECF No. 156].

On October 17, 2022, AerSale filed its Third Amended Counterclaims ("TAC") [2] asserting the following counterclaims against Counterclaim Defendants:

Count I: Declaratory Judgment of Non-Infringement of the '998 patent (against Jetaire);

Count II: Declaratory Judgment of Non-Infringement of the '109 patent (against Jetaire);

Count III: Declaratory Judgment of Non-Infringement of the '541 patent (against Jetaire);

Count IV: Declaratory Judgment of Invalidity of the '998 patent (against Jetaire);

Count V: Declaratory Judgment of Invalidity of the '109 patent (against Jetaire);

Count VI: Declaratory Judgment of Invalidity of the '541 patent (against Jetaire);

Count VII: Declaratory Judgment of Unenforceability of the '109 Patent Due to Inequitable Conduct (against Jetaire);

Count VIII: Declaratory Judgment of Unenforceability of the '541 Patent Due to Inequitable Conduct (against Jetaire);

Count IX: Exceptional Case (against Jetaire);

Count X: Defamation (against all Counterclaim Defendants);

Count XI: Tortious Interference with Business Relationships (against all Counterclaim Defendants); and

Count XII: False Patent Marking (against Jetaire).

---

[2] On October 17, 2022, AerSale filed a redacted version of its TAC. [ECF No. 159]. AerSale then filed the unredacted version upon leave of this Court on October 26, 2022. [ECF No. 161-1]. This Order will cite to the unredacted version of the TAC.

3

*See* [ECF No. 161-1 at 12−53].

On November 7, 2022, Counterclaim Defendants filed their Motion to Dismiss AerSale's TAC. [ECF No. 164]. Specifically, Counterclaim Defendants seek to dismiss only Counts VII, VIII, IX, X, XI, and XII. First, Counterclaim Defendants argue that AerSale's counterclaims for Inequitable Conduct (Counts VII and VIII) should be dismissed because "there can be no inequitable conduct where [a patent examiner] has all the necessary information to evaluate a claim." *Id.* at 6. Next, they argue that AerSale's counterclaim for Exceptional Case (Count IX) warrants dismissal because it is not a proper cause of action. *Id.* at 6−7. Regarding AerSale's Defamation and Tortious Interference counterclaims (Counts X and XI), Counterclaim Defendants argue that they should be dismissed under the *Noerr-Pennington* doctrine and the doctrines of *res judicata* and collateral estoppel. *Id.* at 6. Finally, Counterclaim Defendants argue that the False Patent Marketing (Count XII) and Patent Misuse[3] counterclaims should be dismissed as AerSale failed to obtain leave of Court.

### LEGAL STANDARD

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning that it must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While a court must accept well-pleaded factual allegations as true, "conclusory allegations . . . are not entitled to an assumption of truth—legal conclusions must be supported by factual allegations." *Randall v. Scott*, 610 F.3d 701, 709–10 (11th Cir. 2010). "[T]he pleadings are construed broadly,"

---

[3] Jetaire argues that AerSale's Patent Misuse counterclaim is covertly alleged within Count VI for Inequitable Conduct. [ECF No. 164 at 7].

4

*Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006), and the allegations in the complaint are viewed in the light most favorable to the plaintiff. *Bishop v. Ross Earle & Bonan, P.A.*, 817 F.3d 1268, 1270 (11th Cir. 2016). At bottom, the question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (internal quotation and citation omitted). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Therefore, a complaint that merely presents "labels and conclusions or a formulaic recitation of the elements of a cause of action" will not survive dismissal. *Id.* (internal quotation omitted). "This standard applies to Rule 12(b)(6) motions to dismiss counterclaims as well." *Sciaretta Lincoln Nat'l Life Ins. Co. v. Muchnick*, No. 9:11-CV-80427, 2011 WL 13116844, at *2 (S.D. Fla. Sept. 9, 2011).

### DICUSSION

The Court agrees with Counterclaim Defendants that Counts X, XI, and XII should be dismissed, but it does so for different reasons as to Counts X and XI as they are insufficiently pled. However, the Court finds that Counts VII, VIII, and IX are sufficiently pled.

I.   **Counts VII and VIII – Inequitable Conduct**

To state a claim for inequitable conduct, AerSale must allege that "(1) [Jetaire] made an affirmative misrepresentation of a material fact, failed to disclose material information, or submitted false material information; and (2) [Jetaire] did so with a specific intent to deceive the [United States Patent and Trademark Office] PTO." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327, n.3 (Fed. Cir. 2009). Because a claim for inequitable conduct is sounded in fraud, "the pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO. At the pleading stage, the proponent of

the inequitable conduct theory need only plead facts supporting a reasonable inference that a specific individual knew of the misrepresentation and had the specific intent to deceive the PTO. A reasonable inference is one that is plausible and that flows logically from the facts alleged." *Sanders v. The Mosaic Co.*, 418 F. App'x 914, 918 (Fed. Cir. 2011) (internal quotation and citation omitted).

In Count VII for inequitable conduct, AerSale asserts that Jetaire made a material misrepresentation to the PTO during the application process for the '109 Patent. [ECF No. 161-1 ¶¶ 200−229]. Specifically, AerSale alleges that on September 26, 2019, Jetaire falsely stated to the USPTO that "no new matter [was] added" to an amendment to one of the patent claims. *Id.* ¶¶ 212−13, 222. AerSale asserts that the amendment did in fact introduce new matter that was not supported by the specification submitted to the PTO. *Id.* ¶¶ 212, 217, 222. AerSale furthers that Jetaire intended for the PTO to rely on the false statement and knew or should have known that applicants for a patent are not allowed to introduce new matter when amending a claim. *Id.* ¶¶ 221, 223. AerSale alleges that the PTO relied on that specific false statement when approving the patent claim amendment and issuing the '109 Patent. *Id.* ¶¶ 223−24, 228. In the same count, AerSale then alleges that all the claims of the '109 Patent are method claims and Jetaire "has impermissibly attempted to broaden the scope" of the '109 Patent and that its misuse renders the '109 Patent unenforceable. *Id.* ¶¶ 230, 234−35.

Jetaire argues that its patent attorney's statement to the PTO regarding whether "no new matter [was] added" to the amended patent claim was clearly intended as attorney argument rather than a material representation, and therefore cannot serve as the basis for inequitable conduct. [ECF No. 164 at 13]. Conversely, AerSale argues that while attorney argument to the PTO is permissible, material misrepresentations, like the one alleged, are not. [ECF No. 15 at 14]. AerSale

6

furthers that Jetaire raises factual questions that are inappropriate at the pleading stage. *Id.* at 16. The Court agrees with AerSale. Jetaire asks the Court to interpret the alleged misrepresentation as a form of attorney argument. However, to do so would require factual findings regarding the patent attorney's intent in making the statement. *Taltech Ltd. v. Esquel Enterprises Ltd.,* 604 F.3d 1324, 1328 (Fed. Cir. 2010) (in the inequitable conduct context, "[m]ateriality and intent are questions of fact"). Such analysis is best left for summary judgment. AerSale's factual allegations, taken as true, are sufficient to state a claim for inequitable conduct.[4]

Finally, in Count VIII, AerSale brings another counterclaim for inequitable conduct of the '541 Patent, which is dependent upon the allegations in Count VII. Specifically, AerSale alleges that the "commission of inequitable conduct during the prosecution of the '109 Patent enabled issuance of the '541 Patent and infects the enforceability of the '541 patent". [ECF 161-1 ¶ 248]. Jetaire argues that Count VIII warrants dismissal for the same reason that Count VII warrants dismissal: the statement "no new matter [was] added" is attorney argument, not a material misrepresentation. [ECF No. 164 at 13]. As stated above, the Court rejects this argument at the motion to dismiss stage. Additionally, Jetaire argues that AerSale's argument that the inequitable conduct of one patent "infects" the other has been rejected by courts. *Id.* at 14. In opposition, AerSale argues that Jetaire misinterprets the case law, and that courts have in fact found that inequitable conduct occurring in a chain of patents may render a later patent unenforceable if the

---

[4] Though not explicitly alleged, the Court notes that AerSale all but asserts patent misuse within its counterclaim for inequitable conduct. *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868 (Fed. Cir. 1997) (finding that an assertion of patent misuse "requires that the alleged infringer show that the patentee has impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect"). AerSale fails to utilize the proper method for asserting patent misuse, which is to plead it as an affirmative defense. *Ameritox, Ltd. v. Aegis Services Corp.*, No. 07-80498-CIV, 2008 WL 2705435, at * 6 (S.D. Fla. 2008) ("[T]he proper mechanism to assert patent misuse is to plead it is an affirmative defense."); *see also Virginia Panel Corp.*, 133 F.3d at 868. As further explained below, AerSale failed to obtain leave to add new counterclaims and/or affirmative defenses. Thus, even if AerSale had properly pled its assertion of patent misuse as an affirmative defense, it is too late to do so now.

inequitable conduct is related to the claims of the later-issued patent. [ECF No. 165 at 17]. Once more, the Court agrees with AerSale.

Jetaire relies on *Global Tech LED, LLC v. HiLumz Int'l Corp.*, No. 2:15-cv-553-FtM-29CM, 2017 WL 588669, at *11 (M.D. Fla. Feb. 14, 2017) as support of its argument. In *Global Tech LED, LLC,* the court found that the defendants "improperly rest[ed] their theory of "infectious unenforceability" on nothing more than the parent-child relationship between the '304 Patent and the '424 Patent, [] have not pled facts from which the court may reasonably infer that non-disclosure of the prior art references was "but-for material" to the PTO, and [] failed to allege facts adequately supporting the scienter requirement." *Global Tech LED, LLC,* 2017 WL 588669, at *11. Accordingly, the court dismissed defendants' claim for inequitable conduct because of insufficient pleading. *Id.*

Here, however, AerSale pled sufficient factual allegations that the defendants in *Global Tech LED, LLC* did not. As described above, AerSale alleges the who, what, when, and where of the inequitable conduct that occurred during the application process for the '109 Patent. AerSale specifically alleges that the material misrepresentation made during the patent application process for the '109 Patent was the but-for cause of the PTO issuing the '109 Patent. [ECF No. 161-1 ¶ 228]. AerSale then furthers that the '541 Patent is a continuation of the '109 Patent and shares the same claims that were related to the material misrepresentation. [ECF No. 161-1 ¶¶ 244−255]. It is clear that AerSale is alleging that the '109 Patent and the '541 Patent are directly related and the misconduct during the application process of one patent affects the other. *Fox Indus., Inc. v. Structural Pres. Sys., Inc.,* 922 F.2d 801, 803–04 (Fed. Cir. 1990) ("Claims are not born, and do not live, in isolation. Each is related to other claims, to the specification and drawings ... [and] to earlier or later versions of itself in light of amendments made to it. Therefore, a breach of the duty

Appx00191

of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application.") (internal quotation and citation omitted). An inequitable conduct claim regarding one patent on the basis of inequitable conduct of another when both patents are related is viable. *eSpeed, Inc. v. Brokertec USA, L.L.C.,* 417 F. Supp. 2d 580, 595 (D. Del. 2006), *aff'd*, 480 F.3d 1129 (Fed. Cir. 2007).

Thus, the Motion is denied as to Counts VII and VIII.

## II.   Count IX – Exceptional Case

In Count IX of its TAC, AerSale asserts a cause of action for attorney's fees pursuant to 35 U.S.C. § 285. [ECF No. 161-1 ¶¶ 259−297]. Both Parties have acknowledged "that it is not improper to present an attorney's fees count in a separate counterclaim requesting relief under § 285." *Correct Craft IP Holdings, LLC v. Malibu Boats, LLC*, No. 6:09-cv-813-Orl-28KRS, 2010 WL 598693, at *8 (M.D. Fla. Feb. 17, 2010) (citing *H.R. Techs., Inc. v. Astenchnologies, Inc.*, 275 F.3d 1378, 1386 (Fed. Cir. 2002). However, Jetaire argues that AerSale's counterclaim for exceptional case is insufficiently pled because it is based solely on legal conclusions. [ECF No. 164 at 21]; [ECF No. 168 at 9−10].

"[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). When determining whether a case is "exceptional", "[t]here is no precise rule or formula for making these determinations." *Id.* (internal quotation and citation omitted). In reviewing AerSale's factual allegations, the Court finds that AerSale has sufficiently pled a counterclaim for an exceptional case. *Id.* ("District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion,

9

considering the totality of the circumstances."). Given the lack of a precise pleading standard and the fact-intensive inquiry required to determine whether a case is exceptional, resolution of this issue is better suited for the summary judgment phase. Thus, the Motion is denied as to Count IX.

### III.    Count X – Defamation[5]

Though Counterclaim Defendants seek dismissal of AerSale's defamation counterclaim on other grounds[6], the Court finds that the counterclaim fails to meet basic pleading requirements. To state a counterclaim for defamation, AerSale "must allege that (1) [Jetaire] published a false statement; (2) about [AerSale]; (3) to a third party; (4) proximately damaging [AerSale]." *SZS Sols., Inc. v. Brother Int'l Corp.*, No.17-CV-61942, 2018 WL 3126220, at *2 (S.D. Fla. June 26, 2018) (citing *Forston v. Colangelo*, 434 F. Supp. 2d 1369, 1378 (S.D. Fla. 2006)). Furthermore, while AerSale is permitted to allege facts upon information and belief, it "is still required to allege with particularity the factual basis upon which the information and belief was founded." *Five for Entm't S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1329 (S.D. Fla. 2012).

First, AerSale fails to identify the specific statements claimed to be defamatory. In a defamation case, "a plaintiff 'must allege certain facts such as the identity of the speaker, a description of the statement, and provide a time frame within which the publication occurred.'" *Id.* at 1328 (quoting *Morrison v. Morgan Stanley Props.*, No. 06-CV-80751, 2008 WL 1771871, at *10 (S.D. Fla. Apr. 15, 2008)). For the description of "oral statements, a plaintiff must 'set out the substance of the spoken words with sufficient particularity to enable [the] court to determine whether the publication was defamatory.'" *B & D Nutritional Ingredients, Inc. v. Unique Bio*

---

[5] The Court notes that AerSale fails to identify whether Florida or Georgia substantive law applies to its state law counterclaims. For the purposes of this Order, Florida law will apply.

[6] Jetaire argues that AerSale's defamation and tortious interference with business relationships counterclaims warrant dismissal under the *Noerr-Pennington* doctrine and the doctrines of *res judicata* and collateral estoppel. [ECF No. 164 at 6]. Because AerSale's state law counterclaims fail to meet the requisite pleading standard, the Court need not address Jetaire's grounds for dismissal.

*Ingredients, LLC,* No. 16-CV-62364, 2017 WL 8751751, at *4 (S.D. Fla. Jan. 25, 2017) (quoting

*Spitalny v. Insurers Unlimited, Inc.*, No. 2:05-CV-12FTM-29SPC, 2005 WL 1528629, at *3 (M.D.

Fla. June 24, 2005)).

The defamation counterclaim alleges Michael D. Williams, on behalf of Counterclaim

Defendants, made the following five defamatory statements:

1) On information and belief, Mr. Williams made statements to [a representative of Eastern Airlines, LLC], a US-based customer about the customer's alleged liability under the patent laws, about AerSale's alleged liability under the patent laws, and/or about AerSale's alleged misappropriation of Jetaire's proprietary information.

[ECF No. 161-1 ¶ 303];

2) Mr. Williams also made statements to this US-based customer to the effect that AerSale's AerSafe product for Boeing 777-series aircraft would infringe patents belonging to a Jetaire entity and/or the "Jetaire Group," even though, at the time Mr. Williams made those statements, the AerSafe product for 777-series aircraft was still under development.

*Id.* ¶ 304;

3) In or around April 2021, Mr. Williams told a representative of Azur Air, a Russia-based airline with which AerSale was negotiating a sale of AerSafe products, that AerSale had, in the customer's words, a 'patent problem.' On information and belief, Mr. Williams told this customer that it should not purchase the AerSafe product because the alleged 'patent problem' might require a costly process to uninstall the AerSafe product after it had been purchased and installed.

*Id.* ¶ 307;

4) In or around April 2022, Mr. Williams discussed the litigation between Jetaire and AerSale with a representative of BOC Aviation, a Singapore-based aircraft leasing company that had been in negotiations with AerSale for the purchase of the AerSafe product. On information and belief, Mr. Williams told this customer that it should not purchase the AerSafe product because the alleged infringement of Jetaire's patent might require a costly process to uninstall the AerSafe product after it had been purchased and installed.

*Id.* ¶ 311; and

11

Appx00194

5) On information and belief, Mr. Williams and potentially other employees or representatives of one or both Jetaire entities have told prospective customers, perhaps among others, that AerSale has misappropriated Jetaire's confidential and/or proprietary information, and/or copied the INVICTA design.

*Id.* ¶ 314.

The closest AerSale comes to identifying a specific statement is when it alleges that Williams stated that AerSale's product had a "patent problem." However, this falls short of the particularity requirements of a defamation claim. There are no further allegations about the context in which Williams allegedly stated this or any further explanation as to what the "problem" with the patent was. None of AerSale's other allegations identify specific statements but rather the "gist" of Williams' statements. Such conclusory allegations are insufficient to state a claim for relief. *See Five for Entm't S.A.*, 877 F. Supp. 2d at 1328 (dismissing defamation claim as it related to statements because the plaintiffs failed to include a sufficient description of the statements).

Second, "under Florida law, a defamation plaintiff must plead the 'identity of the particular person to whom the remarks were made with a reasonable degree of certainty' to afford the defendant 'enough information to determine affirmative defenses.'" *Ward v. Triple Canopy, Inc.*, 8:17-CV-802-T-24 MAP, 2017 WL 3149431, at *3 (M.D. Fla. July 25, 2017) (quoting *Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So. 2d 1025, 1027 (Fla. 3d DCA 1981)). Here, AerSale fails to identify with a reasonable degree of certainty the people to whom the remarks were made. Each allegation states that the purported defamatory statements were made to a "representative" of a business entity. In the absence of the necessary facts—an adequate description of the statements, when they were made, and to whom—AerSale fails to state a counterclaim for defamation. Thus, Count X shall be dismissed.

## IV.   Count XI – Tortious Interference with Business Relationships

To state a counterclaim for tortious interference with a business relationship, AerSale must

allege "(1) the existence of a business relationship under which [AerSale] has legal rights; (2) an intentional and unjustified interference with the relationship; and (3) damage to [AerSale] as a result of the tortious interference with that relationship." *Ad–Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp.*, 849 F.2d 1336, 1348–49 (11th Cir.1987) (citations omitted); *see also Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla.1994).

In order to satisfy the first prong, AerSale must prove a business relationship with identifiable customers. *Coach Services, Inc. v. 777 Lucky Accessories, Inc.*, 752 F. Supp. 2d 1271, 1273 (S.D. Fla. 2010) (dismissing plaintiff's claim for tortious interference with business relationships because it alleges a business relationship with the community at large). AerSale fails to do so here. AerSale alleges that it has business relationships with its "existing and prospective customers" and that Jetaire "interfered with AerSale's relationships with the entities mentioned in paragraphs 302, 307, and 311, above, and, on information and belief, with other existing and prospective customers." [ECF No. 161-1 ¶¶ 324, 327]. But this is not enough. AerSale fails to identify the other parties or the nature of their business relationships. *Coach Services, Inc.*, 752 F. Supp. 2d at 1273 ("As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered."). Without that information, the Court cannot determine whether the Counterclaim Defendants interfered with actual and identifiable business relationships. Thus, the Motion is granted as to Count XI.

## V.    Count XII – False Patent Marketing

AerSale now alleges a new counterclaim for false patent marketing in its TAC. [ECF No. 161-1 ¶¶ 338−362]. As Jetaire correctly notes, AerSale failed to obtain leave from the Court to do

so. In its Order, this Court granted AerSale leave to amend its Second Amended Counterclaims because it was a shotgun pleading. [ECF No. 156]. The Order did not, however, expressly grant leave for AerSale to add new counterclaims. *Id.* If AerSale so desired, it should have sought leave from the Court to do so. Fed. R. Civ. P. 15(a)(2) ("[A] party may amend its pleading only with the opposing party's written consent or the court's leave"); *see also Fly Low, Inc. v. Moore,* No. 14-22666-Civ, 2015 WL 6105894 (S.D. Fla. Oct. 16, 2015*).*

Furthermore, AerSale fails to show good cause to permit the addition of new counterclaims this late into the litigation. Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). AerSale argues that it only recently confirmed that Jetaire has been marking its product packaging with its method patent number. [ECF No. 165 at 27]. However, AerSale had an ample opportunity to confirm this through diligent discovery. Notably, it has been nearly three years since the start of litigation and two years since AerSale first filed its Counterclaims, and fact discovery was nearing its completion at the time the TAC was filed. [ECF No. 1] (filing of Jetaire's Complaint on December 17, 2020; [ECF No. 19] (filing of AerSale's Answer, Affirmative Defenses, and Counterclaims on March 2, 2021); [ECF No. 187] (entry of Eighth Amended Scheduling Order setting the deadline to complete fact discovery on February 10, 2023).

As AerSale has failed to obtain leave of this Court to add new counterclaims, Count XII shall be dismissed.

## CONCLUSION

Based on the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1.  Plaintiff/Counter-Defendants' Motion to Dismiss Defendant/Counter-Plaintiff's Third Amended Counterclaims, [ECF No. 164], is **GRANTED, in part, and DENIED, in part** as follows:

14

Appx00197

   a.  GRANTED as to Counts X, XI, and XII, and

   b.  DENIED as to Counts VII, VIII, and IX;

2.  Counts X and XI of Defendant/Counter-Plaintiff AerSale, Inc.'s Third Amended Counterclaims, [ECF Nos. 159 and 161-1], are **DISMISSED without prejudice**;[7]

3.  Count XII of Defendant/Counter-Plaintiff AerSale, Inc.'s Third Amended Counterclaims, [ECF Nos. 159 and 161-1], is **DISMISSED WITH PREJUDICE.**

**DONE AND ORDERED** in Chambers at Miami, Florida, this 28thday of November 2023.

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

cc:   All Counsel of Record

---

[7] To be clear, AerSale may seek leave to amend the counterclaims originally asserted in its Second Amended Counterclaim. AerSale may not add any new counterclaims or affirmative defenses, including patent misuse and/or false patent marketing.

15

Appx00198

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 20-CV-25144-GAYLES/TORRES

JETAIRE AEROSPACE, LLC,

     *Plaintiff*,

v.

AERSALE, INC.,

     *Defendant*.

_____

AERSALE, INC.,

     *Plaintiff*,

v.

JETAIRE AEROSPACE, LLC,
JETAIRE FLIGHT SYSTEMS, LLC, and
MICHAEL WILLIAMS,

     *Defendants*.
_____/

**ORDER ON MOTIONS TO STRIKE EXPERTS**

This matter is before the Court on Aersale's Motions to strike expert testimony [D.E. 199; D.E. 200]. The motions are fully briefed and ripe for disposition. Having reviewed the briefing, the record, the relevant authorities, and for the reasons discussed below, Aersale's motion to strike Bill Ashworth's expert testimony [D.E. 199] is **GRANTED IN LIMITED PART** and otherwise **DENIED**. Aersale's motion to strike Justin Blok's expert testimony [D.E. 200] is **DENIED**.

1

## I.    INTRODUCTION

This is a patent infringement case arising from the aviation industry. The Federal Aviation Administration ("FAA") requires passenger and cargo aircraft to be fitted with fuel tank ignition mitigation solutions to minimize the risk of an explosion. For a system to meet these Fuel Tank Flammability Reduction ("FTFR") requirements, the FAA must issue a Supplemental Type Certificate ("STC"), permitting the system to be used in aircraft. To acquire an STC, the applicant must show that the FTFR system can be effectively and safely used on an actual aircraft. Michael Williams, principal of Jetaire Aerospace, LLC ("Jetaire"), developed and patented[1] his INVICTA products, which are FTFR-compliant foam-based ignition mitigation kits. Basically, filling an aircraft fuel tank with specialized foam helps prevent a spark causing an explosion. While seeking the STC for its Boeing 737 FTFR system, Jetaire entered into a relationship with Aersale, Inc. ("Aersale") who provided Jetaire with private access to one of Aersale's Boeing 737s for development and testing purposes. After Jetaire declined a request from Aersale to develop a FTFR system for its own use, Aersale developed and marketed its Aersafe™ products, directly competing with Jetaire. This patent infringement litigation ensued. After extensive discovery and motion practice, the case is now set for trial in February 2024.

---

[1] The three patents at issue, which share a common specification, are U.S. Patent Nos. 9,849,998 (the '998 patent),10,633,109 (the '109 patent), and the 10,800,541 (the '541 patent). Collectively, these are the "Asserted Patents."

## II.    BACKGROUND

### A.    *The remaining claims and counterclaims.*

Jetaire is suing Aersale for infringing the '998, '109, and '541 patents. Aersale is seeking declaratory judgments that Jetaire's Asserted Patents are invalid, unenforceable, and not infringed. Aersale also contends that Jetaire, Jetaire Flight Systems, and Michael Williams defamed and disparaged Aersale to customers for whose business the parties are in direct competition, causing a tortious interference with Aersale's business relationships. Aersale is also pursuing a false patent marking claim against Jetaire.

### B.    *The proffered experts.*

*William Ashworth* is Jetaire's proffered expert on patent infringement and the practices of the Federal Aviation Administration ("FAA"). He holds an undergraduate degree in Aeronautical Engineering from St. Louis University and a master's degree in Technical Management from University of Washington. He has extensive experience designing, managing, and certifying FAA compliant aircraft systems. Mr. Ashworth also has a 15-year employment record with the FAA, beginning as a project engineer and concluding as a senior manager of the Seattle Certification Office, where he oversaw the application of safety and airworthiness regulations for transport airplanes. He also issued Type and Production Certificates for Boeing and Airbus airplanes as a senior manager.

*Justin Blok* is Jetaire's proffered damages expert. He is a certified fraud examiner who holds an undergraduate degree in Business Administration from

Baylor University, an M.B.A. with a concentration in Finance from University of Houston-Clear Lake, and a master's degree in Accounting from University of North Carolina at Chapel Hill. Out of over 20 years of accounting experience, Mr. Blok has 14 years of litigation consulting experience, part of which included the valuation of economic damages in a variety of commercial disputes.

### III.   GOVERNING PRINCIPLES

The decision to admit or exclude expert testimony is within the trial court's discretion and the court enjoys "considerable leeway" when determining the admissibility of this testimony.  *See Cook v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1103 (11th Cir. 2005).  As explained in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the admissibility of expert testimony is governed by Fed. R. Evid. 702.  The party offering the expert testimony carries the burden of laying the proper foundation for its admission, and admissibility must be shown by a preponderance of the evidence.[2]  *See Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The

---

[2]    Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case.").

"Under Rule 702 and *Daubert*, district courts must act as 'gate keepers' which admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589). The purpose of this role is "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Also, in its role as gatekeeper, a court's duty is not to make ultimate conclusions as to the persuasiveness of the proffered evidence. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

To facilitate this process, district courts engage in a three-part inquiry to determine the admissibility of expert testimony:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.,* 609 F.3d 1183, 1194 (11th Cir. 2010); *City of Tuscaloosa v. Harcros Chemicals,* 158 F.3d 548, 562 (11th Cir. 1998). The Eleventh Circuit refers to these requirements as the "qualification," "reliability," and "helpfulness" prongs and, while they remain distinct concepts, courts must take care not to conflate them. *Frazier*, 387 F.3d at 1260 (citing *Quiet Tech*, 326 F.3d at 1341).

5

In determining the reliability of a scientific expert opinion, the Eleventh Circuit also considers the following factors to the extent possible:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community. Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis.

*Quiet Tech*, 326 F.3d at 1341 (citations omitted). These factors are not "a definitive checklist or test," *Daubert*, 509 U.S. at 593, but are "applied in case-specific evidentiary circumstances," *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). While this inquiry is flexible, the Court must focus "solely on principles and methodology, not on conclusions that they generate." *Daubert*, 509 U.S. at 594-95. It is also important to note that a "district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" *Quiet Tech*, 326 F.3d at 1341 (quoting *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 597; *see also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) ("As gatekeeper for the expert evidence presented to the jury, the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology

6

properly can be applied to the facts in issue.'") (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)).

"[T]he objective of [the gatekeeping role] is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert,* 509 U.S. at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991)).

## IV.   ANALYSIS

Aersale has moved to strike expert testimony from both Mr. Ashworth and Mr. Blok. Each expert will be discussed in turn.

### A.   *Bill Ashworth.*

Aersale argues that Mr. Ashworth's entire expert testimony should be excluded under *Daubert* and Rule 702. Aersale claims that Mr. Ashworth's testimony is unreliable and unhelpful because it contradicts the Court's construction of patent terms, the patents' definitions, its own accepted facts, and it fails to disclose a person of ordinary skill in the art. Aersale also moves to strike Mr. Ashworth's testimony because he is not sufficiently qualified. Alternatively, Aersale moves to strike portions of Mr. Ashworth's testimony that reach legal conclusions. For the reasons

below, the Court disagrees with Aersale's objections to Mr. Ashworth's entire expert testimony but agrees that limited portions of his opinions at trial should be stricken as improperly proffering a legal conclusion.

Aersale contends that Mr. Ashworth's report construes certain patent terms differently than the Court does. Specifically, the Court initially concluded that the term "FAA-certified fuel gauge calibrating procedures for the [subject] aircraft"[3] was indefinite, adopting the Special Master's conclusion. [D.E. 133 (R&R) at 114; D.E. 155 (adopting R&R)]. Mr. Ashworth advances his patent infringement opinion as if that term is not indefinite and that therefore, the '998 patent claims are valid. Normally, this disagreement would be grounds to strike the contradicting constructions of the expert report as irrelevant and unhelpful. *See Treehouse Avatar LLC v. Valve Corp.*, 54 F. 4th 709, 715 (Fed. Cir. 2022) (affirming the striking of expert testimony "based on a claim construction that is materially different from the construction adopted by the parties and the court").

But on September 14, the Court granted Jetaire's Motion for Reconsideration that objected to the Court's adoption of the Special Master's recommended conclusion that the term was indefinite. [D.E. 266]. The Court found the term "FAA-certified fuel gauge calibrating procedures for the [subject] aircraft" is *not* indefinite, contrary to the Special Master's Report and Recommendations. "[T]he Court finds that the FAA-Certified Limitations are not indefinite and accords them their plain and ordinary

---

[3] "FAA certified fuel gauge calibrating procedures for the [subject] aircraft" appears in claims 1–3 of the '998 patent.

meaning." [D.E. 266 at 5]. Therefore, Mr. Ashworth's expert report does not improperly rely on invalid patent claims in the '998 patent. Aersale's argument that Mr. Ashworth's reliance on the formerly rejected claim construction of "FAA-certified fuel gauge calibrating procedures" would be unhelpful under *Daubert* is largely moot.

Similarly, Aersale argues that Mr. Ashworth's proffered opinions on the meaning of the terms "channel void to reduce weight"[4] should be excluded as unreliable because the Special Master's report rejected the same supporting arguments when Jetaire made them in its claim construction brief. But Aersale cites no *Daubert*-based authority mandating exclusion of an expert opinion supported by analysis allegedly rejected by the Court at claim construction. Aersale's cited authority merely supports the general idea that the court at summary judgment or the fact finder at trial should "discount" or not give significant weight to extrinsic evidence such as expert testimony when it clearly contradicts the intrinsic written patent record. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005). But this says nothing about the admissibility of expert testimony under *Daubert* and Rule 702. In fact, *Phillips* acknowledged the "considerable task" of deciding between contradicting, yet admissible, expert testimony. "In the course of litigation, each party will naturally choose the pieces of extrinsic evidence most favorable to its cause, leaving the court with the considerable task of filtering the useful extrinsic evidence from the fluff." *Id.*

---

[4] "Channel void to reduce weight" appears in all claims of the '109 patent and claims 5 and 18 of the '541 patent.

9

A jury's assessment of an expert testimony's credibility and a court's assessment of an expert testimony's admissibility are separate inquiries. This Court will "be careful not to conflate questions of admissibility of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *Carideo v. Whet Travel Inc.*, No. 16-23658-CIV, 2018 U.S. Dist. LEXIS 43356, at *31 (S.D. Fla. Mar. 16, 2018). Here, although the Court adopted the Special Master's concerns with Jetaire's arguments for definiteness of the term "channel void to reduce weight," the Special Master, and thereby the Court, did not construe the term itself. The Court "defer[s] ruling on construction of ["channel void to reduce weight"] until a later point in the case, when more evidence may be available." [D.E. 133 (R&R), at 73-83; D.E. 155 (adopting R&R)]. The Court's lack of claim construction leaves Mr. Ashworth free to render an opinion as to the term's meaning to a person of ordinary skill in the art. Therefore, Mr. Ashworth's testimony relating to the term "channel void to reduce weight" does not per se contradict the Court's and should not be excluded under *Daubert*.

Aersale similarly argues that Mr. Ashworth's opinion relating to the term "fully packed system" is unreliable because his definition of the term is allegedly inconsistent with the definition in the patents. The patents define the term as follows: "A fully packed system is defined as one where all potential fuel tank ullage is filled with reticulated polyurethane foam with cutouts for components only." [D.E. No. 1-1 at 4:38-42]. Mr. Ashworth opines on the term "fully packed system" while rebutting

Aersale's expert's opinion that the prior art invalidates the Asserted Patents. Specifically, he states,

> In my opinion, Mr. Smith only points to evidence of foam usage in military aircraft in general and not the specific determination of dimensions required by the claim. In fact, the disclosures cited by Mr. Smith teach away from the requirements of element 1[a] because they refer to a "fully packed system" in which (as is often typical in military applications), foam can be effectively stuffed or forced into a fuel tank without attempting to determine precise sizing that would be necessary in a civilian context, like that governed by the FAA to which the asserted patents are directed.

[D.E. 197-18 ¶ 78] (citations omitted).

Mr. Ashworth here does not explicitly construe "fully packed system" and he seems to imply that the relevant meaning of "fully packed system" requires measuring space out of the foam to make way for the components. Nevertheless, there is nothing per se unreliable about this opinion because the Court has not construed "fully packed system," leaving the expert free to apply the term's plain and ordinary meaning from the perspective of a person of ordinary skill in the art. Mr. Ashworth's testimony relating to the term "fully packed system" should not be excluded.

Aersale further moves to exclude Mr. Ashworth's testimony because he allegedly does not define who qualifies as a person of ordinary skill in the art. Not so. Although Mr. Ashworth does not explicitly define the relevant "person of ordinary skill" in his main report, he does in his rebuttal report. Specifically, Mr. Ashworth adopts the opposing expert's definition and adds his own modification, disclosing his own definition of "person of ordinary skill":

> I have reviewed [opposing expert's] opinion that a person of ordinary skill in the art for purposes of the asserted patents "would have been a

11

person having at least a bachelor-level degree in Mechanical Engineering, Aerospace Engineering, Aviation Maintenance (or equivalent), and three years' experience in the field of aviation maintenance, or an FAA-licensed mechanic with five years' experience and two years direct experience with aircraft fuel systems." I generally agree with this assessment, though I would add that in my opinion the relevant level of skill in the art would also include concurrent industry experience with the FAA certification process for obtaining approval for related designs and associated manufacturing authorizations.

[D.E. 197-18 ¶ 64] (citations omitted). Nevertheless, Aersale does not cite any binding or persuasive authority to support the theory that a patent infringement expert must define with precision a person of ordinary skill in the art for the testimony to be reliable under *Daubert*. The Court will not exclude Mr. Ashworth's testimony on this basis.  Of course, the trier of fact will be instructed on the proper law to apply and how a determination of a person skilled in the art will have a bearing on the jury's finding of invalidity or obviousness.  *See, e.g., KSR Intern. Co. v. Teleflex, Inc.,* 550 U.S. 398, 421 (2007).

Aersale further argues that Mr. Ashworth's testimony regarding the absence of non-infringing alternatives to the foam-based ignition mitigation systems should be excluded because he allegedly contradicts himself. Mr. Ashworth states that there are no "competitive or comparable non-infringing alternatives to the patented inventions of Jetaire" while conceding that "nitrogen-inerting systems like those offered by Boeing and Airbus" are "available in the marketplace." [D.E. 222-1 ¶ 110]. Aersale's objection arises from a plainly factual dispute that does not implicate *Daubert*-based issues of unreliability or unhelpfulness. Any supposed contradiction can be cross-examined at trial. *See, e.g., Rutledge v. NCL (Bahamas), Ltd.,* 464 F.

12

App'x 825, 828 (11th Cir. 2012) (affirming denial of *Daubert* motion; "this creates a contradiction, which could certainly go to the weight accorded to the results by the jurors, but it does not destroy the reliability of the method itself, which was confirmed in laboratory testing. The purpose of *Daubert* is to determine whether a methodology 'is sufficiently reliable' to be presented to a jury.") (quoting *Hudgens v. Bell Helicopters/Textron,* 328 F.3d 1329, 1338 (11th Cir. 2003)); *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2022 WL 1262203, at *5 (N.D. Fla. Apr. 28, 2022) (contradictions and inconsistencies in expert's reports/opinions "are more appropriately addressed through cross-examination and competing expert testimony."); *Exim Brickell LLC v. Bariven, S.A.*, No. 09-CV-20915, 2011 WL 13131317, at *5 (S.D. Fla. Mar. 11, 2011) (denying *Daubert* motion premised on "witness contradicted [himself] or went back on certain assertions that he had previously made in his written reports," . . . "because such contradictions or concessions should go toward the weight of the evidence put forth by the expert, not toward its admissibility.").

Lastly, Aersale contends that this Court should exclude the entirety of Mr. Ashworth's expert testimony because he lacks basic qualifications. "To offer expert testimony from the perspective of a skilled artisan in a patent case—like for claim construction, validity, or infringement—a witness must at least have ordinary skill in the art." *Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n*, 22 F.4th 1369, 1376–77 (Fed. Cir. 2022). Although conceding that Mr. Ashworth "unquestionably has experience in the broad field of aviation, and in particular . . . FAA procedures,"

13

Aersale argues that Mr. Ashworth does not have direct experience with aircraft fuel systems or fuel tank ignition mitigation technology. [D.E. 199 at 20].

Yet it seems that Aersale is unduly attempting to narrow the scope of the relevant art to exclude Mr. Ashworth, who, with his extensive engineering, aviation industry, and FAA experience, is more than minimally qualified to give his opinion on aircraft patent infringement. The Court's "gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury" because "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech*, 326 F.3d at 1341. Ultimately, although Aersale naturally disagrees with Mr. Ashworth's substantive conclusions, Aersale does not advance any legitimate grounds to exclude the entirety of Mr. Ashworth's testimony under *Daubert* or Rule 702.

In the alternative, Aersale argues that this Court should exclude Mr. Ashworth's improperly reached legal conclusion that Jetaire's alleged offers for sale could not be invalidating offers for sale for purposes of the on-sale bar. Mr. Ashworth states that "the Alleged Invalidating Patent Sales could not be commercial offers for sale" and "the Alleged Invalidating '109 Patent Sales could not be commercial offers for sale." [D.E. 222-1 ¶¶ 1238, 1243]. If the claimed invention was the subject of a commercial offer for sale and was ready for patenting at some time before the critical date, the patent is invalidated. *The Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1371 (Fed. Cir. 2016) (en banc). Whether or not a product was on sale for purposes of

the on-sale bar is a question of law. *Sonoscan, Inc. v. Sonotek, Inc.*, 936 F.2d 1261, 1264 (Fed. Cir. 1991). The courts analyze this question under the law of contracts as generally understood. *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047 (Fed. Cir. 2001). Specifically, the Uniform Commercial Code defines "whether . . . a communication or series of communications rises to the level of a commercial offer for sale." *Id.* Mr. Ashworth's experience does not include UCC or other commercial law expertise. Therefore, for the on-sale bar issue, this Court doubts he would meet the *Daubert* qualification requirement. But even if he did, it is not clear from the record that his opinion is supported by a reliable application of the UCC. Embracing its gatekeeping role, the Court will strike that limited part of his testimony because Mr. Ashworth is unqualified and fails to reliably support his conclusion as required by law.

This Order striking this opinion does *not* foreclose Mr. Ashworth's engineering or industry-related expertise from being admitted if it relates to a purely factual point underlying the on sale bar analysis.  For instance, an expert opinion may be offered to address whether a product's drawings or disclosures evidence readying for patenting, which is an essential element of an on sale bar invalidity defense.  *See, e.g., Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1145 (Fed. Cir. 2004) (expert opinion as to nature of disclosure was relevant and substantial evidence supporting on sale bar analysis).

Here it is not clear that Mr. Ashworth is prepared to or disclosed for such an opinion and whether that is an issue here.  Our review of the record only evidences a

broader legal conclusion that he is making without having any particular expertise on that broader legal issue.  So to that extent the motion is Granted in part and he is stricken for that purpose, again without prejudice to any proffer at trial of a factual opinion that may go to the on sale bar issue.

### B.    *Justin Blok.*

The Patent Act provides that a patentee shall be awarded "damages adequate to compensate for infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C § 284. As Jetaire's damages expert, Mr. Blok opines on both the lost profits and reasonable royalty theories of damages. Aersale argues that Mr. Blok's entire expert damages testimony is "inherently unreliable" and unhelpful because it contradicts binding Federal Circuit law and it is unsupported by the record. [D.E. 200 at 4]. For the reasons below, the Court disagrees with Aersale's wholesale objections to Mr. Blok's expert testimony.

Aersale starts by objecting to Mr. Blok's lost profits theory because Mr. Blok treats Jetaire and Jetaire Flight Systems as the same entity for purposes of determining lost profits, contradicting Federal Circuit case law. Specifically, "the patentee needs to have been selling some item, the profits of which have been lost due to infringing sales," and "a patentee may not claim, as its own damages, the lost profits of a related company." *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004); *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1375 (Fed. Cir. 2015). Here, Jetaire is the patentee, but Jetaire Flight Systems sells the patented INVICTA brand products at issue in this case. Therefore, Aersale

argues, Jetaire cannot recover lost profits damages for the alleged infringement of Jetaire's patents.

But *Poly-America* also provides that "the recovery of lost profits by a patentee is not limited to the situation in which the patentee is selling the patented device." 383 F.3d at 1311. Jetaire relies on this and *Polaris Indus., Inc. v. Arctic Cat Inc.*, to argue that Jetaire and Jetaire Flight Systems share a bank account, a structural arrangement that allows Jetaire to retain control over the revenue earned by Jetaire Flight Systems such that any lost profits damages Jetaire Flight Systems incurs "inexorably flows" to Jetaire. *See* No. 15-4129, 2019 U.S. Dist. LEXIS 38530, at *20 (D. Minn. Mar. 11, 2019). Further, Jetaire contends that treating both companies as the same entity is proper because Jetaire, as the holder of the FAA required STC certifications, charges a licensing fee with every sale of an INVICTA product that ensures the customer's lawful use of the INVICTA product under Jetaire's STC. In other words, Jetaire Flight Systems cannot sell a single INVICTA product without Jetaire's STC license. Combining these facts, both product and licensing fee revenues flow into a shared bank account controlled by a single person—Michael Williams, the owner and operator of Jetaire and the inventor on the Asserted Patents.

Based on this record, a genuine dispute of material fact exists as to whether Jetaire's STC license satisfies the *Poly-America* requirement that the patentee must sell "some item" the profits of which are lost because of infringing sales. *Poly*-America, 383 F.3d at 1311. This issue—along with other relevant facts regarding Jetaire's business arrangement—persuades us to decline to strike Mr. Blok on the basis that

his lost profits theory opinion contradicts Federal Circuit law. The trial judge will instruct the jury on the rule of law to follow on this score and the jury will find if Jetaire may recover lost profits given this arrangement.

Aersale next argues that Mr. Blok's reasonable royalty opinion lacks an evidentiary basis in the record because Mr. Blok solely relies on the assumption that the entirety of Aersale's gross profits can be credited to the claimed invention of the Asserted Patents. Given this assumption, Mr. Blok then calculates Aersale's gross profit margin applying a 100.0% technical apportionment factor to arrive at a hypothetical royalty rate for each product. Mr. Blok multiplies the respective royalty rates by the number of infringing products to arrive at the final reasonable royalty amounts. Aersale contends that the 100.0% technical apportionment factor and the resulting final royalty amounts are baseless because Mr. Blok only superficially references an interview with Mr. Ashworth as support while the basis for the assumption does not appear in Mr. Ashworth's report. In response, Jetaire argues that any confusion could have been resolved if Aersale deposed Mr. Blok and, alternatively, that the substance of Mr. Ashworth's report clearly supports Mr. Blok's 100.0% technical apportionment factor.

The Court agrees with Jetaire. The record here does not allow for us to strike his testimony under *Daubert*. Mr. Ashworth explains in his report how, in his opinion, all the components of the Aersafe products are covered by the Asserted Patents from a technical standpoint. Mr. Blok then properly relies on this opinion and a clarifying interview with Mr. Ashworth to assume that 100.0% of Aersale's

18

allegedly infringing sales should be apportioned for a reasonable royalty damages calculation. Regardless, Aersale had an opportunity to depose Mr. Blok and declined to do so. Any gap in the record that goes to Mr. Blok's lack of proper methodology falls on Aersale.  For its part, Jetaire has satisfied its initial prima facie burden of showing that Mr. Blok is qualified to render this damages opinion and has a reliable basis in the record with which to do so.  Whether the trier of fact reaches a different conclusion after cross-examination and after hearing from Aersale's own expert is a matter that will be determined at trial.  A *Daubert* motion is not the appropriate vehicle to reach that conclusion.

### V.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that:

(1) Defendant Aersale, Inc.'s Motion to Exclude the Testimony of Bill Ashworth [D.E. 199] is **GRANTED IN LIMITED PART** and **DENIED IN PART**;

(2) Defendant Aersale's Motion to Exclude the Testimony of Justin R. Blok [D.E. 200] is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 8th day of January, 2024.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
Chief United States Magistrate Judge

19

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

Case No. 20-25144-Civ-GAYLES/TORRES

JETAIRE AEROSPACE, LLC,

     *Plaintiff,*

v.

AERSALE, INC.,

     *Defendant.*

_____/

AERSALE, INC.,

     *Counter-Plaintiff,*

v.

JETAIRE AEROSPACE, LLC,
JETAIRE FLIGHT SYSTEMS, LLC, and
MICHAEL WILLIAMS,

     *Counter-Defendants.*

_____/

**REPORT AND RECOMMENDATION ON DEFENDANT/COUNTER-
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This cause comes before the Court on Defendant / Counter-Plaintiff, AerSale, Inc.'s ("AerSale"), motion for summary judgment [D.E. 196] against Plaintiff / Counter-Defendants, Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, and Michael Williams ("Mr. Williams") (collectively, "Jetaire"). Jetaire responded to the motion on August 4, 2023 [D.E. 230], to which AerSale replied on August 11, 2023. [D.E. 247]. The Court also held a hearing on the motion. [D.E. 310]. The motion,

1

therefore, is ripe for disposition.[1] After careful consideration of the briefing materials, the evidence of record, the relevant authorities, and for the reasons discussed below, we hereby RECOMMEND that Defendant's motion be **GRANTED**.

## I.    BACKGROUND

This case involves a patent infringement dispute. Specifically, Jetaire alleges that AerSale infringed on three of its patents for fuel tank ignition mitigation technology: U.S. Patent No. 9,849,998 ("'998 Patent"), U.S. Patent No. 10,633,109 ("'109 Patent"), and U.S. Patent No. 10,800,541 ("'541 Patent") (collectively, the "Asserted Patents"). The underlying technology (i.e., Jetaire's "Invicta" product) provides a method and system of accomplishing ignition mitigation using reticulated polyurethane safety foam in coordinated shapes to fill the fuel tanks in compliance with Federal Aviation Administration ("FAA") regulations. [D.E. 1 at ¶ 17].

In 2013, Jetaire began documented conversations with Xtra Airways and AerSale for the purchase of the Invicta product. While Jetaire disputes that it made a commercial offer for sale of the product, it is undisputed that AerSale purchased the Invicta product from Jetaire, installed it in an aircraft, and, finding it to be an ineffective product, uninstalled it from the aircraft. Shortly after, AerSale began developing its own ignition mitigation technology to compete with Jetaire's Invicta product.

Consequently, Jetaire filed this action against AerSale asserting three counts

---

[1] On December 8, 2023, the Honorable Darrin P. Gayles referred this matter to the Undersigned Magistrate Judge for a report and recommendation. [D.E. 279].

Appx00219

of patent infringement: I: Infringement of the '998 Patent; II; Infringement of the '109 Patent; and III: Infringement of the '541 Patent. [D.E. 1]. In response, AerSale has filed twelve counterclaims (now its Third Amended Counterclaim), six of which are material to this motion:

I: Declaratory Judgment of Non-Infringement of the '998 Patent;

II: Declaratory Judgment of Non-Infringement of the '109 Patent;

III: Declaratory Judgment of Non-Infringement of the '541 Patent;

IV: Declaratory Judgment of Invalidity of the '998 Patent;

V: Declaratory Judgment of Invalidity of the '109 Patent; and

VI: Declaratory Judgment of Invalidity of the '541 Patent.

[D.E. 159]. AerSale now seeks summary judgment in favor of each of those six counterclaims.

## II.    APPLICABLE PRINCIPLES AND LAW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the

3

motion. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986) (quoting another source).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). In making this determination, the Court must decide which issues are material. A material fact is one that might affect the outcome of the case. *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). "Summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### III.   ANALYSIS

In its motion, AerSale raises three primary arguments as to liability. First, it argues that, for several reasons, the Asserted Patents are invalid. It further argues that for all of AerSale's product installations that occurred outside of the United States, AerSale did not infringe upon Jetaire's patents. Lastly, AerSale argues that, for several reasons, it did not infringe upon a particular one of the Asserted Patents (the '541 patent).

Separately, AerSale argues that even if AerSale is liable for infringement, Jetaire cannot prove that it is entitled to damages for lost profits.

Appx00221

For its invalidity arguments, AerSale asserts three separate bases. It argues primarily that the "on-sale bar" renders all of the Asserted Patents invalid. As for Patent '998, AerSale argues that the patent is indefinite and therefore is invalid. As for Patent '109 and Patent '541, AerSale argues that, for separate reasons than Patent '998, the two patents are indefinite and therefore invalid.

We will first address the on-sale bar argument because it seeks to invalidate all the Asserted Patents on a common basis. Accordingly, if this argument succeeds, the remainder of AerSale's arguments will effectively be moot.

### A. *On-Sale Bar*

The on-sale bar is a mechanism that renders a patent invalid when certain requirements are satisfied. *See Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 249 F.3d 1307, 1313 (Fed. Cir. 2001) (affirming the invalidity of a patent where the on-sale bar's requirements were satisfied); *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 855 F.3d 1356, 1375 (Fed. Cir. 2017), *aff'd*, 139 S. Ct. 628, 202 L. Ed. 2d 551 (2019) (same); *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1367 (Fed. Cir. 2000) (same). In *Pfaff v. Wells Electronics, Inc.*, the Supreme Court delineated "that the on-sale bar applies when two conditions are satisfied before the critical date."[2] 525 U.S. 55, 67 (1998). The first is that "the product must be the subject of a commercial offer for sale." *Id.* The second is that "the invention must be ready for patenting." *Id.* These

---

[2] "The date exactly one year prior to the date of application for the patent is known as the critical date." *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1327 (Fed. Cir. 2001).

barriers "can only be overcome by clear and convincing evidence." *Dana Corp. v. Am. Axle & Mfg., Inc.*, 279 F.3d 1372, 1375 (Fed. Cir. 2002).

On balance, the on-sale bar ensures that parties may not enjoy the benefit of monopoly that the patent process provides if they have availed their patent-ready product for commercial sale a year or more before the patent's effective filing date. *See Merck & Cie v. Watson Laboratories, Inc.*, 822 F.3d 1347, 1350–51 (Fed. Cir. 2016) ("[A]n inventor acquires an undue advantage over the public by delaying to take out a patent, inasmuch as he thereby preserves the monopoly to himself for a longer period than is allowed by the policy of the law.") (quoting *City of Elizabeth v. Am. Nicholson Pavement Co.*, 97 U.S. 126, 137, 24 L.Ed. 1000 (1877)). If both requirements are met, then essentially, the patent falls victim to "section 102 of the Patent Act [which] serves as a limiting provision, both excluding ideas that are in the public domain from patent protection and confining the duration of the monopoly to the statutory term." *Pfaff*, 525 U.S. at 64 (citing *Frantz Mfg. Co. v. Penix Mfg. Co.*, 457 F.2d 314, 320 (7th Cir. 1972)).

Accordingly, if on or before the critical date of September 11, 2014,[3] (1) Jetaire offered its Invicta product for commercial sale, and (2) Jetaire's Invicta product was ready for patenting, the Asserted Patents are invalid and summary judgment is proper.

---

[3] It is undisputed that the "earliest effective filing date" of the Asserted Patents is September 11, 2015. *See* [D.E. 315 at ¶ 1]; [D.E. 239 at ¶ 1]. Accordingly, the critical date is September 11, 2014 ("the date exactly one year prior to the date of application for the patent is known as the critical date."). *Scaltech, Inc.*, 269 F.3d at 1327.

6

Appx00223

### 1. *Commercial Offer For Sale*

The first step of the on-sale bar analysis is to determine whether the Asserted Patents were subject to a "commercial offer for sale" by Jetaire on or before September 11, 2014. *See id.* at 67. This date is sufficient to encompass the effective filing date for all three of the Asserted Patents. That is because the record evidence demonstrates that the Invicta product encompasses the Asserted Patents. For example, Mr. Williams (Jetaire's designated representative) testified that the "original design" of the Invicta product, "as covered by the STC, [is] protected by the patents-in-suit." [D.E. 253-1 at 59:18–23]. It is also evidenced by Jetaire marking the boxes of its Invicta product with all three of the Asserted Patents. [D.E. 253-14].

"Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)." *Scaltech, Inc.*, 269 F.3d at 1328 (quoting *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048, 59 USPQ2d 1121, 1126 (Fed. Cir. 2001)). Importantly, "[a]n offer for sale does not have to be accepted to implicate the on sale bar." *Id.* In determining whether an offer for sale was made, "we look to the specific facts and circumstances presented in this case, 'apply[ing] traditional contract law principles' along the way." *Junker v. Med. Components, Inc.*, 25 F.4th 1027, 1032 (Fed. Cir. 1998), *cert. denied*, 143 S. Ct. 205, 214 L. Ed. 2d 79 (2022) (quoting *Merck & Cie*, 822 F.3d at 1351). "In determining whether an offer [has been] made[,] relevant factors include the terms of any previous inquiry, the completeness of the terms of the suggested bargain, and the number of

7

Appx00224

persons to whom a communication is addressed." *Id.* (quoting Restatement (Second) of Contracts § 26 cmt. c (1981)). Informed by the Uniform Commercial Code (which is not "determinative individually"), "[a] sale occurs when there is a 'contract between parties to give and to pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold.'" *Helsinn Healthcare S.A.*, 855 F.3d at 1364 (quoting *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1361 (Fed. Cir. 2010)).

AerSale argues that four commercial offers for sale were made before the critical date: a December 8, 2013 offer to Xtra Airways; a April 11, 2014 revised offer to Xtra Airways; a July 14, 2014 offer to AerSale; and an August 21, 2014 offer to AerSale.

We will start with December 8, 2013. On that date, Xtra Airways sent to Jetaire an email hoping to "put a deal together." [D.E. 315-38 at 3]. Then, on the same day, Jetaire responded to Xtra Airways with a signed letter. That letter stated that "[w]e understand that you are ready to proceed with the installation of Invicta," and provided that "[o]ur offer is as follows," before providing the price, payment terms, and services. [*Id.* at 24]. The signed letter also provided that "[o]ur standard agreement is attached for your execution." [*Id.*]. That "standard agreement" proposed pricing, detailed payment terms, identified services, and included myriad other contract terms within its nineteen pages.

A few months later, on April 11, 2014, Jetaire sent to Xtra Airways another signed letter. This letter identified "a revision to Jetaire's original offer," followed by,

once again, a statement that "our offer is as follows" before providing price, payment terms, services, and certain conditions. [D.E. 315-39 at 3].

Then, on July 14, 2014, Jetaire sent to AerSale a "propos[al]" of its "services" to provide the Invicta technology. [D.E. 315-40]. It included detailed pricing in this proposal: $190,000.00 per unit if AerSale purchased 1–5 units, and discounted pricing of $180,000.00 per unit if AerSale purchased 6–10 units. [*Id.*]. The "propos[al]" also noted that pricing was "exclusive to AerSale … in appreciation of [Jetaire's and AerSale's] long term relationship" and provided the timeframe in which delivery would be made. [*Id.*]. It anticipated that, sometime during the week of July 14, 2014, the FAA would issue the required Supplemental Type Certificate ("STC"). [*Id.*] The letter then thanked AerSale for its "consideration of Jetaire's proposal." [*Id.*].

Lastly, on August 21, 2024, Jetaire emailed AerSale and informed AerSale that it was "taking orders for the [Invicta] System now!" and attached its STC (which was received on July 28, 2014). [D.E. 315–23 at 2–5]. The email then stated that Jetaire would "call in a few days to discuss potential business." [*Id.*]. The record, as provided to the Court, does not indicate whether that phone call ever took place, or whether price terms, delivery terms, or other terms of sale were discussed.

Here, drawing all reasonable inferences in favor of Jetaire, no reasonable jury could conclude that Jetaire did *not* make an offer to Xtra Airways on December 9 and April 11, and to AerSale on July 14. Conversely, based on the absence of definite sales terms in the August 21 communications, a reasonable juror could conclude that no commercial offer for sale was made on that date.

9

Appx00226

Beginning with Xtra Airways, unmistakably on December 8, 2013, Jetaire placed a commercial offer on the table. By way of example, in *Merck & Cie*, the Federal Circuit held that a commercial offer was made where the offeror sent a fax that included the service to be provided as well as "essential price, delivery, and payment terms." 822 F.3d at 1351. The court noted in further support that the "fax was not an unsolicited price quote sent to numerous potential customers," but was directed to a specific customer. *Id*. (holding that the asserted patent was invalid as a matter of law under the on-sale bar).

Here, quite similarly, the unexecuted contract accompanying AerSale's December 8 email included "essential price, delivery, and payment terms." *Id*. As for price, the unexecuted contract detailed the "per unit" price of $225,000.00, the initial payment due at the execution of the agreement ($112,500.00), and the remaining balance that would be due at delivery ($112,500.00). [D.E. 315-38 at 22]. As for payment details, it required that payment be made by wire transfer [i*d*. at 8], provided wiring details [*id*. at 11], identified the deposit amount [*id*. at 22], explained the invoice system, and explained the consequences for withholding delivery and/or default. [*Id*.]. As for delivery, Jetaire's letter specified that delivery would take place on April 15, 2014, and any remaining balance would be "due at the time of delivery."

Plainly, this situation is not one in which "[t]he letter to [Xtra Airways] lacked any mention of quantities, time of delivery, place of delivery, or product specifications beyond the general statement that the potential product would be [the Invicta product]" and included a "licensing fee" as opposed to "price terms." *Elan Corp., PLC*

10

*v. Andrx Pharms., Inc.*, 366 F.3d 1336, 1341 (Fed. Cir. 2004). Rather, the letter and accompanying contract are more akin to *Merck & Cie* as well as *Helsinn Healthcare S.A.*, in which the Federal Circuit held that a commercial offer was made where, in addition to identifying the precise services to be provided, "[t]he agreement … included other specific terms, such as price, method of payment, and method of delivery". 855 F.3d at 1364–65.

Moreover, Jetaire's offer letter was directly and uniquely addressed to Xtra Airways; importantly, it "was not an unsolicited price quote sent to numerous potential customers." *Merk & Cie*, 822 F.3d at 1351 (citing Restatement (Second) of Contracts § 26, cmt. c (1981) (explaining that a "relevant factor[ ]" in determining whether an offer has been made is "the number of persons to whom a communication is addressed"); *see also Junker*, 25 F.4th at 1033 ("As stated on the face of the letter, Xentek was directly responding to a 'request for quotation' from Boston Scientific, and the letter was addressed to Boston Scientific alone. This signals that the letter was not an unsolicited price quotation or invitation to negotiate, but rather a specific offer to Boston Scientific to take further action.").

Plainly, then, on December 8, 2013, Jetaire offered to Xtra Airways a commercial sale of its Invicta product (i.e., a product which featured the Asserted Patents). Jetaire's "detailed [letter]—providing essential price, delivery, and payment terms—contained all the required elements to qualify as a commercial offer for sale." *Merck & Cie*, 822 F.3d at 1351. Accordingly, drawing all reasonable inferences in favor of Jetaire, a commercial offer for sale was made and no reasonable juror could

11

conclude otherwise. It is not dispositive whether Xtra Airways accepted the offer and/or the sale was ever consummated; all that is required under *Pfaff* is a commercial offer for sale. *See Helsinn Healthcare S.A.*, 855 F.3d at 1370 (noting that "we have never required that a sale be consummated or an offer accepted for the invention to be in the public domain and the on-sale bar to apply, nor have we distinguished sales from mere offers for sale") (citing *Hamilton Beach Brands, Inc. v. Sunbeam Prods., Inc.*, 726 F.3d 1370, 1374, 1377 (Fed. Cir. 2013)) (other internal citations omitted).

And to remove all doubt, Jetaire sent to Xtra Airways a follow-up letter on April 11, 2014. This letter included "a revision *to Jetaire's original offer*", and provided that it was a "substantial incentive over the *existing great offer on the table*." [D.E. 315-39 at 3] (emphasis added). It then stated "[o]ur offer is as follows," while providing a revision to prices and services, and requiring certain conditions. [*Id.*]

Clearly, on April 11, 2014, Jetaire conceded that it made an offer on December 8, 2013 by referring to it both as an "original offer" and an "existing great offer on the table," and then revised that offer (i.e., noted that "our offer is as follows" with revised terms). Even drawing all reasonable inferences in favor of Jetaire, it is difficult for Jetaire to contend, and impossible for a reasonable juror to conclude, that Jetaire did not make a commercial offer to Xtra Airways on December 9 and revise that offer (i.e., make a new offer) on April 11, 2014. *See Junker*, 25 F.4th at 1033 ("The completeness of the relevant commercial sale terms [i.e., "price," "delivery conditions," and a "payment term"] in the letter itself signals that this letter was not merely an

12

invitation to further negotiate, but rather multiple offers for sale, any one or more of which Boston Scientific could have simply accepted to bind the parties in a contract.").

The record also demonstrates, even drawing all justifiable inferences in favor of Jetaire, that on July 14, 2014, Jetaire yet again offered its Invicta product for commercial sale—this time to AerSale. Like the Xtra Airways offers, Jetaire's self-titled "proposal" to AerSale included all the material elements of a commercial offer. Jetaire's letter thanked AerSale "for the opportunity to propose our services" of the "Invicta Ignition Mitigation Technology." [D.E. 315-28 at 3]. The letter further noted that Jetaire "anticipate[d] that the FAA [would] issue the STC" some time that week. [*Id.*]. It then provided detailed pricing: for 1–5 units, $190,000.00 per unit and $10,000.00 installation; and for 6–10 units, discounted pricing of $180,000.00 per unit $10,000.00 installation. [*Id.* at 4]. The letter also specified delivery details—specifically, that "the delivery lead time … [would] be one month" with "priority handling," and if six or more units were purchased, "they [could] be delivered on [AerSale's] schedule over a two year period." [*Id.*]. Lastly, the letter thanked AerSale "for [its] consideration of Jetaire's proposal," followed by Mr. Williams signature. [*Id.*].

Akin to the Xtra Airways offer, and consistent with applicable Federal Circuit caselaw, Jetaire's July 14 letter to AerSale indisputably includes price points, delivery information, services to be provided, identified itself as a "proposal," and placed into AerSale's hands the power of acceptance. Clearly and unequivocally, on July 14, Jetaire offered its Invicta product to AerSale for commercial sale. *See Merck*

13

*& Cie*, 822 F.3d at 1351 (holding that "Martin's detailed fax—providing essential price, delivery, and payment terms—contained all the required elements to qualify as a commercial offer for sale" and explaining that a "relevant factor[ ]" in determining whether an offer has been made is "the number of persons to whom a communication is addressed"); *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1369 (Fed. Cir. 2007) ("The June 7 letter explicitly sets forth an amount of oil to be delivered to P & G, at a specified unit price, and under a standard contract designation, FOB … which allocates the risks and responsibilities of a buyer and a seller. As recognized by the district court, that is powerful evidence of a sales transaction."); *Junker*, 25 F.4th at 1033 ("The completeness of the relevant commercial sale terms [i.e., "price," "delivery conditions," and a "payment term"] in the letter itself signals that this letter was not merely an invitation to further negotiate, but rather multiple offers for sale, any one or more of which Boston Scientific could have simply accepted to bind the parties in a contract."); *Enzo Biochem, Inc. v. Gen-Probe, Inc.*, 424 F.3d 1276, 1282 (Fed. Cir. 2005) (affirming a finding that a commercial offer for sale was made where the "agreement created the necessary contractual obligations on the parties to constitute a commercial offer for sale," because the offered product for purchase "clearly [evidenced] commercial purposes"); *Scaltech, Inc.*, 269 F.3d at 1328 ("Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b).") (quoting *Group One, Ltd.*, 254 F.3d at 1048); *The Medicines Co. v.*

*Hospira, Inc.*, 881 F.3d 1347, 1351 (Fed. Cir. 2018) (finding that the terms of the agreement "ma[d]e clear" that there was an offer for sale where the "relevant terms include[d] a statement that [the offeree] 'now desire[d] to sell the product'" … the price of the product … the purchase schedule … and the passage of title").

In defense, Jetaire argues that there could be no commercial offer for sale because the intended use of its Invicta products was merely experimental. "To determine whether a use is 'experimental,' a question of law, the totality of the circumstances must be considered, including various objective indicia of experimentation surrounding the use, such as the number of prototypes and duration of testing, whether records or progress reports were made concerning the testing, the existence of a secrecy agreement between the patentee and the party performing the testing, whether the patentee received compensation for the use of the invention, and the extent of control the inventor maintained over the testing." *Lough v. Brunswick Corp.*, 86 F.3d 1113, 1120 (Fed. Cir. 1996) (citing *TP Lab'ys, Inc. v. Pro. Positioners, Inc.*, 724 F.2d 965, 971–72 (Fed. Cir. 1984)). Specifically, "[t]he last factor of control is critically important, because, if the inventor has no control over the alleged experiments, he is not experimenting." *Id.*; *see also Zacharin v. United States*, 43 Fed. Cl. 185, 192 (1999), *aff'd*, 213 F.3d 1366 (Fed. Cir. 2000) ("The final factor is crucial because an inventor must have controlled the alleged experiments in order for a court to conclude that he was experimenting.")

The Federal Circuit has refined what sorts of factors undermine an argument that an offer was made for primarily experimental purposes. *See Sunoco Partners*

15

*Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 32 F.4th 1161, 1169 (Fed. Cir. 2022). In *Sunoco*, for example, the relevant agreement did not make any "reference to any experimental purpose." *Id.* Additionally, as consideration, it contemplated the "purchase" of the relevant product and specified that the offeree "agree[d] to purchase a minimum of 500,000 barrels of Butane." *Id.* It also stated that the offeror already "'developed' the relevant technology and equipment, that [the offeree] wanted to purchase it, and that [the offeror] was willing to sell it, install it, and supply butane for it." *Id.* Moreover, there was "'no suggestion' that the agreement 'did not involve transfer of title,'" and in fact, "'expressly contemplate[d] it.'" *Id.* (quoting *Helsinn Healthcare S.A.*, 855 F.3d at 1364). Accordingly, the relevant agreement "bear[ed] 'all the hallmarks of a commercial contract for sale.'" *Id.* (quoting *Helsinn Healthcare S.A.*, 855 F.3d at 1364); *cf. EZ Dock v. Schafer Sys., Inc.*, 276 F.3d 1347, 1353 (Fed. Cir. 2002) (recognizing a genuine dispute of fact as to whether there was experimental use where the inventors "monitor[ed]" the experimentation, "visited the dock that [was] purchased on several occasions," "made repairs for free," and therefore "show[ed] that the inventors were still working to detect and correct flaws in their invention.").

Here, the details of the offers made by Jetaire to Xtra Airways and AerSale do not include indicia of experimental use. The language of the offered agreements between the parties make no mention of experimental use, prototypes, or anything of the like. The agreement offered to Xtra Airways, for example, states only that "Buyer … desires to purchase from Seller engineering services and related items to comply

16

Appx00233

with SFAR 88 for the B737-400 Center Wing Tank as more fully identified in Appendix A ….” [315-38 at 5]. Nowhere in Appendix A does the agreement mention experimental or prototypical use. [*Id.* at 13]. Indeed, as in *Sunoco*, 32 F.4th at 1169, the offered contact does not make “any reference to any experimental purpose,” and in fact “expressly contemplates” transfer of title. In pertinent part, Appendix A of the Xtra Airways offer states that “nothing contained in the foregoing shall prevent BUYER from transferring its rights to the STC as may be required or necessary in connection with [several situations].” [D.E. 315-38 at 13].

And in addition to making no mention of experimental or prototypical use, each of the offered agreements contained “all the hallmarks of a commercial contract for sale” by including price points, payment terms, delivery details, and other contract terms. *Sunoco*, 32 F.4th at 1169. These factors also negate the existence of an experimental agreement. *Id.*

There simply is no compelling argument or evidence to raise a genuine dispute that when Jetaire offered its Invicta product for sale to Xtra Airways and AerSale, its primary purpose was experimental rather than commercial. Jetaire relies on testimony from Mr. Nezaj of AerSale that the Invicta product had a “poor design” and that it was “difficult to remove and reinstall.” [D.E. 239 at 14]. But Jetaire points to no authority to suggest that because a purchaser does not like a product, it must be that “the primary purpose of the offer[ ] … was to conduct experimentation.” *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed. Cir. 2008).

17

Beyond Mr. Nezaj's irrelevant testimony, the record is devoid of evidence to raise a triable issue that Jetaire offered the sale of its Invicta product primarily for experimental purposes; this is especially true where Jetaire wholly lacks the "critically important" element of control over the alleged experiments. *Lough*, 86 F.3d at 1120; *see also Cargill, Inc.*, 476 F.3d at 1370 (granting summary judgment on the basis of the on-sale bar where the offeror's "post hoc effort to say [that the offeror] did not intend what is abundantly plain from the price, quantity, and delivery terms on the face of the June 7 letter does not raise a genuine issue of fact"); *Pennwalt Corp. v. Akzona Inc.*, 740 F.2d 1573, 1581 (Fed. Cir. 1984) ("Any experimentation over one year before an application's filing date must be for a bona fide experimental purpose rather than for commercial exploitation. If any commercial exploitation does occur, it must be merely incidental to the primary purpose of experimentation to perfect the invention. Here, based on testimony by Pennwalt's employees, the district court found that Pennwalt's primary motive in seeking an EPA temporary permit was for the commercial purpose of recovering developmental expenses and testing the market. … [T]he district court correctly held as a matter of law that … the [ ] patent .. was … invalid.") (internal citations omitted).

In contrast to *EZ Dock*, 276 F.3d at 1353, Jetaire simply fails to offer any facts to show that it monitored AerSale's ostensibly-experimental use of the product, visited AerSale to gauge the viability of the Invicta product, or acted in any other manner to suggest it had "control over the alleged testing to establish experimentation." *See Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361,

18

Appx00235

1366 (Fed. Cir. 2008) ("Atlanta Attachment was not experimenting within the contemplation of the experimental use doctrine when it sold its invention to Sealy because Sealy performed the testing and because Atlanta Attachment did not have control over the alleged testing to establish experimentation."). In fact, at the hearing on this motion, counsel for Jetaire conceded that "only AerSale would know" when asked at what point the alleged "prototype" was removed from the aircraft. [D.E. 316 at 73:3–12]. This acknowledgment, coupled with an absence of evidence as to whether Jetaire monitored the alleged experiments, demonstrate that no reasonable juror could conclude that for purposes of the on-sale bar, Jetaire's primary motive was experimentation.

At best, any experimentation was "merely incidental" to the primary purpose of commercial exploitation. *Pennwalt Corp.*, 740 F.2d at 1581; *see also Lough*, 86 F.3d at 1120 ("The … factor of control is critically important, because, if the inventor has no control over the alleged experiments, he is not experimenting. If he does not inquire about the testing or receive reports concerning the results, similarly, he is not experimenting."); *Electromotive Div. of Gen. Motors Corp. v. Transportation Sys. Div. of Gen. Elec. Co.*, 417 F.3d 1203, 1212 (Fed. Cir. 2005) ("When sales are made in an ordinary commercial environment and the goods are placed outside the inventor's control, an inventor's secretly held subjective intent to 'experiment,' even if true, is unavailing without objective evidence to support the contention. Under such circumstances, the customer at a minimum must be made aware of the experimentation.") (quoting *LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d

19

1066, 1072 (Fed. Cir. 1992)); *Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1334 (Fed. Cir. 1998) (affirming the district court's rejection of Weatherchem's experimental use argument where "Weatherchem was not jointly experimenting with Durkee" and therefore "Weatherchem did not show experimental use of the [invention]").

Separately, Jetaire argues that it could not have made a commercial offer for sale because, at the time of its offer, it had not yet received its FAA-issued Parts Manufacturing Authorization ("PMA") or STC. Specifically, Jetaire argues that, per its expert (Mr. Ashworth), at the time of the alleged offer, the Invicta product could not have been sold because it lacked the requisite certifications.

This argument is also not persuasive. First, factually speaking, Jetaire's July 14 offer to AerSale makes abundantly clear that it "anticipate[d] that the FAA w[ould] issue the STC sometime th[at] week." [D.E. 315-28 at 3]. The lack of timely FAA approval, therefore, clearly did not dissuade Jetaire's decision to offer the Invicta product to AerSale in exchange for hundreds of thousands of dollars.

And even if it did, as the Federal Circuit has made clear, the fact that a sale cannot be consummated until the future does not undermine the fact that a commercial offer was made—i.e., all that is required under *Pfaff*. *See Cargill, Inc.*, 476 F.3d at 1370 ("Cargill tries to recast its offer for sale as merely a ramp up to a business relationship, pointing out that the June 7 letter suggested that DNAP wanted "very much to do business" with P & G and that the parties should discuss a purchase agreement. However, expressing a desire to do business in the future does

20

Appx00237

not negate the commercial character of the transaction then under discussion."). Section 102 imports no requirement that the delivery of the product offered for commercial sale must take place instantaneously with acceptance, nor does Jetaire point the Court to any law to the contrary. *See* 35 U.S.C. § 102.

Second, even if FAA approval could not be procured by the time of the proposed sale, the Federal Circuit has clarified that "the mere fact that the offer for sale was illegal or ineffective does not remove it from the purview of" the on-sale bar. *Evans Cooling Sys., Inc. v. Gen. Motors Corp.*, 125 F.3d 1448, 1452 (Fed. Cir. 1997) ("Evans argues that Mr. Najarian's order is ineffective … because GM had not yet received fuel economy labels or a Certificate of Conformity from the EPA. Even assuming this to be the case, the mere fact that the offer for sale was illegal or ineffective does not remove it from the purview of the section 102(b) bar."). Accordingly, Jetaire's argument that the Invicta product had not received FAA approval at the time of its offer is, for several reasons, of no moment.

In sum, drawing all reasonable inferences in favor of Jetaire and as a matter of law, on December 9, 2013, Jetaire made a commercial offer for sale of the Asserted Patents to Xtra Airways; on April 11, 2014, Jetaire made a revised commercial offer for sale of the Asserted Patents to Xtra Airways; and on July 14, 2014, Jetaire made a revised commercial offer for sale of the Asserted Patents to AerSale.[4]

---

[4] The record evidence fails to demonstrate that on August 21, 2014, an offer for sale was made. That email simply lacks the requisite elements of a commercial for sale under *Pfaff*; i.e., price terms, quantity terms, delivery terms, intent to transfer title, the placing of the power of acceptance into AerSale's hands, and other persuasive indicia.

21

## 2. *Ready for Patenting*

Next, we assess the second requirement of *Pfaff's* on-sale bar test: that "the invention must be ready for patenting." 525 U.S. at 67. The Federal Circuit in *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.* aptly described the meaning of "ready for patenting":

> An invention is "ready for patenting" when evidence shows that the invention was reduced to practice or described in a written description sufficient to permit one of ordinary skill in the art to practice the invention without undue experimentation. An invention is reduced to practice when the patentee has an embodiment that meets every limitation and operates for its intended purpose. An invention works for its intended purpose when there is a demonstration of the workability or utility of the claimed invention.

488 F.3d 982, 997 (Fed. Cir. 2007) (internal citations omitted). That being said, "'fine-tuning' of an invention after the critical date does not mean that the invention was not ready for patenting." *Hamilton Beach Brands, Inc. v. Sunbeam Prod., Inc.*, 726 F.3d 1370, 1379 (Fed. Cir. 2013) (citing *Weatherchem,* 163 F.3d at 1332–34). But "[t]o be 'ready for patenting' the inventor must be able to prepare a patent application, that is, to provide an enabling disclosure as required by 35 U.S.C. § 112." *Space Sys./Loral, Inc. v. Lockheed Martin Corp.*, 271 F.3d 1076, 1080 (Fed. Cir. 2001).

AerSale does not argue that the Invicta product became ready for patenting when it was "reduced to practice." *Honeywell Int'l Inc.*, 488 F.3d at 997. Rather, AerSale argues that the Asserted Patents became ready for patenting on May 23, 2013, at which time Jetaire applied for an STC for its Invicta product. AerSale further argues that, at the latest, the item was ready for patenting on July 28, 2014, when Jetaire received an STC from the FAA. Jetaire, meanwhile, argues that the Asserted

22

Patents could not have been ready for patenting at the times argued by AerSale because the product was defective until 2016. This is evidenced, Jetaire argues, by the fact that AerSale itself deemed Jetaire's product faulty, per Mr. Nezaj's testimony. *See* [D.E. 239 at 14] (Mr. Nezaj testifying that Jetaire's product had a "poor design" and was "difficult to remove and install").

We find, drawing all reasonable inferences in favor of Jetaire, that on July 14, 2014, a reasonable juror could conclude only that the Invicta product was ready for patenting under *Pfaff*. Undisputedly, at the time Jetaire made its July 14 offer to AerSale, Jetaire applied to the FAA to obtain an STC for the Invicta product. Further, its indisputable that Jetaire anticipated the immediate issuing of that STC. [D.E. 315-28 at 3] ("We [Jetaire] anticipate that the FAA will issue the STC sometime this week of July 14, 2014, and will notify you as soon as it is received."). Jetaire is hard pressed to argue, then, that its Invicta products were not ready for patenting at the time of its July 14 offer—especially because it does not present to the Court a meaningful difference between the requirements for an STC and the requirements for patentability. This is further bolstered by the fact that only a month later, Jetaire was "taking orders for the [Invicta] system now!" [D.E. 315-23 at 2].

Moreover, counsel for Jetaire acknowledged in the hearing on this motion that while "[w]e do disagree with [AerSale's] characterizations that it was ready for patenting at the time the STC application was filed …, really this case is going to hinge on whether or not there was a commercial offer for sale." [D.E. 316 at 52:6–9].

23

Appx00240

While this quasi-concession is not dispositive, it is coupled with record evidence that substantiates Jetaire's counsel's lack of fervor on this issue.

Specifically, in paragraph 17 of its statement of facts, AerSale cites to numerous attachments to Jetaire's STC application, which detail drawings of the Invicta product and detail the installation process. [D.E. 315-18; D.E. 315-20; D.E. 315-21; D.E. 315-22; D.E. 315-24; D.E. 315-25]. One document, for example, "shows installation sequence and position number of already trimmed piece of foam … so that installation time is minimized as follows." [D.E. 315-25]. Another document "governs installation of Jetaire Invicta brand Ignition Mitigation Means (I2MT) in the Center Wing Tank (CWT) of any B737 … Series Aircraft to bring it into compliance with SFAR 88 requirements." [D.E. 315-21]. That document includes a list of detailed "foam fabrication drawings" and "foam installation drawings." [D.E. 315-21].

Jetaire's response in opposition to AerSale's motion does not address head-on these attachments, or whether they accurately reflect the patented product. While Jetaire mentions in its statements of fact that "iterative design and configuration changes" occurred after the STC application [D.E. 239 at ¶ 17], Mr. Williams' actual testimony undermines Jetaire's argument. Specifically, he testified that "[t]here may have been some changes to the … foam shapes," and that its "not uncommon for us to find better ways of manufacturing or installing." [D.E. 315-1 at 57:15–22; 58:3–9]. This testimony does nothing to persuade the Court, nor a reasonable factfinder, that

24

Appx00241

the supposed "changes" that "may have been made" transformed the Invicta product from unpatentable on July 14, 2014 to patentable thereafter.

As an initial matter, Mr. Williams testimony does not explain whether the changes that "may" have occurred were effectuated before or after July 14, 2014. Additionally, Mr. Williams hardly elaborates on the supposed changes, and Jetaire fails to present evidence to show that the supposed changes were made after July 14, 2014. Jetaire also fails to demonstrate these supposed changers were appreciable in terms of the patent process, let alone that they turned a non-patentable product into a patentable product. Accordingly, a reasonable factfinder is left with no choice but to infer that, if changes even took place, they were precisely the "fine-tuning of an invention" that the Federal Circuit has held not to impact the *Pfaff* analysis. *See Hamilton Beach Brands, Inc.*, 726 F.3d at 1379 (citing *Weatherchem,* 163 F.3d at 1332–34) (noting that "'fine-tuning' of an invention after the critical date does not mean that the invention was not ready for patenting."); *see also Cont'l Plastic Containers v. Owens Brockway Plastic Prod., Inc.*, 141 F.3d 1073, 1078 (Fed. Cir. 1998) (affirming a finding that an item was a ready for patenting despite seven revisions "to accommodate the manufacturing difficulties," because "there were insufficient differences to rise to the level of a practical ornamental difference from the pre-critical date drawings and, hence, the molds and article drawings did embody the patented design.").

Moreover, in its response, Jetaire relies almost entirely on AerSale's dislike for the Invicta product to show that it was not ready for patenting; specifically, that Mr.

25

Nezaj thought it was "trash" and uninstalled it. But whether AerSale or Xtra Airways disliked the Invicta product is not dispositive of whether the product was ready for patenting. The Federal Circuit is cognizant of the fact that a product's concept before reduction to practice need not be impeccable in the eyes of the conceiver: "It will be a rare case indeed in which an inventor has no uncertainty concerning the workability of his invention before he has reduced it to practice." *Robotic Vision Sys., Inc.*, 249 F.3d at 1312.

Jetaire's argument is especially unpersuasive when weighed against Jetaire's quasi-concession in the hearing, Jetaire's limited response in opposition to the "ready for patenting" prong, and Jetaire's failure to show that the patented version of its Invicta product is materially different than the version of its Invicta product for which it obtained FAA approval. *See Robotic Vision Sys., Inc.*, 249 F.3d at 1312 (finding that a detailed concept that had not yet actually been created satisfied *Pfaff*, because "[n]otably absent from this test is a requirement that an inventor have complete confidence that his invention work will work for its intended purpose. Such confidence often must await a reduction to practice, which is a separate basis on which an invention may be shown to be ready for patenting.").

Based on this record, the Court is persuaded that at least on July 14, 2014, if not earlier, Jetaire in its STC application "described [its Invicta product incorporating the Asserted Patents] in a written description sufficient to permit one of ordinary skill in the art to practice the invention without undue experimentation." *Honeywell Int'l Inc.*, 488 F.3d at 997. Accordingly, because no reasonable juror could make a

26

contrary finding (i.e., no reasonable juror could find, based on the STC application and Mr. Williams' testimony, that the Invicta product was *not* ready for patenting at least one year before the effective filing date of the Asserted Patents), we find that the Invicta product was "ready for patenting" under *Pfaff*.

Therefore, because both prongs of *Pfaff's* on-sale bar test have been satisfied, we recommend that summary judgment be granted in favor of AerSale as to its on-sale bar argument. And, because the consequence of the on-sale bar is invalidation of the subject patents, we further recommend that the Asserted Patents be invalidated on this basis. *See Robotic Vision Sys., Inc.*, 249 F.3d at 1313 (affirming finding that a patent was invalid because the on-sale bar's requirements were satisfied); *Helsinn Healthcare S.A.*, 855 F.3d at 1375 (same); *Vanmoor*, 201 F.3d at 1367 (same).

### B.     *Other Bases for Invalidity Are Moot*

As a result, the Court need not reach the remainder of AerSale's arguments, all of which seek invalidation of the Asserted Patents, seek a declaration that AerSale did not infringe upon the Asserted Patents, or argue that Jetaire suffered no lost profit damages from the alleged infringement. These issues are effectively moot.

### IV.     *CONCLUSION*

For the reasons set forth above, we recommend that AerSale's motion for summary judgment [D.E. 196] in favor of its counterclaims I, II, III, IV, V, and VI [D.E. 159] be **GRANTED**.

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to

Appx00244

file written objections, if any, to the District Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 17th day of April, 2024.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

28

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:20-cv-25144-GAYLES/TORRES

JETAIRE AEROSPACE, LLC,

      Plaintiff,

v.

AERSALE, INC.,

      Defendant.

_____/

AERSALE, INC.,

      Counter-Plaintiff,

v.

JETAIRE AEROSPACE, LLC,
JETAIRE FLIGHT SYSTEMS, LLC, and
MICHAEL WILLIAMS,

      Counter-Defendants.

_____/

**REPORT AND RECOMMENDATION ON**
**COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause comes before the Court on Counter-Defendants, Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, and Michael Williams' (collectively "Jetaire") motion for summary judgment against AerSale, Inc.'s ("Counter-Plaintiff" or "AerSale") Fifth Amended Counterclaims. [D.E. 376]. Both parties also provided supplemental briefing. [D.E. 383, 393]. The motions have been fully briefed and are

1

now ripe for disposition.[1] After careful consideration of the motion, response, reply, supplemental briefing, the evidence of record, the relevant authority, and for the reasons discussed below, we hereby RECOMMEND that Counter-Defendants' motion be **GRANTED in part**.

## I.   *BACKGROUND*

Jetaire's complaint arises from a patent infringement dispute between Jetaire and AerSale. In response to Jetaire's complaint, AerSale filed numerous counterclaims (and on April 18, 2024, its Fifth Amended Counterclaim). At issue are five of those counterclaims: defamation, tortious interference, inequitable conduct (two separate claims), and exceptional case.

As for defamation, AerSale asserts two distinct theories. One such theory relates to Eastern Airlines. AerSale alleges that Mr. Williams, Jetaire's representative, told Eastern Airlines—while knowing that Eastern Airlines was in negotiations with AerSale—that Eastern Airlines should not buy AerSale's product. Mr. Williams further said that to create that product, AerSale stole Jetaire's confidential data. AerSale concludes that these statements constitute a "felony and/or conduct incompatible with the proper exercise of AerSale's business, and therefore constitute[ ] defamation per se." [D.E. 376 at ¶ 319].

AerSale also alleges Mr. Williams made defamatory statements about AerSale to Azurair. For this claim, AerSale argues that, at a time when Jetaire knew AerSale

---

[1] On December 8, 2023, the Honorable Darrin P. Gayles referred this matter to the Undersigned Magistrate Judge for a ruling on non-dispositive matters and a Report and Recommendation on dispositive matters. [D.E. 279].

2

was in negotiations with Azurair, Mr. Williams told Azurair that AerSale could not legally make the relevant IMM product. While AerSale eventually completed the sale with Azurair, AerSale argues that Jetaire's defamatory statements delayed the sale. In that delay period, AerSale argues that the Russian-Ukraine war commenced, which cut into more potential sales with Azurair (who operates in Russia).

As to its tortious interference claim, AerSale similarly alleges two separate bases: one for Eastern Airlines and one for Azurair. As to Eastern Airlines, AerSale alleges that Mr. Williams' allegedly defamatory statements disrupted a business relationship between AerSale and Eastern Airlines. In turn, AerSale argues that Mr. Williams' statement caused AerSale to lose Eastern Airlines' business. Tacked on, AerSale argues, is an untrue statement by Mr. Williams that Jetaire's patent was broader than it actually was (i.e., that "Jetaire's patents covered all foam-based IMMs"). [*Id.* at ¶ 341]. Therefore, AerSale argues that, based on Mr. Williams' statements, Eastern Airlines falsely believed that AerSale's product infringed on Jetaire's patent(s).

Similarly, AerSale alleges that Mr. Williams' statements to Azurair tortiously damaged AerSale and Azurair's business relationship. Specifically, AerSale alleged that, because of Mr. Williams' statements, Azurair feared it would have a "patent problem" if purchased AerSale's IMM product. Consequently, Azurair feared it would have to implement a costly process to uninstall the product. Mr. Williams' statements, alleges AerSale, thus caused a delay in AerSale's sale to Azurair. This delay allegedly proved costly to AerSale—shortly after the sale was consummated,

3

the Ukraine-Russian war damaged AerSale's business with Azurair. Had the Jetaire-occasioned delay not occurred, asserts AerSale, it could have done more business with Azurair.

Lastly, as for its inequitable misconduct and exceptional case counterclaims, AerSale argues that Jetaire made knowing misrepresentations and omissions to the patent office in procuring its patents. But for these misrepresentations and omissions, argues AerSale, Jetaire would not have received its patents.

## II.    *APPLICABLE PRINCIPLES AND LAW*

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). On summary judgment, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 597 (1986) (quoting another source).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). In

4

making this determination, the Court must decide which issues are material. A material fact is one that might affect the outcome of the case. *See id*. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). "Summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

### III.   *ANALYSIS*

Jetaire seeks summary judgment against AerSale's counterclaims for defamation, tortious interference, inequitable conduct, and exceptional case. Jetaire, while contesting liability against each of these theories, also asserts that the tort claims are preempted by federal patent law.

#### A. *Federal Preemption of State-Law Tort Claims*

Jetaire asserts that its ostensibly-tortious statements to Azurair and Eastern Airlines are protected by a "patent privilege." That is, that Jetaire's exercise of its rights under federal patent law preempt AerSale's state-law tort claims of defamation and tortious interference.

The Federal Circuit "has held that federal patent law preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about patent litigation." *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004) (citing *Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1355 (Fed. Cir.

Appx00271

2008)). Consequently, "federal patent laws thus bar state-law liability for communications concerning alleged infringement so long as those communications are not made in 'bad faith.'" *Id.* at 1374–75.

To that end, the burden at trial would be on AerSale to demonstrate by clear and convincing evidence that Mr. Williams' allegedly tortious statements were made in bad faith. *See Lite-Netics, LLC v. Nu Tsai Capital, LLC*, 60 F.4th 1335, 1344 (Fed. Cir. 2023) ("HBL's state-law claims here thus 'can survive federal preemption only to the extent that those claims are based on a showing of "bad faith" action in asserting infringement.'") (quoting *Globetrotter*, 362 F.3d at 1374); *see also Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 Fi.3d 1291, 1304 (Fed. Cir. 2018) ("State tort claims based on enforcing a patent, including for tortious interference, are preempted by federal patent laws, unless the claimant can show that the patent holder acted in bad faith.").

To show the required bad faith, AerSale must "offer clear and convincing evidence that [Jetaire] had no reasonable basis to believe" that infringement occurred or would occur. *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1371 (Fed. Cir. 2002) ("To show bad faith in Pingel's actions, Golan must offer clear and convincing evidence that Pingel has no reasonable basis to believe that the GP petcock infringed Pingel's patents or that Pingel knew it was enforcing an expired, and therefore unenforceable, patent.").

And "in light of the underlying jurisprudential basis for the bad faith standard, rooted as it is in Supreme Court cases and Constitutional principles, a party

6

attempting to prove bad faith on the part of a patentee enforcing its patent rights has a heavy burden to carry." *800 Adept, Inc. v. Murex Sec., Ltd.*, 539 F.3d 1354, 1370 (Fed. Cir. 2008) (internal citation omitted).

### 1.  *Jetaire's Statements to Eastern Airlines*

With these principles in mind, we turn to whether federal patent law preempts the portions of AerSale's tortious interference claim and defamation claim that relate to Mr. Williams' communications with Eastern Airlines.

In his declaration, Mr. Courveur (Eastern Airlines' representative) states that while Eastern Airlines was negotiating with Jetaire and AerSale, Mr. Williams told Mr. Courveur that Eastern Airlines "should not purchase [AerSale's IMM product] because it was derived through AerSale having stolen [Mr. Williams'] and/or Jetaire's data." [D.E. 338-8 at ¶ 7]. Further, Mr. Williams also told Mr. Courveur that Jetaire had "several patents" that encompassed AerSale's IMM product. [D.E. 338-4 at 423:2–20].

As for the first portion of that statement, Jetaire argues that it had a good faith basis to believe that AerSale developed its product from Jetaire's data or that, at least, AerSale's product was sufficiently similar to Jetaire's product such that patent infringement was possible. Thus, Jetaire argues that its statements to Eastern Airlines were not made in bad faith.

To support this, Jetaire relies on a prior arbitration between the parties. There, the arbitration panel made a factual finding that AerSale had sent Jetaire's confidential information to third parties. [D.E. 325-10]. This apparently occurred

after Jetaire shared sensitive information with AerSale under a non-disclosure agreement ("NDA") to prototype Jetaire's system. [*Id.*]. When Jetaire backed out of the partnership, AerSale decided to develop its own competing technology. [*Id.*]. In doing so, the arbitrator's final award stated that AerSale "forwarded the [NDA-protected] materials provided [to] it by Jetaire to [two aeronautical engineers]." [*Id.* at 50]. Then, the two aeronautical engineers (per their testimony) "at the request of AerSale destroyed the Jetaire documentation." [*Id.*].

Accordingly, Jetaire argues that it was simply protecting its patent by informing Eastern Airlines that AerSale developed its product from Jetaire. And, at the very least, Jetaire argues that it was not "objectively baseless" for it to inform Mr. Courveur that AerSale's IMM product was created from Jetaire's stolen data and was therefore in violation of Jetaire's patents.

In response, AerSale argues that the arbitration panel concluded there was no evidence that AerSale created its product from data stolen from Jetaire. [*Id.* at 35] ("There is no evidence in the record that would support a claim that AerSale copied [Jetaire's] system or that it relied upon any documents provided to it at the time of the execution of the NDA …."). This, AerSale argues, is enough to show that Mr. Williams engaged in bad faith, or at the very least, is enough to raise a genuinely disputed issue of fact as to bad faith.

We cannot find that Jetaire's interpretation of the arbitrator's ruling, without more supporting facts, is enough to raise a genuine dispute that Mr. Williams engaged in bad faith. To stave off summary judgment, AerSale must raise a triable

8

Appx00274

issue that Jetaire's "patent-infringement allegation is objectively baseless"; that is, that "no reasonable litigant could realistically expect success on the merits." *Lite-Netics, LLC*, 60 F.4th at 1343. On balance, this is not a situation where Jetaire's "infringement allegations were so clearly meritless that their assertion was in bad faith." *Id.* at 1342.

Indeed, the arbitration panel did find that AerSale stole Jetaire's data. AerSale cannot meaningfully dispute that after its partnership ended with Jetaire, it sent Jetaire's NDA-protected data to two separate engineers then directed those engineers to destroy any evidence of the data. That being so, AerSale has not met its heavy burden to show that Jetaire's warning to Eastern Airlines that patent infringement may be afoot was "objectively baseless." Perhaps AerSale is correct that it did not rely on Jetaire's data when it created its IMM product. But even considering the arbitration panel's factual findings, that does not mean that AerSale's suspicion was "objectively baseless" under the circumstances.

Seeing that Jetaire has established a prima facie showing of good faith, it is AerSale's "burden to present affirmative evidence that [Jetaire] acted in bad faith." *Golan*, 310 F.3d at 1371–73 (citing *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1369, 48 USPQ2d 1225, 1246 (Fed. Cir. 1998)) ("To survive summary judgment, the party challenging such statements must present affirmative evidence sufficient for a reasonable jury to conclude that the patentee acted in bad faith, in light of the burden of clear and convincing evidence that will adhere at trial.").

That affirmative evidence has simply not been presented. All that AerSale has

presented is Jetaire's reasonable (or at least, not baseless) interpretation of the arbitrator's findings, and Jetaire's effort to protect its patent in light of those findings. From this, no reasonable juror could conclude thatAerSale has carried its "heavy burden" of proving that Jetaire's suspicions of potential infringement were "objectively baseless"—particularly in light of the clear and convincing evidence standard at trial. *See, e.g., Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 897 (Fed. Cir. 1998) (noting that "it is not improper for a patent owner to advise possible infringers of its belief that a particular product may infringe the patent" and that "[a] patentee has the right to inform a potential infringer of the existence of the patent, whereby the recipient of the information may adjust its activities, perhaps seek a license, or otherwise act to protect itself"); U.S. *Nutraceuticals, LLC v. Cyanotech Corp.*, No. 5:12-CV-366-OC-10PRL, 2014 WL 1092504, at *5 (M.D. Fla. Mar. 19, 2014) ("In general, a threshold showing of incorrectness or falsity, or disregard for either, is required in order to find bad faith in the communication of information about the existence or pendency of patent rights.") (citing *Mikohn*, 165 F.3d at 897); *Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8, 37–38, 33 S.Ct. 202, 57 L.Ed. 393 (1913) ("Patents would be of little value if infringers of them could not be notified of the consequences of infringement …. Such action, considered by itself, cannot be said to be illegal.")

As for the second portion of Mr. Williams' statement (that Jetaire had "several patents" encompassing IMM products), Jetaire argues that, once again, it had a good faith belief that a sale between Jetaire and Eastern Airlines would result in an

infringement of Jetaire's patents.

AerSale, conversely, argues that for several reasons Jetaire should have known its patent rights were illegitimate. As an initial matter, AerSale argues that Mr. Williams—not Jetaire Aerospace, LLC (the patent holder)—made the statements and therefore the statements cannot be protected by the "patent privilege." Additionally, AerSale argues that Jetaire knew it had been making commercial offers for sale and therefore should have known its patent would have been invalidated by the on-sale bar. Further, AerSale argues that Jetaire lied to the patent office when it procured the patent and therefore should have known that its patents were invalid or would be invalidated. Moreover, AerSale asserts that Jetaire should have known that the scope of its patent did not encompass AerSale's IMM product.

First, we reject AerSale's argument that the statements cannot be protected by the "patent privilege" because they were made by Mr. Williams. Throughout this litigation, Mr. Williams has been treated as Jetaire's corporate representative. In fact, numerous times throughout this litigation AerSale has sought to use Mr. Williams' statements against the patent holder, Jetaire Aerospace, LLC—specifically when AerSale sough invalidation of Jetaire's patents via the on-sale bar. AerSale points us to no authority to suggest that Mr. Williams statements cannot be imputed the patent-holding entity. Accordingly, we find this argument to be without merit or support.

Further, AerSale's arguments that Jetaire should have known that the on-sale bar would invalidate its patents and/ot misstated the scope of its patents would also

11

Appx00277

fail to convince a reasonable juror of bad faith. The Federal Circuit has made clear that "it is not improper for a patent owner to advise possible infringers of its belief that a particular product may infringe the patent." *Mikohn*, 165 F.3d at 897; *see also Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 709, 24 USPQ2d 1173, 1180 (Fed. Cir. 1992) (noting that a patentee "that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringers").

That is precisely what Jetaire sought to do. Mr. Williams apparently learned that Eastern Airlines was considering AerSale's IMM product, and informed Mr. Courveur that Jetaire had several patents relating to that product (which it did). Even if Jetaire was ultimately mistaken regarding the validity and/or scope of its patents, we have not been persuaded that at the time of Mr. Williams conversation with Mr. Courveur, Mr. Williams acted in bad faith by informing Mr. Courveur about potential patent infringement (or that a triable issue exists therein). This is especially true where "a patentee, acting in good faith on its belief as to the nature and scope of its rights, is fully permitted to press those rights '*even though he may misconceive what those rights are*.'" *Mikohn*, 165 F.3d at 897 (quoting *Kaplan v. Helenhart Novelty Corp.*, 182 F.2d 311, 314, 85 USPQ 285, 287 (2d Cir.1950)) (emphasis added).

Indeed, at that point in time, Jetaire possessed two different patents relating to a similar IMM product and was awaiting the issuing of a third (which was issued a few months after Jetaire spoke with Mr. Couvreur). Even if Jetaire misinterpreted the scope of its patents, or did not anticipate that the on-sale bar doctrine would years later invalidate its patents, neither scenario is fatal to federal preemption of Jetaire's

12

tort claims. AerSale has demonstrated at most, drawing all reasonable inferences in its favor, that Jetaire may have misconceived what its patent rights were when it warned Eastern Airlines of potential infringement. But AerSale has not presented affirmative evidence (that could reasonably satisfy its clear and convincing evidence burden), *Golan*, 310 F.3d at 1373, that Jetaire's warning of patent infringement was objectively baseless.

If anything, Jetaire's alleged misinterpretations of its patents' scope and validity were "potentially inaccurate and questionable"—not objectively baseless. *Id.* at 1373 (holding that "[t]he evidence of record relating to Pingel's reliance on attorney advice [regarding the validity of its patent], while potentially inaccurate and questionable, does not support Golan's claim that Pingel acted in bad faith"); *see also See Iguana, LLC v. Lanham*, 835 F. Supp. 2d 1372, 1379 (M.D. Ga. 2011) (granting summary judgment against tortious interference and defamation claims and holding that patent holder did not act in bad faith when communicating its' patent rights even though it relied on apparently errant licensing agreements, mistakenly thought that the correct licensing fees had been paid on the patents, and drew a slightly mistaken conclusion about the scope of the patent).

Additionally, drawing all reasonable inferences in favor of AerSale, we are not persuaded that Jetaire's alleged misrepresentations to the patent office were so severe that Jetaire should have known that its patents would be invalidated. As an initial matter, most of AerSale's arguments in favor of patent misconduct seem to go towards subjective bad faith—which is not proper to consider unless objective

13

Appx00279

baselessness is established. *See 800 Adept, Inc.*, 539 F.3d at 1370–71 (applying federal preemption to state-law tort claims despite Adept's allegations "that Targus knew the disclosure in the Neville patents anticipated the claims of the '897 patent, and that Targus misrepresented the scope of Neville to the PTO so that the '897 patent claims would survive the reexamination requested by Adept in 1999. Adept's argument sounds more like an allegation of subjective bad faith on Targus's part, a question that is not at issue absent the predicate showing that the claims asserted by Targus were objectively baseless."); *see also GP Indus., Inc. v. Eran Indus., Inc.*, 500 F.3d 1369, 1375 (Fed. Cir. 2007) ("Subjective considerations of bad faith are irrelevant if the assertions are not objectively baseless.") (citing *Prof' l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ("Only if the challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.")).

That being said, AerSale argues that Jetaire was aware of a similar patent (the SAE AIR4170A) before applying for its own patents but failed to disclose it to the patent office. But as Jetaire points out, reference to the SAE AIR4170A is plainly present in Jetaire's '998 Patent. [D.E. 325-2 at 13]. Thus, the Court is hard pressed to find that, against the backdrop of the clear and convincing evidence standard, "a neutral observer would reasonably think … that the patent was almost certain to be declared invalid." *Asahi Glass Co. v. Pentech Pharms., Inc.*, 289 F. Supp. 2d 986, 993 (N.D. Ill. 2003) (Posner, J.), *dismissed*, 104 F. App'x 178 (Fed. Cir. 2004).

Certainly, as AerSale points out, its possible that AerSale's reference to the

SAE AIR4170A did not wholly satisfy its disclosure duty. But it does not follow that because of that potential misstep, Jetaire's belief that its patents were valid was objectively baseless. At most, this evidence goes towards subjective bad faith (which is irrelevant).

AerSale also argues that Jetaire failed to disclose numerous offers of sale to the patent office—offers which Jetaire should have known would invalidate its patents under the on-sale bar. But Jetaire has contended throughout this litigation— all the way through summary judgment—that those offers were not "sale" offers, but "experimental use" offers. While the Undersigned ultimately recommended that that argument should not survive summary judgment, it cannot be said that the argument was raised in bad faith. Thus, we do not find compelling AerSale's arguments that Jetaire should have known its communications of patent infringement were objectively baseless because of its offers for sale.

Our limited focus is whether, in light of AerSale's argument that Jetaire mislead the patent office, there exists a genuine dispute that Jetaire's belief that its patents were being infringed was objectively baseless. Here, based on the murky affirmative evidence, we cannot say there is a genuine dispute as to bad faith; that is, that "no reasonable litigant [in Jetaire's shoes] could realistically expect success on the merits." *Lite-Netics, LLC*, 60 F.4th at 1343.

Accordingly, we find that federal patent law preempts those portions of Count X and XI of AerSale's Fifth Amended Counterclaim that relate to Eastern Airlines (i.e., the counterclaims of tortious interference and defamation relating to Eastern

15

Appx00281

Airlines). *See Golan*, 310 F.3d at 1373 (applying federal preemption of state-law tort claim where "the evidence d[id] not clearly show that Pingel knew the '921 patent was invalid at the time it asserted infringement or that Pingel had no reason to believe that Golan did not infringe any of Pingel's asserted patents"); *Globetrotter*, 362 F.3d at 1377 (granting summary judgment against state law tort claims "because of [the plaintiff's] failure to show that [the patent holder's] assertions of infringement were objectively baseless*"); Scosche Indus., Inc. v. Visor Gear Inc.*, 121 F.3d 675, 681 (Fed. Cir. 1997) (holding at summary judgment that federal patent law preempts unfair competition claim because "Scosche has offered no evidence to suggest that Visor Gear was acting in bad faith when it expressed the belief that Scosche's products infringed the '159 patent"); *GP Indus., Inc.*, 500 F.3d at 1375 (holding that there was an absence of bad faith and applying federal preemption despite there being evidence that the tort-defendant, Eran, "did not show that its president examined any product sold or distributed by" the tort-plaintiff, "did not show that any expert advice or opinions were sought before Eran made the accusations of infringement," and sent a letter threatening to file suit for infringement); *Dominant Semiconductors Sdn. Bhd. v. OSRAM GmbH*, 524 F.3d 1254, 1264 (Fed. Cir. 2008) ("Because Dominant failed to identify a genuine issue of fact regarding whether OSRAM's communications were objectively baseless, entry of summary judgment [against tort claims] was appropriate."); *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 343 F. Supp. 2d 272, 326 (D. Del. 2004), *aff'd*, 488 F.3d 982 (Fed. Cir. 2007) (holding that state law tort claims where preempted where "[n]othing has been

16

shown that transforms Honeywell's competitive goals into a finding of bad faith. The evidence offered by Universal and Sandel fails in this regard.").

### 2.  *Jetaire's Statements to Azurair*

Next, we assess Mr. Williams' statements to Azurair's representative, Mr. Saridere. Per Mr. Saridere's declaration, Mr. Williams told Mr. Saridere that "AerSale could not legally make an IMM product without a patent of its own, and that AerSale had no such patent." [D.E. 392-1 at ¶ 4]. Further, Mr. Williams informed him that there was an "ongoing court action with AerSale for the development of similar IMM products." [*Id.*]. As a result, Mr. Saridere feared that if he purchased AerSale's product, Azurair's aircrafts could be grounded for non-compliance with Federal Aviation Administration standards. [*Id.*].

Jetaire argues that these statements are clearly within the confines of Jetaire and AerSale's patent dispute. That is, that Jetaire was merely informing Azurair that a patent dispute existed, and Jetaire believed that it had a patent (or patents) encompassing AerSale's relevant IMM product. Any statements that Jetaire made to Azurair, argues Jetaire, were to protect Jetaire's patent(s) from being infringed.

Meanwhile, AerSale argues that Mr. Williams' statements painted a bad faith picture that Jetaire's patents encompassed all IMM products. Additionally, AerSale argues that Mr. Williams' statements cannot be given the benefit of preemption because Azurair operates in Russia where United States patent laws ostensibly do not apply.

Crucially, the inquiry is not whether Jetaire's belief that it had a valid,

17

Appx00283

applicable patent was legally correct. *See Golan*, 310 F.3d at 1373. Rather, the inquiry is whether there is a genuine dispute that Jetaire's belief and related communications to Azurair were "objectively baseless."

Here, incorporating much of the reasoning from the Eastern Airlines' statements, AerSale has not raised a triable issue that Jetaire acted in bad faith when it communicated potential infringement to Azurair. Giving credence to the arbitrator's final award, the sequence of events is as follows: Jetaire and AerSale shared protected information to develop Jetaire's IMM product; Jetaire and AerSale signed an NDA relating to that work; Jetaire pulled out of the partnership; AerSale sent to two aeronautical engineers Jetaire's confidential information; AerSale instructed the engineers to destroy the information; and AerSale developed a competing IMM product. [D.E. 325-10]. Also, it is undisputed by the parties that Jetaire and AerSale are the only two entities offering "FAA certified foam-based ignition mitigation systems in the market." [D.E. 325 at ¶ 5; D.E. 338-1 at ¶ 5].

Based on those facts, it was not objectively baseless for Jetaire to inform Azurair that it may have had a patent problem if it purchased AerSale's IMM product. These were the only two FAA-certified IMM products on the market, and AerSale's product was conspicuously developed after Jetaire and AerSale disbanded their partnership of creating an IMM product. AerSale's product was also developed against the backdrop of an arbitrator's finding that AerSale stole confidential data from Jetaire and shared it with aeronautical engineers. Granted, the arbitration panel found no evidence that AerSale's product was developed from that data—but

that finding does not entail that Jetaire's suspicion of infringement was objectively baseless.

To be clear, we make no finding whether AerSale *actually* violated Jetaire's patent rights, nor whether AerSale relied on Jetaire's data to create its IMM product. Rather, we assess only whether Jetaire's belief that AerSale infringed on Jetaire's patents was objectively baseless. To that end, "[t]here is nothing improper about a patentee attempting to enforce its rights under the patent by advising potential infringers of its good faith belief that a particular product infringes." *Scosche Indus., Inc.*, 121 F.3d at 681.

Even if the Court ultimately adopts the Undersigned's report and recommendation and concludes that Jetaire's patents are invalid, that is not dispositive on the issue of federal preemption. At the time of these communications, Jetaire sought to defend its patent rights, for which its belief of infringement was not objectively baseless. *See Concrete Unlimited Inc. v. Cementcraft*, Inc., 776 F.2d 1537, 1539 (Fed. Cir. 1985) ("Concrete Unlimited had the right to exclude others from making, using, and selling the invention and to enforce those rights until the '028 patent was held invalid. Concrete Unlimited did only what any patent owner has the right to do to enforce its patent, and that includes threatening alleged infringers with suit.").

Similarly, even if Jetaire's beliefs about the scope of its patents were off base, that, too, is not dispositive. *See Honeywell Int'l Inc.*, 488 F.3d at 1000 (analyzing bad faith and noting that "patentees are permitted to make representations about their

19

rights even though they are inaccurate"); *see also Golan*, 310 F.3d at 1373 (applying the federal preemption doctrine and granting summary judgment against state tort claims because "[t]he evidence of record relating to Pingel's reliance on attorney advice, while potentially inaccurate and questionable, does not support Golan's claim that Pingel acted in bad faith. 'Whether or not an opinion was "legally" correct is not the proper focus.'") (quoting *Graco, Inc. v. Binks Mfg. Co.*, 60 F.3d 785, 793–94 (Fed. Cir. 1995)). Unless we are presented with affirmative evidence from which a reasonable juror could conclude that Jetaire's belief and communications were in bad faith—which we have not been, especially in light of the clear and convincing standard at trial—federal preemption must apply.

Lastly, the fact that Azurair appears to do business in Russia does not sway our analysis. "Foreign entities can infringe a United States patent if they make, use, or sell an infringing product in the United States, or import an infringing product into the United States." *SSI Techs., LLC v. Dongguan Zhengyang Elec. Mech. LTD.*, 59 F.4th 1328, 1338 (Fed. Cir. 2023) (quoting 35 U.S.C. § 271(a)). In other words, Azurair could have (hypothetically) infringed upon Jetaire's patent if Azurair sought to "make, use, or sell" AerSale's IMM product in the United States.

AerSale may be correct that Azurair had no intention to make, use, or sell the product in the United States. But the analysis is not whether Jetaire's suspicion of infringement was ultimately "legally correct." Rather, the analysis is whether there is a genuine dispute that Jetaire's suspicion of the possibility of infringement— whether correct or incorrect—was objectively baseless; i.e., was levied in bad faith.

*Golan*, 310 F.3d at 1373 ("'Whether or not an opinion was 'legally' correct is not the proper focus.'") (quoting *Graco, Inc.*, 60 F.3d at 793–94).

Here, against the backdrop of the clear and convincing standard, AerSale has not presented affirmative evidence to show that Jetaire's suspicion that Azurair could infringe its patent was so off base that "no reasonable litigant could realistically expect success on the merits." *Lite-Netics, LLC*, 60 F.4th at 1343; *see also SSI Techs., LLC*, 59 F.4th at 1338 ("Each letter [warning of patent infringement] sent by SSI, on its face, refers only to alleged infringement of a United States patent. Foreign entities can infringe a United States patent if they make, use, or sell an infringing product in the United States, or import an infringing product into the United States. The argument that SSI could not obtain government action against the foreign entities to which it sent letters is therefore unpersuasive.").

To be clear, we make no finding whether Azurair would or would not have infringed upon Jetaire's patents if it purchased AerSale's IMM product. We find only that AerSale, with all justifiable inferences drawn in its favor, has not carried its "heavy burden" to raise a triable issue that Jetaire's communications with Azurair warning of potential infringement were objectively in bad faith. *800 Adept, Inc.*, 539 F.3d at 1370 (noting that "a party attempting to prove bad faith on the part of a patentee enforcing its patent rights has a heavy burden to carry").

Thus, because AerSale has not raised a genuine dispute that by clear and convincing evidence Jetaire's communications with Azurair could be found by a reasonable juror to be in bad faith, we recommend a finding that Jetaire's defamation

21

and tortious interference claims relating to Azurair are preempted by federal patent law. *See id.* at 1372 (reversing jury's decision and holding that state-law tort claims were subject to federal preemption despite the tort plaintiff's arguments that the patentee "acted deceptively" when applying for the patent; misstated the scope of its patent; knew that its patent "was subject to an on-sale bar"; led the patent examiner "astray"; and had no reasonable basis to believe that its patent was being infringed); *Scosche*, 121 F.3d at 682 (granting summary judgment against a state-law tort claim and holding that it was preempted by federal patent law where "Scosche has offered no evidence to suggest that Visor Gear was acting in bad faith when it expressed the belief that Scosche's products infringed the '159 patent"); *Kaplan*, 182 F.2d at 314 (holding that "it is not an actionable wrong for one in good faith to make plain to whomsoever he will that it is his purpose to insist upon what he believes to be his legal rights, even though he may misconceive what those legal rights are"); *Dominant Semiconductors Sdn. Bhd.*, 524 F.3d at 1264 (affirming the finding of an absence of bad faith because "objective baselessness requires a determination based on the record ultimately made in the infringement proceedings and the record of the state tort action, and not on the basis of information available to the patentee at the time the allegations were made. Because Dominant failed to identify a genuine issue of fact regarding whether OSRAM's communications were objectively baseless, entry of summary judgment [against Dominant's state-law tort claims] was appropriate."); *SSI Techs., LLC*, 59 F.4th at 1338 (holding that "[i]n view of SSI's expert report and DZEM's failure to adduce evidence of objective baselessness, the district court

properly granted summary judgment that SSI's communications to outside parties, including those DZEM claimed to be its customers or prospective customers, were protected").

In sum, because AerSale has not raised a genuine dispute that there exists clear and convincing evidence that Jetaire's communications alleging patent infringement were objectively baseless (as to both Azurair and Eastern Airlines), we recommend summary judgment be granted against AerSale's counterclaims for defamation (Count X) and tortious interference (Count XI).

### B. *Inequitable Conduct and Exceptional Case*

Jetaire also seeks summary judgment against AerSale's counterclaims for inequitable conduct and exceptional case (Count VII, Count VIII, and Count IX). [D.E. 376-1 at 30–42]. But for purposes of this motion, these counterclaims are presently moot.

The Court has recommended that Jetaire's patents be invalidated via the on-sale bar. [D.E. 366]. Thus, on the score of invalidity, AerSale can gain no relief from an inequitable conduct claim.

AerSale also seeks attorneys' fees on the basis of inequitable conduct. This argument, however, is also presently moot. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1383 (Fed. Cir. 2007) (affirming that inequitable conduct claim was moot where the prevailing party had not yet filed its "attorney fee application on inequitable conduct," and "therefore affirm[ed] the decision that the inequitable conduct counterclaim is presently moot"); *Zenith Elecs. Corp.*, 522 F.3d at 1367 n.11

23

(holding that inequitable conduct counterclaim was not moot because *all* of the asserted patents had not been declared invalid, but noting that "[t]his case is unlike *Liebel–Flarsheim*, where we concluded that the defendant Medrad's counterclaim for inequitable conduct was moot in view of, inter alia, our determination that all of the asserted claims were invalid").[2]

## IV.   *CONCLUSION*

For the reasons set forth above, we recommend that Jetaire's motion for summary judgment [D.E. 322] against Counts VII, VIII, IX, X, and XI of AerSale's Fifth Amended Counterclaims [D.E. 376] be **GRANTED in part**:

A. AerSale's counterclaims for inequitable conduct and exceptional case (Counts VII, VIII, and IX) should be deemed **presently MOOT**; and

B. Summary judgment should be **granted** against AerSale's counterclaims for defamation and tortious interference (Counts X and XI).

Pursuant to Local Magistrate Rule 4(b) and Fed. R. Civ. P. 73, the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, to the District Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report *and* shall bar the parties from challenging on

---

[2] Jetaire also seeks summary judgment against AerSale's counterclaim of "exceptional case." Because the sole remedy for his claim is attorneys' fees, this claim is, similarly, better suited as being styled and briefed as a motion for attorneys' fees after final disposition. This is especially true where the Undersigned must await the District Court's order on the parties' motions for summary judgment. Thus, deciding attorneys' fees at this juncture—which is the sole remedy for the exceptional case counterclaim—would be premature.

appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see, e.g., Patton v. Rowell,* 2017 WL 443634 (11th Cir. Feb. 2, 2017); *Cooley v. Commissioner of Social Security,* 2016 WL 7321208 (11th Cir. Dec. 16, 2016).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 17th day of May, 2024.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:20-cv-25144-DPG

JETAIRE AEROSPACE, LLC,

 Plaintiff,

v.

AERSALE INC.,

 Defendant/Counter-Plaintiff,

v.

JETAIRE AEROSPACE, LLC,
JETAIRE FLIGHT SYSTEMS, LLC,
and MICHAEL WILLIAMS,

 Counter-Defendants.

_____/

**ORDER**

**THIS CAUSE** comes before the Court on Defendant/Counter-Plaintiff AerSale, Inc.'s

("AerSale") Objection to Order [ECF Nos. 296 & 297] on AerSale's Motion to Exclude the

Testimony of Justin R. Blok (the "Objection").[1] [ECF No. 305]. On December 8, 2023, the case

was referred to Chief Magistrate Judge Edwin G. Torres for a ruling on all pretrial, non-dispositive

matters, and for a report and recommendation on any dispositive matters. [ECF No. 279]. On July

14, 2023, AerSale filed its Motions to Strike the expert testimony of Bill Ashworth and Justin

Blok. [ECF Nos. 199, 200]. January 8, 2024, Judge Torres entered an Order: (1) granting, in part,

and denying, in part, AerSale's Motion to Strike Mr. Ashworth's testimony; and (2) denying

---

[1] AerSale objects only to the portion of Judge Torres' Order relating to the expert testimony of Justin R. Blok, [ECF No. 296 at 16–19]. There are no objections to the remainder of Judge Torres' Order.

AerSale's Motion to Strike Mr. Blok's testimony. [ECF Nos. 296, 297].[2] After AerSale filed its Objection, Plaintiffs/Counter-Defendants Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, and Michael Williams filed their Response on February 5, 2024. [ECF Nos. 320, 323].[3] The Court has considered the Objection, the record, and the applicable law and is otherwise fully advised.

A party may file an appeal detailing specific objections to a magistrate judge's non-dispositive pretrial order. Upon review, the district court is required to consider the objections and must set aside any portion of the order found to be "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005) (citation and internal quotation marks omitted). "A ruling is contrary to law if the magistrate judge has misinterpreted or misapplied applicable law." *Root ex rel. A.R. v. Dudek*, 151 F. Supp. 3d 1309, 1312 (S.D. Fla. 2015) (citation and internal quotation marks omitted). "In the absence of a legal error, a district court may reverse only if there was an 'abuse of discretion' by the magistrate judge." *SEC v. Merkin*, 283 F.R.D. 699, 700 (S.D. Fla. 2012).

AerSale argues that Judge Torres' Order errs because it: (1) incorrectly finds that it is a question for the jury to decide whether Jetaire is entitled to lost profits; (2) improperly finds a genuine dispute of material fact on the basis of the "inexorable flow" theory; and (3) improperly relied on a "sham declaration". Having reviewed the Order for clear error of fact or law, the Court agrees with Judge Torres' analysis and conclusion to deny AerSale's Motion to Strike the expert testimony of Justin Blok. [ECF Nos. 296, 297]. Accordingly, Defendant/Counter-Plaintiff AerSale, Inc.'s ("AerSale") Objection to Order [ECF Nos. 296 & 297] on AerSale's Motion to

---

[2] An identical order was entered at both docket numbers.
[3] Jetaire filed an unredacted version of its Response at ECF No. 323.

Appx00293

Exclude the Testimony of Justin R. Blok, [ECF No. 305], is **OVERRULED**; and Magistrate

Judge Torres' Order, [ECF Nos. 296, 297], is **AFFIRMED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 1st day of August, 2024.

_____

DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE

**EXHIBIT A**

**U.S. Patent No. 9,849,998**

S.D. Fla.: *Jetaire Aerospace, LLC v. AerSale Inc.*          ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT



US009849998B2

(12) **United States Patent**
Williams

(10) **Patent No.:** **US 9,849,998 B2**
(45) **Date of Patent:** **Dec. 26, 2017**

(54) **BLOCK FOAM METHOD OF ACCOMPLISHING IGNITION MITIGATION IN AIRCRAFT FUEL TANKS**

(71) Applicant: **Michael D Williams**, Fayetteville, GA (US)

(72) Inventor: **Michael D Williams**, Fayetteville, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 241 days.

(21) Appl. No.: **14/851,511**

(22) Filed: **Sep. 11, 2015**

(65) **Prior Publication Data**

US 2017/0073079 A1      Mar. 16, 2017

(51) **Int. Cl.**
*B64D 37/08*      (2006.01)
*B64D 37/32*      (2006.01)
*B64D 37/02*      (2006.01)
*B60K 15/03*      (2006.01)

(52) **U.S. Cl.**
CPC ............. ***B64D 37/32*** (2013.01); ***B64D 37/02*** (2013.01); *B60K 2015/03032* (2013.01); *B60K 2015/03039* (2013.01); *B64D 37/08* (2013.01)

(58) **Field of Classification Search**
CPC ..... B23P 2700/01; B64D 37/02; B64D 37/08; B64D 37/32; A62C 2/06; A62C 3/08; B60K 2015/03032; B60K 2015/03039; B60K 2015/0344; B60K 2015/03407; B60K 2015/03421; B60K 15/03006; B60K 15/03
USPC ................................... 244/135 R; 511/135 R
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,358,591 B1 | 3/2002 | Smith | |
| H2054 H | 12/2002 | Bennet | |
| 6,803,090 B2 | 10/2004 | Castiglione et al. | |
| 7,341,113 B2 | 3/2008 | Fallis et al. | |
| 2011/0272526 A1* | 11/2011 | Barbosa | B64C 17/10 244/135 A |
| 2014/0076285 A1 | 3/2014 | Marin et al. | |
| 2014/0216416 A1 | 8/2014 | Novaco et al. | |
| 2017/0096234 A1* | 4/2017 | Martindale | B64D 37/06 |

FOREIGN PATENT DOCUMENTS

WO      WO 2015/170088 A1 *   5/2015   ............. B60K 15/03

* cited by examiner

*Primary Examiner* — Christopher Besler
(74) *Attorney, Agent, or Firm* — J. T. Hollin, Attorney-at-Law, P.C.

(57) **ABSTRACT**

A process method utilizing customized, specifically-shaped pieces of reticulated polyurethane foam (RPF) to fill an aircraft fuel tank or tank compartment to provide ignition mitigation and prevent explosion in the tank. The process involves inserting the shaped pieces of RPF through existing access ports into a fuel tank in order to fill the tank, excepting minimal planned void spaces. This process effects ignition mitigation by acting as an ignition blocker, mechanically interfering with the compression wave that precedes the flame front in an explosion, and changing the vaporous mixture above the fuel level (ullage) in the tank. The foam pieces are assembled and fitted together throughout the tank in a pattern that replicates the shape of the tank. After the foam insertion is complete, the fuel tank is filled with purging fluid, drained through a filter until no debris is found, and the new maximum fuel quantity is recalibrated.

**6 Claims, 7 Drawing Sheets**



U.S. Patent          Dec. 26, 2017          Sheet 1 of 7          US 9,849,998 B2



FIG. 1

**U.S. Patent**    Dec. 26, 2017    Sheet 2 of 7    **US 9,849,998 B2**



FIG. 2



FIG. 3

FIG. 3A

U.S. Patent        Dec. 26, 2017        Sheet 3 of 7        US 9,849,998 B2



FIG. 4



FIG. 5

FIG. 5A

FIG. 6

U.S. Patent          Dec. 26, 2017          Sheet 5 of 7          US 9,849,998 B2



FIG. 7

**U.S. Patent**    Dec. 26, 2017    Sheet 6 of 7    US 9,849,998 B2



FIG. 8



FIG. 8A



FIG. 8B



FIG. 8C

U.S. Patent     Dec. 26, 2017     Sheet 7 of 7     US 9,849,998 B2



FIG. 9

US 9,849,998 B2

**1**

## BLOCK FOAM METHOD OF ACCOMPLISHING IGNITION MITIGATION IN AIRCRAFT FUEL TANKS

### CROSS-REFERENCES TO RELATED APPLICATIONS

Not applicable.

### STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

Not applicable.

### NAMES OF THE PARTIES TO A JOINT RESEARCH AGREEMENT

Not applicable.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The inventive concept disclosed relates generally to methods employed to prevent and/or minimize fuel ignition, fire, and/or explosion in the interior of aircraft fuel tanks. In particular, the inventive concept disclosed is concerned with specific methods of installing shaped, reticulated sheets or blocks, of foam to fill the internal space of fuel tanks of transport category aircraft.

2. Background

Since 1959, there have been sixteen documented incidents of fuel tank ignition events in aircraft. These fuel tank ignition events have resulted in 542 fatalities, 11 hull losses and 3 incidents causing substantial damage. The causes of the fuel tank ignition events were attributed as follows: 4 were caused by external wing fires, 4 by electrostatics, 3 by faulty fuel pumps or wiring, 2 by lightning, and 3 to unknown causes.

On Jul. 17, 1996, TWA Flight 800 sustained an in-flight break-up after taking off from Kennedy International Airport in New York, resulting in 230 fatalities. The National Transportation Safety Board ("NTSB") conducted a lengthy investigation and determined that ignition of the flammable fuel/air mixture in a center wing fuel tank had occurred, causing an explosion that disintegrated the aircraft in flight. Although the exact ignition source could not be determined, the NTSB concluded that the most likely ignition source was a short circuit outside the center wing fuel tank that allowed excessive voltage to enter the tank through electrical wiring associated with the fuel quantity indication system (FQIS).

The NTSB announced their official findings regarding the TWA 800 accident at a public meeting held on Aug. 22 and 23, 2000 in Washington. D.C. Primarily as a consequence of TWA Flight 800, the Federal Aviation Administration ("FAA") issued numerous airworthiness directives intended to reduce possible ignition sources and thereby the risk of another fuel tank explosion. On May 7, 2001, the FAA promulgated rulemaking to establish several new transport category airplane fuel tank safety requirements (66 Federal Registry 23086, May 7, 2001). The rulemaking, effective Jun. 6, 2001, included Amendment 21-78, Amendment 25-102 and Special Federal Aviation Regulation ("SFAR") No. 88 entitled "Transport Airplane Fuel Tank System Design Review. Flammability Reduction and Maintenance Requirements." SFAR No. 88 required that type certificate holders and supplemental type certificate holders conduct a revalidation of the fuel tank system designs on the existing

**2**

fleet of transport category airplanes capable of carrying thirty (30) or more passengers or a payload of 7,500 pounds or more.

Legislation was enacted as 14 CFR §25.981 (Rule 25.981) and FAA Advisory Circulars AC 25.981-1B and 25.981-2 were issued to provide compliance guidance. Compliance with Rule 25.981 required each applicant to develop a failure analysis for the fuel tank installation to substantiate that ignition sources would not be present in the fuel tanks. The requirements of this section are in addition to the more general propulsion failure analyses requirements of 14 CFR 25.901 and 14 CFR 25.1309 that have been applied to propulsion installations.

14 CFR §25.981 (a) (3) defines three failure scenarios that must be addressed in order to show compliance with the rule (known as the "three phases" of compliance):

(a) Each single failure, regardless of the probability of occurrence of the failure, must not cause an ignition source;

(b) Each single failure, regardless of the probability of occurrence, in combination with any latent failure condition not shown to be at least extremely remote (i.e., not shown to be extremely remote or extremely improbable), must not cause an ignition source; and

(c) All combinations of failures not shown to be extremely improbable must not cause an ignition source.

Compliance with 14 CFR §25.981 (Amendment 25-125) requires investigation of the airplane fuel tank system using analytical methodology and documentation currently used by the aviation industry to demonstrate compliance with 14 CFR 25.901 and 25.1309 but with consideration of unique requirements included in this amendment of this paragraph.

The Federal Aviation Administration (FAA) mandates forced certificate holders to develop and implement all design changes required to demonstrate that their aircraft meet the new ignition prevention requirements and to develop fuel tank maintenance and inspection instructions. Specifically, SFAR No. 88 contains six (6) requirements applicable to transport category aircraft: 1) determine the highest temperature allowed before ignition occurs; 2) demonstrate that this temperature is not achieved anywhere on the aircraft where ignition is possible; 3) demonstrate that ignition could not occur as a result of any single point failure; 4) Establish Critical Design Configuration Control Limitations ("CDCCL"), inspections or other procedures to prevent changes to the aircraft that would result in re-introduction or creation of ignition sources; 5) develop visible means to identify critical features of the aircraft where maintenance, repairs or alterations would affect areas or systems of possible ignition; and 6) design of fuel tanks must contain a means to minimize development of flammable vapors in fuel tanks or a means to mitigate the effects of ignition within fuel tanks.

Maintenance of ignition source prevention features is necessary for the continued operational safety of an airplane's fuel tank system. One of the primary functions of the fuel tank system is to deliver fuel in a safe manner. Preventing ignition sources is as important a function of the fuel system as the delivery and gauging of fuel. The failure of any ignition source prevention feature may not immediately result in an ignition event, but a failure warrants maintenance for continued airworthiness because the failure could eventually have a direct adverse effect on operational safety.

There have been various solutions proposed and implemented to comply with the mandated transport category aircraft fuel tank ignition mitigation requirements. Examples of compliance methods implemented include electronic

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT
Appx00304

US 9,849,998 B2

**3**

solutions such as the installation of Transient Suppression Devices ("TSD"), Ground Fault Interrupters ("GFI"), and similar current limiting devices. These devices are deficient in that they retain possible failure rates that a "passive." non-electronic solution could resolve. Clearly, there is a need for a simplified and reliable solution to make implementation of the SFAR No. 88 compliance feasible. A better solution would be a less expensive, passive solution that is applicable to commercial and private transport category aircraft.

### BRIEF SUMMARY OF THE INVENTION

An apparatus and process method in accordance with the principles of the present invention includes the use of conformed, interrelated blocks of reticulated foam shaped to replicate the inside dimensions of an aircraft fuel tank. The foam is used as a passive means to mitigate ignition in aircraft auxiliary fuel tanks. The present inventive concept advantageously satisfies the aforementioned deficiencies by providing a method of accomplishing ignition mitigation in transport category aircraft fuel tanks using molded polyurethane safety foam in coordinated shapes to fill the fuel tanks. Polyurethane safety foam is a reticulated flexible foam composed of a skeletal matrix of lightweight interconnecting strands. For purposes of this disclosure, this particular material is referred to as "Reticulated Polyurethane Foam" ("RPF").

Other advantages of the inventive concept include slosh attenuation, hydrodynamic ram attenuation, and foreign object debris barrier properties of RPF. As a surge or explosion mitigating agent, RPF attenuates the sloshing of fuel and, in some cases, eliminates the need for structural baffles within a tank. RPF further provides for a "smooth" sine wave motion of the fuel and reduces rapid redistribution of mass.

Hydrodynamic ram effect within a fuel tank or bladder cell is caused when a projectile impacts the exterior structure of the fuel tank. Ram force can be intensified when the tank is penetrated by a high explosive incendiary ("HEI") delayed detonating-type projectile. The matrix-type structure of RPF absorbs a portion of the shock wave as a projectile penetrates a fuel tank. Attenuation of hydrodynamic ram minimizes damage to the fuel tank structure by reducing the overpressure of the shock wave and helps to orient the round to prevent tumbling. The reduction of fuel tank structural damage can effectively reduce fuel discharge through the projectile entrance and exit points.

The foreign object debris barrier capability of RPF materials is an inherent beneficial effect rather than a product specification requirement. The RPF used in this inventive concept is a natural filter, due to its inherent structure resembling a fibrous network. The finer the porosity of a material used as a fuel filter, the greater the entrapment of foreign objects and loose debris. The RFP material entraps loose debris within a fuel tank and minimizes the amount of debris entering an adjacent tank, the tank fuel lines, or the engine fuel system.

Explosion within a fuel tank containing kerosene-type fuels occurs as a result of the existence of flammable mixture in the ullage in combination with an ignition source. Examples of possible ignition sources include incendiary ammunition penetrating the fuel tank, static discharges, lightning strikes, switch refueling, and electrical shorts. Reticulated polyurethane foam (RPF) is in effect a three-dimensional fire screen, which minimizes the possibility of gasoline and kerosene-type (such as jet aircraft fuel) explo-

**4**

sions under one or a combination of the following theories: the foam acts as a heat sink, (i.e., it removes energy from the combustion process by absorbing heat); it mechanically interferes with the compression wave that precedes the flame front in an explosion; and, the high surface-to-volume of reticulated polyurethane foam enables the strands to collect or coalesce the droplets of fuel, thus changing the vaporous mixture in the empty space above the fuel level (ullage), in the tank. Coalescing causes the vaporous mixture to become lean, which minimizes possible explosion.

The present inventive concept advantageously allows for greatly increased effectiveness in preventing the hazardous ignition of fuel within aircraft auxiliary tanks (satisfying all three phase requirements of 14 CFR §25.981 compliance), is passive and therefore far less likely to experience a system failure, and available at a cost of implementation far less than that of alternative electronic solutions.

Experience in the aviation industry has shown that any fuel tank can be filled to maximum of about 85% capacity (not including a fuel swell of 12%) with reticulated polyurethane foam blocks, not including any planned voids. The foam blocks should be kept clear of tank components such as the fuel inlets, fuel sensors, float switches, and tank vents.

Other embodiments of an apparatus and method in accordance with the above principles of the inventive concept may include alternative or optional additional aspects. One such aspect would be use of foam of sufficient porosity and ignition mitigation properties composed of a synthetic or naturally occurring material other than polyurethane.

Another aspect of the present invention is the use of block foam material in an interrelated, geometrical shape different from those shapes depicted in FIG. **4**.

Another aspect of the present invention is to use alternate access ports of the aircraft auxiliary fuel tank to insert the foam blocks and position them in a distinct pattern to minimize any voids along tank walls.

Another aspect of the present inventive concept is the utilization of a "fully packed" design concept. A fully packed system is defined as one where all potential fuel tank ullage is filled with reticulated polyurethane foam with cutouts for components only. This system is most desirable where minimal or no tank over-pressure can be tolerated.

Another aspect of the present inventive concept is the utilization of a grossly voided design concept. A grossly voided system is defined as one where the fuel tank contains strategically positioned reticulated foam for explosion suppression. This system provides for minimal weight penalty and fuel retention, and is best suited for a fuel system that can withstand substantial overpressures.

These and various other advantages and features of novelty which characterize the invention are pointed out in the accompanying descriptive matter and drawings which form a further part hereof. For a better understanding of the invention, its advantages and the objects obtained by its use reference should be made to the drawings in which are illustrated and described specific examples of an apparatus and method in accordance with the present invention.

### BRIEF DESCRIPTION OF THE VIEWS OF THE DRAWINGS

FIG. **1** illustrates a general overall fuselage-cutaway view of a Boeing® 737 jet aircraft, further showing the location of the center wing fuel tank.

FIG. **2** shows the location of the center wing tank of the Boeing® 737 aircraft, as would be seen looking through the

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Appx00305

US 9,849,998 B2

5

bottom of the fuselage, and further, a tank access panel utilized by maintenance personnel for ground servicing.

FIG. 3 depicts a close-up view of the access panel to the center wing tank shown in FIG. 2.

FIG. 3(A) is an illustration of the manner in which the access panel is removed from the exterior of the center wing tank

FIG. 4 shows a cutaway view of the structural members of the center wing tank, in accordance with section line 4-4 of FIG. 1.

FIG. 5 illustrates the profile of a single, specifically-shaped RPF block which has been precisely cut to fit, in a vertical orientation, the exact contour of one section of the center wing tank.

FIG. 5(A) presents a side view of the RPF block of FIG. 5.

FIG. 6 presents a diagram of the aggregate of a plurality of sequentially-arranged, pre-cut RPF blocks to be installed adjacent to one another, thereby conforming to the contour of the forward compartment of the center wing tank.

FIG. 7 is a stylized rendering of the center wing tank, further showing the packing arrangement of a plurality of RPF blocks properly installed in the forward compartment of the center wing tank.

FIG. 8 depicts the initiation of installation of RPF blocks on the right side of the aft compartment.

FIG. 8A shows the initiation of installation of RPF blocks on the left side of the aft compartment, the right side of the compartment having been completed

FIG. 8B presents depicts the beginning of installation of RPF blocks in the middle section of the aft compartment.

FIG. 8C depicts the completion of installation of RPF blocks in the aft compartment.

FIG. 9 illustrates a diagram of the resultant installation of all RPF blocks in the forward, center, and aft compartments of the center wing tank of a typical Boeing® 737 aircraft.

DETAILED DESCRIPTION OF THE
INVENTION

The present inventive concept includes the use of shaped, interrelated, sequential blocks of reticulated polyurethane foam (RPF) blocks to fill specific fuel tank(s) of a transport category aircraft. The objects, features, and advantages of the concept presented in this application are more readily understood when referring to the accompanying drawings. The drawings, totaling nine figures, show the basic components and functions of embodiments and/or the proper method steps. In the several figures, like reference numbers are used in each figure to correspond to the same component as may be depicted in other figures.

For illustrative purposes only, and not by way of limitation, the methods and systems described in this disclosure apply primarily to Boeing® 737 series aircraft. This detailed description section is merely exemplary in nature and is not intended to limit the methods and uses shown in this inventive concept. There is no intention for the applicant to be bound or constrained by any expressed or implied theory (ies) set forth in the relevant technical fields, background, brief summary, or the present detailed description of the inventive concept as it relates to Boeing® 737 aircraft. Further, there is no intent to confine the inventive method disclosed to one particular make, model, or series of aircraft, or particular configurations of aircraft fuel tanks.

By utilizing the disclosed method of installing RPF blocks 50 to fill one or more fuel tanks of an aircraft, the aircraft operator prevents or minimizes the potentially damaging or

6

catastrophic effects of fuel ignition, fire, and/or explosion. For ease of explanation and for illustrative purposes, the disclosed method is described with regard to installation of the RPF blocks into the center wing tank 112 of a Boeing® 737 aircraft 110.

The discussion of the present inventive concept will be initiated with FIG. 1, which illustrates an overall view of a Boeing® 737 jet aircraft 110. FIG. 1 also depicts the fuselage 111, and the center wing tank 112, which is encircled. As in most similar jet aircraft, the predominance of the fuel load is generally carried in fuel tanks constructed within the left wing 104 and right wing 105, with equal quantities in each wing 104, 105. The wing-loaded fuel serves to add a counter-balancing weight to offset the upward wing structural bend due to the aerodynamic lift force generated by the wings 104, 105 when in flight. However, for substantially increased range, the aircraft 110 may be loaded with additional fuel in the center wing tank 112 and other internal tanks, if available.

FIG. 2 is a stylized rendering looking upward at the undersurface of the Boeing® 737 fuselage 111, further revealing the location of the center wing tank 112. Also shown in FIG. 2 is a center wing tank access panel 20 utilized by maintenance personnel during ground servicing of this particular model and series of the Boeing® 737.

FIG. 3 depicts an expanded view of the access panel 20 shown in FIG. 2. FIG. 3(A) is an illustration of the manner in which the access panel 20 is removed from the exterior of the center wing tank 112, further showing a clamp ring 21, one of a plurality of washers 22, and one of a plurality of bolts 23, the washers 22 and bolts 23 utilized for insertion through apertures 24 for fastening the clamp ring 21 onto a lower center wing panel 26.

FIG. 4 illustrates a stand-alone sectional view of the center wing tank 112, in accordance with section line 4-4 of FIG. 1. The structural integrity of the center wing tank 112, as positioned within the fuselage 111, substantially determines the internal contour of the center wing tank 112. The aircraft 110 structural members shown in FIG. 4 include the front spar 120, the rear spar 121, the floor beams 122, and the tank ceiling 127 abutting the aircraft floor beams 122. As shown in FIG. 4, the center wing tank 112 comprises a forward compartment 131, a center compartment 132, and an aft compartment 133. The three compartments 131, 132, 133 are separated by spanwise beam #2 124 and spanwise beam #1 125. In each of the three compartments 131, 132, 133, the fuel tank floor 128 comprises lower stiffeners 128 and the fuel tank ceiling 127 comprises upper stiffeners 129, which give additional rigidity to the tank compartments 131, 132, 133.

Before continuing with the immediate discussion of installation of the RPF aggregate blocks 50, explanation will be given of the methodology and process of measuring, sizing, and cutting the RPF blocks 50. Shown in FIG. 5 there is illustrated, by way of example, a forward compartment RPF block 51.

FIG. 5 shows a profile view of a forward compartment RPF block 51. This forward compartment RPF block 51 is designated as such due to the fact that the contour of its outer perimeter corresponds to the location of a specific, vertically-oriented cross-section of the forward compartment 131 of the center wing tank 112. In examining FIG. 5, the topmost section shows four upper cutouts 52 which provide clearance for the upper stiffeners 129 of the forward compartment 131 as shown in FIG. 4. The left edge 55 of RPF block 51 is fabricated so as to correspond to the forward tank wall 123, and further shows an arcuate cutout 53 which

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT
Appx00306

US 9,849,998 B2

7

provides clearance for a tank fuel pump, or other tank component. The bottommost section of the forward compartment RPF block 51 illustrates three cutouts 54 which allow clearance for the three lower stiffeners 130 of the forward compartment 131, as shown in FIG. 4.

The right edge 56 of the forward compartment RPF block 51 corresponds to spanwise beam #2 124, as is depicted in FIG. 4. FIG. 5(A) is a view looking directly at the right edge 56 of the forward compartment RPF block 51, and further showing the nominal width 57 of the forward compartment RPF block 51. The width of the aggregate RPF blocks 50 are fabricated in the range of 2.0 inches to 4.0 inches, depending on the size and contour of the fuel tank in which RPF blocks 50 are to be installed. A directional UP arrow and a FORWARD arrow are printed on the surface of the RPF block 51 to further ensure the installer places the block 51 in the correct orientation.

The illustrated forward compartment RPF block 51 of FIG. 5 is further given a part number (P/N) to indicate its exact location in the forward compartment 131 of the center wing tank 112. The part number also defines the order of its loading in the installation sequence of all RPF blocks 50. The general manner of construction of the contour of the previously-described forward compartment RPF block 51 is typical of the parameters to be met for each of the aggregate RPF blocks 50 to be inserted in the forward compartment 131 of the center wing tank 112 of a Boeing® 737 series 400 aircraft as well as those RPF blocks to be installed in the mid compartment and aft compartment of the center wing tank 112. Similarly, the general manner of construction of the contour of any other RPF block described above is typical of the parameters to be met for any RPF block to be installed in any of a variety of aircraft fuel tanks.

The contours of the aggregate of all RPF blocks 50 are a culmination of determinations made of the internal dimensions, profile, connections, attachments, and integral components of the inner surface of the fuel tank at the specific measured increment along one length of the forward, center, and aft compartments 131, 132, 133 of the center wing tank 112. This methodology is applicable to the determination of the size and contour of any RPF block that may be fabricated for insertion into any of an unlimited variety of aircraft fuel tanks.

In preparing for installation of RPF blocks in the center wing tank 112, a plurality of planar sheets of reticulated polyurethane foam (RPF) material is manufactured. Each of said sheets, in the preferred embodiment, generally comprises a thickness 57 of 2.0 inches. However, in general applicability, the thickness is dependent upon the size and type of aircraft fuel tank in which the RPF blocks are to be inserted. During the manufacturing process, the planar sheets of reticulated polyurethane foam may be dyed a purple color. The purple color facilitates the trouble-shooting of fuel contamination or irregularities associated with the engine fuel feed or tank.

By way of example only, in the case of the center wing tank 112 of a −300 series Boeing® 737 aircraft, engineering drawings are executed in a sequential series of scaled renderings of the profile of the forward compartment 131 of the center wing tank 112. The profile of the compartment is measured and scaled at regularly-spaced increments (2.0 inches in the preferred embodiment) along an essentially horizontal line extending from the right side to the left side of the interior of the forward compartment 131. In the same manner, engineering drawings are rendered for the incremental profile of the center compartment 132 and aft compartment 133 of the center wing tank 112.

8

A plurality of cutouts of RPF blocks 50 is made from the manufactured sheets of RPF, each block cutout excised according to the previously-described scaled renderings and further, each RPF block cutout is progressively identified with a part number and an orientating UP arrow and FORWARD arrow is printed thereon. Cutting and shaping of the individual RPF block cutouts from the RPF sheets is accomplished by use of several optional means: a mechanical blade type cutting, specially designated/manufactured smooth blade type cutting tools, an extremely fine-toothed band saw-type blade, or a hot-wire type cutting tool per SAE AIR4170A.

Once the entirety of the aggregate RPF blocks 50 required for the center wing tank 112 have been excised, each cutout is painted with a part number (P/N) and numerical sequencing corresponding to the sequential placement of each RPF block cutout along the line of measured increments within each of the forward, center, or aft compartments 131, 132, 133. The RPF blocks 50 are individually packaged and arranged in a stack or stacks which correspond to the orderly, sequential installation of each RPF block 50 along the horizontal line of increments previously measured. Further, detailed written instructions regarding the installation are drafted and organized in a manual for the guidance of technicians who will install said RPF blocks 50.

To install the shaped block reticulated polyurethane foam in the center wing tank 112, the aircraft 110 must be positioned on a level surface and at a convenient height for access to the center wing tank 112. The access opening cover is then removed and the RPF blocks 50 are inserted through the access openings with the exercise of care to avoid tearing or abrading the RPF blocks on the lip of the opening. FIG. 2, FIG. 3 and FIG. 3(A) illustrate the relative position of the access panel 20 of the center wing tank 112.

As stated previously, a very specific order of insertion of the RPF blocks 50 must be followed so that all spaces that are intended to be filled in the center wing tank 112 are indeed filled. Empty spaces in the tank can only be those left by design, which is referred to as "planned voiding." The center wing tank 112 under discussion here should be filled with the RPF blocks 50 fitted according to the patterns specified in the specific engineering drawings and installation instructions of each designed block contour.

By way of further illustration, FIG. 6 depicts a diagram of a plurality of sequentially-arranged, pre-cut RPF blocks to be installed adjacent to one another, thereby conforming to the interior contour of the forward compartment 131 of the center wing tank 112 of a Boeing® 737 aircraft. Each of the RPF blocks 50 has a shape and an order of installation which ultimately conforms to a specific contour of the forward compartment 131 at a precise point in the forward compartment 131. FIG. 7 is a stylized rendering of the center wing tank 112, further showing the packing arrangement of a plurality of RPF blocks 50 in the process of being installed in the forward compartment 131 of the center wing tank 112.

Generally, the installation of the RPF blocks 50 is accomplished by technicians entering through existing fuel tank access bays and openings, along with the uploading of the RPF blocks 50 into the tank 112. In the preferred embodiment, as disclosed in this inventive concept, and for illustrative purposes only, the center wing tank 112 of a typical Boeing® 737 aircraft is depicted as undergoing installation of the RPF blocks. On aircraft other than the Boeing® 737, existing fuel tank access openings that may be used for insertion and installation include, but are not limited to, maintenance access holes, wet and dry access bays found on non-cylindrical auxiliary fuel tanks, inspection holes in belly

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT
Appx00307

US 9,849,998 B2

**9**

tanks, and the like. A very specific order of insertion of the RPF blocks **50** must be followed so that all spaces that are intended to be filled in the tank are indeed filled.

The shaped blocks **50** of reticulated polyurethane foam (RPF) are inserted through one or more of the access bays, ports, etc., and fitted together in accordance with the present invention. Care is necessarily exercised to avoid tearing or abrading the foam on the lip of the access bays. Shaped block foam pieces are inserted and positioned in a manner to ensure that the required internal tank void is filled and maximum ignition source prevention is achieved. The foam material used is considered to be a "memory foam" type, the kind that returns to its original shape after compression down to 40% of its original volume. These "memory foam" RPF blocks **50** may be compressed for passage through the access ports. A key feature of the present inventive concept is that the design of the shaped block foam pieces to allow them to fit through the existing access bays or ports of various aircraft fuel tanks. Previously, installation of similar material had to be accomplished by removing some portions of the aircraft wing skin in some areas.

The majority of Boeing® 737 series 300 and series 400 aircraft are characterized by a first internal access port **18** between the aft compartment **133** and the center compartment **132** of the aircraft and a second internal access port **19** between the center compartment **132** and the forward compartment **131**. These access ports are depicted in FIGS. **8**, **8**A, **8**B, and **8**C. In the installation of RPF blocks **50** in the center wing tank **112** of a Boeing® 737 aircraft, the procedure begins with the right side of the aft compartment **133** of the center wing tank **112**. The installer(s) must gain access to the aft compartment **133** first, through the lower access panel **20** located on the underside of the fuselage **111** of the aircraft, as shown in FIG. **2** and FIG. **3**. Access is sequentially accomplished through the second internal access port **19**, and the first internal access port **18**.

FIG. **8** depicts a quantity of RPF blocks **50** having been installed on the right side of the aft compartment **133**. Next, the installer(s) work the left side of the aft compartment **133**. FIG. **8**A showing the completion of installation of RPF blocks on the left side of the aft compartment **133**, the right side of the compartment **133** having been completed. As the installer(s) begins exiting the aft compartment **133** through the first access port **18**, he/she installs RPF blocks **50** in the middle section of the aft compartment **133**, as shown in FIG. **8**B, FIG. **8**C depicts the completion of installation of RPF blocks **50** in the aft compartment **133**.

FIG. **9** illustrates a diagram of the resultant installation of all RPF blocks in the forward, mid, and aft compartments of the center wing tank **112** of a typical Boeing® 737 aircraft. The diagram depicts the aft compartment **133**, the mid

The fitted size, shape and installation of the aggregate of RPF blocks **50** should be such that no internal tank voids longer than 2.5 feet exist (with the internal tank fuel probes installed). The RPF blocks **50** must be kept clear of the tank components such as the fuel ports, fuel probes, float switches, and tank vents. The "planned" voiding areas around these structures should not exceed a volume of 10% of the total fuel tank volume and there should be no connecting voids between any of the planned void spaces. The minimum space of foam filled area required between the planned void areas is three (3.0) inches if maximum void size is used.

While the present invention has been described above in terms of specific embodiments, it is understood that the invention is not limited to these disclosed embodiments. It is not intended to be exhaustive or to limit the invention to

**10**

the precise form disclosed. Many modifications, variations, and other embodiments of the invention will come to mind of those skilled in the art to which this invention pertains, and which are intended to be and are covered by both this disclosure and hereafter submitted claims. It is indeed intended that the scope of the invention should be determined by proper interpretation and construction of the hereafter submitted claims and their legal equivalents, as understood by those of skill in the art relying upon the disclosure in this specification and the attached drawings. It is intended that the scope of the invention is not limited to any particular aircraft.

What is claimed is:

1. In an aircraft equipped with at least one liquid fuel tank, the tank having internal surfaces contoured for the accommodation of structural members such as spars, beams, valves, and piping, a method for providing fuel ignition mitigation in the tank, comprising the steps of:

a) determining dimensions, contour, and precise locations of structural members of the fuel tank as encountered at sequentially-measured linear increments along either width or length dimension of the tank interior;

b) rendering a scaled engineering drawing of a vertically-oriented cross-sectional profile of the fuel tank at each linear increment;

c) numerically sequencing each drawing so as to correspond to a respective drawing location along the liner increments within the tank;

d) providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said RPF comprising a thickness dependent upon size and type of aircraft fuel tank;

e) excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each cutout conforming to each of the scaled engineering drawings, and further, designating each cutout by a part number, an orientating "UP" arrow, and an orientating "FORWARD" arrow;

f) arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of each RPF cutout part number;

g) sequentially packaging said aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping;

h) composing instructions to be used by technicians/installers for the purpose of inserting and installing said RPF blocks into the tank;

i) parking the aircraft on a level surface, and emptying and purging the tank;

j) removing a fuel tank access panel or other external fuel tank cover which i) functions as a point of entry for maintenance personnel and/or technicians into the fuel tank, and ii) is proximate a pre-determined starting point of the installation;

k) inspecting the internal surfaces of the tank to ensure cleanliness and accessibility by the installers;

l) placing the first sequential RPF block at a specified location within the fuel tank as so designated in the instructions;

m) placing each successively-ordered RPF block at its designated location within the fuel tank, as set forth in the instructions, until said fuel tank is filled in accordance with the previously determined aggregate of RPF blocks;

n) performing an inspection of the installed RPF blocks, and afterwards, closing any previously opened fuel tank access panel; and

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT
Appx00308

US 9,849,998 B2

11

o) re-fueling the fuel tank and verifying the fuel tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the aircraft.

**2**. In an aircraft equipped with at least one fuel tank consisting of multiple compartments, each compartment having interior surfaces contoured for the accommodation of compartment structural members, and equipment a method for providing fuel ignition mitigation within each individual compartment, comprising the steps of:

a) determining dimensions, contour, and precise location of structural members for each compartment as encountered at sequentially-measured linear increments along either width or length dimension of the compartment interior;

b) rendering a scaled engineering drawing of a vertically-oriented cross-sectional profile at each measured linear increment in each compartment;

c) numerically sequencing each drawing corresponding to a respective drawing location along the measured linear increment within its respective compartment;

d) providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said RPF material comprising a thickness in-dependent upon size and type of aircraft fuel tank;

e) excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each cutout conforming to each of the scaled engineering drawings for each particular compartment, and further, designating each RPF block by a part number, an orientating "UP" arrow, and an orientating "FORWARD" arrow;

f) for each compartment, arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of the cutout part number of each RPF block;

g) for each compartment, sequentially packaging said aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping;

h) composing instructions for each compartment, to be used by technicians and/or installers for the purpose of inserting the RPF blocks into the compartment;

i) parking the aircraft on a level surface and emptying and purging all compartments of the fuel tank;

j) commencing installation in a selected compartment by removing a fuel tank access panel or other external tank cover which i) functions as an opening for entry of maintenance personnel and/or technicians into the compartment, and ii) is proximate the selected compartment;

k) inspecting the interior surfaces of the selected compartment to ensure cleanliness and accessibility by the installers;

l) placing the first sequential RPF block at a specified location within the selected compartment as so designated in the instructions;

m) placing each successively-ordered RPF block at its designated location within the compartment as set forth in the instructions, until the compartment is filled in accordance with the instructions;

n) for each remaining compartment of the fuel tank, performing steps j) through m), above;

o) performing an inspection of the installed RPF blocks, and afterwards, closing all open compartment or fuel tank access panels;

p) re-fueling all compartments of the fuel tank and verifying the fuel tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the subject aircraft.

12

**3**. A method for providing fuel ignition mitigation for the interior of the center wing tank of an aircraft of the type having a center wing tank consisting of a forward, center, and aft compartment, in which each compartment manifests interior surfaces contoured for the accommodation of compartment structural members and equipment, said method comprising the steps of:

a) determining dimensions, contour, and precise location of structural members for each of the compartments as encountered at sequentially-measured linear increments along either width or length dimension of the interior of each compartment;

b) rendering scaled engineering drawing of a vertically-oriented cross-sectional profile of each of the forward, center, and aft compartments at each measured linear increment;

c) numerically sequencing each drawing corresponding to a respective drawing location along the measured linear increments within the respective forward, center and aft compartment;

d) providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said sheets of RPF comprising a thickness dependent upon size and type of aircraft fuel tank;

e) excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each block cutout conforming to the scaled engineering drawing for each particular compartment, and further, designating each RPF block by a part number, an orientating "UP" arrow and an orientating "FORWARD" arrow;

f) arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of each RPF cutout part number for each of the forward, center, and aft compartments;

g) for each compartment, sequentially packaging an aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping;

h) composing instructions for each compartment to be used by technicians/installers for the purpose of inserting and installing said RPF blocks into each compartment;

i) parking the aircraft on a level surface, and emptying and purging all compartments of the center wing tank;

j) beginning with the aft compartment, removing a tank access panel or other external tank cover which i) functions as an opening for entry of maintenance personnel and/or technicians into the aft compartment, and ii) is proximate the aft compartment;

k) inspecting the interior surfaces of the aft compartment to ensure cleanliness and accessibility by persons;

l) placing the first sequential RPF block at a specified location within the aft compartment, as so designated in the instructions;

m) placing each successively-ordered RPF block at its designated location within the aft compartment as set forth in the installation instructions, until said aft compartment is filled in accordance with the previously determined aggregate of RPF blocks;

n) performing an inspection of the installed RPF blocks in the aft compartment, then closing any previously opened tank/compartment access panels,

o) placing successively-ordered RPF blocks at their designated locations within the center compartment as set forth in steps j) through n), above until said center compartment is filled with the required aggregate of RPF blocks;

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Appx00309

US 9,849,998 B2

13

14

p) placing successively-ordered RPF block at their designated locations within the forward compartment as set forth in steps j) through n) above, until said forward compartment is filled with the required aggregate of RPF blocks; and

q) re-fueling all compartments of the center wing tank and verifying the tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the aircraft.

4. The method as in claim 1, wherein the reticulated polyurethane foam material comprises a purple color.

5. The method as in claim 2, wherein the reticulated polyurethane foam material comprises a purple color.

6. The method as in claim 3, wherein the reticulated polyurethane foam material comprises a purple color.

\* \* \* \* \*

**EXHIBIT B**

**U.S. Patent No. 10,633,109**



US010633109B2

(12) **United States Patent**

Williams

(10) **Patent No.:**    **US 10,633,109 B2**

(45) **Date of Patent:**    **\*Apr. 28, 2020**

(54) **METHOD AND MATERIAL FOR ACCOMPLISHING IGNITION MITIGATION IN TANKS CONTAINING FLAMMABLE LIQUID**

(71) Applicant: **Jetaire Aerospace, LLC**, Atlanta, GA (US)

(72) Inventor: **Michael D Williams**, Fayetteville, GA (US)

(73) Assignee: **JETAIRE AEROSPACE, LLC**, Atlanta, GA (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/816,150**

(22) Filed: **Nov. 17, 2017**

(65) **Prior Publication Data**

US 2018/0339789 A1     Nov. 29, 2018

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 14/851,511, filed on Sep. 11, 2015, now Pat. No. 9,849,998.

(51) **Int. Cl.**
**B64D 37/32**    (2006.01)
**B64D 37/06**    (2006.01)
**B64F 5/00**    (2017.01)

(52) **U.S. Cl.**
CPC ............. **B64D 37/32** (2013.01); **B64D 37/06** (2013.01); **B64F 5/00** (2013.01)

(58) **Field of Classification Search**
CPC .. B64D 2037/325; B64D 37/32; B64D 37/08; B64D 37/06; B23P 2700/01
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,013,190 A  *  3/1977  Wiggins ................... A62C 4/00
                                                            220/501
4,294,279 A  *  10/1981  Wyeth .................... B64D 37/32
                                                            137/264

(Continued)

FOREIGN PATENT DOCUMENTS

WO     WO 2015/170088     11/2015

OTHER PUBLICATIONS

Transcription and Frame Captures from "China Lake Video," Naval Weapons Center, China Lake, CA; Jun. 1989, pp. 1-89.

(Continued)

*Primary Examiner* — Christopher J Besler

(74) *Attorney, Agent, or Firm* — Thomas | Horstemeyer, LLP; Jason M. Perilla

(57) **ABSTRACT**

A method utilizing quantities of flexible foam material inserted into a fuel tank, thereby providing ignition mitigation and minimizing the risk of explosion in the tank. The foam material is sculpted into a few, or a substantial quantity of foam blocks. In large-scale installations, the blocks are labeled according to exact placement within a stacking pattern that replicates the tank interior. The blocks are inserted by technicians through existing access ports until the tank is filled, excepting minimal planned void spaces. The foam material establishes ignition mitigation by acting as an ignition blocker, mechanically interfering with the compression wave created by a flame front in an explosion, and changing the vaporous mixture-above the fuel level in the tank. Upon completion of foam insertion, the fuel tank is filled with purging fluid, drained through a filter until no debris is found, and a new maximum fuel quantity recalibrated.

**31 Claims, 10 Drawing Sheets**



ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Appx00312

**US 10,633,109 B2**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,352,851 A * | 10/1982 | Heitz ........................ | A62C 3/06 442/222 |
| 6,358,591 B1 | 3/2002 | Smith | |
| 6,408,979 B1 | 6/2002 | Forbes et al. | |
| H2054 H | 12/2002 | Bennett et al. | |
| 6,803,090 B2 | 10/2004 | Castiglione et al. | |
| 7,341,113 B2 | 3/2008 | Fallis et al. | |
| 9,321,347 B2 | 4/2016 | Cragel et al. | |
| 9,849,998 B2 * | 12/2017 | Williams ............... | B64D 37/32 |
| 2011/0272526 A1 | 11/2011 | Barbosa et al. | |
| 2014/0076285 A1 | 3/2014 | Martin et al. | |
| 2014/0216416 A1 | 8/2014 | Novaco et al. | |
| 2017/0096234 A1 | 4/2017 | Martindale et al. | |

OTHER PUBLICATIONS

SAE International; "Aerospace Information Report". Reticulated Polyurethane Foam Explosion Suppression Material for Fuel Systems and Dry Bays. (1991). pp. 1-38.
Appendix 2 Claim chart of independent claims 1, 17, and 32 for U.S. Appl. No. 16/165,609, as amended Sep. 26, 2019.
Appendix 1 Claim chart of independent claims 26 and 41 for U.S. Appl. No. 15/816,150, as amended Sep. 26, 2019.
Aviation Rulemaking Advisory Committee "Foam" Jul. 21, 1998 pp. 1-52.
AIR4170, S.A.E., (1998) "Reticulated Polyurethane Foam Explosion Suppression Material for Fuel System and Dry Bays."

* cited by examiner

**U.S. Patent**    Apr. 28, 2020    Sheet 1 of 10    US 10,633,109 B2



FIG. 1

U.S. Patent      Apr. 28, 2020      Sheet 2 of 10      US 10,633,109 B2



FIG. 2



FIG. 3

FIG. 3A

**U.S. Patent**      **Apr. 28, 2020**      **Sheet 3 of 10**      **US 10,633,109 B2**



FIG. 4

**U.S. Patent**      Apr. 28, 2020      Sheet 4 of 10      **US 10,633,109 B2**



FIG. 5

FIG. 5A

FIG. 6

U.S. Patent        Apr. 28, 2020        Sheet 5 of 10        US 10,633,109 B2



FIG. 7



FIG. 8

FIG. 8A

FIG. 8B

FIG. 8C

U.S. Patent        Apr. 28, 2020        Sheet 7 of 10        US 10,633,109 B2



FIG. 9

U.S. Patent        Apr. 28, 2020        Sheet 8 of 10        US 10,633,109 B2



FIG. 10

U.S. Patent      Apr. 28, 2020      Sheet 9 of 10      US 10,633,109 B2



FIG. 11

U.S. Patent        Apr. 28, 2020        Sheet 10 of 10        US 10,633,109 B2



FIG. 12

US 10,633,109 B2

**1**

# METHOD AND MATERIAL FOR ACCOMPLISHING IGNITION MITIGATION IN TANKS CONTAINING FLAMMABLE LIQUID

### CROSS-REFERENCES TO RELATED APPLICATIONS

This is a continuation-in-part patent application which claims the benefit and priority of parent U.S. Published patent application Ser. No. 14/851,511 filed on Sep. 11, 2015, and currently co-pending before the USPTO, by reference as though said parent application Ser. No. 14/851, 511 appears fully herein.

### STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

Not applicable.

### NAMES OF THE PARTIES TO A JOINT RESEARCH AGREEMENT

Not applicable.

### BACKGROUND OF THE INVENTION

#### (1) Field of the Invention

The inventive concept disclosed relates generally to methods employed to prevent and/or minimize fuel ignition, fire, and/or explosion in the interior of tanks containing fuel or other types of flammable liquids. Different systems, materials, and methods have been used in an attempt to achieve this end, including inert gaseous material, which features active systems using Halon 1301 inerting and nitrogen inerting in some military aircraft. "Reactive" systems have been designed that react to the initiation of an explosion and discharge a substance intended to suppress the internal explosion, hopefully within milliseconds. These reactive systems axe initiated by either physical or chemical means.

In the preferred embodiment of the instant inventive concept there are disclosed different embodiments of specific methods of installing accurately measured quantities of flexible foam material to fill the internal space of tanks that bold flammable liquid, with particular emphasis on aircraft fuel tanks.

#### (2) Background

Since 1959, there have been sixteen documented incidents of fuel task ignition events in aircraft. These fuel tank ignition events have resulted in 542 fatalities, 11 hull losses and 3 incidents causing substantial damage. The causes of the fuel tank ignition events were attributed as follows: 4 were caused by external wing fires, 4 by electrostatics, 3 by faulty fuel pumps or wiring, 2 by lightning, and 3 to unknown causes.

On Jul. 17, 1996, TWA Flight 800 sustained an in-flight break-up after taking off from Kennedy International Airport in New York, resulting in 230 fatalities. The National Transportation Safety Board ("NTSB") conducted a lengthy investigation and determined that ignition of the flammable fuel/air mixture in a center wing fuel tank had occurred, causing an explosion that disintegrated the aircraft in flight. Although the exact ignition source could not be determined, the NTSB concluded that the most likely ignition source was

**2**

a short circuit outside the center wing fuel tank that allowed excessive voltage to enter the tank through electrical wiring associated with the fuel quantity indication system (FQIS).

The NTSB announced their official findings regarding the TWA 800 accident at a public meeting held on Aug. 22 and 23, 2000 in Washington, D.C. Primarily as a consequence of TWA Flight 800, the Federal Aviation Administration ("FAA") issued numerous airworthiness directives intended to reduce possible ignition sources and thereby the risk of another fuel tank explosion. On May 7, 2001, the FAA promulgated rulemaking to establish several new transport category airplane fuel tank safety requirements (66 Federal Registry 23086, May 7, 2001). The rulemaking, effective Jun. 6, 2001, included Amendment 21-78, Amendment 25-102 and Special Federal Aviation Regulation ("SFAR") No. 88 entitled "Transport Airplane Fuel Tank System Design Review, Flammability Reduction and Maintenance Requirements." SFAR No. 88 required that type certificate holders and supplemental type certificate holders conduct a revalidation of the fuel tank system designs on the existing fleet of transport category airplanes capable of carrying thirty (30) or more passengers or a payload of 7,500 pounds or more.

Legislation was enacted as 14 CFR § 25.981 (Rule 25.981) and FAA Advisory Circulars AC 25.981-1B and 25.981-2 were issued to provide compliance guidance. Compliance with Rule 25.981 required each applicant to develop a failure analysis for the fuel tank installation to substantiate that ignition sources would not be present in the fuel tanks. The requirements of this section are in addition to the more general propulsion failure analyses requirements of 14 CFR 25.901 and 14 CFR 25.1309 that have been applied to propulsion installations.

14 CFR § 25.981 (a) (3) defines three failure scenarios that must be addressed in order to show compliance with the rule (known as the "three phases" of compliance):

Phase A. Each single failure, regardless of the probability of occurrence of the failure, must not cause an ignition source;

Phase B. Each single failure, regardless of the probability of occurrence, in combination with any latent failure condition not shown to be at least extremely remote (i.e., not shown to be extremely remote or extremely improbable), must not cause an ignition source; and

Phase C. All combinations of failures not shown to be extremely improbable must not cause an Ignition source.

Compliance with 14 CFR § 25.981 (Amendment 25-125) requires investigation of the airplane fuel tank system using analytical methodology and documentation currently used by the aviation industry to demonstrate compliance with 14 CFR 25.901 and 25.1309 but with consideration of unique requirements included in this amendment of this paragraph.

The Federal Aviation Administration (FAA) mandates forced certificate holders to develop and implement all design changes required to demonstrate that their aircraft meet the new ignition prevention requirements and to develop fuel lank maintenance and inspection instructions. Specifically, SFAR No. 88 contains six (6) requirements applicable to transport category aircraft: 1) determine the highest temperature allowed before ignition occurs; 2) demonstrate that this temperature is not achieved anywhere on the aircraft where ignition is possible; 3) demonstrate that ignition could not occur as a result of any single point failure; 4) Establish Critical Design Configuration Control Limitations ("CDCCL"), inspections or other procedures to prevent changes to the aircraft that would result in re-introduction or creation of ignition sources; 5) develop

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Appx00324

US 10,633,109 B2

**3**

visible means to identify critical features of the aircraft where maintenance, repairs or alterations would affect areas or systems of possible ignition; and 6) design of fuel tanks must contain a means to minimize development of flammable vapors in fuel tanks or a means to mitigate the effects of ignition within fuel tanks.

Maintenance of ignition source prevention features is necessary for the continued operational safety of an airplane's fuel tank system. One of the primary functions of the fuel tank system is to deliver fuel in a safe and reliable manner. Preventing ignition sources is as important a function of the fuel system as the delivery and gauging of fuel. The failure of any ignition source prevention feature may not immediately result in an ignition event, but a failure warrants maintenance for continued airworthiness because the failure could eventually have a direct adverse effect on operational safety.

There have been various solutions proposed and implemented to comply with the mandated transport category aircraft fuel tank ignition mitigation requirements. Examples of compliance methods implemented include electronic solutions such as the installation of Transient Suppression Devices ("TSD"), Ground Fault Interrupters ("GFI"), and similar current limiting devices. These devices are deficient in that they retain possible failure rates that a "passive," non-electronic solution could resolve. Clearly, there is a need for a simplified and reliable solution to make implementation of the SFAR No. 88 compliance feasible. A better solution would be a less expensive, passive solution that is applicable to commercial and private aircraft and other vehicles.

(3) Description of the Related Art, including information disclosed under 37 CFR 1.97 and 1.98.

There are no known uses of flexible foam material in the same manner and for purposes similar to the inventive disclosure. However at least one entity, BAE Systems, PLC, utilizes a "tie assembly" as structural components within the interior of a liquid storage tank for the purpose of reducing hydrodynamic ram pressure and minimizing possibility of catastrophic failure of the fuel tank in the event of projectile impact. Ref. WO 2015/170088 A1, published Nov. 12, 2015.

U.S. Published patent application Ser. No. 14/851,511 (Sep. 11, 2015) A method utilizing specific quantities of flexible foam material inserted into a fuel tank, thereby providing ignition mitigation and minimizing the risk of explosion in the tank. The foam material is sculpted into one, a few, or a substantial quantity of foam blocks. The blocks may be labeled according to exact placement within a stacking pattern that replicates the tank interior. The blocks are inserted by technicians through existing access ports until the tank is filled. The foam acts as an ignition blocker, mechanically interfering with the compression wave created by a flame front in an explosion, and changing the vaporous mixture above the fuel level (ullage) in the tank.

### BRIEF SUMMARY OF THE INVENTIVE CONCEPT

The method and materials discussed in this document will focus primarily on the use of one or more conformed, interrelated pieces of flexible foam material shaped to replicate the inside dimensions of an aircraft fuel tank. The inventive concept, method, and materials disclosed herein are equally applicable to tanks designed and constructed for use in various types of vehicles and flammable liquid storage tanks. However, for the sake of simplicity and ease of explanation, most of the discussion will be centered on the

**4**

preferred embodiment, which is concerned with aircraft fuel tanks. The term "aircraft fuel tanks," as used in this disclosure shall apply to integral and auxiliary fuel tanks of fixed wing aircraft, rotary wing aircraft, drones, and other types of machines capable of flight.

The foam material disclosed herein is intended to be used as a passive means to mitigate ignition in aircraft fuel tanks. The present inventive concept advantageously satisfies the aforementioned deficiencies in aircraft fuel tanks by providing a method of accomplishing ignition mitigation in aircraft fuel tanks using, in the preferred embodiment, molded polyurethane safety foam in coordinated shapes to fill one tank or multiple fuel tanks.

A preferred material for this inventive concept is polyurethane safety foam, which is a reticulated flexible foam composed of a skeletal matrix of lightweight interconnecting strands. For purposes of this disclosure, this particular material is referred to as "Reticulated Polyurethane Foam" ("RPF"). The RPF is also a biofuel-compatible material. There are also other varieties of foam material currently in existence, or that may be developed, which will function as well as RPF, including, but not limited to, polyether. Among these materials are polyethers, in which the repeating chemical unit contains a carbon-oxygen bond derived especially from an aldehyde or an epoxide.

Other advantages of the use of flexible foam include slosh attenuation, hydrodynamic ram attenuation, and forming a barrier against foreign object debris. These qualities are inherent properties of many foam-type materials, including RPF. As a surge or explosion mitigating agent, RPF attenuates the sloshing of fuel and, in some cases, eliminates the need for structural baffles within a tank. RPF further provides for a "smooth" sine wave motion of the fuel and reduces rapid redistribution of mass.

Hydrodynamic ram effect within a fuel tank or bladder cell is caused when a projectile impacts the exterior structure of the fuel tank. Ram force can be intensified when the tank is penetrated by a high explosive incendiary ("HEI") delayed detonating-type projectile. The matrix-type structure of RPF absorbs a portion of the shock wave as a projectile penetrates a fuel tank. Attenuation of hydrodynamic ram minimizes damage to the fuel tank structure by reducing the overpressure of the shock wave and helps to orient the round to prevent tumbling. The reduction of fuel tank structural damage can effectively reduce fuel discharge through the projectile entrance and exit points.

The foreign object debris barrier capability of RPF materials is an inherent beneficial effect rather than a product specification requirement. The RPF used in this inventive concept is a natural filter, due to its natural structure resembling a fibrous network. The finer the porosity of a material used as a fuel filter, the greater the entrapment of foreign objects and loose debris. The RFP material entraps loose debris within a fuel tank and minimizes the amount of debris entering an adjacent tank, the tank fuel lines, or the engine fuel system.

Explosion within a fuel tank containing kerosene-type fuels occurs as a result of the existence of flammable mixture in the ullage in combination with an ignition source. Examples of possible ignition sources include incendiary ammunition penetrating the fuel tank, static discharges, lightning strikes, switch refueling, and electrical shorts. Reticulated polyurethane foam (RPF) is in effect a three-dimensional fire screen, which minimizes the possibility of gasoline and kerosene-type (such as jet aircraft fuel) explosions under one or a combination of the following theories: the foam acts as a heat sink, (i.e., it removes energy from the

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT
Appx00325

US 10,633,109 B2

5                                        6

combustion process by absorbing heat); it mechanically interferes with the compression wave that precedes the flame front in an explosion; and, the high surface-to-volume of reticulated polyurethane foam enables the strands to collect or coalesce the droplets of fuel, thus changing the vaporous mixture in the empty space above the fuel level (ullage), in the tank. Coalescing causes the vaporous mixture to become lean, which minimizes possible explosion.

The present inventive concept advantageously allows for greatly increased effectiveness in preventing the hazardous ignition of fuel within aircraft fuel tanks (satisfying all three phase requirements of 14 CFR § 25.981 compliance), is passive and therefore far less likely to experience a system failure, and available at a cost of implementation far less than that of alternative electronic solutions.

Experience in the aviation industry has shown that any fuel tank can be filled to maximum of about 85% capacity (not including a fuel swell of 12%) with the internal presence of reticulated polyurethane foam, not including any planned voids. The foam blocks should be kept clear of tank components such as the fuel inlets, fuel sensors, valves, float switches, and tank vents.

Other embodiments of a foam material and method in accordance with the above principles of the inventive concept may include alternative or optional additional aspects. One such, aspect would be use of foam of sufficient porosity and ignition mitigation properties composed of a synthetic or naturally occurring material other than polyurethane.

Another aspect of the present invention is the use of block foam material in interrelated, geometrical shapes which collectively conform to the interior shapes of fuel tanks.

An important aspect of the present invention is the frequent requirement to use alternate access ports of an aircraft fuel tank to insert the foam or foam blocks and position them in a distinct pattern to minimize any voids along tank walls. In the case of aircraft having internal fuel tanks integral to the wing, fuselage, cargo bays, or tail structure, it may be necessary to detach certain segments of the aircraft skin to provide access to the tank.

Another aspect of the present inventive concept is the utilization of a "fully packed" design concept. A fully packed system is defined as one where all potential fuel tank ullage is filled with reticulated polyurethane foam with cutouts for internal tank components only. This system is most desirable where minimal or no tank over-pressure can be tolerated.

An important objective of the present inventive concept is the utilization of a grossly "voided" design concept. A grossly voided system is defined as one where the fuel tank contains strategically positioned reticulated foam for explosion suppression. This method provides for minimal weight penalty and fuel retention, and is best suited for a fuel system that can withstand substantial overpressures.

These and various other advantages and features of novelty which characterize the inventive concept are pointed out in the accompanying descriptive matter and drawings which form a further part hereof. For a better understanding of the inventive concept its advantages, and the objects obtained by its use, reference should be made to the drawings in which are illustrated and described specific examples of a method and material in accordance with the present invention.

BRIEF DESCRIPTION OF THE VIEWS OF THE DRAWINGS

FIG. **1** illustrates a general overall fuselage-cutaway view of a Boeing® 737 jet **110** aircraft, further showing the location of the center wing fuel tank **112**.

FIG. **2** shows the location of the center wing tank **112** of the Boeing® 737 aircraft, as would be seen looking through the bottom of the fuselage, and further, a tank access panel **20** utilized by maintenance personnel for ground servicing.

FIG. **3** depicts a close-up view of the access panel **20** to the center wing tank **112** shown in FIG. **2**.

FIG. **3**(A) is an illustration of the manner in which the access panel **20** of FIG. **2** is removed from the exterior of the center wing tank

FIG. **4** shows a cutaway view of the structural members of the center wing tank **112**, in accordance with section line **4-4** of FIG. **1**.

FIG. **5** illustrates the profile of a specifically-shaped foam block **51** precisely cut to fit the exact contour of a sector of the center wing tank **112**.

FIG. **5**(A) presents a side view of the foam block **51** of FIG. **5**.

FIG. **6** presents a stylized diagram of the aggregate **50** of a plurality of sequentially-arranged, pre-cut foam blocks to be installed adjacent to one another, conforming to the contour of the forward compartment of the center wing tank **112**.

FIG. **7** is a stylized rendering of the center wing tank **112**, further showing the packing arrangement of a plurality of foam blocks **51** properly installed in the forward compartment **131**.

FIG. **8** depicts the first stages of installation of foam blocks **50** on the right side of the aft compartment **133**.

FIG. **8**A shows the beginning of installation of foam blocks on the left side of the aft compartment **133**b, the right side of the compartment having been completed

FIG. **8**B depicts the start of installation of foam blocks is the middle section of the aft compartment **133**.

FIG. **8**C depicts the completion of installation of foam blocks in the aft compartment **133**.

FIG. **9** is a stylized rendering of the resultant installation of all foam blocks in the forward **131**, center **132**, and aft **133** compartments of the center wing tank of a typical Boeing® 737 aircraft.

FIG. **10** depicts an exploded view of exemplary foam blocks **64-73** which comprise one of twelve (12) vertically-oriented columns sculpted to fit within the first center wing box cavity **211** of a Boeing® 767 BR aircraft **200**.

FIG. **11** illustrates an exploded view of the aggregate of all foam blocks (circled numbers 001-108) necessary for a complete filling of foam blocks into the first center wing box cavity **211** of a Boeing® 767 ER aircraft **200**.

FIG. **12** depicts the joining of the aggregate of foam blocks required to fill both wing box cavities **211**, **212** of the 767 BR center wing tank **200**.

DETAILED DESCRIPTION OF THE INVENTION

The present inventive concept is based upon the use of precisely measured and contoured quantities of flexible foam material to be inserted into a tank constructed for the storage or retention of a flammable liquid. The principal intended use of this inventive concept is for the insertion of measured quantities of flexible foam material into the fuel tanks of aircraft. In the typical accomplishment of this method, interrelated sequential groupings of blocks of flexible foam material are used to fill specific fuel tank(s) of an aircraft.

However, in some instances, the flexible foam material may be cut and shaped into relatively small, uniformly-sked pieces so as to fit through tank access ports, service bays, or

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT
Appx00326

US 10,633,109 B2

**7**

other available tank openings. The objects, features, and advantages of the concept presented in this document are more readily understood when referring to the accompanying drawings. The drawings, totaling seventeen (17) figures, show the basic components and functions of embodiments and/or the specific method steps. In the several figures, like reference numbers are used in each figure to correspond to the same component as may be depicted in other figures.

For illustrative purposes only, and not by way of limitation, the methods and systems described in this disclosure are disclosed as applicable to Boeing® 737 or Boeing® 767 series aircraft. This detailed description section is merely exemplary in nature and is not intended to limit the methods and uses shown in this inventive concept. The method disclosed may be utilized, with appropriate changes to the procedures, in a variety of types and locales of fuel tanks, whether on a vessel aircraft, or affixed to the ground or a structure.

There is no intent for the applicant to be bound or constrained by any expressed or implied theory(ies) set forth in the relevant technical fields, background, brief summary, or the present detailed description of the inventive concept as it relates to Boeing® 737 or Boeing® 767 aircraft. Further, there is no intent to confine the inventive method disclosed to one particular make, model, or series of aircraft, or particular configurations of aircraft fuel tanks.

The flexible foam material referred to in this document may be comprised of any of a variety of different foam materials, including different structures, textures, chemical compositions, and constituent qualities. A preferred foam material is reticulated polyurethane. Additionally, any material selected from the group consisting of polyethers in which the repeating unit contains a carbon-oxygen bond derived especially from an aldehyde or an epoxide may be used in the method set forth in this inventive concept.

By way of illustration only, and not as a limitation, the preferred embodiment of the present inventive concept depicts the use of contoured, interrelated, sequential groupings of foam blocks to fill a specific fuel tank or tanks of an aircraft. In situations where a fuel tank is relatively small, comprises an irregular shape, or its location makes it difficult to access, flexible foam pieces of certain shapes and sizes may be inserted through ports, openable panels, or other means, until the tank is determined to be fully satiated with the foam pieces.

When utilizing specifically-cut foam blocks, the blocks are engineered, fabricated, and/or sculpted to occupy a volumetric sector, or sectors, of the interior of a fuel tank. By utilizing the disclosed methods of installing blocks **50** or foam pieces to fill one or more fuel tanks of an aircraft, the aircraft operator prevents or minimizes the potentially damaging or catastrophic effects of fuel ignition, fire, and/or explosion.

For ease of explanation and illustrative purposes only, and not as a means of limitation, the disclosed method is described with regard to installation of the foam blocks into the center wing tank **112** of a Boeing® 737 aircraft **110** or the center wing box cavities **211**, **212**, of a Boeing® 767 aircraft **200**.

The discussion of the present inventive concept will be initiated with FIG. **1**, which illustrates an overall view of a Boeing® 737 jet aircraft **110**. FIG. **1** also depicts the fuselage **111**, and a center wing tank **112**, which is encircled. As in most similar jet aircraft, the predominance of the fuel load is generally carried in fuel tanks constructed within the left wing **104** and right wing **105**, with equal quantities in each wing **104**, **105**. The wing-loaded fuel serves to add a

**8**

counter-balancing weight to offset the upward wing structural bend due to the aerodynamic lift force generated by the wings **104**, **105** when in flight. However, for substantially increased range, the aircraft **110** may be loaded with additional fuel in the center wing tank **112** and other internal tanks, if available.

FIG. **2** is a stylized rendering looking upward at the undersurface of the Boeing® 737 fuselage **111**, further revealing the location of the center wing tank **112**. Also shown in FIG. **2** is a center wing tank access panel **20** utilized by maintenance personnel during ground servicing of this particular model and series of the Boeing® 737.

FIG. **3** depicts an expanded view of the access panel **20** shown in FIG. **2**. FIG **3**(A) is an illustration of the manner in which the access panel **20** is removed from the exterior of the center wing tank **112**, further showing a clamp ring **21**, one of a plurality of washers **22**, and one of a plurality of bolts **23**, the washers **22** and bolts **23** utilized for insertion through apertures **24** for fastening the clamp ring **21** onto a lower center wing panel **26**.

FIG. **4** illustrates a stand-alone sectional view of the center wing tank **112**, in accordance with section line **4-4** of FIG. **1**. The structural integrity of the center wing tank **112**, as positioned within the fuselage **111**, substantially determines the internal contour of the center wing tank **112**. The internal wing tank **112** contour, on initial determination of the quantity of foam material required, can be divided into a plurality of volumetric sectors, each sector amenable to acceptance of one, a few, or a substantial quantity of foam blocks or pieces conforming to each sector.

Referring to FIG. **4**, the aircraft **110** structural members shown include a front spar **120**, rear spar **121**, floor beams **122**, and a tank ceiling **127** abutting the aircraft floor beams **122**. It is important to note that, as shown in FIG. **4**, the center wing tank **112** comprises multiple compartments: a forward compartment **131**, a center compartment **132**, and an aft compartment **133**. The three compartments **131**, **132**, **133** are separated by spanwise beam #2 **124** and spanwise beam #1 **125**. In each of the three compartments **131**, **132**, **133**, a fuel tank floor **128** comprises lower stiffeners **128** and the fuel tank ceiling **127** comprises upper stiffeners **129**, which give additional rigidity to all three tank compartments **131**, **132**, and **133**.

As a planning consideration, it is important to assess the structural arrangement and means of access to each individual compartment of a tank with multiple compartments. This is vital in order to arrive at pre-determined working order as to which of the compartments should be the first to be filled with the foam material and in what sequence the remaining compartments should be filled.

As further discussion of the installation of aggregate foam blocks **50**, explanation will be given of the methodology and process of measuring, sizing, and sculpting an exemplary foam block **50**. Shown in FIG. **5** there is illustrated, by way of example, a profile view of a forward compartment foam block **51**. This forward compartment foam block **51** is designated as such due to the fact that the contour of its outer perimeter corresponds to the shape, internal fittings and components of a specific, sector within the forward compartment **131** of the center wing tank **112**.

In viewing FIG. **5**, the topmost edge shows four upper cutouts **52** which provide clearance for upper stiffeners **129** of the forward compartment **131** as previously shown in FIG. **4**. The left edge **55** of the foam block **51** is fabricated so as to correspond to the forward tank wall **123**, and further shows an arcuate cutout **53** which provides clearance for a tank fuel pump, or other tank component. The bottommost

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Appx00327

US 10,633,109 B2

9

section of the forward compartment foam block **51** illustrates three cutouts **54** which allow clearance for the three lower stiffeners **130** of the forward compartment **131**, as shown in FIG. **4**. Thus, the sector into which this foam block is placed manifests upper stiffeners **129**, lower softeners **130**, the forward tank wall **123**, and a portion of a fuel pump.

The right edge **56** of the forward compartment foam block **51** corresponds to spanwise beam #2 **124** as is depicted in FIG. **4**. FIG. **5**(A) is a view looking directly at the right edge **56** of the forward compartment foam block **51**, and further showing the nominal width **57** of the forward compartment foam block **51**. The dimensions of each of the foam blocks **50** have been measured and fabricated or sculpted in a size and contour which is completely dependent upon the size and contour of the fuel tank sector into which the specific foam block is to be installed.

As observed in FIG. **5**, a directional UP arrow and a forward (FWD) arrow are printed on the surface of the foam block **51** to further guide an installer or technician in placing this particular foam block **51** in the correct orientation. Aircraft mechanics will also need foam block orientation and positioning guidance in the event one or more foam blocks **50** may need to be removed for internal tank or tank component inspection or maintenance during aircraft line operations.

The illustrated forward compartment foam block **51** of FIG. **5** is further given a part number (P/N) to indicate its exact location in the forward compartment **131** of the center wing tank **112**. The part number also defines the order of its loading in the installation sequence of the aggregate of all foam blocks **50**. The general manner of construction of the contour of the previously-described forward compartment foam block **51** is typical of the parameters to be met for each of the aggregate foam blocks **50** to be inserted in the forward compartment **131** of the center wing tank **112** of a Boeing® 737 series 400 aircraft as well as those foam blocks to be installed in the mid compartment and aft compartment of the center wing task **112**. Similarly, the general manner of construction of the contour of any other foam block described above is typical of the parameters to be met for any foam block to be installed in any of a variety of aircraft fuel tanks.

The contours of the aggregate of all foam blocks **50** are a culmination of determinations made of the dimensions, profile, connections, attachments, and integral components of the inner surfaces of the fuel tank at the specifically designated sectors internal to each the forward, center, and aft compartments **131**, **132**, **133** of the center wing tank **112**. This methodology is applicable to the determination of the size and contour of any foam block that may be fabricated for insertion into any of an unlimited variety of fuel tanks.

In planning a project for installation of foam blocks in the center wing tank **112**, the initial process requires the manufacture and delivery of a pre-determined quantity of bulk foam material. The bulk forms generally measure approximately 12'x4'x2'. However, in everyday applicability, the overall dimensions and volumetric quantity of the bulk material is dependent upon the size and contour of the particular type of fuel tank into which the finished sculpted foam pieces are to be inserted.

During the manufacturing process, the bulk quantities of flexible foam may be colored, as required by the customer. In the preferred embodiment, a purple color facilitates the trouble-shooting of fuel contamination or irregularities associated with fuel lines, the engine fuel pump, filters, etc.

10

Purple-colored flexible foam enables a determination whether an ignition event or possible foam deterioration has taken place.

By way of example only, in the case of the center wing tank **112** of a −300 series Boeing® 737 aircraft, engineering drawings are executed in a sequential series of scaled renderings of volumetric sectors of, for instance, the forward compartment **131** of the center wing tank **112**. The profile of the compartment is measured and scaled at regularly-spaced increments along a line extending from a selected wall, tank floor, or the ceiling of the forward compartment **131**. The measurements also take into consideration the placement of tank structural components and equipment. In the sane manner, engineering drawings are rendered for the interrelated sectors and contour of the center compartment **132** and aft compartment **133** of the center wing tank **112**.

A plurality of cutouts of foam blocks **50** is made from the manufactured bulk foam, each block cut and sculpted according to the previously-described scaled renderings and further, each block cutout is progressively identified with a part number (P/N). Further, orientating symbols or text, such as "UP," "DOWN," "REAR," or "FORWARD," may be printed thereon. Cutting and shaping of the individual foam block cutouts from the bulk material may be accomplished by use of several optional means. These options include, but are not limited to mechanical blade type-cutting, specially designated/manufactured smooth blade type cutting tools, an extremely fine-toothed band saw-type blade, or a hot-wire type cutting tool.

Once the entirety of the aggregate foam blocks **50** required for the center wing tank **112** have been sculpted, each block is identified with a part number (P/N) and numerical or alphabetical sequencing corresponding to the sequential placement of the foam block into its corresponding, sector within each of the forward, center, or aft compartments **131**, **132**, **133**. The foam blocks **50** are individually packaged and arranged in a stack or stacks which correspond to the orderly, sequential installation of the foam blocks **50** into the appropriate sector previously calculated. Further, detailed written instructions regarding the installation of the foam in each compartment are drafted and organized in a manual for the guidance of technicians who will install the foam blocks **50**.

To install the foam blocks **50** into the center wing tank **112**, it is preferable to position the aircraft **110** on a level surface and at a convenient height for access to the center wing tank **112**. The access opening cover is then removed aid the foam blocks **50** are inserted through the access openings with the exercise of care to avoid tearing or abrading the foam blocks on the lip of the opening. FIG. **2**, FIG. **3** and FIG. **3**(A) illustrate the relative position of the access panel **20** of the center wing tank **112**.

In many instances, installation of the foam blocks may be accomplished during the manufacturing or initial assembly stages of a fuel tank. In these situations, the job of the technicians or installers is much less problematic, since access to the interior of the tank is relatively straightforward and convenient. As a preliminary step, in installation of flexible foam into fuel tanks that have been in service for a period of time, the cleanliness of the tank must first be ensured by draining the tank, purging, and then vacuuming the interior.

As stated previously, a very specific order of insertion of the foam blocks **50** must be followed so that all spaces that are intended to be filled in the center wing tank **112** are indeed filled. Empty spaces in the tank can only be those left by design, which is referred to as "planned voiding." The

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Appx00328

US 10,633,109 B2

**11**

center wing tank **112** under discussion here should be filled with the foam blocks **50** fitted according to the sectors and pattern specified in the previously-mentioned engineering drawings and installation instructions.

By way of further illustration, FIG. **6** depicts a diagram of a representative sample of a plurality of sequentially-arranged, pre-cut foam blocks **50** to be installed adjacent to one another, thereby conforming to the interior contour of the forward compartment **131** of the center wing tank **112** of the Boeing® 737 aircraft. Each of the blocks **50** has a shape and an order of installation which ultimately conforms to a specific contour of the forward compartment **131** at a particular sector of the forward compartment **131**. FIG. **7** is a stylized "see-through" rendering of the center wing tank **112**, further showing the packing arrangement of a plurality of blocks **50** in the process of being installed in the forward compartment **131** of the center wing tank **112**.

Generally, the installation of the foam blocks **50** is accomplished by technicians entering through existing fuel tank access bays and openings. Further, a certain amount of the foam blocks **50** may be uploaded directly into the tank **112**. On aircraft other than the Boeing® 737, existing fuel tank access openings that may be used for insertion and installation include, but are not limited to, maintenance access holes, wet and dry access bays found on non-cylindrical auxiliary fuel tanks, inspection holes in belly tanks, and the like. In the case of an aircraft having integral wing tanks, for instance, access may be necessary by means of removing a portion of the wing skin to access the fuel tank.

A very specific order of insertion of the foam blocks **50** must be followed so that all spaces that are intended to be filled in the tank are indeed filled. The method disclosed in this document must take into consideration the fact that all tanks designed to contain flammable liquid, including aircraft fuel tanks, manifest distinctive shapes and contours of the tank floor, ceiling, and walls.

Care is necessarily exercised to avoid tearing or abrading the foam on the lip of the access bays or holes. Shaped block foam pieces are inserted and positioned in a manner to ensure that the required internal tank void is filled and maximum ignition source prevention is achieved. The foam material selected for this disclosed method is considered to be "memory foam." Memory foam generally returns to its original shape after compression down to 40% of its original volume. A key feature of the present inventive concept is that the design and structure of the shaped block foam pieces allows them to be bent or slightly compressed in order to fit through existing access bays or ports of various aircraft fuel tanks.

In referring to FIGS. **8**, **8**A, **8**B and **8**C, it is to be noted that the majority of Boeing® 737 series 300 and series 400 aircraft are characterized by a first internal access port **18** between the aft compartment **133** and the center compartment **132** of the aircraft and a second internal, access port **19** between the center compartment **132** and the forward compartment **131**. Further, a lower access panel **20** is depicted at the midpoint of the forward compartment **131**, which coincides with the underside of the fuselage.

In the installation of foam blocks **50** into the center wing tank **112** of a Boeing® 737 aircraft, the procedure begins with the right side of the aft compartment **133** of the center wing tank **112**. The installer(s) must gain access to the aft compartment **133** first, through a lower access panel **20** located on the underside of the fuselage **111** of the aircraft, as shown in FIG. **2** and FIG. **3**. Access is sequentially accomplished through the second internal access port **19**, and the first internal access port **18**.

**12**

FIG. **8** depicts a quantity of foam blocks **50** having been installed on the right side of the aft compartment **133**. Next, the installer(s) work the left side of the aft compartment **133**, FIG. **8**A showing the completion of installation of foam blocks on the left s de of the aft compartment **133**, the right side of the compartment **133** having been completed. As the installer(s) begins exiting the aft compartment **133** through the first access port **18**, he/she installs RPF blocks **50** in the middle section of the aft compartment **133**, as shown in FIG. **8**B. FIG. **8**C depicts the completion of installation of foam blocks **50** in the aft compartment **133**.

FIG. **9** illustrates a stylized diagram of the resultant installation of all foam blocks in the forward, mid, and aft compartments **131**, **132**, **133** of the center wing tank **112** of a typical Boeing® 737 aircraft.

For illustrative purposes, renderings of the method of foam filling of the center wing tank **210** of a Boeing® 767 ER aircraft **200** is shown in FIG. **10**, FIG. **11**, and FIG. **12**. For informational purposes, the specific model 767 ER illustrated is constructed with a center wing tank **210** consisting of a first center wing box cavity **211** and a second wing box cavity **212**.

Beginning with FIG. **10**, there is shown an exploded view of a column of ten foam blocks **64-73** which comprise one of twelve (12) vertically-oriented columns designed to fill contiguous sectors of the first center wing box cavity **211** of the Boeing 767® ER aircraft **200**. Each block **64-73** manifests cutouts and a shape to fit the first center wing box cavity **211** contour and/or structural components corresponding to the sector into which the blocks **64-73** are sculpted to fit. FIG. **11** depicts an exploded view of the aggregate of all foam blocks (circled numbers 001-108) which are necessary to comprise a complete filling of foam material into the first center wing box cavity **211**.

In turning to FIG. **12**, there is shown a stylized rendering of the joining of the assemblies of foam blocks required to fill both the first center wing box cavity **211** and the second center wing box cavity **212** of the Boeing® 767 ER **200**. The foam blocks depicted as filling the second center wing box cavity **212** are structured and arranged similarly to the required assembly of foam blocks for the first center wing box cavity **211**. As a result, the union of these two groups of foam blocks completely fills the center wing tank **210** of the 767 ER aircraft **200** with ignition mitigating foam.

When conducting any of the above described methods and procedures, the fitted size, shape and installation of any aggregate of flexible foam material should be such that no internal tank voids longer than 2.5 feet exist (with the internal tank fuel probes installed). All flexible foam blocks must be kept clear of the tank components such as the fuel ports, fuel probes, float switches, and tank vents. The "planned" voiding areas around these structures should not exceed a volume of 10% of the total fuel tank volume and there should be no additional connecting voids between any of the planned void spaces. The minimum space of foam filled area required between the planned void areas is three (3.0) inches if maximum void size is used.

While the present invention has been described above in terms of specific embodiments, it is understood that the invention is not limited to these disclosed embodiments. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications, variations, and other embodiments of the invention will come to mind of those skilled in the art to which this invention pertains, and which are intended to be and are covered by both this disclosure and hereafter submitted claims. If is indeed intended that the scope of the invention should be deter-

US 10,633,109 B2

13

mined by proper interpretation and construction of the hereafter submitted claims and their legal equivalents, as understood by those of skill in the art relying upon the disclosure in this specification and the attached drawings. It is intended that the scope of the invention is not limited to any particular aircraft, or to any particular type of tank constructed to hold flammable liquid.

What is claimed is:

1. A method for providing ignition mitigation for a fuel tank, comprising:

determining interior dimensions of the fuel tank;

providing a bulk quantity of foam material;

cutting the foam material into a plurality of foam blocks, wherein:

at least two foam blocks among the plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces within a compartment of the fuel tank; and

the plurality of foam blocks comprise an upper cutout for clearance around an upper stiffener of the fuel tank, an arcuate cutout for clearance around a fuel pump of the fuel tank, and a lower cutout for clearance around a lower stiffener of the fuel tank;

positioning the plurality of foam blocks within the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank; and

filling the fuel tank with fuel and verifying a quantity of the fuel in the fuel tank, wherein:

a first foam block among the plurality of foam blocks comprises the upper cutout:

a second foam block among the plurality of foam blocks comprises the lower cutout;

the first foam block and the second foam block are stacked in a vertically-oriented column within the fuel tank;

the plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and

the third foam block comprises at least one channel void to reduce weight.

2. The method of claim 1, wherein the foam material comprises reticulated polyurethane foam.

3. The method of claim 1, wherein the foam material comprises polyether foam.

4. The method of claim 1, wherein at least one foam block among the plurality of foam blocks comprises a specified color.

5. The method of claim 1, wherein the fuel tank comprises at least one of a center wing tank or an auxiliary tank.

6. The method of claim 1, further comprising, before positioning the plurality of foam blocks within the fuel tank, purging and vacuuming the fuel tank.

7. The method of claim 1, wherein cutting the foam material further comprises:

cutting the foam material into a second plurality of foam blocks, wherein at least two foam blocks among the second plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces of the fuel tank within a second compartment of the fuel tank.

8. The method of claim 1, wherein cutting the foam material further comprises:

14

cutting a plurality of upper cutouts including the upper cutout in the first foam block to provide clearance around upper stiffeners including the upper stiffener in the fuel tank.

9. The method of claim 8, wherein cutting the foam material further comprises:

cutting a plurality of lower cutouts including the lower cutout in the second foam block to provide clearance around lower stiffeners including the lower stiffener in the fuel tank.

10. The method of claim 9, wherein cutting the foam material further comprises:

cutting the arcuate cutout in at least one foam block among the plurality of foam blocks to provide clearance around the fuel pump.

11. The method of claim 1, further comprising arranging the plurality of foam blocks in a stack corresponding to a sequential installation at respective sectors within at least one compartment of the fuel tank.

12. The method of claim 1, further comprising forming a directional indicator in or on at least one foam block among the plurality of foam blocks to indicate an installation orientation at a sector within at least one compartment of the fuel tank.

13. The method of claim 1, further comprising marking an identifier on at least one foam block among the plurality of foam blocks to indicate an installation location at a sector within at least one compartment of the fuel tank.

14. The method of claim 13, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the plurality of foam blocks within the at least one compartment of the fuel tank.

15. A method of forming foam blocks for fuel tank ignition mitigation, comprising:

providing a bulk quantity of foam material;

cutting the foam material into a plurality of foam blocks, wherein:

at least two foam blocks among the plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces within a compartment of a fuel tank; and

the plurality of foam blocks comprise an upper cutout for clearance around an upper stiffener of the fuel tank and a lower cutout for clearance around a lower stiffener of the fuel tank; and

positioning the plurality of foam blocks within the fuel tank with the upper cutout around the upper stiffener of the fuel tank and the lower cutout around the lower stiffener of the fuel tank, wherein:

a first foam block among the plurality of foam blocks comprises the upper cutout;

a second foam block among the plurality of foam blocks comprises the lower cutout;

the first foam block and the second foam block are stacked in a vertically-oriented column within the fuel tank;

the plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and

the third foam block comprises at least one channel void to reduce weight.

16. The method of claim 15, further comprising cutting the foam material into a second plurality of foam blocks, wherein at least two foam blocks among the second plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces of the fuel tank within a second compartment of the fuel tank.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

US 10,633,109 B2

15                    16

**17**. The method of claim **15**, wherein the foam material comprises reticulated polyurethane foam.

**18**. The method of claim **15**, wherein the foam material comprises polyether foam.

**19**. The method of claim **15**, wherein at least one foam block among the plurality of foam blocks comprises a specified color.

**20**. The method of claim **15**, wherein the fuel tank comprises at least one of a center wing tank or an auxiliary wing tank.

**21**. The method of claim **15**, further comprising:

filling the fuel tank with fuel and verifying a quantity of the fuel in the fuel tank.

**22**. The method of claim **21**, further comprising, before positioning the plurality of foam blocks within the fuel tank, purging and vacuuming the fuel tank.

**23**. The method of claim **15**, wherein cutting the foam material further comprises:

cutting a plurality of upper cutouts including the upper cutout in the first foam block to provide clearance around upper stiffeners including the upper stiffener in the fuel tank.

**24**. The method of claim **23**, wherein cutting the foam material further comprises:

cutting a plurality of lower cutouts including the lower cutout in the second foam block to provide clearance around lower stiffeners including the lower stiffener in the fuel tank.

**25**. The method of claim **24**, wherein cutting the foam material further comprises:

cutting at least one arcuate cutout in at least one foam block among the plurality of foam blocks to provide clearance around a fuel pump in the fuel tank.

**26**. The method of claim **15**, further comprising arranging the plurality of foam blocks in a stack corresponding to a sequential installation at respective sectors within at least one compartment of the fuel tank.

**27**. The method of claim **15**, further comprising forming a directional indicator in or on at least one foam block among the plurality of foam blocks to indicate an installation orientation at a sector within at least one compartment of the fuel tank.

**28**. The method of claim **15**, further comprising marking an identifier on at least one foam block among the plurality of foam blocks to indicate an installation location at a sector within at least one compartment of the fuel tank.

**29**. The method of claim **28**, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the plurality of foam blocks within the at least one compartment of the fuel tank.

**30**. The method of claim **15**, wherein the plurality of foam blocks fit within the fuel tank to fill a total volume of the fuel tank with open voids of no larger than a certain size and less than a percentage of the total volume of the fuel tank.

**31**. The method of claim **15**, wherein a fourth foam block among the plurality of foam blocks is oriented vertically, spans the vertically-oriented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column.

\* \* \* \* \*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

**EXHIBIT C**

**U.S. Patent No. 10,800,541**



US010800541B2

(12) **United States Patent**
Williams

(10) **Patent No.:**    **US 10,800,541 B2**
(45) **Date of Patent:**    ***Oct. 13, 2020**

(54) **METHOD AND MATERIAL FOR ACCOMPLISHING IGNITION MITIGATION IN TANKS CONTAINING FLAMMABLE LIQUID**

(71) Applicant: **Jetaire Aerospace, LLC**, Atlanta, GA (US)

(72) Inventor: **Michael D. Williams**, Fayetteville, GA (US)

(73) Assignee: **JETAIRE AEROSPACE, LLC**, Atlanta, GA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/165,609**

(22) Filed: **Oct. 19, 2018**

(65) **Prior Publication Data**

US 2019/0055031 A1    Feb. 21, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 15/816,150, filed on Nov. 17, 2017, which is a continuation-in-part of
(Continued)

(51) **Int. Cl.**
***B64D 37/32***    (2006.01)
***B64D 37/06***    (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............... ***B64D 37/32*** (2013.01); *A62C 3/08* (2013.01); *B60K 2015/03407* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .. B64D 2037/325; B64D 37/32; B64D 37/08; B64D 37/06; B64D 37/02;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,013,190 A * 3/1977 Wiggins ................... A62C 4/00
220/501
5,755,486 A * 5/1998 Wycech ................. B29C 70/66
296/187.02
(Continued)

FOREIGN PATENT DOCUMENTS

WO    2015170088    11/2015

OTHER PUBLICATIONS

US 5,803,090 A1, 10/2004, Castiglione et al. (withdrawn)
(Continued)

*Primary Examiner* — Christopher J Besler
(74) *Attorney, Agent, or Firm* — Thomas Horstemeyer, LLP

(57)    **ABSTRACT**

The use of flexible foam material to provide ignition mitigation in fuel tanks is described. In one example, a system for ignition mitigation includes a number of foam blocks, wherein each foam block is pre-cut from a flexible foam material. Each foam block can have a unique profile corresponding to inner surfaces of a fuel tank at a particular sector within a compartment of the fuel tank. In other aspects, one or more of the foam blocks can include one or more upper cutouts to provide clearance for upper stiffeners in the fuel tank, one or more lower cutouts to provide clearance for lower stiffeners in the fuel tank, and one or more arcuate cutouts to provide clearance for a tank fuel pump. The foam blocks can be arranged in a stack corresponding to a sequential installation at respective sectors within the compartment of the fuel tank.

**19 Claims, 10 Drawing Sheets**



50

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT
Appx00333

**US 10,800,541 B2**

Page 2

**Related U.S. Application Data**

application No. 14/851,511, filed on Sep. 11, 2015, now Pat. No. 9,849,998.

(51) **Int. Cl.**

| | |
|---|---|
| ***B64F 5/00*** | (2017.01) |
| ***A62C 3/08*** | (2006.01) |
| ***B64D 37/08*** | (2006.01) |
| ***B60K 15/03*** | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *B64D 37/06* (2013.01); *B64D 37/08* (2013.01); *B64D 2037/325* (2013.01); *B64F 5/00* (2013.01)

(58) **Field of Classification Search**
CPC ......... B23P 2700/01; A62C 2/06; A62C 3/08; B60K 2015/03032; B60K 2015/03039; B60K 2015/0344; B60K 2015/03407; B60K 2015/03421
See application file for complete search history.

(56)         **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,358,591 | B1 | 3/2002 | Smith |
| 6,408,979 | B1 | 6/2002 | Forbes et al. |
| H2054 | H | 12/2002 | Bennett |
| 7,341,113 | B2 | 3/2008 | Fallis et al. |
| 9,321,347 | B2 | 4/2016 | Cragel et al. |
| 9,849,998 | B2 * | 12/2017 | Williams ............... B64D 37/32 |
| 2011/0272526 | A1 | 11/2011 | Barbosa et al. |
| 2013/0240539 | A1 * | 9/2013 | Cragel ................. B60K 15/077 220/652 |
| 2014/0076285 | A1 | 3/2014 | Martin et al. |
| 2014/0216416 | A1 | 8/2014 | Novaco et al. |
| 2017/0096234 | A1 | 4/2017 | Martindale et al. |
| 2018/0339789 | A1 * | 11/2018 | Williams ............... B64D 37/06 |

OTHER PUBLICATIONS

Transcription and Frame Captures from "China Lake Video," Naval Weapons Center, China Lake, CA; Jun. 1989, pp. 1-89.
SAE International; "Aerospace Information Report". Reticulated Polyurethane Foam Explosion Suppression Material for Fuel Systems and Dry Bays. (1991). pp. 1-38.
Appendix 2 Claim chart of independent claims 1, 17, and 32 for U.S. Appl. No. 16/165,609, as amended Sep. 26, 2019.
Appendix 1 Claim chart of independent claims 26 and 41 for U.S. Appl. No. 15/816,150, as amended Sep. 26, 2019.
Aviation Rulemaking Advisory Committee "Foam" Jul. 21, 1998 pp. 1-52.
AIR4170, S.A.E., (1998) "Reticulated Polyurethane Foam Explosion Suppression Material for Fuel System and Dry Bays."

* cited by examiner

**U.S. Patent**        Oct. 13, 2020        Sheet 1 of 10        US 10,800,541 B2



FIG. 1

**U.S. Patent**      Oct. 13, 2020      Sheet 2 of 10      **US 10,800,541 B2**



FIG. 2



FIG. 3

FIG. 3A

U.S. Patent          Oct. 13, 2020          Sheet 3 of 10          US 10,800,541 B2



FIG. 4

**U.S. Patent**        Oct. 13, 2020        Sheet 4 of 10        US 10,800,541 B2



FIG. 5

FIG. 5A

FIG. 6

**U.S. Patent**     Oct. 13, 2020     Sheet 5 of 10     US 10,800,541 B2



FIG. 7



FIG. 8

FIG. 8A

FIG. 8B



FIG. 8C

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

U.S. Patent      Oct. 13, 2020      Sheet 7 of 10      US 10,800,541 B2



FIG. 9

U.S. Patent      Oct. 13, 2020      Sheet 8 of 10      US 10,800,541 B2



FIG. 10

U.S. Patent          Oct. 13, 2020          Sheet 9 of 10          US 10,800,541 B2



FIG. 11

U.S. Patent        Oct. 13, 2020        Sheet 10 of 10        US 10,800,541 B2



FIG. 12

US 10,800,541 B2

**1**

## METHOD AND MATERIAL FOR ACCOMPLISHING IGNITION MITIGATION IN TANKS CONTAINING FLAMMABLE LIQUID

### CROSS-REFERENCES TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/816,150, filed on Nov. 17, 2017, which is a continuation-in-part of U.S. patent application Ser. No. 14/851,511, filed on Sep. 11, 2015, the entire contents of which both of which applications are hereby incorporated herein by reference.

### BACKGROUND OF THE INVENTION

#### (1) Field of the Invention

The inventive concept disclosed relates generally to methods employed to prevent and/or minimize fuel ignition, fire, and/or explosion in the interior of tanks containing fuel or other types of flammable liquids. Different systems, materials, and methods have been used in an attempt to achieve this end, including inert gaseous material, which features active systems using Halon 1301 inerting and nitrogen inerting in some military aircraft. "Reactive" systems have been designed that react to the initiation of an explosion and discharge a substance intended to suppress the internal explosion, hopefully within milliseconds. These reactive systems are initiated by either physical or chemical means.

In the preferred embodiment of the instant inventive concept there are disclosed different embodiments of specific methods of installing accurately measured quantities of flexible foam material to fill the internal space of tanks that hold flammable liquid, with particular emphasis on aircraft fuel tanks.

#### (2) Background

Since 1959, there have been sixteen documented incidents of fuel tank ignition events in aircraft. These fuel tank ignition events have resulted in 542 fatalities, 11 hull losses and 3 incidents causing substantial damage. The causes of the fuel tank ignition events were attributed as follows: 4 were caused by external wing fires, 4 by electrostatics, 3 by faulty fuel pumps or wiring, 2 by lightning, and 3 to unknown causes.

On Jul. 17, 1996, TWA Flight 800 sustained an in-flight break-up after taking off from Kennedy International Airport in New York, resulting in 230 fatalities. The National Transportation Safety Board ("NTSB") conducted a lengthy investigation and determined that ignition of the flammable fuel/air mixture in a center wing fuel tank had occurred, causing an explosion that disintegrated the aircraft in flight. Although the exact ignition source could not be determined, the NTSB concluded that the most likely ignition source was a short circuit outside the center wing fuel tank that allowed excessive voltage to enter the tank through electrical wiring associated with the fuel quantity indication system (FQIS).

The NTSB announced their official findings regarding the TWA 800 accident at a public meeting held on Aug. 22nd and 23rd, 2000 in Washington, D.C. Primarily as a consequence of TWA Flight 800, the Federal Aviation Administration ("FAA") issued numerous airworthiness directives intended to reduce possible ignition sources and thereby the risk of another fuel tank explosion. On May 7, 2001, the

**2**

FAA promulgated rulemaking to establish several new transport category airplane fuel tank safety requirements (66 Federal Registry 23086, May 7, 2001). The rulemaking, effective Jun. 6, 2001, included Amendment 21-78, Amendment 25-102 and Special Federal Aviation Regulation ("SFAR") No. 88 entitled "Transport Airplane Fuel Tank System Design Review, Flammability Reduction and Maintenance Requirements." SFAR No. 88 required that type certificate holders and supplemental type certificate holders conduct a revalidation of the fuel tank system designs on the existing fleet of transport category airplanes capable of carrying thirty (30) or more passengers or a payload of 7,500 pounds or more.

Legislation was enacted as 14 CFR § 25.981 (Rule 25.981) and FAA Advisory Circulars AC 25.981-1B and 25.981-2 were issued to provide compliance guidance. Compliance with Rule 25.981 required each applicant to develop a failure analysis for the fuel tank installation to substantiate that ignition sources would not be present in the fuel tanks. The requirements of this section are in addition to the more general propulsion failure analyses requirements of 14 CFR 25.901 and 14 CFR 25.1309 that have been applied to propulsion installations.

14 CFR § 25.981 (a) (3) defines three failure scenarios that must be addressed in order to show compliance with the rule (known as the "three phases" of compliance):

Phase A: Each single failure, regardless of the probability of occurrence of the failure, must not cause an ignition source;

Phase B: Each single failure, regardless of the probability of occurrence, in combination with any latent failure condition not shown to be at least extremely remote (i.e., not shown to be extremely remote or extremely improbable), must not cause an ignition source; and

Phase C: All combinations of failures not shown to be extremely improbable must not cause an ignition source.

Compliance with 14 CFR § 25.981 (Amendment 25-125) requires investigation of the airplane fuel tank system using analytical methodology and documentation currently used by the aviation industry to demonstrate compliance with 14 CFR 25.901 and 25.1309 but with consideration of unique requirements included in this amendment of this paragraph.

The Federal Aviation Administration (FAA) mandates forced certificate holders to develop and implement all design changes required to demonstrate that their aircraft meet the new ignition prevention requirements and to develop fuel tank maintenance and inspection instructions. Specifically, SFAR No. 88 contains six (6) requirements applicable to transport category aircraft: 1) determine the highest temperature allowed before ignition occurs; 2) demonstrate that this temperature is not achieved anywhere on the aircraft where ignition is possible; 3) demonstrate that ignition could not occur as a result of any single point failure; 4) Establish Critical Design Configuration Control Limitations ("CDCCL"), inspections or other procedures to prevent changes to the aircraft that would result in reintroduction or creation of ignition sources; 5) develop visible means to identify critical features of the aircraft where maintenance, repairs or alterations would affect areas or systems of possible ignition; and 6) design of fuel tanks must contain a means to minimize development of flammable vapors in fuel tanks or a means to mitigate the effects of ignition within fuel tanks.

Maintenance of ignition source prevention features is necessary for the continued operational safety of an airplane's fuel tank system. One of the primary functions of the fuel tank system is to deliver fuel in a safe and reliable

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT
Appx00345

US 10,800,541 B2

**3**

manner. Preventing ignition sources is as important a function of the fuel system as the delivery and gauging of fuel. The failure of any ignition source prevention feature may not immediately result in an ignition event, but a failure warrants maintenance for continued airworthiness because the failure could eventually have a direct adverse effect on operational safety.

There have been various solutions proposed and implemented to comply with the mandated transport category aircraft fuel tank ignition mitigation requirements. Examples of compliance methods implemented include electronic solutions such as the installation of Transient Suppression Devices ("TSD"), Ground Fault Interrupters ("GFI"), and similar current limiting devices. These devices are deficient in that they retain possible failure rates that a "passive," non-electronic solution could resolve. Clearly, there is a need for a simplified and reliable solution to make implementation of the SFAR No. 88 compliance feasible. A better solution would be a less expensive, passive solution that is applicable to commercial and private aircraft and other vehicles.

(3) Description of the Related Art, Including Information Disclosed Under 37 CFR 1.97 and 1.98

There are no known uses of flexible foam material in the same manner and for purposes similar to the inventive disclosure. However at least one entity, BAE Systems, PLC, utilizes a "tie assembly" as structural components within the interior of a liquid storage tank for the purpose of reducing hydrodynamic ram pressure and minimizing possibility of catastrophic failure of the fuel tank in the event of projectile impact. Ref. WO 2015/170088 A1, published Nov. 12, 2015.

BRIEF SUMMARY

The method and materials discussed in this document will focus primarily on the use of one or more conformed, interrelated pieces of flexible foam material shaped to replicate the inside dimensions of an aircraft fuel tank. The inventive concept, method, and materials disclosed herein are equally applicable to tanks designed and constructed for use in various types of vehicles and flammable liquid storage tanks. However, for the sake of simplicity and ease of explanation, most of the discussion will be centered on the preferred embodiment, which is concerned with aircraft fuel tanks. The term "aircraft fuel tanks," as used in this disclosure shall apply to integral and auxiliary fuel tanks of fixed wing aircraft, rotary wing aircraft, drones, and other types of machines capable of flight.

The foam material disclosed herein is intended to be used as a passive means to mitigate ignition in aircraft fuel tanks. The present inventive concept advantageously satisfies the aforementioned deficiencies in aircraft fuel tanks by providing a method of accomplishing ignition mitigation in aircraft fuel tanks using, in the preferred embodiment, molded polyurethane safety foam in coordinated shapes to fill one tank or multiple fuel tanks.

A preferred material for this inventive concept is polyurethane safety foam, which is a reticulated flexible foam composed of a skeletal matrix of lightweight interconnecting strands. For purposes of this disclosure, this particular material is referred to as "Reticulated Polyurethane Foam" ("RPF"). The RPF is also a biofuel-compatible material. There are also other varieties of foam material currently in existence, or that may be developed, which will function as

**4**

well as RPF, including, but not limited to, polyether. Among these materials are polyethers, in which the repeating chemical unit contains a carbon-oxygen bond derived especially from an aldehyde or an epoxide.

Other advantages of the use of flexible foam include slosh attenuation, hydrodynamic ram attenuation, and forming a barrier against foreign object debris. These qualities are inherent properties of many foam-type materials, including RPF. As a surge or explosion mitigating agent, RPF attenuates the sloshing of fuel and, in some cases, eliminates the need for structural baffles within a tank. RPF further provides for a "smooth" sine wave motion of the fuel and reduces rapid redistribution of mass.

Hydrodynamic ram effect within a fuel tank or bladder cell is caused when a projectile impacts the exterior structure of the fuel tank. Ram force can be intensified when the tank is penetrated by a high explosive incendiary ("HEI") delayed detonating-type projectile. The matrix-type structure of RPF absorbs a portion of the shock wave as a projectile penetrates a fuel tank. Attenuation of hydrodynamic ram minimizes damage to the fuel tank structure by reducing the overpressure of the shock wave and helps to orient the round to prevent tumbling. The reduction of fuel tank structural damage can effectively reduce fuel discharge through the projectile entrance and exit points.

The foreign object debris barrier capability of RPF materials is an inherent beneficial effect rather than a product specification requirement. The RPF used in this inventive concept is a natural filter, due to its natural structure resembling a fibrous network. The finer the porosity of a material used as a fuel filter, the greater the entrapment of foreign objects and loose debris. The RFP material entraps loose debris within a fuel tank and minimizes the amount of debris entering an adjacent tank, the tank fuel lines, or the engine fuel system.

Explosion within a fuel tank containing kerosene-type fuels occurs as a result of the existence of flammable mixture in the ullage in combination with an ignition source. Examples of possible ignition sources include incendiary ammunition penetrating the fuel tank, static discharges, lightning strikes, switch refueling, and electrical shorts. Reticulated polyurethane foam (RPF) is in effect a three-dimensional fire screen, which minimizes the possibility of gasoline and kerosene-type (such as jet aircraft fuel) explosions under one or a combination of the following theories: the foam acts as a heat sink, (i.e., it removes energy from the combustion process by absorbing heat); it mechanically interferes with the compression wave that precedes the flame front in an explosion; and, the high surface-to-volume of reticulated polyurethane foam enables the strands to collect or coalesce the droplets of fuel, thus changing the vaporous mixture in the empty space above the fuel level (ullage), in the tank. Coalescing causes the vaporous mixture to become lean, which minimizes possible explosion.

The present inventive concept advantageously allows for greatly increased effectiveness in preventing the hazardous ignition of fuel within aircraft fuel tanks (satisfying all three phase requirements of 14 CFR § 25.981 compliance), is passive and therefore far less likely to experience a system failure, and available at a cost of implementation far less than that of alternative electronic solutions.

Experience in the aviation industry has shown that any fuel tank can be filled to maximum of about 85% capacity (not including a fuel swell of 12%) with the internal presence of reticulated polyurethane foam, not including any

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT
Appx00346

US 10,800,541 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

planned voids. The foam blocks should be kept clear of tank components such as the fuel inlets, fuel sensors, valves, float switches, and tank vents.

Other embodiments of a foam material and method in accordance with the above principles of the inventive concept may include alternative or optional additional aspects. One such aspect would be use of foam of sufficient porosity and ignition mitigation properties composed of a synthetic or naturally occurring material other than polyurethane.

Another aspect of the present invention is the use of block foam material in interrelated, geometrical shapes which collectively conform to the interior shapes of fuel tanks.

An important aspect of the present invention is the frequent requirement to use alternate access ports of an aircraft fuel tank to insert the foam or foam blocks and position them in a distinct pattern to minimize any voids along tank walls. In the case of aircraft having internal fuel tanks integral to the wing, fuselage, cargo bays, or tail structure, it may be necessary to detach certain segments of the aircraft skin to provide access to the tank.

Another aspect of the present inventive concept is the utilization of a "fully packed" design concept. A fully packed system is defined as one where all potential fuel tank ullage is filled with reticulated polyurethane foam with cutouts for internal tank components only. This system is most desirable where minimal or no tank over-pressure can be tolerated.

An important objective of the present inventive concept is the utilization of a grossly "voided" design concept. A grossly voided system is defined as one where the fuel tank contains strategically positioned reticulated foam for explosion suppression. This method provides for minimal weight penalty and fuel retention, and is best suited for a fuel system that can withstand substantial overpressures.

These and various other advantages and features of novelty which characterize the inventive concept are pointed out in the accompanying descriptive matter and drawings which form a further part hereof. For a better understanding of the inventive concept, its advantages, and the objects obtained by its use, reference should be made to the drawings in which are illustrated and described specific examples of a method and material in accordance with the present invention.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates a general overall fuselage-cutaway view of a Boeing® 737 jet aircraft, further showing the location of the center wing fuel tank.

FIG. **2** shows the location of the center wing tank of the Boeing® 737 aircraft, as would be seen looking through the bottom of the fuselage, and further, a tank access panel utilized by maintenance personnel for ground servicing.

FIG. **3** depicts a close-up view of the access panel to the center wing tank shown in FIG. **2**.

FIG. **3**(A) is an illustration of the manner in which the access panel of FIG. **2** is removed from the exterior of the center wing tank.

FIG. **4** shows a cutaway view of the structural members of the center wing tank, in accordance with section line **4-4** of FIG. **1**.

FIG. **5** illustrates the profile of a specifically-shaped foam block precisely cut to fit the exact contour of a sector of the center wing tank.

FIG. **5**(A) presents a side view of the foam block of FIG. **5**.

FIG. **6** presents a stylized diagram of the aggregate of a plurality of sequentially-arranged, pre-cut foam blocks to be installed adjacent to one another, conforming to the contour of the forward compartment of the center wing tank.

FIG. **7** is a stylized rendering of the center wing tank, further showing the packing arrangement of a plurality of foam blocks properly installed in the forward compartment.

FIG. **8** depicts the first stages of installation of foam blocks on the right side of the aft compartment.

FIG. **8**A shows the beginning of installation of foam blocks on the left side of the aft compartment, the right side of the compartment having been completed.

FIG. **8**B depicts the start of installation of foam blocks in the middle section of the aft compartment.

FIG. **8**C depicts the completion of installation of foam blocks in the aft compartment.

FIG. **9** is a stylized rendering of the resultant installation of all foam blocks in the forward, center, and aft compartments of the center wing tank of a typical Boeing® 737 aircraft.

FIG. **10** depicts an exploded view of exemplary foam blocks which comprise one of twelve (12) vertically-oriented columns sculpted to fit within the first center wing box cavity of a Boeing® 767 ER aircraft.

FIG. **11** illustrates an exploded view of the aggregate of all foam blocks (circled numbers 001-108) necessary for a complete filling of foam blocks into the first center wing box cavity of a Boeing® 767 ER aircraft.

FIG. **12** depicts the joining of the aggregate of foam blocks required to fill both wing box cavities of the 767 ER center wing tank.

### DETAILED DESCRIPTION

The present inventive concept is based upon the use of precisely measured and contoured quantities of flexible foam material to be inserted into a tank constructed for the storage or retention of a flammable liquid. The principal intended use of this inventive concept is for the insertion of measured quantities of flexible foam material into the fuel tanks of aircraft. In the typical accomplishment of this method, interrelated sequential groupings of blocks of flexible foam material are used to fill specific fuel tank(s) of an aircraft.

However, in some instances, the flexible foam material may be cut and shaped into relatively small, uniformly-sized pieces so as to fit through tank access ports, service bays, or other available tank openings. The objects, features, and advantages of the concept presented in this document are more readily understood when referring to the accompanying drawings. The drawings, totaling seventeen (17) figures, show the basic components and functions of embodiments and/or the specific method steps. In the several figures, like reference numbers are used in each figure to correspond to the same component as may be depicted in other figures.

For illustrative purposes only, and not by way of limitation, the methods and systems described in this disclosure are disclosed as applicable to Boeing® 737 or Boeing® 767 series aircraft. This detailed description section is merely exemplary in nature and is not intended to limit the methods and uses shown in this inventive concept. The method disclosed may be utilized, with appropriate changes to the procedures, in a variety of types and locales of fuel tanks, whether on a vessel, aircraft, or affixed to the ground or a structure.

There is no intent for the applicant to be bound or constrained by any expressed or implied theory(ies) set forth

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Appx00347

US 10,800,541 B2

**7**

in the relevant technical fields, background, brief summary, or the present detailed description of the inventive concept as it relates to Boeing® 737 or Boeing® 767 aircraft. Further, there is no intent to confine the inventive method disclosed to one particular make, model, or series of aircraft, or particular configurations of aircraft fuel tanks.

The flexible foam material referred to in this document may be comprised of any of a variety of different foam materials, including different structures, textures, chemical compositions, and constituent qualities. A preferred foam material is reticulated polyurethane. Additionally, any material selected from the group consisting of polyethers in which the repeating unit contains a carbon-oxygen bond derived especially from an aldehyde or an epoxide may be used in the method set forth in this inventive concept.

By way of illustration only, and not as a limitation, the preferred embodiment of the present inventive concept depicts the use of contoured, interrelated, sequential groupings of foam blocks to fill a specific fuel tank or tanks of an aircraft. In situations where a fuel tank is relatively small, comprises an irregular shape, or its location makes it difficult to access, flexible foam pieces of certain shapes and sizes may be inserted through ports, openable panels, or other means, until the tank is determined to be fully satiated with the foam pieces.

When utilizing specifically-cut foam blocks, the blocks are engineered, fabricated, and/or sculpted to occupy a volumetric sector, or sectors, of the interior of a fuel tank. By utilizing the disclosed methods of installing blocks **50** or foam pieces to fill one or more fuel tanks of an aircraft, the aircraft operator prevents or minimizes the potentially damaging or catastrophic effects of fuel ignition, fire, and/or explosion.

For ease of explanation and illustrative purposes only, and not as a means of limitation, the disclosed method is described with regard to installation of the foam blocks into the center wing tank **112** of a Boeing® 737 aircraft **110** or the center wing box cavities **211**, **212**, of a Boeing® 767 aircraft **200**.

The discussion of the present inventive concept will be initiated with FIG. **1**, which illustrates an overall view of a Boeing® 737 jet aircraft **110**. FIG. **1** also depicts the fuselage **111**, and a center wing tank **112**, which is encircled. As in most similar jet aircraft, the predominance of the fuel load is generally carried in fuel tanks constructed within the left wing **104** and right wing **105**, with equal quantities in each wing **104**, **105**. The wing-loaded fuel serves to add a counter-balancing weight to offset the upward wing structural bend due to the aerodynamic lift force generated by the wings **104**, **105** when in flight. However, for substantially increased range, the aircraft **110** may be loaded with additional fuel in the center wing tank **112** and other internal tanks, if available.

FIG. **2** is a stylized rendering looking upward at the undersurface of the Boeing® 737 fuselage **111**, further revealing the location of the center wing tank **112**. Also shown in FIG. **2** is a center wing tank access panel **20** utilized by maintenance personnel during ground servicing of this particular model and series of the Boeing® 737.

FIG. **3** depicts an expanded view of the access panel **20** shown in FIG. **2**. FIG. **3**(A) is an illustration of the manner in which the access panel **20** is removed from the exterior of the center wing tank **112**, further showing a clamp ring **21**, one of a plurality of washers **22**, and one of a plurality of bolts **23**, the washers **22** and bolts **23** utilized for insertion through apertures **24** for fastening the clamp ring **21** onto a lower center wing panel **26**.

**8**

FIG. **4** illustrates a stand-alone sectional view of the center wing tank **112**, in accordance with section line **4-4** of FIG. **1**. The structural integrity of the center wing tank **112**, as positioned within the fuselage **111**, substantially determines the internal contour of the center wing tank **112**. The internal wing tank **112** contour, on initial determination of the quantity of foam material required, can be divided into a plurality of volumetric sectors, each sector amenable to acceptance of one, a few, or a substantial quantity of foam blocks or pieces conforming to each sector.

Referring to FIG. **4**, the aircraft **110** structural members shown include a front spar **120**, rear spar **121**, floor beams **122**, and a tank ceiling **127** abutting the aircraft floor beams **122**. It is important to note that, as shown in FIG. **4**, the center wing tank **112** comprises multiple compartments: a forward compartment **131**, a center compartment **132**, and an aft compartment **133**. The three compartments **131**, **132**, **133** are separated by spanwise beam #**2 124** and spanwise beam #**1 125**. In each of the three compartments **131**, **132**, **133**, a fuel tank floor **128** comprises lower stiffeners **128** and the fuel tank ceiling **127** comprises upper stiffeners **129**, which give additional rigidity to all three tank compartments **131**, **132**, and **133**.

As a planning consideration, it is important to assess the structural arrangement and means of access to each individual compartment of a tank with multiple compartments. This is vital in order to arrive at pre-determined working order as to which of the compartments should be the first to be filled with the foam material and in what sequence the remaining compartments should be filled.

As further discussion of the installation of aggregate foam blocks **50**, explanation will be given of the methodology and process of measuring, sizing, and sculpting an exemplary foam block **50**. Shown in FIG. **5** there is illustrated, by way of example, a profile view of a forward compartment foam block **51**. This forward compartment foam block **51** is designated as such due to the fact that the contour of its outer perimeter corresponds to the shape, internal fittings and components of a specific, sector within the forward compartment **131** of the center wing tank **112**.

In viewing FIG. **5**, the topmost edge shows four upper cutouts **52** which provide clearance for upper stiffeners **129** of the forward compartment **131** as previously shown in FIG. **4**. The left edge **55** of the foam block **51** is fabricated so as to correspond to the forward tank wall **123**, and further shows an arcuate cutout **53** which provides clearance for a tank fuel pump, or other tank component. The bottommost section of the forward compartment foam block **51** illustrates three cutouts **54** which allow clearance for the three lower stiffeners **130** of the forward compartment **131**, as shown in FIG. **4**. Thus, the sector into which this foam block is placed manifests upper stiffeners **129**, lower stiffeners **130**, the forward tank wall **123**, and a portion of a fuel pump.

The right edge **56** of the forward compartment foam block **51** corresponds to spanwise beam #**2 124**, as is depicted in FIG. **4**. FIG. **5**(A) is a view looking directly at the right edge **56** of the forward compartment foam block **51**, and further showing the nominal width **57** of the forward compartment foam block **51**. The dimensions of each of the foam blocks **50** have been measured and fabricated or sculpted in a size and contour which is completely dependent upon the size and contour of the fuel tank sector into which the specific foam block is to be installed.

As observed in FIG. **5**, a directional UP arrow and a forward (FWD) arrow are printed on the surface of the foam block **51** to further guide an installer or technician in placing this particular foam block **51** in the correct orientation.

US 10,800,541 B2

9

Aircraft mechanics will also need foam block orientation and positioning guidance in the event one or more foam blocks **50** may need to be removed for internal tank or tank component inspection or maintenance during aircraft line operations.

The illustrated forward compartment foam block **51** of FIG. **5** is further given a part number (P/N) to indicate its exact location in the forward compartment **131** of the center wing tank **112**. The part number also defines the order of its loading in the installation sequence of the aggregate of all foam blocks **50**. The general manner of construction of the contour of the previously-described forward compartment foam block **51** is typical of the parameters to be met for each of the aggregate foam blocks **50** to be inserted in the forward compartment **131** of the center wing tank **112** of a Boeing® 737 series 400 aircraft as well as those foam blocks to be installed in the mid compartment and aft compartment of the center wing tank **112**. Similarly, the general manner of construction of the contour of any other foam block described above is typical of the parameters to be met for any foam block to be installed in any of a variety of aircraft fuel tanks.

The contours of the aggregate of all foam blocks **50** are a culmination of determinations made of the dimensions, profile, connections, attachments, and integral components of the inner surfaces of the fuel tank at the specifically designated sectors internal to each of the forward, center, and aft compartments **131**, **132**, **133** of the center wing tank **112**. This methodology is applicable to the determination of the size and contour of any foam block that may be fabricated for insertion into any of an unlimited variety of fuel tanks.

In planning a project for installation of foam blocks in the center wing tank **112**, the initial process requires the manufacture and delivery of a pre-determined quantity of bulk foam material. The bulk forms generally measure approximately 12'×4'×2'. However, in everyday applicability, the overall dimensions and volumetric quantity of the bulk material is dependent upon the size and contour of the particular type of fuel tank into which the finished sculpted foam pieces are to be inserted.

During the manufacturing process, the bulk quantities of flexible foam may be colored, as required by the customer. In the preferred embodiment, a purple color facilitates the trouble-shooting of fuel contamination or irregularities associated with fuel lines, the engine fuel pump, filters, etc. Purple-colored flexible foam enables a determination whether an ignition event or possible foam deterioration has taken place.

By way of example only, in the case of the center wing tank **112** of a −300 series Boeing® 737 aircraft, engineering drawings are executed in a sequential series of scaled renderings of volumetric sectors of, for instance, the forward compartment **131** of the center wing tank **112**. The profile of the compartment is measured and scaled at regularly-spaced increments along a line extending from a selected wall, tank floor, or the ceiling of the forward compartment **131**. The measurements also take into consideration the placement of tank structural components and equipment. In the same manner, engineering drawings are rendered for the interrelated sectors and contour of the center compartment **132** and aft compartment **133** of the center wing tank **112**.

A plurality of cutouts of foam blocks **50** is made from the manufactured bulk foam, each block cut and sculpted according to the previously-described scaled renderings and further, each block cutout is progressively identified with a part number (P/N). Further, orientating symbols or text, such as "UP," "DOWN," "REAR," or "FORWARD," may be

10

printed thereon. Cutting and shaping of the individual foam block cutouts from the bulk material may be accomplished by use of several optional means. These options include, but are not limited to mechanical blade type-cutting, specially designated/manufactured smooth blade type cutting tools, an extremely fine-toothed band saw-type blade, or a hot-wire type cutting tool.

Once the entirety of the aggregate foam blocks **50** required for the center wing tank **112** have been sculpted, each block is identified with a part number (P/N) and numerical or alphabetical sequencing corresponding to the sequential placement of the foam block into its corresponding sector within each of the forward, center, or aft compartments **131**, **132**, **133**. The foam blocks **50** are individually packaged and arranged in a stack or stacks which correspond to the orderly, sequential installation of the foam blocks **50** into the appropriate sector previously calculated. Further, detailed written instructions regarding the installation of the foam in each compartment are drafted and organized in a manual for the guidance of technicians who will install the foam blocks **50**.

To install the foam blocks **50** into the center wing tank **112**, it is preferable to position the aircraft **110** on a level surface and at a convenient height for access to the center wing tank **112**. The access opening cover is then removed and the foam blocks **50** are inserted through the access openings with the exercise of care to avoid tearing or abrading the foam blocks on the lip of the opening. FIG. **2**, FIG. **3** and FIG. **3**(A) illustrate the relative position of the access panel **20** of the center wing tank **112**.

In many instances, installation of the foam blocks may be accomplished during the manufacturing or initial assembly stages of a fuel tank. In these situations, the job of the technicians or installers is much less problematic, since access to the interior of the tank is relatively straightforward and convenient. As a preliminary step, in installation of the flexible foam into fuel tanks that have been in service for a period of time, the cleanliness of the tank must first be ensured by draining the tank, purging, and then vacuuming the interior.

As stated previously, a very specific order of insertion of the foam blocks **50** must be followed so that all spaces that are intended to be filled in the center wing tank **112** are indeed filled. Empty spaces in the tank can only be those left by design, which is referred to as "planned voiding." The center wing tank **112** under discussion here should be filled with the foam blocks **50** fitted according to the sectors and pattern specified in the previously-mentioned engineering drawings and installation instructions.

By way of further illustration, FIG. **6** depicts a diagram of a representative sample of a plurality of sequentially-arranged, pre-cut foam blocks **50** to be installed adjacent to one another, thereby conforming to the interior contour of the forward compartment **131** of the center wing tank **112** of the Boeing® 737 aircraft. Each of the blocks **50** has a shape and an order of installation which ultimately conforms to a specific contour of the forward compartment **131** at a particular sector of the forward compartment **131**. FIG. **7** is a stylized "see-through" rendering of the center wing tank **112**, further showing the packing arrangement of a plurality of blocks **50** in the process of being installed in the forward compartment **131** of the center wing tank **112**.

Generally, the installation of the foam blocks **50** is accomplished by technicians entering through existing fuel tank access bays and openings. Further, a certain amount of the foam blocks **50** may be uploaded directly into the tank **112**. On aircraft other than the Boeing® 737, existing fuel tank

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT
Appx00349

US 10,800,541 B2

11

access openings that may be used for insertion and installation include, but are not limited to, maintenance access holes, wet and dry access bays found on non-cylindrical auxiliary fuel tanks, inspection holes in belly tanks, and the like. In the case of an aircraft having integral wing tanks, for instance, access may be necessary by means of removing a portion of the wing skin to access the fuel tank.

A very specific order of insertion of the foam blocks **50** must be followed so that all spaces that are intended to be filled in the tank are indeed filled. The method disclosed in this document must take into consideration the fact that all tanks designed to contain flammable liquid, including aircraft fuel tanks, manifest distinctive shapes and contours of the tank floor, ceiling, and walls.

Care is necessarily exercised to avoid tearing or abrading the foam on the lip of the access bays or holes. Shaped block foam pieces are inserted and positioned in a manner to ensure that the required internal tank void is filled and maximum ignition source prevention is achieved. The foam material selected for this disclosed method is considered to be "memory foam." Memory foam generally returns to its original shape after compression down to 40% of its original volume. A key feature of the present inventive concept is that the design and structure of the shaped block foam pieces allows them to be bent or slightly compressed in order to fit through existing access bays or ports of various aircraft fuel tanks.

In referring to FIGS. **8**, **8**A, **8**B and **8**C, it is to be noted that the majority of Boeing® 737 series 300 and series 400 aircraft are characterized by a first internal access port **18** between the aft compartment **133** and the center compartment **132** of the aircraft and a second internal access port **19** between the center compartment **132** and the forward compartment **131**. Further, a lower access panel **20** is depicted at the midpoint of the forward compartment **131**, which coincides with the underside of the fuselage.

In the installation of foam blocks **50** into the center wing tank **112** of a Boeing® 737 aircraft, the procedure begins with the right side of the aft compartment **133** of the center wing tank **112**. The installer(s) must gain access to the aft compartment **133** first, through a lower access panel **20** located on the underside of the fuselage **111** of the aircraft, as shown in FIG. **2** and FIG. **3**. Access is sequentially accomplished through the second internal access port **19**, and the first internal access port **18**.

FIG. **8** depicts a quantity of foam blocks **50** having been installed on the right side of the aft compartment **133**. Next, the installer(s) work the left side of the aft compartment **133**, FIG. **8**A showing the completion of installation of foam blocks on the left side of the aft compartment **133**, the right side of the compartment **133** having been completed. As the installer(s) begins exiting the aft compartment **133** through the first access port **18**, he/she installs RPF blocks **50** in the middle section of the aft compartment **133**, as shown in FIG. **8**B. FIG. **8**C depicts the completion of installation of foam blocks **50** in the aft compartment **133**.

FIG. **9** illustrates a stylized diagram of the resultant installation of all foam blocks in the forward, mid, and aft compartments **131**, **132**, **133** of the center wing tank **112** of a typical Boeing® 737 aircraft.

For illustrative purposes, renderings of the method of foam filling of the center wing tank **210** of a Boeing® 767 ER aircraft **200** is shown in FIG. **10**, FIG. **11**, and FIG. **12**. For informational purposes, the specific model 767 ER illustrated is constructed with a center wing tank **210** consisting of a first center wing box cavity **211** and a second wing box cavity **212**.

12

Beginning with FIG. **10**, there is shown an exploded view of a column of ten foam blocks **64-73** which comprise one of twelve (12) vertically-oriented columns designed to fill contiguous sectors of the first center wing box cavity **211** of the Boeing 767® ER aircraft **200**. Each block **64-73** manifests cutouts and a shape to fit the first center wing box cavity **211** contour and/or structural components corresponding to the sector into which the blocks **64-73** are sculpted to fit. FIG. **11** depicts an exploded view of the aggregate of all foam blocks (circled numbers 001-108) which are necessary to comprise a complete filling of foam material into the first center wing box cavity **211**.

In turning to FIG. **12**, there is shown a stylized rendering of the joining of the assemblies of foam blocks required to fill both the first center wing box cavity **211** and the second center wing box cavity **212** of the Boeing® 767 ER **200**. The foam blocks depicted as filling the second center wing box cavity **212** are structured and arranged similarly to the required assembly of foam blocks for the first center wing box cavity **211**. As a result, the union of these two groups of foam blocks completely fills the center wing tank **210** of the 767 ER aircraft **200** with ignition mitigating foam.

When conducting any of the above described methods and procedures, the fitted size, shape and installation of any aggregate of flexible foam material should be such that no internal tank voids longer than 2.5 feet exist (with the internal tank fuel probes installed). All flexible foam blocks must be kept clear of the tank components such as the fuel ports, fuel probes, float switches, and tank vents. The "planned" voiding areas around these structures should not exceed a volume of 10% of the total fuel tank volume and there should be no additional connecting voids between any of the planned void spaces. The minimum space of foam filled area required between the planned void areas is three (3.0) inches if maximum void size is used.

While the present invention has been described above in terms of specific embodiments, it is understood that the invention is not limited to these disclosed embodiments. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications, variations, and other embodiments of the invention will come to mind of those skilled in the art to which this invention pertains, and which are intended to be and are covered by both this disclosure and hereafter submitted claims. It is indeed intended that the scope of the invention should be determined by proper interpretation and construction of the hereafter submitted claims and their legal equivalents, as understood by those of skill in the art relying upon the disclosure in this specification and the attached drawings. It is intended that the scope of the invention is not limited to any particular aircraft, or to any particular type of tank constructed to hold flammable liquid.

What is claimed is:

1. A system for ignition mitigation, comprising:

a fuel tank,

a first plurality of foam blocks, at least two foam blocks among the first plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a first compartment of the fuel tank; and

a second plurality of foam blocks, at least two foam blocks among the second plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a second compartment of the fuel tank, wherein:

at least one foam block among the first plurality of foam blocks comprises an upper cutout in a top surface for

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT
Appx00350

US 10,800,541 B2

13

clearance around an upper stiffener of the fuel tank, an arcuate cutout in a side surface for clearance around a fuel pump of the fuel tank, and a lower cutout in a bottom surface for clearance around a lower stiffener of the fuel tank; and

the first plurality of foam blocks is positioned within the first compartment of the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank.

2. The system of claim 1, further comprising:

a third plurality of foam blocks, at least two foam blocks among the third plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a third compartment of the fuel tank.

3. The system of claim 2, wherein:

the fuel tank comprises part of an airplane fuel tank system;

the first compartment comprises a forward compartment of the fuel tank;

the second compartment comprises a center compartment of the fuel tank; and

the third compartment comprises an aft compartment of the fuel tank.

4. The system of claim 1, wherein the fuel tank comprises at least one of a center wing tank or an auxiliary fuel tank of an airplane fuel tank system.

5. The system of claim 1, wherein:

a first foam block among the first plurality of foam blocks comprises a plurality of upper cutouts, including the upper cutout, to provide clearance for upper stiffeners in the fuel tank;

a second foam block among the first plurality of foam blocks comprises a plurality of lower cutouts, including the lower cutout, to provide clearance for lower stiffeners in the fuel tank;

the first foam block and the second foam block are stacked in a vertically-oriented column;

the first plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and

the third foam block comprises at least one channel void to reduce weight.

6. The system of claim 5, wherein a fourth foam block among the first plurality of foam blocks is oriented vertically in the vertically-oriented column, spans the vertically-oriented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column.

7. The system of claim 1, wherein at least two foam blocks among the first plurality of foam blocks comprise at least two arcuate cutouts, including the arcuate cutout, to provide clearance for the fuel pump of the fuel tank.

8. The system of claim 1, wherein the first plurality of foam blocks are arranged in a stack corresponding to a sequential installation at respective sectors within the first compartment of the fuel tank.

9. The system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises a directional indicator to indicate an installation orientation within the fuel tank.

10. The system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises an identifier to indicate an installation location at a sector within at least one compartment of the fuel tank.

14

11. The system of claim 10, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the first plurality of foam blocks within the at least one compartment of the fuel tank.

12. The system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises a specified color to identify fuel contamination, an ignition event, or foam deterioration.

13. The system of claim 1, wherein the first plurality of foam blocks are formed from a flexible foam material.

14. The system of claim 13, wherein the flexible foam material comprises reticulated polyurethane foam.

15. The system of claim 13, wherein the flexible foam material comprises polyether foam.

16. A system for ignition mitigation, comprising:

a fuel tank for an airplane;

a first plurality of foam blocks, at least two foam blocks among the first plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a first compartment of the fuel tank; and

a second plurality of foam blocks, at least two foam blocks among the second plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a second compartment of the fuel tank, wherein:

at least one foam block among the first plurality of foam blocks comprises an upper cutout in a top surface for clearance around an upper stiffener of the fuel tank, an arcuate cutout in a side surface for clearance around a fuel pump of the fuel tank, and a lower cutout in a bottom surface for clearance around a lower stiffener of the fuel tank;

the first plurality of foam blocks is positioned within the first compartment of the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank; and

the second plurality of foam blocks is positioned within the second compartment of the fuel tank.

17. The system of claim 16, wherein the first plurality of foam blocks fit within the fuel tank to fill a total volume of the fuel tank with open voids of no larger than a certain size and less than a percentage of the total volume of the fuel tank.

18. The system of claim 16, wherein:

a first foam block among the first plurality of foam blocks comprises a plurality of upper cutouts, including the upper cutout, to provide clearance for upper stiffeners in the fuel tank;

a second foam block among the first plurality of foam blocks comprises a plurality of lower cutouts, including the lower cutout, to provide clearance for lower stiffeners in the fuel tank;

the first foam block and the second foam block are stacked in a vertically-oriented column within the first compartment of the fuel tank;

the first plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and

the third foam block comprises at least one channel void to reduce weight.

19. The system of claim 18, wherein a fourth foam block among the first plurality of foam blocks is oriented vertically in the vertically-oriented column, spans the vertically-ori-

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT
Appx00351

US 10,800,541 B2

**15**                                                                                           **16**

ented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column.

*   *   *   *   *

APPEAL,BNDEGT,CLOSED,EGT,MEDREQ,MOTREF,PATENT,REF_DISCOV,REF_PTN

**U.S. District Court**
**Southern District of Florida (Miami)**
**CIVIL DOCKET FOR CASE #: 1:20−cv−25144−DPG**

Jetaire Aerospace, LLC v. AerSale Inc.
Assigned to: Judge Darrin P. Gayles
Referred to: Magistrate Judge Edwin G. Torres
Case in other court:  USCA for the Federal Circuit, 25−01127
                       USCA for the Federal Circuit, 25−01177
Cause: 35:0271 Patent Infringement

Date Filed: 12/17/2020
Date Terminated: 09/23/2024
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

| Date Filed | # | Docket Text |
|---|---|---|
| 12/17/2020 | 1 | COMPLAINT against AerSale Inc.. Filing fees $ 402.00 receipt number AFLSDC−14057163, filed by Jetaire Aerospace, LLC. (Attachments: # 1 Exhibit A: U.S. Patent No. 9,849,998, # 2 Exhibit B: U.S. Patent No. 10,633,109, # 3 Exhibit C: U.S. Patent No. 10,800,541, # 4 Exhibit D: Webpage: AerSafe Fuel Tank Ignition Mitigation System, # 5 Exhibit E: Webpage: AerSale Blog November 26, 2019, # 6 Exhibit F: Webpage: AerSale Blog December 24, 2019, # 7 Exhibit G: Fact Sheet: AerSafe Fuel Tank Ignition Mitigation System, # 8 Civil Cover Sheet, # 9 Summon(s), # 10 Exhibit USPTO Form)(Davis, Timothy) (Entered: 12/17/2020) |
| 12/17/2020 | 2 | Clerks Notice of Judge Assignment to Judge Darrin P. Gayles. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Edwin G. Torres is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. (drz) (Entered: 12/18/2020) |
| 12/18/2020 | 3 | FORM AO 120 SENT TO DIRECTOR OF U.S. PATENT AND TRADEMARK. (Attachments: # 1 Complaint with Exhibits) (drz) (Entered: 12/18/2020) |
| 12/18/2020 | 4 | Summons Issued as to AerSale Inc. (drz) (Entered: 12/18/2020) |
| 12/18/2020 | 5 | Bar Letter re: Admissions sent to attorney James F. McDonough, III, Jonathan R. Miller, Travis E. Lynch, mailing date December 18, 2020, (pt) (Entered: 12/18/2020) |
| 12/18/2020 | 6 | Plaintiff's Certificate of Other Affiliates/Corporate Disclosure Statement − NONE disclosed by Jetaire Aerospace, LLC (Davis, Timothy) (Entered: 12/18/2020) |
| 12/21/2020 | 7 | NOTICE OF COURT PRACTICE. Unless otherwise specified by the Court, every motion shall be double−spaced in Times New Roman 12−point typeface. **Multiple Plaintiffs or Defendants shall file joint motions with co−parties unless there are clear conflicts of position.** If conflicts of position exist, parties shall explain the conflicts in their separate motions. Failure to comply with **ANY** of these procedures may result in the imposition of appropriate sanctions, including but not limited to, the striking of the motion or dismissal of this action. Signed by Judge Darrin P. Gayles (jsi) (Entered: 12/21/2020) |
| 02/03/2021 | 8 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for James F. McDonough, III. Filing Fee $ 200.00 Receipt # AFLSDC−14333062 by Jetaire Aerospace, LLC. Responses due by 2/17/2021 (Attachments: # 1 Text of Proposed Order)(Davis, Timothy) (Entered: 02/03/2021) |
| 02/10/2021 | 9 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,, with a 21 day response/answer filing deadline pursuant to Fed. R. Civ. P. 12 by Jetaire Aerospace, LLC. AerSale Inc. served on 1/26/2021, answer due 2/16/2021. (Davis, Timothy) (Entered: 02/10/2021) |
| 02/12/2021 | 10 | Agreed MOTION for Extension of Time for Defendant to Answer, Move, or Otherwise Respond to Complaint by AerSale Inc.. Attorney Amelia Toy Rudolph added to party AerSale Inc.(pty:dft). Responses due by 2/26/2021 (Attachments: # 1 |

| | | Text of Proposed Order)(Rudolph, Amelia) (Entered: 02/12/2021) |
|---|---|---|
| 02/12/2021 | 11 | PAPERLESS ORDER granting Defendant AerSale, Inc.'s 10 Agreed Motion for Extension of Time for Defendant to Answer, Move, or Otherwise Respond to Complaint. Defendant shall file a responsive pleading to Plaintiff's 1 Complaint on or before March 2, 2021. Signed by Judge Darrin P. Gayles (jsi) (Entered: 02/12/2021) |
| 02/18/2021 | 12 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Shawn Rafferty. Filing Fee $ 200.00 Receipt # AFLSDC−14405961 by AerSale Inc.. Responses due by 3/4/2021 (Attachments: # 1 Text of Proposed Order)(Rudolph, Amelia) (Entered: 02/18/2021) |
| 02/18/2021 | 13 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Valerie S. Sanders. Filing Fee $ 200.00 Receipt # AFLSDC−14405999 by AerSale Inc.. Responses due by 3/4/2021 (Attachments: # 1 Text of Proposed Order)(Rudolph, Amelia) (Entered: 02/18/2021) |
| 02/19/2021 | 14 | PAPERLESS ORDER granting 12 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Attorney Shawn Rafferty is permitted to appear before this Court on behalf of Defendant AerSale, Inc. for all purposes relating to this action. The clerk is directed to provide Notice of Electronic Filings to Mr. Rafferty at shawnrafferty@evershedssutherland.com. Signed by Judge Darrin P. Gayles (jsi) (Entered: 02/19/2021) |
| 02/19/2021 | 15 | PAPERLESS ORDER granting 13 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Attorney Valerie S. Sanders is permitted to appear before this Court on behalf of Defendant AerSale, Inc. for all purposes relating to this action. The clerk is directed to provide Notice of Electronic Filings to Ms. Sanders at valeriesanders@evershedssutherland.com. Signed by Judge Darrin P. Gayles (jsi) (Entered: 02/19/2021) |
| 02/19/2021 | 16 | PAPERLESS ORDER denying without prejudice 8 Motion to Appear *Pro Hac Vice*, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for James F. McDonough, III.<br><br>The Motion is denied without prejudice because local counsel did not consent to electronically serve all documents and things that may be served electronically or consent to serving documents in compliance with the CM/ECF Administrative Procedures, as required by Rule 4(b) of Rules Governing the Admission, Practice, Peer Review, and Discipline of Attorneys. Signed by Judge Darrin P. Gayles (jsi) (Entered: 02/19/2021) |
| 03/02/2021 | 17 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Regis C. Worley, Jr.. Filing Fee $ 200.00 Receipt # AFLSDC−14476936 by AerSale Inc.. Responses due by 3/16/2021 (Attachments: # 1 Text of Proposed Order)(Rudolph, Amelia) (Entered: 03/02/2021) |
| 03/02/2021 | 18 | Amended MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for James F. McDonough, III. *(Previously Paid on February 3, 2021)* Pay.gov Agency Tracking ID FLSDC−14333062. Filing Fee $ 200.00 by Jetaire Aerospace, LLC. Responses due by 3/16/2021 (Davis, Timothy) (Entered: 03/02/2021) |
| 03/02/2021 | 19 | ANSWER and Affirmative Defenses to Complaint , COUNTERCLAIM against Jetaire Aerospace, LLC by AerSale Inc.. (Rudolph, Amelia) (Entered: 03/02/2021) |
| 03/02/2021 | 20 | Corporate Disclosure Statement by AerSale Inc. identifying Corporate Parent AerSale Aviation, Inc., Corporate Parent Monocle Parent LLC, Corporate Parent AerSale Corporation for AerSale Inc. (Rudolph, Amelia) (Entered: 03/02/2021) |
| 03/05/2021 | 21 | PAPERLESS ORDER granting 17 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Attorney Regis C. Worley, Jr. is permitted to appear before this Court on behalf of Defendant AerSale, Inc. for all purposes relating to this action. The clerk is directed to provide Notice of Electronic Filings to Mr. Worley at |

| | | |
|---|---|---|
| | | regisworley@eversheds−sutherland.com. Signed by Judge Darrin P. Gayles (jsi) (Entered: 03/05/2021) |
| 03/05/2021 | 22 | PAPERLESS ORDER granting 18 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Attorney James F. McDonough, III is permitted to appear before this Court on behalf of Plaintiff Jetaire Aerospace, LLC for all purposes relating to this action. The clerk is directed to provide Notice of Electronic Filings to Mr. McDonough at jmcdonough@hgdlawfirm.com. Signed by Judge Darrin P. Gayles (jsi) (Entered: 03/05/2021) |
| 03/05/2021 | 23 | PAPERLESS ORDER REQUIRING JOINT SCHEDULING REPORT AND PROPOSED SCHEDULING ORDER. Pursuant to S.D. Fla. Local Rule 16.1, on or before **March 23, 2021**, the parties shall prepare and file a Joint Scheduling Report, as well as Certificates of Interested Parties and Corporate Disclosure Statements._x000B__x000B_The parties shall also file a Proposed Scheduling Order, adhering to the format and guidance of the attached form. If the parties deviate in any way from that format and guidance, they **shall** contemporaneously submit a written explanation, which provides their purported justification for each and every deviation. ***If the parties fail to submit such written explanation, the Court may enter a Scheduling Order that does not take into account the parties' proposed dates.***_x000B__x000B_Failure to comply with this Order shall be grounds for dismissal without prejudice and without further notice. Signed by Judge Darrin P. Gayles (jsi) (Entered: 03/05/2021) |
| 03/23/2021 | 24 | Joint SCHEDULING REPORT − **Rule 16.1** by Jetaire Aerospace, LLC (Attachments: # 1 Text of Proposed Order Proposed Scheduling Order)(Davis, Timothy) (Entered: 03/23/2021) |
| 03/23/2021 | 25 | MOTION TO DISMISS 19 Answer to Complaint, Counterclaim FOR FAILURE TO STATE A CLAIM *Defendant's Counterclaims and to Strike Defendant's Affirmative Defenses* by Jetaire Aerospace, LLC. Responses due by 4/6/2021 (Attachments: # 1 Affidavit Declaration in Support, # 2 Exhibit 1: Complaint from Jetaire I Case, # 3 Exhibit 2: Answer and Counterclaims in Jetaire I Case, # 4 Exhibit : 3: Docket Report for Jetaire I Case, # 5 Exhibit 4: AerSale's Application to Confirm Arbitration Award in Jetaire I Case, # 6 Exhibit 5: Defendant's Answer and Counterclaims in Electronic Communs. Techs., LLC v. Clever Athletics Co., LLC, S.D. Fla. No. 9:16−cv−81466−WPD)(Davis, Timothy) (Entered: 03/23/2021) |
| 04/05/2021 | 26 | SCHEDULING ORDER SETTING CIVIL TRIAL DATE AND PRETRIAL SCHEDULE, REQUIRING MEDIATION, AND REFERRING CERTAIN MOTIONS TO MAGISTRATE JUDGE: ( Jury Trial set for 9/26/2022 before Judge Darrin P. Gayles., Calendar Call set for 9/21/2022 09:30 AM before Judge Darrin P. Gayles., Status Conference set for 7/20/2022 10:00 AM before Judge Darrin P. Gayles., Mediation Deadline 6/22/2022.) Signed by Judge Darrin P. Gayles on 4/2/2021. *See attached document for full details.* (jao)_x000B__x000B_***Pattern Jury Instruction Builder*** − To access the latest, up to date changes to the 11th Circuit Pattern Jury Instructions go to https://pji.ca11.uscourts.gov or click here. (Entered: 04/05/2021) |
| 04/05/2021 | 27 | DEMAND for Trial by Jury by AerSale Inc. (Rudolph, Amelia) (Entered: 04/05/2021) |
| 04/06/2021 | 28 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 25 MOTION TO DISMISS 19 Answer to Complaint, Counterclaim FOR FAILURE TO STATE A CLAIM *Defendant's Counterclaims and to Strike Defendant's Affirmative Defenses* by AerSale Inc.. (Attachments: # 1 Text of Proposed Order)(Rudolph, Amelia) (Entered: 04/06/2021) |
| 04/08/2021 | 29 | PAPERLESS ORDER granting 28 Defendant/Counter−Plaintiff's Unopposed Motion for Extension of Time to Respond to Motion to Dismiss. Defendant/Counter−Plaintiff shall file its Response to 25 Plaintiff/Counter−Defendant's Motion to Dismiss Defendant/Counter−Plaintiff's Counterclaims [Dkt. 19] on or before **April 13, 2021**. Signed by Judge Darrin P. Gayles (jsi) (Entered: 04/08/2021) |

| 04/13/2021 | 30 | Amended COUNTERCLAIM against Jetaire Aerospace, LLC, filed by AerSale Inc..(Rudolph, Amelia) (Entered: 04/13/2021) |
|---|---|---|
| 04/13/2021 | 31 | RESPONSE in Opposition re 25 MOTION TO DISMISS 19 Answer to Complaint, Counterclaim FOR FAILURE TO STATE A CLAIM *Defendant's Counterclaims and to Strike Defendant's Affirmative Defenses* filed by AerSale Inc.. Replies due by 4/20/2021. (Rudolph, Amelia) (Entered: 04/13/2021) |
| 04/16/2021 | 32 | ORDER SETTING DISCOVERY PROCEDURES. Signed by Magistrate Judge Edwin G. Torres on 4/16/2021. *See attached document for full details.* (mdc) (Entered: 04/16/2021) |
| 04/20/2021 | 33 | REPLY to Response to Motion re 25 MOTION TO DISMISS 19 Answer to Complaint, Counterclaim FOR FAILURE TO STATE A CLAIM *Defendant's Counterclaims and to Strike Defendant's Affirmative Defenses* filed by Jetaire Aerospace, LLC. (Davis, Timothy) (Entered: 04/20/2021) |
| 04/27/2021 | 34 | MOTION TO DISMISS 30 Counterclaim FOR FAILURE TO STATE A CLAIM by Jetaire Aerospace, LLC. Responses due by 5/11/2021 (Attachments: # 1 Affidavit, # 2 Exhibit 1: Complaint in Jetaire I, # 3 Exhibit 2: Answer and Counterclaims in Jetaire I, # 4 Exhibit 3: Docket Sheet for Jetaire I, # 5 Exhibit 4: Application to Confirm Arbitration Award in Jetaire I, # 6 Exhibit 5: Answer of Clever Athletics)(Davis, Timothy) (Entered: 04/27/2021) |
| 05/10/2021 | 35 | Joint MOTION to Amend/Correct 26 Scheduling Order,,, Order Referring Case to Mediation,,, Order Referring Case to Magistrate Judge,, *to Modify the Due Dates for Infringement Contentions and Invalidity Contentions* by Jetaire Aerospace, LLC. Responses due by 5/24/2021 (Attachments: # 1 Text of Proposed Order)(Davis, Timothy) (Entered: 05/10/2021) |
| 05/11/2021 | 36 | PAPERLESS ORDER granting the parties' 35 Stipulation to Modify Scheduling Order. The Court finds good cause to amend the current 26 Scheduling Order. The parties shall adhere to the following amended deadlines:<br><br>1. Plaintiff shall serve infringement contentions on or before **May 26, 2021**.<br><br>2. Defendant shall serve invalidity contentions on or before **July 14, 2021**.<br><br>Signed by Judge Darrin P. Gayles (jsi) (Entered: 05/11/2021) |
| 05/11/2021 | 37 | RESPONSE in Opposition re 34 MOTION TO DISMISS 30 Counterclaim FOR FAILURE TO STATE A CLAIM *(Response in Opposition to Motion to Dismiss AMENDED Counterclaims)* filed by AerSale Inc.. Replies due by 5/18/2021. (Rudolph, Amelia) (Entered: 05/11/2021) |
| 05/17/2021 | 38 | Joint MOTION to Amend/Correct 26 Scheduling Order,,, Order Referring Case to Mediation,,, Order Referring Case to Magistrate Judge,, by AerSale Inc.. Responses due by 6/1/2021 (Rudolph, Amelia) (Entered: 05/17/2021) |
| 05/17/2021 | 39 | PAPERLESS ORDER granting the parties' 38 Joint Motion to Modify Scheduling Order. The Court finds good cause to amend the current 26 Scheduling Order, as amended. Joinder of any additional parties and filing of motions to amend the Complaint shall be filed on or before **June 14, 2021**. Signed by Judge Darrin P. Gayles (jsi) (Entered: 05/17/2021) |
| 05/18/2021 | 40 | REPLY to Response to Motion re 34 MOTION TO DISMISS 30 Counterclaim FOR FAILURE TO STATE A CLAIM filed by Jetaire Aerospace, LLC. (Davis, Timothy) (Entered: 05/18/2021) |
| 06/14/2021 | 41 | Joint MOTION to Amend/Correct 39 Order on Motion to Amend/Correct, 26 Scheduling Order,,, Order Referring Case to Mediation,,, Order Referring Case to Magistrate Judge,, by AerSale Inc.. Responses due by 6/28/2021 (Rudolph, Amelia) (Entered: 06/14/2021) |
| 06/17/2021 | 42 | PAPERLESS ORDER granting the parties' 41 Joint Motion to Modify Scheduling Order. The Court finds good cause to amend the current 26 Scheduling Order, as amended. The parties shall adhere to the following amended deadline: Joinder of any additional parties and filing of motions to amend the complaint on or before **June 30,** |

| | | |
|---|---|---|
| | | **2021**. Signed by Judge Darrin P. Gayles (jsi) (Entered: 06/17/2021) |
| 06/30/2021 | 43 | MOTION for Leave to File *Second Amended Counterclaims and to Join Counterclaim Defendants* by AerSale Inc.. (Attachments: # 1 Exhibit A (Proposed Second Amended Counterclaims))(Rudolph, Amelia) (Entered: 06/30/2021) |
| 06/30/2021 | 44 | Joint MOTION For Entry of a Protective Order Regarding the Disclosure and Use of Discovery Materials (Protective Order) and Order Concerning Production of Electronically−Stored Information (ESI Order) by Jetaire Aerospace, LLC. (Attachments: # 1 Proposed Order Concerning ESI, # 2 Agreed Protective Order)(Davis, Timothy) (Entered: 06/30/2021) |
| 07/09/2021 | 45 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Justin Gray. Filing Fee $ 200.00 Receipt # AFLSDC−14835095 by AerSale Inc.. Responses due by 7/23/2021 (Attachments: # 1 Text of Proposed Order)(Rudolph, Amelia) (Entered: 07/09/2021) |
| 07/12/2021 | 46 | ORDER granting 44 Motion for Protective Order & ESI Order.<br><br>Signed by Magistrate Judge Edwin G. Torres on 7/12/2021. *See attached document for full details.* (ahg) (Entered: 07/12/2021) |
| 07/13/2021 | 47 | Joint MOTION to Amend/Correct 26 Scheduling Order,,, Order Referring Case to Mediation,,, Order Referring Case to Magistrate Judge,, *(Joint Motion to Modify Scheduling Order, ECF Nos. 26, 36)* by AerSale Inc.. Responses due by 7/27/2021 (Rudolph, Amelia) (Entered: 07/13/2021) |
| 07/14/2021 | 48 | Unopposed MOTION to Seal *Plaintiffs Opposition To Defendant/Counter−Plaintiff AerSale, Inc.s Motion For Leave To File Second Amended Counterclaims And To Join Counterclaim Defendants [Dkt. No. 43]* per Local Rule 5.4 by Jetaire Aerospace, LLC. (Attachments: # 1 Text of Proposed Order) (Davis, Timothy) (Entered: 07/14/2021) |
| 07/15/2021 | 49 | PAPERLESS ORDER granting 45 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Attorney Justin Gray is permitted to appear before this Court on behalf of Defendant AerSale, Inc., for all purposes relating to this action. The clerk is directed to provide Notice of Electronic Filings to Mr. Gray at justingray@eversheds−sutherland.com. Signed by Judge Darrin P. Gayles (jsi) (Entered: 07/15/2021) |
| 07/15/2021 | 50 | PAPERLESS ORDER granting the parties' 47 Joint Motion to Modify Scheduling Order. The Court finds good cause to amend the current 26 Scheduling Order, as amended. The parties shall adhere to the following amended deadlines:<br><br>1. Defendant shall serve invalidity contentions on or before **August 11, 2021**.<br><br>2. The parties shall exchange claims for construction on or before **August 18, 2021**.<br><br>3. The parties shall exchange proposed construction of patent terms on or before **September 1, 2021**.<br><br>4. The parties shall file a joint claim construction statement on or before **September 8, 2021**.<br><br>5. The parties shall file opening claim construction briefs on or before **September 15, 2021**.<br><br>6. The parties shall file responsive claim construction briefs on or before **October 6, 2021**.<br><br>Additionally, the parties shall attend a Telephonic Status Conference before Judge Darrin P. Gayles at 10:00 A.M. on **July 28, 2021**. Counsel shall enter their appearances telephonically using the following dial−in information: **Dial−in Number 888−273−3658**; **Access Code 7032614**; **Security Code 5170**. Please dial in at least ten minutes before the Telephonic Status Conference begins and wait until your case is called.<br><br>Signed by Judge Darrin P. Gayles (jsi) (Entered: 07/15/2021) |

| 07/19/2021 | 51 | MOTION to Stay *Claim Construction Deadlines and Technical Discovery Concerning the Accused Products* by AerSale Inc.. Responses due by 8/2/2021 (Attachments: # 1 Worley Decl., # 2 Exhibit A to Worley Decl. (Plaintiff's Preliminary Infringement Contentions), # 3 Exhibit B to Worley Decl. ('998 Patent), # 4 Exhibit C to Worley Decl. ('109 Patent), # 5 Exhibit D to Worley Decl. ('541 Patent), # 6 Text of Proposed Order)(Rudolph, Amelia) (Entered: 07/19/2021) |
| --- | --- | --- |
| 07/20/2021 | 52 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Jonathan R. Miller. Filing Fee $ 200.00 Receipt # AFLSDC−14861276 by Jetaire Aerospace, LLC. Responses due by 8/3/2021 (Attachments: # 1 Text of Proposed Order)(Davis, Timothy) (Entered: 07/20/2021) |
| 07/21/2021 | 53 | REPLY to Response to Motion re 43 MOTION for Leave to File *Second Amended Counterclaims and to Join Counterclaim Defendants* filed by AerSale Inc.. (Rudolph, Amelia) (Entered: 07/21/2021) |
| 07/22/2021 | 54 | PAPERLESS ORDER granting 52 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Attorney Jonathan R. Miller is permitted to appear before this Court on behalf of Plaintiff Jetaire Aerospace, LLC, for all purposes relating to this action. The clerk is directed to provide Notice of Electronic Filings to Mr. Miller at jmiller@hgdlawfirm.com. Signed by Judge Darrin P. Gayles (jsi) (Entered: 07/22/2021) |
| 07/23/2021 | 55 | **PAPERLESS NOTICE of Hearing**:<br><br>A Telephonic Discovery Hearing is set for 7/29/2021 at 1:30 PM in the Miami Division before Magistrate Judge Edwin G. Torres.<br><br>At the scheduled time, counsel for all parties shall call the following toll−free number: 1−888−684−8852 (access code 5264742#) (security code 1231#).<br><br>Parties appearing at the telephonic hearing must be on a landline to facilitate communication. Any counsel appearing at the hearing that is not arguing may appear by cellular phone or other means so long as the device may be muted. (ahg) (Entered: 07/23/2021) |
| 07/23/2021 | 56 | NOTICE of Compliance *With Paragraph 3(c) of Order Setting Discovery Procedures* by Jetaire Aerospace, LLC re 32 Order (Davis, Timothy) (Entered: 07/23/2021) |
| 07/28/2021 | 57 | PAPERLESS Minute Entry for proceedings held before Judge Darrin P. Gayles: Telephonic Status Conference held on July 28, 2021. Attorney Appearances: Amelia Toy Rudolph, Valerie S. Sanders, Shawn Rafferty, Justin Gray, James F. McDonough, III, and Jonathan R. Miller. Court Reporter: Patricia Diaz, 305−523−5178 / Patricia_Diaz@flsd.uscourts.gov. (jsi) (Entered: 07/28/2021) |
| 07/28/2021 | 58 | PAPERLESS ORDER granting 48 Plaintiff Jetaire Aerospace, LLC's Unopposed Motion to File Under Seal its Opposition to Defendant/Counter−Plaintiff AerSale, Inc.'s Motion for Leave to File Second Amended Counterclaims and to Join Counterclaim Defendants [Dkt. No. 43]. Plaintiff may file under seal its Opposition To Defendant/Counter−Plaintiff AerSale, Inc.'s Motion For Leave To File Second Amended Counterclaims And To Join Counterclaim Defendants. Signed by Judge Darrin P. Gayles (jsi) (Entered: 07/28/2021) |
| 07/28/2021 | 59 | MOTION for Extension of Time to File Response/Reply/Answer as to 51 MOTION to Stay *Claim Construction Deadlines and Technical Discovery Concerning the Accused Products* by Jetaire Aerospace, LLC. (Attachments: # 1 Affidavit, # 2 Exhibit A: Email Thread, # 3 Text of Proposed Order)(Davis, Timothy) (Entered: 07/28/2021) |
| 07/29/2021 | 60 | RESPONSE in Opposition re 59 MOTION for Extension of Time to File Response/Reply/Answer as to 51 MOTION to Stay *Claim Construction Deadlines and Technical Discovery Concerning the Accused Products* filed by AerSale Inc.. Replies due by 8/5/2021. (Rudolph, Amelia) (Entered: 07/29/2021) |
| 07/29/2021 | 61 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge Edwin G. Torres: Discovery Hearing held on 7/29/2021. Attorney Appearance(s): James F. McDonough, III, Jonathan R. Miller, Valerie S. Sanders, Shawn Rafferty, Regis C. |

| | | |
|---|---|---|
| | | Worley, Jr, Justin Gray. (Digital EGT−02/07−29−2021−AT&T Conference) Total time in court: 1 hour(s) : 15 minutes. (mdc) (Entered: 07/29/2021) |
| 07/29/2021 | | SYSTEM ENTRY − Docket Entry 62 [misc] restricted/sealed until further notice. (1576531) (Entered: 07/29/2021) |
| 07/30/2021 | 63 | REPLY to Response to Motion re 59 MOTION for Extension of Time to File Response/Reply/Answer as to 51 MOTION to Stay *Claim Construction Deadlines and Technical Discovery Concerning the Accused Products* filed by Jetaire Aerospace, LLC. (Davis, Timothy) (Entered: 07/30/2021) |
| 08/02/2021 | 64 | RESPONSE in Opposition re 51 MOTION to Stay *Claim Construction Deadlines and Technical Discovery Concerning the Accused Products* filed by Jetaire Aerospace, LLC. Replies due by 8/9/2021. (Attachments: # 1 Affidavit, # 2 Exhibit A: June 8, 2021 Letter, # 3 Exhibit B: June 15, 2021 Letter, # 4 Exhibit C: July 26, 2021 email thread, # 5 Exhibit D: July 20, 2021 email thread, # 6 Exhibit E: July 13, 2021 email thread, # 7 Exhibit F: Motion To Strike from Atlas IP, LLC v. Biotronik, Inc., S.D. Fla. No. 14−cv−20602)(Davis, Timothy) (Entered: 08/03/2021) |
| 08/04/2021 | 65 | PAPERLESS ORDER denying as moot 59 Plaintiff's Opposed Motion for Extension of Time to Respond to Defendant's Motion to Stay in light of 64 Plaintiff's Opposition to Defendant's Motion to Stay Claim Construction Deadlines and Technical Discovery Concerning the Accused Products [Dkt. No. 151]. Signed by Judge Darrin P. Gayles (jsi) (Entered: 08/04/2021) |
| 08/06/2021 | 66 | REPLY to Response to Motion re 51 MOTION to Stay *Claim Construction Deadlines and Technical Discovery Concerning the Accused Products* filed by AerSale Inc.. (Rudolph, Amelia) (Entered: 08/06/2021) |
| 08/13/2021 | 67 | PAPERLESS NOTICE of Hearing: A Telephonic Discovery Hearing is set for 9/9/2021 at 1:30 PM in the Miami Division before Magistrate Judge Edwin G. Torres. At the scheduled time, counsel for all parties shall call the following toll−free number: 1−888−684−8852 (access code 5264742#) (security code 1231#). Parties appearing at the telephonic hearing must be on a landline to facilitate communication. Any counsel appearing at the hearing that is not arguing may appear by cellular phone or other means so long as the device may be muted. (ahg) (Entered: 08/13/2021) |
| 08/17/2021 | 68 | NOTICE of Compliance *With Paragraph 3(c) of Order Setting Discovery Procedures* by Jetaire Aerospace, LLC re 32 Order (Davis, Timothy) (Entered: 08/17/2021) |
| 09/08/2021 | 69 | NOTICE by Jetaire Aerospace, LLC *of Joint Claim Construction Statement* (Davis, Timothy) (Entered: 09/08/2021) |
| 09/09/2021 | 70 | NOTICE by Jetaire Aerospace, LLC re 32 Order *of Compliance With Paragraph 3(c) Of Order Setting Discovery Procedures − Amended* (Davis, Timothy) (Entered: 09/09/2021) |
| 09/09/2021 | 71 | PAPERLESS NOTICE of Telephonic Hearing: A Telephonic Discovery Hearing is set for 10/14/2021 at 2:30 PM in the Miami Division before Magistrate Judge Edwin G. Torres. The parties shall file the Notice of Compliance per the Standing Order Setting Discovery Procedures by noon on 10/11/2021. At the scheduled time, counsel for all parties shall call the following toll−free number: 1−888−684−8852 (access code 5264742#) (security code 1231#). Parties appearing at the telephonic hearing must be on a landline to facilitate communication. Any counsel appearing at the hearing that is not arguing may appear by cellular phone or other means so long as the device may be muted. (ahg) (Entered: 09/09/2021) |

| 09/09/2021 | 72 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge Edwin G. Torres: Discovery Hearing held on 9/9/2021. The Court sets hearing for 10/14/21 at 2:30 pm. Attorney Appearance(s): James F. McDonough, III, Jonathan R. Miller, Valerie S. Sanders, Shawn Rafferty, Regis C. Worley, Jr. (Digital EGT−02−09−09−2021−AT&T Conference) Total time in court: 1 hour(s) : 2 minutes. (mdc) (Entered: 09/09/2021) |
|---|---|---|
| 09/15/2021 | 73 | NOTICE by AerSale Inc. *of Opening Claim Construction Brief* (Attachments: # 1 Gray Decl., # 2 Exhibit A to Gray Decl. (USPTO Office Action, dated 04−04−2019), # 3 Exhibit B to Gray Decl. (Response to USPTO Non−Final Office Action, dated 05−24−2019)) (Rudolph, Amelia) (Entered: 09/15/2021) |
| 09/15/2021 | 74 | NOTICE by Jetaire Aerospace, LLC *of Opening Claim Construction Brief* (Attachments: # 1 McDonough Declaration, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E) (Davis, Timothy) (Entered: 09/15/2021) |
| 09/29/2021 | 75 | NOTICE of Compliance *(with Paragraph 3(c) of Order Setting Discovery Procedures (Dkt. No. 32))* by AerSale Inc. re 32 Order (Rudolph, Amelia) (Entered: 09/29/2021) |
| 10/06/2021 | 76 | NOTICE by AerSale Inc. re 74 Notice (Other) *of Responsive Claim Construction Brief* (Attachments: # 1 Affidavit of Justin E. Gray, # 2 Exhibit A, # 3 Exhibit B) (Rudolph, Amelia) (Entered: 10/06/2021) |
| 10/06/2021 | 77 | Unopposed MOTION to Seal *Plainitiff's Response Claim Construction Brief* per Local Rule 5.4 by Jetaire Aerospace, LLC. (Attachments: # 1 Text of Proposed Order) (Davis, Timothy) (Entered: 10/06/2021) |
| 10/08/2021 | 78 | RESPONSE in Opposition re 77 Unopposed MOTION to Seal *Plainitiff's Response Claim Construction Brief* per Local Rule 5.4 filed by AerSale Inc.. Replies due by 10/15/2021. (Rudolph, Amelia) (Entered: 10/08/2021) |
| 10/12/2021 | 79 | NOTICE of Compliance *COMPLIANCE WITH 3(c) OF ORDER SETTING DISCOVERY PROCEDURES (DKT. 32)* by Jetaire Aerospace, LLC re 72 Discovery Hearing, (Attachments: # 1 Text of Proposed Order) (Davis, Timothy) (Entered: 10/12/2021) |
| 10/13/2021 | 80 | NOTICE by AerSale Inc. re 26 Scheduling Order,,, Order Referring Case to Mediation,,, Order Referring Case to Magistrate Judge,, *of Filing Defendant's Technology Tutorial* (Attachments: # 1 Exhibit AerSale's Technology Tutorial) (Rudolph, Amelia) (Entered: 10/13/2021) |
| 10/14/2021 | 81 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge Edwin G. Torres: Discovery Hearing held on 10/14/2021. Attorney Appearance(s): James F. McDonough, III, Jonathan R. Miller, Valerie S. Sanders, Shawn Rafferty, Regis C. Worley, Jr. (Digital EGT−03−10−14−21−3:36 pm−AT&T Conference−Hearing #2) Total time in court: 1 hour(s) : 10 minutes. (mdc) (Entered: 10/15/2021) |
| 10/15/2021 | 82 | REPLY to Response to Motion re 77 Unopposed MOTION to Seal *Plainitiff's Response Claim Construction Brief* per Local Rule 5.4 filed by Jetaire Aerospace, LLC. (Attachments: # 1 Text of Proposed Order − Amended)(Davis, Timothy) (Entered: 10/15/2021) |
| 10/29/2021 | | Set/Reset Hearings: *Markman* Hearing set for November 10, 2021, at 2:00 PM before Judge Darrin P. Gayles per the 26 Scheduling Order. (jsi) (Entered: 10/29/2021) |
| 10/29/2021 | 83 | PAPERLESS ORDER granting 43 Defendant/Counter−Plaintiff Aersale, Inc.'s Motion for Leave to File Second Amended Counterclaims and to Join Counterclaim Defendants. Pursuant to Local Rule 15.1, Defendant/Counter−Plaintiff shall separately file its Second Amended Counterclaims on or before **November 3, 2021**. Signed by Judge Darrin P. Gayles on 10/29/2021. (jsi) (Entered: 10/29/2021) |
| 10/29/2021 | 84 | PAPERLESS ORDER denying as moot Plaintiff's 25 Motion to Dismiss Defendant's Counterclaims and granting Plaintiff's 25 Motion to Strike Defendant's Affirmative Defenses.<br><br>Plaintiff's Motion to Dismiss Defendant's Counterclaims is denied as moot in light of the Court's 83 Order granting 43 Defendant's Motion for Leave to File Second Amended Counterclaims and to Join Counterclaim Defendants. |

| | | |
|---|---|---|
| | | Plaintiff's Motion to Strike Defendant's Affirmative Defenses is granted as follows. Federal Rule of Civil Procedure 12(f) states in pertinent part that a court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "[A] court has broad discretion when considering a motion to strike . . . ." *Hartford Fire Ins. Co. v. N.Y. Mart Grp., Inc.*, 391 F. Supp. 3d 1175, 1176 (S.D. Fla. 2019) (citation omitted). As to Affirmative Defense 1, the Motion is **GRANTED** because failure to state a claim is not an affirmative defense. *See Spiegel & Utrera, P.A. v. Stevens & Lee, P.C.*, No. 10−CIV−23451, 2011 WL 13223501, at *1 (S.D. Fla. Apr. 21, 2011) ("[F]ailure to state a claim is not a recognized affirmative defense."). As to the remaining Affirmative Defenses, the Motion is **GRANTED** because they are "comprised of no more than 'bare−bones, conclusory allegations' . . . [and are] 'insufficient as a matter of law[.]'" *Longhini v. Kendall Lakes Off. Park Condo. Ass'n, Inc.*, No. 20−CIV−23352, 2020 WL 7074641, at *2 (S.D. Fla. Dec. 3, 2020) (quoting *Northrop & Johnson Holding Co., Inc. v. Leahy*, No. 16−CIV−63008, 2017 WL 5632041, at *3 (S.D. Fla. Nov. 22, 2017)). <br><br> Signed by Judge Darrin P. Gayles on 10/29/2021. (jsi) (Entered: 10/29/2021) |
| 10/29/2021 | 85 | PAPERLESS ORDER denying as moot 34 Plaintiff's Motion to Dismiss Defendant's Amended Counterclaims [Dkt. No. 30] in light of the Court's 83 Order granting 43 Defendant's Motion for Leave to File Second Amended Counterclaims and to Join Counterclaim Defendants. Signed by Judge Darrin P. Gayles on 10/29/2021. (jsi) (Entered: 10/29/2021) |
| 10/29/2021 | 86 | PAPERLESS ORDER granting in part and denying in part 77 Plaintiff's Motion to File Under Seal Its Response Claim Construction Brief. Plaintiff's request is **GRANTED** as to Exhibit B, Exhibit C, and Exhibit D and otherwise **DENIED**. Signed by Judge Darrin P. Gayles on 10/29/2021. (jsi) (Entered: 10/29/2021) |
| 10/29/2021 | 87 | PAPERLESS ORDER setting Telephonic Status Conference at 10:00 A.M. on November 3, 2021, before Judge Darrin P. Gayles. Counsel shall enter their appearances telephonically using the following dial−in information: **Dial−in Number 888−273−3658**; **Access Code 7032614**; **Security Code 5170**. Please dial in at least ten minutes before the Telephonic Status Conference begins and wait until your case is called. Signed by Judge Darrin P. Gayles on 10/29/2021. (jsi) (Entered: 10/29/2021) |
| 11/01/2021 | 88 | STRICKEN per DE 93 NOTICE by Jetaire Aerospace, LLC re 73 Notice (Other), *of Plaintiff's Responsive Claim Construction Brief* (Attachments: # 1 Affidavit Declaration in Support, # 2 Exhibit A: Expert Declaration, # 3 Exhibit B (redacted), # 4 Exhibit C (redacted), # 5 Exhibit D (redacted), # 6 Exhibit E: Office Action) (Davis, Timothy) Modified on 11/4/2021 (jao). (Entered: 11/01/2021) |
| 11/01/2021 | | SYSTEM ENTRY − Docket Entry 89 [misc] restricted/sealed until further notice. (1576531) (Entered: 11/01/2021) |
| 11/02/2021 | 90 | Amended COUNTERCLAIM *(Second Amended Counterclaims)* against Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams, filed by AerSale Inc..(Rudolph, Amelia) (Entered: 11/02/2021) |
| 11/03/2021 | 91 | PAPERLESS Minute Entry for proceedings held before Judge Darrin P. Gayles: Status Conference held on 11/3/2021. Counsel for all parties present. Court Reporter: Patricia Diaz, 305−523−5178 / Patricia_Diaz@flsd.uscourts.gov. (hs01) (Entered: 11/03/2021) |
| 11/03/2021 | | PAPERLESS Terminate Deadlines and Hearings. The Markman Hearing set for November 10, 2021, is cancelled. Signed by Judge Darrin P. Gayles (hs01) (Entered: 11/03/2021) |
| 11/04/2021 | 92 | NOTICE by Jetaire Aerospace, LLC re 73 Notice (Other), *of Plaintiff's Corrected Responsive Claim Construction Brief* (Attachments: # 1 Affidavit Declaration in Support, # 2 Exhibit A: Expert Declaration, # 3 Exhibit B (sealed document), # 4 Exhibit C (sealed document), # 5 Exhibit D (sealed document), # 6 Exhibit E: Office Action) (Davis, Timothy) (Entered: 11/04/2021) |
| 11/04/2021 | 93 | NOTICE of Striking 88 Notice (Other), filed by Jetaire Aerospace, LLC by Jetaire Aerospace, LLC (Davis, Timothy) (Entered: 11/04/2021) |

| | | |
|---|---|---|
| 11/04/2021 | 94 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Travis E., Lynch. Filing Fee $ 200.00 Receipt # AFLSDC−15150591 by Jetaire Aerospace, LLC. Responses due by 11/18/2021 (Attachments: # 1 Text of Proposed Order)(Davis, Timothy) (Entered: 11/04/2021) |
| 11/08/2021 | 95 | PAPERLESS ORDER. The Court shall appoint a Special Master to oversee the claim construction process. The parties shall adhere to the following schedule for selecting a Special Master to oversee the claim construction process:<br><br>1. On or before **November 22, 2021**, each party shall submit no more than two (2) proposed candidates for the role of Special Master. For each candidate, the party proposing the candidate shall include a basis for the recommendation, not to exceed one (1) page, as well as the candidate's curriculum vitae.<br><br>2. On or before **November 22, 2021**, the parties shall jointly submit an agreed upon list of five (5) selection criteria for the Court to consider in making its determination.<br><br>3. On or before **November 29, 2021**, each party shall submit any written objections, not to exceed one (1) page, to the opposing party's candidate(s).<br><br>4. On or before **December 6, 2021**, the Court shall make a determination as to the Special Master selected to oversee the claim construction process.<br><br>Signed by Judge Darrin P. Gayles on 11/8/2021. (jsi) (Entered: 11/08/2021) |
| 11/10/2021 | 96 | PAPERLESS ORDER denying without prejudice 94 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Attorney Travis E. Lynch. *Pro hac vice* counsel fails to include language in their Certification that he has not filed three or more motions for pro hac vice admission in this District within the last 365 days. Signed by Judge Darrin P. Gayles on 11/10/2021. (jsi) (Entered: 11/10/2021) |
| 11/11/2021 | 97 | Corrected MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Travis E. Lynch. Filing Fee $ 200.00 Amended/Corrected Motion to Appear Pro Hac Vice Filed − Filing Fees Previously Paid. See 94 Motion to Appear Pro Hac Vice, by Jetaire Aerospace, LLC. Responses due by 11/29/2021 (Attachments: # 1 Text of Proposed Order)(Davis, Timothy) (Entered: 11/11/2021) |
| 11/15/2021 | 98 | PAPERLESS ORDER granting 97 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Attorney Travis E. Lynch is permitted to appear before this Court on behalf of Plaintiff Jetaire Aerospace, LLC for all purposes relating to this action. The clerk is directed to provide Notice of Electronic Filings to Mr. Lynch at tlynch@hgdlawfirm.com. Signed by Judge Darrin P. Gayles on 11/15/2021. (jsi) (Entered: 11/15/2021) |
| 11/16/2021 | 99 | MOTION TO DISMISS 90 Counterclaim FOR FAILURE TO STATE A CLAIM by Jetaire Aerospace, LLC. Responses due by 11/30/2021 (Attachments: # 1 Affidavit, # 2 Exhibit 1: Complaint in Jetaire I, # 3 Exhibit 2: Answer and Counterclaims in Jetaire I, # 4 Exhibit 3: Docket Sheet for Jetaire I, # 5 Exhibit 4: Application to Confirm Arbitration Award in Jetaire I, # 6 Exhibit 5: Answer of Clever Athletics)(Davis, Timothy) (Entered: 11/17/2021) |
| 11/18/2021 | 100 | **PAPERLESS NOTICE of Discovery Hearing**:<br><br>A Discovery Hearing is set for 1/6/2022 at 02:30 PM in the Miami Division before Magistrate Judge Edwin G. Torres, in person at the James Lawrence King Federal Justice Building, 99 NE 4th Street, 10th Floor − Courtroom 5, Miami, FL 33132. (ahg) (Entered: 11/18/2021) |
| 11/22/2021 | 101 | NOTICE by Jetaire Aerospace, LLC re 95 Order,,,,, Set/Reset Deadlines,,,, *of Joint Submission of Selection Criteria for the Court to Consider In Appointing A Special Master For Claim Construction* (Davis, Timothy) (Entered: 11/22/2021) |
| 11/22/2021 | 102 | NOTICE by AerSale Inc. re 95 Order,,,,, Set/Reset Deadlines,,,, *AerSale, Inc.'s Identification of Proposed Candidates for Claim Construction Special Master* |

| | | (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Rudolph, Amelia) (Entered: 11/22/2021) |
|---|---|---|
| 11/23/2021 | 103 | NOTICE by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams re 95 Order,,,,, Set/Reset Deadlines,,,, *of Their Identification of Proposed Candidates for Claim Construction Special Master*. Attorney Timothy Carl Davis added to party Jetaire Flight Systems, LLC(pty:cd), Attorney Timothy Carl Davis added to party Michael D. Williams(pty:cd). (Attachments: # 1 Exhibit A: CV for Friedland, # 2 Exhibit B: CV for Keyzer) (Davis, Timothy) (Entered: 11/23/2021) |
| 11/23/2021 | 104 | NOTICE of Compliance *By the Parties With 3(c) Of Order Setting Discovery Procedures (Dkt. 32)* by Jetaire Aerospace, LLC re 100 Notice re Hearing, (Davis, Timothy) (Entered: 11/23/2021) |
| 11/29/2021 | 105 | NOTICE by AerSale Inc. re 103 Notice (Other), *AerSale, Inc.'s Written Objections to Proposed Candidates for Claim Construction Special Master* (Rudolph, Amelia) (Entered: 11/29/2021) |
| 11/30/2021 | 106 | NOTICE by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams re 102 Notice (Other) *AerSale, Inc.'s Proposed Candidates for Claim Construction Special Master* (Davis, Timothy) (Entered: 11/30/2021) |
| 11/30/2021 | 107 | RESPONSE in Opposition re 99 MOTION TO DISMISS 90 Counterclaim FOR FAILURE TO STATE A CLAIM *(Response in Opposition to Motion to Dismiss Second Amended Counterclaims)* filed by AerSale Inc.. Replies due by 12/7/2021. (Rudolph, Amelia) (Entered: 11/30/2021) |
| 12/02/2021 | 108 | PAPERLESS ORDER. Pursuant to Federal Rule of Civil Procedure 53(a)(1)(C), the Court appoints Professor Paul M. Janicke, a Professor of Law at the University of Houston Law Center in Houston, Texas, as Special Master in this matter. The Special Master's duties shall be to conduct the *Markman* Hearing and issue a Report and Recommendation as to the claim construction issues in this matter. The parties shall coordinate a hearing schedule with the Special Master and provide him with all relevant materials for his consideration on or before **December 17, 2021**. The Special Master shall be compensated at a reasonable rate that shall be shared equally by the parties.<br><br>The Clerk of Court is directed to: (1) add the Special Master to the Court's electronic service list and (2) provide the Special Master access to CM/ECF for this case. Professor Janicke's contact information is:<br><br>    Professor Paul M. Janicke<br><br>    2409 McClendon Street<br><br>    Houston, Texas 77030<br><br>    Email: pjanicke@uh.edu<br><br>    Phone: (713) 218−8151<br><br>Signed by Judge Darrin P. Gayles on 12/2/2021. (jsi) (Entered: 12/02/2021) |
| 12/07/2021 | 109 | REPLY to Response to Motion re 99 MOTION TO DISMISS 90 Counterclaim FOR FAILURE TO STATE A CLAIM *(Defendants Second Amended Counterclaims)* filed by Jetaire Aerospace, LLC. (Davis, Timothy) (Entered: 12/07/2021) |
| 12/08/2021 | 110 | Joint MOTION to Amend/Correct 50 Order on Motion to Amend/Correct,,,,, 36 Order on Motion to Amend/Correct, 26 Scheduling Order,,, Order Referring Case to Mediation,,, Order Referring Case to Magistrate Judge,, *(Joint Motion to Modify Scheduling Order, ECF Nos. 26, 36, 50)* by AerSale Inc.. Responses due by 12/22/2021 (Rudolph, Amelia) (Entered: 12/08/2021) |
| 12/17/2021 | 111 | PAPERLESS ORDER granting the parties' 110 Joint Motion to Modify Scheduling Order. The Court finds good cause to amend the current 26 Scheduling Order, as amended. The parties shall adhere to the following amended deadlines: |

|  |  |  |
|---|---|---|
|  |  | 1. Plaintiff shall disclose experts, expert witness summaries, and reports as required by Fed. R. Civ. P. 26(a)(2) on or before **April 8, 2022**.<br><br>2. Defendant shall disclose experts, expert witness summaries, and reports as required by Fed. R. Civ. P. 26(a)(2) on or before **April 8, 2022**.<br><br>3. The parties shall exchange rebuttal expert witness summaries and reports as required by Fed. R. Civ. P. 26(a)(2) on or before **May 6, 2022**.<br><br>4. Fact discovery shall be completed on or before **March 11, 2022**.<br><br>5. Expert discovery shall be completed on or before **May 27, 2022**.<br><br>6. Dispositive motions, including those regarding summary judgment and *Daubert*, shall be filed on or before **June 17, 2022**.<br><br>Signed by Judge Darrin P. Gayles on 12/17/2021. (jsi) (Entered: 12/17/2021) |
| 12/21/2021 | 112 | ACKNOWLEDGMENT OF SERVICE as to 90 Counterclaim *(Acknowledgment of Service of Second Amended Counterclaims by Counter−Defendant Jetaire Flight Systems, LLC)* filed by AerSale Inc.. (Rudolph, Amelia) (Entered: 12/21/2021) |
| 12/21/2021 | 113 | ACKNOWLEDGMENT OF SERVICE as to 90 Counterclaim *(Acknowledgment of Service of Second Amended Counterclaims by Counter−Defendant Michael Williams)* filed by AerSale Inc.. (Rudolph, Amelia) (Entered: 12/21/2021) |
| 12/27/2021 | 114 | **PAPERLESS NOTICE RESETTING Discovery Hearing**:<br><br>In light of the parties' request, the in−person Discovery Hearing before Magistrate Judge Edwin G. Torres is RESET to 1/27/2022 at 2:30 PM. (ahg) (Entered: 12/27/2021) |
| 01/07/2022 | 115 | NOTICE by AerSale Inc. *AerSale, Inc.'s Response to Jetaire's Alternative Claim Constructions* (Attachments: # 1 Affidavit of Justin E. Gray, # 2 Exhibit A) (Rudolph, Amelia) (Entered: 01/07/2022) |
| 01/21/2022 | 116 | NOTICE of Compliance *With Paragraph 3(c) Of Order Setting Discovery Procedures (Dkt. No. 32)* by AerSale Inc. re 114 Notice re Hearing (Rudolph, Amelia) (Entered: 01/21/2022) |
| 01/27/2022 | 117 | NOTICE of Attorney Appearance by Marcos Daniel Jimenez on behalf of Jetaire Aerospace, LLC. Attorney Marcos Daniel Jimenez added to party Jetaire Aerospace, LLC(pty:pla). (Jimenez, Marcos) (Entered: 01/27/2022) |
| 01/27/2022 | 118 | PAPERLESS Minute Entry for proceedings held before Ch. Magistrate Judge Edwin G. Torres: Discovery Hearing held on 1/27/2022. Attorney Appearance(s): Regis C. Worley, Jr, (Valerie S. Sanders and Shawn Rafferty by phone) James F. McDonough, III, Marcos Daniel Jimenez, (Digital 14:32;36) Total time in court: 1 hour : 21 minutes. (mdc) (Entered: 01/27/2022) |
| 01/28/2022 | 119 | NOTICE of Attorney Appearance by Marcos Daniel Jimenez on behalf of Jetaire Flight Systems, LLC, Michael D. Williams. Attorney Marcos Daniel Jimenez added to party Jetaire Flight Systems, LLC(pty:cd), Attorney Marcos Daniel Jimenez added to party Michael D. Williams(pty:cd). (Jimenez, Marcos) (Entered: 01/28/2022) |
| 02/04/2022 | 120 | NOTICE by AerSale Inc. *AerSale, Inc.'s Additional Briefing Regarding Indefinite Terms* (Attachments: # 1 Affidavit of Justin E. Gray, # 2 Exhibit A) (Rudolph, Amelia) (Entered: 02/04/2022) |
| 02/10/2022 | 121 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Jonathan L. Hardt. Filing Fee $ 200.00 Receipt # AFLSDC−15390089 by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Attorney Marcos Daniel Jimenez added to party Jetaire Aerospace, LLC(pty:cd). Responses due by 2/24/2022 (Attachments: # 1 Text of Proposed Order)(Jimenez, Marcos) (Entered: 02/10/2022) |

| 02/10/2022 | 122 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for C. Matthew Rozier. Filing Fee $ 200.00 Receipt # AFLSDC−15390203 by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Responses due by 2/24/2022 (Attachments: # 1 Text of Proposed Order)(Jimenez, Marcos) (Entered: 02/10/2022) |
|---|---|---|
| 02/10/2022 | 123 | NOTICE by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams , *Notice of Change of Firm Affiliation and Appearance on Behalf of Counter−Defendants* (Jimenez, Marcos) (Entered: 02/10/2022) |
| 02/10/2022 | 124 | PAPERLESS ORDER denying 51 Defendant/Counter−Plaintiff's Motion to Stay Claim Construction Deadlines and Technical Discovery Concerning the Accused Products. Signed by Judge Darrin P. Gayles on 2/10/2022. (jsi) (Entered: 02/10/2022) |
| 02/10/2022 | 125 | PAPERLESS ORDER granting 121 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Attorney Jonathan L. Hardt is permitted to appear before this Court on behalf of Plaintiff Jetaire Aerospace, LLC and Counter−Defendants Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, and Michael Williams for all purposes relating to this action. The clerk is directed to provide Notice of Electronic Filings to Mr. Hardt at hardt@RHMtrial.com Signed by Judge Darrin P. Gayles on 2/10/2022. (jsi) (Entered: 02/10/2022) |
| 02/10/2022 | 126 | PAPERLESS ORDER granting 122 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Attorney C. Matthew Rozier is permitted to appear before this Court on behalf of Plaintiff Jetaire Aerospace, LLC and Counter−Defendants Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, and Michael Williams for all purposes relating to this action. The clerk is directed to provide Notice of Electronic Filings to Mr. Rozier at matt@RHMtrial.com. Signed by Judge Darrin P. Gayles on 2/10/2022. (jsi) (Entered: 02/10/2022) |
| 02/18/2022 | 127 | Joint MOTION to Amend/Correct 50 Order on Motion to Amend/Correct,,,,, 36 Order on Motion to Amend/Correct, 111 Order on Motion to Amend/Correct,,,, 26 Scheduling Order,,, Order Referring Case to Mediation,,, Order Referring Case to Magistrate Judge,, *Joint Motion to Modify Scheduling Order* by AerSale Inc.. Responses due by 3/4/2022 (Attachments: # 1 Text of Proposed Order)(Rudolph, Amelia) (Entered: 02/18/2022) |
| 02/19/2022 | 128 | STRICKEN RESPONSE to 120 Notice (Other) *ADDITIONAL BRIEFING REGARDING INDEFINITE TERMS* by Jetaire Aerospace, LLC. (Attachments: # 1 Appendix A, # 2 Appendix B)(Davis, Timothy) Modified on 2/22/2022 per DE 129 Notice (kpe). (Entered: 02/19/2022) |
| 02/22/2022 | 129 | NOTICE of Striking 128 Response/Reply (Other) filed by Jetaire Aerospace, LLC by Jetaire Aerospace, LLC (Davis, Timothy) (Entered: 02/22/2022) |
| 02/22/2022 | 130 | NOTICE by AerSale Inc. re 129 Notice of Striking *Statement of Non−Opposition* (Rudolph, Amelia) (Entered: 02/22/2022) |
| 02/25/2022 | 131 | Unopposed MOTION to Seal *Plaintiffs Additional Briefing Regarding Indefinite Terms* per Local Rule 5.4 by Jetaire Aerospace, LLC. (Attachments: # 1 Text of Proposed Order) (Davis, Timothy) (Entered: 02/25/2022) |
| 02/25/2022 | 132 | AMENDED SCHEDULING ORDER. The parties' Joint Motion to Modify Scheduling Order is **GRANTED**. Trial set for 1/17/2023 09:30 AM in Miami Division before Judge Darrin P. Gayles; Telephonic Calendar Call set for 1/11/2023 09:30 AM before Judge Darrin P. Gayles; Telephonic Status Conference set for 11/9/2022 10:00 AM before Judge Darrin P. Gayles; Expert Discovery due by 9/16/2022; Fact Discovery due by 7/1/2022; Expert Witness List due by 7/29/2022; Mediation Deadline 10/12/2022; Dispositive Motions due by 10/7/2022; In Limine Motions due by 11/11/2022; Pretrial Motions due by 11/11/2022; Pretrial Stipulation due by 12/12/2022; Proposed Pretrial Order due by 12/12/2022. Signed by Judge Darrin P. Gayles on 2/25/2022. *See attached document for full details.* (jsi) (Entered: 02/25/2022) |
| 03/09/2022 | 133 | REPORT AND RECOMMENDATIONS of Special Master Paul M. Janicke as to the claim construction issues in this matter. The parties shall have fourteen (14) days in |

| | | |
|---|---|---|
| | | which to serve and file written objections, if any, with the Court. Objections to R&R due by 3/23/2022. Signed by Special Master Paul M. Janicke on 3/1/2022. *See attached document for full details.* (jsi) (Entered: 03/09/2022) |
| 03/09/2022 | 134 | PAPERLESS ORDER granting 131 Plaintiff's Unopposed Motion to File Under Seal Its Additional Briefing Regarding Indefinite Terms. Pursuant to Local Rule 5.4, Plaintiff shall be permitted to file under seal its Response To Defendant AerSale's Additional Briefing Regarding Indefinite Terms. Signed by Judge Darrin P. Gayles on 3/9/2022. (jsi) (Entered: 03/09/2022) |
| 03/09/2022 | | SYSTEM ENTRY − Docket Entry 135 [misc] restricted/sealed until further notice. (1576531) (Entered: 03/09/2022) |
| 03/09/2022 | 136 | REDACTION to 128 Response/Reply (Other) *and 135 Sealed Event −− Plaintiff Jetaire Aerospace's Response to AerSale's Additional Briefing Regarding Allegedly Indefinite Terms 120* by Jetaire Aerospace, LLC (Attachments: # 1 Appendix A − Jetaire's Supplemental Claim Constructions By Order of The Special Master, dated December 31, 2021, # 2 Appendix B − Jetaire's Supplemental Claim Construction Brief, dated January 21, 2022)(Davis, Timothy) (Entered: 03/09/2022) |
| 03/23/2022 | 137 | OBJECTIONS by AerSale Inc. re 133 REPORT AND RECOMMENDATIONS of Special Master re 90 Counterclaim filed by AerSale Inc., 1 Complaint,, filed by Jetaire Aerospace, LLC *AerSale, Inc.'s Objections to Special Master's Report and Recommendations* (Rudolph, Amelia) (Entered: 03/23/2022) |
| 03/23/2022 | 138 | OBJECTIONS by Jetaire Aerospace, LLC re 133 REPORT AND RECOMMENDATIONS of Special Master re 90 Counterclaim filed by AerSale Inc., 1 Complaint,, filed by Jetaire Aerospace, LLC *(Objections)* (Attachments: # 1 Affidavit, # 2 Exhibit A: Jetaire's Supplemental Brief, # 3 Exhibit B: January 21, 2022 Email) (Davis, Timothy) (Entered: 03/23/2022) |
| 03/24/2022 | 139 | **PAPERLESS NOTICE of Hearing**: <br><br> A Discovery Hearing is set for 5/19/2022 at 11:30 AM before Ch. Magistrate Judge Edwin G. Torres. This hearing will take place in person at the United States Courthouse, James Lawrence King Building, Courtroom 5 − Tenth Floor, 99 N.E. 4th Street, Miami, Florida. <br><br> All persons attending the hearing will be subject to the Court's latest COVID order and guidelines. (jfz) (Entered: 03/24/2022) |
| 03/24/2022 | 140 | NOTICE of Compliance *with Paragraph 3(c) of Order Setting Discovery Procedures (Dkt. No. 32)* by AerSale Inc. re 139 Notice re Hearing, (Rudolph, Amelia) (Entered: 03/24/2022) |
| 04/05/2022 | 141 | NOTICE of Compliance *with Paragraph 3(c) of Order Setting Discovery Procedures (Dkt. No. 32) (Amended)* by AerSale Inc. re 139 Notice re Hearing, (Rudolph, Amelia) (Entered: 04/05/2022) |
| 05/06/2022 | 142 | Joint MOTION to Amend/Correct 50 Order on Motion to Amend/Correct,,,,, 132 Scheduling Order,,,, Terminate Motions,,, 36 Order on Motion to Amend/Correct, 111 Order on Motion to Amend/Correct,,,, 26 Scheduling Order,,, Order Referring Case to Mediation,,, Order Referring Case to Magistrate Judge,, *Joint Motion to Modify Scheduling Order* by AerSale Inc.. Responses due by 5/20/2022 (Attachments: # 1 Text of Proposed Order)(Rudolph, Amelia) (Entered: 05/06/2022) |
| 05/09/2022 | 143 | SECOND AMENDED SCHEDULING ORDER, granting 142 Motion to Modify Scheduling Order. Expert Discovery due by 11/11/2022. Fact Discovery due by 8/26/2022. Mediation Deadline 12/7/2022. Dispositive Motions due by 12/2/2022. Motions due by 1/6/2023. Telephonic Calendar Call set for 3/8/2023 at 9:30 AM in Miami Division before Judge Darrin P. Gayles. Trial set for 3/13/2023 in Miami Division before Judge Darrin P. Gayles. Telephonic Status Conference set for 1/4/2023 at 10:00 AM in Miami Division before Judge Darrin P. Gayles. Signed by Judge Darrin P. Gayles on 5/9/2022. *See attached document for full details.* (pes) (Entered: 05/10/2022) |

| 05/19/2022 | 144 | MOTION For Entry Of Order by Jetaire Aerospace, LLC. (Attachments: # 1 Text of Proposed Order)(Davis, Timothy) (Entered: 05/19/2022) |
|---|---|---|
| 05/19/2022 | 145 | PAPERLESS Minute Entry for proceedings held before Ch. Magistrate Judge Edwin G. Torres: Discovery Hearing held on 5/19/2022. Attorney Appearance(s): James F. McDonough, III, Valerie S. Sanders, Shawn Rafferty, Regis C. Worley, Jr. (Digital 11:41:32) Total time in court: 48 minutes. (mdc) (Entered: 05/20/2022) |
| 05/20/2022 | 146 | Notice of Supplemental Authority re 138 Notice (Other), *And In Further Support Of Plaintiff's Objections* by Jetaire Aerospace, LLC (Attachments: # 1 Exhibit A) (Davis, Timothy) (Entered: 05/20/2022) |
| 05/27/2022 | 147 | RESPONSE to 146 Notice of Supplemental Authority by AerSale Inc. (Rudolph, Amelia) (Entered: 05/27/2022) |
| 07/07/2022 | 148 | Joint MOTION to Amend/Correct 50 Order on Motion to Amend/Correct,,,,, 143 Order on Motion to Amend/Correct,, 132 Scheduling Order,,,, Terminate Motions,,, 36 Order on Motion to Amend/Correct, 111 Order on Motion to Amend/Correct,,,, 26 Scheduling Order,,, Order Referring Case to Mediation,,, Order Referring Case to Magistrate Judge,, *Joint Motion to Modify Scheduling Order* by AerSale Inc.. Responses due by 7/21/2022 (Attachments: # 1 Text of Proposed Order)(Rudolph, Amelia) (Entered: 07/07/2022) |
| 07/11/2022 | 149 | THIRD AMENDED SCHEDULING ORDER granting 148 Joint Motion to Amend/Correct. Expert Discovery due by 1/6/2023. Fact Discovery due by 10/21/2022. Mediation Deadline 2/1/2023. Dispositive Motions due by 1/27/2023. In Limine Motions due by 3/3/2023. Pretrial Motions due by 3/3/2023. Joint Pretrial Stipulation due by 4/3/2023. Telephonic Calendar Call set for 5/3/2023 09:30 AM before Judge Darrin P. Gayles. Jury Trial set for 5/8/2023 before Judge Darrin P. Gayles. Telephonic Status Conference set for 3/1/2023 10:00 AM before Judge Darrin P. Gayles. Signed by Judge Darrin P. Gayles on 7/8/2022. *See attached document for full details.* (jas) (Entered: 07/11/2022) |
| 08/15/2022 | 150 | **PAPERLESS NOTICE of Hearing**: <br><br> A Discovery Hearing set for 9/8/2022 at 11:30 AM before Ch. Magistrate Judge Edwin G. Torres. This hearing will take place in person at the United States Courthouse, James Lawrence King Building, Courtroom 5 − Tenth Floor, 99 N.E. 4th Street, Miami, Florida. <br><br> All persons attending the hearing will be subject to the Court's latest COVID Order and guidelines. (jfz) (Entered: 08/15/2022) |
| 08/15/2022 | 151 | NOTICE of Compliance *with Paragraph 3(c) of Order Setting Discovery Procedures (Dkt. No. 150)* by AerSale Inc. re 150 Notice re Hearing, (Rudolph, Amelia) (Entered: 08/15/2022) |
| 09/02/2022 | 152 | Joint MOTION to Amend/Correct 149 Order on Motion to Amend/Correct,, *Joint Motion to Modify Scheduling Order* by AerSale Inc.. Responses due by 9/16/2022 (Attachments: # 1 Text of Proposed Order)(Rudolph, Amelia) (Entered: 09/02/2022) |
| 09/06/2022 | 153 | **ORDER OF CANCELLATION OF HEARING Pursuant to Consent Order**: <br><br> Upon notification of the parties that they have resolved the discovery dispute, the Discovery Hearing set for 9/8/2022 at 11:30 AM is now CANCELLED. <br><br> Plaintiff/Counter−Defendant Jetaire must comply with the terms of the attached Consent Order **on or before 9/30/2022**. (jfz) (Entered: 09/06/2022) |
| 09/06/2022 | 154 | FOURTH AMENDED SCHEDULING ORDER; granting 152 Motion to Modify Scheduling Order. Expert Discovery due by 3/31/2023. Fact Discovery due by 1/13/2023. Mediation Deadline 2/24/2023. Dispositive Motions due by 4/21/2023. In Limine Motions due by 5/26/2023. Pretrial Motions due by 5/26/2023. Joint Pretrial Stipulation due by 6/26/2023. Calendar Call set for 7/26/2023 09:30 AM before Judge Darrin P. Gayles. Jury Trial set for 7/31/2023 before Judge Darrin P. Gayles. Status Conference set for 5/24/2023 10:00 AM before Judge Darrin P. Gayles. Signed by Judge Darrin P. Gayles on 9/6/2022. *See attached document for full details.* (jas) (Entered: 09/06/2022) |

| | | |
|---|---|---|
| 09/26/2022 | 155 | (VACATED IN PART per DE 266 Order) ORDER ADOPTING REPORT AND RECOMMENDATIONS; Affirming and Adopting 133 Report and Recommendations − Special Master. Signed by Judge Darrin P. Gayles on 9/26/2022. *See attached document for full details.* (jas) Modified text on 9/15/2023 (kpe). (Entered: 09/26/2022) |
| 09/27/2022 | 156 | PAPERLESS ORDER granting 99 Plaintiff/Counter−Defendants' Motion to Dismiss Defendant/Counter−Plaintiff's Second Amended Counterclaims. Defendant/Counter−Plaintiff AerSale, Inc.'s 90 Second Amended Counterclaims is a shotgun pleading. *Weiland v. Palm Beach Cnty. Sheriffs Off.*, 792 F.3d 1313, 1320−21 (11th Cir. 2015). Counts II through XI of Defendant's Second Amended Counterclaims incorporates by reference all prior paragraphs, "leading to a situation where most of the counts (i.e., all but the first) contain irrelevant factual allegations and legal conclusions." *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1295 (11th Cir. 2002); *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001). This is a technical, yet significant, error which requires dismissal. Shotgun complaints make it "virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996). As such, shotgun complaints are routinely condemned by the Eleventh Circuit. Defendant may file an Amended Counterclaim within 20 days of this order. Signed by Judge Darrin P. Gayles on 9/27/2022. (mja) (Entered: 09/27/2022) |
| 10/07/2022 | 157 | PAPERLESS ORDER denying as moot 144 Motion for Entry of Order upon the orders entered in subsequent discovery hearings.<br><br>Signed by Ch. Magistrate Judge Edwin G. Torres on 10/7/2022. (EGT) (Entered: 10/07/2022) |
| 10/17/2022 | 158 | Unopposed MOTION to Seal *AerSale's Third Amended Counterclaims* per Local Rule 5.4 by AerSale Inc.. (Attachments: # 1 Text of Proposed Order) (Rudolph, Amelia) (Entered: 10/17/2022) |
| 10/17/2022 | 159 | Amended COUNTERCLAIM *(AerSale's Third Amended Counterclaims (Redacted))* against Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams, filed by AerSale Inc..(Rudolph, Amelia) (Entered: 10/17/2022) |
| 10/24/2022 | 160 | PAPERLESS ORDER granting Defendant/Counter Claimant Aersale, Inc.'s 158 Unopposed Motion to Seal. Aersale, Inc. shall file its unredacted Third Amended Counterclaims under seal, which shall remain under seal for 3 years or until further order of the Court. Signed by Judge Darrin P. Gayles on 10/24/2022. (mja) (Entered: 10/24/2022) |
| 10/26/2022 | | SYSTEM ENTRY − Docket Entry 161 [misc] restricted/sealed until further notice. (1098998) (Entered: 10/26/2022) |
| 10/31/2022 | 162 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 159 Counterclaim by Jetaire Aerospace, LLC. (Attachments: # 1 Text of Proposed Order)(Davis, Timothy) (Entered: 10/31/2022) |
| 11/01/2022 | 163 | PAPERLESS ORDER granting 162 Unopposed Motion for Extension of Time for Counter−Defendants to Answer, Move, or Otherwise Respond to Defendant/Counter−Plaintiff's Third Amended Counterclaims. Counter−Defendants shall file their response on or before November 7, 2022. Signed by Judge Darrin P. Gayles on 11/1/2022. (mja) (Entered: 11/01/2022) |
| 11/07/2022 | 164 | MOTION TO DISMISS 159 Counterclaim FOR FAILURE TO STATE A CLAIM by Jetaire Aerospace, LLC. Responses due by 11/21/2022 (Attachments: # 1 Affidavit, # 2 Exhibit 1. Complaint in Jetaire Aerospace LLC, v. AerSale, Inc., # 3 Exhibit 2. Answer and Counterclaims in Jetaire Aerospace LLC, v. AerSale, Inc., # 4 Exhibit 3. Docket Sheet for Jetaire Aerospace LLC, v. AerSale, Inc., # 5 Exhibit 4. Application to Confirm Arbitration Award in Jetaire Aerospace LLC, v. AerSale, Inc.)(Davis, Timothy) (Entered: 11/07/2022) |
| 11/21/2022 | 165 | RESPONSE in Opposition re 164 MOTION TO DISMISS 159 Counterclaim FOR FAILURE TO STATE A CLAIM filed by AerSale Inc.. Replies due by 11/28/2022. (Rudolph, Amelia) (Entered: 11/21/2022) |

| 11/28/2022 | 166 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 165 Response in Opposition to Motion *164 (to Dismiss 159 Counterclaim) up to and including December 5, 2022* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Text of Proposed Order)(Davis, Timothy) (Entered: 11/28/2022) |
|---|---|---|
| 11/29/2022 | 167 | PAPERLESS ORDER granting 166 Counter−Defendants' Unopposed Motion for Extension of Time to Reply in Support of the Motion to Dismiss Defendant/Counter−Plaintiff's Third Amended Counterclaims. Counter−Defendants shall file their reply on or before December 5, 2022. Signed by Judge Darrin P. Gayles on 11/29/2022. (mja) (Entered: 11/29/2022) |
| 12/05/2022 | 168 | REPLY to Response to Motion re 164 MOTION TO DISMISS 159 Counterclaim FOR FAILURE TO STATE A CLAIM filed by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Davis, Timothy) (Entered: 12/05/2022) |
| 12/21/2022 | 169 | MOTION for Reconsideration re 155 Order Adopting Report and Recommendations, Order on Report and Recommendations − Special Master *and Supporting Memorandum of Law* by Jetaire Aerospace, LLC. (Jimenez, Marcos) (Entered: 12/21/2022) |
| 12/28/2022 | 170 | Joint MOTION to Amend/Correct 154 Order on Motion to Amend/Correct,, *Joint Motion to Modify Scheduling Order* by AerSale Inc.. Responses due by 1/11/2023 (Attachments: # 1 Text of Proposed Order)(Rudolph, Amelia) (Entered: 12/28/2022) |
| 12/30/2022 | 171 | FIFTH AMENDED SCHEDULING ORDER: (Jury Trial set for 8/28/2023 before Judge Darrin P. Gayles, Calendar Call set for 8/23/2023 09:30 AM before Judge Darrin P. Gayles, Status Conference set for 6/21/2023 10:00 AM before Judge Darrin P. Gayles.), ORDER REFERRING CASE to Magistrate Judge Edwing G. Torres for all discovery matters. Signed by Judge Darrin P. Gayles on 12/30/2022. *See attached document for full details.* (jas) (Entered: 01/03/2023) |
| 01/04/2023 | 172 | RESPONSE in Opposition re 169 MOTION for Reconsideration re 155 Order Adopting Report and Recommendations, Order on Report and Recommendations − Special Master *and Supporting Memorandum of Law* filed by AerSale Inc.. Replies due by 1/11/2023. (Rudolph, Amelia) (Entered: 01/04/2023) |
| 01/06/2023 | 173 | **PAPERLESS NOTICE of Hearing**:<br><br>A Discovery Hearing is set for 2/9/2023 at 02:30 PM before Ch. Magistrate Judge Edwin G. Torres. This hearing will take place in person at the United States Courthouse, James Lawrence King Building, Courtroom 5 − Tenth Floor, 99 N.E. 4th Street, Miami, Florida. (jfz) (Entered: 01/06/2023) |
| 01/09/2023 | 174 | NOTICE of Compliance *By the Parties With Paragraph 3(c) Of Order Setting Discovery Procedures (Dkt. 32)* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams re 173 Notice re Hearing, (Davis, Timothy) (Entered: 01/09/2023) |
| 01/11/2023 | 175 | Plaintiff's REPLY to Response to Motion re 169 MOTION for Reconsideration re 155 Order Adopting Report and Recommendations, Order on Report and Recommendations − Special Master *and Supporting Memorandum of Law* filed by Jetaire Aerospace, LLC. (Jimenez, Marcos) (Entered: 01/11/2023) |
| 02/06/2023 | 176 | **PAPERLESS NOTICE of Hearing**: **\*\*TIME CHANGE ONLY\*\***<br><br>The discovery hearing is reset for 2/9/2023 at **1:30 PM** before Chief Magistrate Judge Edwin G. Torres. It will still take place in person at the United States Courthouse, 99 N.E. Fourth Street, Tenth Floor, Courtroom Five, Miami, Florida. (elk) (Entered: 02/06/2023) |
| 02/09/2023 | 177 | NOTICE of Change of Address, Email or Law Firm Name by Marcos Daniel Jimenez. Attorney Marcos Daniel Jimenez added to party Jetaire Aerospace, LLC(pty:cd). (Jimenez, Marcos) (Entered: 02/09/2023) |
| 02/09/2023 | 178 | PAPERLESS Minute Entry for proceedings held before Ch. Magistrate Judge Edwin G. Torres: Discovery Hearing held on 2/9/2023. Attorney Appearance(s): James F. McDonough, III, Regis C. Worley, Jr, Shawn Rafferty. (Digital 13:31:05) Total time |

| | | |
|---|---|---|
| | | in court: 1 hour(s) : 38 minutes. (mdc) (Entered: 02/09/2023) |
| 02/10/2023 | 179 | CLERK'S NOTICE − Attorney Admissions has not updated address and/or email information for attorney Marcos Daniel Jimenez re 177 Notice of Change of Address, Email or Law Firm Name. Attorney Marcos Daniel Jimenez has not completed the required procedures for updating their information with the Court. After filing something in any pending cases, Attorney is instructed to go to their PACER account, Manage My Account, to complete the process of updating their information. The Court is NOT responsible for updating secondary email addresses. See the Courts website for detailed instructions. www.flsd.uscourts.gov/updating−your−information (pt) (Entered: 02/10/2023) |
| 02/10/2023 | 180 | CLERK'S NOTICE − Attorney Admissions has updated the contact information for attorney Marcos Daniel Jimenez. (cw) (Entered: 02/10/2023) |
| 03/09/2023 | 181 | Joint Motion to Modify Scheduling Order by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Responses due by 3/23/2023 (Jimenez, Marcos) (Entered: 03/09/2023) |
| 03/10/2023 | 182 | Notice of Ninety Days Expiring by Jetaire Aerospace, LLC re 164 MOTION TO DISMISS 159 Counterclaim FOR FAILURE TO STATE A CLAIM filed by Jetaire Aerospace, LLC (Jimenez, Marcos) (Entered: 03/10/2023) |
| 03/13/2023 | 183 | SIXTH AMENDED SCHEDULING ORDER: Granting 181 Joint Motion to Modify Scheduling Order. ( Jury Trial reset for 10/23/2023 before Judge Darrin P. Gayles., Telephonic Calendar Call set for 10/18/2023 09:30 AM before Judge Darrin P. Gayles., Telephonic Status Conference set for 7/12/2023 10:00 AM before Judge Darrin P. Gayles.) ORDER REFERRING CASE to Chief Magistrate Judge Edwin G. Torres for Discovery Matters; ORDER Referring Case to Mediation. Signed by Judge Darrin P. Gayles on 3/13/2023. *See attached document for full details.* (ls) *Pattern Jury Instruction Builder* − To access the latest, up to date changes to the 11th Circuit Pattern Jury Instructions go to https://pji.ca11.uscourts.gov or click here. (Entered: 03/13/2023) |
| 03/31/2023 | 184 | Joint MOTION to Amend/Correct *Scheduling Order* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Responses due by 4/14/2023 (Jimenez, Marcos) (Entered: 03/31/2023) |
| 04/03/2023 | 185 | SEVENTH AMENDED SCHEDULING ORDER: granting 184 Joint MOTION to Amend/Correct *Scheduling Order*. (Jury Trial set for 10/23/2023 before Judge Darrin P. Gayles, Calendar Call set for 10/18/2023 09:30 AM before Judge Darrin P. Gayles, Status Conference set for 7/12/2023 10:00 AM before Judge Darrin P. Gayles.), ORDER REFERRING CASE to Magistrate Judge Edwin G. Torres for all discovery matters. Signed by Judge Darrin P. Gayles on 4/3/2023. *See attached document for full details.* (jas) (Entered: 04/03/2023) |
| 04/14/2023 | 186 | Joint Motion to Modify *Scheduling Order* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Responses due by 4/28/2023 (Jimenez, Marcos) (Entered: 04/14/2023) |
| 04/17/2023 | 187 | EIGHTH AMENDED SCHEDULING ORDER: (Jury Trial set for 10/23/2023 before Judge Darrin P. Gayles, Telephonic Calendar Call set for 10/18/2023 09:30 AM before Judge Darrin P. Gayles, Telephonic Status Conference set for 7/12/2023 10:00 AM before Judge Darrin P. Gayles.), ORDER REFERRING CASE to Chief Magistrate Judge Edwin G. Torres for all Discovery Matters. Signed by Judge Darrin P. Gayles on 4/17/2023. *See attached document for full details.* (jas) (Entered: 04/17/2023) |
| 04/17/2023 | 188 | Notice of Ninety Days Expiring by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams re 169 MOTION for Reconsideration re 155 Order Adopting Report and Recommendations, Order on Report and Recommendations − Special Master *and Supporting Memorandum of Law* filed by Jetaire Aerospace, LLC (Jimenez, Marcos) (Entered: 04/17/2023) |
| 06/06/2023 | 189 | TRANSCRIPT of discovery hearing held on 2−9−2023 before Ch. Magistrate Judge Edwin G. Torres, 1−62 pages, Court Reporter: Dawn Savino, 305−523−5598 / Dawn_Savino@flsd.uscourts.gov. Transcript may be viewed at the court public |

| | | |
|---|---|---|
| | | terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/27/2023. Redacted Transcript Deadline set for 7/7/2023. Release of Transcript Restriction set for 9/5/2023. (Savino, Dawn) (Entered: 06/06/2023) |
| 06/15/2023 | 190 | Joint MOTION to Amend/Correct 187 Scheduling Order,, Order Referring Case to Magistrate Judge,, Terminate Motions, by AerSale Inc.. Responses due by 6/29/2023 (Rudolph, Amelia) (Entered: 06/15/2023) |
| 06/20/2023 | 191 | ORDER GRANTING 190 JOINT MOTION TO AMEND AND NINTH AMENDED SCHEDULING ORDER: Expert Discovery due by 7/10/2023. Mediation Deadline 6/30/2023. Dispositive Motions due by 7/14/2023. In Limine Motions due by 7/14/2023. Motions due by 7/14/2023. Pretrial Stipulation due by 8/21/2023. TELEPHONIC CALENDAR CALL set for 10/18/2023 at 09:30 AM before Judge Darrin P. Gayles. JURY TRIAL set for 10/23/2023 in Miami Division before Judge Darrin P. Gayles. TELEPHONIC STATUS CONFERENCE set for 7/12/2023 at 10:00 AM before Judge Darrin P. Gayles. Signed by Judge Darrin P. Gayles on 6/20/2023. *See attached document for full details.* (caw) (Entered: 06/21/2023) |
| 07/05/2023 | 192 | FINAL MEDIATION REPORT by Jointly Prepared by the Parties. Disposition: Case did not settle. (Rudolph, Amelia) (Entered: 07/05/2023) |
| 07/11/2023 | 193 | PAPERLESS ORDER. The Status Conference on July 12, 2023, is reset for July 26, 2023, at 10:00 AM before Judge Darrin P. Gayles. Counsel shall enter their appearances telephonically using the following dial−in information: Dial−in Number 888−273−3658; Access Code 7032614; Security Code 5170. Please dial in at least ten minutes before the Status Conference begins and wait until your case is called. Signed by Judge Darrin P. Gayles on 7/11/2023. (mja) (Entered: 07/11/2023) |
| 07/11/2023 | | Deadline(s)/Hearing(s) terminated. Pursuant to ECF No. 193. (mja) (Entered: 07/11/2023) |
| 07/14/2023 | 194 | Unopposed MOTION to Seal *Dispositive and Pretrial Motions* per Local Rule 5.4 by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Text of Proposed Order Order Granting Unopposed Motion to File Pretrial Motion Under Seal) (Jimenez, Marcos) (Entered: 07/14/2023) |
| 07/14/2023 | 195 | Unopposed MOTION to Seal per Local Rule 5.4 by AerSale Inc.. (Attachments: # 1 Text of Proposed Order) (Rudolph, Amelia) (Entered: 07/14/2023) |
| 07/14/2023 | 199 | Defendant's MOTION Under Rule 702 and Daubert to Exclude Testimony from Bill Ashworth by AerSale Inc.. (Rudolph, Amelia) (Entered: 07/14/2023) |
| 07/14/2023 | 200 | Defendant's MOTION Under Rule 702 and Daubert to Exclude Testimony from Justin Blok by AerSale Inc.. (Rudolph, Amelia) (Entered: 07/14/2023) |
| 07/14/2023 | | SYSTEM ENTRY − Docket Entry 196 [motion] restricted/sealed until further notice. (kpe) (Entered: 07/26/2023) |
| 07/14/2023 | | SYSTEM ENTRY − Docket Entry 197 [misc] restricted/sealed until further notice. (kpe) (Entered: 07/26/2023) |
| 07/14/2023 | | SYSTEM ENTRY − Docket Entry 198 [motion] restricted/sealed until further notice. (kpe) (Entered: 07/26/2023) |
| 07/14/2023 | | SYSTEM ENTRY − Docket Entry 201 [motion] restricted/sealed until further notice. (kpe) (Entered: 07/26/2023) |
| 07/15/2023 | 202 | STRICKEN per DE# 206 , Statement of: In Support of Motion for Summary Judgment and Statement of Undisputed Material Facts by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams (Attachments: # 1 Exhibit Declaration)(Jimenez, Marcos) Modified text on 7/21/2023 (jas). (Entered: 07/15/2023) |
| 07/15/2023 | 204 | MOTION to Compel *And Open Discovery for the Limited Purpose of Deposing Aersale's Experts* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Responses due by 7/31/2023 (Attachments: # 1 Exhibit Exhibit A − Email Correspondence, # 2 Exhibit Exhibit B − Email Correspondence, # 3 Exhibit Exhibit C − Email Correspondence)(Jimenez, Marcos) (Entered: 07/15/2023) |

| | | |
|---|---|---|
| 07/15/2023 | | SYSTEM ENTRY − Docket Entry 203 [motion] restricted/sealed until further notice. (kpe) (Entered: 07/26/2023) |
| 07/17/2023 | 205 | PAPERLESS ORDER REFERRING MOTIONS to Chief Magistrate Judge Edwin G. Torres for a ruling on 199 Defendant/Counter−Plaintiff AerSale Inc.'s Daubert Motion to Exclude the Testimony of Bill Ashworth and 200 Defendant/Counter−Plaintiff AerSale Inc.'s Daubert Motion to Exclude the Testimony of Justin R. Blok. Signed by Judge Darrin P. Gayles on 7/17/2023. (mja) (Entered: 07/17/2023) |
| 07/20/2023 | 206 | NOTICE of Striking 202 Statement filed by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams (Jimenez, Marcos) (Entered: 07/20/2023) |
| 07/20/2023 | 208 | Unopposed MOTION to Seal *Docket Entry No. 202* per Local Rule 5.4 by Jetaire Aerospace, LLC. (Jimenez, Marcos) (Entered: 07/20/2023) |
| 07/20/2023 | | SYSTEM ENTRY − Docket Entry 207 [misc] restricted/sealed until further notice. (kpe) (Entered: 07/26/2023) |
| 07/21/2023 | 209 | PAPERLESS ORDER granting 208 Unopposed Motion to Seal. ECF No. 202 shall remain under seal until further order of the Court. Signed by Judge Darrin P. Gayles on 7/21/2023. (mja) (Entered: 07/21/2023) |
| 07/24/2023 | 210 | CLERK'S NOTICE of Compliance by Sealing document 202 pursuant to 209 Order. (kpe) (Entered: 07/24/2023) |
| 07/25/2023 | 211 | PAPERLESS ORDER granting 194 Unopposed Motion to File Dispositive and Pretrial Motions Under Seal and 195 Defendant/Counter−Plaintiff AerSale Inc.'s Unopposed Motion to Seal. ECF Nos. 196, 197, 198, 201, 203, and 207 shall remain under seal for five (5) years or until further order of the Court. Signed by Judge Darrin P. Gayles on 7/25/2023. (mja) (Entered: 07/25/2023) |
| 07/26/2023 | 212 | PAPERLESS Minute Entry for proceedings held before Judge Darrin P. Gayles: Status Conference held on 7/26/2023. All parties were present. Court Reporter: Quanincia Hill, 305−523−5634 / Quanincia_Hill@flsd.uscourts.gov. (mja) (Entered: 07/26/2023) |
| 07/26/2023 | 213 | CLERK'S NOTICE of Compliance by Sealing documents pursuant to DE 211 Order. (kpe) (Entered: 07/26/2023) |
| 07/27/2023 | 214 | MOTION for Extension of Time to respond to Motions in Limine by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Responses due by 8/10/2023 (Attachments: # 1 Exhibit A. Email Correspondence, # 2 Exhibit B. Email Correspondence)(Jimenez, Marcos) (Entered: 07/27/2023) |
| 07/28/2023 | 215 | Joint MOTION to Amend/Correct 191 Order on Motion to Amend/Correct,, *two deadlines of Ninth Amended Scheduling Order* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Responses due by 8/11/2023 (Jimenez, Marcos) (Entered: 07/28/2023) |
| 07/28/2023 | 216 | RESPONSE in Opposition re 204 MOTION to Compel *And Open Discovery for the Limited Purpose of Deposing Aersale's Experts* filed by AerSale Inc.. Replies due by 8/4/2023. (Attachments: # 1 Affidavit of Regis C. Worley, Jr., # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Rudolph, Amelia) (Entered: 07/28/2023) |
| 07/28/2023 | 217 | NOTICE by AerSale Inc. *AerSale, Inc.'s Response in Opposition to Plaintiff/Counter−Defendants' Motion in Limine [ECF No. 203]* (Rudolph, Amelia) (Entered: 07/28/2023) |
| 08/01/2023 | 218 | PAPERLESS ORDER granting the parties' 215 Joint Motion to Modify Scheduling Order. The motion is granted as follows:<br><br>1. The parties shall file their responses to the respective Motions in Limine on or before August 4, 2023;<br><br>2. Defendant/Counter−Plaintiff AerSale shall file its Response to 204 Plaintiff/Counter−Defendants' Motion to Compel on or before August 4, 2023; and<br><br>3. Joint pretrial stipulation, proposed joint jury instructions, proposed joint verdict form, and/or proposed findings of fact and conclusions of law shall be filed by |

| | | September 25, 2023. |
|---|---|---|
| | | Plaintiff/Counter−Defendants' 214 Motion to Extend Time to Respond to Motions in Limine is DENIED AS MOOT. Signed by Judge Darrin P. Gayles on 8/1/2023. (mja) (Entered: 08/01/2023) |
| 08/02/2023 | 219 | Unopposed MOTION to Seal per Local Rule 5.4 by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Text of Proposed Order Proposed Order on Unopposed Motion to file Under Seal) (Jimenez, Marcos) (Entered: 08/02/2023) |
| 08/03/2023 | | SYSTEM ENTRY − Docket Entry 220 [motion] restricted/sealed until further notice. (520625) (Entered: 08/03/2023) |
| 08/03/2023 | | SYSTEM ENTRY − Docket Entry 221 [motion] restricted/sealed until further notice. (520625) (Entered: 08/03/2023) |
| 08/03/2023 | | SYSTEM ENTRY − Docket Entry 222 [motion] restricted/sealed until further notice. (520625) (Entered: 08/03/2023) |
| 08/04/2023 | 223 | Plaintiff's REPLY to 204 MOTION to Compel *And Open Discovery for the Limited Purpose of Deposing Aersale's Experts Jetaire's Reply in Further Support of its Motion to Compel and Open Discovery for the Limited Purpose of Deposing Aersale's Experts* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Exhibit Exhibit D Email)(Jimenez, Marcos) (Entered: 08/04/2023) |
| 08/04/2023 | 224 | Plaintiff's REPLY *Jetaire's Reply in Further Support of its Motion in Limine [DE 203]* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Jimenez, Marcos) (Entered: 08/04/2023) |
| 08/04/2023 | 225 | RESPONSE in Opposition re 200 Defendant's MOTION Under Rule 702 and Daubert to Exclude Testimony from Justin Blok filed by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Replies due by 8/11/2023. (Jimenez, Marcos) (Entered: 08/04/2023) |
| 08/04/2023 | 226 | Plaintiff's RESPONSE *Plaintiff/Counter−Defendants' Response to Defendant/Counterclaim−Plaintiff's Motions in Limine Nos. 1−12 [DE 198 and DE 211]* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Affidavit Declaration in Support of Plaintiff/Counter−Defendants' Responses to Defendant.Counterclaim−Plaintiff's Motion in Limine Nos. 1−12, # 2 Exhibit A Filed Under Seal, # 3 Exhibit B Filed Under Seal, # 4 Exhibit C Filed Under Seal, # 5 Exhibit D Filed Under Seal, # 6 Exhibit E Filed Under Seal, # 7 Exhibit F Filed Under Seal, # 8 Exhibit G Filed Under Seal, # 9 Exhibit H Filed Under Seal, # 10 Exhibit I Filed Under Seal, # 11 Exhibit J Filed Under Seal, # 12 Exhibit K Filed Under Seal, # 13 Exhibit L Filed Under Seal, # 14 Exhibit M Filed Under Seal, # 15 Exhibit N Filed Under Seal)(Jimenez, Marcos) (Entered: 08/04/2023) |
| 08/04/2023 | 227 | Plaintiff's RESPONSE *Plaintiff/Counter−Defendants' Response in Opposition to Aersale's Daubert Motion Regarding Bill Ashworth [DE 199]* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Jimenez, Marcos) (Entered: 08/04/2023) |
| 08/04/2023 | 228 | Unopposed MOTION to Seal per Local Rule 5.4 by AerSale Inc.. (Attachments: # 1 Text of Proposed Order) (Rudolph, Amelia) (Entered: 08/04/2023) |
| 08/04/2023 | 229 | Defendant's RESPONSE *Defendant/Counter−Plaintiff AerSale, Inc.'s Response in Opposition to Plaintiff/Counter−Defendants' Motion for Summary Judgment [DE 201]* by AerSale Inc.. (Rudolph, Amelia) (Entered: 08/04/2023) |
| 08/04/2023 | 230 | Plaintiff's RESPONSE *Plaintiff/Counter−Defendants' Response in Opposition to AerSale's Motion for Summary Judgment [DE 196]* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Jimenez, Marcos) (Entered: 08/04/2023) |
| 08/04/2023 | 231 | Statement of: Material Facts in Opposition to Plaintiff/Counter−Defendants' Motion for Summary Judgment by AerSale Inc. re 229 Response/Reply (Other) (Attachments: # 1 Affidavit of Justin E. Gray, # 2 Index of Exhibits to Gray Declaration, # 3 Exhibit A (Filed Under Seal), # 4 Exhibit B (Filed Under Seal), # 5 Exhibit C (Filed Under Seal), # 6 Exhibit D (Filed Under Seal), # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # |

| | | |
|---|---|---|
| | | 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K (Filed Under Seal), # 14 Exhibit L (Filed Under Seal), # 15 Exhibit M, # 16 Exhibit N (Filed Under Seal), # 17 Exhibit O (Filed Under Seal), # 18 Exhibit P (Filed Under Seal), # 19 Exhibit Q (Filed Under Seal), # 20 Exhibit R (Filed Under Seal), # 21 Exhibit S (Filed Under Seal), # 22 Exhibit T (Filed Under Seal), # 23 Exhibit U (Filed Under Seal))(Rudolph, Amelia) (Entered: 08/04/2023) |
| 08/04/2023 | 232 | Plaintiff's RESPONSE *Plaintiff/Counter−Defendants' Response to Aersale's Statement of Material Facts in Support of its Motion for Summary Judgment [DE 197]* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Exhibit 21 Filed Under Seal, # 2 Exhibit 22 Filed Under Seal, # 3 Exhibit 23 Filed Under Seal, # 4 Exhibit 24 Filed Under Seal, # 5 Exhibit 25 Filed Under Seal, # 6 Exhibit 26 Filed Under Seal, # 7 Exhibit 27 Filed Under Seal, # 8 Exhibit 28 Filed Under Seal, # 9 Exhibit 29 Filed Under Seal, # 10 Exhibit 30 Filed Under Seal, # 11 Exhibit 31 Filed Under Seal, # 12 Exhibit 32 Filed Under Seal, # 13 Exhibit 33 Filed Under Seal, # 14 Exhibit 34 Filed Under Seal, # 15 Exhibit 35 Filed Under Seal, # 16 Exhibit 36 Filed Under Seal, # 17 Exhibit 37 Filed Under Seal, # 18 Exhibit 38 Filed Under Seal, # 19 Exhibit 39 Filed Under Seal, # 20 Exhibit 40 Filed Under Seal, # 21 Affidavit Declaration in Support of Jetaire's Opposition to Aersale's Motion for Summary Judgment and Statement of Undisputed Material Facts)(Jimenez, Marcos) (Entered: 08/04/2023) |
| 08/10/2023 | 233 | PAPERLESS ORDER granting 219 Unopposed Motion to File Under Seal and 228 Defendant/Counter−Plaintiff AerSale, Inc.'s Unopposed Motion to Seal. The parties shall refile unredacted versions of their response/reply briefs on or before August 14, 2023. The filings shall remain under seal for five (5) years or until further order of the Court. Signed by Judge Darrin P. Gayles on 8/10/2023. (mja) (Entered: 08/10/2023) |
| 08/11/2023 | 234 | Unopposed MOTION to Seal *Plaintiff/Counter−Defendant Reply In Support of Motion for Summary Judgment* per Local Rule 5.4 by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Text of Proposed Order Proposed Order Granting Motion to File Under Seal Reply ISO MSJ) (Jimenez, Marcos) (Entered: 08/11/2023) |
| 08/11/2023 | | SYSTEM ENTRY − Docket Entry 235 [motion] restricted/sealed until further notice. (520625) (Entered: 08/11/2023) |
| 08/11/2023 | | SYSTEM ENTRY − Docket Entry 236 [motion] restricted/sealed until further notice. (520625) (Entered: 08/11/2023) |
| 08/11/2023 | | SYSTEM ENTRY − Docket Entry 237 [motion] restricted/sealed until further notice. (520625) (Entered: 08/11/2023) |
| 08/11/2023 | | SYSTEM ENTRY − Docket Entry 238 [motion] restricted/sealed until further notice. (520625) (Entered: 08/11/2023) |
| 08/11/2023 | | SYSTEM ENTRY − Docket Entry 239 [motion] restricted/sealed until further notice. (520625) (Entered: 08/11/2023) |
| 08/11/2023 | 240 | Unopposed MOTION to Seal per Local Rule 5.4 by AerSale Inc.. (Attachments: # 1 Text of Proposed Order) (Rudolph, Amelia) (Entered: 08/11/2023) |
| 08/11/2023 | 241 | Defendant's REPLY to 232 Response/Reply (Other),,,, 230 Response/Reply (Other) *AerSale's Reply Brief in Support of Its Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment* by AerSale Inc.. (Attachments: # 1 AerSale's Reply Statement of Material Facts, # 2 Affidavit of Justin E. Gray, # 3 Index of Exhibits, # 4 Exhibit WW, # 5 Exhibit XX (Filed Under Seal), # 6 Exhibit YY (Filed Under Seal), # 7 Exhibit ZZ (Filed Under Seal), # 8 Exhibit AAA (Filed Under Seal), # 9 Exhibit BBB (Filed Under Seal), # 10 Exhibit CCC, # 11 Exhibit DDD)(Rudolph, Amelia) (Entered: 08/11/2023) |
| 08/11/2023 | 242 | Defendant's REPLY to 226 Response/Reply (Other),,, *AerSale's Reply Brief in Support of Motions in Limine* by AerSale Inc.. (Rudolph, Amelia) (Entered: 08/11/2023) |
| 08/11/2023 | 243 | Defendant's REPLY to 227 Response/Reply (Other), *AerSale's Reply Brief in Support of Daubert Motion to Exclude the Testimony of Bill Ashworth* by AerSale Inc.. (Rudolph, Amelia) (Entered: 08/11/2023) |

| 08/11/2023 | 244 | Defendant's REPLY to 225 Response in Opposition to Motion, *AerSale's Reply Brief in Support of Daubert Motion to Exclude the Testimony of Justin R. Blok* by AerSale Inc.. (Rudolph, Amelia) (Entered: 08/11/2023) |
|---|---|---|
| 08/11/2023 | 245 | REPLY *Statement of Material Facts in Support of Plaintiff/Counter−Defendants' Motion for Summary Judgment (DE 201)* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Exhibit 41. Deposition Excerpt of M. Williams (Filed Under Seal), # 2 Exhibit 42. Deposition Excerpt of R. Moyer (Filed Under Seal), # 3 Exhibit 43. Deposition Excerpt of M. Williams (Filed Under Seal), # 4 Affidavit Declaration of J. McDonough)(Jimenez, Marcos) (Entered: 08/11/2023) |
| 08/11/2023 | 246 | REPLY *in Support of Plaintiff/Counter−Defendants' Motion for Summary Judgment (DE 201)* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Jimenez, Marcos) (Entered: 08/11/2023) |
| 08/14/2023 | | SYSTEM ENTRY − Docket Entry 247 [misc] restricted/sealed until further notice. (1098998) (Entered: 08/14/2023) |
| 08/14/2023 | | SYSTEM ENTRY − Docket Entry 248 [misc] restricted/sealed until further notice. (1098998) (Entered: 08/14/2023) |
| 08/14/2023 | | SYSTEM ENTRY − Docket Entry 249 [misc] restricted/sealed until further notice. (1098998) (Entered: 08/14/2023) |
| 08/14/2023 | | SYSTEM ENTRY − Docket Entry 250 [misc] restricted/sealed until further notice. (1098998) (Entered: 08/14/2023) |
| 08/14/2023 | | SYSTEM ENTRY − Docket Entry 251 [misc] restricted/sealed until further notice. (1098998) (Entered: 08/14/2023) |
| 08/14/2023 | | SYSTEM ENTRY − Docket Entry 252 [misc] restricted/sealed until further notice. (1098998) (Entered: 08/14/2023) |
| 08/14/2023 | | SYSTEM ENTRY − Docket Entry 253 [misc] restricted/sealed until further notice. (1098998) (Entered: 08/14/2023) |
| 08/14/2023 | 254 | PAPERLESS ORDER granting 240 Defendant/Counter−Plaintiff Aersale, Inc.'s Unopposed Motion Seal. The filings shall remain under seal for five (5) years or until further order of the Court. Plaintiff/Counter−Defendant's 234 Unopposed Motion to File Reply in Support of Motion for Summary Judgment Under Seal is DENIED AS MOOT. The Court has already granted leave for the parties to file their respective response/reply briefs under seal on or before August 14, 2023. *See* [ECF No. 233]. For all future filings the parties seek to file under seal, the parties shall seek leave of the Court to file said motions, briefs, and/or documents under seal and await the Court's ruling on said motions before filing their respective motions, briefs, or documents. Signed by Judge Darrin P. Gayles on 8/14/2023. (mja) (Entered: 08/14/2023) |
| 08/14/2023 | | SYSTEM ENTRY − Docket Entry 255 [misc] restricted/sealed until further notice. (1098998) (Entered: 08/14/2023) |
| 08/14/2023 | | SYSTEM ENTRY − Docket Entry 256 [misc] restricted/sealed until further notice. (1098998) (Entered: 08/14/2023) |
| 08/14/2023 | | SYSTEM ENTRY − Docket Entry 257 [misc] restricted/sealed until further notice. (1098998) (Entered: 08/14/2023) |
| 08/15/2023 | | SYSTEM ENTRY − Docket Entry 258 [motion] restricted/sealed until further notice. (520625) (Entered: 08/15/2023) |
| 08/15/2023 | | SYSTEM ENTRY − Docket Entry 259 [motion] restricted/sealed until further notice. (520625) (Entered: 08/15/2023) |
| 08/15/2023 | 260 | Clerk's Notice to Filer re 258 and 259 − SEALED MOTIONS. ERROR − The Filer selected the wrong events. These are not motions. The docket text was corrected/motions were terminated by the Clerk. It is not necessary to refile these documents. (scn) (Entered: 08/15/2023) |

| | | |
|---|---|---|
| 08/17/2023 | <u>261</u> | TRANSCRIPT of Discovery Hearing held on 05/19/2022 before Ch. Magistrate Judge Edwin G. Torres, 1−39 pages, Court Reporter: Bonnie Joy Lewis, 954−985−8875. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/7/2023. Redacted Transcript Deadline set for 9/18/2023. Release of Transcript Restriction set for 11/15/2023. (jgo) (Entered: 08/18/2023) |
| 09/05/2023 | <u>262</u> | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Scott Penner. Filing Fee $ 200.00 Receipt # AFLSDC−16894480 by AerSale Inc.. Responses due by 9/19/2023 (Attachments: # <u>1</u> Text of Proposed Order)(Rudolph, Amelia) (Entered: 09/05/2023) |
| 09/05/2023 | 263 | PAPERLESS ORDER granting <u>262</u> Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Attorney Scott Penner is permitted to appear before this Court on behalf of Defendant AerSale, Inc. for all purposes relating to this action. The clerk is directed to provide Notice of Electronic Filings to Mr. Penner at scottpenner@eversheds−sutherland.com. Signed by Judge Darrin P. Gayles on 9/5/2023. (bs00) (Entered: 09/05/2023) |
| 09/13/2023 | <u>264</u> | Joint MOTION to Amend/Correct 218 Order on Motion for Extension of Time,,,, Order on Motion to Amend/Correct,,, <u>191</u> Order on Motion to Amend/Correct,, by AerSale Inc.. Responses due by 9/27/2023 (Attachments: # <u>1</u> Text of Proposed Order)(Rudolph, Amelia) (Entered: 09/13/2023) |
| 09/13/2023 | 265 | PAPERLESS ORDER granting the Parties' <u>264</u> Joint Motion to Modify Scheduling Order. The Motion is granted as follows:<br><br>(1)The Party with the burden of proof shall exchange pretrial disclosures (Witness List, Exhibit List, and Deposition Designations for witnesses unavailable for trial) on or before October 17, 2023;<br><br>(2)The Party without the burden of proof shall exchange pretrial disclosures (Witness List, Exhibit List, and Deposition Designations for witnesses unavailable for trial) on or before October 23, 2023;<br><br>(3)The Parties shall exchange objections to pretrial disclosures previously disclosed by the Party with the burden of proof on or before October 23, 2023;<br><br>(4)The Parties shall exchange objections to pretrial disclosures previously disclosed by the Party without the burden of proof on or before October 30, 2023;<br><br>(5)Joint pretrial stipulation, proposed joint jury instructions, proposed joint verdict form, and/or proposed findings of fact and conclusions of law shall be filed on or before November 6, 2023; and<br><br>(6)This matter is reset for jury trial during the Courts two−week trial calendar beginning on Monday, December 4, 2023. The Telephonic Calendar Call will be held at 9:30 A.M. on Wednesday, November 29, 2023.<br><br>Signed by Judge Darrin P. Gayles on 9/13/2023. (bs00) (Entered: 09/13/2023) |
| 09/14/2023 | | Reset Hearings Per DE#265. Calendar Call set for 11/29/2023 09:30 AM before Judge Darrin P. Gayles. Jury Trial set for 12/4/2023 before Judge Darrin P. Gayles. (cqs) (Entered: 09/14/2023) |
| 09/14/2023 | <u>266</u> | ORDER granting <u>169</u> Motion for Reconsideration re <u>169</u> MOTION for Reconsideration re <u>155</u> Order Adopting Report and Recommendations, Order on Report and Recommendations − Special Master *and Supporting Memorandum of Law* filed by Jetaire Aerospace, LLC. Signed by Judge Darrin P. Gayles on 9/14/2023. *See attached document for full details.* (bs00) (Entered: 09/14/2023) |
| 09/18/2023 | <u>267</u> | Unopposed MOTION to Withdraw as Attorney *Justin E. Gray* by Amelia Toy Rudolph for / by AerSale Inc.. Responses due by 10/2/2023 (Attachments: # <u>1</u> Text of Proposed Order)(Rudolph, Amelia) (Entered: 09/18/2023) |

| | | |
|---|---|---|
| 09/19/2023 | 268 | PAPERLESS ORDER granting 267 Unopposed Motion For Leave to Withdraw Appearance as Counsel. Attorney Justin E. Gray, of the law firm Eversheds Sutherland (US) LLP, shall be withdrawn as counsel of record for Defendant AerSale, Inc. Defendant AerSale, inc. shall continue to be represented by the law firm Eversheds Sutherland (US) LLP. Signed by Judge Darrin P. Gayles on 9/19/2023. (bs00) (Entered: 09/19/2023) |
| 09/29/2023 | 269 | PAPERLESS ORDER granting, in part, and denying, in part, 164 Plaintiff/Counter−Defendants' Motion to Dismiss Defendant/Counter−Plaintiff's Third Amended Counterclaims [Dkt. No. 159]. A detailed paper order shall follow. Signed by Judge Darrin P. Gayles on 9/29/2023. (bs00) (Entered: 09/29/2023) |
| 10/16/2023 | 270 | Joint MOTION to Modify Scheduling Order *265 Order on Motion to Modify Scheduling Order* by AerSale Inc.. Responses due by 10/30/2023 (Rudolph, Amelia) Modified text on 10/17/2023 (kpe). (Entered: 10/16/2023) |
| 10/17/2023 | 271 | PAPERLESS ORDER granting the Parties' 270 Joint Motion to Modify Scheduling Order. The Motion is granted as follows: <br><br>(1)The Party with the burden of proof shall exchange pretrial disclosures (Witness List, Exhibit List, and Deposition Designations for witnesses unavailable for trial) on or before December 1, 2023; <br><br>(2)The Party without the burden of proof shall exchange pretrial disclosures (Witness List, Exhibit List, and Deposition Designations for witnesses unavailable for trial) on or before December 1, 2023; <br><br>(3)The Parties shall exchange objections to pretrial disclosures previously disclosed by the Party with the burden of proof on or before December 15, 2023; <br><br>(4)The Parties shall exchange objections to pretrial disclosures previously disclosed by the Party without the burden of proof on or before December 15, 2023; <br><br>(5)Joint pretrial stipulation, proposed joint jury instructions, proposed joint verdict form, and/or proposed findings of fact and conclusions of law shall be filed on or before January 10, 2024; and <br><br>(6)This matter is reset for jury trial during the Courts two−week trial calendar beginning on Monday, February 12, 2024. The Telephonic Calendar Call will be held at 9:30 A.M. on Wednesday, February 7, 2024. <br><br>Signed by Judge Darrin P. Gayles on 10/17/2023. (bs00) (Entered: 10/17/2023) |
| 11/17/2023 | 272 | Notice of Ninety Days Expiring by AerSale Inc. re 199 Defendant's MOTION Under Rule 702 and Daubert to Exclude Testimony from Bill Ashworth filed by AerSale Inc., 200 Defendant's MOTION Under Rule 702 and Daubert to Exclude Testimony from Justin Blok filed by AerSale Inc. (Rudolph, Amelia) (Entered: 11/17/2023) |
| 11/22/2023 | 273 | Defendant's Expedited Motion Modification of Scheduling Order re 271 Order on Motion to Amend/Correct, 265 Order on Motion to Amend/Correct, 218 Order on Motion for Extension of Time, Order on Motion to Amend/Correct, 191 Order on Motion to Amend/Correct, by AerSale Inc.. (Rudolph, Amelia) (Entered: 11/22/2023) |
| 11/28/2023 | 274 | ORDER granting, in part, and denying, in part, 164 Plaintiff/Counter−Defendants' Motion to Dismiss Defendant/Counter−Plaintiff's Third Amended Counterclaims [Dkt. No. 159]. Signed by Judge Darrin P. Gayles on 11/28/2023. *See attached document for full details.* (bs00) (Entered: 11/28/2023) |
| 11/29/2023 | 275 | RESPONSE in Opposition re 273 Defendant's Expedited Motion Modification of Scheduling Order filed by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Replies due by 12/6/2023. (Jimenez, Marcos) (Entered: 11/29/2023) |
| 11/29/2023 | 276 | Defendant's REPLY to Response to Motion re 273 Defendant's Expedited Motion Modification of Scheduling Order filed by AerSale Inc.. (Rudolph, Amelia) (Entered: 11/29/2023) |

| 11/30/2023 | 277 | Defendant's REPLY to Response to Motion re 273 Defendant's Expedited Motion Modification of Scheduling Order *(Amended Reply)* filed by AerSale Inc.. (Rudolph, Amelia) (Entered: 11/30/2023) |
|---|---|---|
| 11/30/2023 | 278 | PAPERLESS ORDER granting 273 Defendant/Counter−Plaintiff AerSale, Inc.'s Expedited Motion to Modify Scheduling Order. The Motion is granted as follows:<br><br>(1)The Parties shall exchange pretrial disclosures (Witness List, Exhibit List, and Deposition Designations for witnesses unavailable for trial) on or before January 15, 2024;<br><br>(2)The Parties shall exchange objections to pretrial disclosures previously disclosed by the other Party on or before January 29, 2024;<br><br>(3)Joint pretrial stipulation, proposed joint jury instructions, proposed joint verdict form, and/or proposed findings of fact and conclusions of law shall be filed on or before February 20, 2024; and<br><br>(4)This matter is reset for jury trial during the Courts two−week trial calendar beginning on Monday, March 18, 2024. The Telephonic Calendar Call will be held at 9:30 A.M. on Wednesday, March 13, 2024.<br><br>Signed by Judge Darrin P. Gayles on 11/30/2023. (bs00) (Entered: 11/30/2023) |
| 11/30/2023 | | Set Hearings per DE 278 Order. Calendar Call set for 3/13/2024 09:30 AM before Judge Darrin P. Gayles. Jury Trial set for 3/18/2024 before Judge Darrin P. Gayles. (kpe) (Entered: 12/01/2023) |
| 12/08/2023 | 279 | PAPERLESS ORDER REFERRING CASE to Chief Magistrate Judge Edwin G. Torres for a ruling on all pre−trial, non−dispositive matters and for a Report and Recommendation on any dispositive matters. Signed by Judge Darrin P. Gayles on 12/8/2023. (bs00) (Entered: 12/08/2023) |
| 12/12/2023 | 280 | ANSWER to Counterclaim by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Jimenez, Marcos) (Entered: 12/12/2023) |
| 12/19/2023 | 281 | Unopposed MOTION to Seal *(AerSale's Motion to Amend Counterclaims)* per Local Rule 5.4 by AerSale Inc.. (Attachments: # 1 Text of Proposed Order) (Rudolph, Amelia) (Entered: 12/19/2023) |
| 12/19/2023 | 282 | MOTION to Amend/Correct *(Motion to Amend Counterclaims and Memorandum in Support) (REDACTED)* by AerSale Inc.. Responses due by 1/2/2024 (Attachments: # 1 Exhibit A (Proposed Fourth Amended Counterclaims) (REDACTED), # 2 Exhibit B (Declaration of Valerie S. Sanders) (REDACTED))(Rudolph, Amelia) (Entered: 12/19/2023) |
| 12/20/2023 | 283 | PAPERLESS ORDER granting 281 Motion to Seal. Aersale's Motion to Amend Counterclaims including exhibits, may be filed under seal without redactions or exclusions until further order of the Court. AerSale has filed a redacted version of the motion in the public record.<br><br>Signed by Chief Magistrate Judge Edwin G. Torres on 12/20/2023. (EGT) (Entered: 12/20/2023) |
| 12/20/2023 | 284 | PAPERLESS ORDER Setting Hearing/Status Conference on all pending motions:<br><br>Hearing on Motion 221 Plaintiff's SEALED MOTION for Summary Judgment, 220 Plaintiff's SEALED MOTION in Limine, 198 AerSale's MOTIONS in Limine, 282 MOTION to Amend/Correct Counterclaims,, 196 MOTION for Summary Judgment or, in the Alternative, Partial Summary Judgment SET for 1/9/2024 09:30 AM in Miami Division before Ch. Magistrate Judge Edwin G. Torres, United States Courthouse, James Lawrence King Bldg., Courtroom 5 − Tenth Floor, 99 N.E. 4th Street, Miami, Florida.<br><br>Signed by Chief Magistrate Judge Edwin G. Torres on 12/20/2023. (EGT) (Entered: 12/20/2023) |

| | | |
|---|---|---|
| 12/21/2023 | | SYSTEM ENTRY − Docket Entry 285 [misc] restricted/sealed until further notice. (1098998) (Entered: 12/21/2023) |
| 01/02/2024 | 286 | MOTION for Extension of Time to File Response/Reply/Answer as to 282 MOTION to Amend/Correct *(Motion to Amend Counterclaims and Memorandum in Support) (REDACTED)* by Michael D. Williams. (Attachments: # 1 Text of Proposed Order)(Jimenez, Marcos) (Entered: 01/02/2024) |
| 01/02/2024 | 287 | PAPERLESS ORDER granting Plaintiff and Counter−Defendants' (Collectively Jetaire) Opposed Motion for Extension of Time to Respond to Defendant/Counter−Plaintiffs Motion to Amend Counterclaims. Jetaire shall file its response on or before January 3, 2024. Signed by Judge Darrin P. Gayles on 1/2/2024. (bs00) (Entered: 01/02/2024) |
| 01/03/2024 | 288 | Unopposed MOTION to Seal per Local Rule 5.4 by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Text of Proposed Order) (Jimenez, Marcos) (Entered: 01/03/2024) |
| 01/03/2024 | 289 | PAPERLESS ORDER granting 288 Motion for Leave to File Under Seal the Response to Amend Counterclaims, filed by Plaintiff/Counterclaim Defendant Jetaire Aerospace, LLC and Counter−Defendants Jetaire Flight Systems, LLC and Michael D. Williams. The Clerk shall accept the sealed filing. A redacted version of the Response should also be filed on the public docket. Signed by Ch. Magistrate Judge Edwin G. Torres on 1/3/2024. (EGT) (Entered: 01/03/2024) |
| 01/03/2024 | 290 | Unopposed MOTION to Continue *January 9, 2024 Hearing* re 284 Order Setting Hearing on Motion,, by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Responses due by 1/17/2024 (Jimenez, Marcos) (Entered: 01/03/2024) |
| 01/03/2024 | 291 | RESPONSE in Opposition re 282 MOTION to Amend/Correct *(Motion to Amend Counterclaims and Memorandum in Support) (REDACTED)* filed by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Replies due by 1/10/2024. (Attachments: # 1 Exhibit Exhibit 1 − Response to Second Set of Interrogatories, # 2 Exhibit Exhibit 2 − Second Supp. to First Set of Interrogatories, # 3 Exhibit Exhibit 3 − JETAIR−0036710)(Jimenez, Marcos) (Entered: 01/04/2024) |
| 01/04/2024 | | SYSTEM ENTRY − Docket Entry 292 [misc] restricted/sealed until further notice. (520625) (Entered: 01/04/2024) |
| 01/04/2024 | 293 | PAPERLESS ORDER granting 290 Motion to Continue, for good cause shown and for the time period requested in the unopposed Motion. The Motions Hearing 284 is reset to 1/24/2024 at 09:30 AM. Signed by Ch. Magistrate Judge Edwin G. Torres on 1/4/2024. (jfz) (Entered: 01/04/2024) |
| 01/04/2024 | 294 | NOTICE of Hearing on Motion 221 Plaintiff's SEALED MOTION *for Summary Judgment*, 220 Plaintiff's SEALED MOTION *in Limine*, 198 MOTION in Limine *AerSale's Motions in Limine*, 282 MOTION to Amend/Correct Counterclaims, 196 MOTION for Summary Judgment *or, in the Alternative, Partial Summary Judgment* : A Motion Hearing is set for 1/24/2023 at 09:30 AM in the Miami Division before Chief Magistrate Judge Edwin G. Torres, James Lawrence King Federal Justice Building, 99 NE 4th Street, 10th Floor − Courtroom 5, Miami, FL 33132. (mdc) (Entered: 01/04/2024) |
| 01/04/2024 | 295 | CORRECTED NOTICE of Hearing on Motion 221 Plaintiff's SEALED MOTION *for Summary Judgment*, 220 Plaintiff's SEALED MOTION *in Limine*, 198 MOTION in Limine *AerSale's Motions in Limine*, 282 MOTION to Amend/Correct Counterclaims, 196 MOTION for Summary Judgment *or, in the Alternative, Partial Summary Judgment* : A Motion Hearing is set for 1/24/2024 at 09:30 AM in the Miami Division before Chief Magistrate Judge Edwin G. Torres, James Lawrence King Federal Justice Building, 99 NE 4th Street, 10th Floor − Courtroom 5, Miami, FL 33132. (mdc) (Entered: 01/04/2024) |

| 01/08/2024 | 296 | ORDER granting in limited part and otherwise denying 199 Motion to Exclude Expert Ashworth.<br><br>Signed by Chief Magistrate Judge Edwin G. Torres on 1/8/2024. *See attached document for full details.* (EGT) (Entered: 01/08/2024) |
|---|---|---|
| 01/08/2024 | 297 | ORDER denying 200 Motion to Exclude Expert Blok.<br><br>Signed by Chief Magistrate Judge Edwin G. Torres on 1/8/2024. *See attached document for full details.* (EGT) (Entered: 01/08/2024) |
| 01/10/2024 | 298 | Unopposed MOTION to Seal *(AerSale's Reply in Support of its Motion to Amend Counterclaims)* per Local Rule 5.4 by AerSale Inc.. (Attachments: # 1 Text of Proposed Order) (Rudolph, Amelia) (Entered: 01/10/2024) |
| 01/10/2024 | 299 | REPLY to Response to Motion re 282 MOTION to Amend/Correct *(Motion to Amend Counterclaims and Memorandum in Support) (REDACTED) (REDACTED)* filed by AerSale Inc.. (Rudolph, Amelia) (Entered: 01/10/2024) |
| 01/11/2024 | 300 | PAPERLESS ORDER granting 298 Unopposed Motion for Leave to File Under Seal the Reply to Amend Counterclaims, filed by Defendant/Counter−Plaintiff AerSale, Inc. The Clerk shall accept the sealed filing. A redacted version of the Reply should also be filed on the public docket.<br><br>Signed by Ch. Magistrate Judge Edwin G. Torres on 1/11/2024. (jfz) (Entered: 01/11/2024) |
| 01/11/2024 | | SYSTEM ENTRY − Docket Entry 301 [misc] restricted/sealed until further notice. (1098998) (Entered: 01/11/2024) |
| 01/19/2024 | 302 | Unopposed MOTION to Seal *Objection to Order* per Local Rule 5.4 by AerSale Inc.. (Rudolph, Amelia) (Entered: 01/19/2024) |
| 01/22/2024 | 303 | PAPERLESS ORDER granting 302 Defendant/Counter−Plaintiff AerSale, Inc.'s Unopposed Motion to Seal. Defendant may file under seal its Objection to Orders, [ECF Nos. 296 & 297], on Defendant's Motion to Exclude the Testimony of Justin Blok. Signed by Judge Darrin P. Gayles on 1/22/2024. (bs00) (Entered: 01/22/2024) |
| 01/22/2024 | 304 | MOTION to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing for Kristin M. Whidby. Filing Fee $ 200.00 Receipt # AFLSDC−17230989 by Jetaire Aerospace, LLC. Responses due by 2/5/2024. (Attachments: # 1 Text of Proposed Order)(Jimenez, Marcos) (Entered: 01/22/2024) |
| 01/22/2024 | | SYSTEM ENTRY − Docket Entry 305 [motion] restricted/sealed until further notice. (1098998) (Entered: 01/22/2024) |
| 01/22/2024 | 306 | Defendant's Notice *of filing Redacted Objection to Order [ECF No 296 & 297] on AerSale's Motion to Exclude Testimony of Mr. Blok* by AerSale Inc. re 296 Order on Motion for Miscellaneous Relief, 297 Order on Motion for Miscellaneous Relief. (Rudolph, Amelia) (Entered: 01/22/2024) |
| 01/22/2024 | 307 | MOTION to Strike 282 MOTION to Amend/Correct *(Motion to Amend Counterclaims and Memorandum in Support) (REDACTED)* 's Reliance On Third Party Declarations by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Responses due by 2/5/2024. (Jimenez, Marcos) (Entered: 01/22/2024) |
| 01/23/2024 | 308 | PAPERLESS ORDER granting 304 Motion to Appear Pro Hac Vice, Consent to Designation, and Request to Electronically Receive Notices of Electronic Filing. Kristin M. Whidby is permitted to appear before this Court on behalf of Plaintiff Jetaire Aerospace, LLC for all purposes relating to this action. The clerk is directed to provide Notice of Electronic Filings to Ms. Whidby, at: kristin@rhmtrial.com, service@rhmtrial.com. Signed by Judge Darrin P. Gayles on 1/23/2024. (bs00) (Entered: 01/23/2024) |
| 01/24/2024 | 309 | NOTICE of Attorney Appearance by Sofia Manzo on behalf of Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Attorney Sofia Manzo added to party Jetaire Aerospace, LLC(pty:pla), Attorney Sofia Manzo added to party Jetaire |

| | | |
|---|---|---|
| | | Flight Systems, LLC(pty:cd), Attorney Sofia Manzo added to party Michael D. Williams(pty:cd). (Manzo, Sofia) (Entered: 01/24/2024) |
| 01/24/2024 | 310 | PAPERLESS Minute Entry for proceedings held before Ch. Magistrate Judge Edwin G. Torres: **Motion Hearing held on 1/24/2024** re 282 MOTION to Amend/Correct *(Motion to Amend Counterclaims and Memorandum in Support) (REDACTED)* filed by AerSale Inc., 196 MOTION for Summary Judgment *or, in the Alternative, Partial Summary Judgment* filed by AerSale Inc., 221 Plaintiff's SEALED MOTION *for Summary Judgment* re DE# 211 Order on Motion to Seal,,, filed by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams, 220 Plaintiff's SEALED MOTION *in Limine* re DE# 211 Order on Motion to Seal,,, filed by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams, 198 MOTION in Limine *AerSale's Motions in Limine* filed by AerSale Inc. <br><br> Attorney Appearance(s): James F. McDonough, Kristin M. Whidby, Travis E. Lynch, Sofia Manzo, Marcos Daniel Jimenez, III, for Plaintiff; Scott Penner, Regis C. Worley, Jr, Valerie S. Sanders, Amelia Toy Rudolph, Shawn Rafferty for Defendants. Other appearances: Mike Williams for JetAire. <br><br> (Digital 9:45:41 and 13:32:30) Total time in court: 6 hour(s) : 37 minutes. (mdc) (Entered: 01/25/2024) |
| 01/26/2024 | 311 | Unopposed MOTION to Seal *Defendant/Counter−Plaintiff's Fourth Amended Counterclaims* per Local Rule 5.4 by AerSale Inc.. (Rudolph, Amelia) (Entered: 01/26/2024) |
| 01/26/2024 | 312 | Amended COUNTERCLAIM *Fourth Amended Counterclaim (Redacted)* against Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams, filed by AerSale Inc..(Rudolph, Amelia) (Entered: 01/26/2024) |
| 01/26/2024 | 313 | PAPERLESS ORDER granting 311 Defendant/Counter−Plaintiff AerSale, Inc.'s Unopposed Motion to Seal. Defendant may file under seal the customer information included in its Fourth Amended Counterclaims. Signed by Judge Darrin P. Gayles on 1/26/2024. (bs00) (Entered: 01/26/2024) |
| 01/26/2024 | | SYSTEM ENTRY − Docket Entry 314 [misc] restricted/sealed until further notice. (1098998) (Entered: 01/26/2024) |
| 01/26/2024 | | SYSTEM ENTRY − Docket Entry 315 [misc] restricted/sealed until further notice. (1098998) (Entered: 01/26/2024) |
| 02/01/2024 | 316 | TRANSCRIPT of Motion Hearing held on 1/24/2024 before Ch. Magistrate Judge Edwin G. Torres, 1−297 pages, Court Reporter: Joanne Mancari, jemancari@gmail.com. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/22/2024. Redacted Transcript Deadline set for 3/4/2024. Release of Transcript Restriction set for 5/1/2024. (jgo) (Entered: 02/02/2024) |
| 02/05/2024 | 317 | Unopposed MOTION to Seal per Local Rule 5.4 by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Supplement) (Jimenez, Marcos) (Entered: 02/05/2024) |
| 02/05/2024 | 318 | PAPERLESS ORDER granting Plaintiff/Counter−Defendant Jetaire Aerospace, LLC and Counter−Defendants Jetaire Flight Systems, LLC and Michael D. Williams' (collectively Jetaire) 317 Unopposed Motion to File Under Seal. Jetaire may file under seal the following: Jetaire's Response to Defendant/Counter−Plaintiff Aersale, Inc.'s Objection to Order [ECF Nos. 296 & 297] on Aersale's Motion to Exclude the Testimony of Justin R. Blok (ECF No. 306); and Jetaire's Amended Motion for Summary Judgment and Statement of Undisputed Material Facts. Signed by Judge Darrin P. Gayles on 2/5/2024. (bs00) (Entered: 02/05/2024) |
| 02/05/2024 | 319 | ANSWER to Counterclaim by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Jimenez, Marcos) (Entered: 02/05/2024) |
| 02/05/2024 | 320 | RESPONSE *to AerSale's Objection to Order Denying Motion to Exclude Testimony of J. Blok* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. |

| | | |
|---|---|---|
| | | (Jimenez, Marcos) (Entered: 02/05/2024) |
| 02/05/2024 | 321 | Statement of: *Amended Statement of Undisputed Material Facts In Support of Their Motion for Summary Judgment* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams (Attachments: # 1 Exhibit Exhibit 1 − Filed Under Seal, # 2 Exhibit Exhibit 2 − Filed Under Seal, # 3 Exhibit Exhibit 3 − Filed Under Seal, # 4 Exhibit Exhibit 4 − Filed Under Seal, # 5 Exhibit Exhibit 5 − Filed Under Seal, # 6 Exhibit Exhibit 6 − Filed Under Seal, # 7 Exhibit Exhibit 7 − Filed Under Seal, # 8 Exhibit Exhibit 8 − Filed Under Seal, # 9 Exhibit Exhibit 9 − Filed Under Seal, # 10 Exhibit Exhibit 10 − Filed Under Seal, # 11 Exhibit Exhibit 11 − Filed Under Seal, # 12 Exhibit Exhibit 12 − Filed Under Seal, # 13 Exhibit Exhibit 13 − Filed Under Seal, # 14 Exhibit Exhibit 14 − Filed Under Seal, # 15 Exhibit Exhibit 15 − Filed Under Seal, # 16 Exhibit Exhibit 16 − Filed Under Seal, # 17 Exhibit Exhibit 17 − Filed Under Seal)(Jimenez, Marcos) (Entered: 02/05/2024) |
| 02/05/2024 | 322 | Amended MOTION for Summary Judgment by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Responses due by 2/20/2024. (Jimenez, Marcos) (Entered: 02/05/2024) |
| 02/06/2024 | | SYSTEM ENTRY − Docket Entry 323 [misc] restricted/sealed until further notice. (520625) (Entered: 02/06/2024) |
| 02/06/2024 | | SYSTEM ENTRY − Docket Entry 324 [motion] restricted/sealed until further notice. (520625) (Entered: 02/06/2024) |
| 02/06/2024 | | SYSTEM ENTRY − Docket Entry 325 [misc] restricted/sealed until further notice. (520625) (Entered: 02/06/2024) |
| 02/06/2024 | 326 | Unopposed MOTION to Seal *Motion for Reconsideration of Order Denying in Part Motion to Amend* per Local Rule 5.4 by AerSale Inc.. (Rudolph, Amelia) (Entered: 02/06/2024) |
| 02/06/2024 | 327 | MOTION for Reconsideration re 310 Motion Hearing,,,,, *REDACTED* by AerSale Inc.. (Attachments: # 1 Exhibit Excerpts from Deposition of I. Nezaj (Redacted))(Rudolph, Amelia) (Entered: 02/06/2024) |
| 02/08/2024 | 328 | PAPERLESS ORDER granting 326 Defendant/Counter−Plaintiff AerSale, Inc.'s Unopposed Motion to Seal. Defendant may file under seal its 327 Motion for Reconsideration. Signed by Judge Darrin P. Gayles on 2/8/2024. (bs00) (Entered: 02/08/2024) |
| 02/08/2024 | | SYSTEM ENTRY − Docket Entry 329 [misc] restricted/sealed until further notice. (1098998) (Entered: 02/08/2024) |
| 02/08/2024 | | SYSTEM ENTRY − Docket Entry 330 [misc] restricted/sealed until further notice. (1098998) (Entered: 02/08/2024) |
| 02/08/2024 | | SYSTEM ENTRY − Docket Entry 331 [misc] restricted/sealed until further notice. (1098998) (Entered: 02/08/2024) |
| 02/12/2024 | | SYSTEM ENTRY − Docket Entry 332 [misc] restricted/sealed until further notice. (scn) (Entered: 02/12/2024) |
| 02/15/2024 | 333 | Unopposed MOTION to Seal per Local Rule 5.4 by AerSale Inc.. (Rudolph, Amelia) (Entered: 02/15/2024) |
| 02/15/2024 | 334 | Statement of: Disputed Material Facts and Response to Statement of Undisputed Facts by AerSale Inc. re 321 Statement,,, (Attachments: # 1 Exhibit (Filed Under Seal), # 2 Exhibit (Filed Under Seal), # 3 Exhibit (Filed Under Seal), # 4 Exhibit (Filed Under Seal), # 5 Exhibit (Filed Under Seal), # 6 Exhibit (Filed Under Seal), # 7 Exhibit (Filed Under Seal), # 8 Exhibit (Filed Under Seal), # 9 Exhibit (Filed Under Seal), # 10 Exhibit (Filed Under Seal), # 11 Exhibit (Filed Under Seal), # 12 Exhibit (Filed Under Seal), # 13 Exhibit (Filed Under Seal), # 14 Exhibit (Filed Under Seal))(Rudolph, Amelia) (Entered: 02/15/2024) |
| 02/15/2024 | 335 | RESPONSE to Motion re 322 Amended MOTION for Summary Judgment *(Redacted)* filed by AerSale Inc.. Replies due by 2/22/2024. (Rudolph, Amelia) (Entered: 02/15/2024) |

| 02/16/2024 | 336 | Defendant's NOTICE *Pursuant to 35 USC section 282* by AerSale Inc. (Rudolph, Amelia) (Entered: 02/16/2024) |
|---|---|---|
| 02/20/2024 | 337 | PAPERLESS ORDER granting 333 Defendant/Counter−Plaintiff AerSale, Inc.'s Unopposed Motion to Seal. Defendant/Counter−Plaintiff AerSale, Inc. may file under seal its response to Plaintiff/Counter−Defendants' Amended Motion for Summary Judgment. Signed by Judge Darrin P. Gayles on 2/20/2024. (bs00) (Entered: 02/20/2024) |
| 02/20/2024 | | SYSTEM ENTRY − Docket Entry 338 [misc] restricted/sealed until further notice. (1098998) (Entered: 02/20/2024) |
| 02/20/2024 | | SYSTEM ENTRY − Docket Entry 339 [misc] restricted/sealed until further notice. (1098998) (Entered: 02/20/2024) |
| 02/20/2024 | 340 | Unopposed MOTION to Seal per Local Rule 5.4 by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Text of Proposed Order) (Jimenez, Marcos) (Entered: 02/20/2024) |
| 02/20/2024 | 341 | RESPONSE in Opposition re 327 MOTION for Reconsideration re 310 Motion Hearing,,,,, *REDACTED* filed by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Replies due by 2/27/2024. (Jimenez, Marcos) (Entered: 02/20/2024) |
| 02/20/2024 | 342 | Joint MOTION for Extension of Time to file Joint Pretrial Stipulation, Proposed Joint Jury Instructions, and Proposed Joint Verdict Form re 278 Order on Expedited Motion,,, by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Responses due by 3/5/2024. (Attachments: # 1 Text of Proposed Order)(Jimenez, Marcos) (Entered: 02/20/2024) |
| 02/21/2024 | 343 | PAPERLESS ORDER granting, in part, the parties' 342 Joint Motion for Extension of Time given the complexity of this case and the number of motions still pending in this action. The joint pretrial stipulation, proposed joint jury instructions, proposed joint verdict form, and/or proposed findings of fact and conclusions of law shall be filed on or before May 24, 2024. This matter is specially reset for jury trial during the Court's two−week trial calendar beginning on Monday, June 24, 2024. The Telephonic Calendar Call will be held at 9:30 A.M. on Wednesday, June 12, 2024. Counsel shall enter their appearances telephonically using the following dial−in information: **Dial−in Number 305−990−2559; Access Code 374050271**. Please dial in at least ten minutes before the Calendar Call begins and wait until your case is called. Signed by Judge Darrin P. Gayles on 2/21/2024. (bs00) (Entered: 02/21/2024) |
| 02/22/2024 | 344 | PAPERLESS ORDER granting 340 Unopposed Motion to File Under Seal. Plaintiff/Counterclaim Defendant Jetaire Aerospace, LLC and Counter−Defendants Jetaire Flight Systems, LLC and Michael D. Williams (collectively "Jetaire") may file under seal Jetaire's Response to Defendant/Counter−Plaintiff Aersale, Inc.'s Motion for Reconsideration of Order Denying in Part AerSale's Motion to Amend, and Memorandum in Support (DE 327). Signed by Judge Darrin P. Gayles on 2/22/2024. (bs00) (Entered: 02/22/2024) |
| 02/22/2024 | | SYSTEM ENTRY − Docket Entry 345 [misc] restricted/sealed until further notice. (520625) (Entered: 02/22/2024) |
| 02/23/2024 | 346 | Unopposed MOTION to Seal *Portions of Transcript of January 24, 2024 Hearing* per Local Rule 5.4 by AerSale Inc.. (Rudolph, Amelia) (Entered: 02/23/2024) |
| 02/23/2024 | 347 | Unopposed MOTION to Seal *Plaintiff/Counter−Defendants' Motion to Strike Third Party Declaration Raised in Opposition to the Amended Motion for Summary Judgment* per Local Rule 5.4 by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Text of Proposed Order) (Jimenez, Marcos) (Entered: 02/23/2024) |
| 02/26/2024 | 348 | PAPERLESS ORDER granting 346 Defendant/Counter−Plaintiff AerSale, Inc.'s Unopposed Motion to Seal. Defendant/Counter−Plaintiff AerSale, Inc. may file under seal the transcript of the January 24, 2024 hearing and redact portions of the transcript that identify customer names or locations, or pricing information. Signed by Judge Darrin P. Gayles on 2/26/2024. (bs00) (Entered: 02/26/2024) |

| | | |
|---|---|---|
| 02/26/2024 | 349 | PAPERLESS ORDER granting 347 Unopposed Motion to File Under Seal. Plaintiff/Counterclaim Defendant Jetaire Aerospace, LLC and Counter−Defendants Jetaire Flight Systems, LLC and Michael D. Williams (collectively "Jetaire") may file under seal Jetaire's Motion to Strike Third Party Declaration Raised in Defendant/Counter−Plaintiffs Opposition to the Amended Motion for Summary Judgment. Signed by Judge Darrin P. Gayles on 2/26/2024. (bs00) (Entered: 02/26/2024) |
| 02/26/2024 | 350 | MOTION to Strike *Third Party Declaration Raised in Defendant/Counter−Plaintiff's Opposition to the Amended Motion for Summary Judgment* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Responses due by 3/11/2024. (Attachments: # 1 Exhibit Exhibit A − Filed Under Seal, # 2 Exhibit Exhibit B − Filed Under Seal, # 3 Exhibit Exhibit C − Filed Under Seal, # 4 Exhibit Exhibit D − Filed Under Seal, # 5 Exhibit Exhibit E − Filed Under Seal)(Jimenez, Marcos) (Entered: 02/26/2024) |
| 02/26/2024 | | SYSTEM ENTRY − Docket Entry 351 [motion] restricted/sealed until further notice. (520625) (Entered: 02/26/2024) |
| 02/26/2024 | 352 | Unopposed MOTION to Seal *Reply in Support of Motion for Reconsideration* per Local Rule 5.4 by AerSale Inc.. (Rudolph, Amelia) (Entered: 02/26/2024) |
| 02/27/2024 | 353 | PAPERLESS ORDER granting 352 Defendant/Counter−Plaintiff AerSale, Inc.'s Unopposed Motion to Seal. Defendant/Counter−Plaintiff AerSale, Inc. may file under seal its Reply in Support of its Motion for Reconsideration of Order Denying in Part AerSale's Motion to Amend. Signed by Judge Darrin P. Gayles on 2/27/2024. (bs00) (Entered: 02/27/2024) |
| 02/27/2024 | 354 | REPLY to Response to Motion re 327 MOTION for Reconsideration re 310 Motion Hearing,,,,, *REDACTED REDACTED* filed by AerSale Inc.. (Rudolph, Amelia) (Entered: 02/27/2024) |
| 02/27/2024 | | SYSTEM ENTRY − Docket Entry 355 [misc] restricted/sealed until further notice. (1098998) (Entered: 02/27/2024) |
| 03/08/2024 | 356 | Unopposed MOTION to Seal *Response to Motion to Strike Third−Party Declaration* per Local Rule 5.4 by AerSale Inc.. (Rudolph, Amelia) (Entered: 03/08/2024) |
| 03/11/2024 | 357 | RESPONSE in Opposition re 350 MOTION to Strike *Third Party Declaration Raised in Defendant/Counter−Plaintiff's Opposition to the Amended Motion for Summary Judgment (REDACTED)* filed by AerSale Inc.. Replies due by 3/18/2024. (Attachments: # 1 Exhibit A (redacted), # 2 Exhibit B, # 3 Exhibit C (filed under seal), # 4 Exhibit D (filed under seal), # 5 Exhibit E (filed under seal), # 6 Exhibit F (filed under seal))(Rudolph, Amelia) (Entered: 03/11/2024) |
| 03/12/2024 | 358 | PAPERLESS ORDER granting 356 Defendant/Counter−Plaintiff AerSale, Inc.'s Unopposed Motion to Seal. Defendant/Counter−Plaintiff AerSale, Inc. may file under seal its Response to Plaintiff/Counter−Defendants' Motion to Strike Third−Party Declaration. Signed by Judge Darrin P. Gayles on 3/12/2024. (bs00) (Entered: 03/12/2024) |
| 03/12/2024 | | SYSTEM ENTRY − Docket Entry 359 [misc] restricted/sealed until further notice. (1098998) (Entered: 03/12/2024) |
| 03/15/2024 | | SYSTEM ENTRY − Docket Entry 360 [misc] restricted/sealed until further notice. (1098998) (Entered: 03/15/2024) |
| 03/18/2024 | 361 | Unopposed MOTION to Seal per Local Rule 5.4 by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Text of Proposed Order) (Jimenez, Marcos) (Entered: 03/18/2024) |
| 03/18/2024 | 362 | REPLY to Response to Motion re 350 MOTION to Strike *Third Party Declaration Raised in Defendant/Counter−Plaintiff's Opposition to the Amended Motion for Summary Judgment* filed by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Jimenez, Marcos) (Entered: 03/18/2024) |
| 03/20/2024 | 363 | PAPERLESS ORDER granting 361 Unopposed Motion to File Under Seal. Plaintiff/Counterclaim Defendant Jetaire Aerospace, LLC and Counter−Defendants Jetaire Flight Systems, LLC and Michael D. Williams (collectively "Jetaire") may file |

| | | |
|---|---|---|
| | | under seal Jetaire's Reply in Support of its Motion to Strike Third Party Declaration Raised in Defendant/Counter−Plaintiff's Opposition to the Amended Motion for Summary Judgment. Signed by Judge Darrin P. Gayles on 3/20/2024. (bs00) (Entered: 03/20/2024) |
| 03/20/2024 | | SYSTEM ENTRY − Docket Entry 364 [misc] restricted/sealed until further notice. (520625) (Entered: 03/20/2024) |
| 03/27/2024 | 365 | ORDER granting in part and denying in part 204 Motion to Compel expert depositions; Staying Order.<br><br>Signed by Ch. Magistrate Judge Edwin G. Torres on 3/27/2024. *See attached document for full details.* (EGT) (Entered: 03/27/2024) |
| 04/17/2024 | 366 | REPORT AND RECOMMENDATIONS re 196 Defendant / Counter−Plaintiff's motion for summary judgment filed by AerSale Inc.<br><br>Recommending motion be granted. Objections to R&R due by 5/1/2024.<br><br>Signed by Chief Magistrate Judge Edwin G. Torres on 4/17/2024. *See attached document for full details.* (ms03) (Entered: 04/17/2024) |
| 04/17/2024 | 367 | ORDER denying 350 Motion to Strike Third Party Declaration Raised in Defendant/Counter−Plaintiff's Opposition to the Amended Motion for Summary Judgment.<br><br>Signed by Ch. Magistrate Judge Edwin G. Torres on 4/17/2024. *See attached document for full details.* (EGT) (Entered: 04/17/2024) |
| 04/17/2024 | 368 | ORDER denying 351 Sealed Motion to Strike Third−party Declaration Raised in Counter−plaintiff's Opposition to the Amended Motion for Summary Judgment.<br><br>Signed by Ch. Magistrate Judge Edwin G. Torres on 4/17/2024. *See attached document for full details.* (EGT) (Entered: 04/17/2024) |
| 04/17/2024 | 369 | PAPERLESS ORDER granting in part and denying in part 282 Motion to Amend/Correct for the reasons fully set forth on the record of the hearing held 1/24/2024. In sum, the Court granted AerSales motion to amend with respect to the allegations concerning Eastern, but denied the motion with respect to the allegations concerning Azur. As to Azur, the Court determined that AerSale had not sufficiently disclosed the bases for its claims during discovery, such that permitting the amendment as to Azur would be prejudicial to Jetaire. The Court granted leave to move for reconsideration if necessary.<br><br>Signed by Ch. Magistrate Judge Edwin G. Torres on 4/17/2024. (EGT) (Entered: 04/17/2024) |
| 04/17/2024 | 370 | ORDER granting 327 Motion for Reconsideration filed by AerSale Inc. re its motion to amend counterclaims (granting motion to amend as to Azur); Ordering filing of amended counterclaim; Ordering supplementation of pending motion for summary judgment on counterclaims.<br><br>Signed by Ch. Magistrate Judge Edwin G. Torres on 4/17/2024. *See attached document for full details.* (EGT) (Entered: 04/17/2024) |
| 04/17/2024 | 371 | PAPERLESS ORDER denying 307 Jetaire's Motion to Strike 307 Reliance On Third Party Declarations cited in support of Counter−plaintiff's Motion to Amend Counterclaims, for the reasons fully set forth in the Court's Orders denying Jetaire's motion to strike declarations and granting Aersale's motion for reconsideration on the motion to amend counterclaims.<br><br>Signed by Ch. Magistrate Judge Edwin G. Torres on 4/17/2024. (EGT) (Entered: 04/17/2024) |
| 04/17/2024 | 372 | PAPERLESS ORDER denying as moot 221 Sealed Motion for Summary Judgment filed by Jetaire, following the filing of an amended motion for summary judgment by leave of court after the hearing held 1/24/2024. The amended motion remains pending. |

| | | |
|---|---|---|
| | | Signed by Ch. Magistrate Judge Edwin G. Torres on 4/17/2024. (EGT) (Entered: 04/17/2024) |
| 04/18/2024 | 373 | Unopposed MOTION to Seal *Fifth Amended Counterclaims* per Local Rule 5.4 by AerSale Inc.. (Rudolph, Amelia) (Entered: 04/18/2024) |
| 04/18/2024 | 374 | AMENDED COUNTERCLAIM *Fifth Amended Counterclaims (Redacted)* against Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams, filed by AerSale Inc.. (Rudolph, Amelia) (Entered: 04/18/2024) |
| 04/18/2024 | 375 | PAPERLESS ORDER granting 373 Motion to Seal Amended Counterclaim. The Court finds good cause to accept a sealed unredacted version of the Counter−plaintiff's Amended Counterclaim. The Clerk shall accept the sealed filing in accordance with the Court's Rules.<br><br>Signed by Ch. Magistrate Judge Edwin G. Torres on 4/18/2024. (EGT) (Entered: 04/18/2024) |
| 04/18/2024 | | SYSTEM ENTRY − Docket Entry 376 [misc] restricted/sealed until further notice. (1098998) (Entered: 04/18/2024) |
| 04/25/2024 | 377 | Joint MOTION for Extension of Time to File Objections and Coinciding Response re 366 REPORT AND RECOMMENDATIONS re 196 MOTION for Summary Judgment *or, in the Alternative, Partial Summary Judgment* filed by AerSale Inc. by Jetaire Flight Systems, LLC, Michael D. Williams. Responses due by 5/9/2024. (Jimenez, Marcos) (Entered: 04/25/2024) |
| 04/26/2024 | 378 | Unopposed MOTION to Seal per Local Rule 5.4 by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Text of Proposed Order) (Jimenez, Marcos) (Entered: 04/26/2024) |
| 04/26/2024 | 379 | PAPERLESS ORDER granting 378 unopposed motion to seal.<br><br>The Court finds good cause to grant the unopposed motion to seal. Plaintiff/Counterclaim Defendant Jetaire Aerospace, LLC and Counter−Defendants Jetaire Flight Systems, LLC and Michael D. Williams, may file under seal Plaintiff / Counter−Defendants' supplement to its Amended Motion for Summary Judgment as against AerSale's FifthAmended Counterclaims and supplemental statement of facts, declaration, and exhibits.<br><br>Signed by Chief Magistrate Judge Edwin G. Torres on 4/26/2024. (ms03) (Entered: 04/26/2024) |
| 04/26/2024 | 380 | PAPERLESS ORDER granting the parties 377 Joint Motion to Modify Briefing Schedule. Plaintiff/Counter−Defendants Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, and Michael Williams shall file their objections the 366 Report and Recommendation on or before May 3, 2024. Defendant/Counter−Plaintiff AerSale, Inc. shall files its response on or before May 20, 2024. Signed by Judge Darrin P. Gayles on 4/26/2024. (bs00) (Entered: 04/26/2024) |
| 04/26/2024 | 381 | SUPPLEMENT to 322 Amended MOTION for Summary Judgment by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams (Jimenez, Marcos) (Entered: 04/26/2024) |
| 04/26/2024 | 382 | Statement of: *Reply Statement of Material Facts and Supplemental Statement of Material Facts In Support of Their Motion for Summary Judgment* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams re 381 Supplement (Attachments: # 1 Affidavit Declaration of James F. McDonough, III, # 2 Exhibit Exhibit 41 − Rebuttal Expert Report of Bill Ashworth (Filed Under Seal), # 3 Exhibit Exhibit 42 − Expert Report of Justin R. Blok (Filed Under Seal), # 4 Exhibit Exhibit 43 − Transcript Excerpt of Deposition of Michael Williams (Filed Under Seal), # 5 Exhibit Exhibit 44 − Transcript Excerpt of Deposition of Ronald C. Moyer (Filed Under Seal), # 6 Exhibit Exhibit 45 − Transcript Excerpt of Deposition of Michael Williams (Filed Under Seal), # 7 Exhibit Exhibit 46 − Declaration of Michael Williams (Filed Under Seal), # 8 Exhibit Exhibit 47 − Transcript Excerpt of Deposition of Iso Nezaj (Filed Under Seal), # 9 Exhibit Exhibit 48 − Transcript Excerpt of Deposition of Nicolas Finazzo (Filed Under Seal), # 10 Exhibit Exhibit 49 |

| | | |
|---|---|---|
| | | − AERSALE009120 (Filed Under Seal), # 11 Exhibit Exhibit 50 − AERSALE0027863 (Filed Under Seal), # 12 Exhibit Exhibit 51 − AERSALE0027480−27502 (Filed Under Seal), # 13 Exhibit Exhibit 52 − AERSALE0027146−28166 (Filed Under Sea), # 14 Exhibit Exhibit 53 − AERSALE0032263 (Filed Under Seal))(Jimenez, Marcos) (Entered: 04/26/2024) |
| 04/26/2024 | | SYSTEM ENTRY − Docket Entry 383 [misc] restricted/sealed until further notice. (520625) (Entered: 04/26/2024) |
| 04/26/2024 | | SYSTEM ENTRY − Docket Entry 384 [misc] restricted/sealed until further notice. (520625) (Entered: 04/26/2024) |
| 05/02/2024 | 385 | Unopposed MOTION to Seal *Response to Supplement to Motion for Summary Judgment* per Local Rule 5.4 by AerSale Inc.. (Rudolph, Amelia) (Entered: 05/02/2024) |
| 05/02/2024 | 386 | PAPERLESS ORDER granting 385 unopposed motion to seal. The Court finds good cause to grant the unopposed motion to seal. Defendant/Counterclaim Plaintiff, AerSale, Inc., may file under seal the customer information included in its response to Plaintiffs/Counterclaim Defendants' Supplement in Support of Counterclaim Defendants' Motion for Summary Judgment. Signed by Chief Magistrate Judge Edwin G. Torres on 5/2/2024. (ms03) (Entered: 05/02/2024) |
| 05/02/2024 | 387 | ANSWER to Counterclaim *Answer to Defendant/Counter−Plaintiff Aersale, Inc.'s Fifth Amended Counterclaims* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Jimenez, Marcos) (Entered: 05/02/2024) |
| 05/02/2024 | 388 | Unopposed MOTION to Seal *Plaintiff/Counter−Defendants' Objection to the Report and Recommendation on Defendant/Counter−Plaintiff's Motion for Summary Judgment* per Local Rule 5.4 by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Text of Proposed Order) (Jimenez, Marcos) (Entered: 05/02/2024) |
| 05/03/2024 | 389 | PAPERLESS ORDER granting 388 Unopposed Motion to File Under Seal. Plaintiff/Counterclaim Defendant Jetaire Aerospace, LLC and Counter−Defendants Jetaire Flight Systems, LLC and Michael D. Williams (collectively "Jetaire") may file under seal Jetaire's Objection to the Report and Recommendation on Defendant/Counter−Plaintiff's Motion for Summary Judgment (DE 366). Signed by Judge Darrin P. Gayles on 5/3/2024. (bs00) (Entered: 05/03/2024) |
| 05/03/2024 | 390 | RESPONSE *(REDACTED)* to Supplemental Statement of Material Facts by AerSale Inc.. (Attachments: # 1 Exhibit Exhibit A (filed under seal), # 2 Exhibit B (filed under seal), # 3 Exhibit C (filed under seal), # 4 Exhibit D (filed under seal), # 5 Exhibit E (filed under seal), # 6 Exhibit F (filed under seal))(Rudolph, Amelia) (Entered: 05/03/2024) |
| 05/03/2024 | 391 | RESPONSE to 381 Supplement *(REDACTED)* by AerSale Inc.. (Rudolph, Amelia) (Entered: 05/03/2024) |
| 05/03/2024 | | SYSTEM ENTRY − Docket Entry 392 [misc] restricted/sealed until further notice. (1098998) (Entered: 05/03/2024) |
| 05/03/2024 | | SYSTEM ENTRY − Docket Entry 393 [misc] restricted/sealed until further notice. (1098998) (Entered: 05/03/2024) |
| 05/03/2024 | 394 | OBJECTIONS to 366 Report and Recommendations by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Jimenez, Marcos) (Entered: 05/03/2024) |
| 05/06/2024 | | SYSTEM ENTRY − Docket Entry 395 [misc] restricted/sealed until further notice. (520625) (Entered: 05/06/2024) |
| 05/15/2024 | 396 | Joint MOTION to Stay re 343 Order on Motion for Extension of Time,,, by AerSale Inc.. Responses due by 5/29/2024. (Attachments: # 1 Text of Proposed Order)(Rudolph, Amelia) (Entered: 05/15/2024) |

| | | |
|---|---|---|
| 05/16/2024 | 397 | PAPERLESS ORDER granting the parties' 396 Joint Motion to Stay Deadlines. The remaining deadlines in the Court's Amended Scheduling Order, [ECF No. 343], shall be stayed pending the Court's ruling on the dispositive motions. This matter shall be set for Telephonic Status Conference set for **August 14, 2024 at 10:00 AM** before Judge Darrin P. Gayles. Counsel shall enter their appearances telephonically using the following dial−in information: **Dial−in Number 305−990−2559; Conference ID 374 050 271#**. Please dial in at least ten minutes before the Status Conference begins and wait until your case is called. Signed by Judge Darrin P. Gayles on 5/16/2024. (bs00) (Entered: 05/16/2024) |
| 05/17/2024 | 398 | REPORT AND RECOMMENDATIONS re 322 Counter−Defendants' Amended Motion for Summary Judgment. Recommending motion be granted in part.<br><br>Objections to R&R due by 5/31/2024.<br><br>Signed by Chief Magistrate Judge Edwin G. Torres on 5/17/2024. *See attached document for full details.* (ms03) (Entered: 05/17/2024) |
| 05/20/2024 | 399 | Unopposed MOTION to Seal *AerSale's Response to in Opposition to Plaintiff/Counter−Defendants' Objections to the Report and Recommendation Regarding Summary Judgment* per Local Rule 5.4 by AerSale Inc.. (Attachments: # 1 Text of Proposed Order) (Rudolph, Amelia) (Entered: 05/20/2024) |
| 05/20/2024 | 400 | PAPERLESS ORDER granting 399 Defendant/Counter−Plaintiff AerSale, Inc.'s Unopposed Motion to Seal. Defendant/Counter−Plaintiff AerSale, Inc. may file under seal its Response to Plaintiff/Counter−Defendants' Objections to the Report and Recommendation Regarding Summary Judgment. Signed by Judge Darrin P. Gayles on 5/20/2024. (bs00) (Entered: 05/20/2024) |
| 05/20/2024 | | SYSTEM ENTRY − Docket Entry 401 [misc] restricted/sealed until further notice. (1098998) (Entered: 05/20/2024) |
| 05/20/2024 | 402 | REDACTION to 394 Objections to Report and Recommendations *Defendant/Counter−Plaintiff AerSale, Inc.'s Response in Opposition to Plaintiff/Counter−Defendants' Objections to the Report and Recommendation Regarding Summary Judgment [redacted version of DE # 401]* by AerSale Inc.. (Rudolph, Amelia) (Entered: 05/20/2024) |
| 05/28/2024 | 403 | MOTION for Leave to File *Reply in Support of Their Objections to Report and Recommendation Regarding Aersale's Motion for Summary Judgment* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Exhibit Reply)(Jimenez, Marcos) (Entered: 05/28/2024) |
| 05/30/2024 | 404 | Unopposed MOTION to Seal *Objections to Report and Recommendation on Counter−Defendants' Motion for Summary Judgment* per Local Rule 5.4 by AerSale Inc.. (Rudolph, Amelia) (Entered: 05/30/2024) |
| 05/31/2024 | 405 | PAPERLESS ORDER granting 404 Defendant/Counter−Plaintiff AerSale, Inc.'s Unopposed Motion to Seal. Defendant/Counter−Plaintiff AerSale, Inc. may file under seal its Objections to the Report and Recommendation on Counter−Defendants' Motion for Summary Judgment. Signed by Judge Darrin P. Gayles on 5/31/2024. (bs00) (Entered: 05/31/2024) |
| 05/31/2024 | 406 | OBJECTIONS to 398 Report and Recommendations *(REDACTED)* by AerSale Inc.. (Rudolph, Amelia) (Entered: 05/31/2024) |
| 05/31/2024 | | SYSTEM ENTRY − Docket Entry 407 [misc] restricted/sealed until further notice. (1098998) (Entered: 05/31/2024) |
| 06/11/2024 | 408 | RESPONSE in Opposition re 403 MOTION for Leave to File *Reply in Support of Their Objections to Report and Recommendation Regarding Aersale's Motion for Summary Judgment* filed by AerSale Inc.. Replies due by 6/18/2024. (Rudolph, Amelia) (Entered: 06/11/2024) |
| 06/14/2024 | 409 | Unopposed MOTION to Seal per Local Rule 5.4 by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Text of Proposed Order) (Jimenez, Marcos) (Entered: 06/14/2024) |

| 06/14/2024 | 410 | RESPONSE TO OBJECTION to 398 Report and Recommendations *(Dkt. No. 406) − PUBLIC VERSION (Confidential Information Redacted)* by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Whidby, Kristin) (Entered: 06/14/2024) |
|---|---|---|
| 06/17/2024 | 411 | PAPERLESS ORDER granting 409 Unopposed Motion to File Under Seal. Plaintiff/Counterclaim−Defendant Jetaire Aerospace, LLC and Counter−Defendants Jetaire Flight Systems, LLC and Michael D. Williams (collectively "Jetaire") may file under seal Jetaire's Response to Defendant/Counter−Plaintiff's Objections to the Report and Recommendation on Plaintiff/Counterclaim Defendants' Motion for Summary Judgment (DE 406). Signed by Judge Darrin P. Gayles on 6/17/2024. (bs00) (Entered: 06/17/2024) |
| 06/17/2024 | | SYSTEM ENTRY − Docket Entry 412 [misc] restricted/sealed until further notice. (520625) (Entered: 06/17/2024) |
| 06/18/2024 | 413 | PAPERLESS ORDER denying 403 Jetaire's Motion for Leave to File Reply in Support of their Objections to Report and Recommendation Regarding AerSale's Motion for Summary Judgment. The Court does not find that a reply brief is warranted. Signed by Judge Darrin P. Gayles on 6/18/2024. (bs00) (Entered: 06/18/2024) |
| 08/01/2024 | 414 | ORDER: Defendant/Counter−Plaintiff AerSale, Inc.'s (AerSale) Objection to Order [ECF Nos. 296 & 297] on AerSale's Motion to Exclude the Testimony of Justin R. Blok, [ECF No. 305], is OVERRULED; and Magistrate Judge Torres' Order, [ECF Nos. 296, 297], is AFFIRMED. Signed by Judge Darrin P. Gayles on 8/1/2024. *See attached document for full details.* (scn) (Entered: 08/01/2024) |
| 08/09/2024 | 415 | ORDER Adopting 366 Report and Recommendation on Defendant/Counter−Plaintiff's Motion for Summary Judgment. Certificate of Appealability: No Ruling. Signed by Judge Darrin P. Gayles on 8/9/2024. *See attached document for full details.* (bs00) (Entered: 08/09/2024) |
| 08/14/2024 | 416 | PAPERLESS Minute Entry for proceedings held before Judge Darrin P. Gayles: Telephonic Status Conference held on 8/14/2024. All parties present. Total time in court: 5 minutes. Court Reporter: Quanincia Hill, 305−523−5634 / Quanincia_Hill@flsd.uscourts.gov. (bs00) (Entered: 08/14/2024) |
| 08/14/2024 | 417 | PAPERLESS ORDER Setting Telephonic Status Conference set for September 25, 2024 at 10:00 AM in Miami Division before Judge Darrin P. Gayles. Counsel shall enter their appearances telephonically using the following dial−in information: **Dial−in Number 305−990−2559; Conference ID 374 050 271#.** Please dial in at least ten minutes before the Status Conference begins and wait until your case is called. Signed by Judge Darrin P. Gayles on 8/14/2024. (bs00) (Entered: 08/14/2024) |
| 09/04/2024 | 418 | ORDER Adopting 398 Report and Recommendations on Counter−Defendants' Motion for Summary Judgment. Certificate of Appealability: No Ruling. Signed by Judge Darrin P. Gayles on 9/4/2024. *See attached document for full details.* (bs00) (Entered: 09/04/2024) |
| 09/05/2024 | 419 | PAPERLESS ORDER: Denying as Moot Defendant/Counter−Plaintiff's Motions in Limine 198 , as all of the issues raised in the motion have been mooted by the Court's Orders on the parties' motions for summary judgment. [D.E. 415, 418]. Signed by Ch. Magistrate Judge Edwin G. Torres on 9/5/2024. (scn) (Entered: 09/05/2024) |
| 09/05/2024 | 420 | PAPERLESS ORDER: Denying as Moot Plaintiff/Counter−Defendant's Motion in Limine 220 , as all of the issues raised in the motion have been mooted by the Court's Orders on the parties' motions for summary judgment. [D.E. 415, 418]. Signed by Ch. Magistrate Judge Edwin G. Torres on 9/5/2024. (scn) (Entered: 09/05/2024) |
| 09/09/2024 | 421 | Unopposed MOTION for Extension of Time to File Motion for Attorneys' Fees and to Tax Costs by AerSale Inc.. Responses due by 9/23/2024. (Rudolph, Amelia) (Entered: 09/09/2024) |
| 09/10/2024 | 422 | PAPERLESS ORDER granting 421 Defendant/Counter−Plaintiff AerSale, Inc.'s Unopposed Motion for Extension of Time to File Motion for Attorney's Fees and to Tax Costs. AerSale shall file and serve its bill of costs and any motion for an award of attorney's fees and/or non−taxable expenses and costs within ninety (90) days of entry |

| | | |
|---|---|---|
| | | of the final judgment. Signed by Judge Darrin P. Gayles on 9/10/2024. (bs00) (Entered: 09/10/2024) |
| 09/23/2024 | 423 | FINAL JUDGMENT: Final Judgment is entered in favor of Defendant/Counter−Plaintiff AerSale, Inc. and against Plaintiff/Counter−Defendant Jetaire Aerospace, LLC on all counts of Plaintiff's Complaint, and on Counts I−VI of Defendant's Fifth Amended Counterclaims. Final Judgment is entered in favor of Counter−Defendants Jetaire Aerospace, LLC; Jetaire Flight Systems, LLC; and Michael Williams, and against Defendant/Counter−Plaintiff AerSale, Inc., on Counts X and XI of Defendant's Fifth Amended Counterclaims. CLOSING CASE. Signed by Judge Darrin P. Gayles on 9/23/2024. *See attached document for full details.* (caw) (Entered: 09/23/2024) |
| 10/08/2024 | 424 | EXPEDITED MOTION for a Limited Reopening of Discovery and to Compel Response to AerSale's Interrogatory No. 1 by AerSale Inc.. (Attachments: # 1 Affidavit Declaration of Regis C. Worley, Jr. in Support of AerSale, Inc's Expedited Motion For a Limited Reopening of Discovery and to Compel Response to AerSale's Interrogatory No. 1)(Rudolph, Amelia) (Entered: 10/08/2024) |
| 10/08/2024 | 425 | ORDER re: 424 Expedited Motion to Reopen Discovery to Move to Compel Interrogatory: Upon review of the motion and supporting record, Plaintiff is Ordered to respond to the motion, raising any procedural objection as well as any substantive arguments on the underlying discovery request, by no later than 10/18/2024. Signed by Ch. Magistrate Judge Edwin G. Torres on 10/8/2024. *See attached document for full details.* (EGT) (Entered: 10/08/2024) |
| 10/18/2024 | 426 | RESPONSE in Opposition re 424 EXPEDITED MOTION for a Limited Reopening of Discovery and to Compel Response to AerSale's Interrogatory No. 1 filed by Jetaire Aerospace, LLC. Replies due by 10/25/2024. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Whidby, Kristin) (Entered: 10/18/2024) |
| 10/23/2024 | 427 | Notice of Appeal *to the Federal Circuit Court of Appeals* as to 423 Judgment,, 296 Order on Motion for Miscellaneous Relief, 415 Order on Report and Recommendations, by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Filing fee $ 605.00 receipt number AFLSDC−17930840. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all−forms. (Whidby, Kristin) (Entered: 10/23/2024) |
| 10/24/2024 | | Transmission of Notice of Appeal, Orders/Judgment under appeal, and Docket Sheet to US Court of Appeals for the Federal Circuit re 427 Notice of Appeal, Notice has been electronically mailed. (apz) (Entered: 10/24/2024) |
| 10/25/2024 | 428 | Defendant's REPLY to Response to Motion re 424 EXPEDITED MOTION for a Limited Reopening of Discovery and to Compel Response to AerSale's Interrogatory No. 1 filed by AerSale Inc.. (Rudolph, Amelia) (Entered: 10/25/2024) |
| 10/29/2024 | 429 | ORDER granting 424 Expedited Motion to Reopen Discovery for Limited Purpose. Signed by Chief Magistrate Judge Edwin G. Torres on 10/29/2024. *See attached document for full details.* (ms03) (Entered: 10/29/2024) |
| 10/29/2024 | 430 | Acknowledgment of Receipt of NOA from USCA re 427 Notice of Appeal, filed by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Date received by USCA: 10/29/2024. USCA for the Federal Circuit Case Number: 2025−1127. (apz) (Entered: 11/05/2024) |
| 11/06/2024 | 431 | Notice of Cross Appeal *re DE 423 Final Judgment, DE 266 Order, DE 274 Order, DE 296 Order, DE 297 Order, DE 369 Order, DE 414 Order, DE 418 Order* by AerSale Inc. Filing fee $ 605.00 receipt number BFLSDC−17965191. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to |

| | | |
|---|---|---|
| | | FRAP 10(b)]. For information go to our FLSD website under All Forms and look for Transcript Order Form www.flsd.uscourts.gov/forms/all−forms. (Rudolph, Amelia) Modified text on 11/7/2024 (apz). (Entered: 11/06/2024) |
| 11/06/2024 | 432 | TRANSCRIPT ORDER FORM filed by Jetaire Aerospace, LLC re 427 Notice of Appeal,, filed by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. No Transcript Requested. (Whidby, Kristin) (Entered: 11/06/2024) |
| 11/06/2024 | 433 | Clerk's Notice to Filer re 431 Notice of Cross Appeal. **Document Not Linked**; ERROR − The filed document was not linked to the related docket entries. The correction was made by the Clerk. It is not necessary to refile this document. (apz) (Entered: 11/07/2024) |
| 11/07/2024 | | Transmission of Notice of Cross Appeal and Docket Sheet to US Court of Appeals for the Federal Circuit re 431 Notice of Cross Appeal, Notice has been electronically mailed. (apz) (Entered: 11/07/2024) |
| 11/14/2024 | 434 | Acknowledgment of Receipt of NOA from USCA for the Federal Circuit re 431 Notice of Cross Appeal, filed by AerSale Inc. Date received by USCA: 11/14/2024. USCA for the Federal Circuit Case Number: 2025−1177. (apz) Modified text on 11/21/2024 (apz). (Entered: 11/21/2024) |
| 12/23/2024 | 435 | Defendant's MOTION to Seal *AerSale, Inc.'s Motion for Attorneys' Fees and Certain Exhibits to the Declaration of Regis C. Worley, Jr. in Support of AerSale, Inc.'s Motion for Attorneys' Fees* per Local Rule 5.4 by AerSale Inc.. (Attachments: # 1 Text of Proposed Order) (Rudolph, Amelia) (Entered: 12/23/2024) |
| 12/23/2024 | 436 | Defendant's MOTION to Tax Costs by AerSale Inc.. Responses due by 1/6/2025. (Attachments: # 1 Exhibit Memorandum in Support of Bill of Costs, # 2 Exhibit Declaration of Shawn Rafferty in Support of Bill of Costs)(Rudolph, Amelia) (Entered: 12/23/2024) |
| 12/23/2024 | | SYSTEM ENTRY − Docket Entry 437 [motion] restricted/sealed until further notice. (1098998) (Entered: 12/23/2024) |
| 12/23/2024 | 438 | Defendant's MOTION for Attorney Fees *DEFENDANT/COUNTER−PLAINTIFF AERSALE, INC.'S MOTION FOR ATTORNEYS' FEES* by AerSale Inc.. Responses due by 1/6/2025. (Attachments: # 1 Exhibit Declaration of Regis C. Worley in Support of AerSale Inc.'s Motion for Attorneys' Fees, # 2 Exhibit Declaration of Shawn Rafferty in Support of AerSale Inc.'s Motion for Attorneys' Fees, # 3 Text of Proposed Order AerSale Inc.'s Proposed Order on AerSale Inc.'s Motion for Attorneys' Fees)(Rudolph, Amelia) (Entered: 12/23/2024) |
| 12/27/2024 | 439 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 436 Defendant's MOTION to Tax Costs , 438 Defendant's MOTION for Attorney Fees *DEFENDANT/COUNTER−PLAINTIFF AERSALE, INC.'S MOTION FOR ATTORNEYS' FEES* by Jetaire Aerospace, LLC. (Attachments: # 1 Text of Proposed Order)(Whidby, Kristin) (Entered: 12/27/2024) |
| 12/27/2024 | 440 | PAPERLESS ORDER granting 439 Motion for Extension of Time to File Response. The Court finds good cause to grant the requested, unopposed extension. Plaintiff/Counter−Defendants must file their response to Defendant/Counter−Plaintiff's Motion for Attorneys Fees and Costs on or before 1/21/2025. Signed by Chief Magistrate Judge Edwin G. Torres on 12/27/2024. (ms03) (Entered: 12/27/2024) |
| 12/27/2024 | 441 | PAPERLESS ORDER referring this action to Chief Magistrate Judge Edwin G. Torres for all post−judgment matters, including attorneys' fees. Signed by Judge Darrin P. Gayles on 12/27/2024. (bs00) (Entered: 12/27/2024) |
| 01/15/2025 | 442 | REDACTED TRANSCRIPT of Motion Hearing held on 1/24/2024 before Ch. Magistrate Judge Edwin G. Torres, 1−297 pages, re: 431 Notice of Cross Appeal, 427 Notice of Appeal. Court Reporter: Joanne Mancari, jemancari@gmail.com. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/5/2025. |

| | | Redacted Transcript Deadline set for 2/18/2025. Release of Transcript Restriction set for 4/15/2025. (apz) (Entered: 01/21/2025) |
|---|---|---|
| 01/21/2025 | 443 | RESPONSE in Opposition re 436 Defendant's MOTION to Tax Costs filed by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. Replies due by 1/28/2025. (Whidby, Kristin) (Entered: 01/21/2025) |
| 01/21/2025 | 444 | MOTION to Seal *their Opposition, and exhibits in support thereof, to 438 AerSale's Motion For Attorneys' Fees* per Local Rule 5.4 by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams. (Attachments: # 1 Text of Proposed Order) (Whidby, Kristin) (Entered: 01/21/2025) |
| 01/21/2025 | 445 | RESPONSE in Opposition re 438 Defendant's MOTION for Attorney Fees *DEFENDANT/COUNTER−PLAINTIFF AERSALE, INC.'S MOTION FOR ATTORNEYS' FEES* filed by Jetaire Aerospace, LLC. Replies due by 1/28/2025. (Attachments: # 1 McDonough Declaration, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19)(Whidby, Kristin) (Entered: 01/21/2025) |
| 01/28/2025 | 446 | Defendant's REPLY in Support of Motion re 438 Defendant's MOTION for Attorney Fees *DEFENDANT/COUNTER−PLAINTIFF AERSALE, INC.'S MOTION FOR ATTORNEYS' FEES. DEFENDANT/COUNTER−PLAINTIFF AERSALE, INC.S REPLY IN SUPPORT OF ITS MOTION FOR ATTORNEYS FEES* filed by AerSale Inc.. (Attachments: # 1 Affidavit Declaration of Regis C. Worley, Jr., # 2 Exhibit Exhibit N, # 3 Exhibit Exhibit O, # 4 Exhibit Exhibit P)(Rudolph, Amelia) (Entered: 01/28/2025) |
| 01/31/2025 | 447 | RESPONSE in Opposition re 444 MOTION to Seal *their Opposition, and exhibits in support thereof, to 438 AerSale's Motion For Attorneys' Fees* per Local Rule 5.4 filed by AerSale Inc.. Replies due by 2/7/2025. (Attachments: # 1 Exhibit Pre−filing correspondence)(Rudolph, Amelia) (Entered: 01/31/2025) |
| 03/27/2025 | 448 | Notice of Ninety Days Expiring by AerSale Inc. re 435 Defendant's MOTION to Seal *AerSale, Inc.'s Motion for Attorneys' Fees and Certain Exhibits to the Declaration of Regis C. Worley, Jr. in Support of AerSale, Inc.'s Motion for Attorneys' Fees* per Local Rule 5.4 filed by AerSale Inc. (Rudolph, Amelia) (Entered: 03/27/2025) |
| 04/18/2025 | 449 | PAPERLESS ORDER REFERRING CASE to Magistrate Judge Edwin G. Torres for all post−trial proceedings. Signed by Judge Darrin P. Gayles on 4/18/2025. (mp02) (Entered: 04/18/2025) |
| 04/21/2025 | 450 | PAPERLESS ORDER REFERRING 437 Defendant's SEALED MOTION *DEFENDANT/COUNTER−PLAINTIFF AERSALE, INC.'S MOTION FOR ATTORNEYS' FEES* re DE# 405 Order on Motion to Seal, filed by AerSale Inc to Magistrate Judge Edwin G. Torres. (mp02) (Entered: 04/21/2025) |
| 04/22/2025 | 451 | PAPERLESS ORDER granting 435 Motion to Seal Exhibits.<br><br>The Court finds good cause to grant the Motion, and permits AerSale, Inc. to file under seal the relevant exhibits to the declaration of Regis C. Worley, Jr. A redacted version of the exhibits should also be filed on the public docket.<br><br>Signed by Ch. Magistrate Judge Edwin G. Torres on 4/22/2025. (MJS) (Entered: 04/22/2025) |
| 04/22/2025 | 452 | PAPERLESS ORDER granting 444 Motion to Seal. The Court finds good cause to grant the Motion. Jetaire may file under seal its Response to AerSale's Motion for Attorneys' Fees, as well as supporting exhibits, provided that Jetaire files redacted versions of the documents on the public record.<br><br>Signed by Ch. Magistrate Judge Edwin G. Torres on 4/22/2025. (MJS) (Entered: 04/22/2025) |
| 04/22/2025 | 453 | Notice of Ninety Days Expiring by AerSale Inc. re 436 Defendant's MOTION to Tax Costs filed by AerSale Inc. (Rudolph, Amelia) (Entered: 04/22/2025) |

| 05/05/2025 | | SYSTEM ENTRY − Docket Entry 454 [misc] restricted/sealed until further notice. (2168952) (Entered: 05/05/2025) |

Page Left Blank

1

THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO.:  20-cv-25144-DPG

JETAIRE AEROSPACE, LLC,            )
                                  )
                Plaintiff,        )          May 19, 2022
                                  )
v.                                )
                                  )
AERSALE, INC.,                    )          Pages 1 - 39
                                  )
                Defendant.        )
_____/

DISCOVERY HEARING

BEFORE THE HONORABLE EDWIN G. TORRES
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

On behalf of the Plaintiff:

                HENINGER GARRISON DAVIS, LLC
                3621 Vinings Slope,
                Suite 4320,
                Atlanta, GA 30339
                BY:  JAMES F. MCDONOUGH, III, ESQ.

APPEARANCES CONTINUED:


Counsel on behalf of Defendant:

                         EVERSHEDS SUTHERLAND (US) LLP
                         999 Peachtree Street, NE
                         Suite 2300,
                         Atlanta, GA 30309-3996
                         BY:  VALERIE S. SANDERS, ESQ.




Transcribed By:
                         BONNIE JOY LEWIS, R.P.R.
                         7001 SW 13 Street
                         Pembroke Pines, FL  33023
                         954-985-8875
                         caselawrptg@gmail.com

(Thereupon, the following proceeding was held:)

THE COURT:  Good morning.  Have a seat.

MR. MCDONOUGH:  Good morning, Your Honor.

THE COURTROOM DEPUTY:  Calling the case of Jetaire Aerospace LLC versus AerSale, Inc.; Case Number 20-cv-25144--Judge Gayles.

Counsel, please state your appearances for the record starting with the Plaintiff.

MR. MCDONOUGH:  Good morning.  James McDonough for the Plaintiff.

MS. SANDERS:  Valerie Sanders for the Defendant AerSale, Inc.

THE COURT:  Good morning.

This is a discovery hearing I believe requested by the Defendant, right, Miss Sanders?

MS. SANDERS:  That's correct, Your Honor.

THE COURT:  What is the most important issue that you want to tackle?

MS. SANDERS:  May I remove the mask while I am speaking?

THE COURT:  Sure.

MS. SANDERS:  Thank you, sir.

The most important issue is the failure to respond to a set of discovery requests served by my client in its capacity as counterclaim Plaintiff.

To provide a brief, very brief orientation, the Plaintiff is Jetaire Aerospace LLC, which has asserted patent infringement claims against my client AerSale.

AerSale, in turn, has asserted counterclaims not only against the Plaintiff, but against two additional counterclaim Defendants Mr. Williams and a related company Jetaire Flight Systems.  And so that is why we've got a second and fourth set of requests that are seeking the same thing from two different set of folks.

The requests, as I mentioned, seek information fairly relevant to the counterclaims.  I am not sure that is even in dispute anymore.  We are (inaudible) at the moment, but the timeline is important here as well.

Bottom line is we have received no responsive documents.  And indeed, have not, as far as I can tell, received any e-mails.  This is a request largely for e-mails and communications.

We have received no e-mails for the time period following the conclusion of the prior arbitration between the parties which is, of course, what is at issue here because the arbitration concluded what happened before was part of the arbitration, we received exactly nothing for the period following that.

Let's turn into the timeline for these requests which is critically important here.  These requests were served on

February 1st. The other side asked all three counterclaim Defendants are represented by Mr. McDonough. They asked for a week's extension in responding. We agreed to that. They responded on March 8th asserting objections to everything; no documents.

We didn't think the objections were well taken. I sent a note to Mr. McDonough laying out our concerns on March 11th. He and I spoke on March 15th and I sent him a detailed note following that. All of which is in the source materials I provided to the Court a few days ago.

At the end of the March 15th call, Mr. McDonough and I agreed it was time to find a hearing. He were at a stalemate. I contacted chambers on March 23rd and got some dates and were back and forth between the parties about that.

No mention at any point about, hey, maybe we don't need a hearing. Maybe we can work with you and maybe we will withdraw some objections. Nothing. Just here are the dates that we can do. See you in Miami.

On April 5th we filed a notice of compliance as required by the Court's rules setting out the issues to be heard today. That was six --

THE COURT: What was your understanding of the initial dispute when you had your first discussion with them?

MS. SANDERS: The objections that they initially took in their March 8th responses and largely sort of withdrew at

4:00 yesterday.

THE COURT:   But was the understanding of the issue?

MS. SANDERS:   Well, the issue is they objected to providing e-mails in response to any of our requests.

THE COURT:   Okay.

MS. SANDERS:   So they had a slew of objections in their March 8th response.   What we didn't like about them, we talked it through.   They said, sorry, disagreement.   We have to go and speak to Judge Torres.

THE COURT:   Okay.

MS. SANDERS:   So here we are.   So that was six weeks ago and nothing happened in the six weeks.   I didn't hear from them.

THE COURT:   When was the hearing set?

MS. SANDERS:   The hearing was set on -- well, March 23rd I believe is when I got back to your clerk.   At the very latest, April 5th is when we filed under compliance.

THE COURT:   So I guess we didn't have a hearing date before --

MS. SANDERS:   Correct.   There might have been one last week that one side or the other couldn't make, but this is the date we were able to get --

THE COURT:   Okay.

MS. SANDERS:   -- that worked for everyone.

So, you know, six weeks ago we set the hearing date.

They objected to everything and we are getting their documents.

Yesterday at 4:31 as I am getting ready to go to the airport, an e-mail comes through saying here are some supplemental responses.  They are really amended responses because what they do is withdraw all but one objection and we still have problems with that one and I will get to that one in a moment.

But they say, oh, well, we already produced documents after all.  No documents enclosed.  Nothing said about what that will look like, or specifically what they are doing, or when to expect it.  So that happened yesterday.

So, you know, it seems like progress and that's good.  But, again, we have no documents and no explanation and notably no phone call.

I mean, I sent source materials to the Court three or four days ago on Sunday copying opposing counsel.  If this had been, oh, we forgot to tell her we are going to retract some of those, we've talked to our client, that is certainly would serve as a reminder, but that didn't happen.

So, Your Honor, I will speak in a moment about the remaining objection and why that is not well taken.  We certainly are pleased that there has now been a proffer without much detail to produce responsive or at least to search for responsive documents, but I am constrained to note that this is not the first time that this has happened.

The prior hearing before the Court in person in Miami was on January 27th.  I didn't attend.  My colleague Mr. Wirley (phonetic) did.  On that occasion we received supplemental responses 23 minutes before the hearing started.

And that was on the patent side and those issues remaining unresolved to the point where the second issue -- so what I just described to the Court is outlined in the first point of our notice of compliance.

The second point is an overdue supplement.  That supplement was promised to us on -- they said we will get it to you by March 18th.  Then they said, no, it is going to be March 21st and it never came and we never heard anything else.

We followed up with them on April 1st and April 14th and no supplement, despite the fact that they agreed to provide, until again yesterday.

And honestly, I don't have a substantive reaction to the supplement provided yesterday afternoon on the second part of our notice of compliance, but they did finally provide something.

So where does that leave us from AerSale's perspective?  We would ask that the Court -- well, let me talk about the one objection that they continue to assert, I think.  These requests seek communications with certain third parties between their clients and certain third parties that refer to our client.

The tort counterclaims are for tortious interference and defamation and we have identified certain categories of recipients such as aircraft -- excuse me -- (inaudible) or equipment providers who are likely to do business with both. So we said let's have -- again for this very narrow time period starting in 2020 and then we had communications with those folks referring to us.

Finally, yesterday, they said, well, okay we will look for those. Except that we are going to cut it off, they say, as of the date you, AerSale, filed your counterclaim because, you know, you didn't say that we are still continuing to do it because you couldn't consistent with Rule 11 is their position.

And so their position appears to be that if their client sent a customer an e-mail yesterday saying AerSale is horrible and they lie and they cheat and steal, that is not discoverable in this case.

So we absolutely see no basis for them bringing the production up through the present up through the time of production. That is the only objection. That end date is the only objection they continue to assert.

We certainly believe and ask the Court that that objection be overruled. We would also ask that the Court --

THE COURT: What date do you propose?

MS. SANDERS: Well, I think the general rule is as of the time the documents are produced. And then, you know, the

10

supplementation obligation is governed by Rule 26.  So there could be a follow-on supplementation obligation, but certainly the time of production.  There is no reason to cut it off sooner.

We would also ask the Court to establish a date certain by which this production that has now been agreed to is going to be made.

THE COURT:  When is that discovery cutoff?

MS. SANDERS:  It is now August 26th.  It had been July 1st when a lot of this was going on, but the Court has recently moved it to August 26th, but still not so very far away.  We need to take depositions, including, potentially third party ones.  These are the documents at the heart of our case.  So we would ask that a date certain be established for production.

I am constrained also to request that the Court order Jetaire or its attorneys to pay my clients for its expenses under Rule 37 in connection with today's hearing.  This is not the first time this has happened.

As we know, Rule 37 contemplates not only what happens if a motion to compel is granted, but also what happens, quote, if discovery is provided after the motion was filed, end quote.

I certainly don't think discovery has fully been provided, but I certainly do think that if there was going to be a material change in position that might have obviated the

need for this hearing.

I submit it was up to Jetaire to let us and the Court know in sufficient time to try to avoid taking up the Court's time and, frankly, having my client spend money to have me here today.

So that's what we ask.  Thank you, Your Honor.

THE COURT:  And just so I understand the objection that you are talking about -- well, let me back up a step.

I am not clear on what the supplement that you received yesterday provides.

MS. SANDERS:  And Your Honor, I am afraid I don't have a copy with me.  Mr. McDonough can correct me, but I believe that they stated their original -- it's the same.  I won't use the word boilerplate, except I just did.  It is the same objection to each request originally.

It is also the same objection to each request now.  However, some of the other objections about the start date or it might not be in our position our gone.  It doesn't say they are withdrawing, but they are not in the new response.  The new response, however, does still say we will only search for documents created up until the date you filed your counterclaims.

And that is the objection that we could ask that the Court overrule, which I understand to be the only remaining objection.  Though, Mr. McDonough, of course, can speak to that

better than I can do.  I looked at it quickly last night.

THE COURT:  Okay.  And that would be response to, for example, give me a request for production that --

MS. SANDERS:  So there are two sets.  It depends on which one you are looking at.  One of them starts with 95 and one of them starts with 84.  They are the four -- any communications between Jetaire and then it will say something like aircraft flyers or aircraft owners.  They should be highlighted be on the Sunday copies.

THE COURT:  On the Sunday copies?

MS. SANDERS:  I sent the source materials this past Sunday.  So if that is what the Court has in front of it, they should be highlighted in the responses.  These are, again, the ones that have or are superseded now by yesterday's.

THE COURT:  Oh, I see.  I'm sorry.  I thought there was only one.

MS. SANDERS:  They are of a kind.

THE COURT:  Yes, I see what you are saying.  I see what you are saying.  Okay.  I got you now.  I am at your highlighted copy.

MS. SANDERS:  Okay.  Great.  Thank you.

THE COURT:  So the original -- so do I have the supplement that you got yesterday?

MS. SANDERS:  Not from me.  I don't know if Mr. McDonough's team submitted it or not.

THE COURT:  Do you know if that was e-mailed to us?

MR. MCDONOUGH:  I did not e-mail that to you, but I can have that e-mailed to you.

THE COURT:  Okay.  Well, let me hear from you first, then, I guess.

MS. SANDERS:  Thank you, Your Honor.

MR. MCDONOUGH:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. MCDONOUGH:  Okay.  So I would just like to sort of reset the table here a little bit after what I heard.

So this dispute that led to this really goes back to our last hearing.  So at our last hearing there was a request for production that was served by AerSale that said -- and again, I am paraphrasing, but any document including e-mails that mentions the name AerSale or AerSafe.

You denied that particular request saying it was overbroad because of their competitors, et cetera.  And so two days later, or maybe it was three days later, we got about 60 RFPs served on us that asked for -- you have them in front of you, I suppose.  It asked for all documents, including e-mails, that mention AerSale and a lessee of an aircraft or an equity investor in an aircraft.

And so what effectively was done was that almost equally broad search terms were provided in the RFP as was prior because a lot of the narrowing terms or I suppose

14

narrowing terms of a lessee of an aircraft that is every single person that Jetaire would probably be talking to about selling one of the (inaudible) to or selling some of the other products that they offer to market to.

So we originally objected to that saying, look, this was exactly what you were just denied this and you turn around and serve 60 RFPs across three different Defendants asking for essentially the same thing or any possible combination that you could think of with AerSale or AerSafe.  So we object on that.

We had a call on that.  We discussed the potential of doing an e-mail of search terms.  It was suggested that the only reason that you denied the request for the first time was because you maybe thought that there were too many documents that would have been returned in a search like that.

Anyway, we had disagreed and came to an impasse on that.  And there was also, as you know and as was brought up a minute ago, the objection as to the timing of, like, as of the date of the counterclaims is what we believe is the date where the cutoff on that discovery should stop.

They are going back to the date of the arbitration mainly because it is a counterclaim for defamation and tortious interference based on past events.  They say we said this and we said that.  It is not pled as a continuing tort.  Like, for instance, a patent infringement.  Some does and it is incorporated into a product.  They are still going to

15

(inaudible) some resolution that the Court decides that there is infringement or there isn't and there is (inaudible) involved in all this.  So this is two counterclaims based on past events.

And by the way, there has been no evidence produced in this case by AerSale that there was any defamation or -- we have one statement that is produced that is an e-mail from --

MS. SANDERS:  Excuse me.  I would just caution you not to name any customers, if you would, that was AEO information.  I don't know if you were going to.  Sorry, but I had to.

Thank you.

MR. MCDONOUGH:  Should we put this -- we would like to have this under --

MS. SANDERS:  I suspect you can say we are going to say without actually naming any customers, but if you are going to, then, yes, it would have to be sealed.

THE COURT:  Just say customer.

MR. MCDONOUGH:  Customer.  I was distracted in my train of thought there.

THE COURT:  You were saying about that you were arguing about the date and, then, you were going to give me an example of why that would be relevant.

MR. MCDONOUGH:  Okay.  So I was just saying that as of today, you don't have any evidence produced from the other side that there was any statement, right?

That they are apparently on a fishing expedition trying to find something that maybe our client has said along the way that may be interpreted as defamation and tortious interference.

We have asked for production and we've gotten one e-mail that has a customer saying that Mike said -- Mike our client -- said that AerSale has a patent problem and that was it.

And so the request to go into (inaudible) is particularly offensive, I would say, when there is no evidence that my client has done anything or said anything.  In fact, since the last hearing and last arbitration, the same timeframes were alleged.  They were unable to prove that.

And let's just say our client is very careful about what he says.  And so the idea of going through all the e-mails up until now, I guess, and searching for really anybody that had the name where AerSale came up, it is just overbroad.  The scope of the case doesn't justify it.  But, anyway, that is sort of a source of dispute.

Yesterday when we are coming over to the hearing and, you know, we were trying to narrow the disputes, we ended up saying, okay, fine.  Basically we will look for anything prior to the timeframe (inaudible) that has the name AerSale on it, right?

Because, you know, it just seemed that we could come

17

to an agreement on search terms or on something else that we have not had a meeting on yet.  And so we dropped those objections, but we maintain the objection that we have over here for no reason is wrong that sanctions should be granted because we come here today and there is no issue.  I mean, you know, there is still the issue of the date of the counterclaim.  So I understand how this could have been avoided.

THE COURT:  Well, let me ask you this question.

After your initial objections, which you are basically saying this is basically what we already argued back in the prior hearing.  And so, then, did you suggest to narrow it to a particular product?  Did you do that part of it?

MR. MCDONOUGH:  Well, actually, I did not suggest terms to (inaudible).  Except there are a few RFPs in there that do name specific customers and you will see them in there.

THE COURT:  Okay.

MR. MCDONOUGH:  We didn't object to -- I'm not going to mention the names, but they are in the RFPs that you have.

THE COURT:  Okay.

MR. MCDONOUGH:  Maybe counsel knows the actual RFP numbers, but there are some where there are actual customer names.  We did not interpose that objection about it being overbroad and not relevant in light of the news of the case.

And so where there are specific names we agree that's something that is manageable.

THE COURT:  Okay.

MR. MCDONOUGH:  What I did do was actually pose to opposing counsel if you have a way to narrow it, we will happy to consider it.  But, as is, we're not going to assert to you.  It seems like the identical of RFPs that was previous and it's not I guess in a different form it served in 30 different segments.

And so I did suggest to opposing counsel to me you are the one serving document requests and I don't feel as though -- except for the customer names, like I agreed to, you should be the one that is (inaudible), right?

I did ask them and nothing came about it and our conversation was a little bit heated.  But, ultimately, we were not able to come to an agreement on narrowing.  But I did ask if (inaudible).  She asked me to narrow, just as you suggested to, and I don't have any ideas except for customer names.

THE COURT:  Okay.  Well, I guess, since the -- did you actually try to see how much communications would actually be responsive to some of these?  Have you already done that search?

MR. MCDONOUGH:  Well, so --

THE COURT:  Have you been just doing kind of arguing in theory?

MR. MCDONOUGH:  So this is part of the conversation I had with opposing counsel.  It was the same idea and how many

are there and the search.  And so after the call we did do a search for -- we tried to search based on the terms that were in the RFPs, but like equity investor (inaudible) because they are not things that you would use in every day terminology, I don't think.

So we reverted back to, okay, just AerSale or just AerSafe, which is actually the name of the product.  And so we did that and then by the time we looked through for privilege and things of that nature and things that were completely, you know, irrelevant to the case or outside the timeframe, we just decided let's just, you know, produce the documents.  That's kind of where we ended up yesterday.

Now we didn't withdraw all the objections obviously, but on those we thought we could minimize it and given the reality of the situation and how many are actually -- how many hits are returned actually in the time period that are relevant, you know, we just basically was the objection.

THE COURT:  Okay.  And on the date issue, tell me what your argument is on the date issue.

MR. MCDONOUGH:  So the date being --

THE COURT:  These requests are asking for, I guess, February 2020 forward.

MR. MCDONOUGH:  Yes.  So the date we are fine with is the February date.  Originally we had a March date, which was a disagreement that we got passed I believe on our call because

the March date was the date that the arbitration was actually entered by the District Court as sort of a final judgment.  But then there was a date where the arbitration order actually issued, which was a February date.  And so we just -- it didn't matter.  So we were fine that that's the date and search back to them.

But the other date like we searched up until and that was the issue that we were discussing before in terms of the counterclaims being based on past events and things that we supposedly said.  There is no allegation that we are continuing to say this or anything of that nature.

And so it seems to me especially given the fact that we don't have any evidence produced in the case showing that our client did defame or saying anything other than there is a patent lawsuit that which apparently came in the form of a patent problem according to an e-mail that was produced by the Defendant.

I don't think it merits digging into every single e-mail that has happened in the past in almost two years since this case has been going a year and-a-half.

THE COURT:  Because what is the date of the counterclaim that you are looking at?

MR. MCDONOUGH:  I think March 2nd.  Somewhere in early March.

THE COURT:  Of?

MR. MCDONOUGH:  Of 2021.

THE COURT:  2021.

MR. MCDONOUGH:  The lawsuit was originally brought in December of 2020 and then the counterclaim in March of defamation and tortious interference.

Our position is that obviously if you were able to make a counterclaim on that, then there was apparently something that you think was defamatory or tortious interfered with business, that happened prior to that date, of course. And so that without an allegation of a continuing wrongdoing, I don't think that discovery, ongoing discovery was at issue.

THE COURT:  Okay.  And then, tell me about what was she referring to in terms of the supplement that was outstanding.  Tell me about that.

MR. MCDONOUGH:  For the interrogatories?

THE COURT:  I don't know.  What did you serve yesterday?

MR. MCDONOUGH:  So we withdrew our objection effectively to the overbreadth of the term that were being used in the documents.  And we also served amended interrogatories that were four or five interrogatories that we had agreed to supplement based on several conversations that I had with one of the opposing counsel that's not here today.  He was here at the last hearing.

So we had several conversations over the course of a

few weeks and basically came to an agreement on what we would provide in response to those interrogatories and we were supposed to provide those earlier.

I had a personal issue and then things just got, you know, essentially de-prioritized because of the case and discovery deadlines that got pushed out several times due to not having a (inaudible) order in the case yet.

And so it fell off as a priority which is our bad, I suppose.  But, I believe we updated those interrogatories as we agreed on the phone with Mr. Wirley.  If that's not the case, you know, that is pretty easy to work with Mr. Wirley.

THE COURT:  Are you saying that you now completed the work on the interrogatories?

MR. MCDONOUGH:  Yes.  Yes, yesterday.

THE COURT:  And then, let's see here.

Okay.  Oh, did I ask you, do I have a copy of those?

MR. MCDONOUGH:  Of the interrogatories, you do not.

And if the security officer did not take my phone and my laptop I would have e-mailed somebody to send that to you.

THE COURT:  Did you tell him that you were a lawyer?

MR. MCDONOUGH:  I did, but I didn't have my Bar card with me.

THE COURT:  Oh, you've got to have your Bar card.

MR. MCDONOUGH:  That's exactly what he said.

THE COURT:  Okay.  All right.  Let me turn back to

counsel for the Defendant.

MS. SANDERS:  Thank you, Your Honor.

Just a viewpoint in response.  I think a lot of what we just heard is moot in light of what happened yesterday.  A lot of those results were in accurate and/or --

THE COURT:  Now did you just simply restate the request for production that was at issue back in the prior hearing?

MS. SANDERS:  No.  No, Your Honor.  A couple of things about that.  First of all, if I may?

I think perhaps the Court may have been left with a misimpression at the last hearing about the universe of even what the broader request was seeking.  These are pretty -- Jetaire, in particular, is a pretty small company.  They only have one competing product in a fairly small subset of the aviation market.

So what happened at the last hearing was there was a suggestion that, oh, gosh anything mentioning AerSale would be thousands of document.  There is nothing in the record about that.

After that the Court said, yeah, that seems broad to me.  We did what you do is break it up and serve -- and the reason there is so many is because we've all been there.  Maybe this one is okay and I think this one is overbroad and I am going to give you the ones to these parties, but not these

parties.

So, yes, we broke it up into segments. We got the same boilerplate objections to all of them and here's the thing. Overbreadth was not among those objections even the first time these were served.

You know, I heard just a minute ago we withdrew our objections as to overbreadth. Those were never made and the Court has the highlighted responses and you will see that. There was a date issue and a custody and control issue. Nothing about a burden.

And so, as Mr. McDonough mentioned when he and I spoke on the 15th, he said as he told the Court, well, gosh this seems similar to what the Court already entertained. And I told him I've got reservations as to whether the Court was fully informed about the burden when the Court made that ruling.

And I asked Mr. McDonough, have you actually done a head count? Let's just find out and then we'll talk about it. If you're telling me that you've got 50,000 documents looking for our names we'll talk about some supplemental search terms to bring that down.

I also heard a moment ago that we have not had a call about search terms in this case. That was then months ago. We had a time to talk. Mr. McDonough didn't join the call. I don't have all the dates in front of me on that here, but many

attempts on that was made.  Maybe by both sides, but I was left hanging on the line at least once.

So when I spoke to him on the 15th, I said what's the head count?  What he said to me, as he mentioned to the Court, can you narrow it?  I said, well, what is the universe.  What (inaudible) are you finding.  And he said, you know, I don't need to tell you whether we searched or not.

I don't need to tell you what we have done.  And I said, okay, well, I don't understand why you are telling me you can't find any documents and we ended up here before the Court today.

Again, really moved both in light of the failure to assert an overbreadth objection initially, much less substantiated.  Meaning, of the Court rules I believe require a little more than boilerplate overbreadth.  You know, there is nothing there why it would be broad.  Objection not made even in a summary fashion and to the extent it ever was made it was withdrawn yesterday.

So, no, we did not receive the same requests.  We broke it up, but also this business about overbreadth is a little bit of a red herring given what we have actually seen from them in their signed responses.  I.

I did want to just address this notion that it we are in involved in a, quote, a fishing expedition.  All the Court needs to do if it is concerned about that is to take a look at

the District Court order in the Northern District of Georgia confirming the prior arbitration award.

That is a public document.  It is true my client was not awarded damages, but there are finding of fact about things that were said without basis and things of that nature.

We've got some e-mails we produced and some interrogatory responses dealing with that.  And at the end of the day, Your Honor, that's why we do discovery.  As I believe the Court noted in a conference early on in the case, who knows what customers they have spoken to better than the Defendant, himself, and his companies.

So, you know, you run the search and you pull out the privilege.  If it is still a big number you tell us and we work it out.  We are not in a position to give you the name of every customer you might have -- we know you spoke with.  I mean, that's not going to give us the discovery to which we are entitled.  That's the whole point.

One thing on customer names.  As Mr. McDonough mentioned, we did have some specific requests naming customers. And it is true that they told us way back when in March, March 8th, that they would produce these documents.  We have not received them.  We received certification that there aren't any.

I mean, it was just we will give them back to you back in March and nothing.  As I mentioned nothing at all for the

post arbitration period.  And you know, I am tempted to get a little more into the substance that we heard.  Suffice it to say that we disagree with a lot of it, but the bottom line is as of yesterday -- oh, on the date restriction.

You know, this is not a patent claim and Rule 8 requires notice pleading.  So we don't have to say exactly when each of the defamatory statements was made.

Even if we did, that is not really a discoverability question.  I mean, there could have been an e-mail yesterday from their guys saying, hey, I'm so glad you didn't buy from AerSale after what we told you about their dirty, you know, rotten (inaudible) on their side two months ago.

So the idea that you can put aside for the moment what is in the case or out of the case and we certainly don't agree with them about that, that does not impact the scope of discoverability.

Particularly when there has been no showing that bringing it forward that additional year results in any significant burden or other reason that they shouldn't be required to do it.

So if the Court has questions for me about anything it has just heard or anything about our request, I would be happy to answer it.

THE COURT:  Do you have any authority on that issue of discoverability in terms of dates for tortious interference

claims?

MS. SANDERS:  I don't and I looked.

Because, you know, I've been practicing a while and I have never heard this objection that discovery cut off as of the day that the complaint was filed.

I mean, maybe on the merits you might have conversations about that in some kinds of cases.  Like, for instance, if you are talking about sales in violation of an agreement maybe when it comes to damages and you say, well, these sales were in the complaint and these weren't.

But, you know, what we are seeing, again, is an attempted gotcha because they filed a motion to dismiss saying, you know, did you really have a basis for knowing that we said these bad things and we did.  That I think may be one of those motions pending and one was denied because we amended our complaint.

So what they want to do is say -- and they said this in their objection.  You can't consistently with Rule 11 talk about what might happen after that date you filed your counterclaim.  You can't have a good faith basis for that.  Then they want to turn around and say so therefore, since you didn't allege it you don't get the documents.

So I didn't find any authority either way, but just looking at the scope of discovery under Rule 26, again, there could be an e-mail yesterday talking about something that

29

happened a long time ago.

So we don't even need really to get into which instances of defamation and, you know, maybe there aren't any and that would be good news for everyone, I think.

We don't need to get into what is in the case to decide that we are entitled to documents up to the present to the date of production.  Certainly absent any showing that that is imposing some undue hardship.

THE COURT:  All right.  So, then, as far as you are concerned the interrogatories are fine and I don't have to --

MS. SANDERS:  Unfortunately, no.

I think the issue is moot for today's purposes because all we are able to notice for today was they (inaudible) a supplement.  So should the supplement be faulty and I don't know that.  We got them yesterday and my patent team has to look at them.

THE COURT:  In other words, are they substantive responses or --

MS. SANDERS:  My general understanding is that they are somewhat substantive, but potentially inadequate.  I mean, I don't think it was here are some more objections which, of course, you can't do by supplement either.  You've got to make them originally.

So I think there is something to be digested there.  I certainly hope if there are any remaining substantive issues

they could be worked out without having to come back to court, but for practical purposes, those are not up for today because all we sought was the supplement we got.  I agree that is moot, but I can't agree that the responses are sufficient for all purposes.

THE COURT:  All right.  Then, I guess we can make some progress on this.

With respect to the outstanding request for production then Defendant -- excuse me -- the counter-Defendant, the Plaintiff is withdrawing objections that it originally stated other than the date.

So, then, what I am going to do is compel those responses with production in 14 days because at this point we have already gone this far.  So you are going to have to get cracking on that right away.

In exchange for that, for that time period, I am going to deny the motion for sanctions because I am actually going to agree in part on the date restriction.  It is not my understanding that for something like this you can simply go to all current dates.

There has to be some tie to the relevance of the request.  And here, the relevance of the request dates to a tortious interference claim that was filed back in, what, March of 2021, right?

On the other hand, it is too artificial to use that

date because what if there were already discussions that were relevant that would have continued past the date of the counterclaim?

So you may have June or July to communication that actually evidences communications prior to that.  So the March 21st date is artificial as the date as current.

So I think rather than to make everybody's job easier, the six months from March would be what?

MS. SANDERS:  September.

THE COURT:  September.  So September 30th of 2021 is the cutoff date.  So I will compel production of all those requests as it relates to AerSale product, because that is a much more specific -- it's more of a specific request as opposed to anything having to do with AerSale.

What do you call it the AerSafe product?

MS. SANDERS:  It is called the AerSafe product, but I would say I think it would make sense that it would have to be relevant to the AerSafe product.  But I would submit that I wouldn't expect the product's name necessarily to have been used in the e-mail.

THE COURT:  What would you --

MS. SANDERS:  I think AerSale would be used in the e-mail.  You know, we were going to buy from AerSale or what do you think about AerSale?  I think that is likely to be how it is used.

So I would suggest that while substantively just as, you know, AerSale was at the same conference I was -- maybe not, but I think the search needs to be broader than AerSafe just defined e-mails having to do with the product.

THE COURT:  Well, let me ask you this question.

Who do you think they would communicating with that relates to this?

MS. SANDERS:  At least customers.

THE COURT:  Okay.

MS. SANDERS:  So, again, it is a small market of generally existing older aircraft, but there is a totally -- so these two are ground based solutions and there is a whole other category of solutions that a lot of planes use.

So this market is fairly small.  And absolutely, we think indeed know that customers have gotten phone calls, e-mails, at least we know about one e-mail.  And so phone calls from your guy saying, you know, I don't want to give quotes, but saying bad things about our company and our product.

THE COURT:  Okay.  Well, the other way that you narrowed the scope of it is you did in some instances identify who the third parties were more specifically.

MS. SANDERS:  In all instances, Your Honor.

THE COURT:  One of them was like equity investors. What does that mean?

MS. SANDERS:  It probably overlaps with owners of

aircraft.  I mean, aircraft are generally they could be owned in complicated structures that I think that there is (inaudible) was not to get a huge objection about, well, if it is a 50 percent of the e-mails that owns it and it is not an owner.  So folks with ownership interests in aircraft.

THE COURT:  Okay.

MS. SANDERS:  And, again, I really don't think -- I haven't heard the hit number, but it sounds like part of what they did yesterday was motivated by the fact that it was not a big universe.  So just with my history with these cases and these businesses, I really don't think that it is going to be an issue.

THE COURT:  All right.  Well, I will accept that since I am narrowing the scope of it to the time period.  So I will accept that it would be for AerSale or the AerSafe product limited to those communications identified by the requests themselves.  Then, that must be complete within 14 days, okay.

MS. SANDERS:  Thank you, Your Honor.

THE COURT:  As to the supplement, I guess what you are saying is it may have been sufficiently substantive that you don't want to raise it at this point.

MS. SANDERS:  I actually don't know.  I am sort of agnostic on that, but they did give us something.  So there was no reason to compel that they supplement.  They did provide a supplement.

THE COURT: Okay. And then, as to any sanction I will deny it without prejudice if production is not had. Obviously I can revisit the original sanction request.

MS. SANDERS: Thank you, Your Honor.

THE COURT: I'm assuming production will be had based on my order. So I am assuming that it will be (inaudible). Okay. So that is what we will do, then.

And then, we have a cutoff on the 26th. So what I am going to do is I am going to go ahead and put you on the calendar just to make sure there are no issues. Because at this point is there any reason why a deposition cannot be started in June?

MS. SANDERS: I don't know because the patent side, there may be some overlap with the patent issues, but certainly our expectation is that we've got to get started because the end of August will be here before we know it.

THE COURT: Don't wait for August for depositions.

MS. SANDERS: Right.

THE COURT: Everybody has to wait until the last month. And as far as I am concerned, you are (inaudible) in June because I am compelling the 14 days in part to get the deposition process started.

MS. SANDERS: We understand. Thank you, Your Honor.

THE COURT: So what I am going to do is I am going to go ahead and set aside a date at the end of June that I know is

available and I am just going to set it.  in these patent cases (inaudible).

And if you ultimately don't do it that's fine, but one of the things I want to make sure is that by this date that is June 30th, I will give you the 3:30 time slot there.  June 30th at 3:30.

MS. SANDERS:  Got it, Your Honor.

THE COURT:  If you don't need it, great.  You will let me know.  But if you do need it, it is already set aside because the main issue I want to make sure is that things are progressing for the August 26th date.

MS. SANDERS:  Thank you, Your Honor.

THE COURT:  So if I don't do that and that way whatever conflict you have, fix it.  Okay.

MS. SANDERS:  Yes.  Thank you, Your Honor.

THE COURT:  Okay.  Thank you all very much.

MR. MCDONOUGH:  Your Honor?

THE COURT:  Yes.

MR. MCDONOUGH:  Could I just address one issue?

THE COURT:  Sure.

MR. MCDONOUGH:  Really one issue that I am requesting, is it possible to have instead of 14 days, to have 21 days?

And the only reason being that once we are into like post counterclaim communications, it brings into a lot of privileged communications that we will have to look through as

well as --

THE COURT:  These are third party communications.

Remember, I am not compelling -- what I am compelling has to do with third party communications that wouldn't be privileged.

MR. MCDONOUGH:  Right.  But the search is when we search through the e-mail for that.  I can't really specify like that it goes outside the organization, like, things that (inaudible).

THE COURT:  You will have to produce those.

MR. MCDONOUGH:  Right.  I am just saying --

THE COURT:  You might as well do that.  When you do the search you can segregate AerSafe and (inaudible) that's not compelled by (inaudible).  So, then, the (inaudible) should be relatively narrowed, number one.  And number two, obviously (inaudible) take you to review this in the last month.

MR. MCDONOUGH:  Right.

THE COURT:  So you just need to finish the process.

But to the extent that it helps you, yeah, I am not compelling communications.  If counsel is (inaudible) maybe you can just put it aside.

What they want is pure -- what they are looking for is not communications with counsel.  What they are looking for is communications strictly with third parties and the sales people, ultimately.

MR. MCDONOUGH:  Right.

THE COURT:  So I think that you can do in 14 days.  We are doing it in 14 days from Monday.  How's that?  So it is not 14 days from today.

It is 14 days from Monday, which is what?  May the 23rd.  So 14 days from that would take you to -- oh, the 31st is a holiday.  Let's make it easier for you.  June 1st, okay.

MR. MCDONOUGH:  And the other issue I wanted to raise is just something that occurred to me while we were sitting here.  From the last hearing we had -- it was actually a dispute as to your rulings and we had submitted via e-mail a proposed order that give out effectively having each of our understanding of your ruling.

THE COURT:  Did I not do that?

MR. MCDONOUGH:  No, it never --

THE COURT:  Did you all file a motion?

MR. MCDONOUGH:  No, we just submitted the proposed order and I think we e-mailed your attention to it and we didn't hear back.

THE COURT:  Well, hold on.

MR. MCDONOUGH:  We didn't know whether it was a proper to file a motion because it was a ruling that came out of a motion (inaudible) it was more a matter of what you meant by your words during the hearing.

THE COURT:  Hold on.  Let me see.

MR. MCDONOUGH:  I think it was the month of May.

THE COURT:  I didn't direct you to file a motion?
Normally I would do that.

MR. MCDONOUGH:  No.  You had asked us to submit a
proposed order and we did that.  We agreed on some of the
orders that you issued.

Like we had to produce certain things within a certain
amount of days and we did that.  Then, unfortunately, the stuff
that we were supposed to be getting from AerSale there was a
disagreement as to what your order or your order during the
hearing meant.

THE COURT:  All right.  Hold on.  It's not coming up.

I may have forgotten to do this, but when you get back
to your office, then go ahead and file a motion for entry --

MR. MCDONOUGH:  Okay.

THE COURT:  -- that attaches your proposal and
attaches their proposal as an exhibit, or whatever, and then
file that today and I will get it tomorrow.

MR. MCDONOUGH:  Okay.

THE COURT:  Okay.

MR. MCDONOUGH:  All right.

THE COURT:  I get so many e-mails on the --

MR. MCDONOUGH:  I'm sure.

THE COURT:  That sometimes it gets lost and I try to

flag them for myself, but I don't see you on my flag list here. So do that today.

MR. MCDONOUGH:  Okay.

THE COURT:  Because obviously you want to bring that to closure.  Okay.

MR. MCDONOUGH:  Thank you, Your Honor.

THE COURT:  Okay.  So you know the dates to compel June 1st and then we have June 30th already set.  Okay.

MR. MCDONOUGH:  Yes.

THE COURT:  Take care.  Thank you very much.

MS. SANDERS:  Thank you.

(Thereupon, the proceedings concluded.)

CERTIFICATE


        I hereby certify that the foregoing transcript is an

accurate transcript of the audiotape recorded proceedings in

the above-entitled matter.


07/02/23                          Bonnie Joy Lewis,
                          Registered Professional Reporter
                             CASE LAW REPORTING, INC.
                            7001 Southwest 13 Street,
                          Pembroke Pines, Florida 33023
                                954-985-8875

Activity in Case 1:20-cv-25144-DPG Jetaire Aerospace, LLC v. AerSale Inc. Motion Hearing

cmecfautosender@flsd.uscourts.gov <cmecfautosender@flsd.uscourts.gov>

Thu 1/25/2024 8:25 AM

To:flsd_cmecf_notice@flsd.uscourts.gov <flsd_cmecf_notice@flsd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**Southern District of Florida**

**Notice of Electronic Filing**

The following transaction was entered on 1/25/2024 at 9:24 AM EST and filed on 1/24/2024

**Case Name:**    Jetaire Aerospace, LLC v. AerSale Inc.

**Case Number:**    1:20-cv-25144-DPG

**Filer:**

**Document Number:** 310(No document attached)

**Docket Text:**
**PAPERLESS Minute Entry for proceedings held before Ch. Magistrate Judge Edwin G. Torres: Motion Hearing held on 1/24/2024 re [282] MOTION to Amend/Correct *(Motion to Amend Counterclaims and Memorandum in Support) (REDACTED)* filed by AerSale Inc., [196] MOTION for Summary Judgment *or, in the Alternative, Partial Summary Judgment* filed by AerSale Inc., [221] Plaintiff's SEALED MOTION *for Summary Judgment* re DE# [211] Order on Motion to Seal,,, filed by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams, [220] Plaintiff's SEALED MOTION *in Limine* re DE# [211] Order on Motion to Seal,,, filed by Jetaire Aerospace, LLC, Jetaire Flight Systems, LLC, Michael D. Williams, [198] MOTION in Limine *AerSale's Motions in Limine* filed by AerSale Inc.**

**Attorney Appearance(s): James F. McDonough, Kristin M. Whidby, Travis E. Lynch, Sofia Manzo, Marcos Daniel Jimenez, III, for Plaintiff; Scott Penner, Regis C. Worley, Jr, Valerie S. Sanders, Amelia Toy Rudolph, Shawn Rafferty for Defendants. Other appearances: Mike Williams for JetAire.**

**(Digital 9:45:41 and 13:32:30) Total time in court: 6 hour(s) : 37 minutes. (mdc)**

**1:20-cv-25144-DPG Notice has been electronically mailed to:**

Amelia Toy Rudolph     amyrudolph@eversheds-sutherland.com, amy-rudolph-1418@ecf.pacerpro.com, danielkent@eversheds-sutherland.com, danielkent@eversheds-sutherland.us

C. Matthew Rozier     matt@RHMtrial.com, service@RHMtrial.com

James F. McDonough , III     jim@rhmtrial.com, service@RHMtrial.com

Jonathan R. Miller     jmiller@hgdlawfirm.com

Kristin M. Whidby     kristin@rhmtrial.com, service@rhmtrial.com

Marcos Daniel Jimenez     mjimenez@leoncosgrove.com, aquezada@leoncosgrove.com, nbauza@leoncosgrove.com, smanzo@leoncosgrove.com

Regis C. Worley , Jr     regisworley@eversheds-sutherland.com

Scott Penner     scottpenner@eversheds-sutherland.com

Shawn Rafferty     shawnrafferty@eversheds-sutherland.com

Sofia Manzo     smanzo@leoncosgrove.com, aquezada@leoncosgrove.com

Timothy Carl Davis     tim@hgdlawfirm.com, patent@hgdlawfirm.com

Travis E. Lynch     tlynch@hgdlawfirm.com, patent@hgdlawfirm.com

Valerie S. Sanders     valeriesanders@eversheds-sutherland.com

**1:20-cv-25144-DPG Notice has not been delivered electronically to those listed below and will be provided by other means. For further assistance, please contact our Help Desk at 1-888-318-2260.:**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-25144-DPG

JETAIRE AEROSPACE, LLC,

    Plaintiff/Counter-Defendant,    Miami, Florida

                                      January 24, 2024
      vs.

AERSALE, INC.,

    Defendant/Counter-Plaintiff.    Pages 1 - 297

------------------------------------------------------------

MOTION HEARING
TRANSCRIBED FROM DIGITAL AUDIO RECORDING
BEFORE THE HONORABLE EDWIN G. TORRES
UNITED STATES CHIEF MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF(S):  JAMES F. MCDONOUGH, III, ESQ.
HENINGER GARRISON DAVIS, LLC
3621 Vinings Slope
Atlanta, GA 30339
(404) 996-0869
jmcdonough@hgdlawfirm.com


KRISTIN M. WHIDBY, ESQ.
TRAVIS LYNCH, ESQ.
ROZIER HARDT MCDONOUGH, PLLC
1500 K Street
Washington, D.C. 20005
(404) 996-0869
kristin@rhmtrial.com
tlynch@rhmtrial.com

APPEARANCES (CONT'D)

FOR THE PLAINTIFF(S):   MARCOS D. JIMENEZ, ESQ.
                        SOFIA MANZO, ESQ.
                        LEON COSGROVE JIMENEZ, LLP
                        255 Alhambra Circle
                        Miami, FL 33134
                        (305) 740-1975
                        mjimenez@leoncosgrove.com
                        smanzo@leoncosgrove.com

FOR THE DEFENDANT(S):   SCOTT PENNER, ESQ.
                        REGIS C. WORLEY, JR.
                        EVERSHEDS SUTHERLAND (US), LLP
                        12255 El Camino Real
                        San Diego, CA 92130
                        (858) 252-2510
                        scottpenner@eversheds-sutherland.com
                        regisworley@eversheds-sutherland.com

                        VALERIE S. SANDERS, ESQ.
                        SHAWN RAFFERTY, ESQ.
                        EVERSHEDS SUTHERLAND (US), LLP
                        999 Peachtree Street, NE
                        Atlanta, GA 30309
                        (404) 853-8168
                        valeriesanders@eversheds-sutherland.com
                        shawnrafferty@eversheds-sutherland.com

TRANSCRIBED BY:         Joanne Mancari, RPR, CRR, CSR
                        Court Reporter
                        jemancari@gmail.com

Thereupon,

the following proceedings were held:

THE DEPUTY CLERK:  Calling case Jetaire Aerospace, LLC v. AerSale, Inc., case No. 20-25144, civil, Judge Gayles.

Counsel, please state your appearances for the record, starting with the plaintiff.

MR. MCDONOUGH:  Good morning, your Honor.  James McDonough on behalf of the plaintiff and counterclaimant defendant.  I'm here with cocounsel Jonathan Hardt, to my right, Travis Lynch, Kristin Whidby.  We also have local counsel with us, who is in the back row here, Marco Jimenez, and Sofia Manzo.

Also, I want to make the court aware that our client and our client representative, Michael Williams, is here as well.

MR. PENNER:  Good morning, your Honor.  May it please the court, my name is Scott Penner.  I represent defendant AerSale and counter-plaintiff AerSale.

With me here in the courtroom is Ms. Valerie Sanders and Mr. Regis Worley, and also on the line we have Mr. Shawn Rafferty, and maybe joining us Ms. Amy Rudolph.  They will not be participating but they intend to listen in and so may come in and out on occasion.

THE COURT:  OK.  Good morning, everybody.

This case has been referred to me by Judge Gayles.  I

initial presentation on the motion for summary judgment?

MR. PENNER:  Is there a particular issue?  We are going to divide up the summary judgment issue based on which issues there are.

THE COURT:  I see.  Yes.  The way I structure summary judgment motions is what is the one ground that you believe is a dead winner, and start with that, because if I agree with you, then we can all go home.  So whoever has that argument, and you can discuss among yourselves, but whoever wants to raise that, because I read all the arguments you've made.  So you tell me which one you want to -- you have my most attention span right now.

MR. PENNER:  Your Honor, in that case, it is our motion so I believe we should begin, and it will be the on-sale bar.

THE COURT:  OK.

MR. PENNER:  Would you prefer I speak from here or from the dais?

THE COURT:  Go up there.

MR. PENNER:  From the lectern, not the dais, your Honor.

THE COURT:  Right.  Right.

MR. PENNER:  So, your Honor, AerSale moves for summary judgment that the on-sale bar renders all the patents in the suit invalid.  The on-sale bar consists of essentially two

components.  One is that the item had to be ready for patenting and the second is that it had to be on sale and, in this case, more than one year prior to the filing of the patent.

So there are a couple of things that we can all agree on.  The first is that the patent was filed September 11, 2015.  So one year before is September 11, 2014.  So anything that happened September 10, 2014 or earlier would be part of this on-sale bar.

Here, under Pfaff v. Wells Electric, the two-step process is to first determine whether or not the item was ready for patenting before that date and if so, whether there was an actual offer for sale or sale.

I'd like to point the court to Pfaff.  While it is not in our brief, it is from the Pfaff case, and it is pages 62 to 64.  In that case the Supreme Court points to the fact that Mr. Pfaff had actually submitted drawings that a skilled artisan could use to ultimately build the item that he was going to try and patent, and he had submitted those drawings to a skilled artisan and it was done more than one year before the priority date.

So the court said, look, he hadn't built it yet.  It was a socket for an electric light.  He hadn't actually built the socket yet.  So that wasn't a requirement.  He had just submitted drawings sufficient enough for someone to then go ahead and build it themselves.  That is exactly what we have

here.

THE COURT: Now, when you say that he submitted it, he submitted it in what form?

MR. PENNER: He had given it to a third party. In fact, he had given it to Wells Electric, and they had -- not to Wells Electric. They gave it to Wells Electric's competitor. Shogun said, this is what I'd like to build, and in discovery that all came out. The point was it was given to someone without the obligation of confidentiality.

Here, the plaintiffs submitted all of the drawings, all of the documentation, and everything was completed prior to them submitting the information to the FAA publicly for their STC.

Just to go through, the FAA is the Federal Aviation Administration, and the STC is a Supplemental Type Certificate. So if you want to make a modification to the aircraft, you have to ask for permission to do so and then get authorization, and that is essentially what they did.

Here, all of the information about the types of foam material, the manner in which it would be configured, all of that was submitted prior to September 11, 2014. In fact, it was submitted --

THE COURT: Submitted to whom?

MR. PENNER: To the FAA and to the government.

So if we look at Exhibit BB, and I don't know if your

be considered a valid offer.  I think I explained -- first of all, I'll explain why that is not true.

Elon actually says that, what they found, the Federal Circuit reviewed the contract and determined that it wasn't an offer for sale but an offer for a license, and that was different.  So an offer to license the technology wasn't the same thing as an offer to sell or any sale of the technology, and that is why it determined that there was not an offer for sale in Elon, not because the terms didn't indicate there was a sale or it was missing price or it was missing quantity or delivery date or things like that.  In fact, the Federal Circuit, as I think I've explained, the Helsinn case makes very clear they just use UCC to determine if there was a sale or an offer for sale.

So I just wanted to point out the Elon case because I know that one was that featured prominently in their opposition.

THE COURT:  Anything to add?

MR. PENNER:  No, nothing at this time.  Of course, I am happy to respond to anything that is raised in their opposition.

THE COURT:  OK.  Let me stop you there then.

MR. PENNER:  Sure.

THE COURT:  Let me turn to counsel for the plaintiff.

MR. PENNER:  Thank you, your Honor.

MR. HARDT:  Good morning, your Honor.  Jonathan Hardt on behalf of the plaintiff.

I have a copy of the slides we are going to be showing.  I can bring them up to you.  I can give them to you later.  You will see them as we go.

THE COURT:  Oh, sure.  Hand them up.

You have to turn off the ELMO.  It is a direct connection to work.

MR. HARDT:  We will blindly accept your help.  I'm sure I will need to.

Your Honor, the facts really matter in disputes like this.  So does the law.  I want to address both of those in detail because I think us understanding the standard that we are dealing with here is very important, and then understanding the facts surrounding the alleged offers will demonstrate that none of them were actually offers.  It was an entirely different business relationship that was developing.

So, first of all, if you look at slide 7, it is AerSale's burden to establish by clear and convincing evidence that there was a definite sale or offer for sale and also that the subject matter of the sale or the offer of the sale fully anticipated the claimed invention.  That is AerSale's burden. They cannot establish either of those.

Let's talk first about the offer for sale.

We don't dispute the test from the Pfaff case that he

raised.  It is the correct test.  It is, first, the product must be the subject of a commercial offer for sale, and we will get to that in a second.  That commercial offer for sale was really the crux of this issue.  Second, the invention must be ready for patenting.

We do disagree with his characterizations that it was ready for patenting at the time the STC application was filed in 2013, but really this case is going to hinge on whether or not there was a commercial offer for sale.

As he raised with the UCC, the inquiry here is on the facts.  It's about the expectations of the party as to whether or not this was an offer for sale.  There are multiple reasons why it is not.

If you look at the next slide, one of them is the experimental use doctrine.  When he relied on the Pfaff case earlier about offer for sale, he ignores the fact that Pfaff expressly states that the offer in that case was without question commercial rather than experimental in character.

So why does that matter as to the offer itself?  It is because, like the UCC says, we've got to look at the facts.  It really matters what the parties understood was happening.

At the relevant time -- and in looking back, I could give a little bit of background on both AerSale and Jetaire.

Jetaire is a small company owned and run by a Mr. Williams here in the courtroom with us today.  What they

don't have is aircraft. It is a small company with a great idea at this time. They were trying to develop this system. He was confident it was going to be an amazing alternative to what was then available in the marketplace, which was a nitrogen inerting system offered by Boeing and Airbus that was expensive. It was expensive for all operators, especially -- it is one thing if you are United Airlines or Delta Airlines. It is another thing if you are a smaller operator of these large aircraft and you're on a budget.

So he came up with a great idea. Let's see if we can develop and put into practice an overall system that is going to be foam based and we are going to do it in a way that the FAA will -- that it is going to be reliable so that we can get FAA approvals. That is really the challenge here. The fact that you could put foam in a fuel tank is not a new concept. It is doing it in a way in a modern aircraft that is reliable, repeatable, and certifiable by the FAA. That's the challenge, and that is what the patents are about.

In that context, he started reaching out to individuals that he knew. He's been in the aviation industry for over 30 years, in a variety of different safety aspects. This was a new area for him. He understood the STC process. He understood what he needed to do with the FAA, and he knew he was going to need an aircraft because he was going to have to be able to demonstrate this to the FAA, that it was safe,

reliable, repeatable. It would be easily removed and replaced. All the things that the FAA regulations require.

So in that context one of the contacts he had was at AerSale. So he got in contact with AerSale and by virtue of that Xtra Airways.

AerSale's trying to blur that line a little bit. Xtra Airways is not an independent third party that is just off the street. Whether they want to say it is fully owned by AerSale or they are jointly owned, they are related. When Mr. Williams is dealing with Xtra Airways, he's also dealing with the "AerSale people" side by side.

THE COURT: How are they technically related?

MR. HARDT: My understanding is there is some sort of a holding company and then there is -- AerSale is one entity that is sort of the operating and management company with all the executives, and then there is Xtra Airways -- excuse me, your Honor -- there is Xtra Airways which is operating -- that is an aircraft lessor that is operating the aircraft. So they are two different entities but they are essentially run by the same executives.

When we start to see in a little bit things from Mr. Nezaj, who is the chief operating officer from AerSale, he is fully apprised of what is going on with Xtra Airways. When we are talking about the CEO of AerSale, although I think not a lot of that is on this particular record, it is not really

relevant, but he is apprised of what is going on with Xtra Airways because it is one of the companies he is responsible for.  So these are not just, Xtra Airways is not just some off-the-street third party.

At this time it is also important to understand what AerSale's business was.  They did two things, which opposing counsel started to highlight.  One, they were an aircraft lessor, or their subsidiaries like Xtra Airways were lessors, and they operated aircraft.  So that was one thing.

The other thing they do is they repair aircraft.  So they are basically a reseller and an FAA-certified installer of components.  You need a new fuel pump or you need whatever the case may be, that was the type of thing they handled.

At that time, over 30 years of experience in the aviation industry, AerSale had never done one thing, gotten an STC.  They were always a reseller, right.  They're an operator, they're a lessor, they're a maintenance facility.  What they are not is an engineering firm.  They don't have an engineering department.  They never developed anything like that.

Mr. Williams knew that.  He thought this is a perfect partner for me during the prototyping phase of all this.  So let me go to them.  I need an aircraft.  I know they've got some Xtra aircraft of the body types I need just sitting in the desert.  I can work with them, we'll prototype this, we'll see how it works, and I can get my FAA approvals.  And if I get my

FAA approvals, well, they can keep the -- once you install the foam and the kerosene jet fuel goes in, it's a hazardous material.  So when we're done with the prototyping they can keep it and it is a little benefit to them and I get my certification, and maybe we can even find a way to do business together because, again, they are a maintenance facility that could install these, things like that.

That is the relationship.  As we start to go through the record, we see repeatedly AerSale knows that, and that is what all these alleged offers are about.

When you look at slide 10, this is Mr. Nezaj's testimony.  This is the COO of AerSale.  Not Xtra Airways, AerSale.  He is fully apprised of what is going on.  He was asked:  "What happened with the prototype installations?"

He said:  "Well, there's only one prototype."

And we're talking about the 737 Classic in this context.

"What happened to it?

"It was a poor design; it wasn't very reliable.  We pulled it out of the aircraft a few months later and threw it in the garbage.

"Why?

"Because it was not the complete system that is currently being sold as the Invicta system by Jetaire."

They were going through this process together of

saying, here's our aircraft.  You do your installation, we will have the FAA inspectors come, and we'll see if you get an STC.  That is what is happening.

In that context, we see all of the alleged offers.  When you look at the April 11th -- I believe this is Exhibit KK that was discussed earlier.  This is April 11, 2014.  What are the conditions of this alleged offer?  It's talking about, let's enter into a nondisclosure agreement to include all terms of our arrangements.  That is ultimately entered into, by the way.  They did enter into an NDA.  It was retroactive.  It covered all of this back and forth they'd been doing.  And they continued to work together under that NDA for an extended period until the relationship fell apart.

Why did it fall apart?  Because, Mr. Williams found out, once AerSale learned enough about this technology they were going to develop it themselves.  They were going to go and get their first ever STCs.

To this day the only STCs they've ever gotten are the competitor products to Mr. Williams.

In addition, the only offer they would make him ultimately in the business relationship was, we'll take your STCs, we'll make those products, we'll sell them, we'll give you a little revenue, but this is our baby.  Mr. Williams said, I've been working on this for years.  I'm getting the manufacturing facilities together.  I'm ready to go.  This is

my thing.  I'm gonna sell it.  And the relationship fell apart.

This is all subject of the arbitration, all those sorts of things.  I don't need to get into those details, but that is the context.  Again, the context is very important here.

When you look at -- I may need to pull these up individually, but if you look at the other alleged offers, we're going to see the same type of thing.

Do you want to put GG up?  I'm sure you have it.  GG on the ELMO.

Your Honor, if I may approach, I'll just hand you a paper copy of this one.

(Pause)

THE COURT:  Yes.  There was one provision of this letter that I wanted to ask you about.

MR. HARDT:  Absolutely.

THE COURT:  The third paragraph at the bottom, where take your orders for the system now.  "Operators have until December 2014 to show compliance for 50 percent of their fleet.  We anticipate issuance of an STC within the next 45 days.  I will call you in a few days to discuss potential business."

How do you deal with that?

MR. HARDT:  That is just puffing.  They were not taking orders at that point.

THE COURT:  Is there any authority that puffing

language somehow is irrelevant to the on-sale commercialization issue?

MR. HARDT:  There is a --

THE COURT:  Because it is actually the opposite, isn't it?  If you're puffing, if you are already engaged in that chicanery, for lack of a better term, that does seem like commercial exploitation, because that is what companies do.

MR. HARDT:  I understand what you are asking.  So in our opposition brief -- I don't recall the case off the top of my head, but there is a case about mere marketing efforts and puffery do not necessarily amount to an offer for sale.

To add on to that, let me talk about the overall context here, because opposing counsel wants to really lean into this and say, well, this must be an offer for sale, it is even after the STC.  When you read it in context, it actually makes quite a bit of sense that it is not.

The reason for that, the first paragraph says: "Jetaire just received the STC for inerting the 737 Classic center wing tank."

That is the project they were prototyping together. That's the system that is in AerSale's whatever you want to call it, Xtra Airways' aircraft.  It is the prototype system. It is the one that they ultimately threw away because the STC was revised through that process and it was slightly different what was ultimately issued.  That's kind of the iterative

citing to Williams' transcript testimony down below.  So we are going to check that right now.  It is likely that testimony.

MR. PENNER:  They cite to that testimony and then specifically state there were none, as if to say Mr. Williams' testimony is incorrect, we are reiterating there are no licenses to the patents in suit.  They didn't say, oh, there are licenses to the patents in suit, see Mr. Williams' testimony; they said there are no licenses to the patents in suit.

MR. HARDT:  Your Honor, what it says is there are no offers to license the patents in suit.

MR. PENNER:  No.

MR. HARDT:  I'm looking at the language.

THE COURT:  It said licenses or offers.  It said licenses or offers to license.

MR. PENNER:  Jetaire states that there are no licenses for the patents in suit and there have been no offers to license the patents in suit.  Very clear.

THE COURT:  Yes.

What do I do with that?

MR. LYNCH:  They were on notice as of Mr. Williams' deposition.

THE COURT:  You can't create an issue of fact among yourselves.  That is not the way it works.

So they are entitled to rely upon a specific answer to

a specific question.  The fact that a layperson thinks he may have a license, that doesn't necessarily mean he has one.  So then when you file an interrogatory answer after the deposition that says there are no licenses to the patents in suit, no reasonable lawyer would construe that other than none, right.

MR. LYNCH:  Correct, but then we followed it up by citing Mr. Williams' testimony.

THE COURT:  That is at trial, basically.  So you can't do that.  I mean, that is the same thing with the whole counterclaim issue.  You can't then say at summary judgment, oh, OK, now here's some facts that we think support our position when you didn't disclose them before.

Here, you actually disclosed two positions.  Three, right.  You have the original no.  Then you have Mr. Williams' layperson testimony.  Then you have a supplemental answer that says no again.  So I don't know how else I can construe that other than they are entitled to rely on that.  They are entitled to rely on your discovery responses.

That is basically the ruling.  So for purposes of this it is no.  So I agree with the motion.  So I will grant the motion as to No. 8 that the plaintiff cannot introduce evidence or imply or suggest that there is a license agreement or an offer to license with any party.

MR. LYNCH:  Your Honor --

THE COURT:  What effect that has on the damages thing

is for the expert to construe.

MR. LYNCH:  Your Honor, if I may, for the record just note an objection to that ruling based on 2020 U.S. Dist. LEXIS 16261, at 7 through 9, Centre Hill Courts Condo.

THE COURT:  Which holds what?

MR. LYNCH:  Pardon?

THE COURT:  Which holds what?

MR. LYNCH:  That this is a substantive issue and it is improper to rule on something like this in a motion in limine. A limitation of damages specifically.

THE COURT:  I am not limiting your damages.  That is the thing.  I am not limiting your damages.  I am striking a piece of evidence that it wasn't disclosed in discovery under Rule 37.

You can still -- by the way, that doesn't mean that you can't object to that, but you have to show clear error. Good luck.

MR. LYNCH:  Thank you, your Honor.

THE COURT:  What is the next issue?

MR. PENNER:  Your Honor, Mr. Worley would like to address motion in limine No. 10, please.

MR. WORLEY:  Good afternoon, your Honor.  Regis Worley on behalf of AerSale.

Motion in limine No. 10 is very similar to what we just discussed.  The question is whether or not AerSale is

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. _____

JETAIRE AEROSPACE, LLC,

      Plaintiff,

v.

AERSALE INC.,

      Defendant.

**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff, JETAIRE AEROSPACE, LLC ("Jetaire" or "Plaintiff") files this Original Complaint for Patent Infringement against Defendant AERSALE INC. (hereinafter, "AerSale" or "Defendant") as follows:

**NATURE OF THE ACTION**

1. This is a patent infringement action to stop Defendant's infringement of the following patents (hereinafter, the "Patents-in-Suit") issued by the United States Patent and Trademark Office (hereinafter, the "USPTO"), copies of which are attached hereto as **Exhibit A**, **Exhibit B**, and **Exhibit C**, respectively:

|   | **U.S. Patent No.** | **Title** |
|---|---|---|
| A. | 9,849,998 (the "'998 Patent") | Block Foam Method Of Accomplishing Ignition Mitigation In Aircraft Fuel Tanks |
| B. | 10,633,109 (the "'109 Patent") | Method And Material For Accomplishing Ignition Mitigation In Tanks Containing Flammable Liquid |
| C. | 10,800,541 (the "'541 Patent") | Method And Material For Accomplishing Ignition Mitigation In Tanks Containing Flammable Liquid |

2. Plaintiff seeks injunctive relief and monetary damages.

## PARTIES

3.   Jetaire is a limited liability company organized and existing under the laws of the State of Georgia and maintains its principal place of business at 105 Cecil Court, Fayetteville, Georgia, 30214 (Fayette County).

4.   Based upon public information, AerSale is a corporation duly organized and existing under the laws of the state of Florida since July 28, 2008.

5.   Based upon public information, AerSale has its principal place of business located at 121 Alhambra Plaza, Suite 1700, Coral Gables, Florida 33134 (Dade County).

6.   Defendant may be served through its registered agent, Nicolas Finazzo, 121 Alhambra Plaza, Suite 1700, Coral Gables, Florida 33134.

## JURISDICTION AND VENUE

7.   This action arises under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. §§ 271, 281, 283, 284, and 285.  This Court has subject matter jurisdiction over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338(a).

8.   The Court has personal jurisdiction over AerSale because: Defendant has minimum contacts within the State of Florida and in this District; Defendant has purposefully availed itself of the privileges of conducting business in the State of Florida and in this District; Defendant has sought protection and benefit from the laws of the State of Florida and is incorporated there; Defendant regularly conducts business within the State of Florida and within this District, and Plaintiff's causes of action arise directly from Defendant's business contacts and other activities in the State of Florida and in this District.

9.   More specifically, AerSale directly and/or through its intermediaries, ships, distributes, makes, uses, imports, offers for sale, sells, and/or advertises its products and services in the United States, the State of Florida, and in this District.

10.   Based upon public information, AerSale solicits customers in the State of Florida and in this District and has paying customers who are residents of the State of Florida and this District and who use its products in the State of Florida and in this District.  AerSale is also incorporated in the State of Florida and in this District.

11.   Venue is proper pursuant to 28 U.S.C. § 1400(b) because AerSale resides in this District because of its formation under the laws of Florida and its principle place of business in this District.

## BACKGROUND INFORMATION

12.  Plaintiff is the owner of the Patents-in-Suit, and possesses all right, title and interest in the Patents-in-Suit including the right to enforce the Patents-in-Suit, the right to license the Patents-in-Suit, and the right to sue Defendant for infringement and recover past damages.

13.  Plaintiff has at all times complied with the marking provisions of 35 U.S.C. § 287 with respect to the Patents-in-Suit, including by marking the then-issued patent numbers for the Patents-in-Suit on all proposals, brochures, shipping crates, and individual product components.

14.  In 1996, the Federal Aviation Administration ("FAA") issued new regulations which imposed Fuel Tank Flammability Reduction ("FTFR") requirements for passenger and cargo aircraft, including various Boeing and Airbus models, to minimize the risk of an explosion in the fuel tank.

15.  There have been various solutions in the past to comply with these mandated aircraft fuel tank ignition mitigation requirements, including pumping inert nitrogen gas into the fuel tank during operation.  *See* **Ex. C** (1:23-31).

16.  However, these prior solutions were both expensive, time consuming, and had their own potential failure rates.  *See* **Ex. A** (2:64-3:10).

17.  The inventive concept of the Patents-in-Suit is to overcome these prior deficiencies by providing a method and system of accomplishing ignition mitigation using reticulated polyurethane safety foam in coordinated shapes to fill the fuel tanks. *See* **Ex. A** (3:14-23).

18.  Michael Williams, the inventor of the Patents-in-Suit, sought to develop an alternative system that would comply with these FTFR requirements, and would be less expensive and easier to deploy.

19.  Before a FTFR system can be installed in an aircraft, the FAA must approve the system, and then issue a Supplemental Type Certificate ("STC") permitting the system to be used in an aircraft.

20.  Before the FAA would issue a STC for Mr. Williams' system, Mr. Williams was required to develop, install, configure, and test various versions of ignition mitigation systems that would satisfy the FTFR requirements on an actual aircraft.  Neither Jetaire nor Mr. Williams had possession of or owned an aircraft, and therefore, to undergo the FAA approval process for an STC on a Boeing 737, Jetaire entered a confidential relationship with AerSale by which Jetaire would

be provided with secure and private access to one of AerSale's Boeing 737s for development and testing purposes.

21. Jetaire eventually received from the FAA an STC for the Boeing 737. Jetaire currently holds several FAA certificates relevant to ignition mitigation technologies that satisfy the FTFR requirements, including but not limited to the following:

    a. B737 (200-900) - ST03450NY

    b. B757(200) - ST04415AT

    c. B767 (200-300) - ST04405AT

    d. Airbus (A319-A321) - ST03834NY

22. Recognizing the benefits of Jetaire's system, AerSale requested that Jetaire develop a system for AerSale that would satisfy the FTFR requirements and be suitable to be approved by the FAA and receive an STC. After some discussion, Jetaire declined to develop such a system for AerSale.

23. AerSale then began developing a competing and almost identical foam-based ignition mitigation systems to that which Jetaire ultimately developed and patented. AerSale appears to have obtained approvals from the FAA to provide their AerSafe™ products on several model aircrafts.

## DEFENDANT'S PRODUCTS AND SERVICES

24. Based upon public information, AerSale offers its AerSafe™ products, which AerSale advertises and markets as an aircraft fuel tank ignition mitigation systems. *See* **Exhibit D.**

25. Based upon public information, AerSale owns, operates, advertises, and/or controls the website www.aersale.com through which it advertises, sells, offers to sell, provides and/or educates customers about its products and services. *Id*.

26. AerSale's AerSafe™ products are installed on the following airplanes: (1) Airbus A319; (2) Airbus A320; (3) Airbus A321; (4) Boeing 767 Series; (5) Boeing 737 NG Series; and (6) Boeing 737 Classic Series; upon information and belief and based on public information, AerSale's AerSafe™ products are also installed on the Airbus A330 and being configured for the Boeing 777 Series.

27. The AerSafe™ products use "custom-designed foam blocks that meet the exact tolerances required to fill the fuel tank cavity." *See* **Exhibit E** (at E-3).

28. AerSale measured and designed the AerSafe™ products to fill the dimensions of a fuel tank for the aircrafts listed above. *See* **Exhibit F** (at F-2).

29. AerSale installs its AerSafe™ products on and/or provides training and instructions on the installation of its products to its customers, partners, and/or agents. *See* **Exhibit G** (at G-2).

30. AerSale can perform AerSafe™ installation at any hangar around the world and can also provide training for the installation. *See id.*

31. Prior to installation, the aircraft center tank must be de-fueled. *See id.*

32. Upon information and belief, AerSale has been aware that its AerSafe™ products infringe at least the '998 Patent since early in 2018.

33. AerSale has been aware that its AerSafe™ products infringe at least the claims from U.S. Patent Application No. 15/816,150 and U.S. Patent Application No. 16/165,609 and that issued into the '109 Patent, and '541 Patent, respectively, since November of 2020, when AerSale notified Jetaire that it should include certain prior art found and claim charts developed by AerSale.

34. Jetaire is and has been, at all relevant times, a direct competitor to AerSale.

35. Jetaire has lost customers, sales, market share, and goodwill as a result of AerSale's infringement of the Patents-in-Suit.

36. A substantial portion of Jetaire's business is centered on the sale and provision of its patented fuel tank mitigation technologies and a substantial portion of its sales are strictly related to the sale and provision of its patented fuel tank mitigation technologies.

37. There is a substantial demand for the patented technologies and the products that incorporate them and there are no acceptable non-infringing alternatives for them—the patented technologies and the products that incorporate them can only be sold with FAA approval and pursuant to a supplemental type certificate (STC) that covers a particular model airplane.

38. Jetaire has the manufacturing and marketing capability to exploit the demand for the patented technologies and the products that incorporate them, and Jetaire would have made substantial profits from the patented technologies and the products that incorporate them but for AerSale's infringement.

39. It is Jetaire's belief that it has accrued damages of over $20 million since the issuance of the '998 Patent, but that number could be more, and Jetaire seeks all of those damages by way of this complaint.

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 9,849,998

40.  Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

41.  U.S. Patent No. 9,849,998 (the "'998 Patent") was issued on December 26, 2017 after full and fair examination by the USPTO of Application No. 14/851,511 which was filed on September 11, 2015.  *See* **Ex. A**.

42.  Upon information and belief, Defendant has directly infringed one or more claims of the '998 Patent, either literally or under the doctrine of equivalents, because it performs each and every step set forth in at least Claim 1 and Claim 2 of the '998 Patent by providing and/or installing the AerSafe™ products on aircraft.

43.  To the extent that Defendant contends that it does not perform any of the claimed steps themselves, Defendant directs or controls others—its customers, partners, and/or agents—to perform such steps.

44.  To the extent that any of the claimed method steps are considered to be performed by another entity, Defendant has contracted with such entity to perform such steps pursuant to a service agreement, and Defendant conditions payment to such entity upon such entity's performance of such steps.

45.  Upon information and belief, Defendant has intentionally induced and continues to induce infringement of one or more claims of the '998 Patent in this district and elsewhere in the United States, by its intentional acts which have successfully, among other things, encouraged, instructed, enabled, and otherwise caused Defendant's customers, partners, and/or agents to use and install the AerSafe™ products in an infringing manner.  To the extent that Defendant is not the only direct infringer of the '998 Patent, customers, partners, and/or agents that have purchased, installed and/or used the AerSafe™ products (*see* **Exs. D-G**), constitute direct infringers.

46.  Despite knowledge of the '998 Patent as early as 2018, and upon information and belief, Defendant continues to encourage, instruct, enable, and otherwise cause its customers, partners, and/or agents to use its AerSafe™ products, in a manner which infringes the '998 Patent.  *See* **Exs. D-G**.  Based upon public information, the provision of and sale of the AerSafe™ products is a source of revenue and a business focus of Defendant.  *See id.*

47.  Upon information and belief, Defendant specifically intends its customers, partners, and/or agents to use its products and services in such a way that infringes the '998 Patent by, at a minimum, providing and supporting the AerSafe™ products and instructing its customers,

partners, and/or agents on how to use and install them in an infringing manner, available upon purchase of the AerSafe™ products.  *See* **Exs. D-G.**

48. Specifically, Defendant offers services to install its AerSafe™ products and assist its customers, partners, and/or agents in installing and utilizing its ignition mitigation systems.  *See* **Exs. D-G**.  Based upon public information, Defendant knew that its actions, including but not limited to any of the aforementioned products and services, would induce, have induced, and will continue to induce infringement by its customers and/or partners of the '998 Patent by continuing to sell, support, and instruct its customers and/or partners on using the AerSafe™ products.  *See* **Exs. D-G.**

49. Upon information and belief, Defendant also contributes to the infringement of the '998 Patent by offering for sale and/or selling components that constitute a material part of the invention claims in the '998 Patent.

50. For example, Defendant has offered for sale and/or sold numerous ignition mitigation systems that infringe the '998 Patent, as discussed above.

51. As a result, the AerSafe™ products can only be used in a manner that infringes the '998 Patent, and on information and belief, have been used by Defendant's customers, partners, and/or agents in a manner that directly infringes one or more claims of the '998 Patent. AerSale knew of the '998 Patent and that its actions would lead to infringement of the '998 Patent.

52. Defendant's AerSafe™ products have no substantial, non-infringing uses.

53. The acts of infringement by Defendant have occurred with full knowledge of the '998 Patent and have been willful and deliberate, making this case exceptional within the meaning of the United States patent laws.

54. Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

55. Plaintiff is entitled to recover from Defendant the damages in an amount of its lost profits, or at a minimum, a reasonable royalty, sustained by Plaintiff as a result of Defendant's wrongful acts with respect to the '998 Patent in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### COUNT II: INFRINGEMENT OF U.S. PATENT NO. 10,633,109

56. Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

---

S.D. Fla.: *Jetaire Aerospace, LLC v. AerSale Inc.*                  ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT
Page | 7

57. U.S. Patent No. 10,633,109 (the "'109 Patent") was issued on April 28, 2020 after full and fair examination by the USPTO of Application No. 15/816,150 which was filed on November 17, 2017. *See* Ex. B.

58. Upon information and belief, Defendant has directly infringed one or more claims of the '109 Patent, either literally or under the doctrine of equivalents, because it performs each and every step set forth in at least Claim 1 and Claim 15 of the '109 Patent by providing and/or installing the AerSafe™ products on aircraft.

59. To the extent that Defendant contends that it does not perform any of the claimed steps themselves, Defendant directs or controls others—its customers, partners, and/or agents—to perform such steps.

60. To the extent that any of the claimed method steps are considered to be performed by another entity, Defendant has contracted with such entity to perform such steps pursuant to a service agreement, and Defendant conditions payment to such entity upon such entity's performance of such steps.

61. Upon information and belief, Defendant has intentionally induced and continues to induce infringement of one or more claims of the '109 Patent in this district and elsewhere in the United States, by its intentional acts which have successfully, among other things, encouraged, instructed, enabled, and otherwise caused Defendant's customers, partners, and/or agents to use and install the AerSafe™ products in an infringing manner. To the extent that Defendant is not the only direct infringer of the '109 Patent, customers, partners, and/or agents that have purchased, installed and/or used the AerSafe™ products (*see* **Exs. D-G**), constitute direct infringers.

62. Despite knowledge of the '109 Patent as early as the filing of this complaint, and upon information and belief, Defendant continues to encourage, instruct, enable, and otherwise cause its customers, partners, and/or agents to use its products and services, in a manner which infringes the '109 Patent. *See* **Exs. D-G**. Based upon public information, the provision of and sale of the AerSafe™ products is a source of revenue and a business focus of Defendant. *See id.*

63. Upon information and belief, Defendant specifically intends its customers, partners, and/or agents to use its products and services in such a way that infringes the '109 Patent by, at a minimum, providing and supporting the AerSafe™ products and instructing its customers, partners, and/or agents on how to use and install them in an infringing manner, available upon purchase of the AerSafe™ products. *See e.g.,* **Exs. D-G.**

64. Specifically, Defendant offers design services to select, deploy and integrate its AerSafe™ products to assist its customers, partners, and/or agents in installing and utilizing the ignition mitigation systems. *See e.g.*, **Exs. D-G**. Based upon public information, Defendant knew that its actions, including but not limited to any of the aforementioned products and services, would induce, have induced, and will continue to induce infringement by its customers, partners, and/or agents of the '109 Patent by continuing to sell, support, and instruct its customers, partners, and/or agents on using the AerSafe™ products. *See e.g.*, **Exs. D-G.**

65. Upon information and belief, Defendant also contributes to the infringement of the '109 Patent by offering for sale and/or selling components that constitute a material part of the invention claimed in the '109 Patent.

66. For example, Defendant has offered for sale and/or sold numerous ignition mitigation systems that infringe the '109 Patent, as discussed above.

67. As a result, these AerSafe™ products can only be used in a manner that infringes the '109 Patent, and upon information and belief, have been used by Defendant's customers, partners, and/or agents in a manner that directly infringes one or more claims of the '109 Patent. AerSale knew of the '109 Patent and that its actions would lead to infringement of the '109 Patent.

68. Defendant's AerSafe™ products have no substantial, non-infringing uses.

69. Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

70. Plaintiff is entitled to recover from Defendant the damages in an amount of its lost profits, or at a minimum, a reasonable royalty, sustained by Plaintiff as a result of Defendant's wrongful acts with respect to the '109 Patent in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 10,800,541

71. Plaintiff re-alleges and incorporates by reference each of the paragraphs above.

72. U.S. Patent No. 10,800,541 (the "'541 Patent") was issued on October 13, 2020 after full and fair examination by the USPTO of Application No. 16/165,609 which was filed on October 19, 2018. *See* Ex. C.

73. Upon information and belief, Defendant has infringed at least Claim 1 and Claim 16 of the '541 Patent, either literally or under the doctrine of equivalents, because it makes, uses, imports, offers for sale, sells, and/or advertises its AerSafe™ products.

74. An end-user (*e.g.*, owner and/or leasee of the subject airplane) of the AerSafe™ products directly infringes the '541 Patent by using the AerSafe™ products.

75. To the extent the components of the system covered by Claims 1 and 16 include components provided or owned by third parties, Defendant is vicariously liable because it (i) puts into service the AerSafe™ products, through their manufacture, sale and use, that infringe one or more claims of the '541 Patent and (ii) controls its products and derives a benefit from the use of every element of them and the entire system(s) by its customers, partners, or agents.

76. Similarly, to the extent third parties (*e.g.,* customers, partners, or agents) form or use the patented system, Defendants infringed Claims 1 and 16 because the third parties' beneficial use of the system is conditioned on using components in an infringing manner as established by Defendant.

77. Upon information and belief, Defendant has intentionally induced and continues to induce infringement of one or more claims of the '541 Patent in this district and elsewhere in the United States, by its intentional acts which have successfully, among other things, encouraged, instructed, enabled, and otherwise caused Defendant's customers, partners, and/or agents to use and install the AerSafe™ product in an infringing manner.  To the extent that Defendant is not the only direct infringer of the '541 Patent, customers, partners, and/or agents that have purchased, installed and/or used the AerSafe™ product (*see* **Exs. D-G**), constitute direct infringers.

78. Despite knowledge of the '541 Patent as early as the filing of this Complaint, and upon information and belief, Defendant continues to encourage, instruct, enable, and otherwise cause its customers, partners, and/or agents to use its products and services, in a manner which infringes the '541 Patent.  *See* **Exs. D-G**.  Based upon public information, the provision of and sale of the Accused Products and Services is a source of revenue and a business focus of Defendant.  *See id.*

79. Upon information and belief, Defendant specifically intends its customers, partners, and/or agents to use its products and services in such a way that infringes the '541 Patent by, at a minimum, providing and supporting the Accused Products and Services and instructing its customers, partners, and/or agents on how to use and install them in an infringing manner, available upon purchase of the Accused Products.  *See e.g.,* **Exs. D-G.**

80. Specifically, Defendant offers design services to select, deploy and integrate its AerSafe™ products to assist its customers in installing and utilizing the ignition mitigation systems.  *See e.g.*, **Exs. D-G**.  Based upon public information, Defendant knew that its actions, including but not

---

limited to any of the aforementioned products and services, would induce, have induced, and will continue to induce infringement by its customers, partners, and/or agents of the '541 Patent by continuing to sell, support, and instruct its customers, partners, and/or agents on using the Accused Products and Services. *See e.g.*, **Exs. D-G.**

81. Upon information and belief, Defendant also contributes to the infringement of the '541 Patent by offering for sale and/or selling components that constitute a material part of the invention claimed in the '541 Patent.

82. For example, Defendant has offered for sale and/or sold numerous ignition mitigation systems that infringe the '541 Patent, as discussed above.

83. As a result, these AerSafe™ products can only be used in a manner that infringes the '541 Patent, and on information and belief, have been used by Defendant's customers, partners, and/or agents in a manner that directly infringes one or more claims of the '541 Patent. AerSale knew of the '541 Patent and that its actions would lead to infringement of the '541 Patent.

84. Defendant's AerSafe™ products have no substantial, non-infringing uses.

85. Defendant's aforesaid activities have been without authority and/or license from Plaintiff.

86. Plaintiff is entitled to recover from Defendant the damages in an amount of its lost profits, or at a minimum, a reasonable royalty, sustained by Plaintiff as a result of Defendant's wrongful acts with respect to the '541 Patent in an amount subject to proof at trial, which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

## JURY DEMAND

87. Plaintiff demands a trial by jury on all issues.

## PRAYER FOR RELIEF

88. Plaintiff respectfully requests the following relief:

    A. An adjudication that one or more claims of the Patents-in-Suit has been infringed, either literally and/or under the doctrine of equivalents, by AerSale;

    B. An adjudication that Defendant has induced infringement of one or more claims of the Patents-in-Suit;

    C. An adjudication that Defendant has contributed to the infringement of one or more claims of the Patents-in-Suit;

D. An award of damages, including lost profits, but at a minimum, a reasonable royalty, to be paid by AerSale adequate to compensate Plaintiff for AerSale's past infringement, including interest, costs, and disbursements as justified under 35 U.S.C. § 284 and, if necessary to adequately compensate Plaintiff for AerSale's infringement, an accounting of all infringing sales including, but not limited to, those sales presented and not presented at trial;

E. An adjudication that Defendant's infringement of one or more claims of the '998, '109, and '541 Patents have been willful such that damages may be enhanced under 35 U.S.C. § 284;

F. That this Court declare this to be an exceptional case and award Plaintiff its reasonable attorneys' fees and costs in accordance with 35 U.S.C. § 285; and,

G. Any further relief that this Court deems just and proper.

Respectfully submitted: <u>December 17, 2020,</u>

*/s/ Timothy C. Davis*

Timothy C. Davis, FL No. 571880
**HENINGER GARRISON DAVIS, LLC**
2224 1st Avenue North
Birmingham, Alabama 35203
Telephone: (205) 326-3336, 327-9128
Facsimile: (205) 373-2294, 380-8078
Email: tim@hgdlawfirm.com

*for Plaintiff*
***JETAIRE AEROSPACE, LLC***

**Of Counsel**
James F. McDonough, III (GA No. 117088,)
Jonathan R. Miller (GA No. 507179)
Travis E. Lynch (GA No. 162373)
**HENINGER GARRISON DAVIS, LLC**
3621Vinings Slope, Suite 4320
Atlanta, Georgia 30339
Telephone: (404) 996-0869, -0863, -0867
Facsimile: (205) 547-5502, -5506, -5515
Email: jmcdonough@hgdlawfirm.com
Email: jmiller@hgdlawfirm.com
Email: tlynch@hgdlawfirm.com

**List of Exhibits**

A.  U.S. Patent No. 9,849,998
B.  U.S. Patent No. 10,633,109
C.  U.S. Patent No. 10,800,541
D.  Webpage: AerSafe™ Fuel Tank Ignition Mitigation System
E.  Webpage: AerSale Blog – November 26, 2019
F.  Webpage: AerSale Blog – December 24, 2019
G.  Fact Sheet: AerSafe™ Fuel Tank Ignition Mitigation System

---

S.D. Fla.: *Jetaire Aerospace, LLC v. AerSale Inc.*          ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:20-cv-25144-GAYLES/TORRES

| | |
|---|---|
| JETAIRE AEROSPACE, LLC, | ) |
| | ) |
|     Plaintiff/Counter-Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| AERSALE, INC. | ) |
| | ) |
|     Defendant/Counter-Plaintiff | ) |
| v. | ) |
| | ) |
| JETAIRE AEROSPACE, LLC, | ) |
| JETAIRE FLIGHT SYSTEMS, LLC, | ) |
| and MICHAEL D. WILLIAMS, | ) |
| | ) |
|     Counter-Defendants. | ) |

DEFENDANT/COUNTER-PLAINTIFF AERSALE, INC.'S
THIRD AMENDED COUNTERCLAIMS

Defendant AerSale, Inc. ("AerSale") asserts its counterclaims as follows:

**The Parties**

1.    AerSale is a Florida corporation with its principal place of business in Florida.

2.    Jetaire Aerospace, LLC ("Jetaire Aerospace") is a Georgia LLC with its principal place of business in Georgia. Jetaire Aerospace does business throughout the United States, including in this District.

3.    Jetaire Flight Systems, LLC (Jetaire Flight Systems") is a Georgia LLC with its principal place of business in Georgia. Jetaire Flight Systems does business throughout the United States, including in this District.

Appx00798

306.    Mr. Williams had no objectively reasonable basis on which to claim, in or before June 2020, that AerSale's product for 777-series aircraft would infringe any patent.

307.    In or around April 2021, Mr. Williams told a representative of ▮▮▮▮, a Russia-based airline with which AerSale was negotiating a sale of AerSafe products, that AerSale had, in the customer's words, a "patent problem."  On information and belief, Mr. Williams told this customer that it should not purchase the AerSafe product because the alleged "patent problem" might require a costly process to uninstall the AerSafe product after it had been purchased and installed.

308.    Mr. Williams had no objectively reasonable basis on which to tell the representative of a Russia-based airline that the customer should not purchase an AerSafe product because of a "patent problem" because, among other reasons, the Russia-based airline does not operate in the United States, while the United States patent laws operate only domestically.

309.    Mr. Williams had no objectively reasonable basis on which to claim that any AerSale customer would have to "uninstall" an AerSafe product, because there is no basis to claim that any alleged damage to Jetaire would not have an adequate remedy at law.

310.    AerSale ultimately reached a deal with the Russia-based customer, but had to give the customer a significant discount.  On information and belief, the customer was able to negotiate the discount at least in part because of Mr. Williams's disparagement of AerSale and the AerSafe product.

311.    In or around April 2022, Mr. Williams discussed the litigation between Jetaire and AerSale with a representative of ▮▮▮▮▮▮, a Singapore-based aircraft leasing company that had been in negotiations with AerSale for the purchase of the AerSafe product.  On information

44

Appx00841

and belief, Mr. Williams told this customer that it should not purchase the AerSafe product because the alleged infringement of Jetaire's patent might require a costly process to uninstall the AerSafe product after it had been purchased and installed.

312.    Mr. Williams had no objective basis on which to claim that this litigation would affect the Singapore-based customer, because the United States patent laws operate only domestically.

313.    Mr. Williams had no objectively reasonable basis on which to claim that any AerSale customer would have to "uninstall" an AerSafe product, because there is no basis to claim that any alleged damage to Jetaire would not have an adequate remedy at law.

314.    On information and belief, Mr. Williams and potentially other employees or representatives of one or both Jetaire entities have told prospective customers, perhaps among others, that AerSale has misappropriated Jetaire's confidential and/or proprietary information, and/or copied the INVICTA design.

315.    Mr. Williams made statements disparaging AerSale, including the statements described in paragraphs 303, 304, 307, 311, and 314, above, while he was principal of both Jetaire entities, with a subjective intent to harm AerSale's business to the benefit of the Jetaire entities and Mr. Williams.

316.    The Jetaire entities and Michael D. Williams knew or should have known that any statements to the effect that AerSale had misappropriated confidential and/or proprietary information were false at the time they were made.

317.    In light of the results of the prior litigation and arbitration between the parties, the fact that the Jetaire entities and/or Michael D. Williams asserted that the AerSafe product for 777-series aircraft would infringe Jetaire patents while the relevant AerSafe product was still

under development, and the dearth of publicly available information about AerSale's AerSafe products, no reasonable litigant could expect success on Jetaire Aerospace's claims that AerSale has infringed Jetaire Aerospace's patents.

318.    Jetaire Aerospace, Jetaire Flight Systems, and/or Michael D. Williams have asserted that AerSale has infringed (or will infringe) patents belonging to a Jetaire entity or the "Jetaire Group" with a motivation to interfere directly with AerSale's business relationships.

319.    The statements made by Jetaire Aerospace, Jetaire Flight Systems, and/or Michael D. Williams and concerning AerSale were made in reference to AerSale's trade, office, or profession, and were calculated to injure it therein.

320.    The statements made by Jetaire Aerospace, Jetaire Flight Systems, and/or Michael D. Williams concerning AerSale were false and defamatory *per se.*

321.    The statements made by Jetaire Aerospace, Jetaire Flight Systems, and/or Michael D. Williams concerning AerSale were not privileged and were made to third parties, including to AerSale's customers and potential customers.

322.    Jetaire Flight Systems, Jetaire Aerospace, and/or Michael D. Williams made the above-described statements concerning AerSale deliberately, intentionally, and with malice directed toward AerSale and its reputation.

323.    AerSale has been, and continues to be, damaged by defamatory statements made by Mr. Williams, Jetaire Aerospace, and/or Jetaire Flight Systems, in an amount to be proven by motion or at trial.

Appx00843

<u>Count XI</u>

**(Tortious Interference with Business Relationships)**

**(Against All Counterclaim Defendants)**

324.    AerSale has existing and prospective business relationships with its customers and with potential customers.

325.    Following the conclusion of the prior arbitration between the parties, Jetaire Aerospace, Jetaire Flight Systems, and/or Michael D. Williams, with knowledge of AerSale's business relationships, have continued to induce AerSale's customers within and outside the United States not to continue their relationships with AerSale.  Mr. Williams and the Jetaire entities have done this by threatening that doing business with AerSale would violate federal law; by telling AerSale's customers that they might face a costly process of "un-installing" an AerSafe product; and, on information and belief, by claiming that AerSale had misappropriated information proprietary to a Jetaire entity and/or the "Jetaire Group."

326.    Following the conclusion of the arbitration between the parties, Jetaire Aerospace, Jetaire Flight Systems, and/or Michael D. Williams, with knowledge of AerSale's business relationships, induced prospective customers within and outside the United States not to enter into business relationships with AerSale.  On information and belief, Mr. Williams and the Jetaire entities have done this by, among other things, threatening that doing business with AerSale would violate federal law; by telling AerSale's prospective customers that they might face a costly process of "un-installing" an AerSafe product; and by claiming that AerSale had misappropriated information proprietary to a Jetaire entity and/or the "Jetaire Group."

327.    Jetaire Aerospace, Jetaire Flight Systems, and/or Michael D. Williams have interfered with AerSale's relationships with the entities mentioned in paragraphs 302, 307, and

Appx00844

311, above, and, on information and belief, with other existing and prospective customers.

328.    Jetaire Aerospace, Jetaire Flight Systems, and Michael D. Williams knew or should have known that any statement to the effect that AerSale's AerSafe product for the Boeing 777-series aircraft infringed a Jetaire patent, made before December 23, 2020, was false at the time it was made, because the AerSafe product for the 777-series was still under development.

329.    Particularly in light of the result of the prior arbitration, Jetaire Aerospace, Jetaire Flight Systems, and Michael D. Williams knew or should have known that any statement to the effect that AerSale had misappropriated a Jetaire entity's or Michael D. Williams's confidential and/or proprietary information was false at the time it was made.

330.    Jetaire Aerospace, Jetaire Flight Systems, and Michael D. Williams knew or should have known that any statement to the effect that a purchaser of the AerSafe product would have to "un-install" the product was false at the time it was made, because there is no basis for Jetaire to assert that any alleged damage to it would not have an adequate remedy at law.

331.    Jetaire Aerospace, Jetaire Flight Systems, and Michael D. Williams knew or should have known that any statement to the effect that use of an AerSale product solely outside the United States would infringe a Jetaire patent was false at the time the statement was made, because the United States patent laws operate only domestically.

332.    In light of the results of the prior litigation and arbitration between the parties, the fact that the Jetaire entities and/or Michael D. Williams asserted that the AerSafe product for 777-series aircraft would infringe Jetaire patents while the relevant AerSafe product was still under development, and the dearth of publicly available information about AerSale's AerSafe

48

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**Case No. 1:20-cv-25144-GAYLES/TORRES**

| | |
|---|---|
| **JETAIRE AEROSPACE, LLC,** | ) |
| | ) |
| Plaintiff/Counter-Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| **AERSALE, INC.** | ) |
| | ) |
| Defendant/Counter-Plaintiff | ) |
| v. | ) |
| | ) |
| **JETAIRE AEROSPACE, LLC,** | ) |
| **JETAIRE FLIGHT SYSTEMS, LLC,** | ) |
| and **MICHAEL D. WILLIAMS,** | ) |
| | ) |
| Counter-Defendants. | ) |

**DEFENDANT/COUNTER-PLAINTIFF AERSALE, INC.'S
THIRD AMENDED COUNTERCLAIMS**

Defendant AerSale, Inc. ("AerSale") asserts its counterclaims as follows:

**The Parties**

1.    AerSale is a Florida corporation with its principal place of business in Florida.

2.    Jetaire Aerospace, LLC ("Jetaire Aerospace") is a Georgia LLC with its principal place of business in Georgia. Jetaire Aerospace does business throughout the United States, including in this District.

3.    Jetaire Flight Systems, LLC (Jetaire Flight Systems") is a Georgia LLC with its principal place of business in Georgia. Jetaire Flight Systems does business throughout the United States, including in this District.

Appx00854

295. In light of the facts known to Jetaire Aerospace through any pre-filing investigation and Jetaire Aerospace's current pleadings, it would be objectively baseless for Jetaire Aerospace to maintain its patent infringement action.

296. Jetaire Aerospace cannot maintain this action in good faith.

297. AerSale is entitled to a finding that this case is exceptional under 35 U.S.C. § 285, as well as an award of attorney fees from a time beginning no later than the filing of these Counterclaims.

## Count X

### (Defamation)

### (Against all Counterclaim Defendants)

298. Following the conclusion of the arbitration between the parties, and, on information and belief, on a continuing basis, Michael D. Williams, potentially among other employees of Jetaire Aerospace and/or Jetaire Flight Systems, has continued to disparage AerSale to customers and potential customers for whose business the Jetaire entities and AerSale are in direct competition.

299. Because most if not all of Mr. Williams's statements about AerSale have been made orally and not in writing, AerSale does not currently know the full extent of Mr. Williams's and the Jetaire entities' disparagement.

300. Further, because Mr. Williams is the principal of both Jetaire entities; the two Jetaire entities share a registered office; and the two Jetaire entities are referred to collectively and/or interchangeably in their internet presence and marketing materials, AerSale does not know the extent to which Mr. Williams, in disparaging AerSale, has purported to speak on behalf of one or both of the Jetaire entities. Because Mr. Williams is the principal of both entities,

42

contains Confidential Information

however, he and both Jetaire entities would stand to benefit if business were diverted from AerSale to Jetaire Flight Systems and/or Jetaire Aerospace.

301.   Even though AerSale does not yet know the full extent of Mr. Williams's and/or other Jetaire representatives' disparagement of AerSale, it is currently aware of several instances, discussed below, in which Mr. Williams, acting for the benefit of both Jetaire entities, disparaged AerSale.

302.   In or around June, 2020, a representative of     Redacted     , a US-based airline that had been negotiating a purchase of AerSale's AerSafe product, explained his delay in finalizing the purchase from AerSale by citing a conversation he had had with Mr. Williams.

303.   On information and belief, Mr. Williams made statements to this US-based customer about the customer's alleged liability under the patent laws, about AerSale's alleged liability under the patent laws, and/or about AerSale's alleged misappropriation of Jetaire's proprietary information.  Mr. Williams made these statements months before Jetaire filed any action for patent infringement, and following an arbitration in which the panel found no evidence that AerSale had copied any of Jetaire's proprietary information.

304.   Mr. Williams also made statements to this US-based customer to the effect that AerSale's AerSafe product for Boeing 777-series aircraft would infringe patents belonging to a Jetaire entity and/or the "Jetaire Group," even though, at the time Mr. Williams made those statements, the AerSafe product for 777-series aircraft was still under development.

305.   Particularly in light of the results of the prior arbitration, Mr. Williams had no objectively reasonable basis on which to claim that AerSale had misappropriated any information from Mr. Williams or either Jetaire entity.

*contains Confidential Information*

306. Mr. Williams had no objectively reasonable basis on which to claim, in or before June 2020, that AerSale's product for 777-series aircraft would infringe any patent.

307. In or around April 2021, Mr. Williams told a representative of Redacted a Russia-based airline with which AerSale was negotiating a sale of AerSafe products, that AerSale had, in the customer's words, a "patent problem." On information and belief, Mr. Williams told this customer that it should not purchase the AerSafe product because the alleged "patent problem" might require a costly process to uninstall the AerSafe product after it had been purchased and installed.

308. Mr. Williams had no objectively reasonable basis on which to tell the representative of a Russia-based airline that the customer should not purchase an AerSafe product because of a "patent problem" because, among other reasons, the Russia-based airline does not operate in the United States, while the United States patent laws operate only domestically.

309. Mr. Williams had no objectively reasonable basis on which to claim that any AerSale customer would have to "uninstall" an AerSafe product, because there is no basis to claim that any alleged damage to Jetaire would not have an adequate remedy at law.

310. AerSale ultimately reached a deal with the Russia-based customer, but had to give the customer a significant discount. On information and belief, the customer was able to negotiate the discount at least in part because of Mr. Williams's disparagement of AerSale and the AerSafe product.

311. In or around April 2022, Mr. Williams discussed the litigation between Jetaire and AerSale with a representative of Redacted , a Singapore-based aircraft leasing company that had been in negotiations with AerSale for the purchase of the AerSafe product. On information

and belief, Mr. Williams told this customer that it should not purchase the AerSafe product because the alleged infringement of Jetaire's patent might require a costly process to uninstall the AerSafe product after it had been purchased and installed.

312. Mr. Williams had no objective basis on which to claim that this litigation would affect the Singapore-based customer, because the United States patent laws operate only domestically.

313. Mr. Williams had no objectively reasonable basis on which to claim that any AerSale customer would have to "uninstall" an AerSafe product, because there is no basis to claim that any alleged damage to Jetaire would not have an adequate remedy at law.

314. On information and belief, Mr. Williams and potentially other employees or representatives of one or both Jetaire entities have told prospective customers, perhaps among others, that AerSale has misappropriated Jetaire's confidential and/or proprietary information, and/or copied the INVICTA design.

315. Mr. Williams made statements disparaging AerSale, including the statements described in paragraphs 303, 304, 307, 311, and 314, above, while he was principal of both Jetaire entities, with a subjective intent to harm AerSale's business to the benefit of the Jetaire entities and Mr. Williams.

316. The Jetaire entities and Michael D. Williams knew or should have known that any statements to the effect that AerSale had misappropriated confidential and/or proprietary information were false at the time they were made.

317. In light of the results of the prior litigation and arbitration between the parties, the fact that the Jetaire entities and/or Michael D. Williams asserted that the AerSafe product for 777-series aircraft would infringe Jetaire patents while the relevant AerSafe product was still

45

under development, and the dearth of publicly available information about AerSale's AerSafe products, no reasonable litigant could expect success on Jetaire Aerospace's claims that AerSale has infringed Jetaire Aerospace's patents.

318. Jetaire Aerospace, Jetaire Flight Systems, and/or Michael D. Williams have asserted that AerSale has infringed (or will infringe) patents belonging to a Jetaire entity or the "Jetaire Group" with a motivation to interfere directly with AerSale's business relationships.

319. The statements made by Jetaire Aerospace, Jetaire Flight Systems, and/or Michael D. Williams and concerning AerSale were made in reference to AerSale's trade, office, or profession, and were calculated to injure it therein.

320. The statements made by Jetaire Aerospace, Jetaire Flight Systems, and/or Michael D. Williams concerning AerSale were false and defamatory *per se.*

321. The statements made by Jetaire Aerospace, Jetaire Flight Systems, and/or Michael D. Williams concerning AerSale were not privileged and were made to third parties, including to AerSale's customers and potential customers.

322. Jetaire Flight Systems, Jetaire Aerospace, and/or Michael D. Williams made the above-described statements concerning AerSale deliberately, intentionally, and with malice directed toward AerSale and its reputation.

323. AerSale has been, and continues to be, damaged by defamatory statements made by Mr. Williams, Jetaire Aerospace, and/or Jetaire Flight Systems, in an amount to be proven by motion or at trial.

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**Case No. 1:20-cv-25144-GAYLES/TORRES**

| | |
|---|---|
| **JETAIRE AEROSPACE, LLC,** | ) |
| | ) |
|     **Plaintiff/Counter-Defendant,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **AERSALE, INC.,** | ) |
| | ) |
|     **Defendant/Counter-Plaintiff,** | ) |
| **v.** | ) |
| | ) |
| **JETAIRE AEROSPACE, LLC,** | ) |
| **JETAIRE FLIGHT SYSTEMS, LLC,** | ) |
| **and MICHAEL D. WILLIAMS,** | ) |
| | ) |
|     **Counter-Defendants.** | ) |

**DEFENDANT/COUNTER-PLAINTIFF AERSALE, INC.'S
FIFTH AMENDED COUNTERCLAIMS[1]**

Defendant AerSale, Inc. ("AerSale") asserts its counterclaims as follows:

**The Parties**

1.    AerSale is a Florida corporation with its principal place of business in Florida.

2.    Jetaire Aerospace, LLC ("Jetaire Aerospace") is a Georgia LLC with its principal place of business in Georgia. Jetaire Aerospace does business throughout the United States, including in this District.

---

[1] Only Counts X and XI of Counter-Plaintiff's Fourth Amended Counterclaims are amended hereby, by the addition of Paragraphs 326-47 and 376-95, as permitted by the Court's April 17, 2024 Order (ECF No. 370) granting AerSale's Motion for Reconsideration. Counts I-IX are unchanged from the Fourth Amended Counterclaims (ECF No. 312).

*contains Confidential Information*

322.   At the time Mr. Williams told  Redacted  that AerSale's AerSafe product for the Boeing 777 model aircraft was derived through AerSale's having stolen Mr. Williams's and/or Jetaire's data, AerSale's AerSafe product for the Boeing 777 model aircraft was still under development.

323.   At the time Mr. Williams told  Redacted  that the AerSafe product was derived through AerSale having stolen Mr. Williams's and/or Jetaire's data, Mr. Williams did not have any understanding as to the design or installation of the AerSafe product, other than that the AerSafe product involves foam blocks.

324.   Particularly in light of the results of the prior arbitration, including the finding that "[t]here is no evidence in the record that would support a claim that AerSale copied [Jetaire's] INVICTA system," and the fact that the AerSafe product for the Boeing model 777 aircraft was still under development at the time the statement was made, Mr. Williams had no objectively reasonable basis on which to tell  Redacted  that AerSale had derived its AerSafe product through stealing data from Mr. Williams or either Jetaire entity.

325.   Mr. Williams made the above-described statements to  Redacted  with the subjective intent to interfere directly with AerSale's potential sale to  Redacted .  Redacted

326.   In or around April 2021, Mr. Williams spoke with  Redacted , a representative of  Redacted , about AerSale.

327.   Redacted  is an airline based in Russia.

328.   At the time Mr. Williams spoke with  Redacted  in 2021,  Redacted  was in negotiations with AerSale for the purchase of AerSafe kits for multiple aircraft.

45

*contains Confidential Information*

329. Mr. Williams told Redacted that AerSale could not legally make an IMM product without a patent of its own, and that AerSale had no such patent.

330. Mr. Williams also told Redacted that AerSale's alleged "patent problem" might require a costly process to uninstall the AerSafe product after it had been purchased and installed.

331. Mr. Williams's statement to Redacted that AerSale could not legally make an IMM product without a patent of its own was and is false.

332. Mr. Williams knew that AerSale was making and selling IMM products, and that AerSale did not hold a patent covering any IMM product, at the time he told Redacted that AerSale could not legally make an IMM product without a patent of its own.

333. Mr. Williams's statement to Redacted that AerSale could not legally make an IMM product without a patent of its own was and is false.

334. Mr. Williams's statement to Redacted that AerSale could not legally make an IMM product without a patent of its own, made with knowledge that AerSale was making and selling IMM products and with knowledge that AerSale did not have a patent covering any IMM product, was defamatory.

335. Mr. Williams's statement to Redacted that AerSale could not legally make an IMM product without a patent of its own, made to a customer considering the purchase of an IMM product from AerSale, imputes to AerSale conduct incompatible with the proper exercise of its business and constitutes defamation *per se*.

336. AerSale was proximately damaged by Mr. Williams's statement to Redacted that AerSale could not legally make an IMM product without a patent of its own.

*contains Confidential Information*

337.    Mr. Williams's statements caused  Redacted  to delay its purchase from AerSale, and to require additional assurances from AerSale.

338.    Shortly after  Redacted  decided to purchase the AerSale product, Redacted

Redacted  , and federal law prohibited AerSale from doing business with  Redacted .

339.    Absent the delay caused by Mr. Williams's defamatory comments, AerSale would have been able to deliver additional IMM kits to  Redacted  before the legal prohibition took effect.

340.    Mr. Williams had no objectively reasonable basis for his statement to Mr. Redacted that AerSale could not make an IMM product without a patent of its own.

341.     Redacted  is, and was in 2021, a Russia-based airline.

342.     Redacted  does not, and did not in 2021, operate in the United States.

343.    The United States patent laws operate only domestically.

344.    Neither Mr. Williams nor Jetaire hold, or held in 2021, any foreign patents for an IMM product.

345.    Mr. Williams had no objectively reasonable basis on which to claim that any AerSale customer would have to "uninstall" an AerSafe product, because there is no basis to claim that any alleged damage to Jetaire would not have an adequate remedy at law.

346.    Mr. Williams made the above-described statements to Redacted with the subjective intent to interfere with AerSale's potential sale to  Redacted .

347.    AerSale has been, and continues to be, damaged by defamatory statements made by Mr. Williams, Jetaire Aerospace, and/or Jetaire Flight Systems, in an amount to be proven by motion or at trial.

*contains Confidential Information*

## Count XI

### (Tortious Interference with Business Relationships)

### (Against All Counterclaim Defendants)

348.    AerSale is a Florida corporation with its principal place of business in Florida.

349.    Jetaire Aerospace, LLC is a Georgia LLC with its principal place of business in Georgia.

350.    Jetaire Flight Systems, LLC is a Georgia LLC with its principal place of business in Georgia.

351.    Michael D. Williams is an individual resident and citizen of Georgia.

352.    The Court has jurisdiction over AerSale's counterclaim for tortious interference pursuant to 28 U.S.C. §§ 1332 and 1367(a).

353.    Jetaire Aerospace has submitted to the jurisdiction of this Court and in any event the Court has jurisdiction over Jetaire Aerospace pursuant to Fla. Stat. Ann. § 48.93(1)(a) 1, 2, and 6.

354.    The Court has jurisdiction over Jetaire Flight Systems pursuant to Fla. Stat. Ann. § 48.193 (a)(1) 1, 2, and 6.

355.    The Court has jurisdiction over Michael D. Williams pursuant to Fla. Stat. Ann. § 48.193(1)(a) 1, 2, and 6.

356.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), (c), and (d), and 28 U.S.C. § 1400(b).

Redacted

357.    Following the conclusion of the prior arbitration between the parties, Michael D. Williams, acting as an agent of both Jetaire entities, continued to interfere with AerSale's

48

*contains Confidential Information*
business relationships.

358.    In the summer of 2020, Mr. Williams spoke with Redacted about AerSale's AerSafe product.

359.    In the summer of 2020, Redacted was negotiating a potential purchase for Redacted of an IMM solution for the Boeing 777 model aircraft.

360.    As part of his work for Redacted the summer of 2020, Redacted spoke with AerSale's Iso Nezaj as well as with Mr. Williams.

361.    When Mr. Williams spoke with Redacted in the summer of 2020, Mr. Williams knew that Redacted was also in negotiations, on behalf of Redacted with AerSale.

362.    Mr. Williams told Redacted that he (meaning Redacted ) should not buy AerSale's AerSafe product because the AerSafe product was derived through AerSale's having stolen Mr. Williams's and/or Jetaire's data.

363.    Mr. Williams also told Redacted that Jetaire's patents cover all foam-based IMM systems.

364.    At the time Mr. Williams spoke to Redacted , AerSale had a business relationship with Redacted .

365.    At the time Mr. Williams spoke to Redacted , Mr. Williams knew that Redacted Redacted was negotiating with AerSale to purchase the AerSafe product.

366.    Mr. Williams's statement that the AerSafe product was derived through AerSale's having stolen Mr. Williams's and/or Jetaire's data was and is false.

367.    Mr. Williams's statement that Jetaire's patents cover all foam-based IMM systems was and is false.

49

*contains Confidential Information*

368.    Mr. Williams's statements to Redacted that the AerSafe product was derived through AerSale's having stolen Mr. Williams's and/or Jetaire's data, and that Jetaire's patents covered all foam-based IMM systems, constituted intentional and unjustified interference with AerSale's business relationship with Redacted .

369.    AerSale was proximately damaged by Mr. Williams's statements to Redacted that the AerSafe product was derived through AerSale's having stolen Mr. Williams's and/or Jetaire's data and that Jetaire's patents covered all foam-based IMMs.

370.    Redacted delayed purchasing products from AerSale because of Mr. Williams's statements.

371.    At the time Mr. Williams told Redacted that AerSale's AerSafe product for the Boeing 777 model aircraft was derived through AerSale's having stolen Mr. Williams's and/or Jetaire's data, AerSale's AerSafe product for the Boeing 777 model aircraft was still under development.

372.    At the time Mr. Williams told Redacted that the AerSafe product was derived through AerSale having stolen Mr. Williams's and/or Jetaire's data, Mr. Williams did not have any understanding as to the design or installation of the AerSafe product, other than that the AerSafe product involves foam blocks.

373.    Particularly in light of the results of the prior arbitration, including the finding that "[t]here is no evidence in the record that would support a claim that AerSale copied [Jetaire's] INVICTA system," and the fact that at the time Mr. Williams made the statements, AerSale's AerSafe product for the Boeing 777 model aircraft was still under development, Mr. Williams had no objectively reasonable basis on which to tell Redacted that AerSale had derived its AerSafe product through stealing data from Mr. Williams or either Jetaire entity.

50

*contains Confidential Information*

374.    Mr. Williams has no objectively reasonable basis on which to claim that Jetaire's patents cover all foam-based IMMs.

375.    Mr. Williams made the above-described statements to Redacted with the subjective intent to interfere directly with AerSale's business relationship with Redacted .

Redacted

376.    In or around April 2021, Mr. Williams spoke with Redacted , a representative of Redacted , about AerSale.

377.    Redacted is an airline based in Russia.

378.    At the time Mr. Williams spoke with Redacted in 2021, Redacted was in negotiations with AerSale for the purchase of AerSafe kits for multiple aircraft.

379.    Mr. Williams told Redacted that AerSale could not legally make and IMM product without a patent of its own, and that AerSale had no such patent.

380.    Mr. Williams also told Redacted that AerSale's alleged "patent problem" might require a costly process to uninstall the AerSafe product after it had been purchased and installed.

381.    At the time Mr. Williams made the above-described statements to Redacted, AerSale had a business relationship with Redacted .

382.    Mr. Williams's statement to Redacted that AerSale could not legally make an IMM product without a patent of its own was and is false.

383.    Mr. Williams knew that AerSale was making and selling IMM products, and that AerSale did not hold a patent covering any IMM product, at the time he told Redacted that AerSale could not legally make an IMM product without a patent of its own.

51

*contains Confidential Information*

384.    Mr. Williams's statement to Redacted that AerSale could not legally make an IMM product without a patent of its own constituted intentional and unjustified interference with AerSale's business relationship with  Redacted .

385.    AerSale was proximately damaged by Mr. Williams's statement to Redacted that AerSale could not legally make an IMM product without a patent of its own.

386.    Mr. Williams's statements caused  Redacted  to delay its purchase from AerSale, and to require additional assurances from AerSale.

387.    Shortly after  Redacted  decided to purchase the AerSale product, Redacted  Redacted  , and federal law prohibited AerSale from doing business with  Redacted .

388.    Absent the delay caused by Mr. Williams's statements to Redacted, AerSale would have been able to deliver additional IMM kits to  Redacted  before the legal prohibition took effect.

389.    Mr. Williams had no objectively reasonable basis on which to tell Redacted that AerSale could not make an IMM product without a patent of its own.

390.     Redacted  is, and was in 2021, a Russia-based airline.

391.     Redacted  does not, and did not in 2021, operate in the United States.

392.    The United States patent laws operate only domestically.

393.    Neither Mr. Williams nor Jetaire hold, or held in 2021, any foreign patents for an IMM product.

394.    Mr. Williams had no objectively reasonable basis on which to claim that any AerSale customer would have to "uninstall" an AerSafe product, because there is no basis to claim that any alleged damage to Jetaire would not have an adequate remedy at law.

52

*contains Confidential Information*

395.    Mr. Williams made the above-described statements to Redacted with the subjective intent to interfere with AerSale's potential sale to  Redacted .

Jury Demand

396.    AerSale demands trial by jury on all issues so triable.

WHEREFORE, AerSale respectfully asks that the Court:

a)  Enter judgment in favor of AerSale on each of its Counterclaims;

b)  Declare that AerSale has not infringed the '998 patent, the '109 patent, or the '541 patent;

c)  Declare that the claims of the '998 patent, the '109 patent, and the '541 patent are invalid;

d)  Declare that the '109 patent and the '541 patent are unenforceable;

e)  Enjoin Plaintiff, its assigns, and all those in privity with any of them from asserting the '998 patent, the '109 patent, or the '541 patent against AerSale or any of AerSale's customers or suppliers;

f)  Award AerSale compensatory damages on its Counterclaims, in an amount to be determined by the finder of fact;

g)  Award AerSale punitive damages, in an amount to be determined by the finder of fact, for the Counterclaim Defendants' defamation of AerSale and for the Counterclaim Defendants' tortious interference with AerSale's business relationships;

h)  Find this case an exceptional case and award AerSale its attorneys' fees and costs under 35 U.S.C. § 285; and

i)  Award AerSale such other and further relief as the Court deems just.

53

Appx01017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:20-cv-25144-DPG

| | |
|---|---|
| JETAIRE AEROSPACE, LLC, | |
|     Plaintiff, | |
| v. | |
| AERSALE INC., | |
|     Defendant. | |
| AERSALE, INC., | |
|     Defendant/Counter-Plaintiff, | |
| v. | |
| JETAIRE AEROSPACE, LLC, JETAIRE FLIGHT SYSTEMS, LLC, and MICHAEL D. WILLIAMS, | |
|     Counter-Defendants. | |

**JETAIRE'S NOTICE OF APPEAL**

Plaintiff/Counterclaim Defendant Jetaire Aerospace, LLC ("Jetaire Aerospace") and Counter-Defendants Jetaire Flight Systems, LLC ("Jetaire Flight Systems") and Michael D. Williams ("Williams") (collectively, "Jetaire") hereby give notice of their appeal to the United States Court of Appeals for the Federal Circuit. Jetaire is appealing: [1] Dkt. No. 366 – Report and Recommendation on Defendant/Counter-Plaintiff AerSale, Inc.'s Motion for Summary Judgment (Dkt. No. 196[1]); [2] Dkt. No. 415 – Order adopting and affirming Report and Recommendation (Dkt. No. 366); [3] Dkt. No. 423 – Final Judgment entered in this action on September 23, 2024 in favor of AerSale; [4] Dkt. No. 296 – Order On Motions to Strike Experts; and all adverse opinions, orders, or rulings pertinent, relevant, or ancillary thereto.

---

[1] AerSale filed an unredacted, sealed version of its Motion for Summary Judgment. Dkt. No. 249.

To the extent AerSale appeals Dkt. No. 418 or Dkt. No. 423 in favor of Jetaire, Jetaire appeals the following: [1] Dkt. No. 367 and 368 – Order on Counter-Defendants' Motion to Strike Third-Party Declaration; [2] Dkt. No. 369 – Order Granting in Part and Denying in Part AerSale's Motion (Dkt. No. 282); [3] Dkt. No. 370 – Order on Counter-Plaintiff's Motion for Reconsideration; [4] Dkt. No. 371 – Order Denying Jetaire's Motion to Strike; and all adverse opinions, orders, or rulings pertinent, relevant, or ancillary thereto.

Date:  October 23, 2024                    Respectfully submitted,

                                           /s/ Kristin M. Whidby

                                           Marcos Daniel Jiménez (FL 441503)
                                           Sofia Manzo (FL 1030960)
                                           **LEÓN COSGROVE JIMÉNEZ, LLP**
                                           255 Alhambra Circle, 8th Floor
                                           Miami, Florida 33134
                                           Telephone: (305) 570-3249
                                           Facsimile: (305) 351-4059
                                           Email: mjimenez@leoncosgrove.com
                                           Email: smanzo@leoncosgrove.com

                                           James F. McDonough, III (GA 117088)*
                                           Jonathan R. Miller (GA 507179)*
                                           Travis E. Lynch (GA 162373)*
                                           **ROZIER HARDT MCDONOUGH PLLC**
                                           659 Auburn Avenue, Suite 254
                                           Atlanta, Georgia 30312
                                           Telephone: (404) 564-1866, -1863, -1862
                                           Email: jim@rhmtrial.com
                                           Email: miller@rhmtrial.com
                                           Email: lynch@rhmtrial.com

                                           Jonathan L. Hardt (TX 24039906)*
                                           **ROZIER HARDT MCDONOUGH PLLC**
                                           712 W. 14th Street, Suite A
                                           Austin, Texas 78701
                                           Telephone: (210) 289-7541
                                           Email: hardt@rhmtrial.com

                                           C. Matthew Rozier (CO 46854)*
                                           Kristin M. Whidby (VA 91805)*
                                           **ROZIER HARDT MCDONOUGH PLLC**
                                           1500 K Street, 2nd Floor
                                           Washington, District of Columbia 20005
                                           Telephone: (404) 779-5305; (202) 316-1591
                                           Telephone: (202) 217-0575
                                           Email: matt@rhmtrial.com
                                           Email: kristin@rhmtrial.com

                                           *Admitted pro hac vice*

*Counsel for Plaintiff/Counterclaim Defendant JETAIRE AEROSPACE, LLC, AND COUNTERCLAIM DEFENDANTS JETAIRE FLIGHT SYSTEMS, LLC and MICHAEL WILLIAMS*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on this 23rd day of October, 2024 I caused the foregoing document to be electronically-filed with the Clerk of Court using the Court's CM/ECF system.  As such, this document was served on all counsel who are deemed to have consented to electronic service.

*/s/ Kristin M. Whidby*

Kristin M. Whidby

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**Case No. 1:20-cv-25144-GAYLES/TORRES**

| | |
|---|---|
| JETAIRE AEROSPACE, LLC, | ) |
| | ) |
| Plaintiff/Counter-Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| AERSALE, INC., | ) |
| | ) |
| Defendant/Counter-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JETAIRE AEROSPACE, LLC, | ) |
| JETAIRE FLIGHT SYSTEMS, LLC, | ) |
| and MICHAEL WILLIAMS, | ) |
| | ) |
| Counter-Defendants. | ) |

**DEFENDANT/COUNTER-PLAINTIFF AERSALE, INC.'S NOTICE OF APPEAL**

Pursuant to Fed. R. App. P. 3 and 4(a)(3), Defendant/Counter-Plaintiff AerSale, Inc. ("AerSale") appeals to the United States Court of Appeals for the Federal Circuit from that portion of the final judgment entered on September 23, 2024 (ECF No. 423) that entered judgment in favor of Counter-Defendants Jetaire Aerospace, LLC; Jetaire Flight Systems, LLC; and Michael Williams on Counts X and XI of AerSale's Fifth Amended Counterclaims, and from the following orders in the above-captioned case:

- ECF No. 266: Order granting Plaintiff's Motion for Reconsideration, entered on September 14, 2023;

- ECF No. 274: Order granting in part Motion to Dismiss AerSale's Third Amended Counterclaims, entered on November 28, 2023;

Appx01024

- ECF No. 296: Order granting in limited part and otherwise denying Motion to Exclude Expert Ashworth, entered on January 8, 2024;

- ECF No. 297: Order denying Motion to Exclude Expert Blok, entered on January 8, 2024;

- ECF No. 369: Order granting in part and denying in part AerSale's Motion to Amend, entered on April 17, 2024;

- ECF No. 414: Order denying AerSale, Inc.'s Objection to Order [ECF Nos. 296 & 297] on AerSale's Motion to Exclude the Testimony of Justin R. Blok, entered on August 1, 2024;

- ECF No. 418: Order adopting Report and Recommendation and overruling AerSale's objections, entered on September 4, 2024.

*[Signatures on following page]*

2

/s/ *Amelia Toy Rudolph*
Amelia Toy Rudolph (Florida Bar No. 57015)
Shawn Rafferty (*pro hac vice*)
Valerie S. Sanders (*pro hac vice*)
EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street, NE, Suite 2300
Atlanta, Georgia  30309-3996
404-853-8000 (telephone)
404-853-8806 (facsimile)
amyrudolph@eversheds-sutherland.com
shawnrafferty@eversheds-sutherland.com
valeriesanders@eversheds-sutherland.com

and

Scott A. Penner (*pro hac vice*)
Regis C. Worley, Jr. (*pro hac vice*)
EVERSHEDS SUTHERLAND (US) LLP
12255 El Camino Real, Suite 100
San Diego, California  92130-2071
858-252-6502 (telephone)
858-252-6503 (facsimile)
scottpenner@eversheds-sutherland.com
regisworley@eversheds-sutherland.com

*Attorneys for Defendant/Counter-Plaintiff
AerSale, Inc.*

3

Case 1:20-cv-25144-DPG   Document 431   Entered on FLSD Docket 11/06/2024   Page 4 of 4

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 6, 2024, the foregoing **Defendant/Counter-Plaintiff AerSale, Inc.'s Notice of Appeal** was electronically filed with the Clerk of Court using the CM/ECF filing system. I further certify that the foregoing document was served on all counsel of record via transmission of the Notice of Electronic Filing generated by the Court's CM/ECF system.

/s/ Amelia Toy Rudolph
Amelia Toy Rudolph
Florida Bar No. 57015

# EXHIBIT H

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**Case No. 1:20-cv-25144-GAYLES/TORRES**

| | |
|---|---|
| JETAIRE AEROSPACE, LLC. | ) |
| | ) |
|     **Plaintiff/Counter-Defendant,** | ) |
| | ) |
| v. | ) |
| | ) |
| AERSALE, INC., | ) |
| | ) |
|     **Defendant/Counter-Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| JETAIRE AEROSPACE, LLC, | ) |
| JETAIRE FLIGHT SYSTEMS, LLC, | ) |
| And MICHAEL WILLIAMS, | ) |
| | ) |
|     **Counter-Defendants.** | ) |

---

### PLAINTIFF JETAIRE AEROSPACE, LLC'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT/COUNTERCLAIM-PLAINTIFF AERSALE, INC.'S SECOND SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), and the applicable Local Rules of the United States District Court for the Southern District of Florida and of this Court, Plaintiff Jetaire Aerospace, LLC (hereinafter, "Jetaire" or "Plaintiff") hereby serves its Second Supplemental Responses to the Second Set of Interrogatories (Nos. 2-16) served on December 15, 2021 (hereinafter, the "Interrogatories") by Defendant/Counterclaim-Plaintiff Aersale, Inc. (hereinafter "Aersale" or "Defendant") as follows:

### PRELIMINARY STATEMENT

These responses and objections are made solely for the purposes of this action. These objections are made without waiving, or intending to waive but, on the contrary, expressly

1



DEFENDANT'S EXHIBIT
6
PENGAD 800-631-6989

responsive information.

**FIRST SUPPLEMENTAL RESPONSE (JAN. 27, 2022):** Jetaire is not withholding any non-privileged information pursuant to any general or specific objection, and Jetaire will produce any responsive information within its possession, custody, or control following its continued, reasonable inquiry.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Plaintiff continues to search for responsive information and reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**SECOND SUPPLEMENTAL RESPONSE (MAY 18, 2022):** Based upon its investigation conducted to date, Jetaire identifies the following additional indicia of non-obviousness:

Jetaire identifies all sales of its patented technologies as evidence of non-obviousness.

Jetaire's engineering team has earned the prestigious "Accolades Award" from Delta Airlines and the US Small Business Administration's "Administrator's Award of Excellence" both of which illustrate our commitment to excellence and recognizing Jetaire's patented technologies.

In August 2020, Jetaire was recognized for its patented technologies was named to the Entrepreneur 360 list, which celebrates well-rounded companies that are growing, thriving and building legacies. The list is compiled by the publishers of Entrepreneur magazine.

In December 2020, the Georgia Department of Economic Development's International Trade division joined Governor Brian Kemp to recognize Jetaire and its patented technologies as a winner of Georgia's 7th annual GLOBE Awards, which highlights companies that have entered new international markets as well as had a significant impact on the overall economy in the state

17

of Georgia.

In October 2021, Michael Williams, CEO and Chairman of Jetaire, received the 2021 EPPS Aviation Lifetime Achievement Award at an event hosted by the Atlanta Aero Club on Thursday October 21, 2021. The coveted EPPS Aviation Award recognizes members of the aviation community who have made significant contributions to the aerospace industry in the State of Georgia. The contribution that Mr. Williams and Jetaire was being recognized for is the patented technologies at the center of this lawsuit. Previous winners are Gulfstream and Delta Airlines.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Plaintiff continues to search for responsive information and reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**INTERROGATORY NO. 7:**

For each Patent-in-Suit, identify your, and any licensee of any of the Patents-in-Suit, compliance with the marking requirements of 35 U.S.C. § 287, including identifying products by name, model number, or other identifying indicia that have been marked and when the marking occurred, identifying any communications with any licensees relating to patent marking, and identifying persons with knowledge of the foregoing and documents relating to the foregoing.

**RESPONSE:** In addition to preserving its General Objections, Plaintiff objects to this Interrogatory to the extent that it seeks disclosure of "all documents" protected from discovery by the attorney-client privilege and/or the attorney work product doctrine.

Subject to the general and specific objections listed above, Plaintiff responds as follows upon the best information and belief currently available to Jetaire after reasonable inquiry.

18

Jetaire states that to the best of its knowledge that it has complied with the marking requirement of § 287(a) throughout the relevant time period by applying the relevant patent numbers on the packing of the products and marking on relevant websites.

Jetaire states that it has not licensed its Patents-in-Suit.

Jetaire identifies Mr. Michael Williams as the person most knowledgeable at Jetaire regarding marking.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Thus, Plaintiff reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**FIRST SUPPLEMENTAL RESPONSE (JAN. 27, 2022):** Jetaire is not withholding any non-privileged information pursuant to any general or specific objection, and Jetaire will produce any responsive information within its possession, custody, or control following its continued, reasonable inquiry.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Plaintiff continues to search for responsive information and reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**SECOND SUPPLEMENTAL RESPONSE (MAY 18, 2022):** Based upon its investigation conducted to date, Jetaire identifies the following products that it has marked pursuant to 35 U.S.C. §287 and when the marking occurred:

19

| Model | Name | Dates of Marking |
|---|---|---|
| Airbus A320, A319, A321 Series | INVICTA Ignition Mitigation/Flammability Reduction Technology in the Center Wing Tank (CWT) | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |
| Boeing B737 (200–900 Series) | INVICTA Ignition Mitigation/Flammability Reduction Technology in the Center Wing Tank (CWT) | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |
| Boeing B767-200 Series | INVICTA Ignition Mitigation Means (IMM) in the Center Wing Tank (CWT) | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |
| Boeing B767-300 Series | INVICTA Ignition Mitigation Means (IMM) in the Center Wing Tank (CWT) | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |
| Boeing B757-200 Series | INVICTA Ignition Mitigation Means (IMM) in the Center Wing Tank (CWT) *Reissued | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Plaintiff continues to search for responsive information and

20

reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**INTERROGATORY NO. 8:**

To the extent that you contend any of your products, or any Jetaire-branded products, practice any claims of any of the Patents-in-Suit, provide a claim chart showing how that product practices each of the limitations of the patent claim.

**RESPONSE:** In addition to preserving its General Objections, Plaintiff objects to this Interrogatory to the extent that it seeks disclosure of "all documents" protected from discovery by the attorney-client privilege and/or the attorney work product doctrine.

Jetaire objects to this Interrogatory because it constitutes a contention interrogatory and is therefore premature. The Scheduling Order entered in this lawsuit establishes the date by which Jetaire must make its expert disclosures. *See, e.g., O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.,* 467 F.3d 1355, 1365 (Fed. Cir. 2006) ("Answers to [contention] interrogatories are often postponed until the close of discovery"); *Novanta Corp. v. Iradion Laser, Inc.,* 15-1033-SLR-SRF, 2016 WL 4987110, at *7 (D. Del. Sept. 16, 2018) (Fallon, J.) ("[A] court may defer such interrogatories until the end of discovery."); *Internetad Sys. LLC v. ESPN, Inc.,* 3:03CV2787-D, 2004 WL 5181346, at *2 (N.D. Tex. Oct. 8, 2004) ("Many courts  conclude that contention interrogatories need not be answered until later in the discovery process."). Plaintiff objects to the extent that this Interrogatory is premature in light of the Court's Scheduling Order in this case, including discovery and expert deadlines. Plaintiff also objects to the extent that this Interrogatory requires Plaintiff to make a legal conclusion or judgment.

Subject to the general and specific objections listed above, Plaintiff anticipates that at the

21

appropriate time, Plaintiff will serve one or more expert reports on the issue of infringement, validity, and/or damages that will contain information responsive to this interrogatory. These expert reports, if any, are expressly incorporated herein, including all attachments and any supplements thereto.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Thus, Plaintiff reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**FIRST SUPPLEMENTAL RESPONSE (JAN. 27, 2022):** Jetaire is not withholding any non-privileged information pursuant to any general or specific objection, and Jetaire will produce any responsive information within its possession, custody, or control following its continued, reasonable inquiry.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Plaintiff continues to search for responsive information and reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**SECOND SUPPLEMENTAL RESPONSE (MAY 18, 2022):** Based upon its investigation conducted to date, Jetaire incorporates by reference its response to Interrogatory Number 7, which identifies the Jetaire products that it contends practice certain claims of any of the Patents-in-Suit. Below is an exemplary a claim chart that shows how the Invicta A319, A320, A321, B737 (200-900 series), B757 (200 series), and B767 (200 and 300 series) products practice each of the limitations of the Patents-in-Suit:

22

| '998 Patent Claim Elements | Jetaire's Position |
|---|---|
| 1. In an aircraft equipped with at least one liquid fuel tank, the tank having internal surfaces contoured for the accommodation of structural members such as spars, beams, valves, and piping, a method for providing fuel ignition mitigation in the tank, comprising the steps of: | Jetaire's Invicta products practice this claim element because they provide a method for fuel ignition mitigation in the tank, when installed in an aircraft equipped with at least one liquid fuel tank, the tank having internal surfaces contoured for the accommodation of structural members such as spars, beams, valves, and piping. |
| a) determining dimensions, contour, and precise locations of structural members of the fuel tank as encountered at sequentially-measured linear increments along either width or length dimension of the tank interior; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of determining dimensions, contour, and precise locations of structural members of the fuel tank as encountered at sequentially-measured linear increments along either width or length dimension of the tank interior. |
| b) rendering a scaled engineering drawing of a vertically-oriented cross-sectional profile of the fuel tank at each linear increment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of rendering a scaled engineering drawing of a vertically-oriented cross-sectional profile of the fuel tank at each linear increment. |
| c) numerically sequencing each drawing so as to correspond to a respective drawing location along the liner increments within the tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of numerically sequencing each drawing so as to correspond to a respective drawing location along the liner increments within the tank. |
| d) providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said RPF comprising a thickness dependent upon size and type of aircraft fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said RPF comprising a thickness dependent upon size and type of aircraft fuel tank. |
| e) excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each cutout conforming to each of the scaled engineering drawings, and further, designating each cutout by a part number, an orientating | Jetaire's Invicta products practice this claim element because Jetaire performs the step of excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each cutout conforming to each of the scaled engineering |

23

| | |
|---|---|
| "UP" arrow, and an orientating "FORWARD" arrow; | drawings, and further, designating each cutout by a part number, an orientating "UP" arrow, and an orientating "FORWARD" arrow. |
| f) arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of each RPF cutout part number; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of each RPF cutout part number. |
| g) sequentially packaging said aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of sequentially packaging said aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping. |
| h) composing instructions to be used by technicians/installers for the purpose of inserting and installing said RPF blocks into the tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of composing instructions to be used by technicians/installers for the purpose of inserting and installing said RPF blocks into the tank. |
| i) parking the aircraft on a level surface, and emptying and purging the tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of parking the aircraft on a level surface, and emptying and purging the tank. |
| j) removing a fuel tank access panel or other external fuel tank cover which i) functions as a point of entry for maintenance personnel and/or technicians into the fuel tank, and ii) is proximate a pre-determined starting point of the installation; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of removing a fuel tank access panel or other external fuel tank cover which i) functions as a point of entry for maintenance personnel and/or technicians into the fuel tank, and ii) is proximate a pre-determined starting point of the installation. |
| l) placing the first sequential RPF block at a specified location within the fuel tank as so designated in the instructions; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing the first sequential RPF block at a specified location within the fuel tank as so designated in the instructions. |
| m) placing each successively-ordered RPF block at its designated location within the fuel tank, as set forth in the instructions, until said | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing each successively-ordered RPF block |

24

| fuel tank is filled in accordance with the previously determined aggregate of RPF blocks; | at its designated location within the fuel tank, as set forth in the instructions, until said fuel tank is filled in accordance with the previously determined aggregate of RPF blocks. |
|---|---|
| n) performing an inspection of the installed RPF blocks, and afterwards, closing any previously opened fuel tank access panel; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of performing an inspection of the installed RPF blocks, and afterwards, closing any previously opened fuel tank access panel. |
| o) re-fueling the fuel tank and verifying the fuel tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the aircraft. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of re-fueling the fuel tank and verifying the fuel tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the aircraft. |

| '998 Patent Claim Element | Jetaire's Position |
|---|---|
| 2. In an aircraft equipped with at least one fuel tank consisting of multiple compartments, each compartment having interior surfaces contoured for the accommodation of compartment structural members, and equipment a method for providing fuel ignition mitigation within each individual compartment, comprising the steps of: | Jetaire's Invicta products practice this claim element because they provide a method for providing fuel ignition mitigation within each individual compartment, when installed in an aircraft equipped with at least one fuel tank consisting of multiple compartments, each compartment having interior surfaces contoured for the accommodation of compartment structural members and equipment. |
| a) determining dimensions, contour, and precise location of structural members for each compartment as encountered at sequentially-measured linear increments along either width or length dimension of the compartment interior; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of determining dimensions, contour, and precise location of structural members for each compartment as encountered at sequentially-measured linear increments along either width or length dimension of the compartment interior. |
| b) rendering a scaled engineering drawing of a vertically-oriented cross-sectional profile at | Jetaire's Invicta products practice this claim element because Jetaire performs the step of rendering a scaled engineering drawing of a |

25

| | |
|---|---|
| each measured linear increment in each compartment; | vertically-oriented cross-sectional profile at each measured linear increment in each compartment. |
| c) numerically sequencing each drawing corresponding to a respective drawing location along the measured linear increment within its respective compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of numerically sequencing each drawing corresponding to a respective drawing location along the measured linear increment within its respective compartment. |
| d) providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said RPF material comprising a thickness in-dependent upon size and type of aircraft fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said RPF material comprising a thickness in-dependent upon size and type of aircraft fuel tank. |
| e) excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each cutout conforming to each of the scaled engineering drawings for each particular compartment, and further, designating each RPF block by a part number, an orientating "UP" arrow, and an orientating "FORWARD" arrow; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each cutout conforming to each of the scaled engineering drawings for each particular compartment, and further, designating each RPF block by a part number, an orientating "UP" arrow, and an orientating "FORWARD" arrow. |
| f) for each compartment, arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of the cutout part number of each RPF block; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of for each compartment, arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of the cutout part number of each RPF block. |
| g) for each compartment, sequentially packaging said aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of for each compartment, sequentially packaging said aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping. |
| h) composing instructions for each compartment, to be used by technicians and/or | Jetaire's Invicta products practice this claim element because Jetaire performs the step of composing instructions for each compartment, |

26

| | |
|---|---|
| installers for the purpose of inserting the RPF blocks into the compartment; | to be used by technicians and/or installers for the purpose of inserting the RPF blocks into the compartment. |
| i) parking the aircraft on a level surface and emptying and purging all compartments of the fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of parking the aircraft on a level surface and emptying and purging all compartments of the fuel tank. |
| j) commencing installation in a selected compartment by removing a fuel tank access panel or other external tank cover which i) functions as an opening for entry of maintenance personnel and/or technicians into the compartment, and ii) is proximate the selected compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of commencing installation in a selected compartment by removing a fuel tank access panel or other external tank cover which i) functions as an opening for entry of maintenance personnel and/or technicians into the compartment, and ii) is proximate the selected compartment. |
| l) placing the first sequential RPF block at a specified location within the selected compartment as so designated in the instructions; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing the first sequential RPF block at a specified location within the selected compartment as so designated in the instructions. |
| m) placing each successively-ordered RPF block at its designated location within the compartment as set forth in the instructions, until the compartment is filled in accordance with the instructions; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing each successively-ordered RPF block at its designated location within the compartment as set forth in the instructions, until the compartment is filled in accordance with the instructions. |
| n) for each remaining compartment of the fuel tank, performing steps j) through m), above; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of for each remaining compartment of the fuel tank, performing steps j) through m), above. |
| o) performing an inspection of the installed RPF blocks, and afterwards, closing all open compartment or fuel tank access panels; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of performing an inspection of the installed RPF blocks, and afterwards, closing all open compartment or fuel tank access panels. |

27

| p) re-fueling all compartments of the fuel tank and verifying the fuel tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the subject aircraft. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of re-fueling all compartments of the fuel tank and verifying the fuel tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the subject aircraft. |
| --- | --- |

| '998 Patent Claim Element | Jetaire's Position |
| --- | --- |
| 3. A method for providing fuel ignition mitigation for the interior of the center wing tank of an aircraft of the type having a center wing tank consisting of a forward, center, and aft compartment, in which each compartment manifests interior surfaces contoured for the accommodation of compartment structural members and equipment, said method comprising the steps of: | Jetaire's Invicta products practice this claim element because its provides a method for providing fuel ignition mitigation for the interior of the center wing tank of an aircraft of the type having a center wing tank consisting of a forward, center, and aft compartment, in which each compartment manifests interior surfaces contoured for the accommodation of compartment structural members and equipment, said method comprising the following steps. |
| a) determining dimensions, contour, and precise location of structural members for each of the compartments as encountered at sequentially-measured linear increments along either width or length dimension of the interior of each compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of determining dimensions, contour, and precise location of structural members for each of the compartments as encountered at sequentially-measured linear increments along either width or length dimension of the interior of each compartment. |
| b) rendering scaled engineering drawing of a vertically-oriented cross-sectional profile of each of the forward, center, and aft compartments at each measured linear increment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of rendering scaled engineering drawing of a vertically-oriented cross-sectional profile of each of the forward, center, and aft compartments at each measured linear increment. |
| c) numerically sequencing each drawing corresponding to a respective drawing location along the measured linear increments within | Jetaire's Invicta products practice this claim element because Jetaire performs the step of numerically sequencing each drawing |

28

| | |
|---|---|
| the respective forward, center and aft compartment; | corresponding to a respective drawing location along the measured linear increments within the respective forward, center and aft compartment. |
| d) providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said sheets of RPF comprising a thickness dependent upon size and type of aircraft fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said sheets of RPF comprising a thickness dependent upon size and type of aircraft fuel tank. |
| e) excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each block cutout conforming to the scaled engineering drawing for each particular compartment, and further, designating each RPF block by a part number, an orientating "UP" arrow and an orientating "FORWARD" arrow; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each block cutout conforming to the scaled engineering drawing for each particular compartment, and further, designating each RPF block by a part number, an orientating "UP" arrow and an orientating "FORWARD" arrow. |
| f) arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of each RPF cutout part number for each of the forward, center, and aft compartments; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of each RPF cutout part number for each of the forward, center, and aft compartments. |
| g) for each compartment, sequentially packaging an aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of for each compartment, sequentially packaging an aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping. |
| h) composing instructions for each compartment to be used by technicians/installers for the purpose of inserting and installing said RPF blocks into each compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of composing instructions for each compartment to be used by technicians/installers for the purpose of inserting and installing said RPF blocks into each compartment. |

29

Appx01057

| | |
|---|---|
| i) parking the aircraft on a level surface, and emptying and purging all compartments of the center wing tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of parking the aircraft on a level surface, and emptying and purging all compartments of the center wing tank. |
| j) beginning with the aft compartment, removing a tank access panel or other external tank cover which i) functions as an opening for entry of maintenance personnel and/or technicians into the aft compartment, and ii) is proximate the aft compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of beginning with the aft compartment, removing a tank access panel or other external tank cover which i) functions as an opening for entry of maintenance personnel and/or technicians into the aft compartment, and ii) is proximate the aft compartment. |
| l) placing the first sequential RPF block at a specified location within the aft compartment, as so designated in the instructions; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing the first sequential RPF block at a specified location within the aft compartment, as so designated in the instructions. |
| m) placing each successively-ordered RPF block at its designated location within the aft compartment as set forth in the installation instructions, until said aft compartment is filled in accordance with the previously determined aggregate of RPF blocks; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing each successively-ordered RPF block at its designated location within the aft compartment as set forth in the installation instructions, until said aft compartment is filled in accordance with the previously determined aggregate of RPF blocks. |
| n) performing an inspection of the installed RPF blocks in the aft compartment, then closing any previously opened tank/compartment access panels. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of performing an inspection of the installed RPF blocks in the aft compartment, then closing any previously opened tank/compartment access panels. |
| o) placing successively-ordered RPF blocks at their designated locations within the center compartment as set forth in steps j) through n), above until said center compartment is filled with the required aggregate of RPF blocks; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing successively-ordered RPF blocks at their designated locations within the center compartment as set forth in steps j) through n), above until said center compartment is filled with the required aggregate of RPF blocks. |

30

| | |
|---|---|
| p) placing successively-ordered RPF block at their designated locations within the forward compartment as set forth in steps j) through n) above, until said forward compartment is filled with the required aggregate of RPF blocks; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing successively-ordered RPF block at their designated locations within the forward compartment as set forth in steps j) through n) above, until said forward compartment is filled with the required aggregate of RPF blocks. |
| q) re-fueling all compartments of the center wing tank and verifying the tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the aircraft. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of re-fueling all compartments of the center wing tank and verifying the tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the aircraft. |
| 4. The method as in claim 1, wherein the reticulated polyurethane foam material comprises a purple color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein the reticulated polyurethane foam material comprises a purple color. |
| 5. The method as in claim 2, wherein the reticulated polyurethane foam material comprises a purple color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 2 and wherein the reticulated polyurethane foam material comprises a purple color. |
| 6. The method as in claim 3, wherein the reticulated polyurethane foam material comprises a purple color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 3 and wherein the reticulated polyurethane foam material comprises a purple color. |

| '109 Patent Claim Element | Jetaire's Position |
|---|---|
| 1. A method for providing ignition mitigation for a fuel tank, comprising: determining interior dimensions of the fuel tank; | Jetaire's Invicta products practice this claim element because they provide a method for providing ignition mitigation for a fuel tank, comprising: determining interior dimensions of the fuel tank. |

31

| | |
|---|---|
| providing a bulk quantity of foam material; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of providing a bulk quantity of foam material. |
| cutting the foam material into a plurality of foam blocks, wherein: at least two foam blocks among the plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces within a compartment of the fuel tank; and the plurality of foam blocks comprise an upper cutout for clearance around an upper stiffener of the fuel tank, an arcuate cutout for clearance around a fuel pump of the fuel tank, and a lower cutout for clearance around a lower stiffener of the fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of cutting the foam material into a plurality of foam blocks, wherein: at least two foam blocks among the plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces within a compartment of the fuel tank; and the plurality of foam blocks comprise an upper cutout for clearance around an upper stiffener of the fuel tank, an arcuate cutout for clearance around a fuel pump of the fuel tank, and a lower cutout for clearance around a lower stiffener of the fuel tank. |
| positioning the plurality of foam blocks within the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of positioning the plurality of foam blocks within the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank. |
| filling the fuel tank with fuel and verifying a quantity of the fuel in the fuel tank, wherein: | Jetaire's Invicta products practice this claim element because Jetaire performs the step of filling the fuel tank with fuel and verifying a quantity of the fuel in the fuel tank. |
| a first foam block among the plurality of foam blocks comprises the upper cutout; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of a first foam block among the plurality of foam blocks comprises the upper cutout. |
| a second foam block among the plurality of foam blocks comprises the lower cutout; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of a second foam block among the plurality of foam blocks comprises the lower cutout. |
| the first foam block and the second foam block are stacked in a vertically-oriented column within the fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the first foam block and the second foam block |

32

| | are stacked in a vertically-oriented column within the fuel tank. |
|---|---|
| the plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column. |
| The third foam block comprises at least one channel void to reduce weight. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the third foam block comprises at least one channel void to reduce weight. |
| 2. The method of claim 1, wherein the foam material comprises reticulated polyurethane foam. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein the foam material comprises reticulated polyurethane foam. |
| 3. The method of claim 1, wherein the foam material comprises polyether foam. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein the foam material comprises polyether foam. |
| 4. The method of claim 1, wherein at least one foam block among the plurality of foam blocks comprises a specified color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein at least one foam block among the plurality of foam blocks comprises a specified color. |
| 5. The method of claim 1, wherein the fuel tank comprises at least one of a center wing tank or an auxiliary tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein the fuel tank comprises at least one of a center wing tank or an auxiliary tank. |
| 6. The method of claim 1, further comprising, before positioning the plurality of foam blocks within the fuel tank, purging and vacuuming the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and further comprising, before positioning the plurality of foam blocks within the fuel tank, purging and vacuuming the fuel tank. |
| 7. The method of claim 1, wherein cutting the foam material further comprises: cutting the | Jetaire's Invicta products practice this claim element because Jetaire performs the method |

33

| | |
|---|---|
| foam material into a second plurality of foam blocks, wherein at least two foam blocks among the second plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces of the fuel tank within a second compartment of the fuel tank. | of claim 1 and wherein cutting the foam material further comprises: cutting the foam material into a second plurality of foam blocks, wherein at least two foam blocks among the second plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces of the fuel tank within a second compartment of the fuel tank. |
| 8. The method of claim 1, wherein cutting the foam material further comprises: cutting a plurality of upper cutouts including the upper cutout in the first foam block to provide clearance around upper stiffeners including the upper stiffener in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein cutting the foam material further comprises: cutting a plurality of upper cutouts including the upper cutout in the first foam block to provide clearance around upper stiffeners including the upper stiffener in the fuel tank. |
| 9. The method of claim 8, wherein cutting the foam material further comprises: cutting a plurality of lower cutouts including the lower cutout in the second foam block to provide clearance around lower stiffeners including the lower stiffener in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of claim 8 and wherein cutting the foam material further comprises: cutting a plurality of lower cutouts including the lower cutout in the second foam block to provide clearance around lower stiffeners including the lower stiffener in the fuel tank. |
| 10. The method of claim 9, wherein cutting the foam material further comprises: cutting the arcuate cutout in at least one foam block among the plurality of foam blocks to provide clearance around the fuel pump. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 9 and wherein cutting the foam material further comprises: cutting the arcuate cutout in at least one foam block among the plurality of foam blocks to provide clearance around the fuel pump. |
| 11. The method of claim 1, further comprising arranging the plurality of foam blocks in a stack corresponding to a sequential installation at respective sectors within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and further comprising arranging the plurality of foam blocks in a stack corresponding to a sequential installation at respective sectors within at least one compartment of the fuel tank. |

34

| 12. The method of claim 1, further comprising forming a directional indicator in or on at least one foam block among the plurality of foam blocks to indicate an installation orientation at a sector within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and further comprising forming a directional indicator in or on at least one foam block among the plurality of foam blocks to indicate an installation orientation at a sector within at least one compartment of the fuel tank. |
|---|---|
| 13. The method of claim 1, further comprising marking an identifier on at least one foam block among the plurality of foam blocks to indicate an installation location at a sector within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and further comprising marking an identifier on at least one foam block among the plurality of foam blocks to indicate an installation location at a sector within at least one compartment of the fuel tank. |
| 14. The method of claim 13, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the plurality of foam blocks within the at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of method of claim 13 and wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the plurality of foam blocks within the at least one compartment of the fuel tank. |

| '109 Patent Claim Element | Jetaire's Position |
|---|---|
| 15. A method of forming foam blocks for fuel tank ignition mitigation, comprising: providing a bulk quantity of foam material; | Jetaire's Invicta products practice this claim element because they provide a method of forming foam blocks for fuel tank ignition mitigation, comprising: providing a bulk quantity of foam material. |
| cutting the foam material into a plurality of foam blocks, wherein: at least two foam blocks among the plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces within a compartment of a fuel tank; and the plurality of foam blocks comprise an upper cutout for clearance around an upper stiffener of the fuel tank and a lower cutout for | Jetaire's Invicta products practice this claim element because Jetaire performs the step of cutting the foam material into a plurality of foam blocks, wherein: at least two foam blocks among the plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces within a compartment of a fuel tank; and the plurality of foam blocks comprise an upper |

35

| | |
|---|---|
| clearance around a lower stiffener of the fuel tank; and | cutout for clearance around an upper stiffener of the fuel tank and a lower cutout for clearance around a lower stiffener of the fuel tank. |
| positioning the plurality of foam blocks within the fuel tank with the upper cutout around the upper stiffener of the fuel tank and the lower cutout around the lower stiffener of the fuel tank, wherein: | Jetaire's Invicta products practice this claim element because Jetaire performs the step of positioning the plurality of foam blocks within the fuel tank with the upper cutout around the upper stiffener of the fuel tank and the lower cutout around the lower stiffener of the fuel tank, wherein. |
| a first foam block among the plurality of foam blocks comprises the upper cutout; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of a first foam block among the plurality of foam blocks comprises the upper cutout. |
| a second foam block among the plurality of foam blocks comprises the lower cutout; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of a second foam block among the plurality of foam blocks comprises the lower cutout. |
| the first foam block and the second foam block are stacked in a vertically-oriented column within the fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the first foam block and the second foam block are stacked in a vertically-oriented column within the fuel tank. |
| the plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column. |
| the third foam block comprises at least one channel void to reduce weight. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the third foam block comprises at least one channel void to reduce weight. |
| 16. The method of claim 15, further comprising cutting the foam material into a second plurality of foam blocks, wherein at least two foam blocks among the second plurality of foam blocks have unique profiles, as compared to each other, corresponding to | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising cutting the foam material into a second plurality of foam blocks, wherein at least two foam blocks among the second plurality of foam blocks |

36

| | |
|---|---|
| different inner surfaces of the fuel tank within a second compartment of the fuel tank. | have unique profiles, as compared to each other, corresponding to different inner surfaces of the fuel tank within a second compartment of the fuel tank. |
| 17. The method of claim 15, wherein the foam material comprises reticulated polyurethane foam. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein the foam material comprises reticulated polyurethane foam. |
| 18. The method of claim 15, wherein the foam material comprises polyether foam. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein the foam material comprises polyether foam. |
| 19. The method of claim 15, wherein at least one foam block among the plurality of foam blocks comprises a specified color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein at least one foam block among the plurality of foam blocks comprises a specified color. |
| 20. The method of claim 15, wherein the fuel tank comprises at least one of a center wing tank or an auxiliary wing tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein the fuel tank comprises at least one of a center wing tank or an auxiliary wing tank. |
| 21. The method of claim 15, further comprising: filling the fuel tank with fuel and verifying a quantity of the fuel in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising: filling the fuel tank with fuel and verifying a quantity of the fuel in the fuel tank. |
| 22. The method of claim 21, further comprising, before positioning the plurality of foam blocks within the fuel tank, purging and vacuuming the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 21 and further comprising, before positioning the plurality of foam blocks within the fuel tank, purging and vacuuming the fuel tank. |
| 23. The method of claim 15, wherein cutting the foam material further comprises: cutting a plurality of upper cutouts including the upper cutout in the first foam block to | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein cutting the foam material further comprises: cutting a plurality of upper cutouts including the upper cutout in |

37

| | |
|---|---|
| provide clearance around upper stiffeners including the upper stiffener in the fuel tank. | the first foam block to provide clearance around upper stiffeners including the upper stiffener in the fuel tank. |
| 24. The method of claim 23, wherein cutting the foam material further comprises: cutting a plurality of lower cutouts including the lower cutout in the second foam block to provide clearance around lower stiffeners including the lower stiffener in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 23 and wherein cutting the foam material further comprises: cutting a plurality of lower cutouts including the lower cutout in the second foam block to provide clearance around lower stiffeners including the lower stiffener in the fuel tank. |
| 25. The method of claim 24, wherein cutting the foam material further comprises: cutting at least one arcuate cutout in at least one foam block among the plurality of foam blocks to provide clearance around a fuel pump in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 24 and wherein cutting the foam material further comprises: cutting at least one arcuate cutout in at least one foam block among the plurality of foam blocks to provide clearance around a fuel pump in the fuel tank. |
| 26. The method of claim 15, further comprising arranging the plurality of foam blocks in a stack corresponding to a sequential installation at respective sectors within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising arranging the plurality of foam blocks in a stack corresponding to a sequential installation at respective sectors within at least one compartment of the fuel tank. |
| 27. The method of claim 15, further comprising forming a directional indicator in or on at least one foam block among the plurality of foam blocks to indicate an installation orientation at a sector within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising forming a directional indicator in or on at least one foam block among the plurality of foam blocks to indicate an installation orientation at a sector within at least one compartment of the fuel tank. |
| 28. The method of claim 15, further comprising marking an identifier on at least one foam block among the plurality of foam blocks to indicate an installation location at a sector within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising marking an identifier on at least one foam block among the plurality of foam blocks to indicate an installation location at a sector within at least one compartment of the fuel tank. |

38

| | |
|---|---|
| 29. The method of claim 28, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the plurality of foam blocks within the at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of method of claim 28 and wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the plurality of foam blocks within the at least one compartment of the fuel tank. |
| 30. The method of claim 15, wherein the plurality of foam blocks fit within the fuel tank to fill a total volume of the fuel tank with open voids of no larger than a certain size and less than a percentage of the total volume of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein the plurality of foam blocks fit within the fuel tank to fill a total volume of the fuel tank with open voids of no larger than a certain size and less than a percentage of the total volume of the fuel tank. |
| 31. The method of claim 15, wherein a fourth foam block among the plurality of foam blocks is oriented vertically, spans the vertically-oriented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein a fourth foam block among the plurality of foam blocks is oriented vertically, spans the vertically-oriented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column |

| '541 Patent Claim Element | Jetaire's Position |
|---|---|
| 1. A system for ignition mitigation, comprising: a fuel tank, | Jetaire's Invicta products practice this claim element because they provide a system for ignition mitigation, comprising a fuel tank. |
| A first plurality of foam blocks, at least two foam blocks among the first plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a first compartment of the fuel tank; and | Jetaire's Invicta products practice this claim elements because they comprise a first plurality of foam blocks, at least two foam blocks among the first plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a first compartment of the fuel tank. |
| A second plurality of foam blocks, at least two foam blocks among the second plurality of foam blocks having unique profiles in shape, | Jetaire's Invicta products comprise a second plurality of foam blocks, at least two foam blocks among the second plurality of foam |

39

| | |
|---|---|
| as compared to each other, to conform to different inner surfaces of a second compartment of the fuel tank, wherein: | blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a second compartment of the fuel tank. |
| At least one foam block among the first plurality of foam blocks comprises an upper cutout in a top surface for clearance around an upper stiffener of the fuel tank, an arcuate cutout in a side surface for clearance around a fuel pump of the fuel tank, and a lower cutout in a bottom surface for clearance around a lower stiffener of the fuel tank; and | Jetaire's Invicta products comprise At least one foam block among the first plurality of foam blocks comprises an upper cutout in a top surface for clearance around an upper stiffener of the fuel tank, an arcuate cutout in a side surface for clearance around a fuel pump of the fuel tank, and a lower cutout in a bottom surface for clearance around a lower stiffener of the fuel tank. |
| the first plurality of foam blocks is positioned within the first compartment of the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank. | Jetaire's Invicta products comprise the first plurality of foam blocks is positioned within the first compartment of the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank. |
| 2. The system of claim 1, further comprising: | Jetaire's Invicta products comprise the system of claim 1 and further comprising the following: |
| A third plurality of foam blocks, at least two foam blocks among the third plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a third compartment of the fuel tank. | Jetaire's Invicta products comprise a third plurality of foam blocks, at least two foam blocks among the third plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a third compartment of the fuel tank. |
| 3. The system of claim 2, wherein: the fuel tank comprises part of an airplane fuel tank system; the first compartment comprises a forward compartment of the fuel tank; the second compartment comprises a center compartment of the fuel tank; and the third compartment comprises an aft compartment of the fuel tank. | Jetaire's Invicta products comprise the system of claim 2 and wherein: the fuel tank comprises part of an airplane fuel tank system; the first compartment comprises a forward compartment of the fuel tank; the second compartment comprises a center compartment of the fuel tank; and the third compartment comprises an aft compartment of the fuel tank. |
| 4. The system of claim 1, wherein the fuel tank comprises at least one of a center wing tank or | Jetaire's Invicta products comprise the system of claim and wherein the fuel tank comprises |

40

| | |
|---|---|
| an auxiliary fuel tank of an airplane fuel tank system. | at least one of a center wing tank or an auxiliary fuel tank of an airplane fuel tank system. |
| 5. The system of claim 1, wherein: a first foam block among the first plurality of foam blocks comprises a plurality of upper cutouts, including the upper cutout, to provide clearance for upper stiffeners in the fuel tank; a second foam block among the first plurality of foam blocks comprises a plurality of lower cutouts, including the lower cutout, to provide clearance for lower stiffeners in the fuel tank; the first foam block and the second foam block are stacked in a vertically-oriented column; the first plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and the third foam block comprises at least one channel void to reduce weight. | Jetaire's Invicta products comprise the system of claim 1, wherein: a first foam block among the first plurality of foam blocks comprises a plurality of upper cutouts, including the upper cutout, to provide clearance for upper stiffeners in the fuel tank and a second foam block among the first plurality of foam blocks comprises a plurality of lower cutouts, including the lower cutout, to provide clearance for lower stiffeners in the fuel tank; the first foam block and the second foam block are stacked in a vertically-oriented column; the first plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and the third foam block comprises at least one channel void to reduce weight. |
| 7. The system of claim 1, wherein at least two foam blocks among the first plurality of foam blocks comprise at least two arcuate cutouts, including the arcuate cutout, to provide clearance for the fuel pump of the fuel tank. | Jetaire's Invicta products comprise the system of claim 1 and wherein at least two foam blocks among the first plurality of foam blocks comprise at least two arcuate cutouts, including the arcuate cutout, to provide clearance for the fuel pump of the fuel tank. |
| 8. The system of claim 1, wherein the first plurality of foam blocks are arranged in a stack corresponding to a sequential installation at respective sectors within the first compartment of the fuel tank. | Jetaire's Invicta products comprise the system of claim 1, wherein the first plurality of foam blocks are arranged in a stack corresponding to a sequential installation at respective sectors within the first compartment of the fuel tank. |
| 9. The system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises a directional indicator to indicate an installation orientation within the fuel tank. | Jetaire's Invicta products comprise the system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises a directional indicator to indicate an installation orientation within the fuel tank. |
| 10. The system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises an identifier to indicate an | Jetaire's Invicta products comprise the system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises an identifier to indicate an |

41

| installation location at a sector within at least one compartment of the fuel tank. | installation location at a sector within at least one compartment of the fuel tank. |
|---|---|
| 11. The system of claim 10, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the first plurality of foam blocks within the at least one compartment of the fuel tank. | Jetaire's Invicta products comprise the system of claim 10, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the first plurality of foam blocks within the at least one compartment of the fuel tank. |
| 12. The system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises a specified color to identify fuel contamination, an ignition event, or foam deterioration. | Jetaire's Invicta products comprise the system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises a specified color to identify fuel contamination, an ignition event, or foam deterioration. |
| 13. The system of claim 1, wherein the first plurality of foam blocks are formed from a flexible foam material. | Jetaire's Invicta products comprise the system of claim 1, wherein the first plurality of foam blocks are formed from a flexible foam material. |
| 14. The system of claim 13, wherein the flexible foam material comprises reticulated polyurethane foam. | Jetaire's Invicta products comprise the system of claim 13, wherein the flexible foam material comprises reticulated polyurethane foam. |
| 15. The system of claim 13, wherein the flexible foam material comprises polyether foam | Jetaire's Invicta products comprise the system of claim 13, wherein the flexible foam material comprises polyether foam. |

| '541 Patent Claim Element | Jetaire's Position |
|---|---|
| 16. A system for ignition mitigation, comprising: a fuel tank for an airplane; | Jetaire's Invicta products comprise a system for ignition mitigation, comprising a fuel tank for an airplane. |
| a first plurality of foam blocks, at least two foam blocks among the first plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a first compartment of the fuel tank; and | Jetaire's Invicta products comprise a first plurality of foam blocks, at least two foam blocks among the first plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a first compartment of the fuel tank. |

42

Appx01070

| | |
|---|---|
| A second plurality of foam blocks, at least two foam blocks among the second plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a second compartment of the fuel tank, wherein: | Jetaire's Invicta products comprise a second plurality of foam blocks, at least two foam blocks among the second plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a second compartment of the fuel tank. |
| at least one foam block among the first plurality of foam blocks comprises an upper cutout in a top surface for clearance around an upper stiffener of the fuel tank, an arcuate cutout in a side surface for clearance around a fuel pump of the fuel tank, and a lower cutout in a bottom surface for clearance around a lower stiffener of the fuel tank; | Jetaire's Invicta products comprise at least one foam block among the first plurality of foam blocks comprises an upper cutout in a top surface for clearance around an upper stiffener of the fuel tank, an arcuate cutout in a side surface for clearance around a fuel pump of the fuel tank, and a lower cutout in a bottom surface for clearance around a lower stiffener of the fuel tank. |
| the first plurality of foam blocks is positioned within the first compartment of the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank; and | Jetaire's Invicta products comprise the first plurality of foam blocks is positioned within the first compartment of the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank. |
| the second plurality of foam blocks is positioned within the second compartment of the fuel tank. | Jetaire's Invicta products comprise the second plurality of foam blocks is positioned within the second compartment of the fuel tank. |
| A third plurality of foam blocks, at least two foam blocks among the third plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a third compartment of the fuel tank. | Jetaire's Invicta products comprise a third plurality of foam blocks, at least two foam blocks among the third plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a third compartment of the fuel tank. |
| 17. The system of claim 16, wherein the first plurality of foam blocks fit within the fuel tank to fill a total volume of the fuel tank with open voids of no larger than a certain size and less than a percentage of the total volume of the fuel tank. | Jetaire's Invicta products practice the system of claim 16 and wherein the first plurality of foam blocks fit within the fuel tank to fill a total volume of the fuel tank with open voids of no larger than a certain size and less than a percentage of the total volume of the fuel tank. |

43

| | |
|---|---|
| 18. The system of claim 16, wherein:<br>A first foam block among the first plurality of foam blocks comprises a plurality of upper cutouts, including the upper cutout, to provide clearance for upper stiffeners in the fuel tank; | Jetaire's Invicta products practice system of claim 16 and wherein a first foam block among the first plurality of foam blocks comprises a plurality of upper cutouts, including the upper cutout, to provide clearance for upper stiffeners in the fuel tank. |
| a second foam block among the first plurality of foam blocks comprises a plurality of lower cutouts, including the lower cutout, to provide clearance for lower stiffeners in the fuel tank; | Jetaire's Invicta products comprise a second foam block among the first plurality of foam blocks comprises a plurality of lower cutouts, including the lower cutout, to provide clearance for lower stiffeners in the fuel tank. |
| the first foam block and the second foam block are stacked in a vertically-oriented column within the first compartment of the fuel tank; | Jetaire's Invicta products comprise the first foam block and the second foam block are stacked in a vertically-oriented column within the first compartment of the fuel tank. |
| the first plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and | Jetaire's Invicta products comprise the first plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column. |
| the third foam block comprises at least one channel void to reduce weight. | Jetaire's Invicta products comprise the third foam block comprises at least one channel void to reduce weight. |
| 19. The system of claim 18, wherein a fourth foam block among the first plurality of foam blocks is oriented vertically in the vertically-oriented column, spans the vertically-oriented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column. | Jetaire's Invicta products practice the system of claim 18 and wherein a fourth foam block among the first plurality of foam blocks is oriented vertically in the vertically-oriented column, spans the vertically-oriented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column. |

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Plaintiff continues to search for responsive information and reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

44

Appx01072

**INTERROGATORY NO. 9:**

Identify all products concerning the use of foam for aircraft fuel tank ignition mitigation sold or licensed by Jetaire or any entities related to Jetaire, including: (1) the date of such sale or license; (ii) the selling or license price; and (iii) identification of any invoices showing such sales or licenses.

**RESPONSE:** In addition to preserving its General Objections, Plaintiff objects to this Interrogatory to the extent that it seeks disclosure of "all documents" protected from discovery by the attorney-client privilege and/or the attorney work product doctrine. Plaintiff also objects that the subject matter of the interrogatory seeks information and documents broader than the patented technologies and the AerSale products accused of infringement and is therefore irrelevant in that regard.

Jetaire further objects to an identification of "all products" as overly broad and unduly burdensome. Jetaire further objects to the Interrogatory to the extent it purports to request identification of each and every licensed product sold because that information may be derived from examination of Jetaire's business records, which will be produced pursuant to Fed. R. Civ. Proc. 33(d), and the burden of deriving or ascertaining the identify of such documents is substantially the same for AerSale as for Jetaire. Jetaire reserves the right to identify additional evidence of sales in the future.

Subject to the general and specific objections listed above, after a reasonable search, Plaintiff will produce pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, to the extent they exist and are within its possession, custody or control, non-privileged responsive documents sufficient to show the requested information and from which an answer may be derived or ascertained.

45

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Thus, Plaintiff reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**FIRST SUPPLEMENTAL RESPONSE (JAN. 27, 2022):** Jetaire is not withholding any non-privileged information pursuant to any general or specific objection, and Jetaire will produce any responsive information within its possession, custody, or control following its continued, reasonable inquiry.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Plaintiff continues to search for responsive information and reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**INTERROGATORY NO. 10:**

Identify and describe licenses or offers to license the Patents-in-Suit, including the time, place, and contents of the license or offer to license, the parties to the license or offer to license, and identification of any documents relating to the license or offer to license.

**RESPONSE:** In addition to preserving its General Objections, Plaintiff objects to this Interrogatory to the extent that it seeks disclosure of "all documents" protected from discovery by the attorney-client privilege and/or the attorney work product doctrine.

Jetaire further objects to an identification of "any documents relating to the license or offer to license" as overly broad and unduly burdensome. Jetaire further objects to the Interrogatory to the extent it purports to request identification of each and every document that in any way related

46

to licensing because that information may be derived from examination of Jetaire's business records, which will be produced pursuant to Fed. R. Civ. Proc. 33(d), and the burden of deriving or ascertaining the identify of such documents is substantially the same for AerSale as for Jetaire. Jetaire reserves the right to identify additional evidence of licensing in the future. Jetaire also objects that any information relating to offers for licenses or negotiations are irrelevant as Jetaire has not licensed the Patents-in-Suit.

Subject to the general and specific objections listed above, Jetaire states that there are no licenses related to the Patents-in-Suit and there have been no "offers to license the Patents-in-Suit." Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Thus, Plaintiff reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**INTERROGATORY NO. 11:**

For each license, including settlement agreements, covering any Patent-in-Suit that you contend constitutes a comparable license or a non-comparable license, for purposes of determining a reasonable royalty in this litigation, explain in detail the factual basis for your contention, including an explanation of the math underlying each of the license agreements and how the parties arrived at the amount.

**RESPONSE:** In addition to preserving its General Objections, Plaintiff objects to this Interrogatory to the extent that it seeks disclosure of "all documents" protected from discovery by the attorney-client privilege and/or the attorney work product doctrine.

Jetaire objects to this Interrogatory because it constitutes a contention interrogatory and is

47

therefore premature. The Scheduling Order entered in this lawsuit establishes the date by which Jetaire must make its expert disclosures. *See, e.g., O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365 (Fed. Cir. 2006) ("Answers to [contention] interrogatories are often postponed until the close of discovery "); *Novanta Corp. v. Iradion Laser, Inc.*, 15-1033-SLR-SRF, 2016 WL 4987110, at *7 (D. Del. Sept. 16, 2018) (Fallon, J.) ("[A] court may defer such interrogatories until the end of discovery."); *Internetad Sys. LLC v. ESPN, Inc.*, 3:03CV2787-D, 2004 WL 5181346, at *2 (N.D. Tex. Oct. 8, 2004) ("Many courts  conclude that contention interrogatories need not be answered until later in the discovery process."). Plaintiff objects to the extent that this Interrogatory is premature in light of the Court's Scheduling Order in this case, including discovery and expert deadlines. Plaintiff also objects to the extent that this Interrogatory requires Plaintiff to make a legal conclusion or judgment.

Subject to the general and specific objections listed above, Jetaire states that there are no licenses "covering any Patent-in-Suit."

In addition, Plaintiff anticipates that at the appropriate time, Plaintiff will serve one or more expert reports on the issue of damages that will contain information responsive to this interrogatory. These expert reports, if any, are expressly incorporated herein, including all attachments and any supplements thereto.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Thus, Plaintiff reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

48

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

Case No. <u>1:20-cv-25144-DPG</u>

JETAIRE AEROSPACE, LLC,

     Plaintiff,

v.

AERSALE INC.,

     Defendant.

_____

AERSALE, INC.,

     Defendant/Counter-Plaintiff,

v.

JETAIRE AEROSPACE, LLC, JETAIRE
FLIGHT SYSTEMS, LLC, and MICHAEL
D. WILLIAMS,

     Counter-Defendants.

**PLAINTIFF/COUNTER-DEFENDANTS' RESPONSE TO AERSALE'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Plaintiff/Counterclaim Defendant Jetaire Aerospace, LLC ("Jetaire Aerospace") and Counter-Defendants Jetaire Flight Systems, LLC ("Jetaire Flight") and Michael D. Williams ("Mr. Williams") (collectively, "Jetaire") pursuant to Federal Rule of Civil Procedure 56(c) and S.D. Fla. L.R. 56.1, hereby submit their Response to Defendant/Counterclaim-Plaintiff AerSale Inc.'s (hereinafter, "AerSale") Separate Statement of Undisputed Material Facts In Support Of Motion For Summary Judgment, or In The Alternative Partial Summary Judgment (DE 197, "SUMF"), supplement the record with their own Statement Of Additional Material Facts In Opposition To AerSale's Summary Judgment Motion ("SAMF"), and state as follows:

*contains Confidential Information*

Redacted

16.    **Undisputed**.

Redacted

19.    **Disputed**.  *See, supra*, at ¶18.

20.    **Undisputed**.

Redacted

*contains Confidential Information*

Redacted

*contains Confidential Information*

**<u>Statement Of Additional Material Facts For AerSale's Summary Judgment Motion</u>**

Redacted

*contains Confidential Information*

Redacted

*contains Confidential Information*

Redacted

FILED UNDER SEAL



## Planet Depos
### We Make It Happen™

## HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Transcript of Michael Williams, Designated Representative

**Date:** February 7, 2023
**Case:** Jetaire Aerospace, LLC -v- Aersale Inc.

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

FILED UNDER SEAL

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

_____

JETAIRE AEROSPACE, LLC                    :
                                          :
                                          :
Plaintiff/Counter-Defendant,              :
                                          : CIVIL ACTION
v.                                        : FILE NUMBER:
                                        : 1:20-cv-25144-GAYLES/
AERSALE, INC.                             : TORRES
                                          :
                                          :
Defendant/Counter-Plaintiff,              :
                                          :
V.                                        :
                                          :
JETAIRE AEROSPACE, LLC; JETAIRE           :
FLIGHT SYSTEMS, LLC; and                  :
MICHAEL WILLIAMS,                         :
                                          :
     Counter-Defendants.                  :
                                          :
_____

   HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

          VIDEOTAPED DEPOSITION OF
MICHAEL WILLIAMS as 30(b)(6) WITNESS FOR JETAIRE
               AEROSPACE, LLC

               10:30 a.m.
            February 7, 2023

       EVERSHEDS SUTHERLAND (US) LLP
         999 Peachtree Street, NE
               Suite 2300
            Atlanta, Georgia


   Susan DiFilippantonio, RPR, CCR No. B-2125

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative
February 7, 2023                                           2

APPEARANCES:

On Behalf of the Plaintiff/Counter-Defendant, JETAIRE
AEROSPACE, LLC:

ROZIER HARDT MCDONOUGH, PLLC
BY:  James F. McDonough, III
3621 Vinings Slope
Suite 4300
Atlanta, GA 30339
470.480.9505
jim@rhmtrial.com

On Behalf of the Defendant/Counter-Plaintiff, AERSALE,
INC.:

EVERSHEDS SUTHERLAND (US) LLP
BY:  Regis C. Worley
12255 El Camino Real
Suite 100
San Diego, CA 92130
858.252.6502
regisworley@eversheds-sutherland.com

EVERSHEDS SUTHERLAND (US) LLP
BY:  Valerie S. Sanders
999 Peachtree Street, NE
Suite 2300
Atlanta, GA 30309
404.853.8000
valeriesanders@eversheds-sutherland.com


Also Present:  Shawn Rafferty
               Ervin Farkas, videographer

Appx01124

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative
February 7, 2023                                    3

```
                    I N D E X
WITNESS/EXAMINATION                         PAGE

MICHAEL WILLIAMS                                6
EXAMINATION                                     7
     BY MR. WORLEY
DISCLOSURE                                    207
CERTIFICATE OF REPORTER                       211
SIGNATURE OF DEPONENT                         213
                  E X H I B I T S

Defendant/Counter-Plaintiff's              10
Exhibit 1,
Defendant/Counterclaim-Plaintiff
AerSale, Inc.'s Notice of
Deposition to Jetaire Aerospace,
LLC, Pursuant to Federal Rule of
Civil Procedure 30(b)(6),
Defendant/Counter-Plaintiff's              14
Exhibit 2, United States Patent US
9,849,998 B2
Defendant/Counter-Plaintiff's              14
Exhibit 3, United States Patent US
10,633,109 B2
Defendant/Counter-Plaintiff's              15
Exhibit 4, United States Patent US
10,800,541 B2
Defendant/Counter-Plaintiff's              35
Exhibit 5, Jetaire Group
Capabilities
Defendant/Counter-Plaintiff's              41
Exhibit 6, Plaintiff Jetaire
Aerospace, LLC's Second
Supplemental Responses and
Objections to
Defendant/Counterclaim-Plaintiff
AerSale, Inc.'s Second Set of
Interrogatories
Defendant/Counter-Plaintiff's              51
Exhibit 7, Department of
Transportation Federal Aviation
Administration Supplemental Type
Certificate Number ST03834NY
Defendant/Counter-Plaintiff's              52
Exhibit 8, Department of
Transportation Federal Aviation
Administration Supplemental Type
Certificate Number ST03450NY

Defendant/Counter-Plaintiff's              52
Exhibit 9, Department of
Transportation Federal Aviation
Administration Supplemental Type
Certificate Number ST04415AT
Defendant/Counter-Plaintiff's              53
```

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative
February 7, 2023                                    4

Exhibit 10, Department of
Transportation Federal Aviation
Administration Supplemental Type
Certificate
Defendant/Counter-Plaintiff's                 76
Exhibit 11, E-mail dated July 14,
2018
Defendant/Counter-Plaintiff's                 80
Exhibit 12, E-mail dated April 8,
2017
Defendant/Counter-Plaintiff's                 90
Exhibit 13, E-mail dated October
6, 2015
Defendant/Counter-Plaintiff's                 100
Exhibit 14, Spreadsheet
Defendant/Counter-Plaintiff's                 107
Exhibit 15, Original Complaint for
Patent Infringement
Defendant/Counter-Plaintiff's                 114
Exhibit 16, E-mail dated July 14,
2014
Defendant/Counter-Plaintiff's                 118
Exhibit 17, SpeedNews Publication
Defendant/Counter-Plaintiff's                 122
Exhibit 18, United States Patent
and Trademark Office Notice of
Acceptance of Power of Attorney
Defendant/Counter-Plaintiff's                 124
Exhibit 19, United States Patent
and Trademark Office Issue
Notification Determination of
Patent Term Adjustment Under 35
USC 154(b),
Defendant/Counter-Plaintiff's                 125
Exhibit 20, United States Patent
and Trademark Office Issue
Notification Determination of
Patent Term Adjustment Under 35
USC 154(b),
Defendant/Counter-Plaintiff's                 126
Exhibit 21, Jetaire Drawing

Defendant/Counter-Plaintiff's            127
Exhibit 22, AerSale Fabrication
Drawing
Defendant/Counter-Plaintiff's                 130
Exhibit 23, Fabrication Drawings
Defendant/Counter-Plaintiff's                 131

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative
February 7, 2023                                    5

Exhibit 24, Webpage Printout from
www.jetairegroup.com
Defendant/Counter-Plaintiff's                    132
Exhibit 25, Website Printout from
www.jetairegroup.com
Defendant/Counter-Plaintiff's                    133
Exhibit 26, E-mail dated March 5,
2016
Defendant/Counter-Plaintiff's                    135
Exhibit 27, Video on Thumb Drive
Defendant/Counter-Plaintiff's                    138
Exhibit 28, Screenshots from Video
Defendant/Counter-Plaintiff's                    140
Exhibit 29, Jetaire Press Release
Defendant/Counter-Plaintiff's                    143
Exhibit 30, Jetaire Project
Specific Certification Plan
Defendant/Counter-Plaintiff's                    148
Exhibit 31, E-mail dated June 4,
2015
Defendant/Counter-Plaintiff's                    151
Exhibit 32, SAE Aerospace
Information Report
Defendant/Counter-Plaintiff's                    153
Exhibit 33, Patent Assignment
Cover Sheet
Defendant/Counter-Plaintiff's                    157
Exhibit 34, Web Capture from
www.jetairegroup.com,
Defendant/Counter-Plaintiff's                    159
Exhibit 35, E-mail dated September
5, 2016
Defendant/Counter-Plaintiff's                    183
Exhibit 36, Patent Assignment
Cover Sheet
Defendant/Counter-Plaintiff's                    190
Exhibit 37, Exhibit H

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative
February 7, 2023                                    6

(Tuesday, February 7, 2023, 10:30 a.m.)

THE VIDEOGRAPHER:  Today's date is February 7th, 2023.  The time is approximately 10:30 a.m. eastern time.

My name is Ervin Farkas and I am the videographer.  The Court Reporter is Susan DiFilippantonio.

All counsel present, please introduce yourselves and state your affiliations, starting with the taking attorney.

MR. WORLEY:  Regis Worley on behalf of Defendant AerSale.

MS. SANDERS:  Valerie Sanders, also on behalf of Defendants.

MR. RAFFERTY:  Shawn Rafferty on behalf of the defendant.

MR. MCDONOUGH:  And James McDonough with Rozier Hardt McDonough on behalf of the plaintiff.

THE VIDEOGRAPHER:  Thank you.

Would the Court Reporter please swear in the witness.

MICHAEL WILLIAMS,
called as a witness at the instance of the Defendant, being first duly sworn, was examined and deposed as follows:

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative
February 7, 2023                                          9

that as a potential exception.

MR. WORLEY:  Fair enough.

BY MR. WORLEY:

Q.    It's all good, Mr. Williams?

A.    Yes.

Q.    Okay.  Are there any other employees at Jetaire Aerospace?

A.    No.

Q.    What is Jetaire Aerospace's business?

A.    Its primary business is the holding and maintaining of intellectual property.

Q.    And which intellectual property does it hold or maintain?

A.    It maintains the patents that are in use by Jetaire and supplemental type certificates.

Q.    And supplemental type certificates, do you sometimes refer to those as STCs?

A.    Yes.

Q.    If we refer to something as an STC today, is that what you're referring to?

A.    Yes.

Q.    And when you -- you said that Jetaire Aerospace holds patents for Jetaire.  When you say "Jetaire," who are you referring to?

A.    Jetaire Aerospace and Jetaire Flight Systems.

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative
February 7, 2023                                    10

Q.    Does Jetaire Aerospace sell any products?    10:33:18

A.    No.    10:33:22

Q.    Is Jetaire Aerospace involved in the sale of    10:33:23
Jetaire products?    10:33:29

A.    No.    10:33:29

Q.    Does Jetaire Aerospace -- is it involved with    10:33:29
any customers?    10:33:36

A.    No.  Yes.    10:33:37

Q.    I'm sorry.  So --    10:33:43

A.    I'm sorry.  Correction.  Yes.    10:33:46

Q.    Which -- which customers would Jetaire Aerospace    10:33:47
be involved in?    10:33:53

A.    There may be occasions where Aerospace provides    10:33:54
the licensing agreement to a customer.  Licensing of the    10:34:00
STCs to a customer.    10:34:09

Q.    Other than licensing STCs to a customer, does    10:34:11
Jetaire Aerospace have any involvement with any other    10:34:17
customers?    10:34:19

A.    None.    10:34:20

Q.    Is Jetaire Aerospace involved in any marketing?    10:34:26

A.    No.    10:34:31

Q.    Mr. Williams, I would like to hand to you what    10:34:31
we can mark as Exhibit 1.  It's the notice of today's    10:34:46
deposition.    10:34:48

            (Defendant/Counter-Plaintiff's Exhibit 1,    10:34:48

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative
February 7, 2023                                                111

this action, which was back in December of 2020, has Jetaire Aerospace's knowledge of the accused products changed in any way?

MR. MCDONOUGH:  Object to the form to the extent it calls for legal conclusions.

THE WITNESS:  I don't know that it's changed.

MR. WORLEY:  Okay.  This might be a good time for a quick break.  I think we've been going for about an hour or so.  If we can go off the record for a few minutes?

THE WITNESS:  Sure.

THE VIDEOGRAPHER:  We are going off the record.  The time is 2:04 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 2:28 p.m.  Please continue.

BY MR. WORLEY:

Q.    Welcome back, Mr. Williams.  You understand you're still under oath?

A.    Yes.

Q.    Okay.  If you could please return to Exhibit 8, the STC.

A.    (Complying.)

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative
February 7, 2023                                               112

Q.    Do you have that in front of you?                14:28:35

A.    I do.                                            14:28:37

Q.    Why is it that Jetaire set out to obtain an STC, this STC?    14:28:38 14:28:44

            MR. MCDONOUGH:  Object to the form.       14:28:47

            THE WITNESS:  Why did we -- because there was a market for -- for the product.    14:28:47 14:28:50

BY MR. WORLEY:                                         14:28:52

Q.    Which product?                                  14:28:52

A.    For the product that's described herein, which would be the 737 center wing tank.    14:28:54 14:28:58

Q.    And once the STC issued, could Jetaire then sell the product, the INVICTA system?    14:29:01 14:29:08

A.    No.                                             14:29:09

Q.    Okay.                                           14:29:10

A.    No, we could not.                               14:29:10

Q.    What -- why not?                                14:29:11

A.    Because you have to secure a PMA first.         14:29:14

Q.    Okay.  Please tell me about that.               14:29:17

A.    Okay.  So you -- you can -- you can do one installation which would be considered a prototype for each aircraft type, and, in some cases, each aircraft configuration, as a demonstration of compliance with all FAA requirements, and consequently the FAA issues a certificate.  You cannot sell a subsequent aircraft    14:29:20 14:29:34 14:29:38 14:29:42 14:29:48 14:29:53

Appx01137

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative
February 7, 2023                                              113

without parts manufacturing approval.

Q.    That is the PMA you referred to?

A.    Yes.

Q.    And when you said you can't sell a subsequent aircraft without the PMA, is it also fair to say you cannot install the INVICTA system into an aircraft without the PMA?

A.    Yes.  You -- you cannot install but one aircraft without the PMA.

Is that your question?

Q.    Yes.  Okay.

When did -- or did Jetaire Aerospace ever get a PMA for the Boeing 737-300, 400 and 500 series?

A.    Yes.

Q.    When did that occur?

A.    I believe that was in April 2016.

Q.    Okay.

A.    Any earlier installations would have been considered prototypes and not saleable.

Q.    Okay.  So what was the business consequence of the issuance of the STC shown in Exhibit 8?

A.    Well, we have sold --

MR. MCDONOUGH:  Object to the form.

Go ahead.

THE WITNESS:  We have sold a number of NG

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative
February 7, 2023                                    114

kits and a number of Classic kits.

BY MR. WORLEY:

Q.     As of what time?

A.     We sold the last ones in December, I think, of last year, two months ago -- a month and a half ago, two months ago.

Q.     So is the STC document something that is required before Jetaire Aerospace can sell the INVICTA kits or before Jetaire Aerospace or one of its licensees can sell an INVICTA kit?

          MR. MCDONOUGH:  Object to form.  Asked and answered.

          THE WITNESS:  It is one of the things that is required before you can sell it.

BY MR. WORLEY:

Q.     And your testimony is that a PMA is another thing that is required before the INVICTA kit can be sold?

A.     Absolutely.

Q.     Okay.  We will go to the next exhibit, which I believe is Exhibit 16.

          (Defendant/Counter-Plaintiff's Exhibit , E-mail dated July 14, 2014, was marked for identification.)

BY MR. WORLEY:

Q.     For the record, Exhibit 16 is a document bearing

# EXHIBIT 22

# FILED UNDER SEAL

FILED UNDER SEAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No. 1:20-cv-25144-DPG

| | |
|---|---|
| JETAIRE AEROSPACE, LLC,<br><br>      Plaintiff,<br><br>v.<br><br>AERSALE INC.,<br><br>      Defendant. | |
| AERSALE, INC.,<br><br>      Defendant/Counter-Plaintiff,<br><br>v.<br><br>JETAIRE AEROSPACE, LLC, JETAIRE FLIGHT SYSTEMS, LLC, and MICHAEL D. WILLIAMS,<br><br>      Counter-Defendants. | **FILED UNDER SEAL** |

**DECLARATION OF MICHAEL D. WILLIAMS**

I, Michael D. Williams, am the owner and manager of Plaintiff/Counterclaim Defendant JETAIRE AEROSPACE, LLC ("Jetaire Aerospace") and Counter-Defendant JETAIRE FLIGHT SYSTEMS, LLC ("Jetaire Flight") (together, "Jetaire") in this action. The facts stated herein are based upon my own personal knowledge and information, and if called as a witness I would testify competently thereto.

1. I am the owner and operator of both Jetaire Aerospace and Jetaire Flight.

2. Jetaire Aerospace is a single-member LLC owned solely by me.

3. Jetaire Flight is a single-member LLC owned solely by me.

4. Jetaire Aerospace and Jetaire Flight are both fully controlled by me.

5. There are no employees of Jetaire Aerospace. Jetaire Flight employs approximately fourteen employees (14) presently.

FILED UNDER SEAL

6.    I operate my companies, and Jetaire Aerospace and Jetaire Flight function, as one fully-integrated company under my control which I refer to as "Jetaire" or "Jetaire Group."

7.    While Jetaire has used several bank accounts, Jetaire Aerospace and Jetaire Flight share each of these bank account and all funds in the accounts are comingled.

8.    Jetaire Aerospace holds a variety of intellectual property and certifications.  These include the asserted patents in this case against AerSale as well as all of the FAA-issued supplemental type certificates ("STCs") under which Jetaire's INVICTA products are sold and used.

9.    Jetaire Aerospace is involved in every sale of Jetaire's INVICTA products because Jetaire Aerospace holds the STCs for those products and for every sale grants a license to the customer to use the INVICTA system under the STCs held by Jetaire Aerospace.  The revenue from those sales (which includes licensing fees for the STC) goes into the bank account shared by both Jetaire Aerospace and Jetaire Flight.

10.    The relevant federal regulations and statutory rules mandate that all INVICTA sales are made under an STC held by Jetaire Aerospace.  Each INVICTA sale includes a right-to-use letter from "Jetaire" that grants the customer the ability to use the INVICTA kit on aircraft under Jetaire Aerspace's STC.

11.    The STCs are necessary for the sale of Jetaire Flight's INVICTA products in the marketplace.  The same is true for the parts manufacturing authorizations ("PMAs") that are held by Jetaire Flight.  Without both the STCs and PMAs held by Jetaire, we could not manufacture, offer for sale, or sell the INVICTA products in the marketplace.

12.    The cost and maintenances fees for the Asserted Patents are paid out of the comingled "Jetaire" bank accounts.

FILED UNDER SEAL

13.    All profits from Jetaire's INVICTA sales flow to Jetaire as a whole.

14.    Jetaire Aerospace has not and will not license the asserted patents, which are fully controlled by me as owner of Jetaire Aerospace and Jetaire Flight, to any other entity other than Jetaire Flight, which is allowed to make, use, sell, and offer to sell the technologies covered by the asserted patents.

I declare under penalty of perjury under the United State law that the foregoing is true and correct to the best of my knowledge.


Date:   August 4, 2023

*Michael D. Williams*

FILED UNDER SEAL



## Planet Depos®
### *We Make It Happen*™

<span style="color:darkred">**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**</span>

# Transcript of Michael Williams, Designated Representative, Volume II

**Date:** February 7, 2023
**Case:** Jetaire Aerospace, LLC -v- Aersale Inc.

**Planet Depos**
**Phone:** 777-833-3464
**Fax:** 777-503-3464
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

FILED UNDER SEAL

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

_____

JETAIRE AEROSPACE, LLC                :
                                      :
                                      :
Plaintiff/Counter-Defendant,          :
                                      : CIVIL ACTION
v.                                    : FILE NUMBER:
                                      : 1:20-cv-25144-GAYLES/
AERSALE, INC.                         : TORRES
                                      :
                                      :
Defendant/Counter-Plaintiff,          :
                                      :
V.                                    :
                                      :
JETAIRE AEROSPACE, LLC; JETAIRE       :
FLIGHT SYSTEMS, LLC; and              :
MICHAEL WILLIAMS,                     :
                                      :
        Counter-Defendants.           :
                                      :
_____

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VOLUME II
VIDEOTAPED DEPOSITION OF
MICHAEL WILLIAMS as 30(b)(6) WITNESS FOR JETAIRE FLIGHT
SYSTEMS, LLC

10:15 a.m.

February 8, 2023

EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street, NE
Suite 2300
Atlanta, Georgia

Susan DiFilippantonio, RPR, CCR No. B-2125

Appx01149

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative, Volume II
February 8, 2023

213

```
APPEARANCES:

On Behalf of the Plaintiff/Counter-Defendant, JETAIRE
AEROSPACE, LLC:


ROZIER HARDT MCDONOUGH, PLLC

BY:  James F. McDonough, III
3621 Vinings Slope
Suite 4300
Atlanta, GA 30339
470.480.9505
jim@rhmtrial.com

On Behalf of the Defendant/Counter-Plaintiff, AERSALE,
INC.:

EVERSHEDS SUTHERLAND (US) LLP
BY:  Regis C. Worley
12255 El Camino Real
Suite 100
San Diego, CA 92130
858.252.6502
regisworley@eversheds-sutherland.com

EVERSHEDS SUTHERLAND (US) LLP
BY:  Valerie S. Sanders
999 Peachtree Street, NE
Suite 2300
Atlanta, GA 30309
404.853.8000
valeriesanders@eversheds-sutherland.com


Also Present:  Shawn Rafferty
               Ervin Farkas, videographer
```

FILED UNDER SEAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative, Volume II

February 8, 2023                                    214

                          I N D E X

WITNESS/EXAMINATION                                   PAGE
MICHAEL WILLIAMS
EXAMINATION                                           217
      BY MR. WORLEY
DISCLOSURE                                            223
CERTIFICATE OF REPORTER                               227
SIGNATURE OF DEPONENT                                 229

                        E X H I B I T S
Defendant/Counter-Plaintiff's              235
Exhibit 38, Federal Aviation
Administration-Parts Manufacturer
Approval for Jetaire Flight
Systems, LLC
Defendant/Counter-Plaintiff's              235
Exhibit 39, Spreadsheet
Defendant/Counter-Plaintiff's              262
Exhibit 39A, Thumb Drive
Defendant/Counter-Plaintiff's              266
Exhibit 40,
Defendant/Counterclaim-Plaintiff
AerSale, Inc.'s Notice of
Deposition to Jetaire Flight
Systems, LLC, Pursuant to Federal
Rule of Civil Procedure 30(b)(6),
Defendant/Counter-Plaintiff's              308
Exhibit 41, E-mail dated August
17, 2016
Defendant/Counter-Plaintiff's              316
Exhibit 42, E-mail dated April 8,
2017
Defendant/Counter-Plaintiff's              317
Exhibit 43, E-mail dated April 28,
2015
Defendant/Counter-Plaintiff's              324
Exhibit 44, E-mail dated May 11,
2015
Defendant/Counter-Plaintiff's              327
Exhibit 45, Correspondence dated
August 26, 2020
Defendant/Counter-Plaintiff's              333
Exhibit 46, Correspondence dated
August 27, 2020
Defendant/Counter-Plaintiff's              336
Exhibit 47, E-mail dated December
9, 2013
Defendant/Counter-Plaintiff's              339
Exhibit 48, E-mail dated April 11,
2014
Defendant/Counter-Plaintiff's              340

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative, Volume II
February 8, 2023                                                 215

Exhibit 49, E-mail dated April 16, 2014

Defendant/Counter-Plaintiff's                              342
Exhibit 50, E-mail dated July 14, 2014

Defendant/Counter-Plaintiff's                              334
Exhibit 51, E-mail dated August 21, 2014

Defendant/Counter-Plaintiff's                              347
Exhibit 52, E-mail dated January 21, 2015

Defendant/Counter-Plaintiff's                              355
Exhibit 53, Brochure

Defendant/Counter-Plaintiff's                              357
Exhibit 54, Declaration of Anthony Femminineo

Defendant/Counter-Plaintiff's                              359
Exhibit 55, E-mail dated October 31, 2013

Defendant/Counter-Plaintiff's                              360
Exhibit 56, E-mail dated November 1, 2013

Defendant/Counter-Plaintiff's                              386
Exhibit 57, E-mail dated February 23, 2016

Defendant/Counter-Plaintiff's                              387
Exhibit 58, E-mail dated August 30, 2016

Defendant/Counter-Plaintiff's                              388
Exhibit 59, E-mail dated December 13, 2016

Defendant/Counter-Plaintiff's                              390
Exhibit 60, Jetaire Purchase and Sale Agreement, Engineering and Support Services, 14 CFR 25.981 Compliance

Defendant/Counter-Plaintiff's                              392
Exhibit 61, Jetaire Purchase and Sale Agreement, Engineering and Support Services, 14 CFT 25.981 Compliance

Defendant/Counter-Plaintiff's                              393
Exhibit 62, Jetaire Purchase and Sale Agreement, Engineering and Support Services, Modification of FAA STC

Defendant/Counter-Plaintiff's                              405
Exhibit 63, E-mail dated April 2, 2016

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative, Volume II
February 8, 2023    216

(Wednesday, February 8, 2023          10:15 a.m.)          10:14:53

THE VIDEOGRAPHER:  This is the videotaped     10:14:36
deposition of Michael Williams, corporate     10:14:38
representative of Jetaire Flight Systems, LLC, in     10:14:40
the case of Jetaire Aerospace, LLC, versus AerSale,     10:14:43
Inc.     10:14:48

Today's date is February 8, 2023.  The     10:14:48
time is approximately 10:15 a.m.     10:14:51

My name is Ervin Farkas and I am the     10:14:56
videographer.  The Court Reporter is Susan     10:14:59
DiFilippantonio.     10:15:01

All counsel present, please introduce     10:15:01
yourselves and state your affiliations,     10:15:05
starting with the noticing attorney.     10:15:07

MR. WORLEY:  Regis Worley on behalf of     10:15:09
AerSale.     10:15:11

MS. SANDERS:  Valerie Sanders also for     10:15:11
AerSale.     10:15:14

MR. RAFFERTY:  Shawn Rafferty for     10:15:14
AerSale.     10:15:16

MR. MCDONOUGH:  James McDonough on behalf
of Jetaire Flight Systems, LLC.

THE VIDEOGRAPHER:  Thank you.

Would the Court Reporter please swear in     10:15:23
the witness?  Or do we consider them --     10:15:26

*contains Confidential Information*

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative, Volume II
February 8, 2023                                    237

Redacted

*contains Confidential Information*

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative, Volume II
February 8, 2023                                                256
Redacted

contains Confidential Information

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative, Volume II
February 8, 2023                                          257
Redacted

11:16:00

11:16:04

11:16:07

11:16:08

11:16:10

11:16:10

11:16:14

11:16:19

11:16:23

11:16:25

11:16:25

11:16:30

11:16:38

11:16:38

11:16:43

11:16:51

11:16:55

11:16:55

11:17:02

11:17:09

11:17:12

11:17:13

11:17:14

11:17:20

11:17:25

*contains Confidential Information*

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative, Volume II
February 8, 2023                                    258
Redacted

*contains Confidential Information*

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative, Volume II
February 8, 2023                    259
Redacted

11:19:18

11:19:23

11:19:25

11:19:25

11:19:28

11:19:31

11:19:33

11:19:34

11:19:35

11:19:40

11:19:44

11:19:47

11:19:49

11:19:50

11:19:53

11:19:56

11:20:02

11:20:10

11:20:12

11:20:18

11:20:18

11:20:18

11:20:20

11:20:25

11:20:28

contains Confidential Information

FILED UNDER SEAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative, Volume II
February 8, 2023                                    260
Redacted

11:20:30

11:20:35

11:20:43

11:20:46

11:20:51

11:20:57

11:21:08

11:21:12

11:21:16

11:21:19

11:21:20

11:21:21

11:21:35

11:21:39

11:21:48

11:21:48

11:21:55

11:21:55

11:21:57

11:22:00

11:22:06

11:22:08

11:22:12

11:22:15

11:22:19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:20-cv-25144-GAYLES-TORRES

JETAIRE AEROSPACE LLC,                    )
                                          )
            Plaintiff,                    )
                                          )
vs.                                       )
                                          )
AERSALE, INC.,                            )
                                          )
            Defendant.                    )
                                          )
vs.                                       )
                                          )
JETAIRE AEROSPACE LLC,  JETAIRE )
FLIGHT SYSTEMS, LLC, and       )
MICHAEL WILLIAMS,                         )
                                          )
            Counter-Defendants.)
_____)


        ***CONFIDENTIAL - ATTORNEYS EYES ONLY***




            VIDEOTAPED DEPOSITION OF
              RONALD CHARLES MOYER

        Taken on Behalf of the Plaintiff

   DATE TAKEN:    February 21, 2023
   TIME:          9:35 AM - 4:55 PM
   PLACE:         255 Alhambra Circle
                  Coral Gables, Florida

800.211.DEPO (3376)
EsquireSolutions.com


ESQUIRE
DEPOSITION SOLUTIONS

RONALD C. MOYER  Attorneys Eyes Only                    February 21, 2023
JETAIRE AEROSPACE LLC vs AERSALE                                        2

APPEARANCES:

Counsel for Plaintiff Jetaire Aerospace:
ROZIER HARDT MCDONOUGH PLLC
BY:   JONATHAN R. HARDT, ESQ.
      JAMES F. MCDONOUGH, III, ESQ.
Rozier Hardt McDonough PLLC
712 W. 14th Street, Suite C
Austin, Texas 78701
hardt@rhmtrial.com

-and-

ROZIER HARDT MCDONOUGH PLLC
BY:   JAMES F. MCDONOUGH, III, ESQ.
3621 Vinings Slope, Suite 4300
Atlanta, Georgia 30339
jim@rhmtrial.com


Counsel for Defendant Aersale Inc.:
EVERSHEDS SUTHERLAND
BY:   JUSTIN E. GRAY, ESQ.
      VALERIE SANDERS, ESQ.
12255 El Camino Real, Suite 100
San Diego, California 92130
justingray@eversheds-sutherland.com
valeriesanders@eversheds-sutherland.com




Also present:
    Matthew Leiva, videographer
    Christopher Furlan, corporate counsel, AerSale

800.211.DEPO (3376)
EsquireSolutions.com



Appx01171

RONALD C. MOYER  Attorneys Eyes Only                    February 21, 2023
JETAIRE AEROSPACE LLC vs AERSALE                                        3

INDEX

EXAMINATION

Witness Name                                                        Page

RONALD CHARLES MOYER

    BY MR. HARDT  .................................    6

EXHIBITS

Exhibit        Description                                        Page

Exhibit 1      Deposition notice of Ron Moyer                       7

Exhibit 2      Deposition notice of AerSale, Inc.                   7

Exhibit 3      Supplemental Type Certificate                      37
               #STC0289NY

Exhibit 4      Supplemental Type Certificate                      45
               #ST02980NY

Exhibit 5      Spreadsheet, AerSafe Kit Sales                     61

Exhibit 6      Spreadsheet, AerSafe Development Cost              64
               Log

Exhibit 7      Spreadsheet, AerSafe 737 NEXGEN                    70
               Customer Log

Exhibit 8      Consultant Services Agreement                      87

Exhibit 9      Spreadsheet, AerSafe A320 Customer Log             95

Exhibit 10     Spreadsheet, AerSafe 757 Customer Log              99

Exhibit 11     Spreadsheet, 757 Configuration Control            111

Exhibit 12     Spreadsheet, AERSALE0009119                       117

Exhibit 13     Document titled Centre Tank Foam                  140
               Installation-A319

(Continued on next page)

ESQUIRE
DEPOSITION SOLUTIONS

Appx01172

RONALD C. MOYER  Attorneys Eyes Only                    February 21, 2023
JETAIRE AEROSPACE LLC vs AERSALE                                       4

EXHIBITS (continued)

Exhibit      Description                                      Page

Exhibit 15   Letter dated 6/15/21                             173

Exhibit 16   Work order                                       177

Exhibit 17   Email dated 6/22/21                              182

Exhibit 18   Emails                                           182

Exhibit 19   Emails                                           184

Exhibit 20   Installation drawing hip tank bay 5              187
             foam instl

                    *  *  *  *  *  *

800.211.DEPO (3376)
EsquireSolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

(DISCLAIMER: Words that are not fully spoken, words that are stuttered, words that are lost or cut off by technological difficulties, or words that are spoken over other words, may not be reflected in this written transcript, but may be captured on the videotaped portion of this record.)

                    - - -

        THE VIDEOGRAPHER:  Good morning.  We are now on the video record.  The time is 9:35 a.m. Eastern time.  Today's date is February 21, 2023 in the video deposition of Ron Moyer in the matter of Jetaire Aerospace, LLC versus Aersale, Inc., Case number 1:20-cv-25144.

        My name is Matthew Leiva.  I'm the videographer today.  Michele is your court reporter for today.  We are both representing Esquire Deposition Solutions.

        As a courtesy, counsel please introduce themselves and thereupon the witness will be sworn in.

        MR. HARDT:  This is Jonathan Hardt of Rozier Hardt McDonough on behalf of the plaintiff Jetaire Aerospace, LLC.

        MR. MCDONOUGH:  And Jim McDonough on behalf of the plaintiff.

800.211.DEPO (3376)
EsquireSolutions.com



Q.    I don't know either.  I'm trusting them all.

MR. FURLAN:  We're wearing suits.

MS. SANDERS:  That's right.

MR. MCDONOUGH:  You guys have prepped him well.

BY MR. HARDT:

Q.    During the course of your preparation meetings, did you speak with Iso Nezaj?

A.    No.

Q.    And just so that I don't butcher that for the next week, am I pronouncing his last name correctly?

A.    No.

Q.    Okay.  Why don't you get me -- get me sorted out.

A.    Nezaj.

Q.    Nezaj.  Okay.

During the course of those preparation meetings did you review any documents to get prepared to testify on behalf of the company?

A.    I did.

Q.    What documents did you review?

A.    The one document you gave me, the 30(B)(6).

Q.    Okay.

A.    And a spreadsheet.

Q.    Did that spreadsheet relate to sales?

800.211.DEPO (3376)
EsquireSolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

A.    It has sales information in it.

Q.    Okay.  I sus -- do you remember if there's a name to that spreadsheet?  I suspect we're going to get to that in a little bit but --

A.    The name is AerSafe tracking is how I have it labeled.

Q.    Okay.

A.    AerSafe customer log is how it's titled.

Q.    I suspect I know exactly which one you're talking about, and we'll get to that in a little bit.

What is your title at AerSafe?

A.    I don't have a title at AerSafe.  I have a title at AerSale.

Q.    That's a very good point.  I appreciate that clarification.  What's your title at AerSale?

A.    Director of technical acquisitions.

Q.    How long have you been at AerSale?

A.    That is my 11th full-time year, and I contracted for a year and a half prior to that.

Q.    When you first joint AerSale full-time was your title director of technical acquisition?

A.    No.

Q.    What was your original title when you joined full-time at AerSale?

A.    Project manager.



sale -- sales of the AerSafe product line.  And you've been designated for that topic as I understand it.

Are you prepared to testify to that topic?

A.   I'm prepared to testify on the sheet that I turned in.  Not anybody else's stuff.

Q.   Okay.  So and this document here says AerSafe kit sales, but you haven't seen this -- now I'm talking about -- I should be clear.  I'm now talking about Exhibit Number 5.  It says at the top AerSafe kit sales, but you're not familiar with that particular document, correct?

A.   I did not generate that document.

Q.   Okay.  Keep that handy but set it aside for now.

A.   Okay.

Q.   I'm going to give you another one that maybe is the one you are referring to as the one you printed because I have seen your name on it.

Is the one you were involved in a multi-tab -- is there a number of tabs in that spreadsheet?

A.   Yes, sir.

Q.   Okay.

(Exhibit No. 6 marked for identification.)

BY MR. HARDT:



Q.    So I'm showing you now what's been marked as Plaintiff's Exhibit Number 6.  Let me make sure that doesn't have my notes on it, Plaintiff's Exhibit 6. And this is a document that we did get designated confidential attorney's eyes only on this.  It bears AerSale 0027863 is the Bates number at the bottom right.  On the top it has the title AerSafe Development Cost Log.  And this is the first table of a multi-tab spreadsheet.

A.    Correct.

Q.    Does this one look familiar to you?

A.    Yes, it does.

Q.    Is this the first tab of the document you're referring to when you say the one you created?

A.    Yes, sir.

Q.    Okay.  So I take it you're familiar with this document?

A.    I'm familiar with the one titled "AerSafe Development Cost Log".

Q.    Okay.  What is the purpose of this document that's -- we've marked as Exhibit 6 that's titled AerSafe Development Cost Log.

A.    As a project manager it is my project management tool to keep track of everything that goes on with AerSafe that I'm concerned with.  Developed by

me.  Maintained by me.

Q.    Is it possible there's sales of AerSafe kits that are not included in this sheet?

A.    10/14/22, it's possible there are sales that aren't included in this sheet.

Q.    Let me rephrase.  That's a good clarification.

Is it possible that there are sales of AerSafe kits that occurred prior to October 14, 2022 that are not reflected in this document?

A.    Not my recollection, no.

Q.    Okay.  So as of the date this particular tab was, created October 14, 2022, to the best of your knowledge this is current for all sales of AerSafe kits by AerSale, correct?

A.    That would be a correct statement.

Q.    And this particular tab, which is the first tab of a larger spreadsheet is titled AerSafe development cost log.  Do you see that?

A.    Yes.

Q.    Is one of the purposes of this particular sheet for you to track the overall development costs of the AerSafe products?

A.    At a higher level.

Q.    Okay.  What do you mean, at a higher level?

*contains Confidential Information*    FILED UNDER SEAL

RONALD C. MOYER  Attorneys Eyes Only                    February 21, 2023
JETAIRE AEROSPACE LLC vs AERSALE                                      75

A.    Yes.    Redacted

Q.    And when      s doing an installation in Brazil, do they -- do you ship that AerSafe kit to them from the United States?

A.    It's possible.  Not -- not always but possible.

Q.    How else do they obtain it?

A.    We would ship to it Miami, and then they would pick it up with their own airplanes and bring it down there.    Redacted

Q.    Okay.  So      s doing a Brazilian installation.  They're going to get an AerSafe kit, however they get it they're going to get an AerSafe kit that's designed by you guys and manufactured and approved in the U.S., correct?

A.    It is approved in the U.S., correct.

Q.    And -- and it's also manufactured in the U.S., correct?

A.    Correct.

Q.    That kit in order to get to Brazil for the installation is going either going to be shipped directly by AerSale to them in Brazil is one option, right?

A.    That's one option.

Q.    The other option would be you have it here in

*800.211.DEPO (3376)*
*EsquireSolutions.com*

*contains Confidential Information*    FILED UNDER SEAL

the Miami area and the come pick it up when they've got one of their aircraft here?

A.    That is another option.

Q.    Does Redacted ver do an installation in the United States?

A.    No.  And there's a third option to that. They may -- we may authorize them to FOB, pick it up on our dock in Roswell.

Q.    Okay.  Are all the kits manufactured in Roswell?

A.    That's the PMA house is in Roswell, New Mexico.

Q.    And I know we've got another acronym.  So the record is clear, can you explain what PMA is?

A.    Parts manufacturing authorization.

Q.    And the parts manufacturing authorization another certificate that is issued by the FAA, correct?

A.    That's correct.

Q.    And the PMA is the certificate by the FAA that's issued after the STC, correct?

MR. GRAY:  Object to form.

A.    That's not absolutely correct the way you stated it.

Q.    Okay.  The PMA is the FAA certificate that is required in order for you to manufacture and actually

ESQUIRE
DEPOSITION SOLUTIONS

*contains Confidential Information*          FILED UNDER SEAL

sell the product, correct?

A.    Correct.  There's a lot of nuances in there that we'll just say from a high level that's correct.

Q.    When it comes to the PMA for -- for the AerSafe kits, the PMA house is the facility in Roswell New Mexico, correct?

A.    That's correct.

Q.    Okay.  And so the Roswell, New Mexico facility is where all of the AerSafe kits are final -- manufactured and finalized, correct?

A.    Finalized in Roswell, yes.

Q.    Is that where they're cut?  You know, if you've got big foam sheets and you're going to cut them to proper specs per the STC documentation, are they cut in Roswell?

A.    No.

Q.    Where are they cut?

A.    In California.

Q.    And whose facility does the cutting in California?

A.    Currently it is                    Redacted

Redacted

Redacted

Q.    Is there another company called that you've used in the past?

A.    Yes.

contains Confidential Information         FILED UNDER SEAL

Q.    For the same purpose as what you now use Redacted

A.    Yes. Redacted

Q.    And Redacted s also in California, correct?

A.    They were.  They are no longer in California.

Q.    Okay.  When -- when you were you doing business with them for purposes of the AerSafe program they were in California, right?

A.    Yes. Redacted

Q.    So either _____ depending on the time frame, is going to be the one doing cutting the foam blocks, right?

A.    As a general rule, yes.

Q.    Okay.  And they're going to be cutting those foam blocks pursuant to the documentation in the STC and also the PMA authorization from the FAA, right?

A.    Yes.  And the -- the PMA authorization has a technical name for it.  PMA supplement.

Q.    And why do you call it a PMA supplement instead of just a PMA?

A.    PMA is a certificate.  Like this is a certificate, right?

Q.    Right.

A.    The PMA supplement takes your certificate, which is your authorization to fabricate any part, and

contains Confidential Information          FILED UNDER SEAL

RONALD C. MOYER  Attorneys Eyes Only                    February 21, 2023
JETAIRE AEROSPACE LLC vs AERSALE                                    79

it breaks it down to what you're actually authorized to fabricate.  So they don't just give you a carte blanche authorization to manufacture anything.  You have to have individual authorization based on approved data to manufacture that part.

Q.    Okay.  And so that PMA supplement, will that be the document that's telling them the specific specifications of how to cut the foam blocks?

A.    No.  It tells you what document to use.

Q.    Okay.  And what is the name of the document that would tell you specifically what, you know, foam block number 100 needs to -- you know, what are the specs for that block?

A.    So there's individual drawings, part level drawings under each STC.

Q.    And are those also referenced in the PMA supplement?

A.    It will usually represent either a part number or a master data list.

Q.    Okay.

A.    Much like the STC does.

Q.    All right.  Are there any other vendors that AerSale has used other than ___Redacted___ to cut the foam blocks for the AerSafe program?

A.    No.

800.211.DEPO (3376)
EsquireSolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

*contains Confidential Information*          FILED UNDER SEAL

Q.    Are there any authorized installers that Redacted you've used other than

A.    No.

Q.    Setting aside prototyping, has AerSale ever done any installations of an AerSafe kit by itself without the use of      Redacted

A.    Not that I'm aware of.

Q.    Now with regard to prototyping, if you're going to do an installation for prototyping or design purposes, does AerSale do that itself or do you still Redacted      for that?      Redacted

A.      Redacted

Q.    Okay.  Have you ever not used

A.    For prototyping?

Q.    Yes.

A.    No.  And when you say "you" you mean we. Because remember, I wasn't involved in the first setup.

Q.    Has -- let me reask it.  You can qualify it if you need to.

Has AerSale ever done a prototype installation that was not done by Redacted

A.    I don't know that answer.

Q.    Is the reason you don't know that answer because you don't know the initial prototyping for the initial 737NG?

ESQUIRE
DEPOSITION SOLUTIONS

**In the Matter Of:**

JETAIRE AEROSPACE LLC vs AERSALE

1:20-cv-25144-GAYLES-TORRES

**ISO NEZAJ**

*March 01, 2023*

*Confidential*



800.211.DEPO (3376)
*EsquireSolutions.com*

Appx01206

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:20-cv-25144-GAYLES-TORRES

JETAIRE AEROSPACE LLC,          )
                                )
            Plaintiff,          )
                                )
vs.                             )
                                )
AERSALE, INC.,                  )
                                )
            Defendant.          )
                                )
vs.                             )
                                )
JETAIRE AEROSPACE LLC, JETAIRE )
FLIGHT SYSTEMS, LLC, and        )
MICHAEL WILLIAMS,               )
                                )
            Counter-Defendants.)
_____)


        ***CONFIDENTIAL - ATTORNEYS EYES ONLY***



                VIDEOTAPED DEPOSITION OF
                      ISO NEZAJ

            Taken on Behalf of the Plaintiff

        DATE TAKEN:    March 1, 2023
        TIME:          9:12 AM - 5:53 PM
        PLACE:         255 Alhambra Circle
                       Coral Gables, Florida



800.211.DEPO (3376)
EsquireSolutions.com

Appx01207

ISO NEZAJ  Confidential                                      March 01, 2023
JETAIRE AEROSPACE LLC vs AERSALE                                         2

APPEARANCES:

Counsel for Plaintiff Jetaire Aerospace:
ROZIER HARDT MCDONOUGH PLLC
BY:  JONATHAN R. HARDT, ESQ.
712 W. 14th Street, Suite C
Austin, Texas 78701
hardt@rhmtrial.com


Counsel for Defendant Aersale Inc.:
EVERSHEDS SUTHERLAND
BY:  JUSTIN E. GRAY, ESQ.
     VALERIE SANDERS, ESQ.
12255 El Camino Real, Suite 100
San Diego, California 92130
justingray@eversheds-sutherland.com
valeriesanders@eversheds-sutherland.com


Also present:
    Matthew Leiva, videographer
    Christopher Furlan, corporate counsel, AerSale



800.211.DEPO (3376)
EsquireSolutions.com

```
                        INDEX

                      EXAMINATION

Witness Name                                      Page

ISO NEZAJ

   BY MR. HARDT .................................. 6


                       EXHIBITS

Exhibit     Description                           Page

Exhibit 34  Comtech Form CTG-021 Rev B            23

Exhibit 35  Supplemental Type Certificate number  128
            ST03599NY

Exhibit 36  Email dated 2/18/15 from Nezaj to Sanz  135

Exhibit 37  Email dated 2/18/15 from Embree to    136
            Nezaj

Exhibit 38  Engineering change notice             137

Exhibit 39  NAAS work order form                  138

Exhibit 40  FAA approved aircraft flight manual   140
            supplement for B737 Classic series
            aircraft

Exhibit 41  Repair Station Work Order             141

Exhibit 42  Email dated 5/20/15                   146

Exhibit 43  Declaration                           154

Exhibit 44  Email string                          159

Exhibit 45  Email dated 9/23/15                   165




                 (Continued on next page)
```



ISO NEZAJ  Confidential                                    March 01, 2023
JETAIRE AEROSPACE LLC vs AERSALE                                         4

EXHIBITS (CONT.)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 46 | Defendant/Counter-Plaintiff AerSale, Inc.'s objections and responses to Plaintiff's first set of interrogatories (Nos. 1-13) | 168 |
| Exhibit 48 | Defendant/Counter-Plaintiff AerSale, Inc.'s first supplement to its objections and responses to plaintiff's first set of interrogatories | 170 |
| Exhibit 49 | Defendant/Counter-Plaintiff AerSale, Inc.'s fifth supplement to its objections and responses to plaintiff's first set of interrogatories (Nos. 1-13) | 170 |

* * * * *



800.211.DEPO (3376)
EsquireSolutions.com

ISO NEZAJ  Confidential                                    March 01, 2023
JETAIRE AEROSPACE LLC vs AERSALE                                      5

(DISCLAIMER: Words that are not fully spoken, words that are stuttered, words that are lost or cut off by technological difficulties, or words that are spoken over other words, may not be reflected in this written transcript, but may be captured on the videotaped portion of this record.)

- - -

THE VIDEOGRAPHER:  Good morning.  We are now on the video record.  The time is 9:12 a.m. Eastern time.  Today's date is March 1, 2023 in the video deposition of Ron Moyer in the matter of Jetaire Aerospace, LLC versus Aersale, Inc., Case Number 1:20-cv-25144.

My name is Matthew Leiva.  I'm the videographer today.  Michele is your court reporter for today.  We are both representing Esquire Deposition Solutions.

As a courtesy, would counsel please introduce themselves and thereupon the witness will be sworn in.

MR. HARDT:  Jonathan Hardt of Rozier Hardt McDonough on behalf of the plaintiff Jetaire Aerospace, LLC.

MR. GRAY:  Justin Gray from Eversheds Sutherland on behalf of the defendant AerSale.



800.211.DEPO (3376)
EsquireSolutions.com

Q.    AerSale ultimately kept the prototype foam kits that were installed in those aircraft, correct?

A.    There was one kit installed on the aircraft.

MR. GRAY:  Object to form.

THE WITNESS:  Sorry.

BY MR. HARDT:

Q.    Were there prototype installations on one aircraft or two aircraft?

A.    There's only one prototype.  And no, we did not keep it on the aircraft.

Q.    What happened to it?

A.    It was a poor design.  It wasn't very reliable.  We pulled it out of the aircraft a few months later and threw it in the garbage.

Q.    Who pulled it out of the aircraft?

A.    A company in Jacksonville, FlightStar Services, at our instruction.

Q.    Were any employees from AerSale present when that kit was uninstalled?

MR. GRAY:  Object to form.

A.    Yeah, I don't recall.  But -- yeah, I don't recall.

Q.    Were you present?

A.    I was not.

Q.    You just don't recall one way or the other



whether others from AerSale were present?

A.    I don't recall whether any employees were present or not.

Q.    Referring to the prototype, you said it was a poor design.  What makes you say that?

A.    That was the feedback I got back from the facility that had to pull it out to do the inspection.

Q.    Did they give you any specific complaints other than it was a poor design?

A.    It was a poor design, it wasn't very well thought out, it was difficult to remove and reinstall. With minimal instructions.

Q.    When was it uninstalled?

A.    I -- I don't recall the date.

Q.    In 2014, at some point?

A.    Could have been.

Q.    What other discussions did you have with FlightStar Services about the Jetaire prototype that they uninstalled?

A.    I think that was it.

Q.    You said they pulled it out at your instruction.  What caused you to give them the instruction to pull it out of the aircraft?

A.    It was an inspection required in the fuel tanks, and in order to do the inspection the foam had



# EXHIBIT 35

# FILED UNDER SEAL

FILED UNDER SEAL

In the Matter Of:

## JETAIRE AEROSPACE vs AERSALE

1:20-cv-25144-GAYLES-TORRES

## NICOLAS FINAZZO

*February 23, 2023*

*A.E.O.*



800.211.DEPO (3376)
*EsquireSolutions.com*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:20-cv-25144-GAYLES-TORRES

JETAIRE AEROSPACE LLC,              )
                                   )
            Plaintiff,             )
                                   )
vs.                                )
                                   )
AERSALE, INC.,                     )
                                   )
            Defendant.             )
                                   )
vs.                                )
                                   )
JETAIRE AEROSPACE LLC,  JETAIRE )
FLIGHT SYSTEMS, LLC, and           )
MICHAEL WILLIAMS,                  )
                                   )
            Counter-Defendants.)
_____)



      ***CONFIDENTIAL - ATTORNEYS EYES ONLY***




              VIDEOTAPED DEPOSITION OF
                  NICOLAS FINAZZO

          Taken on Behalf of the Plaintiff

      DATE TAKEN:    February 23, 2023
      TIME:          10:06 AM - 2:33 PM
      PLACE:         255 Alhambra Circle
                     Coral Gables, Florida



800.211.DEPO (3376)
EsquireSolutions.com

```
APPEARANCES:

Counsel for Plaintiff Jetaire Aerospace:
ROZIER HARDT MCDONOUGH PLLC
BY:   JONATHAN R. HARDT, ESQ.
      JAMES F. MCDONOUGH, III, ESQ.
Rozier Hardt McDonough PLLC
712 W. 14th Street, Suite C
Austin, Texas 78701
hardt@rhmtrial.com

-and-

ROZIER HARDT MCDONOUGH PLLC
BY:   JAMES F. MCDONOUGH, III, ESQ.
3621 Vinings Slope, Suite 4300
Atlanta, Georgia 30339
jim@rhmtrial.com


Counsel for Defendant AerSale Inc.:
EVERSHEDS SUTHERLAND
BY:   JUSTIN E. GRAY, ESQ.
      SHAWN RAFFERTY, ESQ.
12255 El Camino Real, Suite 100
San Diego, California 92130
justingray@eversheds-sutherland.com
shawnrafferty@eversheds-sutherland.com




Also present:
     Matthew Leiva, videographer
     James Fry, corporate counsel, AerSale
```



NICOLAS FINAZZO  A.E.O.                    February 23, 2023
JETAIRE AEROSPACE vs AERSALE                              3

INDEX

EXAMINATION

Witness Name                                          Page

NICK FINAZZO

   BY MR. HARDT ................................. 4


EXHIBITS

Exhibit       Description                              Page

Exhibit 21   Rule 30(b)(6) deposition notice          7

Exhibit 22   Nondisclosure, Nonuse and                34
             Confidentiality Agreement

Exhibit 23   Email dated 4/3/15                       37

Exhibit 24   Email string                             41

Exhibit 25   Email chain                              52

Exhibit 26   Email dated 5/26/15 with attachment      56

Exhibit 28   STC Certification Proposal and           62
             Agreement

Exhibit 27   Correspondence dated 8/24/15             65

Exhibit 29   AerSale press release                    68

Exhibit 30   Email dated 12/3/19                      98

Exhibit 31   Document, Attachment 1                   99



800.211.DEPO (3376)
EsquireSolutions.com

Appx01220

(DISCLAIMER: Words that are not fully spoken, words that are stuttered, words that are lost or cut off by technological difficulties, or words that are spoken over other words, may not be reflected in this written transcript, but may be captured on the videotaped portion of this record.)

- - -

THE VIDEOGRAPHER:  Good morning.  We are now on the video record.  The time is 10:06 a.m., Eastern Time.  Today's date is February 23, 2023, in the video deposition of Nick Finazzo in the matter of Jet Aerospace, LLC versus AeroSale Inc., Case Number 1:20-cv-25144.

My name is Matthew Leiva, I'm your videographer for today.  Michele is your court reporter for today.  We're both representing Esquire Deposition Solutions.  As courtesy, would counsel please introduce themselves and thereupon the witness will be sworn in.

MR. HARDT:  Good morning.  This is Jonathan Hardt at Rozier Hardt Mcdonough on behalf of Jetaire.

MR. MCDONOUGH:  Jim McDonough on behalf of Plaintiff.

MR. GRAY:  Justin Gray from Eversheds



800.211.DEPO (3376)
EsquireSolutions.com

Sutherland on behalf of AerSale.

MR. RAFFERTY:  Shawn Rafferty from Eversheds Sutherland on behalf of AerSale.

MR. FRY:  James Fry, general counsel, AerSale.

NICOLAS FINAZZO, having been duly sworn or affirmed, was examined and testified as follows:

EXAMINATION BY MR. HARDT:

Q.   Good morning, sir.  My name is Jonathan Hardt.  I'm one of the attorneys for Jetaire in this case.  Can you state your name for the record.

A.   Nicolas Finazzo, N-i-c-o-l-a-s, Finnazo, F-i-n-a-z-z-o.

Q.   Thank you, sir.  I don't need a specific address, but where do you live?

A.   I live Coral Gables.

Q.   Have you ever been deposed before?

A.   Yes.

Q.   How many times?

A.   Oh, I don't know.  A dozen or more.

Q.   Okay.  Some of this will be old hat to you then.  I'm going to go through a couple of ground rules just so we're on the page, and most of this is to make the court reporter's life a little easier.  I'll



800.211.DEPO (3376)
EsquireSolutions.com

NICOLAS FINAZZO  A.E.O.                           February 23, 2023
JETAIRE AEROSPACE vs AERSALE                                    32

know what the exact date of that is.

Q.    You said it was prior to him asking you if he could use one of your aircraft as a certification aircraft, correct?

A.    Yes.

Q.    So what were the -- so at some point he made a request to you whether he could use one of your aircraft to install the systems as part of the certification process for an STC; is that fair?

A.    At some point, yes.

Q.    And you became aware that he had that product prior to that request?

A.    Yes.

Q.    What were the circumstances of how you became aware of Jetaire's potential solution?

A.    We had -- Bob Nichols and I owned an airline called XTRA Airways and the director of maintenance for that company -- and I'm just drawing a blank on his name right now -- used to work for Miami Air and apparently Mike Williams had contacted him at Miami Air asking whether Miami Air would let him use one of their aircrafts.  So that's how I knew about it.  That's how Iso knew about it before me.

Q.    And did you take -- once you learned that information, did you do anything?



800.211.DEPO (3376)
EsquireSolutions.com

NICOLAS FINAZZO  A.E.O.                    February 23, 2023
JETAIRE AEROSPACE vs AERSALE                            81

Q.    Okay.

A.    These are just estimates.  I have no way to really know that.

Q.    I'll ask you another obvious question, I think, but just so we're clear.  Mr. Nezaj has a wide variety of responsibilities other than the AerSafe program, correct?

A.    Correct.

Q.    Mr. Nezaj is based out of the Coral Gables headquarters, correct?

A.    Correct.

Q.    Do you know an individual named Ron Moyer?

A.    Yes.

Q.    Who is Ron Moyer?

A.    He works for Iso Nezaj.  He's in our PMA group.

Q.    Do you have an estimate of what percentage of time Mr. Moyer would spend on the AerSafe program?

A.    Today?

Q.    Yes.

MR. GRAY:  Object to form.

A.    Similarly with Iso -- no, he would have to be a little bit more.  Maybe five percent of his time.

Q.    So your best estimate right now is, Mr. Moyer more or less, spends about five percent or less of his

-- his time dedicated to the AerSafe program; is that fair?

MR. GRAY:  Object to form.

A.    It's just a pure estimate guess.  I don't know.  I have no way -- we have no way -- we may have a way to track it and if we do, I'm not aware of what the numbers show.

Q.    What you do know for sure, though, is that like Mr. Nezaj, Mr. Moyer also has a wide variety of responsibilities at Aersale beyond the AerSafe program, correct?

A.    No, no.  Mr. Moyer has a -- does not have as wide a range of responsibilities as Iso does because he's specifically focused on developing or manufacturing the parts that go into the STCs we have which would include AerSafe.

Q.    I should have been more clear and asked my question independent of Mr. Nezaj.

Mr. Moyer has many responsibilities related to parts manufacture at Aersale other than those related to AerSafe, correct?

A.    He has other responsibilities, correct.

Q.    Mr. Moyer is also based here at the AerSafe headquarters in Coral Gables, correct?

A.    Correct.



A.    We're not working on any.  So the answer is no.

Q.    How long are STCs valid for?

A.    Indefinite.

Q.    Okay.  So if you got a, you know, I don't remember the exact date, but, you know, the first STC in 2015 for a 737 aircraft variant, that would just be valid unless you hear otherwise from the FAA, correct?

A.    Yes.

Q.    What overhead expenses other than percentage of the salaries for Mr. Nezaj and Mr. Moyer does Aersale have for the AerSafe program?

MR. GRAY:  Object to form.

A.    I don't know the specific, but general categories would be warehouse space, stock people, you know, stock room clerks that would have to stock it, receiving clerks that would have to receive it, Ron Moyer and his group that would -- that would be responsible for making sure that any product that we may -- we had manufactured by a vendor complied with the requirements of our supplemental type certificate. That's -- that's under the PMA authority.

Q.    Is it fair to say that in the grand scheme of your business, that AerSafe would require a small percentage of the time from your stock clerks?



800.211.DEPO (3376)
EsquireSolutions.com

# EXHIBIT E

## (Filed under seal)



Planet Depos®
We Make It *Happen*™

# HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Transcript of Michael Williams, Designated Representative

**Date:** February 7, 2023
**Case:** Jetaire Aerospace, LLC -v- Aersale Inc.

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative     1 (1 to 4)
February 7, 2023

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

_____

JETAIRE AEROSPACE, LLC            :
                                  :
Plaintiff/Counter-Defendant,      :
                                  : CIVIL ACTION
v.                                : FILE NUMBER:
                                  : 1:20-cv-25144-GAYLES/
AERSALE, INC.                     : TORRES
                                  :
Defendant/Counter-Plaintiff,      :
                                  :
V.                                :
                                  :
JETAIRE AEROSPACE, LLC; JETAIRE   :
FLIGHT SYSTEMS, LLC; and          :
MICHAEL WILLIAMS,                 :
                                  :
        Counter-Defendants.       :
_____

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF
MICHAEL WILLIAMS as 30(b)(6) WITNESS FOR JETAIRE
AEROSPACE, LLC

10:30 a.m.
February 7, 2023

EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street, NE
Suite 2300
Atlanta, Georgia

Susan DiFilippantonio, RPR, CCR No. B-2125

**Page 2**

APPEARANCES:

On Behalf of the Plaintiff/Counter-Defendant, JETAIRE
AEROSPACE, LLC:

ROZIER HARDT MCDONOUGH, PLLC
BY: James F. McDonough, III
3621 Vinings Slope
Suite 4300
Atlanta, GA 30339
470.480.9505
jim@rhmtrial.com

On Behalf of the Defendant/Counter-Plaintiff, AERSALE,
INC.:

EVERSHEDS SUTHERLAND (US) LLP
BY: Regis C. Worley
12255 El Camino Real
Suite 100
San Diego, CA 92130
858.252.6502
regisworley@eversheds-sutherland.com

EVERSHEDS SUTHERLAND (US) LLP
BY: Valerie S. Sanders
999 Peachtree Street, NE
Suite 2300
Atlanta, GA 30309
404.853.8000
valeriesanders@eversheds-sutherland.com

Also Present: Shawn Rafferty
              Ervin Farkas, videographer

**Page 3**

I N D E X

WITNESS/EXAMINATION                                    PAGE

MICHAEL WILLIAMS                                          6
EXAMINATION                                              7
    BY MR. WORLEY
DISCLOSURE                                             207
CERTIFICATE OF REPORTER                                211
SIGNATURE OF DEPONENT                                  213

E X H I B I T S

Defendant/Counter-Plaintiff's                           10
Exhibit 1,
Defendant/Counterclaim-Plaintiff
AerSale, Inc.'s Notice of
Deposition to Jetaire Aerospace,
LLC, Pursuant to Federal Rule of
Civil Procedure 30(b)(6),
Defendant/Counter-Plaintiff's                           14
Exhibit 2, United States Patent US
9,849,998 B2
Defendant/Counter-Plaintiff's                           14
Exhibit 3, United States Patent US
10,633,109 B2
Defendant/Counter-Plaintiff's                           15
Exhibit 4, United States Patent US
10,800,541 B2
Defendant/Counter-Plaintiff's                           35
Exhibit 5, Jetaire Group
Capabilities
Defendant/Counter-Plaintiff's                           41
Exhibit 6, Plaintiff Jetaire
Aerospace, LLC's Second
Supplemental Responses and
Objections to
Defendant/Counterclaim-Plaintiff
AerSale, Inc.'s Second Set of
Interrogatories
Defendant/Counter-Plaintiff's                           51
Exhibit 7, Department of
Transportation Federal Aviation
Administration Supplemental Type
Certificate Number ST03834NY
Defendant/Counter-Plaintiff's                           52
Exhibit 8, Department of
Transportation Federal Aviation
Administration Supplemental Type
Certificate Number ST03450NY
Defendant/Counter-Plaintiff's                           52
Exhibit 9, Department of
Transportation Federal Aviation
Administration Supplemental Type
Certificate Number ST04415AT
Defendant/Counter-Plaintiff's                           53

**Page 4**

Exhibit 10, Department of
Transportation Federal Aviation
Administration Supplemental Type
Certificate
Defendant/Counter-Plaintiff's                           76
Exhibit 11, E-mail dated July 14,
2018
Defendant/Counter-Plaintiff's                           80
Exhibit 12, E-mail dated April 8,
2017
Defendant/Counter-Plaintiff's                           90
Exhibit 13, E-mail dated October
6, 2015
Defendant/Counter-Plaintiff's                          100
Exhibit 14, Spreadsheet
Defendant/Counter-Plaintiff's                          107
Exhibit 15, Original Complaint for
Patent Infringement
Defendant/Counter-Plaintiff's                          114
Exhibit 16, E-mail dated July 14,
2014
Defendant/Counter-Plaintiff's                          118
Exhibit 17, SpeedNews Publication
Defendant/Counter-Plaintiff's                          122
Exhibit 18, United States Patent
and Trademark Office Notice of
Acceptance of Power of Attorney
Defendant/Counter-Plaintiff's                          124
Exhibit 19, United States Patent
and Trademark Office Issue
Notification Determination of
Patent Term Adjustment Under 35
USC 154(b),
Defendant/Counter-Plaintiff's                          125
Exhibit 20, United States Patent
and Trademark Office Issue
Notification Determination of
Patent Term Adjustment Under 35
USC 154(b),
Defendant/Counter-Plaintiff's                          126
Exhibit 21, Jetaire Drawing

Defendant/Counter-Plaintiff's      127
Exhibit 22, AerSale Fabrication
Drawing
Defendant/Counter-Plaintiff's                          130
Exhibit 23, Fabrication Drawings
Defendant/Counter-Plaintiff's                          131

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative    2 (5 to 8)
February 7, 2023

**Page 5**

Exhibit 24, Webpage Printout from www.jetairegroup.com
Defendant/Counter-Plaintiff's    132
Exhibit 25, Website Printout from www.jetairegroup.com
Defendant/Counter-Plaintiff's    133
Exhibit 26, E-mail dated March 5, 2016
Defendant/Counter-Plaintiff's    135
Exhibit 27, Video on Thumb Drive
Defendant/Counter-Plaintiff's    138
Exhibit 28, Screenshots from Video
Defendant/Counter-Plaintiff's    140
Exhibit 29, Jetaire Press Release
Defendant/Counter-Plaintiff's    143
Exhibit 30, Jetaire Project Specific Certification Plan
Defendant/Counter-Plaintiff's    148
Exhibit 31, E-mail dated June 4, 2015
Defendant/Counter-Plaintiff's    151
Exhibit 32, SAE Aerospace Information Report
Defendant/Counter-Plaintiff's    153
Exhibit 33, Patent Assignment Cover Sheet
Defendant/Counter-Plaintiff's    157
Exhibit 34, Web Capture from www.jetairegroup.com,
Defendant/Counter-Plaintiff's    159
Exhibit 35, E-mail dated September 5, 2016
Defendant/Counter-Plaintiff's    183
Exhibit 36, Patent Assignment Cover Sheet
Defendant/Counter-Plaintiff's    190
Exhibit 37, Exhibit H

**Page 6**

(Tuesday, February 7, 2023, 10:30 a.m.)

THE VIDEOGRAPHER: Today's date is February 7th, 2023. The time is approximately 10:30 a.m. eastern time.

My name is Ervin Farkas and I am the videographer. The Court Reporter is Susan DiFilippantonio.

All counsel present, please introduce yourselves and state your affiliations, starting with the taking attorney.

MR. WORLEY: Regis Worley on behalf of Defendant AerSale.

MS. SANDERS: Valerie Sanders, also on behalf of Defendants.

MR. RAFFERTY: Shawn Rafferty on behalf of the defendant.

MR. MCDONOUGH: And James McDonough with Rozier Hardt McDonough on behalf of the plaintiff.

THE VIDEOGRAPHER: Thank you.

Would the Court Reporter please swear in the witness.

MICHAEL WILLIAMS, called as a witness at the instance of the Defendant, being first duly sworn, was examined and deposed as follows:

**Page 7**

EXAMINATION

BY MR. WORLEY:

Q.    Okay. Good morning. Would you please state your name for the record?

A.    **Michael Davis Williams.**

Q.    And, Mr. Williams, are you here to speak on behalf of Jetaire Aerospace today?

A.    **Yes, I am.**

Q.    What is your role at Jetaire Aerospace?

A.    **I am the managing partner.**

Q.    Are there any parties -- do you have an interest in the company?

A.    **I do.**

Q.    Anybody else have an interest in the company?

A.    **No.**

Q.    What other -- before we get into the questions here, you have been deposed before, haven't you?

A.    **Yes.**

Q.    Are you familiar with the procedures of a deposition?

A.    **Yes.**

Q.    I would ask if you at any point in time need a break, that is not a problem. Let me know. We'll go ahead and take a break. But if there's a question pending, we will answer the question first.

**Page 8**

A.    **Okay.**

Q.    Okay. And if you have any questions or misunderstandings or not sure what I am asking, please ask for clarification. I will go ahead and clarify. If you answer, I assume that you've understood the question; is that fair?

A.    **Yes.**

MR. MCDONOUGH: And just -- there is one exception. If there is something that you believe implicates potentially attorney-client privileged information, that one we can talk about it on the record and maybe confer prior to answering, but that is the only exception that I can think of in that regard.

Are we in agreement there?

MR. WORLEY: If you believe there is attorney-client privilege, Mr. McDonough, you are free to speak up and raise your objection.

MR. MCDONOUGH: No, no. I am saying for Mr. Williams. If Mr. Williams is not sure what he is going to say is attorney-client privileged, just because he's not a lawyer, it's been my practice that they are allowed to confer with me about that specific issue only prior to answering. I doubt that will come into play, but I just want to raise

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative    3 (9 to 12)
February 7, 2023

9

that as a potential exception.

MR. WORLEY: Fair enough.

BY MR. WORLEY:

Q. It's all good, Mr. Williams?

A. Yes.

Q. Okay. Are there any other employees at Jetaire Aerospace?

A. No.

Q. What is Jetaire Aerospace's business?

A. **Its primary business is the holding and maintaining of intellectual property.**

Q. And which intellectual property does it hold or maintain?

A. **It maintains the patents that are in use by Jetaire and supplemental type certificates.**

Q. And supplemental type certificates, do you sometimes refer to those as STCs?

A. **Yes.**

Q. If we refer to something as an STC today, is that what you're referring to?

A. **Yes.**

Q. And when you -- you said that Jetaire Aerospace holds patents for Jetaire. When you say "Jetaire," who are you referring to?

A. **Jetaire Aerospace and Jetaire Flight Systems.**

10

Q. Does Jetaire Aerospace sell any products?

A. **No.**

Q. Is Jetaire Aerospace involved in the sale of Jetaire products?

A. **No.**

Q. Does Jetaire Aerospace -- is it involved with any customers?

A. **No. Yes.**

Q. I'm sorry. So --

A. **I'm sorry. Correction. Yes.**

Q. Which -- which customers would Jetaire Aerospace be involved in?

A. **There may be occasions where Aerospace provides the licensing agreement to a customer. Licensing of the STCs to a customer.**

Q. Other than licensing STCs to a customer, does Jetaire Aerospace have any involvement with any other customers?

A. **None.**

Q. Is Jetaire Aerospace involved in any marketing?

A. **No.**

Q. Mr. Williams, I would like to hand to you what we can mark as Exhibit 1. It's the notice of today's deposition.

(Defendant/Counter-Plaintiff's Exhibit 1,

11

Defendant/Counterclaim-Plaintiff AerSale, Inc.'s Notice of Deposition to Jetaire Aerospace, LLC, Pursuant to Federal Rule of Civil Procedure 30(b)(6), was marked for identification.)

BY MR. WORLEY:

Q. Just for housekeeping purposes today, sir, are you here pursuant to these -- this deposition notice?

MR. MCDONOUGH: Object to the form.

THE WITNESS: Yes.

BY MR. WORLEY:

Q. And, Mr. Williams, are you prepared to talk about the topics that are identified in this deposition notice?

Sir, I see you are taking some time. Have you seen this deposition notice before?

A. **Possibly.**

Q. And are you prepared to discuss -- speak on behalf of Jetaire Aerospace as to the topics in this deposition notice?

A. **Give me a moment so I can ensure that -- that I understand the topics.**

**Yes, I think so.**

Q. Okay. You can put that document to the side. Thank you, sir.

What did you do today to prepare for this

12

deposition?

A. **Today?**

Q. Yes, sir.

Well, what did you do to prepare for the deposition -- for this deposition?

A. **I met with my attorneys. I reviewed certain internal documents. I think generally that's it.**

Q. And which documents did you review?

MR. MCDONOUGH: Object to the form.

I will instruct you not to answer that one.

Calls attorney-client privilege and work product information into play.

BY MR. WORLEY:

Q. Sir, I am not asking about the conversations that you've had with your attorney. I am asking about documents. Did you look at any documents that refreshed your recollection?

MR. MCDONOUGH: Again, object to the form. Instruct you not to answer that one. If you want to talk more about it, the fact of a document -- if he has reviewed a document, put it in front of him, and if he remembers it, that is fine. But the collection of documents that we chose to review for this deposition is certainly

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative    4 (13 to 16)
February 7, 2023

**13**

work product and privilege.

MR. WORLEY:  And, Mr. McDonough, I would appreciate it if you have an objection to raise it, but speaking objections are not necessary.

BY MR. WORLEY:

Q.    The question is if you have looked at any documents that refreshed your recollection in preparation for today's deposition.

MR. MCDONOUGH:  Once again, instruct the witness not to answer the question due to attorney-client privileged information and work product.

MR. WORLEY:  Let's go off the record for one second.

THE VIDEOGRAPHER:  We are going off the record.  The time is 10:38 a.m.

(Recess.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 10:39 a.m.  Please proceed.

BY MR. WORLEY:

Q.    Mr. Williams, in preparation for today's deposition, which attorneys did you meet with?

A.    I met with Jim McDonough and Jonathan Hardt.

Q.    And how long did you spend with them preparing

**14**

for today's deposition?

A.    Maybe two days.

Q.    I would like to introduce some additional exhibits.  I am handing you what we can mark as Exhibit 2.

(Defendant/Counter-Plaintiff's Exhibit 2, United States Patent US 9,849,998 B2, was marked for identification.)

BY MR. WORLEY:

Q.    Exhibit 2 is a document without a Bates Number.  At the top, it says United States Patent 9,849,998.

Mr. Williams, have you seen this document before?

A.    Yes.

Q.    What is this document?

A.    It is a patent.

Q.    Is this one of your patents, sir?

A.    It is.

Q.    We will put that aside.  We will be asking more questions about it, but for completeness sake, we are going to introduce the next exhibit, Exhibit 3.

(Defendant/Counter-Plaintiff's Exhibit 3, United States Patent US 10,633,109 B2, was marked for identification.)

BY MR. WORLEY:

**15**

Q.    Exhibit 3 is a document without Bates numbers marked at the top of the -- at the top, stating United States Patent US 10,633,109.

Sir, have you seen this document before?

A.    I have.

Q.    What is this document of Exhibit 3?

A.    It's a patent.

Q.    And this is one of your patents as well, sir?

A.    It is.

Q.    And next we will introduce Exhibit 4.

(Defendant/Counter-Plaintiff's Exhibit 4, United States Patent US 10,800,541 B2, was marked for identification.)

BY MR. WORLEY:

Q.    Sir, Exhibit 4 at the top says "United States Patent US 10,800,541." Do you see that?

A.    I do.

Q.    Do you recognize this document?

A.    Yes.

Q.    Is this another one of your patents, sir?

A.    It is.

Q.    Okay.  Do you understand that these three documents of Exhibits: 2, 3 and 4 are the patents that are being asserted in this lawsuit?

MR. MCDONOUGH:  Object to the form.

**16**

THE WITNESS:  Yes.

BY MR. WORLEY:

Q.    Is it Jetaire Aerospace's position that AerSale's installation of the AerSafe product infringes each of these three patents of Exhibit 2, 3 and 4?

MR. MCDONOUGH:  Object to the form to the extent it calls for legal conclusions.

THE WITNESS:  I think that's a legal -- requires a legal conclusion from the judge.

BY MR. WORLEY:

Q.    Well, let's -- let's explore this a little bit more.  And to make things easier for -- can we refer to Exhibits 2, 3 and 4 as the patents-in-suit.  Would that be fair?

A.    Yes.

Q.    Sir, Jetaire Aerospace filed a lawsuit against AerSale, correct?

A.    Yes.

Q.    And Jetaire Aerospace is alleging infringements of patents as part of that lawsuit; isn't that correct?

A.    Yes.

Q.    Jetaire Aerospace is alleging that AerSale infringed the patent of Exhibit 2, correct?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative        11 (41 to 44)

February 7, 2023

**41**

BY MR. WORLEY:

Q.    Thank you, sir.  You can go ahead and put that document to the side.

I would now like to introduce the next exhibit.  It's Exhibit 6.

(Defendant/Counter-Plaintiff's Exhibit 6, Plaintiff Jetaire Aerospace, LLC's Second Supplemental Responses and Objections to Defendant/Counterclaim-Plaintiff AerSale, Inc.'s Second Set of Interrogatories, was marked for identification.)

BY MR. WORLEY:

Q.    For the record, Exhibit 6 is a document --

MR. WORLEY:  Thank you.

BY MR. WORLEY:

Q.    -- bearing the title "Plaintiff Jetaire Aerospace, LLC's Second Supplemental Responses and Objections to Defendant Counterclaim Plaintiff AerSale, Inc's Second Set of Interrogatories."

Sir, have you seen this document before?

A.    I think so.

Q.    Did somebody from Jetaire approve of these interrogatory responses before they were served on AerSale?

MR. MCDONOUGH:  Object to the form.

**42**

THE WITNESS:  I would have to read the entire document to answer that.

BY MR. WORLEY:

Q.    Are you aware that AerSale served interrogatories on Jetaire Aerospace?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Yes.

BY MR. WORLEY:

Q.    And are you aware that Jetaire Aerospace responded to those interrogatories?

A.    Yes.

Q.    And are you aware that Jetaire Aerospace supplemented its responses to the interrogatories, specifically -- well, the second set of interrogatories?

A.    I don't recall.

Q.    Sir, the document in front of you is Jetaire Aerospace's second supplemental responses and objections to the second set of interrogatories.  Do you see that?

A.    I'm sorry, where would I see that?

Q.    On -- on the front page.  That's the title.

A.    I see the title, yes.

Q.    Are these responses of Exhibit 6 made on behalf of Jetaire Aerospace and with Jetaire Aerospace's approval?

A.    Again, I'd have to read the entire document.  It

**43**

appears so.

Q.    Do you -- sitting here today, do you have any reason to doubt that Exhibit 6 was served on AerSale with Jetaire Aerospace's approval?

A.    I don't understand this process.  So I -- I -- I'd be remiss at making such an assertion.

Q.    Are you aware of any instance during this litigation when repre- -- representations were made on Jetaire -- on Jetaire Aerospace's behalf without Jetaire Aerospace's permission?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  No.

BY MR. WORLEY:

Q.    Would you please turn in Exhibit 6 to the second supplemental response -- strike that.

In -- in Exhibit 6, please look at the Interrogatory Response Number 6 at pages 1418 and the response provided therein.

A.    I'm sorry, what page, 14?

Q.    14, sir.

A.    14, okay.

Q.    And interrogatory 6 begins -- is on page 14, and the response you see begins on page 14.  And, sir, do you see the sec- -- the first supplemental response begins on 17, and the second supplemental response

**44**

begins on 17 ending on 18?  Do you see that, sir?

A.    Yes.

Q.    Sir, do you see this response sets forth Jetaire Aerospace's position as to the commercial success of the sales of the Invicta product?

A.    I'm sorry, where are you referring?

Q.    I'm referring to --

A.    What page?

Q.    -- the responses.

For example, on page 17 do you see where it says, "Jetaire identifies all sales of its patented technologies as evidence of nonobviousness"?

This is approximately the middle of page 17.  Do you see that, sir?

A.    Yes.

Q.    And does Jetaire Aerospace identify its sales of the Invicta technology as evidence of nonobviousness?

MR. MCDONOUGH:  Object to the form.  Mischaracterizes testimony.

THE WITNESS:  I'm sorry, restate that question.

BY MR. WORLEY:

Q.    Do you understand one of the issues in this litigation is whether or not the patents-in-suit are valid?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative    12 (45 to 48)
February 7, 2023

45

A.   Yes.

Q.   And do you understand that one way the patents-in-suit might be found invalid is if they were obvious over existing art?

A.   I don't know -- I don't understand what you're referring to.

Q.   Okay. Does Jetaire Aerospace identify the sales of its patented technologies as evidence of nonobviousness as stated in this supplemental interrogatory response?

A.   Yes, I think so.

Q.   As you sit here today, do you have any reason to disagree with the position set forth in Jetaire Aerospace's second supplemental response to Interrogatory Number 6?

A.   Again, though I have seen -- likely seen this document before, it's been quite awhile, I don't recall having objections to it when I saw it before.

Q.   And as you sit here today, do you have any objections to it?

A.   I don't think so.

Q.   Sir, if I could have you please turn to Interrogatory Number 7 which begins on page 18.

A.   (Complying.)

Q.   And to help orient you here, sir, interrogatory

46

7 begins on page 18. The response begins on page 18. The supplemental response and second supplemental response both begin on page 19, ending on page 21.
    Do you see that, sir?

A.   Yes.

Q.   Looking at page 20, do you see a chart set forth here, sir?

A.   Yes.

Q.   Are the products identified on this chart the products that Jetaire Aerospace contends are covered by the patents-in-suit?

    MR. MCDONOUGH:  Object to the form. It calls for legal conclusions.

    THE WITNESS:  I'm sorry. Repeat the question again, please.

BY MR. WORLEY:

Q.   Well, we can go through one by one.
    Sir, are you familiar with the Invicta ignition mitigation flammability reduction technology in the center tank?

A.   I am.

Q.   Is that technology for the Airbus A320 protected by the patents-in-suit?

    MR. MCDONOUGH:  Object to the form.

BY MR. WORLEY:

47

Q.   Sir --

A.   Yes.

Q.   You can look at me. You don't need to look at --

A.   Yes.

Q.   -- your attorney when you're answering --

    MR. MCDONOUGH:  He can do whatever he'd like to do. He can look at me if he wants to look at me. He can look at you. He can look up at the sky.

    MR. WORLEY:  Sir --

    MR. MCDONOUGH:  So stop instructing him and telling him what he can do physically with his body. Okay? You can ask him questions and he can answer them.

    MR. WORLEY:  Mr. McDonough, I do appreciate your position. I also appreciate you not taking the opportunity to coach the witness. I am not --

    MR. MCDONOUGH:  Coaching the witness about whether --

    MR. WORLEY:  I am not saying you are, but I am asking the witness to look at me when he is answering the questions. If he has a question, he can refer that to you, but if he is not asking you

48

a question, I would prefer that our conversation continue between the two of us.

    MR. MCDONOUGH:  I'm sorry. If you do that again, I am going to say the very same thing on the record. Just putting it out there. I was actually not even looking at him.
    So, you know, the inference that we are somehow coaching, the fact that it's even on the record is offensive, and I ask you that you not do it again, please.

    MR. WORLEY:  And James --

    MR. MCDONOUGH:  Ask your questions. He'll answer them. That is why he is here today.

    MR. WORLEY:  To be clear, I'm not -- and I want this on the record. I am not saying that you were coaching nor was I inferring it. I was asking the witness not to look at you before responding.

BY MR. WORLEY:

Q.   Mr. Williams, is it Jetaire Aerospace's position that the Invicta ignition mitigation flammability reduction technology in the center tank is protected by each of the patents-in-suit as it applies to the Airbus A320?

A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative    13 (49 to 52)

February 7, 2023

**49**

Q.    Is it Jetaire Aerospace's position that the Invicta technology -- in shorthand, if we refer to the -- well, I will just go ahead -- sorry.  Strike that.

Is it Jetaire Aerospace's position that the Invicta ignition mitigation technology for the Airbus 319 is covered by each of the patents-in-suit?

**A.    Yes.**

Q.    Is it Jetaire Aerospace's position that the Invicta ignition mitigation technology for the Airbus 320 series is protected by each of the three patents-in-suit?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Yes.

BY MR. WORLEY:

Q.    Sir, is it Jetaire Aerospace's position that the Invicta ignition mitigation technology for the Boeing 737, 200 to 900 series, is protected by each of the three patents-in-suit?

**A.    Yes.**

MR. MCDONOUGH:  Give me a second.

Object to the form.

Go ahead.

BY MR. WORLEY:

Q.    Is it Jetaire Aerospace's position that the

**50**

Invicta ignition mitigation system's technology for the Boeing 767-200 series, the use or installation of that product is protected by each of the patents-in-suit?

**A.    Yes.**

Q.    Is it Jetaire Aerospace's position that the use or installation of the Invicta ignition mitigation means technology for the Boeing 767-300 series is protected by each of the patents-in-suit?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Yes.

BY MR. WORLEY:

Q.    And, sir, is it Jetaire Aerospace's position that use or installation of the INVICTA ignition mitigation means technology in the Boeing 757-200 series is protected by each of the patents-in-suit?

**A.    Yes.**

MR. MCDONOUGH:  Object to the form.

BY MR. WORLEY:

Q.    And, sir, for each of the models of aircraft I just mentioned, -- please feel free to refer to page 20 of Exhibit 6 -- does Jetaire have an STC addressing the INVICTA product for each of these aircraft models?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  I think so.

BY MR. WORLEY:

**51**

Q.    Feel free to put this document to the side.  We will revisit it, so please keep it handy.  I would like to introduce the next exhibit as Exhibit 7.

(Defendant/Counter-Plaintiff's Exhibit 7, Department of Transportation Federal Aviation Administration Supplemental Type Certificate Number ST03834NY, was marked for identification.)

BY MR. WORLEY:

Q.    Sir, for the record, Exhibit 7 is a document beginning with Bates Number Jetaire 0005495 ending 5497.

Sir, have you seen this document before?

**A.    Yes.**

Q.    What is the document of Exhibit 7?

**A.    It's a supplemental type certificate issued by the FAA for the Airbus 319, 20 and 21.**

Q.    And does this STC have number ST03834NY?

**A.    Yes.**

Q.    And when was this first issued?

MR. MCDONOUGH:  Object to the form.

BY MR. WORLEY:

Q.    Strike that.

When was this document issued?

**A.    It looks like November 28th of 2016.**

Q.    Thank you, sir.  You can put that document away.

I will introduce the next document as Exhibit 8.

**52**

(Defendant/Counter-Plaintiff's Exhibit 8, Department of Transportation Federal Aviation Administration Supplemental Type Certificate Number ST03450NY, was marked for identification.)

BY MR. WORLEY:

Q.    For the record, Exhibit 8 is a document bearing Bates Number Jetaire 0003901 through 3902.

Sir, do you recognize this document?

**A.    I do.**

Q.    What document is this?

**A.    It's a supplemental type certificate issued for the Boeing 737-300, 737-400, 737-500.**

Q.    And what is the STC number of Exhibit 8?

**A.    ST03450NY.**

Q.    And when was this STC issued?

**A.    Based on the certificate -- the date here, it looks like July 28, 2014.**

Q.    Thank you, sir.  You can put that document to the side.

We will next mark as Exhibit 9 a document I am handing you bearing Bates Number Jetaire 0036085 ending 36087.

(Defendant/Counter-Plaintiff's Exhibit 9, Department of Transportation Federal Aviation Administration Supplemental Type Certificate Number

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative     14 (53 to 56)
February 7, 2023

53

ST04415AT, was marked for identification.)

BY MR. WORLEY:

Q.   Sir, do you recognize this document?

A.   I do.

Q.   What is this document of Exhibit 9?

A.   This is a supplemental tag certificate issued to Jetaire Aerospace for the Boeing 757-200.

Q.   And what is the STC number of this document?

A.   ST04415AT.

Q.   And when was this STC issued?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  December 13, 2017.

BY MR. WORLEY:

Q.   Thank you, sir.  And we will do one more here.

I am handing you what's now marked as Exhibit 10.

(Defendant/Counter-Plaintiff's Exhibit 10, Department of Transportation Federal Aviation Administration Supplemental Type Certificate Number ST04405AT, was marked for identification.)

BY MR. WORLEY:

Q.   It's a document bearing Bates Number Jetaire 0032658 ending 32660.

Sir, do you recognize this document?

A.   I do.

54

Q.   What is this document of Exhibit 10?

A.   It's a supplemental type certificate issued for the Boeing 767-200 series and -300 series.

Q.   And what is the STC number of the document of Exhibit 10?

A.   ST04405AT.

Q.   And when was this STC issued?

A.   September 16th, 2017.

Q.   Thank you, sir.  You can put that document away.

For each of the STCs that we've just introduced, Exhibits 7 to 10, were there any technical changes for any model aircraft covered by those STCs?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Define "technical changes."

BY MR. WORLEY:

Q.   Well, after the STCs were issued for each of these aircraft, were there ever any amendments or reissues of any of the STCs?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Yes.

BY MR. WORLEY:

Q.   Which STCs were amended or reissued?

MR. MCDONOUGH:  Object to the form.

Go ahead.

THE WITNESS:  ST04405AT was amended.

55

BY MR. WORLEY:

Q.   And what was the amendment to that -- or what did the amendment to that STC involve?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  It involved removing the restriction under "Limitations and Conditions," Item 1.

BY MR. WORLEY:

Q.   And you are referring to Item 1 on the first page of Exhibit 10?

A.   Yes.  Under, "Limitations and Conditions."

Q.   Did that removal have any -- did that effect the design or configuration or installation of the foam system that was being installed?

A.   No, not to my recollection.

Q.   And to be clear, Exhibits 7, 8, 9 and 10 all -- do all of these STCs pertain to the installation of the INVICTA system into various aircraft?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Yes.

BY MR. WORLEY:

Q.   And the aircraft that are at issue for each STC are set forth on the front of that STC, correct?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  I'm sorry.  Say that again.

56

BY MR. WORLEY:

Q.   Yeah, that was poorly worded.  I'm sorry.

These STCs refer to installation of the INVICTA system, correct?

A.   That's correct.

Q.   And each STC addresses a different model of aircraft in which the INVICTA system is installed, correct?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Yes.

BY MR. WORLEY:

Q.   And the aircraft are identified on the front of each STC, correct?

A.   Yes.

Q.   So, for example, Exhibit 8 refers to installation of the INVICTA system for the Boeing 737 aircraft, models 300, 400, 500 series, correct?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Yes.  However, to clarify, now that I think of it, this STC may have been modified.

BY MR. WORLEY:

Q.   Thank you, sir.

And how may it have been modified?

A.   I believe additional series of aircraft were

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative    15 (57 to 60)
February 7, 2023

**57**

added to it.  That corrects a -- an earlier response I gave you --

Q.    Okay.  Thank you, sir.

A.    -- I think.

Q.    Thank you, sir.

And the -- and other than adding additional series of aircraft, would the design or configuration of the INVICTA system addressed in Exhibit 8 have changed for 737-300, 400, and 500 series?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  There is a possibility that -- that changes were made at some point to the design and configuration.

BY MR. WORLEY:

Q.    And what changes may have been made to the design and configuration of the INVICTA system for the aircraft set forth in Exhibit 8?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  There may have been changes to the shapes, foam shapes as we -- as our knowledge of the technology evolved, there may have been changes.

BY MR. WORLEY:

Q.    What changes may have occurred?

MR. MCDONOUGH:  Object to the form.

**58**

Sorry.

BY MR. WORLEY:

Q.    What changes may have occurred to the shapes of the foam blocks?

A.    Well, in general, the -- the -- the shapes of -- you know, there -- there are a number of pieces that go into the tank.  And it's not uncommon for us to find better ways of manufacturing or installing pieces, more efficient ways of -- of installing.

Q.    As you sit here today, do you have any understanding of what changes may have occurred specifically to the design and installation of the products -- of the INVICTA products in accordance with the STC in Exhibit 8?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Well, which aircraft models are you referring to with that question?

BY MR. WORLEY:

Q.    Thank you, sir.

I -- in that question I'm referring to the methods identified in Exhibit 8, the Boeing 737-300, 400, and 500 series.

A.    My recollection was that -- is that there were some changes to the -- to the foam -- the shape of the foam.  I think those changes were made for

**59**

manufacturability and to -- for ease of installation.  There may have been other reasons that we -- that we made the changes, also.

Q.    How did the shapes change?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  My recollection is that in the early designs there were, for lack of a better word, slices of foam installed in the tank.  And we found better ways of doing it where there were more of a block -- you know, slices of block, also, but a more robust -- a more robust, maybe in some cases, more rectangular shape was employed.

BY MR. WORLEY:

Q.    Okay.

A.    Okay.

Q.    Is it Jetaire Aerospace's position that any changes -- well, strike that.

Is it Jetaire Aerospace's position that the original design of the blocks for the Boeing 737-300, 400, and 500 series, as covered by the STC, is protected by the patents-in-suit?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Yes.

BY MR. WORLEY:

Q.    Is it Jetaire Aerospace's position that after

**60**

modification of the shape of the blocks, as you described, that the INVICTA -- that the use or installation of the INVICTA system in the Boeing 737-300, 400, and 500 series is protected by each of the patents-in-suit?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Yes, I think so.

BY MR. WORLEY:

Q.    Returning to the document of Exhibit 6.  At page 20 where we were just looking, sir -- and, again, if you need water or to take a break, please let me know.

A.    Did you say page 20?

Q.    Yes, sir, page 20.

A.    Okay.

Q.    Does this -- does the table on page 20 accurately show when each of the INVICTA products were marked with the patents-in-suit?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  I think so.

BY MR. WORLEY:

Q.    And, sir, if you could go back one page to page 19, the fourth line down, do you see where it says, "Jetaire states that it has not licensed its patents-in-suit"?

A.    Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Designated Representative    16 (61 to 64)
February 7, 2023

61

Q.    Is it correct that Jetaire Aerospace has not licensed its patents-in-suit?

A.    Please restate the question or repeat the question.

Q.    Has Jetaire Aerospace licensed its patents-in-suit?

MR. MCDONOUGH:  Object to the form. Calls for legal conclusions.

THE WITNESS:  It has licensed the patents to Jetaire Flight Systems.

BY MR. WORLEY:

Q.    But that's not what's set forth in this interrogatory, is it?  Or strike that.

Where in this interrogatory -- let's move to Interrogatory Number 10.

A.    Did you want a response to this?

Q.    No, sir.  We'll -- we'll just jump to Interrogatory Number 10.

A.    I see.  What page is that, please?

Q.    Interrogatory 10 begins on page 46, and the response ends at page 47.

Sir, does interrogatory 10 set forth Jetaire Aerospace's response -- sorry.  Does the response to interrogatory 10, at pages 46 to 47, set forth Jetaire Aerospace's response to the interrogatory requesting "to

62

identify and describe licenses or offers to license the patent-in-suit, including the time, place and content of the license or offer to license, the parties to the license or offers to license, and identification of any documents relating to the license or offer to license"?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Could you repeat the question, please?

BY MR. WORLEY:

Q.    Do you see Jetaire's response to Interrogatory Number 10?

A.    I do.

Q.    Is Jetaire's response to interrogatory 10 correct?

A.    I believe so.  You refer to Jetaire in this interrogatory and the one previously discussed, as does Jetaire.

Q.    Well, sir --

A.    Jetaire is defined, I believe earlier in the document, as Jetaire Aerospace and Jetaire Flight Systems.

Q.    Well, sir, please look at the first page of Exhibit 6.  Do you see the first paragraph of the response where it says, in part, "Plaintiff Jetaire Aerospace, LLC herein after Jetaire or Plaintiff"?

63

A.    I see it.

Q.    Sir, does exhibit -- the front page of Exhibit 6 define Jetaire to mean Plaintiff Jetaire Aerospace, LLC?

MR. MCDONOUGH:  Object to the form. Calls for legal conclusions.

THE WITNESS:  Well, it -- further up in the page it refers to Jetaire Aerospace, LLC and Jetaire Flight Systems.

BY MR. WORLEY:

Q.    Are you referring to the caption at the top of the page?

A.    I believe this would be called a caption.

Q.    Well, in the document itself, did this response to -- did Jetaire Aerospace's response to the interrogatories shown in Exhibit 6, which is the second supplemental responses and objections, define Jetaire to be Plaintiff Jetaire Aerospace, LLC?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  It appears so.

BY MR. WORLEY:

Q.    And, sir, isn't it true that in response to interrogatory 10, Jetaire Aerospace stated, in part, "Jetaire states that there are no licenses related to the patents-in-suit and there have been no offers to license the patents-in-suit"?

64

And I'm looking at page 47.  Isn't that true, sir?

A.    47?

Q.    Page 47.

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Well, I've stated before that -- that Jetaire Aerospace and Jet- -- worked exclusively with Jetaire Flight Systems.  So I think that's the response to the question.  It holds the licenses.

BY MR. WORLEY:

Q.    When does Jetaire Aerospace assert that it entered a license with Jetaire Flight Systems regarding the '998 patent?

MR. MCDONOUGH:  Object to the form. Calls for legal conclusions.

THE WITNESS:  I'm sorry, restate the question again.

BY MR. WORLEY:

Q.    Sir, do you agree -- well, strike that.

The second supplemental responses of Exhibit 6 state that "Jetaire," which has been defined earlier as Jetaire Aerospace, LLC, "states that there are no licenses related to the patents-in-suit."

And my question to you is:  In light of your

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative    17 (65 to 68)
February 7, 2023

**65**

testimony today that Jetaire Aerospace has licensed the patents-in-suit to Jetaire Flight Systems, when did the first of those licenses occur?

MR. MCDONOUGH: Object to the form.

THE WITNESS: I don't remember the date. It may have been 2016.

BY MR. WORLEY:

Q. Would it have been before these interrogatory responses were prepared?

A. 2016 would be before, yes.

Q. Would any license from Jetaire Aerospace to Jetaire Flight Systems have been prepared and executed prior to -- for -- for the '109 patent and prior to the second supplemental responses of Exhibit 6?

MR. MCDONOUGH: Object to the form. Calls for legal conclusions.

THE WITNESS: Possibly, yes.

BY MR. WORLEY:

Q. Is it possible it would have been after the sup- -- second supplemental responses which I know on page 75 are dated May 18th, 2022?

MR. MCDONOUGH: Object to the form.

THE WITNESS: No.

BY MR. WORLEY:

Q. Is it possible -- strike that.

**66**

Would any license from Jetaire Aerospace to Jetaire Flight Systems for the '541 patent have occurred after the second supplemental responses of Exhibit 6 were served?

MR. MCDONOUGH: Object to the form.

THE WITNESS: No.

BY MR. WORLEY:

Q. Do you know if any license between Jetaire Aerospace and Jetaire Flight Systems for any of the patents-in-suit have been produced as part of this litigation?

A. I'm sorry, say --

MR. MCDONOUGH: Object to the form.

THE WITNESS: I'm sorry, say that again.

BY MR. WORLEY:

Q. Well, back up.

The licenses that you're referring to, are they written licenses of any of the licenses for the patents-in-suit between Jetaire Aerospace and Jetaire Flight Systems?

MR. MCDONOUGH: Object to the form. Calls for legal conclusions.

THE WITNESS: I believe they are written.

BY MR. WORLEY:

Q. And has Jetaire Aerospace provided copies of

**67**

those written documents to AerSale as part of this litigation?

MR. MCDONOUGH: Object to the form.

THE WITNESS: I don't know.

BY MR. WORLEY:

Q. Do you understand that there were requests made by AerSale to Jetaire Aerospace seeking certain documents as part of this litigation?

A. Seeking certain documents?

Q. Yes, sir.

A. I presume there have been document requests, yes.

Q. And do you understand Jetaire Aerospace has responded to those document requests by producing documents?

A. I understand they have, yes.

Q. And my question is, do you have any understanding as to whether or not any licenses were produced as part of Jetaire Aerospace's response to the document request?

MR. MCDONOUGH: Object to the form.

THE WITNESS: I don't recall.

BY MR. WORLEY:

Q. Do you recall if there would be a reason Jetaire Aerospace would have not provided licenses between

**68**

Jetaire Aerospace and Jetaire Flight Systems in response to document production requests?

MR. MCDONOUGH: Object to the form.

THE WITNESS: I can't think of any reason we would have intentionally not provided the information. Perhaps an oversight, but certainly not intentional. There would be no reason to intentionally hide the existence of those two documents.

MR. MCDONOUGH: By the way, if we did make a mistake and inadvertently not produce that, which it sounds like it's the case, we will get with Mike and produce the documents to the extent they exist and to the extent he understands what a license means and I think in the way that you mean it.

MR. WORLEY: And, Counsel, I appreciate that and request that to the extent any interrogatory responses or other discovery requests needs updating, I request that those updates be made at your earliest convenience.

MR. MCDONOUGH: We will definitely do that before the close of discovery. And as early as possible, to be clear. As soon as we know about information that is not in there, we will add it to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative
February 7, 2023

---

205

the FAA and communications with Jetaire Flight Systems, has Jetaire Aerospace had any communications of any type with anybody in the aviation industry?

**A.   Not to my recollection.**

MR. WORLEY:  At this time I think we can go ahead and go off the record.

THE VIDEOGRAPHER:  We are going off the record.  The time is 6:02 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 6:05 p.m.

MR. WORLEY:  Mr. Williams, I appreciate your time and patience today.

At this time I have no further questions, and I will pass the witness to Mr. McDonough.

MR. MCDONOUGH:  Okay.  I have no questions for redirect for Jetaire Aerospace, LLC.

MS. SANDERS:  Right.

THE VIDEOGRAPHER:  Nothing else for the record?

MR. WORLEY:  Nothing else for the record for Jetaire Aerospace.

THE VIDEOGRAPHER:  This concludes today's testimony of Michael Williams as corporate representative of Jetaire Aerospace.  The time is

---

206

6:06 p.m., and we are off the record.

(The deposition was concluded at 6:06 p.m.)

---

207

DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states:  Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the certified court reporter, the court reporter's employer or the referral source for the deposition, with any party to the litigation, counsel to the parties, or other entity.  Such form shall be attached to the deposition transcript, I make the following disclosure:  I am a Georgia Certified Court Reporter.  I am here as a representative of Planet Depos.

---

208

Planet Depos, was contacted to provide court reporting services for the deposition.  Planet Depos, will not be taking this deposition under any contract that is prohibited by O.C.G.A. 9-11-28(c).  Planet Depos, has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.  Planet Depos, will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

*Susan DiFilippantonio*
_____
Susan DiFilippantonio, Notary Public
and Registered Professional Reporter
Commission Expires 10-22-2028
Georgia Certificate Number 2125

---

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative
53 (209 to 212)
February 7, 2023

**209**

STATE OF GEORGIA:

COUNTY OF FULTON:

I hereby certify that the foregoing transcript was reported, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages represent a true, complete, and correct transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the employ of counsel for any of said parties; nor am I in any way interested in the result of said case.

*Susan DiFilippantonio*
_____
Susan DiFilippantonio, Notary Public
and Registered Professional Reporter
Commission Expires 10-22-2028
Georgia Certificate Number 2125

**210**

CAPTION

The Deposition of MICHAEL WILLIAMS, taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.

**211**

CERTIFICATE OF REPORTER

STATE OF GEORGIA

COUNTY OF FULTON

Before me, this day, personally appeared, MICHAEL WILLIAMS, who, being duly sworn, states that the foregoing transcript of his deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

*If no changes need to be made on the following two pages, place a check here _____, and return only this signed page.*

# EXHIBIT F

## (Filed under seal)



## HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Transcript of Michael Williams, Designated Representative, Volume II

**Date:** February 7, 2023
**Case:** Jetaire Aerospace, LLC -v- Aersale Inc.

**Planet Depos**
**Phone:** 777-833-3464
**Fax:** 777-503-3464
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative, Volume II 1 (t1t o4 t1)2

February 8, 2023

---

**121**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

_____

JETAIRE AEROSPACE, LLC              :
                                    :
                                    :
Plaintiff/Counter-Defendant,        :
                                    : CIVIL ACTION
v.                                  : FILE NUMBER:
                                    : 2:10-cv-15244-GAYLES/
AERSALE, INC.                       : TORRES
                                    :
Defendant/Counter-Plaintiff,        :
                                    :
V.                                  :
                                    :
JETAIRE AEROSPACE, LLC; JETAIRE     :
FLIGHT SYSTEMS, LLC; and            :
MICHAEL WILLIAMS,                   :
                                    :
        Counter-Defendants.         :

_____

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VOLUME II
VIDEOTAPED DEPOSITION OF
MICHAEL WILLIAMS as 30(b)(6) WITNESS FOR JETAIRE FLIGHT
SYSTEMS, LLC

20:25 a.m.

February 8, 1013

EVERSHEDS SUTHERLAND (US) LLP
999 Peachtree Street, NE
Suite 1300
Atlanta, Georgia

Susan DiFilippantonio, RPR, CCR No. B-1215

---

**124**

I N D E X

WITNESS/EXAMINATION                                PAGE
MICHAEL WILLIAMS
EXAMINATION                                         127
     BY MR. WORLEY
DISCLOSURE                                          113
CERTIFICATE OF REPORTER                             117
SIGNATURE OF DEPONENT                               119

                E X H I B I T S
Defendant/Counter-Plaintiff's                       135
Exhibit 38, Federal Aviation
Administration-Parts Manufacturer
Approval for Jetaire Flight
Systems, LLC
Defendant/Counter-Plaintiff's                       135
Exhibit 39, Spreadsheet
Defendant/Counter-Plaintiff's                       161
Exhibit 39A, Thumb Drive
Defendant/Counter-Plaintiff's                       166
Exhibit 40,
Defendant/Counterclaim-Plaintiff
AerSale, Inc.'s Notice of
Deposition to Jetaire Flight
Systems, LLC, Pursuant to Federal
Rule of Civil Procedure 30(b)(6),
Defendant/Counter-Plaintiff's                       308
Exhibit 42, E-mail dated August
27, 1026
Defendant/Counter-Plaintiff's                       326
Exhibit 41, E-mail dated April 8,
1027
Defendant/Counter-Plaintiff's                       327
Exhibit 43, E-mail dated April 18,
1025
Defendant/Counter-Plaintiff's                       314
Exhibit 44, E-mail dated May 22,
1025
Defendant/Counter-Plaintiff's                       317
Exhibit 45, Correspondence dated
August 16, 1010
Defendant/Counter-Plaintiff's                       333
Exhibit 46, Correspondence dated
August 17, 1010
Defendant/Counter-Plaintiff's                       336
Exhibit 47, E-mail dated December
9, 1023
Defendant/Counter-Plaintiff's                       339
Exhibit 48, E-mail dated April 22,
1024
Defendant/Counter-Plaintiff's                       340

---

**123**

APPEARANCES:

On Behalf of the Plaintiff/Counter-Defendant, JETAIRE
AEROSPACE, LLC:

ROjIER HARDT MCDONOUGH, PLLC

BY:  James F. McDonough, III
3612 Vinings Slope
Suite 4300
Atlanta, GA 30339
470.480.9505
Zim@rhmtrial.com

On Behalf of the Defendant/Counter-Plaintiff, AERSALE,
INC.:

EVERSHEDS SUTHERLAND (US) LLP
BY:  Regis C. Worley
21155 El Camino Real
Suite 200
San Diego, CA 91230
858.151.6501
regisworley@eversheds-sutherland.com

EVERSHEDS SUTHERLAND (US) LLP
BY:  Valerie S. Sanders
999 Peachtree Street, NE
Suite 1300
Atlanta, GA 30309
404.853.8000
valeriesanders@eversheds-sutherland.com

Also Present:  Shawn Rafferty
               Ervin Farkas, videographer

---

**215**

Exhibit 49, E-mail dated April 16,
2014
Defendant/Counter-Plaintiff's                       342
Exhibit 50, E-mail dated July 14,
2014
Defendant/Counter-Plaintiff's                       334
Exhibit 51, E-mail dated August
21, 2014
Defendant/Counter-Plaintiff's                       347
Exhibit 52, E-mail dated January
21, 2015
Defendant/Counter-Plaintiff's                       355
Exhibit 53, Brochure
Defendant/Counter-Plaintiff's                       357
Exhibit 54, Declaration of Anthony
Femminineo
Defendant/Counter-Plaintiff's                       359
Exhibit 55, E-mail dated October
31, 2013
Defendant/Counter-Plaintiff's                       360
Exhibit 56, E-mail dated November
1, 2013
Defendant/Counter-Plaintiff's                       386
Exhibit 57, E-mail dated February
23, 2016
Defendant/Counter-Plaintiff's                       387
Exhibit 58, E-mail dated August
30, 2016
Defendant/Counter-Plaintiff's                       388
Exhibit 59, E-mail dated December
13, 2016
Defendant/Counter-Plaintiff's                       390
Exhibit 60, Jetaire Purchase and
Sale Agreement, Engineering and
Support Services, 14 CFR 25.981
Compliance
Defendant/Counter-Plaintiff's                       392
Exhibit 61, Jetaire Purchase and
Sale Agreement, Engineering and
Support Services, 14 CFT 25.981
Compliance
Defendant/Counter-Plaintiff's                       393
Exhibit 62, Jetaire Purchase and
Sale Agreement, Engineering and
Support Services, Modification of
FAA STC
Defendant/Counter-Plaintiff's                       405
Exhibit 63, E-mail dated April 2,
2016

---

*contains Confidential Information*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative, Volume II t (t15 o4 t182

February 8, 2023

216

(Wednesday, February 8, 2023          10:15 a.m.)

THE VIDEOGRAPHER:  This is the videotaped deposition of Michael Williams, corporate representative of Jetaire Flight Systems, LLC, in the case of Jetaire Aerospace, LLC, versus AerSale, Inc.

Today's date is February 8, 2023.  The time is approximately 10:15 a.m.

My name is Ervin Farkas and I am the videographer.  The Court Reporter is Susan DiFilippantonio.

All counsel present, please introduce yourselves and state your affiliations, starting with the noticing attorney.

MR. WORLEY:  Regis Worley on behalf of AerSale.

MS. SANDERS:  Valerie Sanders also for AerSale.

MR. RAFFERTY:  Shawn Rafferty for AerSale.

MR. MCDONOUGH:  James McDonough on behalf of Jetaire Flight Systems, LLC.

THE VIDEOGRAPHER:  Thank you.

Would the Court Reporter please swear in the witness?  Or do we consider them --

217

MS. SANDERS:  No, let's do it again.

MICHAEL WILLIAMS, called as a witness at the instance of the Defendant/Counter-Plaintiff, being first duly sworn, was examined and deposed as follows:

EXAMINATION

BY MR. WORLEY:

Redacted

t

i

218

Redacted

219

Redacted

t

a

c

f

c

t

*contains Confidential Information*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative, Volume II 7 (t35 o4 t382

February 8, 2023

236                                                                                                              238

Redacted

237                                                                                                              239

Redacted

*contains Confidential Information*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative, Volume II

February 8, 2023

Redacted

Redacted

*contains Confidential Information*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative, Volume II 8 (t66 o4 t672

February 8, 2023

Redacted

Redacted

*contains Confidential Information*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative, Volume II 31 (33t o4 33)2

February 8, 2023

Redacted

Redacted

Appx01249

contains Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative, Volume II 3t (335 o4 3382

February 8, 2023

336                                                                338

Redacted

337                                                                339

Redacted

contains Confidential Information

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative, Volume II    33 (369 o4 3632

February 8, 2023

Redacted

Redacted

*contains Confidential Information*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative, Volume II  36 (366 o4 3672

February 8, 2023

Redacted

Redacted

Case: 25-1127    Document: 32-1    Page: 509    Filed: 06/03/2025

*contains Confidential Information*

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative, Volume II 3) (360 o4 3)12

February 8, 2023

Redacted

Redacted

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Appx01253

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative, Volume II )5 (63t o4 63)2

February 8, 2023

432

MR. MCDONOUGH:  I have no questions on redirect.

MR. WORLEY:  Let's go off the record.

THE VIDEOGRAPHER:  This concludes today's testimony of Michael Williams.

The time is 6:17 p.m. and we are off the record.

(The deposition was concluded at 6:17 p.m.)

434

Planet Depos, was contacted to provide court reporting services for the deposition. Planet Depos, will not be taking this deposition under any contract that is prohibited by O.C.G.A. 9-11-28(c).  Planet Depos, has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.  Planet Depos, will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

*Susan DiFilippantonio*
_____
Susan DiFilippantonio, Notary Public and Registered Professional Reporter
Commission Expires 10-22-2028
Georgia Certificate Number 2125

433

DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states:  Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the certified court reporter, the court reporter's employer or the referral source for the deposition, with any party to the litigation, counsel to the parties, or other entity.  Such form shall be attached to the deposition transcript, I make the following disclosure: I am a Georgia Certified Court Reporter.  I am here as a representative of Planet Depos.

435

STATE OF GEORGIA:

COUNTY OF FULTON:

I hereby certify that the foregoing transcript was reported, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages represent a true, complete, and correct transcript of the evidence given upon said hearing, and I further certify that I'm not of kin or counsel to the parties in the case; am not in the employ of counsel for any of said parties; nor am I in any way interested in the result of said case.

*Susan DiFilippantonio*
_____
Susan DiFilippantonio, Notary Public and Registered Professional Reporter
Commission Expires 10-22-2028
Georgia Certificate Number 2125

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Designated Representative, Volume II )7 (635 o4 6382

February 8, 2023

436

CAPTION

The Deposition of MICHAEL WILLIAMS, taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.

437

CERTIFICATE OF REPORTER

STATE OF GEORGIA

COUNTY OF FULTON

Before me, this day, personally appeared, MICHAEL WILLIAMS, who, being duly sworn, states that the foregoing transcript of his deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

*If no changes need to be made on the following two pages, place a check here _____, and return only this signed page.*

# EXHIBIT G

## (Filed under seal)



**Planet Depos**
*We Make It Happen™*

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

# Transcript of Michael Williams, Individually

**Date:** February 7, 2023
**Case:** Jetaire Aerospace, LLC -v- Aersale Inc.

**Planet Depos**
**Phone:** 777-833-3464
**Fax:** 777-503-3464
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Individually
February 8, 2023

1 (1 to 4)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

_____

JETAIRE AEROSPACE, LLC           :
                                 :
                                 :
Plaintiff/Counter-Defendant,     : CIVIL ACTION
                                 : FILE NUMBER:
v.                               : 1:20-cv-25144-GAYLES/
                                 : TORRES
AERSALE, INC.                    :
                                 :
Defendant/Counter-Plaintiff,     :
                                 :
V.                               :
                                 :
JETAIRE AEROSPACE, LLC; JETAIRE  :
FLIGHT SYSTEMS, LLC; and         :
MICHAEL WILLIAMS,                :
                                 :
        Counter-Defendants.      :

_____

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
VIDEOTAPED DEPOSITION OF
MICHAEL WILLIAMS as 30(b)(1) WITNESS

6:47 m.y.

Februarh 8, 2023

EVERSHEDS SUTHERLAND (US) LLP
999 Peacgtree Street, NE
Suite 2300
Atlanta, Georpia

Susan DiFilimmantonio, RPR, CCR No. B-2125

APPEARANCES:

On Begalf of tge Plaintiff/Counter-Defendant, JETAIRE
AEROSPACE, LLC:

ROZIER HARDT MCDONOUGH, PLLC
BY:  Jayes F. McDonoupg, III
3621 Vininps Slome
Suite 4300
Atlanta, GA 30339
470.480.9505
@iywrgytrial.coy

On Begalf of tge Defendant/Counter-Plaintiff, AERSALE,
INC.:

EVERSHEDS SUTHERLAND (US) LLP
BY:  Repis C. Worleh
12255 El Cayino Real
Suite 100
San Diepo, CA 92130
858.252.6502
repiskorlehweversgeds-sutgerland.coy

EVERSHEDS SUTHERLAND (US) LLP
BY:  Valerie S. Sanders
999 Peacgtree Street, NE
Suite 2300
Atlanta, GA 30309
404.853.8000
valeriesandersweversgeds-sutgerland.coy

Also Present:  Sgakn Rafferth
               Ervin Farjas, videopramger

I N D E X
WITNESS/EXAMINATION                    PAGE

MICHAEL WILLIAMS                         5

EXAMINATION                             5

   BY MR. WORLEY

DISCLOSURE                              63

CERTIFICATE OF REPORTER                 67

SIGNATURE OF DEPONENT                   69

        E X H I B I T S

   (Defendant/Counter-Plaintiff's        5

   Exgibit 64, LinjedIn Profile of

   Micgael Williays (DER Eyeritus),

(Wednesday, February 8, 2023          6:47 p.m.)

THE VIDEOGRAPHER:  This is the 30(b)(1) video deposition of Michael Williams in his personal capacity in the case of Jetaire Aerospace, LLC versus AerSale, Inc.  Today's date is February 8, 2023.  The time is approximately 6:47 p.m.  My name is Ervin Farkas, and I'm the videographer.  The Court Reporter is Susan DiFilippantonio.

All counsel present, please introduce yourselves and state your representations starting with the noticing attorney.

MR. WORLEY:  Regis Worley on behalf of AerSale.

MS. SANDERS:  Valerie Sanders, also for AerSale.

MR. RAFFERTY:  Shawn Rafferty for AerSale.

MR. MCDONOUGH:  James McDonough on behalf of Mr. Williams.

THE VIDEOGRAPHER:  Thank you.

Would the Court Reporter please swear in the witness.

THE WITNESS:  I do.

THE REPORTER:  Thank you.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Individually

February 8, 2023

---

**37**

BY MR. WORLEY:

Q.   And so you, in this paragraph, took information from AIR 4170A, used that in this paragraph of your patent application, and then referenced AIR 4170A, correct?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  Yes.  And we gave them credit for it.

BY MR. WORLEY:

Q.   Let's look -- keep these out.  We will come back to them.  But please take a look at the next patent, the '109 patent of Exhibit 3.

A.   Okay.

Q.   If you look at Column 10 of the '109 patent, it's in the second full paragraph starting with, "A plurality of cutouts."

Do you see that paragraph?

MR. MCDONOUGH:  Where are you?

MR. WORLEY:  The '109 patent of Exhibit 3 in Column 10.

BY MR. WORLEY:

Q.   Are you there, sir?

A.   I am.

Q.   Do you see the second full paragraph that begins with the words "A plurality of cutouts"?

---

**38**

Do you see that, sir?

A.   Yes.

Q.   The last sentence in that paragraph reads, "These options include, but are not limited to, mechanical blade-type cutting, specially designated, manufactured smooth blade-type cutting tools, and extremely fine-tooth band saw-type blade, or a hot wire-type cutting tool."

Did I read that correctly?

A.   Yes.

Q.   And in this case, the reference to SAE 4170 has been deleted, has it not?

MR. MCDONOUGH:  Object to the form.

THE WITNESS:  I don't know if it's deleted or just not there.

BY MR. WORLEY:

Q.   Sir, the '998 patent referenced the SAE document when talking about cutting, and you agree that the '109 patent does not in that same section, correct?

A.   It does not appear to be there.

Q.   You can put the '109 patent to the side.

And, sir, returning to the SAE document, looking at the front page, at the bottom, do you see where it says, "Copyright 2007 SAE International"?

A.   Yes.

---

**39**

Q.   And underneath that, it says, "All rights reserved.  No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of SAE."

Did I read that correctly, sir?

A.   Yes.

Q.   Sir, did you receive the prior written permission of SAE before drafting any portion of the '998 patent application?

MR. MCDONOUGH:  Object to the form.

BY MR. WORLEY:

Q.   Let me re-ask.  Did you obtain the prior written permission of SAE to use any portion of AIR4170, Revision A, as part of the '998 patent -- the application that led to the '998 patent?

A.   I don't know if my attorneys did it or not.

Q.   Did you do it, sir?

A.   Did I do it?

Q.   Yes, sir.

A.   No.

Q.   Are you aware of any other portion of the '998 patent that uses material from AIR 4170A?

A.   I'm sorry, say that again.

---

**40**

Q.   Was there any material taken from AIR 4170A and incorporated into the '998 patent, other than that that we just discussed?

A.   I don't know.

Q.   Let's find out.

Please turn to the brief summary of the invention section that appears at Column 3 and Column 4 of the '998 patent, Exhibit 2.

A.   (Complying.)

I guess, based upon that.

Q.   There is no question pending, sir.

A.   Okay.

Q.   Are you there?

A.   Yes.

Q.   Do you see in Column 3, approximately in the middle of the page, a paragraph that starts with the words "Hydrodynamic ram effect"?

Do you see that, sir?

A.   Yes.

Q.   Okay.  Please read what you submitted to the patent office -- sorry, please read that paragraph of the '998 patent, of which you are named inventor, into the record.

A.   "Hydrodynamic ram effect within a fuel tank or bladder cell is caused when a projectile impacts the

---

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Individually

February 8, 2023

**41**

exterior surface of the fuel tank. Ram force can be intensified when the tank is penetrated by high explosive incendiary (HEI), delayed detonation type of projectile, the matrix-type structure of RPF absorbs a portion of the shock wave as the projectile penetrates the fuel tank. Attenuation of hydrodynamic ram minimizes damage to the fuel tank structure by reducing the overpressure of the shock wave and helps to orient the round to prevent tumbling. Reduction of fuel tank structural damage can effectively reduce the fuel discharge through projectile entrance and exit points."

Q. Thank you, sir.

Could you please now pull up Exhibit 32, the SAE document.

A. Yes.

Q. Turn to page 18.

A. (Complying.)

Q. And please read into the record paragraph 3.4.3.

A. "Hydrodynamic ram attenuation. Hydrodynamic ram within a fuel tank or bladder cell is caused when a projectile impacts the exterior surface -- structure of a fuel tank. Ram source can be intensified when the tank is penetrated by an ATI delayed detonation type projectile. The matrix type structure of reticulated polyurethane foam absorbs a portion of the shock wave as

**42**

a projectile penetrates the fuel tank. Attenuation of hydraulic ram minimizes the damage to the fuel tank structure by reducing the overpressure associated with the shock wave" -- excuse me -- "and helps to orient the round to prevent tumbling. Penetration of the fuel tank" --

MR. MCDONOUGH: Mike, she has got to take this down.

THE WITNESS: Huh?

MR. MCDONOUGH: She has got to take that down.

BY MR. WORLEY:

Q. Keep going. Just go slow and continue.

A. Okay. Sorry.

"Reduction of the fuel tank structural damage can effectively reduce the fuel discharge through the projectile entrance and exit points, effectiveness of reticulated polyurethane foam and attenuation -- attenuating hydrodynamic ram may be seen in an actual demonstration in the Wright-Patterson Air Force Base film clip title "Crash Worthiness: Integral Fuel Tanks -- Fuel Cells." Sorry.

BY MR. WORLEY:

Q. Mr. Williams, would you agree that the paragraph from the SAE document is almost word for word identical

**43**

to the portion of the summary of the invention that you read from the '998 patent?

MR. MCDONOUGH: Object to the form.

THE WITNESS: It is similar.

BY MR. WORLEY:

Q. And almost word for word, correct?

MR. MCDONOUGH: Object to the form.

THE WITNESS: I would not say word for word.

BY MR. WORLEY:

Q. Would you say extremely similar?

A. I would say somewhat similar.

Q. We've got a lot of examples, but in the interest of time, let's move to Column 4 of the '998 patent.

A. Okay.

Q. Just below the middle of the page, do you see where it says, "Another aspect of the present inventive concept is the utilization of a "fully packed" design concept."

Do you see that?

A. Yes.

Q. Can you please read into the record the following sentence from where I stopped, beginning with, "A fully packed"?

A. "A fully packed system is defined as one where

**44**

all potential fuel tank ullage is filled with reticulated polyurethane foam with cutouts for components only. The system is most desirable with cutouts for components only. The system is most desirable where minimal or no tank overpressure can be tolerated."

Q. And, sir, if you could please, now, turn to the SAE document of Exhibit 32 and turn to page 19. Do you see paragraph 3.5.2 with the title, "Fully Packed Design Concept"?

A. Yes.

Q. Please read the first two sentences of that paragraph after where it says, "Fully packed' packed design concept."

A. "A fully packed system is defined as one where all potential fuel tank ullage is filled with reticulated polyurethane foam with cutouts for components only. This system is most desirable where minimum or no -- minimal or no tank overpressure can be tolerated."

Q. Well, sir, in this example, you would agree that the words from the SAE AIR4170 are reproduced exactly into the '998 patent application that you just read, correct?

A. I don't know if it's exact.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Individually

12 (45 to 48)

February 8, 2023

**45**

Q.   Check.

A.   **Huh?**

Q.   Feel free to check.  Let me know if I am wrong.

MR. WORLEY:  I tell you what.  Let's -- I am getting a request for a break and I try to be respectful of needs.  So let's take a break and we will continue the questioning after.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  We are going off the record.  The time is 7:50 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is 7:59 p.m.  Please continue.

BY MR. WORLEY:

Q.   Mr. Williams, during the break, were you able to complete your comparison of the portion of the SAE document that we looked at compared to the '998 document?

A.   **I was not.  Is that what I was supposed to be doing?**

Q.   Well, that's what you had the opportunity to do.

Do you have any reason to believe that the portion you read from the SAE document is different than the portion of -- we just read from the '998 patent?

**46**

A.   **Was that paragraph 3.5.2?**

Q.   It was.

A.   **And, I'm sorry, where in --**

Q.   You know what --

A.   **-- this patent.**

Q.   -- the record will speak for itself, sir.  We don't need to burden you with reading these two documents and comparing them.

Let's move on to Column 4 of the '998 patent.

A.   **I am there.**

Q.   Okay.  Do you see toward the bottom of the page, maybe two-thirds of the way down, a paragraph that starts off with the sentence, "Another aspect of the present incentive concept is the utilization of a grossly voided design concept."

Do you see that?

A.   **I do.**

Q.   Okay.  Can you please read the rest of that paragraph?

A.   **"A grossly voided system is defined as one where the fuel tank contains strategically positioned reticulated foam for explosion suppression.  The system provides for minimal weight -- minimal weight penalty and fuel retention, and is best suited for a fuel system that can withstand substantial overpressures.  These and**

**47**

**various other advantages and features of novelty which characterize the invention are pointed out in the"** --

Q.   Sir, that is all right.

A.   **-- "accompanying descriptive matter."**

Q.   You can stop, sir.  Just that paragraph.

Now, please turn to the SAE document of 32 and turn to page 30.

A.   **(Complying.)**

Q.   Do you see the paragraph in the middle that is numbered 3.5.3 that says, "Grossly voided design concept"?

A.   **Yes.**

Q.   Can you please read the first two sentences after it says, "Grossly voided design concept"?

A.   **"A grossly"** --

Q.   Out loud into the record.

A.   **"A grossly voided design concept.  A grossly voided system is defined as one where the fuel tank contains strategically positioned reticulated foam for explosion suppression.  This system provides for minimal weight penalty and fuel retention and is best suited for fuel systems that can withstand substantial overpressures.  The flame 2 data shown in figure 5 shows the effect of"** --

Q.   You can stop.

**48**

A.   **-- "operating pressure" -- I'm sorry?**

Q.   You made it through the first two sentences.

Thank you, sir.

A.   **Okay.**

Q.   Would you agree the first -- well, the record will speak for itself.

Do you, as you sit here today, have any explanation as to why subject matter and -- from the SAE AIR4170 document appears in your patent application -- or your patent?

A.   **No, I don't.**

MR. MCDONOUGH:  Object to the form.

BY MR. WORLEY:

Q.   Okay.

A.   **No, I don't.**

Q.   And looking at the front of the '998 patent, do you see the right column where it says "References cited"?

Do you see that, sir?

A.   **Yes.**

Q.   And there are some patent documents listed.

Do you see those?

A.   **Yes.**

Q.   And foreign patent documents.

Do you see those?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Michael Williams, Individually          13 (49 to 52)
February 8, 2023

49

A.    Yes.

Q.    Is there anywhere in the references cited that it identifies the SAE AIR4170, Revision A?

MR. MCDONOUGH: Sorry. What page number are you looking at this time?

MR. WORLEY: "References Cited."

BY MR. WORLEY:

Q.    The AIR4170A is not identified as a references cited on the front of the patent application. Would you agree, sir?

A.    I don't see it.

Q.    Okay. Are you aware that there was a duty to disclose to the patent office any document that's material to the patent application?

A.    Yes.

Q.    And you did not disclose to the patent office the existence of the AIR4170, Revision A document as it pertains to the '998 patent, correct?

A.    I don't know if it's correct or not. I would have to look at the entire file.

Q.    Well, that is something that I certainly had on my list of things to do and we can certainly consider doing that during a follow-up, but as you sit here today, you have no independent recollection of producing or disclosing the existence of the SAE document to the

50

patent trademark office, correct?

A.    I don't recall very much about any of this. It was ten years ago -- almost ten years ago.

Q.    Sir, are you aware that as part of this ongoing litigation, your counsel has identified the portions of the summary of the invention of the '998 patent that we just read as identifying your invention or disclosing your invention?

A.    I'm sorry, could you repeat that question?

Q.    Are you aware that during the course of the present litigation as we were in the process of claim construction, your counsel relied on the disclosure of the '998 patent application, the summary of the invention, the portions that we just read involving voiding and fully packed design, as showing what it is that you invented?

MR. MCDONOUGH: Object to the form.

THE WITNESS: I think I understand your question. Yes.

BY MR. WORLEY:

Q.    And are you aware that your counsel has relied on your patent application -- your patent of the sections that we just talked about in making representations to the court of what you invented?

MR. MCDONOUGH: Object to form.

51

THE WITNESS: Yes.

BY MR. WORLEY:

Q.    And you are not an author of the AIR4170A document, are you?

A.    No.

Q.    Did you invent anything that is disclosed in the AIR4170A document?

A.    I would have to read the entire document to answer that question.

Q.    As you sit here today, are you aware of any portion of the AIR4170 document that was issued in 1991 and reaffirmed in 2007 that you authored?

MR. MCDONOUGH: Object to form.

THE WITNESS: I'm sorry, ask the question again.

BY MR. WORLEY:

Q.    Did you author any portion of the SAE document of Exhibit 32, sir?

A.    Not to my recollection.

Q.    If you can put that document to the side.

A.    (Complying.)

Q.    Pull out a document that we discussed briefly and Mr. McDonough was kind enough to agree we could follow up to work on its admissibility, but I would like to talk about the file histories of a couple of these

52

patents.

Sir, if you can find for me Exhibit 18, it's a relatively thin document, and it would probably be right next to two big documents with bulldog clips.

A.    I have 19.

Q.    18 is about this thick, and I am holding it up for you to see.

A.    Oh, you want 18?

Q.    Yes, sir.

A.    Oh, I have it.

Q.    Okay. Please -- and I will represent, again, this is the file history or the prosecution history for the application that issued as the '998 patent. And I will confirm my recollection. Yes, I'm looking at the application number at the front of Exhibit 18 and comparing it to the application number at the front of Exhibit 2. So, sir, looking at the front of Exhibit 18 and turn to the page ending 1471 -- I'm sorry. That is a different document.

Give me a second? See, this is the time I am burning now. Okay.

Please turn to the page ending 9080.

A.    (Complying.) 9080?

Q.    Yes, sir.

A.    Okay.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Individually          16 (61 to 64)

February 8, 2023

COURT REPORTER: Before we go off the record, can I have the attorneys state their order and whether the witness is going to read and sign.

MR. MCDONOUGH: We will do the read and sign and get the rough. And I think that you sent the rough from last night, right? But I don't think we need a rush. What is the normal time for you to turnaround?

THE COURT REPORTER: Ten days.

MR. MCDONOUGH: Maybe a rush. Can I just do it off the record? I just have to think. Probably a rush. Is that like 2 or 3 days or something? Yeah, we will do a rush order for the final, if that is okay.

MR. WORLEY: That's fine.

MR. MCDONOUGH: And then just putting on the record again, we do not agree to keep the deposition open. We do not intend to come back. There are still nine minutes left in the record for questioning. I understand counsel does not want to take that and doesn't want to start a new topic, but our position is that the deposition is over.

MR. WORLEY: Okay. We disagree. We can discuss our prior communications offline.

At this point, we will continue the deposition and go off the record.

THE VIDEOGRAPHER: Are we in agreement to go off the record?

MR. MCDONOUGH: We are in agreement to go off the record.

THE VIDEOGRAPHER: Thank you.

This concludes today's deposition of Michael Williams in his special capacity. The time is now 8:32 p.m. and we are off the record.

(The deposition was concluded at 8:32 p.m.)

DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states: Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the certified court reporter, the court reporter's employer or the referral source for the deposition, with any party to the litigation, counsel to the parties, or other entity. Such form shall be attached to the deposition transcript, I make the following disclosure: I am a Georgia Certified Court Reporter. I am here as a representative of Planet Depos.

Planet Depos, was contacted to provide court reporting services for the deposition. Planet Depos, will not be taking this deposition under any contract that is prohibited by O.C.G.A. 9-11-28(c). Planet Depos, has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. Planet Depos, will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

*Susan DiFilippantonio*
_____
Susan DiFilippantonio, Notary Public
and Registered Professional Reporter
Commission Expires 10-22-2028
Georgia Certificate Number 2125

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Michael Williams, Individually

February 8, 2023

65

STATE OF GEORGIA:

COUNTY OF FULTON:

I hereby certify that the foregoing transcript was reported, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages represent a true, complete, and correct transcript of the evidence given upon said hearing, and I further certify that I'm not of kin or counsel to the parties in the case; am not in the employ of counsel for any of said parties; nor am I in any way interested in the result of said case.

*Susan DiFilippantonio*
_____

Susan DiFilippantonio, Notary Public and Registered Professional Reporter

Commission Expires 10-22-2028

Georgia Certificate Number 2125

66

CAPTION

The Deposition of MICHAEL WILLIAMS, taken in the matter, on the date, and at the time and place set out on the title page hereof.

It was requested that the deposition be taken by the reporter and that same be reduced to typewritten form.

It was agreed by and between counsel and the parties that the Deponent will read and sign the transcript of said deposition.

67

CERTIFICATE OF REPORTER

STATE OF GEORGIA

COUNTY OF FULTON

Before me, this day, personally appeared, MICHAEL WILLIAMS, who, being duly sworn, states that the foregoing transcript of his deposition, taken in the matter, on the date, and at the time and place set out on the title page hereof, constitutes a true and accurate transcript of said deposition.

*If no changes need to be made on the following two pages, place a check here _____, and return only this signed page.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:20-cv-25144-GAYLES/TORRES

| | |
|---|---|
| JETAIRE AEROSPACE, LLC. | ) |
| | ) |
| Plaintiff/Counter-Defendant, | ) |
| | ) |
| v. | ) |
| | ) |
| AERSALE, INC., | ) |
| | ) |
| Defendant/Counter-Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JETAIRE AEROSPACE, LLC, | ) |
| JETAIRE FLIGHT SYSTEMS, LLC, | ) |
| And MICHAEL WILLIAMS, | ) |
| | ) |
| Counter-Defendants. | ) |

_____

**PLAINTIFF JETAIRE AEROSPACE, LLC'S THIRD SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT/COUNTERCLAIM-PLAINTIFF AERSALE, INC.'S SECOND SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), and the applicable Local Rules of the United States District Court for the Southern District of Florida and of this Court, Plaintiff Jetaire Aerospace, LLC (hereinafter, "Jetaire" or "Plaintiff") hereby serves its Third Supplemental Responses to the Second Set of Interrogatories (Nos. 2-16) served on December 15, 2021 (hereinafter, the "Interrogatories") by Defendant/Counterclaim-Plaintiff Aersale, Inc. (hereinafter "Aersale" or "Defendant") as follows:

**PRELIMINARY STATEMENT**

These responses and objections are made solely for the purposes of this action. These objections are made without waiving, or intending to waive but, on the contrary, expressly

1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Aviation Lifetime Achievement Award at an event hosted by the Atlanta Aero Club on Thursday October 21, 2021. The coveted EPPS Aviation Award recognizes members of the aviation community who have made significant contributions to the aerospace industry in the State of Georgia. The contribution that Mr. Williams and Jetaire was being recognized for is the patented technologies at the center of this lawsuit. Previous winners are Gulfstream and Delta Airlines.

Furthermore, pursuant to Fed. R. Civ. P. 33(d) and identify the following documents: (1) JETAIR-003046-067 (2) Jetaire Aerospace, LLC's 30(b)(6) deposition in this case on February 8, 2023 and any exhibits attached thereto; (3) Jetaire Flight System, LLC's 30(b)(6) deposition in this case on February 9, 2023 and any exhibits attached thereto; and (4) Michael Williams' 30(b)(1) deposition in this case on February 9, 2023 and any exhibits attached thereto. Plaintiff further incorporates by reference its forth coming expert reports, including without limitation the reports of Mr. Bill Ashworth and/or Mr. Justin Blok.

**INTERROGATORY NO. 7:**

For each Patent-in-Suit, identify your, and any licensee of any of the Patents-in-Suit, compliance with the marking requirements of 35 U.S.C. § 287, including identifying products by name, model number, or other identifying indicia that have been marked and when the marking occurred, identifying any communications with any licensees relating to patent marking, and identifying persons with knowledge of the foregoing and documents relating to the foregoing.

**RESPONSE:** In addition to preserving its General Objections, Plaintiff objects to this Interrogatory to the extent that it seeks disclosure of "all documents" protected from discovery by the attorney-client privilege and/or the attorney work product doctrine.

Subject to the general and specific objections listed above, Plaintiff responds as follows

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

upon the best information and belief currently available to Jetaire after reasonable inquiry.

Jetaire states that to the best of its knowledge that it has complied with the marking requirement of § 287(a) throughout the relevant time period by applying the relevant patent numbers on the packing of the products and marking on relevant websites.

Jetaire states that it has not licensed its Patents-in-Suit.

Jetaire identifies Mr. Michael Williams as the person most knowledgeable at Jetaire regarding marking.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Thus, Plaintiff reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**FIRST SUPPLEMENTAL RESPONSE (JAN. 27, 2022):** Jetaire is not withholding any non-privileged information pursuant to any general or specific objection, and Jetaire will produce any responsive information within its possession, custody, or control following its continued, reasonable inquiry.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Plaintiff continues to search for responsive information and reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**SECOND SUPPLEMENTAL RESPONSE (MAY 18, 2022):** Based upon its investigation conducted to date, Jetaire identifies the following products that it has marked pursuant to 35 U.S.C. §287 and when the marking occurred:

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| Model | Name | Dates of Marking |
|---|---|---|
| Airbus A320, A319, A321 Series | INVICTA Ignition Mitigation/Flammability Reduction Technology in the Center Wing Tank (CWT) | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |
| Boeing B737 (200–900 Series) | INVICTA Ignition Mitigation/Flammability Reduction Technology in the Center Wing Tank (CWT) | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |
| Boeing B767-200 Series | INVICTA Ignition Mitigation Means (IMM) in the Center Wing Tank (CWT) | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |
| Boeing B767-300 Series | INVICTA Ignition Mitigation Means (IMM) in the Center Wing Tank (CWT) | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |
| Boeing B757-200 Series | INVICTA Ignition Mitigation Means (IMM) in the Center Wing Tank (CWT) *Reissued | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Plaintiff continues to search for responsive information and

24

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**THIRD SUPPLEMENTAL RESPONSE (FEB. 10, 2023):** Subject to the general and specific objections listed above, Jetaire identifies the following products that it has marked pursuant to 35 U.S.C. §287 and when the marking occurred:

| Model | Name | Dates of Marking |
|---|---|---|
| Airbus A320, A319, A321 Series | INVICTA Ignition Mitigation/Flammability Reduction Technology in the Center Wing Tank (CWT) | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |
| Boeing B737 (200–900 Series) | INVICTA Ignition Mitigation/Flammability Reduction Technology in the Center Wing Tank (CWT) | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |
| Boeing B767-200 Series | INVICTA Ignition Mitigation Means (IMM) in the Center Wing Tank (CWT) | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |
| Boeing B767-300 Series | INVICTA Ignition Mitigation Means (IMM) in the Center Wing Tank (CWT) | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |
| Boeing B757-200 Series | INVICTA Ignition Mitigation Means (IMM) in the Center Wing Tank (CWT) *Reissued | '998 Patent marking began as early as December 26, 2017. '109 Patent marking began as |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | | early as April 28, 2020. '541 Patent marking began as early as October 13, 2020. |
|---|---|---|

Further evidence that Jetaire marks its Invicta products with its patents, as each patented was issued, is reflected in the testimony of Mr. Michael Williams. *See, e.g.*, Williams 30(b)(6) Rough Tr. Feb. 7, 2023, at 58:22-59:7; Williams 30(b)(6) Rough Tr. Feb. 8, 2023, at 88:22-94:3. Plaintiff further responds pursuant to Fed. R. Civ. P. 33(d) and identify the following documents: (1) Jetaire Aerospace, LLC's 30(b)(6) deposition in this case on February 8, 2023 and any exhibits attached thereto; (2) Jetaire Flight System, LLC's 30(b)(6) deposition in this case on February 9, 2023 and any exhibits attached thereto; (3) Michael Williams' 30(b)(1) deposition in this case on February 9, 2023 and any exhibits attached thereto; (4) JETAIR-0030114- JETAIR-0030121; (5) JETAIR-0030122-JETAIR-0030128; (6) JETAIR-0030129- JETAIR-0030140; (7) JETAIR-0030141- JETAIR-0030152; (8) JETAIR-0030153- JETAIR-0030165; (9) JETAIR-0030166- JETAIR-0030172; (10) JETAIR-0030173- JETAIR-0030179; (11) JETAIR-0030180- JETAIR-0030186; (12) JETAIR-0030187- JETAIR-0030193; (13) JETAIR-0030588- JETAIR-0030597; (14) JETAIR-0030598- JETAIR-0030605; (15) JETAIR-0030606- JETAIR-0030615; (16) JETAIR-0030617- JETAIR-0030626; (17) JETAIR-0030627- JETAIR-0030637; (18) JETAIR-0030638- JETAIR-0030647; (19) JETAIR-0030665- JETAIR-0030666; (20) JETAIR-0030667- JETAIR-0030668; (21) JETAIR-0030669; (22) JETAIR-0030670; (23) JETAIR-0031197; (24) JETAIR-0031532; (25) JETAIR-0031859- JETAIR-0031869; (26) JETAIR-0036637- JETAIR-0036646; (27) JETAIR-0036715; (28) JETAIR-0036716; (29) JETAIR-0036717; (30) JETAIR-0036714; and (31) JETAIR-0036718. Plaintiff further incorporates by reference its forth coming expert reports, including without limitation the reports of Mr. Bill Ashworth and/or Mr. Justin Blok.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTERROGATORY NO. 8:**

To the extent that you contend any of your products, or any Jetaire-branded products, practice any claims of any of the Patents-in-Suit, provide a claim chart showing how that product practices each of the limitations of the patent claim.

**RESPONSE:** In addition to preserving its General Objections, Plaintiff objects to this Interrogatory to the extent that it seeks disclosure of "all documents" protected from discovery by the attorney-client privilege and/or the attorney work product doctrine.

Jetaire objects to this Interrogatory because it constitutes a contention interrogatory and is therefore premature. The Scheduling Order entered in this lawsuit establishes the date by which Jetaire must make its expert disclosures. *See, e.g., O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365 (Fed. Cir. 2006) ("Answers to [contention] interrogatories are often postponed until the close of discovery"); *Novanta Corp. v. Iradion Laser, Inc.*, 15-1033-SLR-SRF, 2016 WL 4987110, at *7 (D. Del. Sept. 16, 2018) (Fallon, J.) ("[A] court may defer such interrogatories until the end of discovery."); *Internetad Sys. LLC v. ESPN, Inc.*, 3:03CV2787-D, 2004 WL 5181346, at *2 (N.D. Tex. Oct. 8, 2004) ("Many courts  conclude that contention interrogatories need not be answered until later in the discovery process."). Plaintiff objects to the extent that this Interrogatory is premature in light of the Court's Scheduling Order in this case, including discovery and expert deadlines. Plaintiff also objects to the extent that this Interrogatory requires Plaintiff to make a legal conclusion or judgment.

Subject to the general and specific objections listed above, Plaintiff anticipates that at the appropriate time, Plaintiff will serve one or more expert reports on the issue of infringement,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

validity, and/or damages that will contain information responsive to this interrogatory. These expert reports, if any, are expressly incorporated herein, including all attachments and any supplements thereto.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Thus, Plaintiff reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**FIRST SUPPLEMENTAL RESPONSE (JAN. 27, 2022):** Jetaire is not withholding any non-privileged information pursuant to any general or specific objection, and Jetaire will produce any responsive information within its possession, custody, or control following its continued, reasonable inquiry.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Plaintiff continues to search for responsive information and reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**SECOND SUPPLEMENTAL RESPONSE (MAY 18, 2022):** Based upon its investigation conducted to date, Jetaire incorporates by reference its response to Interrogatory Number 7, which identifies the Jetaire products that it contends practice certain claims of any of the Patents-in-Suit. Below is an exemplary a claim chart that shows how the Invicta A319, A320, A321, B737 (200-900 series), B757 (200 series), and B767 (200 and 300 series) products practice each of the limitations of the Patents-in-Suit:

| '998 Patent Claim Elements | Jetaire's Position |
|---|---|
| 1. In an aircraft equipped with at least one liquid fuel tank, the tank having internal | Jetaire's Invicta products practice this claim element because they provide a method for |

28

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| surfaces contoured for the accommodation of structural members such as spars, beams, valves, and piping, a method for providing fuel ignition mitigation in the tank, comprising the steps of: | fuel ignition mitigation in the tank, when installed in an aircraft equipped with at least one liquid fuel tank, the tank having internal surfaces contoured for the accommodation of structural members such as spars, beams, valves, and piping. |
| a) determining dimensions, contour, and precise locations of structural members of the fuel tank as encountered at sequentially-measured linear increments along either width or length dimension of the tank interior; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of determining dimensions, contour, and precise locations of structural members of the fuel tank as encountered at sequentially-measured linear increments along either width or length dimension of the tank interior. |
| b) rendering a scaled engineering drawing of a vertically-oriented cross-sectional profile of the fuel tank at each linear increment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of rendering a scaled engineering drawing of a vertically-oriented cross-sectional profile of the fuel tank at each linear increment. |
| c) numerically sequencing each drawing so as to correspond to a respective drawing location along the liner increments within the tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of numerically sequencing each drawing so as to correspond to a respective drawing location along the liner increments within the tank. |
| d) providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said RPF comprising a thickness dependent upon size and type of aircraft fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said RPF comprising a thickness dependent upon size and type of aircraft fuel tank. |
| e) excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each cutout conforming to each of the scaled engineering drawings, and further, designating each cutout by a part number, an orientating "UP" arrow, and an orientating "FORWARD" arrow; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each cutout conforming to each of the scaled engineering drawings, and further, designating each cutout by a part number, an orientating "UP" arrow, and an orientating "FORWARD" arrow. |
| f) arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the | Jetaire's Invicta products practice this claim element because Jetaire performs the step of |

29

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| sequence of each RPF cutout part number; | arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of each RPF cutout part number. |
| g) sequentially packaging said aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of sequentially packaging said aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping. |
| h) composing instructions to be used by technicians/installers for the purpose of inserting and installing said RPF blocks into the tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of composing instructions to be used by technicians/installers for the purpose of inserting and installing said RPF blocks into the tank. |
| i) parking the aircraft on a level surface, and emptying and purging the tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of parking the aircraft on a level surface, and emptying and purging the tank. |
| j) removing a fuel tank access panel or other external fuel tank cover which i) functions as a point of entry for maintenance personnel and/or technicians into the fuel tank, and ii) is proximate a pre-determined starting point of the installation; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of removing a fuel tank access panel or other external fuel tank cover which i) functions as a point of entry for maintenance personnel and/or technicians into the fuel tank, and ii) is proximate a pre-determined starting point of the installation. |
| l) placing the first sequential RPF block at a specified location within the fuel tank as so designated in the instructions; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing the first sequential RPF block at a specified location within the fuel tank as so designated in the instructions. |
| m) placing each successively-ordered RPF block at its designated location within the fuel tank, as set forth in the instructions, until said fuel tank is filled in accordance with the previously determined aggregate of RPF blocks; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing each successively-ordered RPF block at its designated location within the fuel tank, as set forth in the instructions, until said fuel tank is filled in accordance with the previously determined aggregate of RPF blocks. |
| n) performing an inspection of the installed | Jetaire's Invicta products practice this claim |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| RPF blocks, and afterwards, closing any previously opened fuel tank access panel; and | element because Jetaire performs the step of performing an inspection of the installed RPF blocks, and afterwards, closing any previously opened fuel tank access panel. |
| o) re-fueling the fuel tank and verifying the fuel tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the aircraft. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of re-fueling the fuel tank and verifying the fuel tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the aircraft. |

| '998 Patent Claim Element | Jetaire's Position |
| --- | --- |
| 2. In an aircraft equipped with at least one fuel tank consisting of multiple compartments, each compartment having interior surfaces contoured for the accommodation of compartment structural members, and equipment a method for providing fuel ignition mitigation within each individual compartment, comprising the steps of: | Jetaire's Invicta products practice this claim element because they provide a method for providing fuel ignition mitigation within each individual compartment, when installed in an aircraft equipped with at least one fuel tank consisting of multiple compartments, each compartment having interior surfaces contoured for the accommodation of compartment structural members and equipment. |
| a) determining dimensions, contour, and precise location of structural members for each compartment as encountered at sequentially-measured linear increments along either width or length dimension of the compartment interior; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of determining dimensions, contour, and precise location of structural members for each compartment as encountered at sequentially-measured linear increments along either width or length dimension of the compartment interior. |
| b) rendering a scaled engineering drawing of a vertically-oriented cross-sectional profile at each measured linear increment in each compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of rendering a scaled engineering drawing of a vertically-oriented cross-sectional profile at each measured linear increment in each compartment. |
| c) numerically sequencing each drawing corresponding to a respective drawing location | Jetaire's Invicta products practice this claim element because Jetaire performs the step of |

31

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| along the measured linear increment within its respective compartment; | numerically sequencing each drawing corresponding to a respective drawing location along the measured linear increment within its respective compartment. |
| d) providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said RPF material comprising a thickness independent upon size and type of aircraft fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said RPF material comprising a thickness independent upon size and type of aircraft fuel tank. |
| e) excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each cutout conforming to each of the scaled engineering drawings for each particular compartment, and further, designating each RPF block by a part number, an orientating "UP" arrow, and an orientating "FORWARD" arrow; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each cutout conforming to each of the scaled engineering drawings for each particular compartment, and further, designating each RPF block by a part number, an orientating "UP" arrow, and an orientating "FORWARD" arrow. |
| f) for each compartment, arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of the cutout part number of each RPF block; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of for each compartment, arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of the cutout part number of each RPF block. |
| g) for each compartment, sequentially packaging said aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of for each compartment, sequentially packaging said aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping. |
| h) composing instructions for each compartment, to be used by technicians and/or installers for the purpose of inserting the RPF blocks into the compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of composing instructions for each compartment, to be used by technicians and/or installers for the purpose of inserting the RPF blocks into the compartment. |
| i) parking the aircraft on a level surface and emptying and purging all compartments of the | Jetaire's Invicta products practice this claim element because Jetaire performs the step of |

32

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| fuel tank; | parking the aircraft on a level surface and emptying and purging all compartments of the fuel tank. |
| j) commencing installation in a selected compartment by removing a fuel tank access panel or other external tank cover which i) functions as an opening for entry of maintenance personnel and/or technicians into the compartment, and ii) is proximate the selected compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of commencing installation in a selected compartment by removing a fuel tank access panel or other external tank cover which i) functions as an opening for entry of maintenance personnel and/or technicians into the compartment, and ii) is proximate the selected compartment. |
| l) placing the first sequential RPF block at a specified location within the selected compartment as so designated in the instructions; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing the first sequential RPF block at a specified location within the selected compartment as so designated in the instructions. |
| m) placing each successively-ordered RPF block at its designated location within the compartment as set forth in the instructions, until the compartment is filled in accordance with the instructions; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing each successively-ordered RPF block at its designated location within the compartment as set forth in the instructions, until the compartment is filled in accordance with the instructions. |
| n) for each remaining compartment of the fuel tank, performing steps j) through m), above; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of for each remaining compartment of the fuel tank, performing steps j) through m), above. |
| o) performing an inspection of the installed RPF blocks, and afterwards, closing all open compartment or fuel tank access panels; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of performing an inspection of the installed RPF blocks, and afterwards, closing all open compartment or fuel tank access panels. |
| p) re-fueling all compartments of the fuel tank and verifying the fuel tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the subject aircraft. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of re-fueling all compartments of the fuel tank and verifying the fuel tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the subject |

33

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | aircraft. |
|---|---|

| '998 Patent Claim Element | Jetaire's Position |
|---|---|
| 3. A method for providing fuel ignition mitigation for the interior of the center wing tank of an aircraft of the type having a center wing tank consisting of a forward, center, and aft compartment, in which each compartment manifests interior surfaces contoured for the accommodation of compartment structural members and equipment, said method comprising the steps of: | Jetaire's Invicta products practice this claim element because its provides a method for providing fuel ignition mitigation for the interior of the center wing tank of an aircraft of the type having a center wing tank consisting of a forward, center, and aft compartment, in which each compartment manifests interior surfaces contoured for the accommodation of compartment structural members and equipment, said method comprising the following steps. |
| a) determining dimensions, contour, and precise location of structural members for each of the compartments as encountered at sequentially-measured linear increments along either width or length dimension of the interior of each compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of determining dimensions, contour, and precise location of structural members for each of the compartments as encountered at sequentially-measured linear increments along either width or length dimension of the interior of each compartment. |
| b) rendering scaled engineering drawing of a vertically-oriented cross-sectional profile of each of the forward, center, and aft compartments at each measured linear increment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of rendering scaled engineering drawing of a vertically-oriented cross-sectional profile of each of the forward, center, and aft compartments at each measured linear increment. |
| c) numerically sequencing each drawing corresponding to a respective drawing location along the measured linear increments within the respective forward, center and aft compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of numerically sequencing each drawing corresponding to a respective drawing location along the measured linear increments within the respective forward, center and aft compartment. |
| d) providing a plurality of planar sheets of | Jetaire's Invicta products practice this claim |

34

Appx01299

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| reticulated polyurethane foam (RPF) material, said sheets of RPF comprising a thickness dependent upon size and type of aircraft fuel tank; | element because Jetaire performs the step of providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said sheets of RPF comprising a thickness dependent upon size and type of aircraft fuel tank. |
| e) excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each block cutout conforming to the scaled engineering drawing for each particular compartment, and further, designating each RPF block by a part number, an orientating "UP" arrow and an orientating "FORWARD" arrow; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each block cutout conforming to the scaled engineering drawing for each particular compartment, and further, designating each RPF block by a part number, an orientating "UP" arrow and an orientating "FORWARD" arrow. |
| f) arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of each RPF cutout part number for each of the forward, center, and aft compartments; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of each RPF cutout part number for each of the forward, center, and aft compartments. |
| g) for each compartment, sequentially packaging an aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of for each compartment, sequentially packaging an aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping. |
| h) composing instructions for each compartment to be used by technicians/installers for the purpose of inserting and installing said RPF blocks into each compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of composing instructions for each compartment to be used by technicians/installers for the purpose of inserting and installing said RPF blocks into each compartment. |
| i) parking the aircraft on a level surface, and emptying and purging all compartments of the center wing tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of parking the aircraft on a level surface, and emptying and purging all compartments of the center wing tank. |
| j) beginning with the aft compartment, | Jetaire's Invicta products practice this claim |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| removing a tank access panel or other external tank cover which i) functions as an opening for entry of maintenance personnel and/or technicians into the aft compartment, and ii) is proximate the aft compartment; | element because Jetaire performs the step of beginning with the aft compartment, removing a tank access panel or other external tank cover which i) functions as an opening for entry of maintenance personnel and/or technicians into the aft compartment, and ii) is proximate the aft compartment. |
| l) placing the first sequential RPF block at a specified location within the aft compartment, as so designated in the instructions; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing the first sequential RPF block at a specified location within the aft compartment, as so designated in the instructions. |
| m) placing each successively-ordered RPF block at its designated location within the aft compartment as set forth in the installation instructions, until said aft compartment is filled in accordance with the previously determined aggregate of RPF blocks; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing each successively-ordered RPF block at its designated location within the aft compartment as set forth in the installation instructions, until said aft compartment is filled in accordance with the previously determined aggregate of RPF blocks. |
| n) performing an inspection of the installed RPF blocks in the aft compartment, then closing any previously opened tank/compartment access panels, | Jetaire's Invicta products practice this claim element because Jetaire performs the step of performing an inspection of the installed RPF blocks in the aft compartment, then closing any previously opened tank/compartment access panels. |
| o) placing successively-ordered RPF blocks at their designated locations within the center compartment as set forth in steps j) through n), above until said center compartment is filled with the required aggregate of RPF blocks; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing successively-ordered RPF blocks at their designated locations within the center compartment as set forth in steps j) through n), above until said center compartment is filled with the required aggregate of RPF blocks. |
| p) placing successively-ordered RPF block at their designated locations within the forward compartment as set forth in steps j) through n) above, until said forward compartment is filled with the required aggregate of RPF blocks; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing successively-ordered RPF block at their designated locations within the forward compartment as set forth in steps j) through n) above, until said forward compartment is filled with the required aggregate of RPF blocks. |

36

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| q) re-fueling all compartments of the center wing tank and verifying the tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the aircraft. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of re-fueling all compartments of the center wing tank and verifying the tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the aircraft. |
| 4. The method as in claim 1, wherein the reticulated polyurethane foam material comprises a purple color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein the reticulated polyurethane foam material comprises a purple color. |
| 5. The method as in claim 2, wherein the reticulated polyurethane foam material comprises a purple color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 2 and wherein the reticulated polyurethane foam material comprises a purple color. |
| 6. The method as in claim 3, wherein the reticulated polyurethane foam material comprises a purple color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 3 and wherein the reticulated polyurethane foam material comprises a purple color. |

| '109 Patent Claim Element | Jetaire's Position |
|---|---|
| 1. A method for providing ignition mitigation for a fuel tank, comprising: determining interior dimensions of the fuel tank; | Jetaire's Invicta products practice this claim element because they provide a method for providing ignition mitigation for a fuel tank, comprising: determining interior dimensions of the fuel tank. |
| providing a bulk quantity of foam material; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of providing a bulk quantity of foam material. |
| cutting the foam material into a plurality of foam blocks, wherein: at least two foam blocks among the plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces | Jetaire's Invicta products practice this claim element because Jetaire performs the step of cutting the foam material into a plurality of foam blocks, wherein: at least two foam blocks among the plurality of foam blocks have |

37

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| within a compartment of the fuel tank; and the plurality of foam blocks comprise an upper cutout for clearance around an upper stiffener of the fuel tank, an arcuate cutout for clearance around a fuel pump of the fuel tank, and a lower cutout for clearance around a lower stiffener of the fuel tank; | unique profiles, as compared to each other, corresponding to different inner surfaces within a compartment of the fuel tank; and the plurality of foam blocks comprise an upper cutout for clearance around an upper stiffener of the fuel tank, an arcuate cutout for clearance around a fuel pump of the fuel tank, and a lower cutout for clearance around a lower stiffener of the fuel tank. |
| positioning the plurality of foam blocks within the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of positioning the plurality of foam blocks within the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank. |
| filling the fuel tank with fuel and verifying a quantity of the fuel in the fuel tank, wherein: | Jetaire's Invicta products practice this claim element because Jetaire performs the step of filling the fuel tank with fuel and verifying a quantity of the fuel in the fuel tank. |
| a first foam block among the plurality of foam blocks comprises the upper cutout: | Jetaire's Invicta products practice this claim element because Jetaire performs the step of a first foam block among the plurality of foam blocks comprises the upper cutout. |
| a second foam block among the plurality of foam blocks comprises the lower cutout; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of a second foam block among the plurality of foam blocks comprises the lower cutout. |
| the first foam block and the second foam block are stacked in a vertically-oriented column within the fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the first foam block and the second foam block are stacked in a vertically-oriented column within the fuel tank. |
| the plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column. |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| The third foam block comprises at least one channel void to reduce weight. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the third foam block comprises at least one channel void to reduce weight. |
| 2. The method of claim 1, wherein the foam material comprises reticulated polyurethane foam. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and  wherein the foam material comprises reticulated polyurethane foam. |
| 3. The method of claim 1, wherein the foam material comprises polyether foam. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein the foam material comprises polyether foam. |
| 4. The method of claim 1, wherein at least one foam block among the plurality of foam blocks comprises a specified color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein at least one foam block among the plurality of foam blocks comprises a specified color. |
| 5. The method of claim 1, wherein the fuel tank comprises at least one of a center wing tank or an auxiliary tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein the fuel tank comprises at least one of a center wing tank or an auxiliary tank. |
| 6. The method of claim 1, further comprising, before positioning the plurality of foam blocks within the fuel tank, purging and vacuuming the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and further comprising, before positioning the plurality of foam blocks within the fuel tank, purging and vacuuming the fuel tank. |
| 7. The method of claim 1, wherein cutting the foam material further comprises: cutting the foam material into a second plurality of foam blocks, wherein at least two foam blocks among the second plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces of the fuel tank within a second compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein cutting the foam material further comprises: cutting the foam material into a second plurality of foam blocks, wherein at least two foam blocks among the second plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces of the fuel tank within a second compartment of the fuel tank. |

39

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| 8. The method of claim 1, wherein cutting the foam material further comprises: cutting a plurality of upper cutouts including the upper cutout in the first foam block to provide clearance around upper stiffeners including the upper stiffener in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein cutting the foam material further comprises: cutting a plurality of upper cutouts including the upper cutout in the first foam block to provide clearance around upper stiffeners including the upper stiffener in the fuel tank. |
| 9. The method of claim 8, wherein cutting the foam material further comprises: cutting a plurality of lower cutouts including the lower cutout in the second foam block to provide clearance around lower stiffeners including the lower stiffener in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of claim 8 and wherein cutting the foam material further comprises: cutting a plurality of lower cutouts including the lower cutout in the second foam block to provide clearance around lower stiffeners including the lower stiffener in the fuel tank. |
| 10. The method of claim 9, wherein cutting the foam material further comprises: cutting the arcuate cutout in at least one foam block among the plurality of foam blocks to provide clearance around the fuel pump. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 9 and wherein cutting the foam material further comprises: cutting the arcuate cutout in at least one foam block among the plurality of foam blocks to provide clearance around the fuel pump. |
| 11. The method of claim 1, further comprising arranging the plurality of foam blocks in a stack corresponding to a sequential installation at respective sectors within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and further comprising arranging the plurality of foam blocks in a stack corresponding to a sequential installation at respective sectors within at least one compartment of the fuel tank. |
| 12. The method of claim 1, further comprising forming a directional indicator in or on at least one foam block among the plurality of foam blocks to indicate an installation orientation at a sector within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and further comprising forming a directional indicator in or on at least one foam block among the plurality of foam blocks to indicate an installation orientation at a sector within at least one compartment of the fuel tank. |
| 13. The method of claim 1, further comprising | Jetaire's Invicta products practice this claim |

Appx01305

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| marking an identifier on at least one foam block among the plurality of foam blocks to indicate an installation location at a sector within at least one compartment of the fuel tank. | element because Jetaire performs the method of claim 1 and further comprising marking an identifier on at least one foam block among the plurality of foam blocks to indicate an installation location at a sector within at least one compartment of the fuel tank. |
|---|---|
| 14. The method of claim 13, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the plurality of foam blocks within the at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of method of claim 13 and wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the plurality of foam blocks within the at least one compartment of the fuel tank. |

| '109 Patent Claim Element | Jetaire's Position |
|---|---|
| 15. A method of forming foam blocks for fuel tank ignition mitigation, comprising: providing a bulk quantity of foam material; | Jetaire's Invicta products practice this claim element because they provide a method of forming foam blocks for fuel tank ignition mitigation, comprising: providing a bulk quantity of foam material. |
| cutting the foam material into a plurality of foam blocks, wherein: at least two foam blocks among the plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces within a compartment of a fuel tank; and the plurality of foam blocks comprise an upper cutout for clearance around an upper stiffener of the fuel tank and a lower cutout for clearance around a lower stiffener of the fuel tank; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of cutting the foam material into a plurality of foam blocks, wherein: at least two foam blocks among the plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces within a compartment of a fuel tank; and the plurality of foam blocks comprise an upper cutout for clearance around an upper stiffener of the fuel tank and a lower cutout for clearance around a lower stiffener of the fuel tank. |
| positioning the plurality of foam blocks within the fuel tank with the upper cutout around the upper stiffener of the fuel tank and the lower cutout around the lower stiffener of the fuel tank, wherein: | Jetaire's Invicta products practice this claim element because Jetaire performs the step of positioning the plurality of foam blocks within the fuel tank with the upper cutout around the upper stiffener of the fuel tank and the lower |

41

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

|  |  |
|---|---|
|  | cutout around the lower stiffener of the fuel tank, wherein. |
| a first foam block among the plurality of foam blocks comprises the upper cutout; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of a first foam block among the plurality of foam blocks comprises the upper cutout. |
| a second foam block among the plurality of foam blocks comprises the lower cutout; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of a second foam block among the plurality of foam blocks comprises the lower cutout. |
| the first foam block and the second foam block are stacked in a vertically-oriented column within the fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the first foam block and the second foam block are stacked in a vertically-oriented column within the fuel tank. |
| the plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column. |
| the third foam block comprises at least one channel void to reduce weight. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the third foam block comprises at least one channel void to reduce weight. |
| 16. The method of claim 15, further comprising cutting the foam material into a second plurality of foam blocks, wherein at least two foam blocks among the second plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces of the fuel tank within a second compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising cutting the foam material into a second plurality of foam blocks, wherein at least two foam blocks among the second plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces of the fuel tank within a second compartment of the fuel tank. |
| 17. The method of claim 15, wherein the foam material comprises reticulated polyurethane foam. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein the foam material comprises reticulated polyurethane foam. |

42

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| 18. The method of claim 15, wherein the foam material comprises polyether foam. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein the foam material comprises polyether foam. |
| 19. The method of claim 15, wherein at least one foam block among the plurality of foam blocks comprises a specified color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein at least one foam block among the plurality of foam blocks comprises a specified color. |
| 20. The method of claim 15, wherein the fuel tank comprises at least one of a center wing tank or an auxiliary wing tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein the fuel tank comprises at least one of a center wing tank or an auxiliary wing tank. |
| 21. The method of claim 15, further comprising:<br>filling the fuel tank with fuel and verifying a quantity of the fuel in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising: filling the fuel tank with fuel and verifying a quantity of the fuel in the fuel tank. |
| 22. The method of claim 21, further comprising, before positioning the plurality of foam blocks within the fuel tank, purging and vacuuming the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 21 and further comprising, before positioning the plurality of foam blocks within the fuel tank, purging and vacuuming the fuel tank. |
| 23. The method of claim 15, wherein cutting the foam material further comprises:<br>cutting a plurality of upper cutouts including the upper cutout in the first foam block to provide clearance around upper stiffeners including the upper stiffener in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein cutting the foam material further comprises: cutting a plurality of upper cutouts including the upper cutout in the first foam block to provide clearance around upper stiffeners including the upper stiffener in the fuel tank. |
| 24. The method of claim 23, wherein cutting the foam material further comprises:<br>cutting a plurality of lower cutouts including the lower cutout in the second foam block to provide clearance around lower stiffeners including the lower stiffener in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 23 and wherein cutting the foam material further comprises: cutting a plurality of lower cutouts including the lower cutout in the second foam block to provide clearance |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | around lower stiffeners including the lower stiffener in the fuel tank. |
|---|---|
| 25. The method of claim 24, wherein cutting the foam material further comprises: cutting at least one arcuate cutout in at least one foam block among the plurality of foam blocks to provide clearance around a fuel pump in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 24 and wherein cutting the foam material further comprises: cutting at least one arcuate cutout in at least one foam block among the plurality of foam blocks to provide clearance around a fuel pump in the fuel tank. |
| 26. The method of claim 15, further comprising arranging the plurality of foam blocks in a stack corresponding to a sequential installation at respective sectors within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising arranging the plurality of foam blocks in a stack corresponding to a sequential installation at respective sectors within at least one compartment of the fuel tank. |
| 27. The method of claim 15, further comprising forming a directional indicator in or on at least one foam block among the plurality of foam blocks to indicate an installation orientation at a sector within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising forming a directional indicator in or on at least one foam block among the plurality of foam blocks to indicate an installation orientation at a sector within at least one compartment of the fuel tank. |
| 28. The method of claim 15, further comprising marking an identifier on at least one foam block among the plurality of foam blocks to indicate an installation location at a sector within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising marking an identifier on at least one foam block among the plurality of foam blocks to indicate an installation location at a sector within at least one compartment of the fuel tank. |
| 29. The method of claim 28, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the plurality of foam blocks within the at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of method of claim 28 and wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the plurality of foam blocks within the at least one compartment of the fuel tank. |
| 30. The method of claim 15, wherein the plurality of foam blocks fit within the fuel tank | Jetaire's Invicta products practice this claim element because Jetaire performs the method |

44

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| to fill a total volume of the fuel tank with open voids of no larger than a certain size and less than a percentage of the total volume of the fuel tank. | of claim 15 and wherein the plurality of foam blocks fit within the fuel tank to fill a total volume of the fuel tank with open voids of no larger than a certain size and less than a percentage of the total volume of the fuel tank. |
| 31. The method of claim 15, wherein a fourth foam block among the plurality of foam blocks is oriented vertically, spans the vertically-oriented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein a fourth foam block among the plurality of foam blocks is oriented vertically, spans the vertically-oriented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column |

| **'541 Patent Claim Element** | **Jetaire's Position** |
|---|---|
| 1. A system for ignition mitigation, comprising: a fuel tank, | Jetaire's Invicta products practice this claim element because they provide a system for ignition mitigation, comprising a fuel tank. |
| A first plurality of foam blocks, at least two foam blocks among the first plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a first compartment of the fuel tank; and | Jetaire's Invicta products practice this claim elements because they comprise a first plurality of foam blocks, at least two foam blocks among the first plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a first compartment of the fuel tank. |
| A second plurality of foam blocks, at least two foam blocks among the second plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a second compartment of the fuel tank, wherein: | Jetaire's Invicta products comprise a second plurality of foam blocks, at least two foam blocks among the second plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a second compartment of the fuel tank. |
| At least one foam block among the first plurality of foam blocks comprises an upper cutout in a top surface for clearance around an upper stiffener of the fuel tank, an arcuate cutout in a side surface for clearance around a | Jetaire's Invicta products comprise At least one foam block among the first plurality of foam blocks comprises an upper cutout in a top surface for clearance around an upper stiffener of the fuel tank, an arcuate cutout in a side |

45

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| fuel pump of the fuel tank, and a lower cutout in a bottom surface for clearance around a lower stiffener of the fuel tank; and | surface for clearance around a fuel pump of the fuel tank, and a lower cutout in a bottom surface for clearance around a lower stiffener of the fuel tank. |
| the first plurality of foam blocks is positioned within the first compartment of the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank. | Jetaire's Invicta products comprise the first plurality of foam blocks is positioned within the first compartment of the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank. |
| 2. The system of claim 1, further comprising: | Jetaire's Invicta products comprise the system of claim 1 and further comprising the following: |
| A third plurality of foam blocks, at least two foam blocks among the third plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a third compartment of the fuel tank. | Jetaire's Invicta products comprise a third plurality of foam blocks, at least two foam blocks among the third plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a third compartment of the fuel tank. |
| 3. The system of claim 2, wherein: the fuel tank comprises part of an airplane fuel tank system; the first compartment comprises a forward compartment of the fuel tank; the second compartment comprises a center compartment of the fuel tank; and the third compartment comprises an aft compartment of the fuel tank. | Jetaire's Invicta products comprise the system of claim 2 and wherein: the fuel tank comprises part of an airplane fuel tank system; the first compartment comprises a forward compartment of the fuel tank; the second compartment comprises a center compartment of the fuel tank; and the third compartment comprises an aft compartment of the fuel tank. |
| 4. The system of claim 1, wherein the fuel tank comprises at least one of a center wing tank or an auxiliary fuel tank of an airplane fuel tank system. | Jetaire's Invicta products comprise the system of claim and wherein the fuel tank comprises at least one of a center wing tank or an auxiliary fuel tank of an airplane fuel tank system. |
| 5. The system of claim 1, wherein: a first foam block among the first plurality of foam blocks comprises a plurality of upper cutouts, including the upper cutout, to provide clearance for upper stiffeners in the fuel tank; a second foam block among the first plurality | Jetaire's Invicta products comprise the system of claim 1, wherein: a first foam block among the first plurality of foam blocks comprises a plurality of upper cutouts, including the upper cutout, to provide clearance for upper stiffeners in the fuel tank and a second foam |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| of foam blocks comprises a plurality of lower cutouts, including the lower cutout, to provide clearance for lower stiffeners in the fuel tank; the first foam block and the second foam block are stacked in a vertically-oriented column; the first plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and the third foam block comprises at least one channel void to reduce weight. | block among the first plurality of foam blocks comprises a plurality of lower cutouts, including the lower cutout, to provide clearance for lower stiffeners in the fuel tank; the first foam block and the second foam block are stacked in a vertically-oriented column; the first plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and the third foam block comprises at least one channel void to reduce weight. |
| 7. The system of claim 1, wherein at least two foam blocks among the first plurality of foam blocks comprise at least two arcuate cutouts, including the arcuate cutout, to provide clearance for the fuel pump of the fuel tank. | Jetaire's Invicta products comprise the system of claim 1 and wherein at least two foam blocks among the first plurality of foam blocks comprise at least two arcuate cutouts, including the arcuate cutout, to provide clearance for the fuel pump of the fuel tank. |
| 8. The system of claim 1, wherein the first plurality of foam blocks are arranged in a stack corresponding to a sequential installation at respective sectors within the first compartment of the fuel tank. | Jetaire's Invicta products comprise the system of claim 1, wherein the first plurality of foam blocks are arranged in a stack corresponding to a sequential installation at respective sectors within the first compartment of the fuel tank. |
| 9. The system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises a directional indicator to indicate an installation orientation within the fuel tank. | Jetaire's Invicta products comprise the system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises a directional indicator to indicate an installation orientation within the fuel tank. |
| 10. The system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises an identifier to indicate an installation location at a sector within at least one compartment of the fuel tank. | Jetaire's Invicta products comprise the system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises an identifier to indicate an installation location at a sector within at least one compartment of the fuel tank. |
| 11. The system of claim 10, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the first plurality of foam blocks within the at least one compartment of the fuel tank. | Jetaire's Invicta products comprise the system of claim 10, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the first plurality of foam blocks within the at least one compartment of the fuel tank. |

47

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| 12. The system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises a specified color to identify fuel contamination, an ignition event, or foam deterioration. | Jetaire's Invicta products comprise the system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises a specified color to identify fuel contamination, an ignition event, or foam deterioration. |
| 13. The system of claim 1, wherein the first plurality of foam blocks are formed from a flexible foam material. | Jetaire's Invicta products comprise the system of claim 1, wherein the first plurality of foam blocks are formed from a flexible foam material. |
| 14. The system of claim 13, wherein the flexible foam material comprises reticulated polyurethane foam. | Jetaire's Invicta products comprise the system of claim 13, wherein the flexible foam material comprises reticulated polyurethane foam. |
| 15. The system of claim 13, wherein the flexible foam material comprises polyether foam | Jetaire's Invicta products comprise the system of claim 13, wherein the flexible foam material comprises polyether foam. |

| '541 Patent Claim Element | Jetaire's Position |
|---|---|
| 16. A system for ignition mitigation, comprising: a fuel tank for an airplane; | Jetaire's Invicta products comprise a system for ignition mitigation, comprising a fuel tank for an airplane. |
| a first plurality of foam blocks, at least two foam blocks among the first plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a first compartment of the fuel tank; and | Jetaire's Invicta products comprise a first plurality of foam blocks, at least two foam blocks among the first plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a first compartment of the fuel tank. |
| A second plurality of foam blocks, at least two foam blocks among the second plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a second compartment of the fuel tank, wherein: | Jetaire's Invicta products comprise a second plurality of foam blocks, at least two foam blocks among the second plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a second compartment of the fuel tank. |
| at least one foam block among the first | Jetaire's Invicta products comprise at least one |

48

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| plurality of foam blocks comprises an upper cutout in a top surface for clearance around an upper stiffener of the fuel tank, an arcuate cutout in a side surface for clearance around a fuel pump of the fuel tank, and a lower cutout in a bottom surface for clearance around a lower stiffener of the fuel tank; | foam block among the first plurality of foam blocks comprises an upper cutout in a top surface for clearance around an upper stiffener of the fuel tank, an arcuate cutout in a side surface for clearance around a fuel pump of the fuel tank, and a lower cutout in a bottom surface for clearance around a lower stiffener of the fuel tank. |
| the first plurality of foam blocks is positioned within the first compartment of the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank; and | Jetaire's Invicta products comprise the first plurality of foam blocks is positioned within the first compartment of the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank. |
| the second plurality of foam blocks is positioned within the second compartment of the fuel tank. | Jetaire's Invicta products comprise the second plurality of foam blocks is positioned within the second compartment of the fuel tank. |
| A third plurality of foam blocks, at least two foam blocks among the third plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a third compartment of the fuel tank. | Jetaire's Invicta products comprise a third plurality of foam blocks, at least two foam blocks among the third plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a third compartment of the fuel tank. |
| 17. The system of claim 16, wherein the first plurality of foam blocks fit within the fuel tank to fill a total volume of the fuel tank with open voids of no larger than a certain size and less than a percentage of the total volume of the fuel tank. | Jetaire's Invicta products practice the system of claim 16 and wherein the first plurality of foam blocks fit within the fuel tank to fill a total volume of the fuel tank with open voids of no larger than a certain size and less than a percentage of the total volume of the fuel tank. |
| 18. The system of claim 16, wherein: A first foam block among the first plurality of foam blocks comprises a plurality of upper cutouts, including the upper cutout, to provide clearance for upper stiffeners in the fuel tank; | Jetaire's Invicta products practice system of claim 16 and wherein a first foam block among the first plurality of foam blocks comprises a plurality of upper cutouts, including the upper cutout, to provide clearance for upper stiffeners in the fuel tank. |
| a second foam block among the first plurality of foam blocks comprises a plurality of lower cutouts, including the lower cutout, to provide | Jetaire's Invicta products comprise a second foam block among the first plurality of foam blocks comprises a plurality of lower cutouts, |

49

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| clearance for lower stiffeners in the fuel tank; | including the lower cutout, to provide clearance for lower stiffeners in the fuel tank. |
| the first foam block and the second foam block are stacked in a vertically-oriented column within the first compartment of the fuel tank; | Jetaire's Invicta products comprise the first foam block and the second foam block are stacked in a vertically-oriented column within the first compartment of the fuel tank. |
| the first plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and | Jetaire's Invicta products comprise the first plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column. |
| the third foam block comprises at least one channel void to reduce weight. | Jetaire's Invicta products comprise the third foam block comprises at least one channel void to reduce weight. |
| 19. The system of claim 18, wherein a fourth foam block among the first plurality of foam blocks is oriented vertically in the vertically-oriented column, spans the vertically-oriented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column. | Jetaire's Invicta products practice the system of claim 18 and wherein a fourth foam block among the first plurality of foam blocks is oriented vertically in the vertically-oriented column, spans the vertically-oriented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column. |

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Plaintiff continues to search for responsive information and reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**THIRD SUPPLEMENTAL RESPONSE (FEB. 10, 2023):** Subject to the general and specific objections listed above, Jetaire responds as follows:

Jetaire incorporates by reference its third supplemental response to Interrogatory Number 7, which identifies (inter alia) the Jetaire products that it contends practice certain claims of any of the Patents-in-Suit. Below is an exemplary a claim chart that shows how the Invicta A319, A320,

50

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

A321, B737 (200-900 series), B757 (200 series), and B767 (200 and 300 series) products practice each of the limitations of the Patents-in-Suit:

| '998 Patent Claim Elements | Jetaire's Position |
|---|---|
| 1. In an aircraft equipped with at least one liquid fuel tank, the tank having internal surfaces contoured for the accommodation of structural members such as spars, beams, valves, and piping, a method for providing fuel ignition mitigation in the tank, comprising the steps of: | Jetaire's Invicta products practice this claim element because they provide a method for fuel ignition mitigation in the tank, when installed in an aircraft equipped with at least one liquid fuel tank, the tank having internal surfaces contoured for the accommodation of structural members such as spars, beams, valves, and piping. |
| a) determining dimensions, contour, and precise locations of structural members of the fuel tank as encountered at sequentially-measured linear increments along either width or length dimension of the tank interior; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of determining dimensions, contour, and precise locations of structural members of the fuel tank as encountered at sequentially-measured linear increments along either width or length dimension of the tank interior. |
| b) rendering a scaled engineering drawing of a vertically-oriented cross-sectional profile of the fuel tank at each linear increment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of rendering a scaled engineering drawing of a vertically-oriented cross-sectional profile of the fuel tank at each linear increment. |
| c) numerically sequencing each drawing so as to correspond to a respective drawing location along the liner increments within the tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of numerically sequencing each drawing so as to correspond to a respective drawing location along the liner increments within the tank. |
| d) providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said RPF comprising a thickness dependent upon size and type of aircraft fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said RPF comprising a thickness dependent upon size and type of aircraft fuel tank. |
| e) excising an aggregate of cutouts of RPF | Jetaire's Invicta products practice this claim |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| blocks from said planar sheets of RPF, each cutout conforming to each of the scaled engineering drawings, and further, designating each cutout by a part number, an orientating "UP" arrow, and an orientating "FORWARD" arrow; | element because Jetaire performs the step of excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each cutout conforming to each of the scaled engineering drawings, and further, designating each cutout by a part number, an orientating "UP" arrow, and an orientating "FORWARD" arrow. |
| f) arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of each RPF cutout part number; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of each RPF cutout part number. |
| g) sequentially packaging said aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of sequentially packaging said aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping. |
| h) composing instructions to be used by technicians/installers for the purpose of inserting and installing said RPF blocks into the tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of composing instructions to be used by technicians/installers for the purpose of inserting and installing said RPF blocks into the tank. |
| i) parking the aircraft on a level surface, and emptying and purging the tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of parking the aircraft on a level surface, and emptying and purging the tank. |
| j) removing a fuel tank access panel or other external fuel tank cover which i) functions as a point of entry for maintenance personnel and/or technicians into the fuel tank, and ii) is proximate a pre-determined starting point of the installation; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of removing a fuel tank access panel or other external fuel tank cover which i) functions as a point of entry for maintenance personnel and/or technicians into the fuel tank, and ii) is proximate a pre-determined starting point of the installation. |
| l) placing the first sequential RPF block at a specified location within the fuel tank as so designated in the instructions; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing the first sequential RPF block at a specified location within the fuel tank as so designated in the instructions. |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| m) placing each successively-ordered RPF block at its designated location within the fuel tank, as set forth in the instructions, until said fuel tank is filled in accordance with the previously determined aggregate of RPF blocks; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing each successively-ordered RPF block at its designated location within the fuel tank, as set forth in the instructions, until said fuel tank is filled in accordance with the previously determined aggregate of RPF blocks. |
| n) performing an inspection of the installed RPF blocks, and afterwards, closing any previously opened fuel tank access panel; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of performing an inspection of the installed RPF blocks, and afterwards, closing any previously opened fuel tank access panel. |
| o) re-fueling the fuel tank and verifying the fuel tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the aircraft. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of re-fueling the fuel tank and verifying the fuel tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the aircraft. |

| '998 Patent Claim Element | Jetaire's Position |
|---|---|
| 2. In an aircraft equipped with at least one fuel tank consisting of multiple compartments, each compartment having interior surfaces contoured for the accommodation of compartment structural members, and equipment a method for providing fuel ignition mitigation within each individual compartment, comprising the steps of: | Jetaire's Invicta products practice this claim element because they provide a method for providing fuel ignition mitigation within each individual compartment, when installed in an aircraft equipped with at least one fuel tank consisting of multiple compartments, each compartment having interior surfaces contoured for the accommodation of compartment structural members and equipment. |
| a) determining dimensions, contour, and precise location of structural members for each compartment as encountered at sequentially-measured linear increments along either width or length dimension of the compartment interior; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of determining dimensions, contour, and precise location of structural members for each compartment as encountered at sequentially-measured linear increments along either width or length dimension of the compartment interior. |

53

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| b) rendering a scaled engineering drawing of a vertically-oriented cross-sectional profile at each measured linear increment in each compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of rendering a scaled engineering drawing of a vertically-oriented cross-sectional profile at each measured linear increment in each compartment. |
| c) numerically sequencing each drawing corresponding to a respective drawing location along the measured linear increment within its respective compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of numerically sequencing each drawing corresponding to a respective drawing location along the measured linear increment within its respective compartment. |
| d) providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said RPF material comprising a thickness independent upon size and type of aircraft fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said RPF material comprising a thickness independent upon size and type of aircraft fuel tank. |
| e) excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each cutout conforming to each of the scaled engineering drawings for each particular compartment, and further, designating each RPF block by a part number, an orientating "UP" arrow, and an orientating "FORWARD" arrow; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each cutout conforming to each of the scaled engineering drawings for each particular compartment, and further, designating each RPF block by a part number, an orientating "UP" arrow, and an orientating "FORWARD" arrow. |
| f) for each compartment, arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of the cutout part number of each RPF block; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of for each compartment, arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of the cutout part number of each RPF block. |
| g) for each compartment, sequentially packaging said aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of for each compartment, sequentially packaging said aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping. |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| h) composing instructions for each compartment, to be used by technicians and/or installers for the purpose of inserting the RPF blocks into the compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of composing instructions for each compartment, to be used by technicians and/or installers for the purpose of inserting the RPF blocks into the compartment. |
| i) parking the aircraft on a level surface and emptying and purging all compartments of the fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of parking the aircraft on a level surface and emptying and purging all compartments of the fuel tank. |
| j) commencing installation in a selected compartment by removing a fuel tank access panel or other external tank cover which i) functions as an opening for entry of maintenance personnel and/or technicians into the compartment, and ii) is proximate the selected compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of commencing installation in a selected compartment by removing a fuel tank access panel or other external tank cover which i) functions as an opening for entry of maintenance personnel and/or technicians into the compartment, and ii) is proximate the selected compartment. |
| l) placing the first sequential RPF block at a specified location within the selected compartment as so designated in the instructions; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing the first sequential RPF block at a specified location within the selected compartment as so designated in the instructions. |
| m) placing each successively-ordered RPF block at its designated location within the compartment as set forth in the instructions, until the compartment is filled in accordance with the instructions; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing each successively-ordered RPF block at its designated location within the compartment as set forth in the instructions, until the compartment is filled in accordance with the instructions. |
| n) for each remaining compartment of the fuel tank, performing steps j) through m), above; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of for each remaining compartment of the fuel tank, performing steps j) through m), above. |
| o) performing an inspection of the installed RPF blocks, and afterwards, closing all open | Jetaire's Invicta products practice this claim element because Jetaire performs the step of |

55

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| compartment or fuel tank access panels; | performing an inspection of the installed RPF blocks, and afterwards, closing all open compartment or fuel tank access panels. |
| p) re-fueling all compartments of the fuel tank and verifying the fuel tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the subject aircraft. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of re-fueling all compartments of the fuel tank and verifying the fuel tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the subject aircraft. |

| '998 Patent Claim Element | Jetaire's Position |
|---|---|
| 3. A method for providing fuel ignition mitigation for the interior of the center wing tank of an aircraft of the type having a center wing tank consisting of a forward, center, and aft compartment, in which each compartment manifests interior surfaces contoured for the accommodation of compartment structural members and equipment, said method comprising the steps of: | Jetaire's Invicta products practice this claim element because its provides a method for providing fuel ignition mitigation for the interior of the center wing tank of an aircraft of the type having a center wing tank consisting of a forward, center, and aft compartment, in which each compartment manifests interior surfaces contoured for the accommodation of compartment structural members and equipment, said method comprising the following steps. |
| a) determining dimensions, contour, and precise location of structural members for each of the compartments as encountered at sequentially-measured linear increments along either width or length dimension of the interior of each compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of determining dimensions, contour, and precise location of structural members for each of the compartments as encountered at sequentially-measured linear increments along either width or length dimension of the interior of each compartment. |
| b) rendering scaled engineering drawing of a vertically-oriented cross-sectional profile of each of the forward, center, and aft compartments at each measured linear increment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of rendering scaled engineering drawing of a vertically-oriented cross-sectional profile of each of the forward, center, and aft compartments at each measured linear increment. |

56

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| c) numerically sequencing each drawing corresponding to a respective drawing location along the measured linear increments within the respective forward, center and aft compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of numerically sequencing each drawing corresponding to a respective drawing location along the measured linear increments within the respective forward, center and aft compartment. |
| d) providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said sheets of RPF comprising a thickness dependent upon size and type of aircraft fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of providing a plurality of planar sheets of reticulated polyurethane foam (RPF) material, said sheets of RPF comprising a thickness dependent upon size and type of aircraft fuel tank. |
| e) excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each block cutout conforming to the scaled engineering drawing for each particular compartment, and further, designating each RPF block by a part number, an orientating "UP" arrow and an orientating "FORWARD" arrow; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of excising an aggregate of cutouts of RPF blocks from said planar sheets of RPF, each block cutout conforming to the scaled engineering drawing for each particular compartment, and further, designating each RPF block by a part number, an orientating "UP" arrow and an orientating "FORWARD" arrow. |
| f) arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of each RPF cutout part number for each of the forward, center, and aft compartments; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of arranging the aggregate of said RPF blocks in a progressive sequence corresponding to the sequence of each RPF cutout part number for each of the forward, center, and aft compartments. |
| g) for each compartment, sequentially packaging an aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of for each compartment, sequentially packaging an aggregate of RPF blocks into groupings containing a specified number of RPF blocks per grouping. |
| h) composing instructions for each compartment to be used by technicians/installers for the purpose of inserting and installing said RPF blocks into | Jetaire's Invicta products practice this claim element because Jetaire performs the step of composing instructions for each compartment to be used by technicians/installers for the |

Appx01322

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| each compartment; | purpose of inserting and installing said RPF blocks into each compartment. |
| i) parking the aircraft on a level surface, and emptying and purging all compartments of the center wing tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of parking the aircraft on a level surface, and emptying and purging all compartments of the center wing tank. |
| j) beginning with the aft compartment, removing a tank access panel or other external tank cover which i) functions as an opening for entry of maintenance personnel and/or technicians into the aft compartment, and ii) is proximate the aft compartment; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of beginning with the aft compartment, removing a tank access panel or other external tank cover which i) functions as an opening for entry of maintenance personnel and/or technicians into the aft compartment, and ii) is proximate the aft compartment. |
| l) placing the first sequential RPF block at a specified location within the aft compartment, as so designated in the instructions; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing the first sequential RPF block at a specified location within the aft compartment, as so designated in the instructions. |
| m) placing each successively-ordered RPF block at its designated location within the aft compartment as set forth in the installation instructions, until said aft compartment is filled in accordance with the previously determined aggregate of RPF blocks; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing each successively-ordered RPF block at its designated location within the aft compartment as set forth in the installation instructions, until said aft compartment is filled in accordance with the previously determined aggregate of RPF blocks. |
| n) performing an inspection of the installed RPF blocks in the aft compartment, then closing any previously opened tank/compartment access panels, | Jetaire's Invicta products practice this claim element because Jetaire performs the step of performing an inspection of the installed RPF blocks in the aft compartment, then closing any previously opened tank/compartment access panels. |
| o) placing successively-ordered RPF blocks at their designated locations within the center compartment as set forth in steps j) through n), above until said center compartment is filled with the required aggregate of RPF blocks; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing successively-ordered RPF blocks at their designated locations within the center compartment as set forth in steps j) through n), above until said center compartment is filled |

Appx01323

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| | with the required aggregate of RPF blocks. |
|---|---|
| p) placing successively-ordered RPF block at their designated locations within the forward compartment as set forth in steps j) through n) above, until said forward compartment is filled with the required aggregate of RPF blocks; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of placing successively-ordered RPF block at their designated locations within the forward compartment as set forth in steps j) through n) above, until said forward compartment is filled with the required aggregate of RPF blocks. |
| q) re-fueling all compartments of the center wing tank and verifying the tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the aircraft. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of re-fueling all compartments of the center wing tank and verifying the tank's maximum fuel quantity in accordance with FAA-certified fuel gauge calibrating procedures for the aircraft. |
| 4. The method as in claim 1, wherein the reticulated polyurethane foam material comprises a purple color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein the reticulated polyurethane foam material comprises a purple color. |
| 5. The method as in claim 2, wherein the reticulated polyurethane foam material comprises a purple color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 2 and wherein the reticulated polyurethane foam material comprises a purple color. |
| 6. The method as in claim 3, wherein the reticulated polyurethane foam material comprises a purple color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 3 and wherein the reticulated polyurethane foam material comprises a purple color. |

| **'109 Patent Claim Element** | **Jetaire's Position** |
|---|---|
| 1. A method for providing ignition mitigation for a fuel tank, comprising: determining interior dimensions of the fuel tank; | Jetaire's Invicta products practice this claim element because they provide a method for providing ignition mitigation for a fuel tank, comprising: determining interior dimensions of the fuel tank. |

59

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| providing a bulk quantity of foam material; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of providing a bulk quantity of foam material. |
| cutting the foam material into a plurality of foam blocks, wherein: at least two foam blocks among the plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces within a compartment of the fuel tank; and the plurality of foam blocks comprise an upper cutout for clearance around an upper stiffener of the fuel tank, an arcuate cutout for clearance around a fuel pump of the fuel tank, and a lower cutout for clearance around a lower stiffener of the fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of cutting the foam material into a plurality of foam blocks, wherein: at least two foam blocks among the plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces within a compartment of the fuel tank; and the plurality of foam blocks comprise an upper cutout for clearance around an upper stiffener of the fuel tank, an arcuate cutout for clearance around a fuel pump of the fuel tank, and a lower cutout for clearance around a lower stiffener of the fuel tank. |
| positioning the plurality of foam blocks within the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of positioning the plurality of foam blocks within the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank. |
| filling the fuel tank with fuel and verifying a quantity of the fuel in the fuel tank, wherein: | Jetaire's Invicta products practice this claim element because Jetaire performs the step of filling the fuel tank with fuel and verifying a quantity of the fuel in the fuel tank. |
| a first foam block among the plurality of foam blocks comprises the upper cutout: | Jetaire's Invicta products practice this claim element because Jetaire performs the step of a first foam block among the plurality of foam blocks comprises the upper cutout. |
| a second foam block among the plurality of foam blocks comprises the lower cutout; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of a second foam block among the plurality of foam blocks comprises the lower cutout. |
| the first foam block and the second foam block are stacked in a vertically-oriented column | Jetaire's Invicta products practice this claim element because Jetaire performs the step of |

60

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| within the fuel tank; | the first foam block and the second foam block are stacked in a vertically-oriented column within the fuel tank. |
| the plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column. |
| The third foam block comprises at least one channel void to reduce weight. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the third foam block comprises at least one channel void to reduce weight. |
| 2. The method of claim 1, wherein the foam material comprises reticulated polyurethane foam. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and  wherein the foam material comprises reticulated polyurethane foam. |
| 3. The method of claim 1, wherein the foam material comprises polyether foam. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein the foam material comprises polyether foam. |
| 4. The method of claim 1, wherein at least one foam block among the plurality of foam blocks comprises a specified color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein at least one foam block among the plurality of foam blocks comprises a specified color. |
| 5. The method of claim 1, wherein the fuel tank comprises at least one of a center wing tank or an auxiliary tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein the fuel tank comprises at least one of a center wing tank or an auxiliary tank. |
| 6. The method of claim 1, further comprising, before positioning the plurality of foam blocks within the fuel tank, purging and vacuuming the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and further comprising, before positioning the plurality of foam blocks within the fuel tank, purging and vacuuming the fuel tank. |
| 7. The method of claim 1, wherein cutting the | Jetaire's Invicta products practice this claim |

61

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| foam material further comprises: cutting the foam material into a second plurality of foam blocks, wherein at least two foam blocks among the second plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces of the fuel tank within a second compartment of the fuel tank. | element because Jetaire performs the method of claim 1 and wherein cutting the foam material further comprises: cutting the foam material into a second plurality of foam blocks, wherein at least two foam blocks among the second plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces of the fuel tank within a second compartment of the fuel tank. |
| 8. The method of claim 1, wherein cutting the foam material further comprises: cutting a plurality of upper cutouts including the upper cutout in the first foam block to provide clearance around upper stiffeners including the upper stiffener in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and wherein cutting the foam material further comprises: cutting a plurality of upper cutouts including the upper cutout in the first foam block to provide clearance around upper stiffeners including the upper stiffener in the fuel tank. |
| 9. The method of claim 8, wherein cutting the foam material further comprises: cutting a plurality of lower cutouts including the lower cutout in the second foam block to provide clearance around lower stiffeners including the lower stiffener in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of claim 8 and wherein cutting the foam material further comprises: cutting a plurality of lower cutouts including the lower cutout in the second foam block to provide clearance around lower stiffeners including the lower stiffener in the fuel tank. |
| 10. The method of claim 9, wherein cutting the foam material further comprises: cutting the arcuate cutout in at least one foam block among the plurality of foam blocks to provide clearance around the fuel pump. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 9 and wherein cutting the foam material further comprises: cutting the arcuate cutout in at least one foam block among the plurality of foam blocks to provide clearance around the fuel pump. |
| 11. The method of claim 1, further comprising arranging the plurality of foam blocks in a stack corresponding to a sequential installation at respective sectors within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and further comprising arranging the plurality of foam blocks in a stack corresponding to a sequential installation at respective sectors within at least one compartment of the fuel tank. |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| 12. The method of claim 1, further comprising forming a directional indicator in or on at least one foam block among the plurality of foam blocks to indicate an installation orientation at a sector within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and further comprising forming a directional indicator in or on at least one foam block among the plurality of foam blocks to indicate an installation orientation at a sector within at least one compartment of the fuel tank. |
|---|---|
| 13. The method of claim 1, further comprising marking an identifier on at least one foam block among the plurality of foam blocks to indicate an installation location at a sector within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 1 and further comprising marking an identifier on at least one foam block among the plurality of foam blocks to indicate an installation location at a sector within at least one compartment of the fuel tank. |
| 14. The method of claim 13, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the plurality of foam blocks within the at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of method of claim 13 and wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the plurality of foam blocks within the at least one compartment of the fuel tank. |

| '109 Patent Claim Element | Jetaire's Position |
|---|---|
| 15. A method of forming foam blocks for fuel tank ignition mitigation, comprising: providing a bulk quantity of foam material; | Jetaire's Invicta products practice this claim element because they provide a method of forming foam blocks for fuel tank ignition mitigation, comprising: providing a bulk quantity of foam material. |
| cutting the foam material into a plurality of foam blocks, wherein: at least two foam blocks among the plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces within a compartment of a fuel tank; and the plurality of foam blocks comprise an upper cutout for clearance around an upper stiffener of the fuel tank and a lower cutout for | Jetaire's Invicta products practice this claim element because Jetaire performs the step of cutting the foam material into a plurality of foam blocks, wherein: at least two foam blocks among the plurality of foam blocks have unique profiles, as compared to each other, corresponding to different inner surfaces within a compartment of a fuel tank; and the plurality of foam blocks comprise an upper |

Appx01328

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| clearance around a lower stiffener of the fuel tank; and | cutout for clearance around an upper stiffener of the fuel tank and a lower cutout for clearance around a lower stiffener of the fuel tank. |
| positioning the plurality of foam blocks within the fuel tank with the upper cutout around the upper stiffener of the fuel tank and the lower cutout around the lower stiffener of the fuel tank, wherein: | Jetaire's Invicta products practice this claim element because Jetaire performs the step of positioning the plurality of foam blocks within the fuel tank with the upper cutout around the upper stiffener of the fuel tank and the lower cutout around the lower stiffener of the fuel tank, wherein. |
| a first foam block among the plurality of foam blocks comprises the upper cutout; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of a first foam block among the plurality of foam blocks comprises the upper cutout. |
| a second foam block among the plurality of foam blocks comprises the lower cutout; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of a second foam block among the plurality of foam blocks comprises the lower cutout. |
| the first foam block and the second foam block are stacked in a vertically-oriented column within the fuel tank; | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the first foam block and the second foam block are stacked in a vertically-oriented column within the fuel tank. |
| the plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column. |
| the third foam block comprises at least one channel void to reduce weight. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of the third foam block comprises at least one channel void to reduce weight. |
| 16. The method of claim 15, further comprising cutting the foam material into a second plurality of foam blocks, wherein at least two foam blocks among the second plurality of foam blocks have unique profiles, as compared to each other, corresponding to | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising cutting the foam material into a second plurality of foam blocks, wherein at least two foam blocks among the second plurality of foam blocks |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| different inner surfaces of the fuel tank within a second compartment of the fuel tank. | have unique profiles, as compared to each other, corresponding to different inner surfaces of the fuel tank within a second compartment of the fuel tank. |
| 17. The method of claim 15, wherein the foam material comprises reticulated polyurethane foam. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein the foam material comprises reticulated polyurethane foam. |
| 18. The method of claim 15, wherein the foam material comprises polyether foam. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein the foam material comprises polyether foam. |
| 19. The method of claim 15, wherein at least one foam block among the plurality of foam blocks comprises a specified color. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein at least one foam block among the plurality of foam blocks comprises a specified color. |
| 20. The method of claim 15, wherein the fuel tank comprises at least one of a center wing tank or an auxiliary wing tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein the fuel tank comprises at least one of a center wing tank or an auxiliary wing tank. |
| 21. The method of claim 15, further comprising: filling the fuel tank with fuel and verifying a quantity of the fuel in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising: filling the fuel tank with fuel and verifying a quantity of the fuel in the fuel tank. |
| 22. The method of claim 21, further comprising, before positioning the plurality of foam blocks within the fuel tank, purging and vacuuming the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 21 and further comprising, before positioning the plurality of foam blocks within the fuel tank, purging and vacuuming the fuel tank. |
| 23. The method of claim 15, wherein cutting the foam material further comprises: cutting a plurality of upper cutouts including the upper cutout in the first foam block to provide clearance around upper stiffeners | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein cutting the foam material further comprises: cutting a plurality of upper cutouts including the upper cutout in |

65

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| including the upper stiffener in the fuel tank. | the first foam block to provide clearance around upper stiffeners including the upper stiffener in the fuel tank. |
| 24. The method of claim 23, wherein cutting the foam material further comprises: cutting a plurality of lower cutouts including the lower cutout in the second foam block to provide clearance around lower stiffeners including the lower stiffener in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 23 and wherein cutting the foam material further comprises: cutting a plurality of lower cutouts including the lower cutout in the second foam block to provide clearance around lower stiffeners including the lower stiffener in the fuel tank. |
| 25. The method of claim 24, wherein cutting the foam material further comprises: cutting at least one arcuate cutout in at least one foam block among the plurality of foam blocks to provide clearance around a fuel pump in the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 24 and wherein cutting the foam material further comprises: cutting at least one arcuate cutout in at least one foam block among the plurality of foam blocks to provide clearance around a fuel pump in the fuel tank. |
| 26. The method of claim 15, further comprising arranging the plurality of foam blocks in a stack corresponding to a sequential installation at respective sectors within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising arranging the plurality of foam blocks in a stack corresponding to a sequential installation at respective sectors within at least one compartment of the fuel tank. |
| 27. The method of claim 15, further comprising forming a directional indicator in or on at least one foam block among the plurality of foam blocks to indicate an installation orientation at a sector within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising forming a directional indicator in or on at least one foam block among the plurality of foam blocks to indicate an installation orientation at a sector within at least one compartment of the fuel tank. |
| 28. The method of claim 15, further comprising marking an identifier on at least one foam block among the plurality of foam blocks to indicate an installation location at a sector within at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and further comprising marking an identifier on at least one foam block among the plurality of foam blocks to indicate an installation location at a sector within at least one compartment of the fuel tank. |

66

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| 29. The method of claim 28, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the plurality of foam blocks within the at least one compartment of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the step of method of claim 28 and wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the plurality of foam blocks within the at least one compartment of the fuel tank. |
| 30. The method of claim 15, wherein the plurality of foam blocks fit within the fuel tank to fill a total volume of the fuel tank with open voids of no larger than a certain size and less than a percentage of the total volume of the fuel tank. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein the plurality of foam blocks fit within the fuel tank to fill a total volume of the fuel tank with open voids of no larger than a certain size and less than a percentage of the total volume of the fuel tank. |
| 31. The method of claim 15, wherein a fourth foam block among the plurality of foam blocks is oriented vertically, spans the vertically-oriented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column. | Jetaire's Invicta products practice this claim element because Jetaire performs the method of claim 15 and wherein a fourth foam block among the plurality of foam blocks is oriented vertically, spans the vertically-oriented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column |

| '541 Patent Claim Element | Jetaire's Position |
|---|---|
| 1. A system for ignition mitigation, comprising: a fuel tank, | Jetaire's Invicta products practice this claim element because they provide a system for ignition mitigation, comprising a fuel tank. |
| A first plurality of foam blocks, at least two foam blocks among the first plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a first compartment of the fuel tank; and | Jetaire's Invicta products practice this claim elements because they comprise a first plurality of foam blocks, at least two foam blocks among the first plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a first compartment of the fuel tank. |
| A second plurality of foam blocks, at least two foam blocks among the second plurality of foam blocks having unique profiles in shape, | Jetaire's Invicta products comprise a second plurality of foam blocks, at least two foam blocks among the second plurality of foam |

Appx01332

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| as compared to each other, to conform to different inner surfaces of a second compartment of the fuel tank, wherein: | blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a second compartment of the fuel tank. |
| At least one foam block among the first plurality of foam blocks comprises an upper cutout in a top surface for clearance around an upper stiffener of the fuel tank, an arcuate cutout in a side surface for clearance around a fuel pump of the fuel tank, and a lower cutout in a bottom surface for clearance around a lower stiffener of the fuel tank; and | Jetaire's Invicta products comprise At least one foam block among the first plurality of foam blocks comprises an upper cutout in a top surface for clearance around an upper stiffener of the fuel tank, an arcuate cutout in a side surface for clearance around a fuel pump of the fuel tank, and a lower cutout in a bottom surface for clearance around a lower stiffener of the fuel tank. |
| the first plurality of foam blocks is positioned within the first compartment of the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank. | Jetaire's Invicta products comprise the first plurality of foam blocks is positioned within the first compartment of the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank. |
| 2. The system of claim 1, further comprising: | Jetaire's Invicta products comprise the system of claim 1 and further comprising the following: |
| A third plurality of foam blocks, at least two foam blocks among the third plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a third compartment of the fuel tank. | Jetaire's Invicta products comprise a third plurality of foam blocks, at least two foam blocks among the third plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a third compartment of the fuel tank. |
| 3. The system of claim 2, wherein: the fuel tank comprises part of an airplane fuel tank system; the first compartment comprises a forward compartment of the fuel tank; the second compartment comprises a center compartment of the fuel tank; and the third compartment comprises an aft compartment of the fuel tank. | Jetaire's Invicta products comprise the system of claim 2 and wherein: the fuel tank comprises part of an airplane fuel tank system; the first compartment comprises a forward compartment of the fuel tank; the second compartment comprises a center compartment of the fuel tank; and the third compartment comprises an aft compartment of the fuel tank. |
| 4. The system of claim 1, wherein the fuel tank comprises at least one of a center wing tank or | Jetaire's Invicta products comprise the system of claim and wherein the fuel tank comprises |

68

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| an auxiliary fuel tank of an airplane fuel tank system. | at least one of a center wing tank or an auxiliary fuel tank of an airplane fuel tank system. |
| 5. The system of claim 1, wherein: a first foam block among the first plurality of foam blocks comprises a plurality of upper cutouts, including the upper cutout, to provide clearance for upper stiffeners in the fuel tank; a second foam block among the first plurality of foam blocks comprises a plurality of lower cutouts, including the lower cutout, to provide clearance for lower stiffeners in the fuel tank; the first foam block and the second foam block are stacked in a vertically-oriented column; the first plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and the third foam block comprises at least one channel void to reduce weight. | Jetaire's Invicta products comprise the system of claim 1, wherein: a first foam block among the first plurality of foam blocks comprises a plurality of upper cutouts, including the upper cutout, to provide clearance for upper stiffeners in the fuel tank and a second foam block among the first plurality of foam blocks comprises a plurality of lower cutouts, including the lower cutout, to provide clearance for lower stiffeners in the fuel tank; the first foam block and the second foam block are stacked in a vertically-oriented column; the first plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and the third foam block comprises at least one channel void to reduce weight. |
| 7. The system of claim 1, wherein at least two foam blocks among the first plurality of foam blocks comprise at least two arcuate cutouts, including the arcuate cutout, to provide clearance for the fuel pump of the fuel tank. | Jetaire's Invicta products comprise the system of claim 1 and wherein at least two foam blocks among the first plurality of foam blocks comprise at least two arcuate cutouts, including the arcuate cutout, to provide clearance for the fuel pump of the fuel tank. |
| 8. The system of claim 1, wherein the first plurality of foam blocks are arranged in a stack corresponding to a sequential installation at respective sectors within the first compartment of the fuel tank. | Jetaire's Invicta products comprise the system of claim 1, wherein the first plurality of foam blocks are arranged in a stack corresponding to a sequential installation at respective sectors within the first compartment of the fuel tank. |
| 9. The system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises a directional indicator to indicate an installation orientation within the fuel tank. | Jetaire's Invicta products comprise the system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises a directional indicator to indicate an installation orientation within the fuel tank. |
| 10. The system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises an identifier to indicate an installation location at a sector within at least | Jetaire's Invicta products comprise the system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises an identifier to indicate an |

69

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| one compartment of the fuel tank. | installation location at a sector within at least one compartment of the fuel tank. |
| 11. The system of claim 10, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the first plurality of foam blocks within the at least one compartment of the fuel tank. | Jetaire's Invicta products comprise the system of claim 10, wherein the identifier further indicates a relative order of installation of the at least one foam block, in sequence, among the first plurality of foam blocks within the at least one compartment of the fuel tank. |
| 12. The system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises a specified color to identify fuel contamination, an ignition event, or foam deterioration. | Jetaire's Invicta products comprise the system of claim 1, wherein at least one foam block among the first plurality of foam blocks comprises a specified color to identify fuel contamination, an ignition event, or foam deterioration. |
| 13. The system of claim 1, wherein the first plurality of foam blocks are formed from a flexible foam material. | Jetaire's Invicta products comprise the system of claim 1, wherein the first plurality of foam blocks are formed from a flexible foam material. |
| 14. The system of claim 13, wherein the flexible foam material comprises reticulated polyurethane foam. | Jetaire's Invicta products comprise the system of claim 13, wherein the flexible foam material comprises reticulated polyurethane foam. |
| 15. The system of claim 13, wherein the flexible foam material comprises polyether foam | Jetaire's Invicta products comprise the system of claim 13, wherein the flexible foam material comprises polyether foam. |

| '541 Patent Claim Element | Jetaire's Position |
|---|---|
| 16. A system for ignition mitigation, comprising: a fuel tank for an airplane; | Jetaire's Invicta products comprise a system for ignition mitigation, comprising a fuel tank for an airplane. |
| a first plurality of foam blocks, at least two foam blocks among the first plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a first compartment of the fuel tank; and | Jetaire's Invicta products comprise a first plurality of foam blocks, at least two foam blocks among the first plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a first compartment of the fuel tank. |

70

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| A second plurality of foam blocks, at least two foam blocks among the second plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a second compartment of the fuel tank, wherein: | Jetaire's Invicta products comprise a second plurality of foam blocks, at least two foam blocks among the second plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a second compartment of the fuel tank. |
| at least one foam block among the first plurality of foam blocks comprises an upper cutout in a top surface for clearance around an upper stiffener of the fuel tank, an arcuate cutout in a side surface for clearance around a fuel pump of the fuel tank, and a lower cutout in a bottom surface for clearance around a lower stiffener of the fuel tank; | Jetaire's Invicta products comprise at least one foam block among the first plurality of foam blocks comprises an upper cutout in a top surface for clearance around an upper stiffener of the fuel tank, an arcuate cutout in a side surface for clearance around a fuel pump of the fuel tank, and a lower cutout in a bottom surface for clearance around a lower stiffener of the fuel tank. |
| the first plurality of foam blocks is positioned within the first compartment of the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank; and | Jetaire's Invicta products comprise the first plurality of foam blocks is positioned within the first compartment of the fuel tank with the upper cutout around the upper stiffener of the fuel tank, the arcuate cutout around the fuel pump of the fuel tank, and the lower cutout around the lower stiffener of the fuel tank. |
| the second plurality of foam blocks is positioned within the second compartment of the fuel tank. | Jetaire's Invicta products comprise the second plurality of foam blocks is positioned within the second compartment of the fuel tank. |
| A third plurality of foam blocks, at least two foam blocks among the third plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a third compartment of the fuel tank. | Jetaire's Invicta products comprise a third plurality of foam blocks, at least two foam blocks among the third plurality of foam blocks having unique profiles in shape, as compared to each other, to conform to different inner surfaces of a third compartment of the fuel tank. |
| 17. The system of claim 16, wherein the first plurality of foam blocks fit within the fuel tank to fill a total volume of the fuel tank with open voids of no larger than a certain size and less than a percentage of the total volume of the fuel tank. | Jetaire's Invicta products practice the system of claim 16 and wherein the first plurality of foam blocks fit within the fuel tank to fill a total volume of the fuel tank with open voids of no larger than a certain size and less than a percentage of the total volume of the fuel tank. |

71

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | |
|---|---|
| 18. The system of claim 16, wherein:<br>A first foam block among the first plurality of foam blocks comprises a plurality of upper cutouts, including the upper cutout, to provide clearance for upper stiffeners in the fuel tank; | Jetaire's Invicta products practice system of claim 16 and wherein a first foam block among the first plurality of foam blocks comprises a plurality of upper cutouts, including the upper cutout, to provide clearance for upper stiffeners in the fuel tank. |
| a second foam block among the first plurality of foam blocks comprises a plurality of lower cutouts, including the lower cutout, to provide clearance for lower stiffeners in the fuel tank; | Jetaire's Invicta products comprise a second foam block among the first plurality of foam blocks comprises a plurality of lower cutouts, including the lower cutout, to provide clearance for lower stiffeners in the fuel tank. |
| the first foam block and the second foam block are stacked in a vertically-oriented column within the first compartment of the fuel tank; | Jetaire's Invicta products comprise the first foam block and the second foam block are stacked in a vertically-oriented column within the first compartment of the fuel tank. |
| the first plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column; and | Jetaire's Invicta products comprise the first plurality of foam blocks further comprises a third foam block placed between the first foam block and the second foam block in the vertically-oriented column. |
| the third foam block comprises at least one channel void to reduce weight. | Jetaire's Invicta products comprise the third foam block comprises at least one channel void to reduce weight. |
| 19. The system of claim 18, wherein a fourth foam block among the first plurality of foam blocks is oriented vertically in the vertically-oriented column, spans the vertically-oriented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column. | Jetaire's Invicta products practice the system of claim 18 and wherein a fourth foam block among the first plurality of foam blocks is oriented vertically in the vertically-oriented column, spans the vertically-oriented column from the first foam block to the second foam block, and covers the at least one channel void on one side of the vertically-oriented column. |

Jetaire further contends that the use or installation of its current Invicta ignition mitigation means technology in the A319, A320, A321, B737 (200-900 series), B757 (200 series), and B767 (200 and 300 series) is covered by its patents. *See, e.g.*, Williams 30(b)(6) Rough Tr. Feb. 7, 2023, at 8:9-15; 45:8-17; 47:10-49:12; Williams 30(b)(6) Rough Tr. Feb. 8, 2023, at 66:9-67:20.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Plaintiff further responds pursuant to Fed. R. Civ. P. 33(d) and identify the following documents: (1) Jetaire Aerospace, LLC's 30(b)(6) deposition in this case on February 8, 2023 and any exhibits attached thereto; (2) Jetaire Flight System, LLC's 30(b)(6) deposition in this case on February 9, 2023 and any exhibits attached thereto; and (3) Michael Williams' 30(b)(1) deposition in this case on February 9, 2023 and any exhibits attached thereto.  Plaintiff further incorporates by reference its forth coming expert reports, including without limitation the reports of Mr. Bill Ashworth and/or Mr. Justin Blok.

**INTERROGATORY NO. 9:**

Identify all products concerning the use of foam for aircraft fuel tank ignition mitigation sold or licensed by Jetaire or any entities related to Jetaire, including:  (1) the date of such sale or license; (ii) the selling or license price; and (iii) identification of any invoices showing such sales or licenses.

**RESPONSE:** In addition to preserving its General Objections, Plaintiff objects to this Interrogatory to the extent that it seeks disclosure of "all documents" protected from discovery by the attorney-client privilege and/or the attorney work product doctrine. Plaintiff also objects that the subject matter of the interrogatory seeks information and documents broader than the patented technologies and the AerSale products accused of infringement and is therefore irrelevant in that regard.

Jetaire further objects to an identification of "all products" as overly broad and unduly burdensome. Jetaire further objects to the Interrogatory to the extent it purports to request identification of each and every licensed product sold because that information may be derived from examination of Jetaire's business records, which will be produced pursuant to Fed. R. Civ.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Proc. 33(d), and the burden of deriving or ascertaining the identify of such documents is substantially the same for AerSale as for Jetaire. Jetaire reserves the right to identify additional evidence of sales in the future.

Subject to the general and specific objections listed above, after a reasonable search, Plaintiff will produce pursuant to Rule 33(d) of the Federal Rules of Civil Procedure, to the extent they exist and are within its possession, custody or control, non-privileged responsive documents sufficient to show the requested information and from which an answer may be derived or ascertained.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Thus, Plaintiff reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**FIRST SUPPLEMENTAL RESPONSE (JAN. 27, 2022):** Jetaire is not withholding any non-privileged information pursuant to any general or specific objection, and Jetaire will produce any responsive information within its possession, custody, or control following its continued, reasonable inquiry.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Plaintiff continues to search for responsive information and reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**SECOND SUPPLEMENTAL RESPONSE (FEB. 10, 2023):** Subject to the general and specific objections listed above, Jetaire responds as follows:

Pursuant to Rule 33(d), Jetaire identifies and incorporates by reference JETAIR-0038381,

74

*contains Confidential Information*

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

JETAIR-0038383, JETAIR0038476, and JETAIR0038487, which identify (inter alia) Jetaire's sales, customers, unit costs, pricing, purchase order numbers, and proposal dates for its sales.

Redacted

. See, e.g., Williams 30(b)(6) Rough Tr. Feb. 7, 2023, at 113:4-114:3; Williams 30(b)(6) Rough Tr. Feb. 8, 2023, at 33:16-48:9.  Plaintiff further responds pursuant to Fed. R. Civ. P. 33(d) and identify the following documents: (1) Jetaire Aerospace, LLC's 30(b)(6) deposition in this case on February 8, 2023 and any exhibits attached thereto; (2) Jetaire Flight System, LLC's 30(b)(6) deposition in this case on February 9, 2023 and any exhibits attached thereto; (3) Michael Williams' 30(b)(1) deposition in this case on February 9, 2023 and any exhibits attached thereto; (4) JETAIR-0038381; and (5) JETAIR-0038383.   Plaintiff further incorporates by reference its forth coming expert reports, including without limitation the report of Mr. Justin Blok.

**INTERROGATORY NO. 10:**

Identify and describe licenses or offers to license the Patents-in-Suit, including the time, place, and contents of the license or offer to license, the parties to the license or offer to license, and identification of any documents relating to the license or offer to license.

**RESPONSE:** In addition to preserving its General Objections, Plaintiff objects to this Interrogatory to the extent that it seeks disclosure of "all documents" protected from discovery by the attorney-client privilege and/or the attorney work product doctrine.

Jetaire further objects to an identification of "any documents relating to the license or offer to license" as overly broad and unduly burdensome. Jetaire further objects to the Interrogatory to

75

*contains Confidential Information*

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

the extent it purports to request identification of each and every document that in any way related to licensing because that information may be derived from examination of Jetaire's business records, which will be produced pursuant to Fed. R. Civ. Proc. 33(d), and the burden of deriving or ascertaining the identify of such documents is substantially the same for AerSale as for Jetaire. Jetaire reserves the right to identify additional evidence of licensing in the future. Jetaire also objects that any information relating to offers for licenses or negotiations are irrelevant as Jetaire has not licensed the Patents-in-Suit.

Subject to the general and specific objections listed above,        Redacted

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Thus, Plaintiff reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**FIRST SUPPLEMENTAL RESPONSE (FEB. 10, 2023):** Subject to the general and specific objections listed above,        Redacted

Redacted

Redacted    . *See* JETAIRE-0038493-503; *see also* Williams 30(b)(6) Rough Tr. Feb. 7, 2023, at 62:3-63:13. Jetaire also licenses the STCs to customers. *See* Williams 30(b)(6) Rough Tr., Feb. 7, 2023 at 9:11-15. Plaintiff further responds pursuant to Fed. R. Civ. P. 33(d) and identify the following documents: (1) Jetaire Aerospace, LLC's 30(b)(6) deposition in this case on February 8, 2023 and any exhibits attached thereto; (2) Jetaire Flight System, LLC's 30(b)(6)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

deposition in this case on February 9, 2023 and any exhibits attached thereto; and (3) Michael Williams' 30(b)(1) deposition in this case on February 9, 2023 and any exhibits attached thereto. Plaintiff further incorporates by reference its forth coming expert reports, including without limitation the reports of Mr. Bill Ashworth and/or Mr. Justin Blok.

**INTERROGATORY NO. 11:**

For each license, including settlement agreements, covering any Patent-in-Suit that you contend constitutes a comparable license or a non-comparable license, for purposes of determining a reasonable royalty in this litigation, explain in detail the factual basis for your contention, including an explanation of the math underlying each of the license agreements and how the parties arrived at the amount.

**RESPONSE:** In addition to preserving its General Objections, Plaintiff objects to this Interrogatory to the extent that it seeks disclosure of "all documents" protected from discovery by the attorney-client privilege and/or the attorney work product doctrine.

Jetaire objects to this Interrogatory because it constitutes a contention interrogatory and is therefore premature. The Scheduling Order entered in this lawsuit establishes the date by which Jetaire must make its expert disclosures. *See, e.g., O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365 (Fed. Cir. 2006) ("Answers to [contention] interrogatories are often postponed until the close of discovery "); *Novanta Corp. v. Iradion Laser, Inc.*, 15-1033-SLR-SRF, 2016 WL 4987110, at *7 (D. Del. Sept. 16, 2018) (Fallon, J.) ("[A] court may defer such interrogatories until the end of discovery."); *Internetad Sys. LLC v. ESPN, Inc.*, 3:03CV2787-D, 2004 WL 5181346, at *2 (N.D. Tex. Oct. 8, 2004) ("Many courts  conclude that contention

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

interrogatories need not be answered until later in the discovery process."). Plaintiff objects to the extent that this Interrogatory is premature in light of the Court's Scheduling Order in this case, including discovery and expert deadlines. Plaintiff also objects to the extent that this Interrogatory requires Plaintiff to make a legal conclusion or judgment.

Subject to the general and specific objections listed above, Jetaire states that there are no licenses "covering any Patent-in-Suit."

In addition, Plaintiff anticipates that at the appropriate time, Plaintiff will serve one or more expert reports on the issue of damages that will contain information responsive to this interrogatory. These expert reports, if any, are expressly incorporated herein, including all attachments and any supplements thereto.

Discovery is ongoing. Defendant's document production to date is incomplete, and no depositions have been taken to date. Thus, Plaintiff reserves the right to amend, modify, and/or supplement this response based upon further investigation and as it becomes aware of additional responsive information.

**FIRST SUPPLEMENTAL RESPONSE (FEB. 10, 2023):** Subject to the general and specific objections listed above, Plaintiff hereby incorporates its supplemental response to Interrogatory No. 10, above.

**INTERROGATORY NO. 12:**

Describe the bases for your contentions regarding the appropriate measure and amount of damages in this litigation, including identifying whether a reasonable royalty or some other measure of damages is appropriate; the appropriate royalty base, if a royalty is applicable; the appropriate royalty rate, if a royalty is applicable; and all documents that support or form the basis

78

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

| | | |
|---|---|---|
| **JETAIRE AEROSPACE, LLC,** | § | |
| | § | |
| *Plaintiff/Counter-Defendant,* | § | |
| | § | **Case No.: 1:20-cv-25144** |
| **v.** | § | |
| | § | |
| **AERSALE, INC.** | § | |
| | § | |
| *Defendant/Counter-Plaintiff* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **JETAIRE AEROSPACE, LLC,** | § | |
| **JETAIRE FLIGHT SYSTEMS, LLC,** | § | |
| **and MICHAEL D. WILLIAMS,** | § | |
| | § | |
| *Counter-Defendants.* | § | |

---

## EXPERT REPORT OF JUSTIN R. BLOK

---

**April 27, 2023**

Respectfully submitted,

*[signature: Justin R. Blok]*

Justin R. Blok

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

**TABLE OF CONTENTS**

I.   QUALIFICATIONS ....................................................................................... 3
II.  ASSIGNMENT AND SCOPE OF ENGAGEMENT..................................... 3
III. INFORMATION REVIEWED...................................................................... 4
IV. SUMMARY OF OPINIONS ........................................................................ 4
V.  BACKGROUND INFORMATION .............................................................. 5
    A.  Relevant Parties ............................................................................ 5
    B.  Patents-in-Suit ............................................................................... 7
    C.  Jetaire and AerSale Ignition Mitigation Systems......................... 13
    D.  Industry Background...................................................................... 14
    E.  Background of the Dispute ............................................................ 15
VI. PATENT INFRINGEMENT DAMAGES .................................................... 16
    A.  Damages Background .................................................................... 16
    B.  Analysis of Lost Profits Damages ................................................ 17
    C.  Analysis of Reasonable Royalty Damages ................................... 27
VII. PREJUDGMENT OR POST-JUDGMENT INTEREST................................ 56
VIII. RESERVATION OF RIGHTS .................................................................... 56

## I.    QUALIFICATIONS

1.    I am a Partner at Whitley Penn LLP ("Whitley Penn") and a Managing Director in its Forensic, Litigation, & Valuation Services practice.  I am a Certified Licensing Professional and Certified Fraud Examiner.  I have testified in federal, district, and state court matters as well as in private arbitration, involving economic, accounting, valuation and strategy issues related to intellectual property, complex commercial disputes, and general business transactions.  I have also been named to the IAM Patent 1000 annual list of patent experts.  I have been asked to serve as a guest lecturer at the University of Houston Law Center, Baylor University School of Law, and South Texas School of Law, covering a variety of damages topics.

2.    My resume, including my current and past employment and professional affiliations, and a list of my testimony over the past four years, are included as Exhibits 1 and 2 to this report. Whitley Penn is being compensated at an hourly rate of $575 for my work performed in connection with this matter.  Whitley Penn's fees are not contingent upon the outcome of this litigation.

## II.    ASSIGNMENT AND SCOPE OF ENGAGEMENT

3.    Whitley Penn has been retained by Rozier Hardt McDonough PLLC, on behalf of Jetaire Aerospace, LLC ("Jetaire Aerospace" or "Plaintiff"), to determine the amount of damages owed to Jetaire as a result of the alleged infringement of U.S. Patent Nos. 9,849,998 (the "'998 patent"), 10,633,109 (the "'109 patent"), and 10,800,541 (the "'541 patent") (collectively, the "Patents-in-Suit") by AerSale, Inc. ("AerSale" or "Defendant"), as set forth in the Original Complaint for Patent Infringement ("Complaint"), dated December 17, 2020.[1]  Plaintiff alleges Defendant has infringed the Patents-in-Suit by making, using, offering for sale, selling, or importing fuel tank products and services that embody Jetaire Aerospace's patented flammability reduction (or ignition mitigation) methods in aircrafts (the "Accused Products").[2]

---

[1] Original Complaint for Patent Infringement, December 17, 2020 ("Complaint, December 17, 2020").  In all interviews I conducted of Mr. Ashworth, Jetaire Aerospace's technical expert, such interviews were conducted only in the context of the asserted claims of the Patents-in-Suit.
[2] Complaint, December 17, 2020, pg. 4.

*contains Confidential Information*

4.     I understand that Jetaire Aerospace has all the necessary rights to enforce the Patents-in-Suit in patent infringement litigation and to recover damages resulting from infringement.  I have been asked to assume the Patents-in-Suit are valid and infringed by Defendants.

5.     This report reflects my analyses and opinions to date.  As additional data, information, or testimony become available to me, I intend to consider this information.  I may modify or update my opinions to include additional information received subsequent to the date of this report.

## III.    INFORMATION REVIEWED

6.     In connection with this report, Whitley Penn professionals, working under my supervision and direction, and I have reviewed and analyzed the documents and information in the body and footnotes of this report and attached exhibits, as well as in Exhibit 3 to this report.  In addition, I interviewed the following individuals:

- Michael Williams, President and CEO of Jetaire (defined below); and

- Bill Ashworth, Jetaire Aerospace's technical expert in this matter.

## IV.    SUMMARY OF OPINIONS

Redacted

*contains Confidential Information*

Redacted

---

[3] Interview of Mike Williams.
[4] Interview of Mike Williams.
[5] Interview of Mike Williams.
[6] Interview of Mike Williams.

*Jetaire Flight*

10.    Jetaire Flight, founded in 1984 and headquartered in Atlanta, Georgia, is a "full-service avionics and aircraft engineering firm providing high-quality services to clients in the aviation and aerospace industries."[7] Jetaire Flight specializes in (1) fuel tank safety, (2) ignition mitigation, and (3) Federal Aviation Regulations ("FAR") and Fuel Tank Flammability Reduction ("FTFR") certification that complies with Federal Aviation Administration ("FAA"), European Union Aviation Safety Agency ("EASA"), Agência Nacional de Aviação Civil ("ANAC"), and Agencia Federal de Aviación Civil ("AFAC") requirements.[8]

11.    According to Jetaire Flight, its technical solutions, which include electronic and hardware systems, "answer the aviation industry's complex requirements for safety, endurance, and proficiency."[9] Jetaire Flight's growth has focused primarily in avionics systems, structures, safety, project management and FAA Designated Engineering Representative ("DER") services.[10] Jetaire Flight has provided over 150 technical and engineering solutions to customers spanning 51 countries, including services related to the following aircrafts:[11]

- o   The Boeing 727-200 Series;
- o   The Boeing 737-300 Series;
- o   The Boeing 737-400 Series;
- o   The Boeing 727-100 Series;
- o   The McDonnell Douglas DC 9-81, 9-82, 9-83, MD-88, MD 90-30; and
- o   The McDonnell Douglas DC 9-87.

---

[7] https://www.jetairegroup.com/; https://www.linkedin.com/company/jetaire-group/about/.

[8] https://www.linkedin.com/company/jetaire-group/about/; https://www.jetairegroup.com/.

[9] https://www.jetairegroup.com/about.

[10] https://www.jetairegroup.com/about.

[11] https://www.jetairegroup.com/products-services; https://www.jetairegroup.com/about.

*AerSale*

12.      AerSale, founded in 2008 and headquartered in Coral Gables, Florida, is a "global leader and market innovator specializing in aviation products and services."[12]  AerSale was founded by Nicolas Finazzo and Robert Nichols with the goal of addressing wide-ranging needs of mid-life flight equipment.[13]  AerSale provides aftermarket support in global passenger, cargo, and government segments.[14]

13.      In 2013, AerSale was awarded its first multi-million-dollar U.S. government contract "to provide [u]sed [s]erviceable [m]aterial support for F108 aircraft engine maintenance."[15]  In late 2020, AerSale went public and now trades on the NASDAQ under the ticker "ASLE."[16]

## B.  Patents-in-Suit

14.      As noted above, Jetaire Aerospace has accused AerSale of infringing the Patents-in-Suit. In the table below, I have summarized certain information regarding each of the Patents-in-Suit:[17]

| Summary of the Patents-in-Suit | | | | |
|---|---|---|---|---|
| **Patent-in-Suit** | **Title** | **Filing Date** | **Issue Date** | **Expiration Date** |
| '998 Patent [18] | Block Foam Method of Accomplishing Ignition Mitigation in Aircraft Fuel Tanks | 09/11/2015 | 12/26/2017 | 05/09/2036 |
| '109 Patent [19] | Method and Material for Accomplishing Ignition Mitigation in Tanks Containing Flammable Liquid | 11/17/2017 | 04/28/2020 | 09/11/2035 |
| '541 Patent [20] | Method and Material for Accomplishing Ignition Mitigation in Tanks Containing Flammable Liquid | 10/19/2018 | 10/13/2020 | 09/11/2035 |

---

[12] https://www.aersale.com/; https://www.aersale.com/about/facilities; https://www.aersale.com/about/history.
[13] https://www.aersale.com/about/history.
[14] https://www.aersale.com/.
[15] https://www.aersale.com/about/history.
[16] https://www.aersale.com/about/history.
[17] U.S. Patent Nos. 9,849,998, 10,633,109, and 10,800,541.
[18] U.S. Patent No. 9,849,998.  I understand that the asserted claims of the '998 Patent are claims 1 and 2.
[19] U.S. Patent No. 10,633,109.  I understand that the asserted claims of the '109 Patent are claims 1 and 15.
[20] U.S. Patent No. 10,800,541.  I understand that the asserted claims of the '541 Patent are claims 1 and 16.

15.    The '998 Patent is titled, "Block Foam Method of Accomplishing Ignition Mitigation In Aircraft Fuel Tanks."[21] The '109 Patent and '541 Patent are both titled, "Method and Material for Accomplishing Ignition Mitigation in Tanks Containing Flammable Liquid."[22] While the asserted claims in this matter relate to variants of the inventions disclosed in the Patents-in-Suit, they generally all relate to the concept of designing a system that can be reliably, accurately, safely, and repeatably manufactured and installed, such that the necessary FAA approvals for sale and use in the commercial aircraft industry can be attained.[23] The specifications and substance of the '109 and '541 Patents are substantively similar.[24] While the '998 Patent differs slightly in its disclosures and claims, it is generally similar to the '109 and '541 Patents as well.[25]

16.    Claim 1 exemplifies the scope of the invention of the '998 Patent, which covers a comprehensive methodology for systematically designing, manufacturing, and installing a foam-based fuel ignition mitigation system such that it is precisely fitted to the fuel tank, easy to install, able to be repeatably installed and reinstalled, and accompanying a reliable process required to comply with FAA rules and regulations.[26] According to Mr. Ashworth, the asserted claims of the '998 Patent cover the entirety of the process for designing and installing a system such that it will not only be FTFR compliant, but will enable and foster the acquisition of FAA certifications or otherwise ensure consistency with already existing FAA certifications.[27] Essentially, the teachings of the Patent-in-Suit enable repeatable use of a model-specific design without the need to obtain individuals FAA certifications upon every instance in which an ignition mitigation system is created.[28]

17.    According to Mr. Ashworth, the '998 Patent discloses specific techniques such as determining and coordinating shapes of foam blocks to fill the fuel tanks and use of specific dimensions and configurations to reduce costs, ease installation, and create a more reliable and repeatable system compared to preceding systems.[29] The '998 Patent also discloses the use of

---

[21] Interview of Mr. Ashworth.  U.S. Patent Nos. 10,633,109 and 10,800,541.
[22] Interview of Mr. Ashworth.  U.S. Patent No. 9,849,998.
[23] Interview of Mr. Ashworth.
[24] Interview of Mr. Ashworth.
[25] Interview of Mr. Ashworth.
[26] Interview of Mr. Ashworth.
[27] Interview of Mr. Ashworth.
[28] Interview of Mr. Ashworth
[29] Interview of Mr. Ashworth.  U.S. Patent No. 10,633,109.

engineering drawings to account for the various compartments, structural members, (*e.g.* spars and beams), and equipment (*e.g.* fuel pumps), within the aircraft fuel tanks.[30]  These drawings are used to determine the exact shape and dimensions that each of the RPF blocks are cut, specific to its placement within the fuel tank.[31]  According to Mr. Ashworth, such precision is critical because failure to accomplish these needs will not only result in inconsistent and unrepeatable aspects of the system, but will also fail to comply with relevant engineering requirements for the fuel tank and the foam used in the system.[32]

18.    The '998 Patent also teaches the use of foam block identification with part numbers and/or other directive indications to aid in installation and orientation of the blocks during re-install.[33]  These protocols significantly contribute to the ease and repeatability associated with products embodying the teachings of the patents-in-suit.[34]

19.    According to Mr. Ashworth, claim 15 of the '109 Patent demonstrates the scope of the invention of the '109 Patent, which similarly covers a comprehensive methodology for systematically determining the key design considerations, manufacturing, and installing a foam-based fuel ignition mitigation system such that it is accurately fitted within the fuel tank, easy to install, and able to be repeatably installed and reinstalled by its nature, and associated with a reliable process needed to maintain standing model-specific compliance with FAA rules and associated regulations.[35]  As the '109 Patent describes, it covers a methodology for "installing accurately measured quantities of flexible foam material to fill the internal spaces of tanks that hold flammable liquid, with particular emphasis on aircraft fuel tanks."[36]  According to Mr. Ashworth, the asserted claims of the '109 Patent cover the entirety of the process for designing and installing a system such that it will not only be FTFR compliant, but is likely to obtain FAA approval for commercial manufacture and use.[37]

---

[30] Interview of Mr. Ashworth.  U.S. Patent No. 9,849,998.
[31] Interview of Mr. Ashworth.
[32] Interview of Mr. Ashworth.
[33] Interview of Mr. Ashworth.
[34] Interview of Mr. Ashworth
[35] Interview of Mr. Ashworth.
[36] Interview of Mr. Ashworth.  U.S. Patent No. 10,633,109.
[37] Interview of Mr. Ashworth.

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY** Expert Report of Justin R. Blok
April 27, 2023

20.    More specifically, the '109 Patent also teaches specific aspects of a solution for effectively designing an efficient system for ignition mitigation through planned voiding.[38]  The planned voids are cavities in the foam,  designed to provide a number of unique benefits, including the reduction of weight and the facilitation of fuel flow without sacrificing ignition mitigation.[39]

21.    Claim 1 of the '541 Patent also includes teachings similar to the '109 Patent, including without limitation the incorporation of planned voiding such as channel voiding as well as component voids as discussed above.[40]  The '541 Patent also includes specific configurations of blocks to further facilitate the same goals as discussed above with the other patents.[41]

22.    According to Mr. Ashworth, the inventions set forth in the asserted claims are the cornerstone of not only the FTFR-compliant ignition mitigation system, but also the process of obtaining the needed STCs and PMAs from the FAA in order to efficiently market and sell and continually use the products covered by the inventions in the marketplace.[42]  Without the STC and PMA certificates from the FAA the products embodying the inventions could not be sold.[43]  Once the STC and PMA is issued, however, any system sold in the marketplace must be repeatable and identical to the requirements of the STC and PMA, thus exemplifying the benefits of the design and manufacturing process covered by the asserted claims.[44]

23.    In fact, according to Mr. Ashworth, absent an FTFR-compliant solution, any aircraft subject to the FTFR rules would be grounded.[45]  This reality demonstrates another value of a foam-based ignition mitigation system covered by the inventions—it is relatively cheap, easy to install, and maintenance free.[46]  This is a major contrast with other FTFR-compliant systems like Boeing's nitrogen inerting system.[47]  Installation of such a system is vastly more expensive than a foam-based product like those offered by Jetaire and AerSale.[48]  A nitrogen-inerting system requires an

---

[38] Interview of Mr. Ashworth.
[39] Interview of Mr. Ashworth.
[40] Interview of Mr. Ashworth.
[41] Interview of Mr. Ashworth.
[42] Interview of Mr. Ashworth.  Essentially, attaining the STC enables repeatable model specific sales without the need to attain FAA approval for each install.
[43] Interview of Mr. Ashworth.
[44] Interview of Mr. Ashworth.
[45] Interview of Mr. Ashworth.
[46] Interview of Mr. Ashworth.
[47] Interview of Mr. Ashworth.
[48] Interview of Mr. Ashworth.

aircraft to be ground for an extended period of time for the installation to take place—likely at least 14 days—and it also requires ongoing maintenance.[49] AerSale is aware of such benefits, as it notes that nitrogen-inerting systems require structural changes to the aircraft and therefore extended period of aircraft grounding.[50]

24.      By contrast, any system embodying the claimed inventions can be installed in a matter of days (typically three to seven depending on aircraft type), requires no ongoing maintenance, and can be installed anywhere (e.g., there is no need to send an aircraft to a Boeing facility).[51] There is also inherently less lead time to the installation itself because, as AerSale itself has advertised, typical lead time for a foam-based system is as little as 60 days, compared to up to a year to obtain a nitrogen-inerting system.[52]

25.      Because the claimed inventions cover a system resulting in an FAA-approved ignition mitigation system that is inert and has no moving parts, there is also no need for any post-installation testing and there is no need for any structural changes to the aircraft for purposes of installation or future maintenance processes that might require uninstall/reinstall of the foam blocks.[53]

26.      According to Mr. Ashworth, the parties themselves recognize these realities. For example, AerSale has emphasized the cost and time savings associated with its AerSafe kits in the marketplace:[54]

---

[49] Interview of Mr. Ashworth.

[50] Interview of Mr. Ashworth. https://www.aersale.com/media-center/navigating-the-difference-between-nitrogen-inerting-systems-fuel-tank-ignition-mitigation. JETAIRE_20328, at 330 – 331.

[51] Interview of Mr. Ashworth.

[52] Interview of Mr. Ashworth. https://www.businesswire.com/news/home/20180201006321/en/FAA-Approves-AerSafeTM-to-Comply-with-Fuel-Tank-Flammability-Reduction-Rule-for-Boeing-767-Aircraft.

[53] Interview of Mr. Ashworth.

[54] Interview of Mr. Ashworth.  JETAIRE_20328, at 331.

## ADVANTAGES AND BENEFITS

|  | AerSafe | Nitrogen Inerting |
|---|---|---|
| **Cost over 10 years (30,000 hrs)** |  |  |
| List Price | $195,000 | $318,000 |
| Special Tooling for Installation | n/a | $30,000 |
| Maintenance VCK/DET | n/a | $6,000 |
| Maintenance Ozone Converter and Cleaning of NGS | n/a | $150,000 |
| Air Separation Module Replacement | n/a | $225,000 |
| **Total Cost** | **$195,000** | **$729,000** |
|  |  |  |
| **Lead Time** | Less than six (6) weeks | One (1) year |
| **Aircraft Downtime for Installation** | Two (2) days | 14 days |
| **Mechanical/Electrical Parts** | None | Over 100 |

27.    According to Mr. Ashworth, in short, it is important to note that each of these products is FAA-approved for sale in the commercial aviation marketplace pursuant to an STC and PMA for a particular model of aircraft as evidenced by the STCs and PMAs held by Jetaire and AerSale, respectively.[55]  The FAA rules and regulation require all such products to strictly comply with the requirements and documentation set forth in the STCs and associated documentation.[56]

28.    According to Mr. Ashworth, the Patents-in-Suit represented a significant technological improvement over prior art at the time of its invention.[57]  Additionally, Mr. Ashworth is not aware of any available, acceptable non-infringing alternatives to the Patents-in-Suit, as of the date of first infringement (i.e., in or around December 2017), that would have provided the same or similar functionalities and benefits as taught by the Patents-in-Suit without infringing the Patents-in-Suit.[58]

---

[55] Interview of Mr. Ashworth.
[56] Interview of Mr. Ashworth.
[57] Interview of Mr. Ashworth.
[58] Interview of Mr. Ashworth.

In fact, based on the record I have reviewed, AerSale admits that there were no alternatives in the marketplace at all aside from the much more expensive nitrogen-inerting systems.[59]

### C.  Jetaire and AerSale Ignition Mitigation Systems

29.    Jetaire's INVICTA Fuel Tank Ignition Mitigation/Flammability Reduction System ("INVICTA") installs foam kits into aircraft engines to provide ignition mitigation to comply with FAA regulations.[60]  The foam installed in the system "is a lightweight, self-extinguishing, three-dimensional skeletal matrix that suppresses fuel ignition caused by heated fuel vapor, tank rupture, lightning strike, static discharge, or outside factors."[61]  The INVICTA system is designed to comply with FAR 25.981 and FTFR rules.[62]  The system is currently designed for: Airbus A320 Series, Airbus A330-200 Series, Boeing B737 NG Series, Boeing B757 Series, Boeing B767 Series, and is "In Progress" with the Boeing B777 Series.[63]

30.    Similarly, AerSale has produced the AerSafe® Fuel Tank Ignition Mitigation System (i.e., "AerSafe®" or the "Accused Products").[64]  AerSale introduced AerSafe® as a "cost-saving solution to meet the FAA's latest fuel tank flammability mitigation requirements."[65]  AerSafe® works by "installing nonchemical, fuel tank-formed inserts that limit the amount of available oxygen that can potentially ignite fuel vapors."[66]  AerSale has tailored the AerSafe® product to meet the fuel tank cavities of: Airbus A319, Airbus A320, Airbus A321, Boeing 777, Boeing 767, Boeing 757, Boeing 737 NG, Boeing 737 CL (or "classic series"), and Boeing 727 aircrafts.[67]

31.    According to Mr. Ashworth, the INVICTA and AerSafe® products encompass the same technologies and processes (as taught by the Patents-in-Suit) and provide the same technical benefits to the consumer.[68]

---

[59] Deposition of Nicolas Finazzo, February 23, 2023, at pg. 73 ("Q.  And the only other solutions that would bring you into compliance with the FTFR rules that you're aware of would be to go to a nitrogen-inerting system from an OEM, correct?  A.  Yes.").

[60] Interview of Mr. Williams.

[61] https://www.jetairegroup.com/invicta.

[62] https://www.jetairegroup.com/invicta.

[63] https://www.jetairegroup.com/invicta.

[64] https://www.aersale.com/products/aersafe.

[65] https://www.aersale.com/products/aersafe.

[66] https://www.aersale.com/products/aersafe.

[67] https://www.aersale.com/products/aersafe.

[68] Interview of Mr. Ashworth.

### D. Industry Background

32.    The Aircraft Parts industry in the U.S. focuses on the selling of aerostructure components, including fuselage, wings, and flight control surfaces, used "in the maintenance and repair of aircraft to commercial, freight, and defense customers."[69]    The repair and maintenance aspect of the industry is large, as nearly one quarter of all commercial planes in the U.S. are more than 15 years old.[70]    Furthermore, according to AerSale, "[g]ood maintenance is basic fleet cost management" because "an airplane's longevity is usually an issue of how well it has been maintained."[71]

33.    Aircraft Parts Distributors in the U.S. grew by 4.0% from 2018 to 2023, and was projected to grow by 1.1% for the years 2023 to 2028.[72]    Key external drivers of growth included a 8.9% increase in demand for aircraft maintenance, repair, and overhaul, and a 2.3% increase in federal funding for defense.[73]    The industry is further driven due to "aviation regulations [which] dictates the [level of] maintenance, repair, and overhaul aircraft required."[74]

34.    The risks involved in fuel tank ignition led the FAA to pass the Fuel Tank Safety rule, which then led to the FTFR rule.[75]    Under the FTFR rule, "all passenger aircraft with high-flammability fuel tanks must adopt either a nitrogen inerting system or an ignition mitigation solution to prevent fuel tank explosions."[76]    The passing of the FTFR rule led to the introduction of both the foam ignition mitigation and nitrogen inerting systems ("Ignition Mitigation Solutions"), with the foam ignition mitigation system including "foam to line the cavity of an aircraft's center fuel tank" which "mitigates the effects of fuel vapor ignition and ensures explosion does not occur."[77]

---

[69] IBIS World Report, Aircraft Parts Distributors in the US, March 2023, pg. 4.
[70] https://www.aersale.com/media-center/what-mid-life-crisis-getting-the-most-out-of-middle-aged-airplanes.
[71] https://www.aersale.com/media-center/what-mid-life-crisis-getting-the-most-out-of-middle-aged-airplanes.
[72] IBIS World Report, Aircraft Parts Distributors in the US, March 2023, pg. 6.
[73] IBIS World Report, Aircraft Parts Distributors in the US, March 2023, pg. 6.
[74] IBIS World Report, Aircraft Parts Distributors in the US, March 2023, pg. 15.
[75] https://www.aersale.com/media-center/the-rise-of-aircraft-fuel-tank-ignition-mitigation-solutions.
[76] https://www.aersale.com/media-center/the-rise-of-aircraft-fuel-tank-ignition-mitigation-solutions.
[77] https://www.aersale.com/media-center/the-rise-of-aircraft-fuel-tank-ignition-mitigation-solutions.

35.     However, as discussed in detail above, I understand the nitrogen inerting solution is expensive and time consuming as it requires structural modifications and ongoing maintenance.,.[78].This solution is used primarily for OEM applications.[79]

## E. Background of the Dispute

36.     Mr. Williams, President / CEO of Jetaire and inventor of the Patents-in-Suit, aimed to develop a less expensive and easier to deploy aircraft fuel tank ignition mitigation solution that would meet FTFR requirements.[80]   FTFR systems require FAA approval, prior to the fuel tank mitigation system being installed.[81] This approval is known as a Supplemental Type Certificate ("STC"). [82]

37.     However, before being able to meet FTFR requirements, Mr. Williams would be required to develop, install, configure, and test various versions of ignition mitigation systems on an aircraft.[83]   As Jetaire, and Mr. Williams, did not have access to an aircraft, Jetaire executed a confidential agreement with AerSale, in which Jetaire would be provided secure and private access to an aircraft, for development and testing purposes.[84]

38.     Jetaire would later develop a fuel tank ignition mitigation solution (i.e., INVICTA) that met the requirements of the FTFR, including, but not limited to obtaining FAA approval for the following aircraft models:[85]

   o   B737 (200-900) – ST03450NY;

   o   B757 (200) – ST04415AT;

   o   B767 (200-300) – ST04405AT; and

   o   Airbus (A319-A321) – ST03834NY.

---

[78] Interview of Mr. Ashworth.
[79] Interview of Mr. Ashworth.
[80] Complaint, December 17, 2020, pg. 3.
[81] Complaint, December 17, 2020, pg. 3.
[82] Complaint, December 17, 2020, pg. 3.
[83] Complaint. December 17, 2020, pg. 3.
[84] Complaint. December 17, 2020, pgs. 3 – 4.
[85] Complaint. December 17, 2020, pg. 4.

39.    Following Jetaire's success, AerSale requested Jetaire to develop a system for AerSale that would also satisfy the FTFR requirements.[86]  Jetaire declined to develop said system for AerSale, and allegedly, after doing so, AerSale began developing a foam-based ignition mitigation system, that Jetaire asserts is almost identical to its own.[87]  AerSale ultimately developed the Accused Products and obtained FAA approval to install its ignition mitigation products on the following aircrafts:[88]

| AerSale's STC Approval 2016 through March 2023 | |
| --- | --- |
| **Aircraft Model(s)** | **Year of Approval** |
| A319, A320, A321 | 2018 |
| 737NG (600, 700, and 800 Series) | 2016 |
| 737CL (300, 400, and 500 Series) | 2016 |
| 757 (200 and 300 Series) | 2022 |
| 767 (200 and 300 Series) | 2018 |
| 777 | 2020 |

40.    Jetaire Aerospace alleges AerSale's ignition mitigation systems infringe the Patents-in-Suit, resulting in Jetaire suffering economic damages.

## VI.    PATENT INFRINGEMENT DAMAGES

### A.  Damages Background

41.    Patent infringement damages can only be recovered if there is a finding of liability. Accordingly, I have been asked to assume that (a) Jetaire Aerospace has all the necessary rights to enforce the Patents-in-Suit in patent infringement litigation and to recover damages resulting from infringement; and (b) the Patents-in-Suit are valid and have been infringed by AerSale. Compensation to a patent holder arising from patent infringement can take the form of lost profits

---

[86] Complaint. December 17, 2020, pg. 4.
[87] Complaint. December 17, 2020, pg. 4.
[88] See Exhibit 16.  Complaint, December 17, 2020, pg. 4.

*contains Confidential Information*

or reasonable royalties. I understand that damages in patent infringement cases are governed by 35 U.S.C. §284, which states as follows:

> *Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.*

42.    In the current matter, Jetaire claims that, but-for AerSale's alleged infringement of the Patents-in-Suit, it would have made most, if not all, of the sales of the Accused Products made by AerSale. Therefore, I have been asked to analyze the lost profits sustained by Jetaire as a result of AerSale's alleged infringement. I understand Jetaire Aerospace is only entitled to claim damages for patent infringement after December 26, 2017 (i.e., the date of issuance for the first to issue Patents-in-Suit). As a result, I have limited my calculation of damages to the period of December 26, 2017 through March 2023 (i.e., the last date for which AerSale provided information).

43.    In the event the trier-of-fact determines that Jetaire Aerospace is not entitled to lost profits damages (or some portion thereof), I have provided an alternative analysis based on the amount of reasonable royalties that Jetaire Aerospace would be owed as a result of AerSale's alleged infringement of the Patents-in-Suit. For example, Jetaire Aerospace would be entitled to reasonable royalty damages on any infringing sales made by AerSale for which Jetaire Aerospace is not awarded lost profits. I discuss my analyses of Jetaire Aerospace's lost profits and reasonable royalty damages in the following sections of this report.

**B.  Analysis of Lost Profits Damages**

Redacted

*contains Confidential Information*

Redacted

*Panduit Factor No. 1:  Demand for the Patented Product*

Redacted

---

[89] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 197 U.S.P.Q. 726 (6th Cir. 1978).
[90] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 197 U.S.P.Q. 726 (6th Cir. 1978).
[91] *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc*, 567 F.3d 1314, 1331 (Fed. Cir. 2009).
[92] See Exhibits 7 and 6.3.
[93] See Exhibits 7 and 10.
[94] https://www.aersale.com/media-center/the-rise-of-aircraft-fuel-tank-ignition-mitigation-solutions.

*contains Confidential Information*

Redacted

*Panduit Factor No. 2:  Acceptable Non-Infringing Substitutes*

Redacted

---

[95] https://www.AerSale.com/media-center/the-rise-of-aircraft-fuel-tank-ignition-mitigation-solutions.

[96] https://www.aersale.com/media-center/the-rise-of-aircraft-fuel-tank-ignition-mitigation-solutions.

[97] Interview of Mr. Ashworth.

[98] Interview of Mr. Ashworth.

[99] Deposition of Iso Nezaj, March 1, 2023, pgs. 60 and 80 (discussing expected sales as a result of an airworthiness directive that is due in 2026).

[100] Deposition of Ronald Moyer, February 21, 2023, pgs. 13 and 56 – 57.

**HIGHLY CONFIDENTIAL**                                                    Expert Report of Justin R. Blok
**ATTORNEYS' EYES ONLY**          Page 19 of 56                                      April 27, 2023

*contains Confidential Information*

Redacted

---

[101] Interview of Mr. Ashworth.

[102] Interview of Mr. Ashworth.

[103] Interview of Mr. Ashworth. https://www.aersale.com/media-center/navigating-the-difference-between-nitrogen-inerting-systems-fuel-tank-ignition-mitigation. JETAIRE_20328, at 330 – 331.

[104] Interview of Mr. Ashworth.

[105] Interview of Mr. Ashworth. https://www.businesswire.com/news/home/20180201006321/en/FAA-Approves-AerSafeTM-to-Comply-with-Fuel-Tank-Flammability-Reduction-Rule-for-Boeing-767-Aircraft.

[106] Interview of Mr. Ashworth.

[107] Interview of Mr. Ashworth.  JETAIRE_20328, at 331.

**HIGHLY CONFIDENTIAL**                                         Expert Report of Justin R. Blok
**ATTORNEYS' EYES ONLY**              Page 20 of 56                              April 27, 2023

*contains Confidential Information*

Redacted

---

[108] Expert Report of Mr. Ashworth dated April 27, 2023, at pgs. 39 – 41.

Redacted

Deposition of Ronald Moyer, February 21, 2023, pgs. 55 – 56.

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**                  Page 21 of 56                  Expert Report of Justin R. Blok
April 27, 2023

contains Confidential Information

Redacted

---

[111] *Standard Havens Products v. Gencor Industries,* 953 F. 2d 1360, 1373 (Fed. Cir. 1991).

[112] *Grain Processing Corp. v. American Maize-Products,* 185 F. 3d 1341, 1355 (Fed. Cir. 1999).

[113] *TWM Mfg. Co., Inc. v. Dura Corp.,* 789 F. 2d 895, 901 (Fed. Cir. 1986).

[114] *Standard Havens Products v. Gencor Industries,* 953 F. 2d 1360, 1373 (Fed. Cir. 1991).

[115] *Siemens Medical Solutions v. Saint-Gobain Ceramics,* 637 F. 3d 1269, 1288 (Fed. Cir. 2011).

[116] *Standard Havens Products v. Gencor Industries,* 953 F. 2d 1360, 1373 (Fed. Cir. 1991) (citing *TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 901, 229 U.S.P.Q. 525, 529 (Fed. Cir. 1986) and *Panduit Corp. v. Stahlin Bros.*

**HIGHLY CONFIDENTIAL**  
**ATTORNEYS' EYES ONLY**

Expert Report of Justin R. Blok  
April 27, 2023

*contains Confidential Information*

Redacted

_____

*Fibre Works, Inc.*, 575 F.2d 1152, 197 U.S.P.Q. 726 (6th Cir. 1978)); see also *Cohesive Technologies, Inc. v. Waters Corp.*, 543 F.3d 1351, 137 (Fed. Cir. 2008).

[117] Interview of Mr. Williams.

[118] Interview of Mr. Williams.

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**                    Page 23 of 56

Expert Report of Justin R. Blok
April 27, 2023

*contains Confidential Information*

Redacted

---

[119] See Exhibit 7.
[120] See Exhibit 7.
[121] Interview of Mr. Williams.

**HIGHLY CONFIDENTIAL**                              Expert Report of Justin R. Blok
**ATTORNEYS' EYES ONLY**        Page 24 of 56                    April 27, 2023

*contains Confidential Information*

Redacted

---

[122] See Exhibit 7.
[123] Interview of Mr. Williams.
[124] Interview of Mr. Williams.
[125] See Exhibit 6.

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**                    Page 25 of 56

Expert Report of Justin R. Blok
April 27, 2023

---

[126] See Exhibit 5.2.
[127] See Exhibit 5.
[128] See Exhibit 5.

## C. Analysis of Reasonable Royalty Damages

63.    In the event the trier-of-fact determines damages due to Jetaire Aerospace are not appropriately measured through a quantification of lost profits, I have also been asked to calculate damages due to Jetaire Aerospace based upon a reasonable royalty. I understand that damages in patent infringement cases are governed by 35 U.S.C. § 284, which states the following:

> *Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.*

64.    I have performed a reasonable royalty analysis to determine the amount of reasonable royalties Jetaire Aerospace is entitled to as a result of AerSale's alleged infringement, and extent of its use, of the Patents-in-Suit. The determination of a reasonable royalty is based on the hypothetical negotiation set forth in *Georgia-Pacific Corp. v. United States Plywood Corp*

Redacted

("*Georgia-Pacific*").[130]    In *Georgia-Pacific*, the Court held that determination of reasonable royalties generally reflects various factors which might have been considered by a willing licensor and willing licensee in trying to reach agreement at the time of first infringement (the "*Georgia-Pacific* Factors").

65.    In establishing the reasonable royalty in this hypothetical willing licensor/licensee negotiation, courts have established several factors to be considered, including those established by the *Georgia-Pacific* case as discussed below.[131]    The determination of damages based on a reasonable royalty is generally based on a hypothetical negotiation between a willing licensor and a willing licensee at the time of first infringement.  The reasonable royalty analysis focuses on the economic and bargaining positions of the plaintiff and defendant at the time of the hypothetical negotiation and the likely outcome of such negotiation given their respective bargaining positions.  In calculating reasonable royalty damages, a determination is generally made regarding: (1) the reasonable royalty rate; and (2) the appropriate royalty base.  In a hypothetical negotiation, both sides would have recognized that the Patents-in-Suit were valid and had been infringed by Defendant.

66.    While *Georgia-Pacific* enumerates various factors that should be considered in determining reasonable royalties, these factors are not absolute determinants of a reasonable royalty, but rather are guidelines to evaluating the likely actions of the parties in a hypothetical negotiation.  Based on the facts and circumstances of the case, the factors are not necessarily given equal weight, nor is it believed that the factors are all inclusive.  Rather, the *Georgia-Pacific* factors are part of an overall analysis of patent damages.  Furthermore, I have considered recent Federal Circuit opinions as they relate to my opinion of economic damages in this matter and my opinion/report complies with the Federal Circuit's mandates.[132]

---

[130] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).

[131] *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116 (S.D.N.Y. 1970).

[132] *Lucent Technologies, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1326 (Fed. Cir. 2009); *Cornell University v. Hewlett-Packard,* 609 F.Supp.2d 279 (N.D.N.Y. 2009); *ResQNet.com v. Lansa,* 594 F.3d 860 (Fed. Cir. 2010); *Uniloc USA, Inc. v. Microsoft Corporation*, 2011 WL 9738 (Fed. Cir. Jan. 4, 2011); *LaserDynamics, Inc. v. Quanta Computer, Inc.,* (Fed. Cir. Aug. 30, 2012); *VirnetX, Inc., et al. v. Cisco Systems Inc.*, 767 F.3d 1308, 1327 – 1328 (Fed. Cir. 2014); *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys. Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015).

*contains Confidential Information*
<u>*Hypothetical Negotiation*</u>

Redacted

---

[133] *Sinclair Refining Co. v. Jenkins Petroleum Co.*, 289 U.S. 689, 698-99, 53 S. Ct. 736, 77 L. Ed. 1449 (1933); *Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568 (Fed. Cir. 1988).
[134] Weil, Roman L., et al. *Litigation Services Handbook: The Role of the Financial Expert,* Sixth Edition, pgs. 5.11 – 5.12.

**HIGHLY CONFIDENTIAL**                                                Expert Report of Justin R. Blok
**ATTORNEYS' EYES ONLY**          Page 29 of 56                              April 27, 2023

Appx01420

*contains Confidential Information*

Redacted

---

[135] U.S. Patent Nos. 9,849,998.

Redacted

[137] U.S. Patent Nos. 9,849,998, 10,633,109, and 10,800,541.

Redacted

*contains Confidential Information*

Redacted

---

[140] Interview of Mr. Williams.

[141] Interview of Mr. Williams. https://www.linkedin.com/company/jetaire-group/;
https://www.linkedin.com/in/michael-williams-9aa368190/. U.S. Patent Nos. 9,849,998, 10,633,109, and
10,800,541.

[142] U.S. Patent Nos. 9,849,998.  Interview of Mr. Williams.

[143] *Lucent Technologies, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1326 (Fed. Cir. 2009).

**HIGHLY CONFIDENTIAL**                                            Expert Report of Justin R. Blok
**ATTORNEYS' EYES ONLY**                              April 27, 2023

contains Confidential Information

Redacted

---

[144] *Lucent Technologies, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1326 (Fed. Cir. 2009).

[145] *Lucent Technologies, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1326 (Fed. Cir. 2009).

[146] *See, e.g.*, *Apple, Inc. v. Samsung Electronics Co., Ltd.*, No. 12-cv-630, 2014 WL 794328, at *3 (N.D. Cal. Feb. 25, 2014) ("Using the Income Approach, [the expert] looks at the subset of profits for the products that incorporate the patented technology at issue due to that technology, less the return Samsung would have enjoyed had it used the next-best alternative to that technology. . . . Any profits generated on products utilizing the patented technology that are in excess of the next best alternative represent an amount up to which the licensee should be willing to pay for access to the technology."); *Lucent Technologies, Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1326 (Fed. Cir. 2009) (Fed. Cir. 2009) ("Litigants routinely adopt several approaches for calculating a reasonable royalty. The first, the analytical method, focuses on the infringer's projections of profit for the infringing product. *See* TWM Mfg. Co., Inc. v. Dura Corp., 789 F. 2d 895, 901 (Fed. Cir. 1986) (describing the analytical method as 'subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices')."). The "analytical" approach is sometimes called the "income" approach and vice versa. *See, e.g.*, *Ultratec, Inc. v. Sorenson Communications, Inc.*, No. 13-cv-346 (W.D. Wis. Oct. 9, 2014); *Alfred E. Mann Found. For Scientific Research, et al. v. Cochclear Corp.*, No. 07-cv-8108, 2018 WL 56190604, at *15 (C.D. Cal. Nov. 4, 2018) (describing the Analytical Approach as a "variation" on the "Income Approach").

*contains Confidential Information*

Redacted

---

[147] *See, e.g.*, *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F. Supp. 2d 424, 432 n.38 (D. Del. 2007) ("The Market Approach values assets based on comparable transactions between unrelated parties."); *Apple, Inc. v. Samsung Electronics Co., Ltd.*, No. 12-cv-630, 2014 WL 794328, at *3 (N.D. Cal. Feb. 25, 2014) ("Using the Market Approach, [the expert] looks at the terms of licenses and other transactions . . . to determine the royalty amount on which the parties would likely have agreed in a hypothetical negotiation for a license to the patents-in-suit.").

[148] *Prism v. Sprint*, 849 F.3d 1360, 1375-76 (Fed. Cir. 2017).

[149] Interview of Mr. Ashworth.

**HIGHLY CONFIDENTIAL**                                      Expert Report of Justin R. Blok
**ATTORNEYS' EYES ONLY**         Page 33 of 56                           April 27, 2023

*contains Confidential Information*

Redacted

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

Expert Report of Justin R. Blok

April 27, 2023

*contains Confidential Information*

Redacted

---

[150] Deposition of Ronald Moyer, February 21, 2023, pg. 55.

*contains Confidential Information*

Redacted

---

[151] Products with FAA STCs | AerSale.
[152] Products with FAA STCs | AerSale.

*contains Confidential Information*

Redacted

---

[153] U.S. Patents Nos. 9,849,998, 10,633,109, and 10,800,541.

*contains Confidential Information*

Redacted

---

Redacted

[154]

Deposition of Ronald Moyer, February 21, 2023, pg. 75.
[157] See Exhibit 17.

**HIGHLY CONFIDENTIAL**                                          Expert Report of Justin R. Blok
**ATTORNEYS' EYES ONLY**          Page 38 of 56                              April 27, 2023

Redacted

---

[158] See Exhibits 11 and 12. [Revenues x Gross Profit % = Gross Profit].

**ATTORNEYS' EYES ONLY**          Page 39 of 56

Expert Report of Justin R. Blok
April 27, 2023

Appx01430

*contains Confidential Information*

Redacted

Redacted

**HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**    Page 40 of 56

Expert Report of Justin R. Blok
April 27, 2023

*contains Confidential Information*

Redacted

---

[162] Interview of Mr. Ashworth.

[163] U.S. Patents Nos. 9,849,998, 10,633,109, and 10,800,541.

[164] U.S. Patents Nos. 9,849,998, 10,633,109, and 10,800,541.

[165] Deposition of Iso Nezaj, March 1, 2023, pgs. 6 and 58.

[166] https://www.jetairegroup.com/products-services.

[167] https://www.aersale.com/media-center/beat-fleet-downtime-costs-with-integrated-mro-solutions#.

**HIGHLY CONFIDENTIAL**                                       Expert Report of Justin R. Blok
**ATTORNEYS' EYES ONLY**          Page 41 of 56                            April 27, 2023

*contains Confidential Information*

Redacted

---

[168] Interview of Mr. Ashworth.  Expert Report of Mr. Ashworth, April 27, 2023, pgs. 33 – 34.
[169] https://www.aersale.com/products/aersafe.
[170] https://www.aersale.com/products/aersafe; Interview of Mr. Ashworth.

*contains Confidential Information*

Redacted

---

[171] Interview of Mr. Ashworth.
[172] Interview of Mr. Ashworth.
[173] See Exhibits 9, 11, and 12. [Revenues x Gross Profit % = Gross Profit].

*contains Confidential Information*

Redacted

---

[174] Interview of Mr. Ashworth.
[175] Interview of Mr. Ashworth.

*contains Confidential Information*

Redacted

---

[176] *Uniloc USA, Inc. v. Microsoft Corporation*, 2011 WL 9738 (Fed. Cir. Jan. 4, 2011).
[177] *LaserDynamics, Inc. v. Quanta Computer, Inc.*, (Fed. Cir. Aug. 30, 2012), pg. 23.
[178] *VirnetX, Inc., et al. v. Cisco Systems Inc.*, 767 F.3d 1308, 1327 – 1328 (Fed. Cir. 2014).

**HIGHLY CONFIDENTIAL**　　　　　　　　　　　　　　　　　Expert Report of Justin R. Blok
**ATTORNEYS' EYES ONLY**　　　Page 45 of 56　　　　　　　　　April 27, 2023

*contains Confidential Information*

Redacted

---

[179] *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015).
[180] *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338–40 (Fed. Cir. 2015).
[181] *Exmark Manufacturing Co, Inc. v. Briggs & Stratton Power Products Group, LLC*, 879 F.3d 1332, 1347 (Fed. Cir. 2018); *see also Ericsson v. D-Link* (Fed. Cir.) (emphasis added).
[182] *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338–40 (Fed. Cir. 2015).

**HIGHLY CONFIDENTIAL**                                            Expert Report of Justin R. Blok
**ATTORNEYS' EYES ONLY**                               April 27, 2023

*contains Confidential Information*

Redacted

**HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**

Expert Report of Justin R. Blok
April 27, 2023

*contains Confidential Information*

Redacted

---

[183] See Exhibit 10.  Interview of Mr. Ashworth.

*contains Confidential Information*

Redacted

---

[184] Expert Report of Mr. Ashworth dated April 27, 2023, at pgs. 39 – 41.  Interview of Mr. Ashworth.

contains Confidential Information

Redacted

*Reasonable Royalty Rate*

Redacted

---

[185] Interview of Mr. Ashworth.

*contains Confidential Information*

Redacted

---

[186] Interview of Mr. Williams.
[187] See Exhibit 10.  Interview of Mr. Ashworth.
[188] *Gen-Probe v. Becton Dickinson*, Case No. 09-cv-2319 (S.D. Cal. November 26, 2012), Order on *Daubert* Motions and Motions *in Limine.*

contains Confidential Information

Redacted

---

[189] Expert Report of Mr. Ashworth dated April 27, 2023, at pg. 82.
[190] https://www.corporatefinanceinstitute.com/resources/accounting/what-is-roic/.

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

Expert Report of Justin R. Blok
April 27, 2023

contains Confidential Information

Redacted

Redacted

contains Confidential Information

Redacted

Redacted

**HIGHLY CONFIDENTIAL
ATTORNEYS' EYES ONLY**                Expert Report of Justin R. Blok
April 27, 2023

Redacted

---

[197] See Exhibit 7.
[198] See Exhibit 9.  On request of council, I have also calculated a potential reasonable royalty for the amount of units sold and installed exclusively in the United States to be $2.3 million.  See Exhibit 9.1.

*contains Confidential Information*
<u>*Summary of Opinions*</u>

Redacted

## VII.  PREJUDGMENT OR POST-JUDGMENT INTEREST

136.    The damages amounts contained in this report do not include prejudgment or post-judgment interest.  It is my understanding that prejudgment and post-judgment interest, including the appropriate interest rates, are a matter for the Court.  I am prepared to calculate prejudgment and post-judgment interest if asked to do so.

## VIII.  RESERVATION OF RIGHTS

137.    This report reflects my analysis and opinions to date.  It is my understanding that discovery in this matter is ongoing.  As additional data, information, or testimony become available to me, I intend to consider this information.  I may modify or update my opinions to include additional information received after the date of this report.  Furthermore, I may prepare demonstrative graphs and/or charts to assist in the presentation of my opinions at deposition or at hearing if I am requested to testify.

Redacted